ACCEPTED
01-15-00774-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
9/8/2015 6:53:36 PM
CHRISTOPHER PRINE
CLERK

No. ____________________

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
9/8/2015 6:53:36 PM
CHRISTOPHER A. PRINE
Clerk

IN RE PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT,

**Relator.**

Original Proceeding from the 269th District Court,
Harris County, Texas, Trial Court Cause No. 2009-40925
Honorable Dan Hinde, Presiding

# RELATOR'S RECORD IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS VOLUME III OF III

TERRY & THWEATT, P.C.
L. Lee Thweatt
State Bar No. 24008160
lthweatt@terrythweatt.com
Joseph D. Terry
State Bar No. 24013618
jterry@terrythweatt.com
One Greenway Plaza, Suite 100
Houston, TX 77046-0102
(713) 600-4710
(713) 600-4706 (Fax)

BECK REDDEN LLP
Russell S. Post
State Bar No. 00797258
rpost@beckredden.com
Constance H. Pfeiffer
State Bar No. 24046627
cpfeiffer@beckredden.com
William R. Peterson
State Bar No. 24065901
wpeterson@beckredden.com
Parth S. Gejji
State Bar No. 24087575
pgejji@beckredden.com
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

COUNSEL FOR RELATOR

# INDEX TO RELATOR'S MANDAMUS RECORD

**Page**

**Volume I**

Plaintiffs' Second Amended Petition (April 25, 2011) ....................................000001

Order Granting Leave to File Third Party Action (August 19, 2011) .............000010

Defendants' Combined Third Amended Answer (October 5, 2011)...............000011

Second Amended Plea in Intervention (October 12, 2011).............................000020

Defendants' Motion for Leave to File Third Amended Answer & First Amended Answer to Plea in Intervention, and Response to Plaintiff & Intervenor's Joint Motion to Strike (October 17, 2011) ..................................000029

Order Granting Leave to File Pleading Signed (October 17, 2011) ................000046

Plaintiff and Intervenor's Joint Motion for Entry of Final Judgment (November 18, 2011) ..........................................................................000047

Response to Plaintiff and Intervenor's Joint Motion for Entry of Final Judgment (December 13, 2011)..........................................................000079

Plaintiff's Brief in Support of Motion for Judgment (December 15, 2011)....000096

**Volume II**

Intervenor's Brief in Support of Motion for Judgment Based Upon Jury Award (January 10, 2012).........................................................000148

Defendants' Response to Plaintiff Wagner's Brief in Support of Motion for Judgment (January 11, 2012) ......................................................000169

Final Judgment (January 13, 2012).................................................................000249

Motion for Judgment Notwithstanding the Verdict or In the Alternative, Motion for New Trial (February 13, 2012) ..................................000252

**Volume III**

Supplement to Defendants' Motion for Judgment Notwithstanding the Verdict Or, In the Alternative, Motion for New Trial (March 5, 2012)..........000297

Intervenor's Response to Defendants' Motion for Judgment Notwithstanding the Verdict Or, In the Alternative, Motion for New Trial (March 6, 2012)..........000312

Plaintiff's Response to Defendants' Motion for JNOV, New Trial and To Modify, Correct or Reform the Judgment (March 7, 2012)..........000322

Intervenor's Brief on Defendant's Challenge to the Factual Sufficiency of the Jury Verdict that Esperanza Arzola Was Not Negligent (March 16, 2012)..........000410

Plaintiff's Brief on Jury's Failure to Find Negligence in Question 1 (March 16, 2012)..........000419

Defendants' Brief on Jury's Failure to Find Negligence on Esperanza Arzola (March 23, 2012)..........000471

Order Setting Aside Final Judgment (March 27, 2012)..........000480

Motion for Reconsideration of Order Granting New Trial (April 10, 2012)..........000481

Defendants' Response to Plaintiff's Motion for Reconsideration of Order Granting New Trial (May 1, 2012)..........000497

Reply in Support of Motion for Reconsideration of Order Granting New Trial (May 3, 2012)..........000507

Order Denying Plaintiffs' Motion for Reconsideration of Order Granting New Trial (May 4, 2012)..........000515

Order Denying Motion to Dismiss (August 23, 2012)..........000516

Notice of Appeal of Anthonia Uduma (August 24, 2012)..........000517

Mandate ........................................................................................................ 000520

Hearing transcript of Pretrial Motions, Voir Dire, Statement of Facts from October 17, 2011 ........................................................................ 000522

Hearing transcript of Jury Trial from October 18, 2011 ................................ 000875

Hearing transcript of Jury Trial from October 19, 2011 ................................ 001195

Hearing transcript of Motion for Entry of Judgment from January 13, 2012 ........................................................................ 0001417

Verification

Respectfully submitted,

BECK REDDEN LLP

By: */s/ Russell S. Post*

Russell S. Post
State Bar No. 00797258
rpost@beckredden.com
Constance H. Pfeiffer
State Bar No. 24046627
cpfeiffer@beckredden.com
William R. Peterson
State Bar No. 24065901
wpeterson@beckredden.com
Parth S. Gejji
State Bar No. 24087575
pgejji@beckredden.com
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

TERRY & THWEATT, P.C.
L. Lee Thweatt
State Bar No. 24008160

lthweatt@terrythweatt.com
Joseph D. Terry
State Bar No. 24013618
jterry@terrythweatt.com
One Greenway Plaza, Suite 100
Houston, TX 77046-0102
(713) 600-4710
(713) 600-4706 (Fax)

***Counsel for Relator***

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2015, a true and correct copy of the above and foregoing Relator's Record in Support of Petition for Writ of Mandamus was forwarded to all counsel of record by the Electronic Filing Service Provider, if registered, otherwise by email, as follows:

Jim Plummer
Amar Raval
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Suite 270
Houston, TX 77006
jplummer@plummerlawyers.com
araval@plummerlawyers.com
***Counsel for Real Parties in Interest***

Michael D. Hudgins
Nicole James Petrelli
THE HUDGINS LAW FIRM, P.C.
24 Greenway Plaza, Suite 2000
Houston, TX 77046
mhudgins@hudgins-law.com
npetrelli@hudgins-law.com
***Counsel for Real Parties in Interest***

*/s/ Russell S. Post*
Russell S. Post

**NO. 2009-40925**

| | | |
|---|---|---|
| PATTI J. WAGNER, AS GUARDIAN OF JENNI WAGNER, AN INCAPACITATED ADULT, Plaintiff, | § | IN THE DISTRICT COURT |
| v. | § | HARRIS COUNTY, T E X A S |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA, AND GODFREY UDUMA, Defendants. | § | 269TH JUDICIAL DISTRICT |

**SUPPLEMENT TO DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants, Four J's Community Living Center, I c. and Anthonia Uduma, supplement their Motion for Judgment Notwithstanding the Verdict or, In the Alternative, Motion for New Trial, as follows:

Defendants supplement their Motion for Judgment Notwithstanding the Verdict or, In the Alternative, Motion for New Trial with the attached evidence:

1. Revised affidavit of Ms. Debra Little Smith;

2. Affidavit of Ms. Marianne Reat, Custodian of Records for Texas Department of Aging and Disability Services, with attached Contract #001007724.

Respectfully submitted,

PLUMMER & KUYKENDALL

James C. Plummer
Texas Bar No. 16075700
4203 Montrose Boulevard, Suite 270
Houston, Texas 77006
Telephone 713.522.2887
Facsimile 713.522.3605

THE HOLMAN LAW FIRM, P.C.

*s/David W. Holman*

David W. Holman
Texas Bar No. 09902500
24 Greenway Plaza, Suite 2000
Houston, Texas 77046
Telephone 713.400.4840
Facsimile 713.400.4841

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2012:

This document was filed via Texas.gov electronic filing system, and the required number of copies was forwarded to the Court by regular mail or express mail.

This document was forwarded to the following via Texas.gov electronic filing system and/or electronic mail:

*Attorneys for Plaintiff*

Mr. L. Lee Thweatt
Mr. Joseph D. Terry
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, Texas 77046
Telephone 713.600.4710
Facsimile 713.600.4706

Mr. Russell S. Post
Ms. Constance H. Pfeiffer
BECK, REDDEN & SECREST, LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone 713.951.3700
Facsimile 713.951.3720

*Attorneys for Intervenor*

Mr. Shelton Sparks
Ms. Tiffany Harvey
SHELTON SPARKS & ASSOCIATES
706 Cordell Street
Houston, Texas 77009
Telephone 713.862.5533 Facsimile 713.862.4913

s/*David W. Holman*
David W. Holman

## APPENDIX

| Tab | Document |
|---|---|
| A | Affidavit of Debra Little Smith (revised) |
| B | Affidavit of Ms. Marianne Reat, Custodian of Records for Texas Department of Aging and Disability Services, with attached Contract #001007724 |

**A**

**Affidavit of Debra Little Smith (revised)**

TEXAS
Department of Aging
and Disability Services

COMMISSIONER
Chris Traylor

STATE OF TEXAS §
COUNTY OF TRAVIS §

Before me, the undersigned authority, on this day appeared Debra Little Smith, who being by me duly sworn, deposed as follows:

1. "My name is Debra Little Smith. I am of sound mind and capable of making this affidavit. I have personal knowledge of the facts stated herein and they are true and correct.

2. I am the Manager for Waiver Survey and Certification, which is a unit within Regulatory Services at the Texas Department of Aging and Disability Services. My job duties include managing the unit that certifies Home and Community-based Services (HCS) and Texas Home Living (TxHmL) contracts. HCS and TxHmL are home and community-based services waiver programs for persons with intellectual or developmental disabilities adopted in accordance with Section 1915(c) of the federal Social Security Act.

3. Pursuant to my authority, I have investigated the status of Four J's Community Living Center, Inc. Contract # 001007724 to determine its certification history. This is the HCS contract that serves waiver contract area #5, which includes Harris County.

4. From that investigation, I found that this Four J's HCS contract has been certified continuously by the State of Texas since the contract was issued on March 12, 2004. This means this Four J's HCS contract was certified by the State of Texas on September 4, 2008, and this HCS contract is certified by the State of Texas today.

Further, affiant sayeth not."

MARSHA AYERS
Notary Public
STATE OF TEXAS
Commission Exp. 04-26-2014
Notary without Bond

AFFIANT, DEBRA LITTLE SMITH

SWORN TO AND SUBSCRIBED before me on this the 1st day of March, 2012.

Marsha Ayers
Notary Public, State of Texas.

# B

**Affidavit of Ms. Marianne Reat,**
**Custodian of Records for Texas Department of Aging and Disability Services,**
**with attached Contract #001007724**



STATE OF TEXAS §
§ DOCUMENT CERTIFICATION
COUNTY OF TRAVIS §

Before me, the undersigned authority, on this day appeared Marianne Reat, who being by me duly sworn, deposed as follows:

"My name is Marianne Reat. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated. I am the Managing Attorney, Litigation Services Unit, Legal Services Section for the Texas Department of Aging and Disability Services (DADS). The Commissioner of the Texas Department of Aging and Disability Services has delegated to me the authority to serve as custodian of the documents referred to herein below for the Texas Department of Aging and Disability Services.

Pursuant to this authority, I have attached hereto a true and correct copy of 7 pages:

**Contract Records for**
**Four J's Community Living Centers, Inc.**
**Contract # 001007724**

The Texas Department of Aging and Disability Services keeps the attached records in the regular course of business. It was in the regular course of business for an employee or representative of the Texas Department of Aging and Disability Services or its predecessor agency, with knowledge of the act or event, to make the record or to transmit information thereof to be included in such record, and the record was made at or near the time or reasonably soon thereafter; or, in the case of documentation given to DADS by another entity, it was in the regular course of business for an employee or representative of the Texas Department of Aging and Disability Services or its predecessor agency to receive the record and place it in files of the Department. The attached records are exact duplicates of the original, except where information may have been deleted or redacted pursuant to the requirements of law."

Marianne Reat
Marianne Reat
Custodian of Records

**SWORN TO AND SUBSCRIBED** before me on this the 2nd day of February, 2012.

Laura Mull
Notary Public, State of Texas

LAURA MULL
Notary Public
STATE OF TEXAS
Commission Exp. 11-02-2014
Notary without Bond

Medicaid Provider Agreement
For The Provision Of
HCS Program Services

**Component Number 86V** **Vendor Number 001007724**

The Texas Department of Mental Health and Mental Retardation or its successor (the Department) and **Four J's Community Living Centers, Inc.** (the Program Provider) hereby enter into this Medicaid Provider Agreement for the Provision of Home and Community-Based Services (HCS) Program Services (this Agreement) for the considerations set forth herein.

This Agreement is effective the 12th day of March, 2004, and will continue in force until terminated in accordance with the terms of this Agreement.

**I.**

The Department is the Texas state agency responsible for operating the HCS Program administered under §1915(c) of the Social Security Act.

The Program Provider is provisionally certified or certified by the Department as a qualified HCS Program provider to provide HCS Program services to individuals enrolled by the Department in the HCS Program (Individuals) residing in those counties within the Department's Waiver Contract Area 5 (WCA 5) that are set forth under **Vendor # 001007724**in the Department's Automated Enrollment and Billing System (the counties served).

**II.**

**The Program Provider agrees to:**

A. Provide the following HCS Program service components, defined in Attachment A, as authorized by each Individual's Individual Plan of Care (IPC):

1) Case Management;
2) Counseling and Therapies;
3) Nursing Care;
4) Residential Assistance;
5) Day Habilitation;
6) Supported Employment;
7) Adaptive Aids;
8) Minor Home Modifications;
9) Dental Services; and
10) Respite Care;

to Individuals, up to the number set forth under **Vendor # 001007724**, CARE Screen # C70, in the Department's Automated Enrollment and Billing System. These service components will be provided in accordance with applicable state laws and rules, including but not limited to the 25 Texas Administrative Code (TAC) Chapters 409 and 419; applicable federal laws and regulations, including but not limited to the Code of Federal Regulations (CFR) Title 42, Parts 440, 441, 455 and 456;

B. Provide Case Management using only one or more persons employed by, not contracting with, the Program Provider;

C. Maintain continuous certification from the Department as a qualified HCS Program provider;

D. Keep its application for participation in the HCS Program current by informing the Department in writing of any changes to the information contained in its application, including but not limited to, the counties served, changes in ownership or control, federal tax identification number, and addresses, at least ten days prior to making such changes;

E. Upon request by the Department, execute, submit to the Department and comply with the Department's computer security agreement;

F. Accept the current HCS reimbursement rate or the rate as it may hereafter be amended, as payment in full for performance under this Agreement, and to make no additional charge to the Individual, any member of the Individual's family, or any other source, including a third party payor, except as allowed by federal and state laws, rules, regulations and the Medicaid State Plan. In addition, the Program Provider agrees that, in accordance with 42 CFR §433.145 and Human Resources Code §32.033, an Individual assigns to the Department his or her rights to payments and recovery from third parties;

G. Manage an Individual's personal funds at the request of the Individual. This includes maintaining a financial account for Individuals who entrust personal funds to the Program Provider and maintaining a separate detailed record of all deposits and expenditures for each Individual. The Individuals' personal funds will not be commingled with the Program Provider's funds;

H. Submit claims for payment, including electronic claims, in accordance with billing guidelines and procedures promulgated by the Department. The Program Provider certifies that information submitted regarding claims will be true, accurate, and complete, and that such information can be verified by source documents from which data entry is made by the Program Provider. Further, the Program Provider understands that payment of the claim will be from federal and state funds and that any falsification or concealment of a material fact may be prosecuted under federal and state laws;

I. Allow the Department to adjust payments made to the Program Provider, without notice, for prior overpayment or underpayment to the Program Provider, except as provided in paragraph II.J;

J. Refund to the Department any "overpayment" (as defined in 42 CFR §433.304) to the Program Provider. Such refund will be made within 60 days following the Program Provider's discovery of the overpayment or the Program Provider's receipt of a notice of such discovery from the Department, whichever is sooner;

K. Cooperate with and assist the Department and any state and federal agency charged with the duty of identifying, investigating, sanctioning, or prosecuting suspected fraud and abuse;

L. Disclose information on ownership and control, information related to business transactions and information on persons convicted of crimes in accordance with 42 CFR Part 455, Subpart B, and provide such information on request to the Department, the Texas Department of Human Services or its successor (TDHS), Texas Health and Human Services Commission (HHSC), the Texas Department of Health or its successor (TDH), the Texas Department of Family and Protective Services (DFPS), the Texas Attorney General Medicaid Fraud Control Unit (AG Medicaid Fraud), or the United States Department of Health and Human Services (USHHS);

M. Provide the following information to the Department, through the Department's Automated Enrollment and Billing System, each calendar quarter and when the information changes:

1) The Program Provider's business address and telephone number;
2) The name of the Program Provider's chief executive officer;
3) A telephone number at which the Program Provider's chief executive officer or designated representative can be reached during and after normal business hours; and
4) The name, if any, physical address and telephone number of all residences of Individuals in which HCS Program services are provided and in which the Program Provider or the residential assistance provider hold a property interest;

N. As provided by 42 CFR §431.107, keep any records necessary to disclose the extent of services provided by the Program Provider to Individuals (including Individuals' clinical records) and, on request, provide to the Department, HHSC, AG Medicaid Fraud, or USHHS, any such records and any information regarding payments claimed by the Program Provider under this Agreement;

O. Provide any information, records, or copies thereof, required by this Agreement at no cost to the state or federal authority requesting such information or records;

P. Keep all records required by paragraph II. N. of this Agreement until one of the following occurs, whichever is the latest:

1) six years elapse from the date the records were created;
2) any audit exception or litigation involving the records is resolved; or
3) for records concerning an individual under 18 years of age, the individual becomes 21 years of age.

Q. Allow representatives of the Department, or the local mental retardation authority as its designee, HHSC, TDHS, TDH, DFPS, AG Medicaid Fraud, and USHHS, full and free access to the Program Provider staff, Individuals, and all locations where the Program Provider delivers HCS Program services;

R. Allow the AG Medicaid Fraud and HHSC to conduct interviews of the Program Provider's employees, subcontractors and their employees, witnesses, and Individuals without the Program Provider's representative or the Program Provider's legal counsel present unless the person voluntarily requests that the representative be present. The Program Provider's employees, subcontractors and their employees, witnesses, and Individuals must not be coerced by the Program Provider or the Program Provider's representative to accept representation by the Program Provider and the Program Provider agrees that no retaliation will occur against a person who denies the Program Provider's offer of representation. Nothing in this Agreement limits a person's right to counsel of his or her choice. Requests for interviews are to be complied within the form and manner requested. The Program Provider will ensure by contract or other means that its employees and subcontractors over whom the Program Provider has control cooperate fully in any investigation conducted by the AG Medicaid Fraud and/or HHSC. Subcontractors are those persons or entities who provide medical goods or services for which the Program Provider bills the Medicaid program or who provide billing, administrative, or management services in connection with Medicaid-covered services;

S. Comply with applicable state laws and rules, including but not limited to 25 TAC Chapters 409 and 419, and 1 TAC Chapter 355, Subchapter F; applicable federal laws and regulations, including but not limited to 42 CFR Parts 440, 441, 455, and 456, and 45 CFR Parts 46, 80, 84, 90, and 91;

T. Comply with the HCS Service Definitions & Billing Guidelines and any amendments thereto, and the HCS Provider Manual and any amendments thereto, after such manual is provided to the Program Provider;

U. Comply with the Civil Rights Act of 1964, §504 of the Rehabilitation Act of 1973, the Immigration Reform and Control Act of 1986, and the Americans with Disabilities Act of 1990;

V. Comply with the Texas Health and Safety Code, §85.113 relating to workplace and confidentiality guidelines regarding AIDS and HIV;

W. Comply with Executive Order (E.O.) 11246, *Equal Employment Opportunity*, E.O. 11375, *Amending Executive Order No. 11246, Relating to Equal Employment Opportunity*, and 41 CFR Part 60, *Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor*;

X. Comply with 42 United States Code (USC) §7401 et seq., *the Clean Air Act*, and 33 USC §1251 et seq., *the Federal Water Pollution Control Act*, and all applicable standards, orders and regulations issued pursuant to those acts;

Y. Comply with 31 USC §1352, *Limitations on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions*, and 45 CFR Part 93, *New Restrictions on Lobbying*. In accordance with these provisions, the Program Provider will: (a) execute and submit to the Department, Form 2047, *Certification Regarding Federal Lobbying*, upon execution of this Agreement; (b) execute and file with the Department, Standard Form-LLL, *Disclosure Regarding Lobbying*, if applicable; and (c) require compliance with 31 USC §1352 and 45 CFR Part 93 by participants in lower tier transactions, if applicable;

Z. Comply with 45 CFR Part 76, *Governmentwide Debarment and Suspension (Nonprocurement) and Governmentwide Requirements for Drug-Free Workplace (Grants)*. In accordance with these regulations, the Program Provider will: (a) execute and submit to the Department, Form 2046, *Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion--Lower Tier Covered Transactions* upon execution of this Agreement; (b) provide written notice to the Department if at any time the Program Provider learns that its certification is erroneous when submitted or has become erroneous by reason of changed circumstances; and (c) require compliance with 45 CFR Part 76 by participants in lower tier covered transactions;

AA. Comply with the Health Insurance Portability and Accountability Act of 1996 (HIPAA); specifically, the Standards for Privacy of Individually Identifiable Health Information, 45 CFR Parts 160 and 164, Standards for Electronic Transactions, 45 CFR Parts 160 and 162, and Security Standards, 45 CFR Parts 160, 162, and 164;

BB. Comply with all HCS Policy Letters promulgated by the Department that are received by the Program Provider after the effective date of this agreement;

CC. Notify the Department in writing at least 10 days prior to declaring bankruptcy; and

DD. Report to the Department, through the Department's Automated Enrollment and Billing System, within 30 days following the end of each calendar month, the reportable data, by type, for that calendar month. The types of reportable data are described in Attachment B.

III.

**By execution of this Agreement, the Program Provider certifies and agrees:**

A. That the Program Provider is current in its payment of any required Texas franchise tax. If the Program Provider becomes delinquent in the payment of its Texas franchise tax during the term of this Agreement, payment to the Program Provider may be withheld by the Comptroller of Public Accounts until such delinquency is remedied;

B. That, under Texas Family Code §231.006, the Program Provider is not ineligible to receive the payments specified in this Agreement (Texas Family Code §231.006 states that a child support obligor who is more than 30 days delinquent in paying child support and a business entity in which the obligor is a sole proprietor, partner, shareholder, or owner with an ownership interest of at least 25% are not eligible to receive payments from state funds under a contract to provide property, materials, or services, or receive a state-funded grant or loan.);

C. That the Program Provider has not been excluded or debarred from participation in any state or federal health care program, including any Title XVIII (Medicare) or Title XIX (Medicaid) program, under the provisions of §1128(a) or (b) of the Social Security Act [42 U.S.C.§1320a-7(a) or (b)] or Executive Order 12549. The Program Provider will notify the Department within 10 days of the date it receives notice that any action is being taken against the Program Provider or any individual or entity defined under the provisions of §1128(b)(8) or (15) which could result in exclusion of the Program Provider from a Medicaid Program; and

D. That the Program Provider will provide written notice to the Department if, during the term of this Agreement, the Program Provider learns that any of the certifications made by the Program Provider in this Agreement are or have become inaccurate.

IV.

**The Department agrees to:**

A. Pay the Program Provider, in accordance with applicable state and federal laws, rules, and regulations, the current HCS reimbursement rate or the rate as it may hereafter be amended, for HCS Program services provided to Individuals; and

B. Provide an administrative hearing to the Program Provider, in accordance with state and federal laws, rules, and regulations, concerning an adverse action taken by the Department.

V.

**The Department and the Program Provider mutually agree that:**

A. Payment by the Department to the Program Provider under this Agreement is contingent upon the Program Provider's maintaining certification as a qualified HCS Program provider, availability of appropriated funds and federal financial participation, operation of the HCS Program by the Department, and the Program Provider's compliance with the terms of this Agreement. No payment

will be made to the Program Provider under this Agreement for HCS Program services provided to persons who are not eligible for or enrolled by the Department in the HCS Program at the time such services are delivered;

B. This Agreement is subject to all state and federal laws, rules, and regulations relating to fraud and abuse in health care and the Medicaid Program;

C. This Agreement may be terminated:

1) by agreement between the Department and the Program Provider;
2) by the Program Provider upon sixty days written notice to the Department of the Program Provider's intent to terminate this Agreement;
3) by the Department for reasons set forth in federal or state laws, rules or regulations;
4) by the Department if the Program Provider fails to comply with the terms of this Agreement, including but not limited to failure of the Program Provider to maintain certification as a qualified HCS Program provider;
5) by the Department or the Program Provider, subject to the equitable settlement of their respective obligations, if federal or state laws, rules, or regulations are enacted, amended, repealed, or judicially interpreted so as to render the fulfillment of this Agreement by either party unfeasible or impossible and the Department and the Program Provider cannot agree upon amendments to this Agreement necessary to comply with such changes to laws, rules or regulations;
6) by the Department if a certification made by the Program Provider in this Agreement is false or becomes inaccurate; or
7) by the Department for good cause;

D. The Department will notify the Program Provider in writing if the Department decides to terminate this Agreement. The Department will provide the Program Provider an opportunity for a hearing to appeal the Department's decision to terminate this Agreement. If the Program Provider makes a timely request for a hearing, the Department will not terminate this Agreement pending such hearing. If the final determination of a hearing is favorable to the Department, termination of this Agreement will be effective on the date specified in the Department's notice of termination or as specified in the decision of the administrative law judge;

E. If the Department decides to terminate this Agreement, the Department will withhold payments to the Program Provider under this Agreement in accordance with Texas Human Resources Code, §32.034, as of the date specified for such withholding in the Department's notice of termination. If the Program Provider requests a hearing to appeal the Department's decision to terminate this Agreement, and the final decision of the hearing is favorable to the Department or if the Program Provider does not request a hearing, payments withheld under this paragraph will not be made to the Program Provider;

F. The Department may place payments due to the Program Provider under this Agreement on vendor hold for reasons set forth in federal or state laws, rules or regulations, or if the Program Provider fails to comply with the terms of this Agreement;

G. Nothing in this Agreement will be construed to require the Department to enter into a new agreement with the Program Provider, or to renew or extend this Agreement;

H. If the Department amends the HCS Service Definitions & Billing Guidelines, the HCS Billing and Payment Review Protocol or the HCS Provider Manual, it will notify the Program Provider of such amendments. The Program Provider will acknowledge the receipt of such amendments by executing and submitting the form provided by the Department by certified mail to the address indicated on such form. The Department may place payments due to the Program Provider under this Agreement on vendor hold as provided in paragraph V.F. of this Agreement if the Program Provider fails to execute and submit such form within twenty (20) days of the date of the notice;

I. Assignment by the Program Provider of this Agreement must be in accordance with 25 TAC §419.710;

J. In the event any provision of this Agreement becomes unenforceable or void, such will not invalidate any other provision of this Agreement;

K. The venue for any cause of action initiated by the Department or the Program Provider related to this Agreement will be Travis County, Texas; and

L. Any notice, acknowledgment, or disclosure required to be given to the Department by the Program Provider under this Agreement will be delivered in person or by certified mail, return receipt requested, to the following person and address:

Associate Director for Vendor Operations, Medicaid Administration
Texas Department of Mental Health and Mental Retardation
P.O. Box 12668
Austin, Texas 78711-2668

Any notice required to be given to the Program Provider by the Department under this Agreement will be in writing, to the most current business address provided by the Program Provider on its application for participation in the HCS Program and, except the notice referenced in paragraph V.H., delivered in person or by certified mail, return receipt requested.

TEXAS DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

[signature] 4-20-04
Larry North (Date)
Associate Director for Vendor Operations
Medicaid Administration

**Four J's Community Living Centers, Inc.**
(Legal Name of Program Provider)

[signature] 4/16/04
(Authorized Signature) (Date)

ANTHONIA UDUMA
(Type/Print Name)

Director
(Title)

Filed 12 March 6 P8:26
Chris Daniel - District Clerk
Harris County
ED101J016763934
By: Charlie R. Tezeno

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| **WYLETTE TAYLOR, AS GUARDIAN OF DERRICK LEON JAMES,** ***an Incapacitated Adult*** **Intervenor,** | § § § § § | **IN THE DISTRICT COURT** |
| **V.** | § § § | **269TH JUDICIAL DISTRICT** |
| **FOUR J'S COMMUNITY LIVING CENTER, INC., AND ANTHONIA UDUMA Defendants.** | § § § § | **HARRIS COUNTY, TEXAS** |

**INTERVENOR'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR IN THE ALTERNATIVE A MOTION FOR NEW TRIAL**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Intervenors, by and through their attorney of record, SHELTON SPARKS, who ask this Court to deny Defendant's Motion to sign a Judgment Notwithstanding the Verdict or Motion for New Trial.

## A. INTRODUCTION

**1.** Intervenor is An Incapacitated Adult male and Wylette Taylor is his Guardian.

**2.** Defendant, Four J's Community Living Center, Inc. is a corporation authorized to do business in the State of Texas.

**3.** Defendant, Anthonia Uduma, is an individual who owns 100% of the stock in Four J's Community Living Center, Inc. and is the property owner at 16355 Beretta Court, Houston, Texas 77489.

**4.** Intervenor sued Defendant, Anthonia Uduma, for Premises Liability in failing to correct known dangerous conditions on the property owned by her that she maintained

control over that the jury found were the proximate causes of the injuries suffered by Tanya James, Deceased, prior to her death.

**5.** Intervenor sued Defendant, Four J's Community Living Center, Inc., for negligence in failing to provide Tanya James with adequate supervision during the fire when they knew she needed help hand over hand to remove her from an emergency and for failing to ensure their caretaker was adequately trained in the proper fire and emergency evacuation protocols.

## B. FACTS

**6.** After the trial on the merits, the court submitted this case to the jury; the jury returned a verdict for Intervenor. A copy of the Court's Charge reflecting the answers of the jury is attached to this motion as Exhibit A.

**7.** On January 13, 2012, this Court entered Final Judgment. A copy of the Final Judgment is attached as Exhibit B.

## C. ARGUMENTS AND AUTHORITIES

**8.** The court should not grant a Motion for Judgment Notwithstanding the Verdict unless a direct verdict would have been proper, ***Tex. R. Civ. P 301***. Accordingly, the facts of this case as presented by the evidence did not warrant a directed verdict and the court properly submitted the case to the jury. The Court should view a Judgment Notwithstanding the Verdict under a No-Evidence Standard, meaning we credit evidence favorable to the jury verdict if reasonable juror could and disregard contrary evidence unless reasonable juror could not. ***Tanner v. Nationwide Mut. Fire Ins. Co. 289 S.W.3d 828, 830 (Texas 2009).***

**9.** The Court should not disregard the jury's answer to a question unless there is no evidence to support it. ***Tiller v. Medurro, 121, S.W.3d. 709, 713 (Tex. 2003); Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d. 706, 709 (Tex. 2003).*** If more than a Scintilla of Evidence

supports the finding, the court cannot disregard the jury's answer to the question. ***Mancorp, Inc. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990).***

**10.** The Defendants are hereby requesting the Court to disregard the jury's answer to Question No. 1 regarding their findings to whether Esperanza Arzola's acts were "negligent." The jury found there were not.

**11.** Defendants allege her actions were criminal in nature and that she had committed arson and as a result, there was no evidence Four J's or Mrs. Anthonia Uduma knew or should have known she would commit arson. There was no foreseeability of whether criminal conduct previously occurred on the premises. How recently and frequently the criminal conduct occurred how similar the other criminal conduct was to the action on August 4, 2008. ***Timberwalk Apartment, Partners Inc. v. Cain 972 S.W. 749, 756 (Tex. 1998).***

**12.** The jury heard testimony from several witnesses that Mrs. Arzola was a very troubled woman who had a history of committing violent and dangerous acts to herself and others. The jury heard testimony from the caretaker that she was afraid of her and knew her to have destroyed property on numerous occasions at Berretta Court. They heard testimony about her aggressive actions when she needed her medication adjusted and how she had attempted suicide on more than one occasion. They heard testimony about the Defendant's knowledge of her being a smoker and how she had ready access to a cigarette lighter at the Day Hab Center where she was taken to and brought back from by Defendant, Four J's five (5) days a week.

**13.** The jury also heard testimony from Dr. Susan Gallagher that Mrs. Arzola may not have had the requisite mental capacity to form the intent to commit the crime of arson.

**14.** The jury made the determination that the fire was not the proximate cause of the injuries to Tanya James, but the fact of a lock being on the back door fire exit which was dead bolted, and having the inexperienced employee who neglected to remove Tanya James from the property was the proximate cause of her injuries.

000314

## D. ANTHONIA UDUMA'S CONTROL OVER THE PROPERTY

**15.** There is sufficient evidence that was presented to the jury who found Anthonia Uduma 40% liable for the damages to Tanya James.

**16.** The Court should not disregard the jury's answers to Question No. 1 unless there is no evidence to support it. ***Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d, 706, 709 (Tex. 2003).*** If more than a Scintilla of Evidence supports the finding, the Court cannot disregard the jury's response to Question 1 and Question 2, holding Anthonia Uduma individually responsible.

**17.** Over the course of the trial, the jury heard numerous witnesses testify that the property located at 16355 Beretta Court was owned by Anthonia Uduma but leased to Four J's Community Living Center, Inc. The jury was also aware that Mrs. Uduma was the sole owner of the property and 100% owner of corporation.

**18.** The jury heard the testimony of several employees and vendors that Mrs. Uduma maintained control over the Fire Safety Control System on the property and that she was the only person who Omni Alarm System, Inc. dealt with or interacted with whenever there was a system problem or when it was time to schedule the annual system evaluation. Anthonia Uduma was the only person who made the decision on what type of system was in place on the property.

**19.** The jury heard from two (2) former employees who stated that whenever there was an in-service on fire safety, it was Mrs. Uduma who conducted the fire safety training. They testified that she was the one who instructed them not to attempt to "leave out of the back door, that it was dead bolted but to attempt to take Mrs. Wagner out of a window." This is in spite of the fact that the back door with the deadbolt was a designated fire exit.

**20.** The jury heard from Mrs. Amuche Udemezue; that on numerous occasions she was instructed to sign off on fire safety drill sheets showing the time period to evacuate the residence was less than three (3) minutes when in reality it took longer and the time incorrectly recorded.

**21.** The jury heard from Mrs. Uduma that the reason there was no overhead sprinkler system in the house was because they could document the time showing the residence could be evacuated within three (3) minutes.

**22.** The jury also heard that whenever it was time for the Fire Marshal to inspect the property, Mrs. Uduma insisted that she be the one to escort him throughout the house and made sure the back door key to the deadbolt fire exit was available.

**23.** The jury found, per its response to Question 1 and Question 2, that Mrs. Anthonia Uduma was negligent and determined her percentage of liability to be 40%. Far more than a Scintilla of Evidence was present that Mrs. Uduma maintained control over the entrances and exits of the property and the fire alarm system on the property. In fact, a preponderance of evidence was submitted to the jury and they so found. ***Restatement (Second) Torts § 360, 361 (1965). Johnson v. Endsley, 926 S.W. 284, 285 (Tex. 1996), Osti v. Saylor 991 S.W.2d 322 (Tex. App-Houston) [1st Dist.] 1999.***

## E. CHAPTER 74 APPLICABILITY

**24.** On the day of trial, the Court allowed Defendant to amend their pleadings to bring forth their affirmative Defense of Chapter 74. The Court inquired into whether Four J's was licensed, certified or chartered by the State of Texas. Defense counsel stated that they were and the Court asked whether the verification was attached to its Motion for Leave? Defendant stated it was not. Defendant further stated we will "get that for the Court this morning and we certainly have testimony to bring, your honor."

**25.** When Intervenor closed its examination of Mrs. Anthonia Uduma, Defendant reserved its questioning of her until its case in chief. Prior thereto, no questions or evidence had been presented to the jury that Four J's or Mrs. Uduma were a healthcare provider.

000316

**26.** When Defendant, Anthonia Uduma, was on the stand in their case in chief, no evidence was provided to the jury regarding Four J's being a licensed, certified, or chartered by the State of Texas to provide healthcare.

**27.** The Defendants called two other witnesses who were employees of Four J's and no testimony was provided by them to this jury about Four J's being a licensed healthcare provider.

**28.** The MLIIA defines, "healthcare providers, any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, or registered, or chartered by the State of Texas to provide healthcare….."

**29.** With regard to the assertion that a Defendant meets the definition of a healthcare provider because it is certified by the State of Texas, the movant has the Burden of Proof to present evidence to establish that it is certified by the State of Texas. ***City of Van Alstyne v. Young 146 S.W.3d 846, 849 (Tex. App.-Dallas 2004).***

**30.** If the record in the case contains no evidence to show Four J's Community Living Center Inc. is duly licensed, certified or registered or chartered by the State of Texas to provide healthcare, it cannot be determined whether it is a healthcare provider such that the Chapter 74 protections are applicable. ***Brown v. Villegas, 202 S.W.3d 803 (Tex. App-San Antonio 2006).*** In the absence of their evidence, we cannot determine whether Four J's meets the definition of a healthcare provider. ***Id. 807.***

**31.** Defendants allege in their motion, "Plaintiff and Intervenor presented no evidence that Four J's was not a healthcare provider." This vailed attempt to shift the Burden of Proof is contrary to the law. If Defendants wanted to avail themselves of the protection of Chapter 74, it was their responsibility to present evidence to establish they met the statutory requirement of a healthcare provider. ***Id. City of Van Alstyne v. Young 849.***

**32.** This case had been on the court's docket for months and there had been two (2), if not more prior trial settings in which this case had not been reached. During this time, nothing had been filed by Defendants alleging they were healthcare providers and since the issue was not raised prior to Defendants amending their pleadings, a week before trial, Plaintiff and Intervenor had no ability to develop any discovery to determine whether Defendant was licensed by the State of Texas.

**33.** The list in the current definition of "healthcare providers" is not exclusive, so to determine if an entity qualifies as a healthcare provider, then it must be determined whether it is duly licensed, certified, or registered or chartered by the State of Texas to provide healthcare. ***Christus Health v. Beal, 240 S.W.3d (Tex. App.-Houston) [1st Dist.] 2007.*** The record must contain evidence that Four J's is licensed by the State of Texas, **it does not.** There is no testimony from Anthonia Uduma or any other corporate representative that it was licensed. ***San Antonio Extended Medical care, Inc. v. Vasquez, 04-09-00546-cv (Tex Ca 4).***

**34.** Defendants are incorrect in their assertion that the evidence establishes without controversy that Four J's or Anthonia Uduma are healthcare providers under Chapter 74. In open Court, Defendant's made a judicial admission that Anthonia Uduma was not healthcare provider, and as such, waived his trial amended pleadings asserting that she was.

**35.** It is very controversial that Four J's and Anthonia Uduma are healthcare providers and the record does not reflect that they are. Intervenor Objects to the Admission of the Revised Affidavit of Mrs. Debra Little Smith being admitted. Intervenor Objects to the Admissions of the Affidavit of Mrs. Marianne Reat being Admitted. The statements contained therein are hearsay and involve controversial matters. It is an attempt by Defendants to raise and introduce disputed issues of fact some 100 days after the verdict. In a jury case, no evidence on a controversial matter shall be received after the verdict. ***Tex. R. Civ. P. 270, The State of Texas v. Harrington; Et al 407 S.W.2d 467 (Tex. 1966).***

000318

## F. THE LEGAL SUFFICIENCY OF THE EVIDENCE RELATING TO TANYA JAMES' PHYSICAL PAIN AND MENTAL ANGUIS

**36.** At the trial in this case, the jury was informed by testimony of several witnesses that Tanya James had suffered severe burns over major portions of her body. The jury was informed about the time between the paramedics arriving at the Berretta Court property and the time she died at Memorial Herman Hospital. They were informed that she was unconscious, and under heavy pain medication. They were also informed that she was intubated, had IV's in her arms, and photos were also introduced into evidence showing her condition in the hospital prior to her death.

**37.** Accordingly, it is clear that an award of mental anguish damages will survive a legal sufficiency challenge when Plaintiff's have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a disruption in Plaintiff's daily routine. ***Parkway v. Woodruff, 301 S.W.2d 434, 444, (Tex. 1995)***

**38.** Such evidence whether in the form of the Plaintiff's own testimony, or that of third parties or experts, is more likely to provide the fact finder with adequate details to access mental anguish claims. ***Id. 444.***

**39.** The jury determined that the time duration Tanya James suffered with the physical and mental anguish as a result of the second and third degree burns over major portions of her body was adequate for them to base their award on her damages.

**40.** The high degree of physical pain and mental anguish the jury was able to adequate with her suffering was more than "mere worry, anxiety, and vexation." ***Id. 444.***

**41.** This jury was not left to speculate about the existence of compensable severe physical pain and mental anguish that was the result of the negligence of Defendants.

**42.** The Court should not disregard the jury's award when sufficient evidence was provided the jury to justify the award. ***J.B. Custom Design & Bldg. V. Clemson 794 S.W.2d 38, 43 (Tex App-Houston) [1st Dist.] 1990, No Writ.***

## G. INPROPER JURY ARGUMENT

**43.** In the case of Improper Jury Argument, the complainant must prove, (1) an error, (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a mistrial, (4) was not curable by an instruction, a prompt withdrawal of the statement or a reprimand by the judge, (5) that the argument by its nature, degree, and extent constituted reversible harmful error, (6) the arguments probable effect on a material findings, (7) an importantly, a reversal must come from an evaluation of the whole case which begins with voir dire and ends with the closing argument. From all these factors, the complainant must show that the probability from the improper argument caused harm greater than the probability that the verdict was grounded on the proper proceedings and evidence. ***Aultman v. Dallas Ry. & Term Co. 152 Tex. 509, 260, S.W.2d 596 (1953), Standard Fire Insurance Co. v. Reese, 584 S.W. 835 (Tex. 1979).***

**44.** The complainant, by failing to object and press for an instruction at the time of the argument waives his complaint. ***Turner v. Turner 385 S.W.2d 230 (Tex. 1964) Maston v. Texas Employers Ins. Assin, 160 Tex. 438, 331 S.W.2d. 907, 910 (1960).***

**45.** The appellate attorney is attempting to bring racial prejudice into this case when it has no bearing. Defendant's trial attorney is African American and had he felt there was some attempt to marginalize his clients based on race or nationality, he would have objected and gotten a ruling from the Court. He did not because the closing argument **did not !**

**46.** The Court should not sign a judgment Notwithstanding the Verdict or a Motion for New Trial because all answers rendered by the jury was based on substantial evidence to support it.

## H. CONCLUSTION

**47.** The Court should not grant a Motion for Judgment Notwithstanding the Verdict or a Motion for New Trial unless a directed verdict would have been proper. ***Tex. R. Civ. P.***

***301.*** Further, more than a Scintilla of Evidence was submitted to the jury to support their findings and the Court should not disregard their verdict.

## PRAYER

**FOR THESE REASONS**, Intervenors ask the Court to Deny the Defendant's Motion for Judgment Notwithstanding the Verdict or in the alternative, their Motion for New Trial.

Respectfully submitted,
Shelton Sparks & Associates L.L.C.

By:______________________________
SHELTON SPARKS
Texas Bar No. 06507160
706 Cordell Street
Houston, Texas 77009
Telephone (713) 862-5533
Facsimile (713) 862-4913
Attorney for Intervenors

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY THAT ON march 6, 2012 a true and correct copy of the forgoing document was served on the following via facsimile, U.S. mail, and/or electronic mail:

Plummer & Kuykendall – James C. Plummer
4203 Montrose Boulevard, Suite 270
Houston, Texas 77006
Facsimile: 713-522-3605
Phone: 713-522-2887

Terry & Thweatt, P.C. – Lee Thweatt
One Greenway Plaza, Ste. 100
Houston, Texas 77046
Facsimile: 713-600-4706
Phone: 713-600-4710

Beck, Redden & Secrest, LLP – Russell S. Post
1221 McKinney, Ste. 4500
Houston, Texas 77010
Facsimile: 713-951-3720
Phone: 713-951-3700

The Holman Law Firm, P.C. – David W. Holman
24 Greenway Plaza, Ste. 2000
Houston, Texas 77046
Facsimile: 713-400-4841
Phone: 713-400-4840

______________________________
**SHELTON SPARKS**

Filed 12 March 7 P6:16
Chris Daniel - District Clerk
Harris County
ED101J016766226
By: Charlie R. Tezeno

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| FOUR J's COMMUNITY LIVING CENTER, INC.; ANTHONIA UDUMA; and GODFREY UDUMA, | § | |
| Defendants. | § | 269TH JUDICIAL DISTRICT |

# PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS FOR JNOV, NEW TRIAL AND TO MODIFY, CORRECT OR REFORM THE JUDGMENT

Plaintiff Patti J. Wagner ("Ms. Wagner"), appearing as guardian of Jenny Ann Wagner ("Jenny Ann"), files this response to Defendants' post-judgment motions and supplements.

## FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT

This Court accepted briefs and heard extensive arguments before signing a judgment on the verdict. Those arguments focused on Defendants' duties and whether to apply a statutory cap on noneconomic damages. *See* TEX. CIV. PRAC. & REM. CODE § 74.301(a). Because Defendants have no new legal arguments on these issues, there is no need to reconsider them now.

Defendants do offer new evidence in an attempt to conclusively prove, at this late date, that Defendant Four J's was a "certified" health care provider. They are entitled to make a bill, as they promised to do at the conclusion of the hearing on judgment formation, but they are not entitled to prove their defensive theory months after trial. Defendants cite no rule of procedure that authorizes (much less obligates) the Court to alter its judgment based on this new evidence.

Defendants' other arguments are standard preservation points that can be swiftly rejected. They have one meritorious point about an interest calculation, and we attach a new judgment that recalculates pre-judgment interest.

## ARGUMENT

### I. Defendants Offer No New Legal Arguments To Justify JNOV or a New Trial.

Defendants present the same arguments this Court considered before signing a judgment, as they are certainly entitled to do at this stage. They developed their arguments the first time, and their post-judgment papers confirm there is nothing else to say.

This Court showed great diligence when these arguments were first presented, considering lengthy briefs, holding a hearing, and asking pointed questions. At the end of the hearing the Court announced that "I am persuaded to grant the motion for entry of judgment. I am not persuaded to apply the caps. I am not persuaded to exclude Ms. Uduma from liability." Tab A at 69.

At that hearing, the Court denied Defendants' request to take judicial notice of websites that had been attached to their filings, Tab A at 69, and the Court denied Defendants' request to reopen the evidence to allow Defendants to present "the certification." *Id.* When this Court afforded Defendants an opportunity to make a bill, they started to do so and then declined, announcing that they would "present the Court with it later." *Id.* at 70-71. Defendants explained that they wanted more time to get the certificate in admissible form and would present it later. *Id.* Now they present new evidence, presumably for purposes of their bill.

### II. Defendants' New Evidence Cannot Be Considered Now.

Defendants do not formally move to reopen the evidence, nor do they formally request that the Court take notice of new evidence under a rule of civil procedure. They simply attach new evidence and ask for a new ruling. To the extent that the Defendants are making their bill, as the Court invited them to do, they are free to make a record. But there is no procedural basis for the Court to consider new evidence at this point—which is why Defendants cite no authority. They are entitled to make their record, but they are not entitled to any relief at this late date.

### A. The new evidence has never been previously offered, and it would be inappropriate to consider it now.

Nearly two months after this Court signed a judgment, Defendants offer new evidence in the form of two affidavits that state they were signed on February 2, 2012 and March 1, 2012. This newly created evidence is far too late to be considered.

First, this Court has already denied a motion to reopen the evidence under Rule 270. Recall that Defendants did not make a Rule 270 motion before verdict, as the rule requires for "evidence on a controversial matter." *See* TEX. R. CIV. P. 270. Then, at the January hearing, Defendants did not even make a Rule 270 motion until after the Court signed a judgment. Defense counsel confessed that they did not "want to get into the position of asking [the Court] to reopen the evidence to show the certification." *Id.* at 53. But after the Court announced its rulings on the record, Defendants asked that the evidence be reopened. The Court denied that request for the reasons argued extensively before the Court. *See* Tab A at 69-70.

Defendants have not cited Rule 270 in their post-judgment motions, evidently because they are simply making the bill they promised. But make no mistake: By attaching and relying on new evidence, they are in substance asking for the same relief the Court has already denied. Defendants do not cite Rule 270 or formally ask that the evidence be reopened because they are too late under the plain language of the rule.

The plain language of Rule 270 prohibits the untimely admission of evidence on controversial matters: "[I]n a jury case no evidence on a controversial matter shall be received after the verdict of the jury." TEX. R. CIV. P. 270. The language of the rule is not discretionary; in cases tried to a jury, the trial court is bound by the mandatory term "shall." Defendants can offer these affidavits for purposes of their bill, but they cannot reopen the evidence now.

Likewise, Defendants do not ask the Court to take judicial notice of their new affidavits, as they did with the websites in the January hearing, because a new affidavit offered many weeks after trial is obviously not a proper basis for judicial notice. *See* TEX. R. EVID. 201(b).

Defendants only argue that the affidavits are "admissible under the public records rule." Motion for JNOV or New Trial at 13 (citing TEX. R. EVID. 803(8)). It is unnecessary to consider whether either affidavit fits within this hearsay exception, because neither Rule 803 nor the cases Defendants cite offers any basis to admit an affidavit into the record four months after the trial. The admissibility of the affidavits may be relevant to their bill, but not to their request for relief.

Defendants' admissibility arguments simply highlight that we are several steps removed from trial admissibility questions. The issue now is whether Defendants can lose a verdict, lose a judgment and *only then* attempt to create a more robust record on their affirmative defense. At this late stage, the only basis to consider new evidence is Rule 324, which does not apply.

**B. The affidavit is not newly discovered evidence under Rule 324.**

Rule 324(b) requires parties who seek to rely on "newly discovered evidence" to file a motion for new trial. But to make a claim for a new trial based on "newly discovered evidence," the movant is obliged to allege, *inter alia*, that "(1) the evidence has come to its knowledge since the trial, [and] (2) its failure to discover the evidence sooner was not due to lack of diligence." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Thus, diligence is an "essential element." *Jackson v. Van Winkle*, 660 S.W.2d 807, 809-10 (Tex. 1983), *overruled on other grounds by Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003). "Newly discovered evidence is evidence that was not, and could not have been, discovered using reasonable diligence." *Patriacca v. Frost*, 98 S.W.3d 303, 307 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The test looks to whether the movant had notice before trial that the evidence existed—not whether the movant had notice that the evidence was necessary to its case.

Here, there can be no dispute that Defendants' new affidavits are not newly discovered. The affiants purport to review or authenticate documents that Defendants would certainly have known about before trial. At the very least, Defendants could have obtained the underlying documents or the affidavits before trial had they exercised reasonable diligence. To their credit, Defendants do not argue that the affidavits are newly discovered or explain their diligence in a verified motion, tacitly conceding that their lack of diligence is undisputed. *See In re A.G.C.*, 279 S.W.3d 441, 454 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

In this respect, Plaintiffs note that Defendants attempted to supplement their motions with new affidavits filed on March 5, 2012, but those affidavits are untimely. A motion for new trial must be filed within 30 days of the judgment, TEX. R. CIV. P. 329b(a), and may not be amended as a matter of right unless the amendment occurs within 30 days after the judgment is signed. TEX. R. CIV. P. 329b(b). Thus, the supplements and the attached affidavits are untimely.

Because there is no valid procedural basis to admit new evidence at this very late stage, this Court's rulings should not be revisited. Defendants are entitled to make a bill for the record, but they are not entitled to any new relief. The same reasons that persuaded the Court to sign a judgment on the verdict should persuade the Court to deny Defendants' post-judgment motions. This is particularly true where the new evidence fails the newly discovered test. That ruling will be entitled to deference, as the Supreme Court requires every reasonable presumption to be made in favor of trial court orders refusing new trials. *Jackson*, 660 S.W.2d at 809-10.

## III. Defendants' Miscellaneous Other Arguments Should Be Rejected.

Defendants also offer boilerplate arguments about the sufficiency of the evidence and the excessiveness of certain damage findings. Defendants must make these arguments to preserve their rights to appellate review, but it is not necessary for this Court to dwell on routine preservation points. The Court has heard all the evidence, which amply supports the verdict.

Defendants also argue that a new trial should be granted because Intervenor's counsel offered "improper" jury argument. Specifically, they contend that Intervenor's counsel appealed to racial or national prejudice when he asked the jury to send a message to "these people." Motion for JNOV or New Trial at 10. They make this argument in one paragraph and with no enthusiasm because it is entirely without merit.

Everyone who was present during closing arguments knows that this general reference to one's trial opponents had no racial subtext whatsoever. The motion takes it badly out of context. We will resist the temptation to editorialize about the circumstances of this trial and the identity of the lawyers and litigants involved; suffice to say that the notion this reference was designed to appeal to racial prejudice is impossible to take seriously.

Further, Defendants do not use the words "incurable" argument, but that is the standard because there was no contemporaneous objection, motion to instruct, and motion for a mistrial. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). The cases in which incurable appeals to prejudice required a new trial illustrate the stark contrast to this case. *E.g.*, *Living Ctrs. v. Penalver*, 256 S.W.3d 678, 679 (Tex. 2008) (judgment against nursing home reversed because plaintiff compared defense attorney's attempts to limit damages to the Nazis' WWII T-4 Project, in which the elderly and infirm were subjected to human experiments before they were killed). Referring to one's trial opponents as "these people" is a neutral reference, completely devoid of appeal to prejudice or bias. Further, there is no basis to believe that these words caused an improper verdict. "There are only rare instances of incurable harm from improper argument," *Reese*, 584 S.W.2d at 839, and this case is not one of them.

## IV. The Court Should Sign an Amended Judgment that Corrects the Interest Awards.

Defendants correctly note that prejudgment interest should not be calculated on awards of future damages. Because the interest awards were inadvertently calculated on the total verdict, Plaintiffs have corrected these calculations and attach an Amended Final Judgment. *See* Tab B. This amended judgment is otherwise identical to the prior judgment in all material respects.

## CONCLUSION & PRAYER

Based on the reasons offered here and in prior filings and hearings on these same issues, which are incorporated by reference, Plaintiff Patti J. Wagner respectfully prays that this Court deny Defendants' post-judgment motions and sign the proposed Amended Final Judgment. Plaintiff respectfully requests any and all additional relief to which she may be entitled.

Respectfully submitted,

BECK, REDDEN & SECREST, L.L.P.

By: */s/ Russell S. Post*
Russell Post
State Bar. No. 00797258
Constance H. Pfeiffer
State Bar No. 24046627
1221 McKinney, Suite 4500
Houston, TX 77010-2010
(713) 951-3700
(713) 951-3720 (Fax)

L. Lee Thweatt
State Bar No. 24008160
Joseph D. Terry
State Bar No. 24013618
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, TX 77046-0102
(713) 600-4710
(713) 600-4706 (Fax)

**ATTORNEYS FOR PLAINTIFF PATTI J. WAGNER,
AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT**

## Certificate of Service

I hereby certify that on March 7, 2012, a true and correct copy of the foregoing Brief in Support of Motion for Judgment was properly forwarded to the following counsel of record in accordance with the Texas Rules of Civil Procedure through the Texas.gov electronic filing system or by e-file or fax addressed as follows:

James C. Plummer
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Ste. 270
Houston, TX 77006
(713) 522-3605 – Fax

David W. Holman
THE HOLMAN LAW FIRM, P.C.
24 Greenway Plaza, Ste. 2000
Houston, TX 77046
(713) 400-4841 - Fax
***Attorneys for Defendants,***
***Four J's Community Living Center, Inc.***
***and Anthonia Uduma***

Shelton Sparks
Tiffany Harvey
SHELTON SPARKS & ASSOCIATES
706 Cordell St.
Houston, TX 77009
(713) 862-4913 – Fax
***Attorneys for Intervenor***

*/s/ Russell S. Post*
Russell S. Post

# TAB A

VOLUME 1 OF 1
REPORTER'S RECORD
CAUSE NO. 2009-40925

| | | |
|---|---|---|
| PATTI WAGNER, AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT<br>Plaintiff | * | IN THE DISTRICT COURT OF |
| And | * | |
| WYLETTE TAYLOR AS GUARDIAN OF DERRICK JAMES, AN INCAPACITATED ADULT<br>Intervenor, | * | |
| VS. | * | HARRIS COUNTY, T E X A S |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA AND GODFREY UDUMA<br>Defendants. | * | 269TH JUDICIAL DISTRICT |

HEARING ON MOTION FOR ENTRY OF JUDGMENT
JANUARY 13, 2012

On the 13th day of January, 2012, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Dan Hinde, Judge Presiding, held in Houston, Harris County, Texas. Proceedings reported by stenographic machine shorthand.

KATHLEEN KEESE, CSR
Official Court Reporter
269th District Court

A P P E A R A N C E S:

Mr. L. Lee Thweatt
SBN: 24008160
Mr. Joseph D. Terry
SBN: 24013618
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, Texas 77046-0102
713.600.4710

Mr. Russell S. Post
SBN: 00797258
Mr. Robert H. Ford
SBN: 24074219
BECK REDDEN & SECREST
1221 McKinney, Suite 4500
Houston, Texas 77010
713.951.3700

COUNSEL FOR PLAINTIFF

Mr. Shelton Sparks
SBN: 06507160
SHELTON SPARKS & ASSOCIATES, L.L.C.
706 Cordell Street
Houston, Texas 77009
713.862.5533

Ms. Tiffany C. Harvey
SBN: 24067343
THE LAW OFFICE OF TIFFANY HARVEY
706 Cordell Street
Houston, Texas 77009
832.498.7076

COUNSEL FOR INTERVENOR

A P P E A R A N C E S:

Mr. James C. Plummer
SBN: 16075700
Mr. Amar Raval
SBN: 24046682
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Suite 270
Houston, Texas 77006
713.522.2887

Mr. David W. Holman
SBN: 09902500
THE HOLMAN LAW FIRM, PC
24 Greenway Plaza, Suite 2000
Houston, Texas 77046
713.400.4840

COUNSEL FOR DEFENDANTS

# I N D E X
VOLUME 1 OF 1
JANUARY 13, 2012

| | Page |
|---|---|
| PROCEEDINGS ................................ | 5 |
| Calling of case ............................ | 5 |
| Appearances of Counsel ..................... | 5 |
| Plaintiff and Intervenor's Joint Motion for Entry of Judgment ................ | 6 |
| Ruling of the Court ........................ | 69 |
| Court Reporter's Certification ............. | 75 |

* * * * * * * *

P R O C E E D I N G S

*THE COURT:* The Court calls Cause Number 2009-40925. Patti J. Wagner versus Four J's Community Living Center, Inc.

Can I have appearances of counsel for the record, please.

*MR. POST:* Your Honor, on behalf of the Plaintiff, Ms. Wagner, Russell Post.

*MR. THWEATT:* Lee Thweatt, Jim Terry on behalf of the Plaintiff, Ms. Wagner.

MR. FORD: Robert Ford on behalf of the Plaintiff, Ms. Wagner.

MS. HARVEY: Tiffany Harvey for the Intervenor.

MR. SPARKS: Shelton Sparks for the Intervenor.

*MR. HOLMAN:* David Holman on behalf of the Defendants.

MR. PLUMMER: Jim Plummer on behalf of the Defendants, Your Honor.

*THE COURT:* Good afternoon. I appreciate y'all's patience, as a couple of the earlier hearings went a little longer. So thank you for your patience.

We're here on the Plaintiff and

Intervenor's Joint Motion for Entry of Judgment. We've got a lot of substantial briefing on this. I have read the motion and the response and the reply and looked at the cases. So that's just to give y'all a heads up on that. But this is the Plaintiff and Intervenor's motion, so I will let you all proceed first.

*MR. POST:* Your Honor, I appreciate it and I'm happy to proceed in whatever way is simplest for the Court. We have a very straightforward motion for entry of judgment on the verdict. It seems to me it might make sense to allow Mr. Holman to present his substantive challenges, and it may be more efficient for the Court for us to respond to his argument. But I'm happy to proceed whichever way the Court would prefer.

*THE COURT:* Would you like to go first, Mr. Holman?

*MR. HOLMAN:* Sure.

*THE COURT:* All right.

*MR. HOLMAN:* Your Honor, we saw their motion for entry of judgment on the verdict; and there were a couple of problems that we saw initially. Number one, if Chapter 74 applies, then the damages must be reduced, the noneconomic damages,

must be reduced from $14 million down to $250,000 per claimant. Number two, they were asking for judgment against Ms. Uduma personally; and there is no basis for judgment against Ms. Uduma personally. Let me address those in order.

First, the question of whether Chapter 74 applies. As you know, this issue was raised pretrial. Mr. Plummer filed a motion to amend his answers to allow him to assert Chapter 74, which the Court recognized was relevant as to the damage caps. They -- the Plaintiff and the Intervenor filed motions to strike that amended answer, and the Court took that up. The Court allowed that amended answer, and so Chapter 74 is in the case.

Now, does Chapter 74 apply? We think that there is no question Chapter 74 applies; and let me go through the analysis, if I can. First of all, there is in black and white in the Civil Practice and Remedies Code a statement about what constitutes a health care institution. And it says that a health care institution is "a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act, as amended."

Now, there is no dispute in this record that Four J's is a home and community-based services program for the treatment of mentally retarded persons, as authorized by DADS under the charter of the State of Texas. The reason that there is no dispute about that is that every single document -- almost every single document discusses that Four J's is a home and community-based services program. There is -- we presented the Court in our response to -- to the brief filed by the Plaintiff, Wagner, we filed excerpts from all the exhibits that talk about Four J's being a home and community-based services program, an HCS program, for mentionly retarded adults.

Then there was -- we also presented the Court with the reference to the testimony of Ms. Wagner, who said that she was putting Jenny into -- transferring Jenny to Four J's which was an HCS program. We also presented the Court with references to the testimony of other folks, such as Ms. Uduma, Ms. Obichuku and Mr. Kern, all of whom testified about HCS and HCS policies and also the regulation by DADS.

We also presented the Court with the reference to Mr. Kern's expert report in which Mr. Kern said Four J's is a home and community-based

services program, services facility, HCS facility.

The Texas Administrative Code 40, Texas Administrative Code 9.153 defines an HCS program as a home and community-based services waiver program as authorized by Section 1915(c) of the Social Security Act.

*THE COURT:* What provision is that again?

*MR. HOLMAN:* That's 40, Texas Administrative Code 9.153.

*THE COURT:* All right. 9.153?

*MR. HOLMAN:* Yes, sir.

*THE COURT:* Thank you.

*MR. HOLMAN:* Also we cited in our brief the other administrative code provision which further defines the HCS program; and that is 9.154(a), which states, "The HCS Program is a Medicaid waiver program approved by the Centers for Medicare and Medicaid Services (CMS) pursuant to 1915(c) of the Social Services Act. It provides community-based services and supports to eligible individuals as an alternative to the ICF/MR Program," which is the intermediate facility program. That would be similar to the state school program. "The HCS Program is operated by DADS under the authority of HHSC." That's in the 40, Texas

Administrative Code, Section 9.154(a).

Now, so there is no dispute that Four J's -- and there was never any dispute in the record of this case during the trial of the case -- that Four J's operated as a home and community-based waiver program under DADS.

It is clear under Section 74.001(a)(11)(I) that "a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act," is a health care institution. And then we turn to the next section which defines a health care provider; and a health care provider is defined as including, under (12)(A)(vii), "a health care institution." So if you are a health care institution you qualify as a health care provider under Chapter 74. Thus, we don't think that there is any dispute in the record and there can be no dispute in the record that Chapter 74 applies to Four J's and that Four J's is a health care provider. And we have cited the Court to two cases that have held in the same way. They have held that the -- the -- the nature of this entity is a home and community-based services program for mentally retarded adults; and, therefore, it is a health care provider.

Now, the more difficult question for you is whether Ms. Uduma is a health care provider. Now, on a blank slate, if this were being written on a blank slate, there could be no question that as a matter of law Ms. Uduma is a health care provider. And the reason for that is that the statute in unmistakeable terms says that an owner, a director, an employee of a health care provider is a health care provider. We know from the undisputed testimony that was given by both the Plaintiffs and the Defendants in the trial of this case that Ms. Uduma is the owner of Four J's and she is the CEO of Four J's and that she is the president of Four J's. So she would qualify, on a blank slate, as a health care provider under this statute, no question.

The question arises because at the time that the Court in pretrial was wrestling with the issue of whether to grant the motion to amend, the Court -- they raised the question about whether Chapter 74 applied to Ms. Uduma because the argument -- our argument was that she was being sued as a premises owner. Mr. Plummer said, I agree with you, I don't think Chapter 74 applies. And he went further. He said, we are not going to assert any remedies, any rights, defenses for Ms. Uduma under

Chapter 74.

Now, they have taken the position that that is a judicial admission and that bars him from -- bars Ms. Uduma from arguing that she is a health care provider under Chapter 74. I was troubled by the statements that Mr. Plummer made as well. And, you know, I made no secret of that to Mr. Plummer when I saw it because I thought: Well, gosh, you know, you made these statements; the Court heard these statements. But then I started looking into the law of judicial admission. The law of judicial admission is that you can judicially admit a fact but you can't judicially admit a matter of law. The idea is, I can't judicially admit, for example, that the Tort Claims Act doesn't apply to the City of Houston. That's not subject to judicial admission because it is a question of law.

*THE COURT:* Step away from the Tort Claims Act because that brings in the issues of sovereign immunity which also brings in the issues of jurisdiction --

*MR. HOLMAN:* Sure.

*THE COURT:* Give me a different example.

*MR. HOLMAN:* Let me give you a different example. There is a case that we cited where there

were deemed admissions, and one of the deemed admissions was that the defendant breached the contract. Another one of the deemed admissions was that defendant owed a commission. And the Court looked at that as judicial admission and said it doesn't qualify as a judicial admission because it's admitting a question of law. And you can't, in judicial admission, admit a question of law. So those deemed admissions, the Court said, were of no effect.

We cited a number of other cases --

*THE COURT:* So lawyers who make arguments in court can't bind their clients as to the concessions they make? Say you are in oral argument and you concede that, well, Your Honor, yes, this law does not apply in this context. They can't be bound by that concession?

*MR. HOLMAN:* Well, you know, I -- and that's what I had trouble with, as well. I mean, frankly, I was -- I was troubled with the idea of Mr. Plummer representing to you that Chapter 74 didn't apply in that situation. What I did was I looked at it under the concept of judicial admission. If -- if I were to judicially admit, as, you know, Mr. Plummer did, that Chapter 74 doesn't apply to Ms. Uduma and Chapter 74 as a matter of law applies to

Ms. Uduma, I don't think that judicial admission has any effect. I think you can in certain circumstances, you -- you can simplify your case by eliminating certain claims and that sort of thing. Certainly, you know, there are ways you can stipulate and abandon and do Rule 11 agreements and all kinds of things.

*THE COURT:* What's your response, though, to Plaintiff and Intervenor's argument that, well, if Mr. Plummer hadn't said that we would have accepted the Court's offer to continue trial because that did shape our trial strategy and the way we approached presenting evidence and arguing to the jury?

*MR. HOLMAN:* I, you know -- frankly, I have no response to that. I think that -- that probably -- were I arguing on their behalf, I would probably argue judicial estoppel. I would say that, you know, they relied upon that because he made that statement and therefore he should be judicially estopped from taking the contrary position. But, you know, the argument that they made was judicial admission; and, you know, frankly, I'm just addressing the argument that they made.

I believe that what we have to do is look at the statute. And, you know, if we are going

to hold that Four J's is indisputably a health care provider, which I think we have to do, then the question is: Is the owner of Four J's subject to Chapter 74 or not?

I think Mr. Plummer's problem was that when he looked at it he was thinking that they were suing her as a premises owner and that fell outside the statute. And, you know, I think there was some confusion on his part, perhaps; but I don't think that that changes the nature of how the statute applies. But --

*THE COURT:* Well, let me just stop you there.

*MR. HOLMAN:* Okay.

*THE COURT:* What record suggests that they were not suing her as the premises owner?

*MR. HOLMAN:* Nothing.

*THE COURT:* Then why do -- why do we care about whether Chapter 74 applies?

*MR. HOLMAN:* Well, because if she is a health care provider then it becomes a health care liability claim even though they are suing her as, quote, a premises owner.

*THE COURT:* How is that? How is she a health care provider as a premises owner?

*MR. HOLMAN:* Because -- well, Four J's is a health care provider. She, being an employee, whatever, of Four J's is a health care provider. If they sue her for her failure to provide safety for the people that were the residents, the patients, then that's a health care liability claim. You know, we presented those -- all of these cases that talk about health care liability claims and what constitutes a health care liability claim. And there is a number of cases, including the <u>Marks</u> case that they rely upon and the <u>Omaha Healthcare</u> case, the spider bite case, that the Court is familiar with, where the Court said -- where they tried to make the distinction, well, it's just a premises claim, it's not a health care liability claim. And the Court said, no, it's a health care liability claim because the central focus of this claim, the underlying nature of the claim is that you are suing them for failing to provide safety for the residents.

*THE COURT:* So if someone -- let's take a nurse. She owns her own house. Someone trips and falls in the house and scrapes their knee. And she goes, "Oh, wait. I've got the Bactine in my first aid kit and the Band-Aid." She goes and disenfects it, puts a Band-Aid on it. But, unbeknownst to the person

who is injured, the house is infected with staph; and he comes down with a staph infection. And he files a premises liability case, defective condition, that the house had a staph infection. The very fact that, just because she is a nurse, she would not be subject to the ordinary premises liability standards for whether or not she was liable for, you know, failing to warn and make safe her staph-infected house?

*MR. HOLMAN:* Well, you know, I think if you have a situation where you have a nurse and there is a premises problem, somebody falling --

*THE COURT:* And add in that she works for a hospital --

*MR. HOLMAN:* Okay.

*THE COURT:* -- a health care institution.

*MR. HOLMAN:* Right. And somebody falls down in her house. That is a, definitely, a premises claim.

*THE COURT:* She is an employee of the health care institution.

*MR. HOLMAN:* Yes.

*THE COURT:* She is a health care provider.

*MR. HOLMAN:* But what you do is you look

at the underlying nature of the claim. The underlying nature of their claim is they're claiming that these folks were residents of the entity which is a health care provider and that these folks were not provided safety.

The best case on this -- and, you know, I discussed it in the brief; but, you know, it was discussed pretrial, which is the brown recluse spider case. What happened is it's a nursing home, and a spider bit one of the residents. And the plaintiff sued saying, "Well, you didn't do proper pest control. And, you know, you should have prevented spiders from getting in here." And that's a premises claim.

The Court analyzed that and they said, "Look, if somebody is in your -- in your facility and they are in custodial care in your facility and you are responsible for providing their fundamental needs --" What are their fundamental needs? Health and safety. And if your argument is you didn't provide them safety, then that's a health care liability claim. And that's what we're -- that's what we're faced with here.

The arguments and all of their arguments, the underlying nature of all their arguments is: They were patients and you

didn't provide them safety from the fire that occurred. You didn't provide them protection from this fire, protection from this harm. You didn't provide for their fundamental needs. That's a health care liability claim.

Now, whether they are suing Ms. Uduma as a, quote, premises owner or not, the underlying nature of the claim is the same as far as Ms. Uduma goes.

But let me address, if I may, because this -- this feeds right into the other argument. Say Chapter 74 doesn't apply to Ms. Uduma. What are we left with? They want to sue Ms. Uduma individually. They want to get liability against her, a judgment against her personally as a, quote, premises owner. And you have seen that. I mean, you have seen that in their, in their pleadings. You have seen it in their questioning of Ms. Uduma.

They said, "Ms. Uduma, you realize you are being sued as a premises owner?" You saw that in the charge conference and in the language, in the language that they put in the charge about how they wanted liability against her with respect to the condition of the premises, so forth.

Can Ms. Uduma be liable as a premises

owner in this situation? And I submit to you that the case law states that she cannot be liable as a matter of law.

Now, the case that I cite is the same case that they cite. It's the landmark case. It's the Johnson County Sheriff's Posse versus Endsley. It's a Texas Supreme Court 1996 case. And what that case says is that a lessor has no duty to protect one from dangerous conditions that occur on the premises after the, after the place has been leased. There is no duty. Once the lessor leases the premises, there is no duty. And the Court said, the reason for this is because she has relinquished possession of the property; therefore, we will not as a matter of law impose a duty on her.

Now, there are three exceptions to that rule, that general rule. And the three exceptions are burdens that the plaintiff has to prove, according to the Endsley case. The only exceptions that they have are these three: One, to show negligent repairs. There is no allegation or proof of that. Number two, concealed defects. No allegation or proof of that. Or, third, that she retained control over a portion of the premises on which the injury occurred. There is no allegation or proof of that.

Now, in their brief they alleged -- in their brief they allege that she retained control of the fire safety. And they tried to establish that by showing that she took the fire marshal around and that she was the one that dealt with the OMNI group that did the fire alarms. The first problem with that analysis is that there is no showing that she retained any control over a portion of the premises after she leased the property to Four J's. And there is no evidence whatsoever about that, but the second problem is that the evidence establishes the contrary of that proposition.

She was asked directly about taking the fire marshal around and "Didn't you do that as the premises owner?" She said, "No. I had leased the property."

They asked Mr. Overholt, "Well, didn't you --" I can't remember the exact words; but it was something like, "What was your relationship with Ms. Uduma?" He said, "I knew her as the principal of Four J's. Did she ever mention to you that she was the property owner?" He said, "I assumed that, but she never used those words."

There is no evidence whatsoever that she as the premises owner, apart from -- you know, as

the premises owner retained any control over fire safety as if they were retaining control over the premises. So, under the Endsley case -- and the Endsley case is clear -- there are no exceptions that apply to the general rule. And the general rule is that she has no duty as a lessor; and, therefore, she has no duty and cannot be personally liable for this judgment.

Now, they have also cited and we cited as well Restatement provisions 360 and 361. And I think those are important too because the Restatement provisions talk about retention of part of the land. And both of those provisions talk about retention of part of the land. That's the way that a lessor becomes liable, if the lessor retains control over part of the land. And there is no evidence whatsoever that she ever retained control over part of the land, as if, you know, the lessor would retain control over common areas, for example.

Now, they have cited a case called the Osti case. And, if I may, that's the only case that they cited that they say supports liability in this situation against Ms. Uduma. Osti was a case in which the fellow was in a third-floor apartment that didn't have any exits. And the Court said that's a

structural issue. The lessor had a duty to provide a fire escape, and the lessor didn't do it. So the lessor can be liable for failing to provide a fire escape because that's a structural issue.

We don't have that situation here. There is no allegation that there is some kind of structural problem wrong with the house, with the group home that she leased to Four J's.

*THE COURT:* Could it have been a back door that would not open?

*MR. HOLMAN:* Well, it's a back door that was locked, that had a dead bolt; but that's Four J's problem. Four J's was the occupier of the premises. Once she relinquished possession to Four J's, Four J's was responsible for all of that stuff. There is no allegation here that this was a third-floor apartment without a fire escape.

So that -- that case stands for a limited proposition that deals with structural problems. And there are no such problems that are alleged in -- and that case doesn't have any -- I couldn't find any other cases that relied on that case. But I found plenty of cases that relied on the Endsley case that say that there is no duty on the lessor in this particular type of situation.

Now, the other thing that I saw was that they have cited something in the brief called the International Residential Code. And we tried to look through the record of the trial and couldn't find any reference to the International Residential Code. So I don't know where that comes from or how it applies or would be promulgated or how -- how it would apply to Ms. Uduma in this situation. It might apply to Four J's because Four J's was the occupier of the premises, but it wouldn't apply to Ms. Uduma because she had already leased the premises to Four J's.

Now, there is another argument that's made about Ms. Uduma personally, which would apply, I guess, if Chapter 74 didn't apply to Ms. Uduma personally. And they say that, that she could be liable personally as the agent of Four J's. And, first of all, that was not what was tried. As the Court knows they tried her being a premises owner. That's how they framed their case. That's how they told the jury that they were trying their case, that she was being sued personally as a premises owner. They never sued her as an agent.

They did have alterego allegations, but they never tried those alterego allegations.

There is a problem with them trying to hold her personally liable as the agent of the corporation. There is a series of cases -- Leitch versus Hornsby, Chron Tri versus J.T.T., Texas Supreme Court cases -- that said that if the corporate agent is accused of violating the same duty that is owed by the corporation then you can't hold the corporate agent personally liable. And there is a number of cases that have followed that. And, you know, the idea is that they have to have some independent duty that was violated. And there was no evidence or proof of some independent duty that was here. But more importantly -- and I pointed this out at the end of the argument -- is the illogic of it. If it's true that Four J's is a health care provider whose damages are limited to 250,000 per claimant and their argument now is that Ms. Uduma was an agent of Four J's, under the statute an agent of Four J's is also a health care provider and would be subject to the damage caps. But what they are saying in their brief is you should hold that Four J's -- that damages are limited for Four J's, but they are -- you can get unlimited damages against Ms. Uduma as the agent of Four J's. And that doesn't make any sense at all. And it is certainly not the proper construction of the

statute in that circumstance.

If they are saying that she is personally liable as a premises owner, that's one thing. We can deal with that argument. But if she tries to say -- if they try to say she is an agent of Four J's, that takes us right back into Chapter 74.

So what we are asking the Court to do -- this is their motion for entry of judgment -- we are asking the Court, if the Court enters judgment, to reduce the damage caps to 250,000 per claimant. And it's just the noneconomic damages, the 14 million, reduce those down to 250,000 per claimant, pursuant to 74.301, which is the limitation on noneconomic damages. And then, do not enter judgment against Ms. Uduma personally because there is no basis for it.

*THE COURT:* Are you still persisting in this argument that because there was no expert report as to Ms. Uduma that the claims against her should be dismissed?

*MR. HOLMAN:* No. No, we're not. I had made that argument before I saw your comments in the pretrial. And your comments in the pretrial made it clear that that expert report argument was waived, and we're not raising that anymore.

*THE COURT:* All right.

All right. I've got a couple questions for you.

One of the arguments that the Plaintiffs make was that there was a lack of evidence that Four J's was actually licensed at the time of the fire. What evidence do you have in the record that shows that Four J's was actually a licensed institution at the time of the fire?

*MR. HOLMAN:* I don't think that there is a license on file. But -- and, as we said, the undisputed evidence is that they were operating as an HCS facility under the auspices of DADS. Everybody admitted and all the documents admitted that they are operating under, under the authority of DADS.

*THE COURT:* Don't you have to have a license to operate under the authority of DADS?

*MR. HOLMAN:* Of course. The, the situation in Texas is you can't operate a facility as an HCS facility without a license. And, believe me, if we -- if there was any dispute about whether we had a license -- which there wasn't throughout the trial -- if there was any dispute, they would have brought that up and said, you are violating the regulations because you are operating this facility without a license. There was never any evidence or

any dispute that we were properly authorized to act as an HCS facility. And all the documents support that.

*THE COURT:* All right. Those are my questions.

Mr. Post.

*MR. POST:* Yes, sir. Your Honor, I would like to begin with the Chapter 74 question regarding Four J's. I think it's important to step back for one moment and see the big picture of the case, see how the issues interact, because Four J's was found 60 percent responsible for this incident. So it would be jointly and severally liable. Four J's does not have any duty argument here. Four J's is depending on its ability now to establish the applicability of Chapter 74. If it fails in that effort, then the Plaintiff and the Intervenor are entitled to a joint and several judgment of the uncapped damages with respect to Four J's. We still, obviously, would want the judgment with respect to Ms. Uduma personally. But that would essentially be a roadmap to a decision of the case.

*THE COURT:* But that would be after 60 percent -- the percentage liability application, right?

*MR. POST:* With respect to whom, Your

Honor?

*THE COURT:* Four J's.

*MR. POST:* No. Four J's is jointly and severally liable because --

*THE COURT:* But I'm saying that -- you're not saying that you could get 14 million against Four J's? You are saying 60 percent of 14 million?

*MR. POST:* That would include -- we would be entitled to recover everything.

*THE COURT:* That's with the 60 percent of --

*MR. POST:* Yes, because under Chapter 33 a defendant that is found more than 50 percent liable is --

*THE COURT:* All right.

*MR. POST:* We wouldn't be entitled to recover twice, obviously. We would never try to do that.

*THE COURT:* It would be up to Ms. Uduma then to seek contribution for --

*MR. POST:* Exactly. That's exactly right.

*THE COURT:* I see.

*MR. POST:* Now, let me turn to the

question of whether Four J's is entitled to invoke Chapter 74 because this is a question of conclusive evidence. It's not a legal question.

Mr. Holman has cited the statutes that make an HCS program fall within the definition of a health care institution; but the key is he has to establish the factual predicate that Four J's at the time of this incident was, in fact, an HCS program.

We had a full trial. Mr. Holman says repeatedly there was no dispute about this issue, but this is not our burden. It is the Defendants' burden of proof to prove that they are entitled to invoke this statute. They had the burden to prove it, and they did not prove it at trial. And they did not ask for jury findings on it. And so, in this posture, they had the obligation under Rule 279 to establish it conclusively. If it's not conclusively established that Four J's was a certified HCS program at the time of this incident, that defense is waived and they cannot invoke Chapter 74.

The proof that you see in their motion I think underscores their full awareness that they did not prove this fact at trial. The issue never came up. When they filed their original response to our motion for judgment, they simply asserted that they

were an HCS program without proof. We filed our response and pointed out that they hadn't established that fact. They had a month in which to dredge the record for that evidence. And they don't have evidence that conclusively establishes that.

Here's what I want to emphasize. They have given you four categories of evidence that they say establishes that they are an HCS program. None of that evidence is conclusive. And it's important to look at this carefully in light of the conclusive evidence standard. Mr. Holman correctly cites a couple of cases that have found HCS programs to be health care institutions; but, importantly, in neither of those cases was the Court faced with the question of whether the defendant proved it was an HCS program. This is that case.

Now, the first category of evidence that they cite is a series of exhibits that referred to Four J's as an HCS program. That was their Appendix A. All that is is a series of internal documents from Four J's that internally brand it as an HCS program. But those documents don't say anything about certification; they don't say anything that establishes that, in fact, Four J's was certified at the time of this incident; and, in fact, they don't

conclusively establish even that it's an HCS program. They simply say Four J's holds itself out as such. A fact finder would not be obligated to believe that evidence. At best, that would have been probative evidence to put before the jury. But they didn't ask the jury to make a finding, and that's not conclusive evidence of anything.

In a moment, when I deal with the Web site evidence, I'm going to walk you through the way the administrative scheme works; and you will see there is a certification procedure that involves annual reviews, relicensing. And there is a certificate that has to be issued. They haven't dealt with any of that with these internal exhibits.

Their second category of evidence they claim is trial testimony. I read every excerpt of that trial testimony today. None of it says that Four J's was a certified HCS program. Yes, there are references to the procedures of HCS programs. Yes, there are some references to a variety of regulatory proceedings. But nothing in that testimony ever specifically says HCS is a certified program. And even if it did, it's within the province of the trier of fact to believe or disbelieve contested testimony. We would have a chance to impeach and cross-examine

witnesses on that issue if they had ever put a witness up who gave that testimony. So that can't be conclusive evidence.

I would emphasize, among the excerpts that they cited, from the October 18th trial testimony was the testimony of the Plaintiff's expert Mr. Kern, who at Pages 256 to 261 talked some about the certification procedure and the fact that there are annual reviews and that an institution can loose its certification. And so there is in fact converting evidence in the record that would allow a fact finder to question whether this institution was certified. That's certainly not conclusive evidence as they have to prove it.

The third category of evidence -- and this is, I think, the real evidence of a guilty conscience -- is they try to use the Plaintiff's Chapter 74 expert report to prove that they were an HCS program. As the Court knows, that expert report is not in evidence; and so it cannot be used now to establish their defenses as a matter of law.

Second, under Chapter 74, which they are trying to rely on, no expert report can be used for any purpose. They would not be trying to rely on that expert report if they believed they had proved

this defense as a matter of law at trial. They know they didn't.

So that brings us to the key to their case, and their whole defense now rests on this one premise. They want you now to reopen the evidence and take judicial notice of two Web sites which they say now, two months after trial, are going to prove their defense. And I want to talk at some length about what's wrong with that effort to rely on these Web sites.

First of all, I don't think it's an appropriate use of judicial notice to ask a Court to judicially notice a fact that is essential to establish an essential element of a theory of recovery or defense after trial. What they are saying is we can come in for the first time after trial and, essentially, establish the element of our defense as a matter of law. Rule 270 says that you cannot take additional evidence on a controversial matter after the jury has returned a verdict. And that's the essence of what they are asking you to do here. And it fits with the judicial notice rule because, even when judicial notice is proper, it's proper only if the fact that is being requested for judicial notice is not within reasonable dispute. They have to

conclusively establish that the fact exists that they are asking you to take judicial notice of. And these Web site excerpts simply won't do it.

If you turn to the actual documents that they have attached, I want to point out a few problems with these Web site excerpts. The Web site excerpts don't say anything about whether Four J's is certified. That's the key fact, is whether Four J's was in fact an HCS program in accordance with the Social Security Act at the time of this incident. Nothing in these two excerpts say that. In fact, there is a detailed certification procedure --

Robert, if you will give the Court a copy of this.

*(Referenced document tendered to the Court and counsel.)*

*MR. POST:* -- that an institution has to go through to maintain its certification.

I'm going to try to do this efficiently. I don't want to get lost in the regulations, but Tab A is Section 9.151 of the Administrative Code. You will see Paragraph 3 says this statute controls the process for certifying an HCS program. Likewise, Tab B says this subchapter applies to all HCS programs.

I think this is exactly the statutes

that they are relying on.

*THE COURT:* Let me ask, this tab -- these are administrative codes?

*MR. POST:* Correct, Your Honor.

*THE COURT:* You were referring to a statute.

*MR. POST:* Well, I'm loosely referring to the Administrative Code as a statute. It is technically regulatory, but it is the applicable regulatory law here.

*THE COURT:* All right. Thank you.

*MR. POST:* Tab C, Your Honor, in Paragraph (a) -- this is the language upon which Mr. Holman relies. And I agree with him -- establishes that an HCS program is the Medicaid waiver program that is referenced in Section 1915(c) of the social Security Act. We don't quarrel with that conclusion, but they have to establish that they are a certified program.

Turn then to Tab D. Section 9.171 sets forth the certification and review procedures. Paragraph (a) makes clear a provider has to be in continuous compliance with the program certification principles.

Paragraph (c) points out that

DADS conducts on-site certification reviews annually. And Paragraph (d) provides that a certification lasts for one year only, and it has to be renewed each year. And so the fact that at one point in time this institution was a certified HCS program does not mean that it is "world without end, amen."

Turn then to Tab E, which discusses the process for certification. Paragraph (a) assumes the best case. If DADS does a certification review and finds compliance with all certification principles, the program is certified. But that's not the only provision. This is an entire spectrum of what the regulation calls sanctions that deals with the extent of noncompliance. I want to point you to just a couple of potential consequences.

They have the burden to show you conclusively that they were certified; so, I'm not going to try and go through this exhaustively. But look, if you would, at the second page of this provision at Paragraph (d), left-hand column, one-half of the way down, "If DADS determines that a program provider is out of compliance with between 10 and 20 percent of the certification principles at the end of the review exit conference ... DADS does not certify the program." That throws the program into a

follow-up review process. At the end of which -- and you can see this in Paragraph (2) -- "Based on the results of the follow-up review," Subparagraph (B), if corrective action has not been satisfactorily taken DADS denies certification of the program and implements other sanctions.

Without burdening the Court with a lot of administrative parlance, I will tell you that if you go through the rest of this provision you will see heightening degrees of sanctions that, likewise, lead to denials of certification. So it's not the case that simply because one assumes that this program was once an HCS program it is automatically and forever an HCS program.

So what do we have then on these Web sites? Again, the Web sites don't say anything about whether HCS is in fact -- pardon me -- about whether Four J's is in fact a certified HCS program, particularly not on this date. They don't say anything about whether certification was present at the time. And I want to talk a little about the details of what you see on the face here.

These Web site excerpts specifically say, we're providing this as a service to provide a list of providers. Look at -- at the bottom of the

first page at the caution.

The caution says: This is simply a tool we provide you to help you make a selection. This is not a report of the agency's official business. This is a public service to provide a list of potential providers. And, importantly, look at the last sentence of that caution. This site may include some self-declared and unverified information.

The test the Supreme Court has laid out for judicial notice is that the fact you are asked to take judicial notice of must be, quote, verifiably certain. That's what the Supreme Court said in the Eagle Trucking case. This Web site says, we are telling you some of the information on this list is not verifiable. On its very face, it's not appropriate for judicial notice.

When you look at the second attachment that they have provided, you see a compliance history. It is littered with noncompliance. We don't know what action was taken by DADS at the relevant time. We don't know what corrective steps were taken. We don't know whether they were certified at the time.

Now, perhaps a fact finder could draw an inference had this evidence been properly introduced at trial that they were certified; but it's certainly

not conclusive evidence that no reasonable mind could dispute. And had they tried to put it on at trial, we would have cross-examined them, not only about what is on this document, but on the nature of the investigations that took place, the review process that took place, and whether there was in fact a certification.

I want you to note in this respect the dog that's not barking. They didn't put Ms. Uduma on to testify that they were certified as an HCS program. They haven't given you an official certificate that says on this date they were certified as an HCS program. Mr. Holman says, if I hear him correctly, they don't have it.

This is categorically not appropriate --

*MR. HOLMAN:* I don't mean to interrupt, but -- --

*THE COURT:* You will get a chance to respond.

*MR. HOLMAN:* -- I never said that I didn't have it.

*THE COURT:* You will get a chance to respond.

*MR. POST:* They have to prove this fact

conclusively. This evidence doesn't prove this fact conclusively. And because they can't establish it, they have to live with the consequences. They have not established their right to invoke Chapter 74, which means all the other questions related to Chapter 74 are inapplicable.

Now I'm going to touch very briefly on Ms. Uduma's argument that she can invoke Chapter 74. Mr. Holman says he meets the one argument that we raised in our response that this was a judicial admission made by defense counsel; but, of course, I didn't make one argument in my response, I made three arrangements in my response. I argued it was a judicial admission, but I also argued that it was a waiver because counsel made a stipulation to these lawyers and to the Court that he would not assert a defense. And even if you have a legitimate legal position, a lawyer representing a client can choose to waive that position; and defense counsel did that. And you cannot overcome that by saying the evidence was conclusive. He stipulated he would not assert this defense, and he has to be bound by that stipulation.

And the third argument I made, he needed your leave to file an amended pleading asserting

this defense on behalf of Ms. Uduma. You didn't give him that leave because, when counsel on this side of the table asked for a clarification of your ruling, you looked at him and you said: Are you asking for relief for Ms. Uduma? And he said no. He does not have a ruling granting him leave to amend and assert Chapter 74. He has waived that consciously. That means it's immaterial whether it's a judicial admission.

Now, with respect to the judicial admission point, Auld is the only case cited by the parties that deals with the application of Chapter 74; and Auld stands for the proposition that whether you are a health care provider is a fact that can be judicially admitted. And I believe it was admitted here, but that question is not even before the Court.

I'm going to touch finally on the duty question with respect to Ms. Uduma. I don't think we're really in any disagreement about the law. I agree with Mr. Holman's statement of the basic principles. I also agree with his statement of the exceptions with regard to the retention of control.

The Osti case is the key case on this point. It is a Houston 14th Court of Appeals case and

it is in the fire safety context. And the Houston court held that control remained with the property owner with respect to safe egress from the property and the tenant didn't have the obligation to provide a safe fire escape. Mr. Holman tries to distinguish Osti, but I submit he cannot distinguish it on its facts. He says that a structural problem in the premises is what Osti is all about. That's what this case is all about. The dead-bolted fire exit without the key is in violation of the applicable property ordinances and creates a premises defect. It is a structural defect. It is the same as a wall because you couldn't exit. And, in addition, there was evidence at this trial that there should have been overhead sprinklers in this facility. That is another structural defect that falls squarely within the Osti rule.

The argument that's made today that the control that Ms. Uduma exercised over the premises with respect to the fire escape procedures and the fire safety procedures definitely falls within control of the property. And it was for the jury to decide whether she exercised that control as the property owner or as an agent of Four J's.

The jury was asked to apportion fault

between Four J's and Ms. Uduma personally. The jury made this resolution, that she had that control and she acted negligently. And that finding should be upheld.

*THE COURT:* Thank you. I have got a few questions for you.

*MR. POST:* Of course, Your Honor.

*THE COURT:* All right. Just so that we're all clear here, are Plaintiffs persisting in argument that their claim against Ms. Uduma was in her capacity only as the premises owner?

*MR. POST:* As opposed to, again, capacity as the agent, Your Honor?

*THE COURT:* Or anything else.

*MR. POST:* Well, I hadn't even thought about anything else.

*THE COURT:* Negligence. Negligent activity. The only theory of recovery against Ms. Uduma is against her in her capacity as the premises owner?

*MR. POST:* I believe that is correct. Let me confer with lead trial counsel, since I wasn't at the trial.

(Pause.)

*MR. POST:* I think that's right, Your

Honor.

*THE COURT:* Okay. Now, the -- is it the Johnson case -- whatever Supreme Court case -- that talks about a landlord's duty or lack thereof --

*MR. POST:* Yes, Your Honor.

*THE COURT:* -- and sets out the three exceptions? It talks about the exception for a landlord to retain control of a portion of the lease premises. I think the standard thought is the common areas in a condominium or in an apartment complex or whatnot. And your -- as I understand, your argument is that, well, Osti explains that that also addresses control of access and departure, egress and exit -- access and egress -- it's been a long day; excuse me -- of the property. Is that what you are arguing?

*MR. POST:* That's right.

*THE COURT:* Okay. What -- what evidence do I have that Ms. Uduma maintained control of any structural changes to the property?

*MR. POST:* Well, Your Honor, I believe that the testimony was that she, obviously, is the property owner; that she made the decisions about the fire safety systems, the systems that had been installed, the systems that had not been installed

with respect to sprinklers; that she was the individual who worked with the fire marshal on the OMNI systems on dealing with inspections; that she was aware of the dead-bolted door. All of that is evidence from which the jury could draw a conclusion about the capacity in which she was exercising control.

Essentially, the argument that's made by Defendants is that she wore two hats; and, therefore, when she undertook this activity, she was necessarily wearing her Four J's hat. I don't think the evidence of that proposition is conclusive. And so it's for the jury to decide. The jury was asked: Do you find Four J's liable? Do you find Uduma liable? And the jury made that determination and apportioned fault. And I think that the jury had enough evidence before it to conclude that Ms. Uduma was acting in her capacity as property owner when she was dealing with these issues.

*THE COURT:* All right. Do you want to make any responsive reply?

*MR. HOLMAN:* Yes, Your Honor.

First of all, Mr. Post started his argument by saying that we have some duty to get jury findings about our status as a health care provider.

There is not a single case in Texas jurisprudence that would ask a health care provider to get jury findings on that. That's a matter of the Court's interpretation of statute based on the undisputed evidence.

*THE COURT:* Is there any case that says it's a question of law as opposed to a question of fact?

*MR. HOLMAN:* Well, there is cases that talk about it being a construction of statute as a matter of law. And we would submit that we have undisputed --

*THE COURT:* What am I construing? I'm just looking at the definition and applying it to the party to determine whether they satisfied the definition, right?

*MR. HOLMAN:* True.

*THE COURT:* Why isn't that a question of fact?

*MR. HOLMAN:* Well, the question -- it's not a question of fact because the facts are undisputed in this instance.

*THE COURT:* They have got a pretty big brief there as to whether they are a health care institution.

*MR. HOLMAN:* Let me -- let me say why that doesn't apply. The only time that they ever raised this argument about, you know, whether there is certification, or whatever, is after we made the argument post-verdict that Chapter 74 applied. They said, well, you didn't show that you were certified. Well, first of all, everyone admitted, every -- every bit of testimony during the trial admitted that we were an HCS program. There wasn't a single person that got up on the stand or any document they presented that said, wait a minute, they are not an HCS program because they didn't present certification. Had they have done that, we would have presented the certification. And we have the certification to present, if we need to. If we needed to, if that was ever an issue in this case, we certainly would have presented it.

*THE COURT:* But doesn't the definition require there to be -- for the party to be duly certified?

*MR. HOLMAN:* Well, first of all, there is not a single case in Texas that has required a hospital, for example, to come in and present its license in order to be recognized as a health care provider. The only time that would come up is if

somebody said, you don't have a license. Then they would say, well, okay, I have to present my license. But, otherwise, a hospital or an HCS program is operating under the, under the auspices of the State of Texas unless shown otherwise.

There is no proof in -- anywhere that they were operating in somehow some kind of a renegade fashion as a treater of mentally retarded adults in Texas without a license or without certification. There is no -- not even an indication or inference of that.

*THE COURT:* But whose burden is this? I mean, you are asking to impose statutory caps on damages. Isn't it your burden to establish a right to those statutory caps?

*MR. HOLMAN:* And --

*THE COURT:* So why does it matter whether there is any evidence that they are a rogue operation? Isn't it on you all to produce evidence, get a jury finding that would support a judgment by me imposing those caps?

*MR. HOLMAN:* No. There is no -- there is no case that would require us to get a jury finding on that. The Court looks at the nature of the institution and decides whether it qualifies as a

health care provider. And that's those two cases that I showed you where the Court said, the nature of this entity is a home and community-based service program for mentally retarded adults; therefore, it is a health care provider. It is the Court's determination based on the nature of the beast. Just like their argument that somehow we needed to get jury findings on whether this was a health care liability claim or not, there is no case that so holds. In fact, the Supreme Court cases all hold that the way you determine that is to look at the nature of the underlying claim.

That Omaha Healthcare case, the spider bite case, says you look at the nature of the underlying claim in order to determine whether it's a health care liability claim. So you look at the evidence that was presented in this case, and the only evidence that was presented in this case is that they were an HCS program being regulated by DADS. If they are an HCS program being regulated by DADS, they are under Chapter 74. And it's in crystal clear terms in the statute. Now, if they are a health care institution, then they are a health care provider.

Now, this whole issue is a make-way issue about whether there is certification or not. If

that were a requirement of the statute, there would be some case somewhere that said, well, you didn't make your certification requirement. But there is no case.

*THE COURT:* Well, let's be clear, though. The certification that I am referring to -- well, okay. Looking first at the definitions in 74.001 Paragraph (11), it lists a whole slew of different entities that can be considered a health care institution. And one of those is a hospital. And it doesn't say anything about qualifications or certifications or licensure. It just says hospital.

*MR. HOLMAN:* Right.

*THE COURT:* But you are seeking protection under Subparagraph (I) --

*MR. HOLMAN:* Right.

*THE COURT:* -- which is, from what I can tell, the longest definition under Paragraph (11)

*MR. HOLMAN:* Right.

*THE COURT:* "An intermediate care facility for the mentally retarded or a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act."

So it's not like just any intermediate care facility can qualify for that definition. They

are making it narrow there. So why shouldn't you have to establish that you fall within the narrow confines there?

*MR. HOLMAN:* You will notice -- and this definition doesn't say anything about license, about licensure either, just like the hospital doesn't.

*THE COURT:* But (12)(A), "Health care provider" does.

*MR. HOLMAN:* Right. And what they say is "chartered by the State of Texas." The only way you can operate an HCS facility is to be chartered by the State of Texas. You can't go out and operate an HCS facility without one, and that's clear in all the regulations. And in the regulations that we cited to the Court about HCS programs, the only way that you can be an HCS program is to operate under Section 1915(c) of the Social Security Act.

There is no -- there is no dispute about any of this. There is no dispute about what constitutes a home and community-based services program for mentally retarded adults. The regulations require it. And, therefore, we are not required, just like a hospital is not required, to prove that we have a license on file because we are a chartered -- we -- we were operating under the regulations of the State.

And if it were a requirement that you will have to come in and show here is a license, there would be some case that said that, that that was part of the requirement here, to show that, well, wait a minute, that you had a license on file. That's not a requirement. They are just making that up because it's the only attack -- they haven't said -- you notice, they haven't said they are not a home and community-based services program for mentally retarded adults under Section 1915(c). They haven't said that. If we are, then we qualify as a health care provider.

Now, Mr. Post made the statement that I indicated we didn't have such a certification. I never said that. In fact, we have the certification. The problem is that I didn't want to get into the position of asking you to reopen the evidence to show the certification because I didn't think that was part of my burden in order to show that we are a home and community-based services program under 1915(c) because that was never an issue. And it shouldn't be an issue now.

*THE COURT:* Let me ask you something. A doctor is out there treating someone and leaves a sponge in the abdomen, and it turns out that the

doctor had lost his license to practice medicine. Whose burden is it at trial to show that the doctor qualifies as a health care provider?

*MR. HOLMAN:* Well, here's -- here's my belief. You show -- you show the requirements of the statute. You say: I fit this category. I am here. I'm hereby abiding by this statute. I qualify as a health care provider. Then I think the burden is on the opposing party to say: No, they don't. They don't qualify as a health care provider because of XYZ. Because, once you qualify as a health care provider, then the benefits of Chapter 74 follow.

And here's the -- here's the rub. We say we qualify as a health care provider, we fit all the definition requirements under the statute; and they come in and say, well, you didn't prove that you had a certification -- notice they didn't say you don't have a certification -- so you don't qualify as a health care provider. They didn't say: Wait a minute. There is no license; so, you don't qualify as a health care a provider. What they said is: You didn't prove that you had a license; so, you don't qualify as a health care provider.

We fit the definition of the statute. And we are definitely chartered by the State of Texas,

because otherwise you couldn't operate such a group home.

*THE COURT:* Do you -- I just want to make sure I'm clear. You agree that this is an affirmative defense of the Defendants that the -- the application of the Chapter 74 damage caps?

*MR. HOLMAN:* Yes, I do.

*THE COURT:* Okay. Let's take it as a different type of case, a contract case. The defendant claims the affirmative defense of fraud, vitiating the contract. Whose obligation is it to establish the seven elements of fraud to support the jury finding to vitiate the contract? Is it up to the defendant to make sure the question is asked as to the seven elements or is it incumbent on the plaintiff to produce evidence that they didn't show justifiable reliance?

*MR. HOLMAN:* I think the answer to that is, of course, they have to present all the evidence of the statute.

*THE COURT:* Then why wouldn't the health care provider in this situation have to establish that they are licensed or certified?

*MR. HOLMAN:* Just like I said, Your Honor, all of the evidence -- there isn't any dispute

about what the evidence is. All the evidence establishes that they are a home and community-based services program for mentally retarded persons under Section 1915(c). No dispute about that. If they are operating as an HCS program, they are operating under the authority of the State of Texas. That's what the regulations tell us.

We don't have to come in and show our -- here's our contract, by the way. Here's our contract under which we were operating. Because all -- there is no -- there is not a single bit of evidence that controverts that we were properly operating as an HCS provider. And so it seems to me ridiculous that we would be required as part of our burden of proof to come in and present the licenses under which we are operating if nobody ever contested that, if there was never any dispute that we were properly operating as an HCS program. And there still is no dispute to this day. So they bring up this argument, but they don't have any -- a lick of evidence that we weren't operating properly as an HCS provider.

*THE COURT:* What is your response to their argument that Osti interprets the control exception for landlord liability to issues of access and egress problems?

*MR. HOLMAN:* Well, I think it's important to recognize that Ms. Uduma leased the property in 2002. The access and egress that they are talking about is a dead bolt on a door. And the dead bolt on the door that we're talking about was in 2008 and whether there was a key available to open that door or not. And the key was -- I think the testimony was that the key was there but it wasn't in the door, or that sort of thing. That's far different because that kind of duty -- the duty of whether you put in sprinklers after 2002 or not, that was all on Four J's because Four J's was the occupier of the premises. They had possession of the premises. They had the right to control what happened with how they did their fire safety. I think that's clear in the evidence.

There was a statement that the fire marshal -- by her taking the fire marshal around was somehow some evidence that she controlled fire safety. And I quote from the record -- and let me just read it into the record here, for the purposes of our record.

The question was asked by Mr. Thweatt of Ms. Uduma, "Why did you take the fire marshal to the house?"

Ms. Uduma answered, "Because when you

have a four-bed the HCS policy and procedure require that every year the fire marshal will have to come and do inspection to make sure that all the fire systems are working, that the house is in compliance with the State fire code."

Question: "Because you owned the house and you had to escort the fire marshal through the premises, right?"

Answer: "No. This was done by Four J's. But I usually take the fire marshals. It has nothing to do with the group home because the house was leased to the company."

So the only evidence is that Ms. Uduma was doing it on behalf of Four J's, not as the premises owner. So their argument that somehow she retained control because she escorted the fire marshal around, that that imposed liability on her as a premises owner is incorrect.

*THE COURT:* All right. Do you have anything else to add?

*MR. HOLMAN:* No, I don't.

*THE COURT:* Mr. Sparks, I forgot to ask you if you had anything to add; and I apologize for that.

MR. SPARKS: I do, Judge.

I just want to say that Mr. Holman is incorrect because there was some contest about whether or not Four J's was duly licensed and certified. In fact, Mr. Thweatt was arguing against it when we were challenging the third combined amended answer via our motion to strike. And, if I am not mistaken, you asked him yourself, Judge, whether or not they had a license, certification, registration. And he said that he thought they did. And then you asked him if they attached it to their pleadings, and he said they didn't. Then he gave you a document that was nine years old, and then he said that they were going to come back and give you additional documentation and they were going to prove it up by testimony. That's in the record.

Once we got through with the examination of Ms. Uduma, we passed Ms. Uduma; and Mr. Plummer reserved any and all questions that he had about the licensing or anything else related to them being certified until his case in chief. So, at the time, when we got through with Ms. Uduma, there had been nothing in the record that had been elicited from her regarding their corporate status, certification, registration, or anything of that nature.

Once Mr. Plummer took her on his case in

chief -- you can look through the record, Judge -- he asked her not one question, not one, about registration, licensing, certification, any of the things that you asked him about in reference to them proving up whether or not they came up under the Chapter 74 protections. So he never asked her and he never put any additional information into -- no additional evidence into the record.

So our position is that they didn't meet their burden of proving and establishing Chapter 74. And, if they didn't meet their burden, then Ms. Uduma, who allegedly is the owner of the company, can't also be a health care provider unless she is a doctor or a nurse. And her testimony is that she was not. She was some type of counselor.

What they want to do is say, well, Mr. Plummer waived her ability to have Chapter 74 protections; but that's a conclusion of law, he couldn't do that. But our position is, if, in fact, she never -- if, in fact, Four J's was never established as a health care provider because they hadn't met the requirements of providing a license, registration, or certification from the State of Texas, then Ms. Uduma didn't either. And for him to stipulate that she wasn't a health care provider and

they weren't seeking those protections and of which we detrimentally relied on and passed a continuance that you offered us, they can't come back now and say we're protected under Chapter 74.

So I submit to you, Judge, that, not only that Mr. Plummer did not meet their burden after telling you that he would -- you asked him the question, if I'm not mistaken, two or three times about a license. It's in the record. And he said he was going to give it to you. They never did. And he never asked Ms. Uduma any questions about whether or not she was certified by the Social Security Administration, whether or not she was certified by DADS or anybody else.

The issue, Judge, in reference to Ms. Uduma having control over the premises, I think -- I think the facts that went to the jury were several. One of them was how she instructed the staff to never take the people out the back door because it was always locked; to take them out of a window; take them out the garage; try to take them out the front door, even though that back door had been a designated fire exit. And the only time that door was utilized was when she showed up to open it up for the fire marshal. Other than that, they had been instructed not to open

that door. And she was doing that as the owner of the premises.

Mr. Plummer, in his argument to the jury tried to even say this: There is another exit out the side of the garage that they could have went out of. But that wasn't a designated fire exit. The back door had been a designated fire exit, and it had been closed off and sealed off from our clients being able to exit it.

The employee, who ran out of the house when the place was on fire because she was afraid, said that the first thing she did when she thought about trying to extradite these people from the property was that the back door was locked and she didn't have a key. She panicked and she ran out.

Additionally, Judge, I want to share with you the issue on the fire sprinkler system. Ms. Uduma instructed the employees how to go in and do these mock fire drills and put down on the reports that they were getting the people out within a two or three-minute time period, even though everybody else testified that wasn't correct in terms of how it practically happened. And we submitted to the jury that they were manipulating, based on Ms. Uduma's instructions, manipulating the time periods to show

that they could get the people out in less than three minutes so they wouldn't have to put the sprinklers systems in. And I submit, Judge, that by her being directly involved in terms of the fire safety system, the exit door, and what the employees should have done to try to get the people out in the event of a fire showed, and the jury ruled, that she maintained control over those aspects of the property. Therefore, they held her 40 percent liable for the verdict.

And I ask you, Judge, to not throw away the hard work that this jury did and the testimony that they heard and the hours of deliberation they did back there, painstakingly, and came up with this verdict. I ask you to submit it -- to sign it and to render it against Four J's and Ms. Uduma.

*MR. HOLMAN:* May I say one more thing, Your Honor?

*THE COURT:* Yes.

*MR. HOLMAN:* First of all, there is not a single case in Texas jurisprudence that holds that in order to prove that you are a health care provider you are required to present a license or a certification, not a single case that does that. We do not believe that it is our burden to have to prove

that since the undisputed evidence establishes that we are an HCS program. And under the law an HCS program qualifies as a health care institution, under the statute, which is a health care provider.

Now, if the Court believes or is troubled by whether we are properly certified as an HCS program, despite all the evidence that we have presented and was presented undisputed in the record that we are an HCS program, then we would ask the Court to reopen the evidence to allow us to present our certification.

Mr. Post said he didn't think we had it. We have it. We have certification, and it's certified by the State of Texas. And the certification continues until terminated, and it is good as gold. We can present that evidence under a Rule 270 motion to reopen the evidence, which is subject to this Court's discretion.

I am sure that this Court does not want to make a mistake on a matter of law like this when it's involving so many millions of dollars.

*MR. POST:* Your Honor, I will speak only to that one point.

We strenuously object to any effort to reopen the record.

Rule 270 explicitly says, "... provided that in a jury case no evidence on a controversial matter shall be received after the verdict of the jury."

Counsel has essentially admitted they did not prove their defense at trial. And they cannot prove it today.

*MR. HOLMAN:* Let me respond to that point.

Whether one is a health care provider or not is not a jury issue.

*THE COURT:* Can you list for me any other affirmative defenses that are questions of law as opposed to questions of fact?

*MR. HOLMAN:* Well, whether it's a health care liability claim is a question of law.

*THE COURT:* I said "other." It's clear what your argument is, that it's an affirmative defense; but it's a question of law, not a question of fact. Can you list for me any other affirmative defenses that are questions of law and not questions of fact?

*MR. HOLMAN:* Whether the Tort Claims Act applies.

*THE COURT:* I'm sorry. That's an

affirmative defense?

*MR. HOLMAN:* It would be an affirmative defense. They would have to allege the Tort Claims Act or it would be waived.

*THE COURT:* All right. What else?

*MR. HOLMAN:* I'm thinking of other statutory remedies. Whether, whether the -- whether damages should be capped under the punitive damages statute. That wouldn't be an affirmative defense; but it would be as a matter of law whether damages should be capped, and you would apply the statutory remedy. And that wouldn't be a jury issue either.

*THE COURT:* All right. Any further response, Mr. Sparks?

*MR. SPARKS:* Briefly.

Mr. Holman indicated that there are cases -- Brown versus Villegas was cited, 202 S.W.3d 803. That talks about a doctor who came up under a provision of health care provider. But there was a LabCorp that was alleging that they also came up under that same protection because they had done business with the doctor, and the Court ruled that they had to prove it. They didn't have a license. They didn't have a certification. They denied Chapter 74

protections.

*THE COURT:* What was the name of that case?

*MR. SPARKS:* Brown versus Villegas.

*THE COURT:* What is the citation for that?

*MR. SPARKS:* 202 S.W.3d 803, 2006, out of San Antonio.

*THE COURT:* It was a San Antonio court of appeals?

*MR. SPARKS:* Yes, sir.

*MR. POST:* Your Honor, I will just add to that, for the Court's benefit. I think the leading case under Article 4590i that sets out the burden on this issue was Webster versus Johnson, which was a First District case from 1987. It's at 737 S.W.2d 884. And it held that applying the Article 4590i caps is an affirmative defense that has to be asserted by the defendant, and every affirmative defense where there is any factual component has to be proved by the party that has the burden of proof.

*MR. HOLMAN:* What was the cite on that?

*MR. POST:* It is 737 S.W.2d 884.

Any questions, Your Honor?

*THE COURT:* Just a moment.

Brown versus Villegas, Page 806 of the opinion, quote, "With regard to the assertion that LabCorp meets the definition of a health care provider because it is certified by the State of Texas, LabCorp, as the movant, had the burden to present evidence to establish that it is certified by the State of Texas." Cited: Cf. City of Van Alstyne, a Dallas court case that -- and they describe the City of Van Alstyne case as saying, "Noting burden of proof in a motion to dismiss for lack of jurisdiction is on movant."

In Brown versus Villegas, the Court goes on to state, "Without that evidence, we cannot determine whether LabCorp is a health care provider such that the MLIIA is applicable to Brown's claim against LabCorp."

All right. First of all, I want to thank everyone. This has been a very intense and very, very well argued set of issues on this. I know there is a lot at stake, and I have taken it very seriously. And I think all clients have been well served by the arguments of the counsel and the efforts that counsel have made on this matter. So, first of all, I want to thank everyone for their efforts on this.

I am persuaded to grant the motion for entry of judgment. I am not persuaded to apply the caps. I am not persuaded to exclude Ms. Uduma from liability.

Do you have a judgment for me?

*MR. THWEATT:* I do, Your Honor.

*(Referenced document tendered to the Court and counsel.)*

*MR. HOLMAN:* Your Honor, prior to signing the judgment, would you entertain a motion to reopen the evidence to allow us to present the certification, if that is the issue?

*THE COURT:* Under 270?

*MR. HOLMAN:* Yes, sir.

*THE COURT:* I will deny that motion for the reasons, the arguments Mr. Post made, the arguments -- I mean, y'all substantively already argued it anyway, so...

Also, for purposes of the record, I am denying the request to take judicial notice of those Web sites.

*MR. HOLMAN:* Understood.

*THE COURT:* All right. Do you need me to sign an order?

*MR. HOLMAN:* Your Honor, I will present

you with an order on that.

*THE COURT:* All right. Well, you have got it on the record.

*MR. HOLMAN:* Yes.

I would like to, just for the purposes of the record, present the Court with the certification from the --

*THE COURT:* Well, I -- you can make a bill if you would like.

*MR. HOLMAN:* That's what I am doing.

*THE COURT:* Let me finish with this. Since I have denied your request to reopen, let me finish with this; and then we will take up your bill here in a moment.

I am going to -- by the way, it's my standard practice of not specifying what the court costs are in a judgment since the clerk's office generates a tax bill for the court costs. So I'm going to cross that part out of the judgment.

*MR. THWEATT:* Yes, Your Honor.

*THE COURT:* It's not that -- I am awarding court costs to the Plaintiff. I just defer to the clerk's office to calculate the bill.

Now, you all have double-checked your calculations here and made sure that you have applied

the right fractions to the jury verdict, right?

*MR. THWEATT:* Yes, Your Honor.

*THE COURT:* All right. Before I sign this, Mr. Sparks, you have seen the proposed final judgment Mr. Thweatt just handed to me?

*MR. SPARKS:* I have, Judge.

*THE COURT:* And you agree with entry of it as he requested?

*MR. SPARKS:* I do, Judge.

*THE COURT:* Okay. Again, as I said to Mr. Thweatt, I'm just crossing out the number for the court costs that are listed in here, not because I'm excluding that, but it's simply because I defer to the clerk's office to generate the tax bill. I am awarding court costs. It's just up to them to calculate the amount.

*MR. SPARKS:* Yes, Your Honor. Thank you.

*THE COURT:* All right. I have signed the final judgment.

Mr. Holman, you wanted to make a bill real quick?

*MR. HOLMAN:* Actually, Your Honor, I will do that later. I will present the Court with it later. I have looked at the document; and although

it's a valid document, I want to get it in admissible form to present it before the Court.

*THE COURT:* All right. Is there anything else we need to address in this matter?

*MR. POST:* No, Your Honor.

*MR. HOLMAN:* No, Your Honor.

*THE COURT:* Everybody has got everything on the record, every argument and every piece of evidence that they think I should be considering or at least gotten rulings on every piece of evidence?

Can I hear an oral answer to that, please?

*MR. HOLMAN:* Yes, Your Honor.

MR. PLUMMER: Subject to the, the bill.

*THE COURT:* You are going to make a bill on the motion to reopen under Rule 270; I understand that.

MR. PLUMMER: Yes, Judge.

*MR. HOLMAN:* We want to present it in admissible form as to the certification that Four J's was operating under during the time in question.

*THE COURT:* Are you going to do that by way of written motion?

*MR. HOLMAN:* Yes, Your Honor.

*THE COURT:* Okay. So I don't need to

schedule another oral hearing on the record for that, do I?

*MR. HOLMAN:* I don't think so.

*THE COURT:* All right.

*MR. HOLMAN:* We will be filing, of course, postjudgment motions; and we will have to have an oral hearing on those. But as far as the motion dealing with the certification, no.

*THE COURT:* When you file your motion for new trial or whatever motion, go ahead and get a hearing date. Don't wait. Because basically Quee's instructions are that whenever a motion for new trial comes in, she brings it to me; and I set it for hearing regardless. So go ahead and get your hearing because then, you know, we have a little more flexibility as to the particular date you get.

All right. Anything else, Mr. Thweatt?

*MR. THWEATT:* No, Your Honor.

*THE COURT:* Again, very well argued, a lot of really interesting issues. I know y'all have a strong interest on how this will be taken up upstairs. I have a strong intellectual interest, at least, in how they are going to resolve some of these issues. So I say good luck to both sides.

All right. Y'all are excused. Have

a good weekend.

*(Conclusion of proceedings.)*

THE STATE OF TEXAS

COUNTY OF HARRIS

I, Kathleen Keese, Official Court Reporter in and for the 269th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $______________ and was paid by

__________________________________________________.

WITNESS MY OFFICIAL HAND this the 15th day of February, 2012.

/s/ Kathleen Keese
______________________________

KATHLEEN KEESE
TEXAS CSR NO. 758
Expiration: 12/31/12
Official Court Reporter
269th District Court
201 Caroline, 13th Floor
Houston, Texas 77002

# TAB B

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| **PATTI J. WAGNER, AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT**<br>**Plaintiff,** | § | **IN THE DISTRICT COURT** |
| **And** | § | |
| **WYLETTE TAYLOR AS GUARDIAN OF DERRICK JAMES, AN INCAPACITATED ADULT**<br>**Intervenor,** | § | |
| **VS.** | § | **OF HARRIS COUNTY, TEXAS** |
| **FOUR J'S COMMUNITY LIVING CENTER, INC., and ANTHONIA UDUMA**<br>**Defendants.** | § | **269th JUDICIAL DISTRICT** |

## AMENDED FINAL JUDGMENT

On October 17, 2011, this case was called for trial. Plaintiff, Patti J. Wagner, as Guardian of Jenny Ann Wagner, an Incapacitated Adult, appeared in person and through her attorneys announced ready for trial. Intervenor, Wylette Taylor as Guardian of Derrick James, and Incapacitated Adult, appeared in person and through his attorneys and announced ready for trial. Defendant, Four J's Community Living Center, Inc. appeared via its corporate representative and through its attorneys announced ready for trial. Defendant Anthonia Uduma appeared and through her attorneys announced ready for trial.

After a jury was impaneled and sworn, it heard the evidence and arguments of counsel. In response to the jury charge, the jury made findings that the Court received, filed and entered as record on October 21, 2011. The questions submitted to the jury and the jury's findings are attached as Exhibit A and incorporated by reference. The jury found Defendant Four J's Community Living

Center, Inc. 60% responsible for the occurrence, and found Defendant Anthonia Uduma 40% responsible for the occurrence.

The Court hereby renders judgment for Plaintiff and Intervenor.

The Court orders that Plaintiff recover damages from Anthonia Uduma in the amount of $3,236,640, plus prejudgment interest of $169,127.28 (calculated on past damage awards of $2,236,640 times the annual rate of 5% for an accrual period of 552 days (Anthonia Uduma was sued by Plaintiff on Sept 4, 2010)), court costs, and post-judgment interest at the annual rate of 5% until paid, together with all costs of court, including costs incurred in enforcement and collection, in this behalf expended

The Court orders that, pursuant to Chapter 33 of the Texas Civil Practice & Remedies Code, Plaintiff recover damages from the joint and severally liable Defendant, Four J's Community Living Center, Inc., in the sum of $8,091,600, plus prejudgment interest of $756,012.39 (calculated on past damage awards of $5,591,600 times the annual rate of 5% for an accrual period of 987 days (Four J's was sued by Plaintiff on June 26, 2009)), court costs, and postjudgment interest at the annual rate of 5% until paid, together with all costs of court, including costs incurred in enforcement and collection, in this behalf expended.

The Court orders that Intervenor recover damages from Defendant Anthonia Uduma in the sum of $2,404,040, plus prejudgment interest of $182,114.26 (calculated by multiplying the principal amount of $2,404,040 times the annual rate of 5% times an accrual period of 553 days (Anthonia Uduma was sued by Intervenor on Sept. 3, 2010)), court costs, and post-judgment interest at the annual rate of 5% until paid, together with all costs of court, including costs incurred in

enforcement and collection, in this behalf expended.

The Court orders that, pursuant to Chapter 33 of the Texas Civil Practice & Remedies Code, Intervenor recover damages from the joint and severally liable Defendant, Four J's Community Living Center, Inc., in the sum of $6,010,100, plus prejudgment interest of $455,285.66 (calculated by multiplying the principal amount of $6,010,100 times the annual rate of 5% times an accrual period of 553 days (Four J's was sued by Intervenor on Sept. 3, 2010)), court costs, and post-judgment interest at the annual rate of 5% until paid, together with all costs of court, including costs incurred in enforcement and collection, in this behalf expended.

This judgment is final, disposes of all claims and parties, and is appealable.

The Court orders execution to issue for this Judgment.

SIGNED on ____________________, 2012.

______________________________
PRESIDING JUDGE

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| **WYLETTE TAYLOR, AS GUARDIAN OF DERRICK LEON JAMES,** ***an Incapacitated Adult*** **Intervener,** | § § § § | **IN THE DISTRICT COURT** |
| **V.** | § § § § | **269TH JUDICIAL DISTRICT** |
| **FOUR J'S COMMUNITY LIVING CENTER, INC., AND ANTHONIA UDUMA Defendants.** | § § § § | **HARRIS COUNTY, TEXAS** |

**INTERVENOR'S BRIEF ON DEFENDANT'S CHALLENGE TO THE FACTUAL SUFFICIENCY OF THE JURY VERDICT THAT ESPERANZA ARZOLA WAS NOT NEGLIGENT**

COMES NOW, Intervenor, by and through his attorney of record, SHELTON SPARKS, who files this, their Intervenor's Brief on Defendant's Challenge to the Factual Sufficiency of the Jury Verdict that Esperanza Arzola was not Negligent, and shows the court the following.

## A. INTRODUCTION

FOUR J'S & AND ANTHONIA UDUMA have raised a factual sufficiency issue regarding the jury's verdict that found no negligence on ESPERANZA ARZOLA. Defendant complains that the jury's finding of no negligence for Esperanza Arzola is so against the weight and preponderance of the evidence as to be manifestly unjust. They contend Ms. Arzola intentionally used the lighter to start the fire that caused the injuries to Jenny Wagner and Tanya James. However, it is reasonable and probable, as well as supported by the evidence, that the refusal to find any negligence on Esperanza's part by the jury, is based on the fact that the jury considered that Four J's and Anthonia Uduma were the proximate causes of the Tanya James and

Jenny Wagner's injuries namely due to the following reasons: (1) Four J's was responsible for providing Esperanza access to the lighter; (2) Anthonia Uduma failed to ensure residents of the home had adequate egress to exit the property in the event of an emergency by dead-bolting the back door and not providing a key; (3) Four J's failed to report accurate evacuations times to avoid installing a sprinkler system; and (4) Four J's failed to lead Tanya James out of the home by hand in accordance with Tanya's emergency evacuation plan.

## B. FACTS OF THE CASE

**1.** On September 4, 2008, Ms. Amuche Udemezue, an employee of Four J's was driven from the adult day facility in a van owned by Four J's with the four (4) residents to 16355 Berretta Court. Esperanza Arzola, Elisha Campbell, Tanya James, and Jenny Wagner.

**2.** As was her custom, when she arrived at the Berretta Court property, she started to get the woman situated for their evening meal, medication, and baths. After preparing their food, feeding them, and getting them prepared for bed, Esperanza Arzola started acting out by not following instructions and refusing to cooperate.

**3.** Amuche Udemezue alleged Ms. Arzola became combative and attempted to kick the window, thereby causing an injury to herself: A laceration to her foot.

**4.** As she had been trained to do, Ms. Udemezue called a nurse and reported the incident who informed her to put some hydrogen peroxide on it. Initially, Ms. Arzola resisted and demanded to go to the hospital, however, she later relented and accepted the hydrogen peroxide.

**5.** As Ms. Udemezue continued with her duties of preparing the lunch for the ladies to take to the day-hab center the next day, she stated Ms. Arzola had calmed herself and came to

her and apologized, saying she was sorry for acting out. Feeling relieved that Ms. Arzola had calmed herself and had gone into her room and possibly to bed, Ms. Udemezue continued with her next day preparations.

**6.** Soon thereafter, Ms. Udemezue said she heard a loud bang outside the front of the house and went to the front door to investigate.

**7.** When she opened the door, she saw the front of the house and the inside bedroom of Esperanza Arzola in a blaze and she ran back in, went to the rear bedroom woke Elisha Campbell up and told her to run out the front exit. Immediately thereafter, she went down the hallway towards the bedroom of Esperanza Arzola, Jenny Wagner, and Tanya James. Esperanza was standing in the hallway and she told her to leave the area because of the fire, and she directed her to the front exit.

**8.** When Ms. Udemezue returned to the hallway to attempt to get Jenny Wagner and Tonya James, she realized the back rear, designated fire exit had a dead bolt lock on it and she did not have a key. Ms. Udemezue, rather than attempting to get Jenny Wagner and Tanya James out of the house, evacuated herself and left both Jenny Wagner and Tanya James in the burning home.

**9.** The property although designated as a four (4) person group home had no over-head sprinkler system as required because Defendant had been submitting documentation that in the event of a fire, all four residents could be safely be evacuated within three (3) minutes. Ms. Udemezue stated the time on the fire drill reports were incorrect and had been staged by her supervisor who told her to sign the document after she put the times on it showing they had completed the drill within three (3) minutes.

000412

**10.** When the fire department and EMS arrived, they found Jenny Wagner in her room with multiple burns to her body. They found Tanya James slumped over into the bathtub with multiple second and third degree burns over her body and barely breathing.

**11.** Jenny Wagner is a paraplegic and could not have gotten out of her bed without assistance to escape the fire and Tanya James was mentally retarded and could not understand the danger of the fire to escape without assistance of someone leading her hand over hand.

**12.** Ms. Udemezue said she fainted and when she came to, she was in an ambulance, but thought she heard Ms. Arzola acknowledge that she lit the fire with a cigarette lighter.

## C. ANALYSIS

In Defendant's Answer, they designated Esperanza Arzola as a responsible third party who is alleged to have caused or contributed to the injuries of Tanya James and Jenny Wagner by starting the fire at 16355 Berretta Court on September 4, 2008. Therefore, the Defendant's had the burden of proof to establish this defense. Defendant's now challenge the sufficiency of the jury's verdict that found that Esperanza's actions were not the sole cause of Tanya James' and Jenny Wagner's injuries.

When reviewing a factual sufficiency challenge, the Court must "weigh and examine all the evidence, and sustain the challenge only if the evidence is so weak as to render the jury's finding clearly wrong and manifestly unjust." *Cain v. Bain* 709 S.W.2d 175, 176 (Tex. 1986), *Bay, Inc. v. Ramos* 139 S.W.3d 322, 329 (Tex. App-San Antonio 2004 pet. denied.*), Reliant Energy Services, Inc. v. Cotton Valley Compression, LLC,* 01-08-00148-CV (TXCA1).

In determining whether or not a jury's finding is clearly wrong or unjust, the Courts give great deference to the jury's findings, noting that "it is well-established that the jury weighs the evidence, assesses the credibility of witnesses, and resolves conflicts and inconsistencies."

*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Therefore, the Courts will not "substitute their opinion for that of the trier of fact merely because they might have reached a different conclusion." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988); *Klekar v. S. Pac. Transp. Co.*, 874 S.W.2d 818, 827 (Tex. App-Houston; [1st Dist.] 1994, writ denied).

### D. <u>SUFFICIENCY OF EVIDENCE</u>

In the present case, the jury heard testimony that Esperanza started the fire at 16355 Berretta Court on September 4, 2008. However, they jury also heard evidence that (1) Four J's was responsible for providing Esperanza access to the lighter; (2) Anthonia Uduma failed to ensure residents of the home had adequate egress to exit the property in the event of an emergency by dead-bolting the back door and not providing a key; (3) Four J's failed to report accurate evacuations times to avoid installing a sprinkler system; and (4) Four J's failed to lead Tanya James out of the home by hand in accordance with Tanya's emergency evacuation plan.

#### 1. <u>Four J's was responsible for providing Esperanza access to the lighter</u>

In the trial, Anthonia Uduma testified that the lighter Esperanza used to start the fire was provided to her by Four J's. Specifically, Anthonia Uduma testified:

**Q.** Okay. So staff buys cigarettes. What about when they want to smoke? How is that handled?

**A.** They have cigarette breaks where they have a -- apparently there is a detailed process how it goes. But I know they go to the day-hab director, and that day-hab director or the trainers will pass the cigarette. They will all be outside and then they will smoke. After that 15-minute cigarette break, they will take the lighters and everyone will go back in inside. I can't really tell you the protocol.

000414

Q. Okay. But the protocol is that they are not supposed to have lighters and matches and leave the with grounds with that; is that correct?

A. That's correct.

Q. You have heard testimony, I believe, that Arzola hid her lighter in her bra. Do you remember that testimony?

A. Yes, sir.

Q. And that's the one she used to start the fire?

A. Yes, sir.

4 RR 144.

Given Ms. Uduma's testimony regarding Four J's negligence in allowing Esperanza access to the same lighter Esperanza used to start the fire; the jury could have concluded this amounted to the proximate cause of Jenny Wagner's and Tanya James' injuries.

2. **Anthonia Uduma failed to ensure residents of the home had adequate egress to exit the property in the event of an emergency by dead bolting the back door and not providing a key**

Four J's knew the back door fire exit had a dead bolt lock on it, which needed a key to open from the inside. Per conflicting testimony at trial, the CEO, Anthonia Uduma, said the key was always kept in a kitchen drawer, her supervisor Inya Ogbonne said the key was kept on a nail hanging above the door. The staff, Amuche Udemezue and Irondi Chiaka stated there was no key that they had exit through the front door during emergency evacuations.

Given the conflicting testimony, the jury weighed the credibility of each witness, and most likely concluded there was no back door key to the dead bolted back door. Coming to this

conclusion would have certainly weighed heavily on the jury's decision to find the premises defect of the back door being dead bolted with no key, was the proximate cause of Jenny Wagner's and Tanya James' injuries; especially since Amuche Udemezue testified that she panicked *because of* the lack of egress: "I panicked because I, I got just one exit. I would have tried my best if I had another door in that house." 3 RR 215.

Also, in addition to the locked back door, Amuche Udemezue testified that the garage door was broken and could not be used to escape. 3 RR 215. She had only one way to get four people out of the house. 3 RR 215.

### 3. **Four J's failed to report accurate evacuations times to avoid installing a sprinkler system**

During the trial, Ms. Uduma testified that the 16355 Berretta Court property was not required to have a sprinkler system. However, the property although designated as a four (4) person group home had no over-head sprinkler system as required because the Defendants had been submitting documentation that in the event of a fire, all four residents could be safely be evacuated within three (3) minutes. Ms. Udemezue stated the time on the fire drill reports were incorrect and had been staged by her supervisor who told her to sign the document after she put the times on it showing they had completed the drill within three (3) minutes.

Again, due to the Defendants' failure to ensure the proper safety measures were in place to protect the residents, the jury could have also construed this as a proximate cause that led to Jenny Wagner's and Tanya James' injuries.

000416

**4. Four J's failed to lead Tanya James out of the home by hand in accordance with Tanya's emergency evacuation plan**

The jury heard testimony that there were specific instructions regarding how to remove Tanya James and Jenny Wagner in the event of a fire. However, as previously indicated, Ms. Udemezue testified that instead of removing Tanya James and Jenny Wagner from the home in accordance with their emergency evacuation plans, she "panicked."

Four J's failure to conduct proper fire drills, and provide Ms. Udemezue with a key to the back dead-bolted door, could have reasonably resulted in the injuries to Jenny Wagner and death to Tanya James.

## E. CONCLUSION

It is clear for a variety of reasons, given the gravity of Four J's and Anthonia Uduma's negligence, that after weighing all the evidence, it is quite plausible that the jury would find that Four J's and Anthonia Uduma were the only proximate causes of Tanya James' and Jenny Wagner's injuries, thereby superseding the fact that Esperanza started the fire. Therefore, it is incorrect for the Defendants to state that the injuries to Jenny Wagner and death of Tanya James were solely caused by Esperanza Arzola.

The facts clearly support the jury's verdict in this case. Therefore the jury's refusal to find that Tanya James' and Jenny Wagner's injuries were solely caused by Esperanza, is not so against the overwhelming weight of the preponderance of the evidence as to be manifestly wrong and unjust, and is factually sufficient to support the Judgment.

## F. PRAYER

**FOR THESE REASONS,** Intervenor asks the Court to Deny the Defendant's Motion for Judgment Notwithstanding the Verdict or in the alternative, their Motion for New Trial.

Respectfully submitted,
Shelton Sparks & Associates L.L.C.

By: /s/ Shelton Sparks
SHELTON SPARKS
Texas Bar No. 06507160
Tiffany Harvey
Texas Bar No. 24067343
706 Cordell Street
Houston, Texas 77009
Telephone (713) 862-5533
Facsimile (713) 862-4913
Attorneys for Intervenor

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY THAT ON March 16, 2012, a true and correct copy of the forgoing document was served on the following via facsimile, U.S. mail, and/or electronic mail:

Plummer & Kuykendall – James C. Plummer
4203 Montrose Boulevard, Suite 270
Houston, Texas 77006
Facsimile: 713-522-3605
Phone: 713-522-2887

Beck, Redden & Secrest, LLP – Russell S. Post
1221 McKinney, Ste. 4500
Houston, Texas 77010
Facsimile: 713-951-3720
Phone: 713-951-3700

Terry & Thweatt, P.C. – Lee Thweatt
One Greenway Plaza, Ste. 100
Houston, Texas 77046
Facsimile: 713-600-4706
Phone: 713-600-4710

The Holman Law Firm, P.C. – David W. Holman
24 Greenway Plaza, Ste. 2000
Houston, Texas 77046
Facsimile: 713-400-4841
Phone: 713-400-4840

**/s/ Shelton Sparks**
**SHELTON SPARKS**

Filed 12 March 16 P3:25
Chris Daniel - District Clerk
Harris County
ED101J016781870
By: irma medina

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| **PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT,** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiff,** | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| **FOUR J's COMMUNITY LIVING CENTER, INC.; ANTHONIA UDUMA; and GODFREY UDUMA,** | § | |
| **Defendants.** | § | **269TH JUDICIAL DISTRICT** |

## PLAINTIFF'S BRIEF ON JURY'S FAILURE TO FIND NEGLIGENCE IN QUESTION 1

Plaintiff Patti J. Wagner ("Ms. Wagner"), appearing as guardian of Jenny Ann Wagner ("Jenny Ann"), files this brief to respond to a specific ground for new trial.

### FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT

Defendants have moved for a new trial on a variety of grounds, including that the jury's failure to find Ms. Arzola negligent is against the great weight and preponderance of the evidence.[1] Their argument should be rejected because it ignores all the evidence that supports the jury's verdict, including evidence that Four J's acts of negligence were the only proximate causes of Ms. Wagner's injuries for four independent reasons: (1) Four J's bore responsibility for Ms. Arzola's access to the lighter; (2) Four J's knew that Ms. Arzola was seriously troubled and needed extra supervision; (3) Four J's failed to remove Ms. Wagner first, according to fire escape plans; and (4) Four J's bore responsibility for the lack of adequate egress. For any of these reasons, the motion should be denied.

[1] Defendants characterize the jury's answer regarding Ms. Arzola as a "finding of no negligence," which is technically incorrect. Instead, the jury "failed to find" Ms. Arzola negligent when it answered "No" to Question 1.c. In other words, Defendants failed to carry their burden to secure an affirmative finding on their defense.

## ARGUMENT

**I. The Standard of Review Credits The Evidence In Support of the Verdict.**

Defendants designated Ms. Arzola as a responsible third party and had the burden of proving her negligent. When a party challenges the factual sufficiency of an adverse jury finding (or a "non-finding") on an issue where it had the burden of proof at trial, a reviewing court weighs all of the evidence, both for and against the issue, setting aside the verdict only if the evidence supporting it is so weak or the finding is so contrary to the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 647-52 (Tex. 1988) (courts apply same standard of review to "non-findings").

The general rule is that a jury verdict is entitled to great deference by the reviewing court unless the record reflects that the jury is motivated by passion, prejudice or something other than conscientious conviction. *See Lehmann v. Wieghat*, 917 S.W.2d 379, 385 (Tex. App.—Houston [14th Dist.] 1996, writ denied). The verdict cannot be set aside merely because this court would have weighed the evidence differently or reached another conclusion, but only if it is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. *Id.*

Trial courts are now required to "specify the reasons" for refusing to enter judgment on a jury's verdict and ordering a new trial. *In re Columbia Med. Ctr. Of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 215 (Tex. 2009). "The reasons identified should be clearly identified and reasonably specific." *Id.* Thus, as with the appellate courts, which must detail the evidence in support of and against a verdict, trial courts must give due respect to jury verdicts by demonstrating that they have fully credited the evidence supporting a verdict before granting a new trial.

## II. Determinations About Causation and Responsibility Are Squarely For the Jury.

In addition to using the correct standard of review, it is also important to be mindful of the jury's province to weigh evidence and make fact-findings about causation and responsibility. "The rule is well settled that the question of proximate causation is one of fact peculiarly within the province of the jury, and the jury finding on it will be set aside only in the most exceptional cases." *Glover v. City of Houston*, 590 S.W.2d 799, 801 (Tex. Civ. App.—Houston [14th Dist.] 1979, no writ) (citing *Enloe v. Barfield*, 422 S.W.2d 905 (Tex. 1967); *Pate v. Southern Pacific Transp. Co.*, 567 S.W.2d 805 (Tex. Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.)). "Moreover, whether a particular act of negligence is a cause in fact of an injury has been said to be a particularly apt question for jury determination." *Farley v. MM Cattle Co.*, 529 S.W.2d 51, 756 (Tex. 1975) (citing Prosser, LAW OF TORTS § 41 at 237 (4th ed. 1971)).

In determining which acts and omissions are a cause of an event, jurors are entitled to think of causation "'in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred.'" *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991) (quoting Restatement (Second) of Torts 431, comment a (1965)). Jurors may evaluate an array of potential causes and isolate the "true cause" of an injury. *See Parker v. Seligman & Latz, Inc.*, 429 S.W. 159, 162 (Tex. Civ. App.—Houston [14th Dist.] 1968, no writ) (holding jury's negative finding on proximate cause was supported by substantial evidence and should not have been disregarded by the trial court). These principles require a reviewing court to give the jury every bit of deference. The jury sits to make a collective judgment where reasonable minds can differ, and the evidence here offers sound reasons to determine that Ms. Arzola bore no responsibility for the injuries.

## III. The Evidence Supports the Verdict that Defendants' Actions Were The Only Proximate Causes of Ms. Wagner's Injuries.

Much of this trial involved evidence of the various ways Defendants were negligent. They were negligent in ways that would have prevented the fire entirely; they were negligent in reacting to the fire as it was occurring; and they were negligent in ways that would have allowed safe egress from the Berretta Court property. When dissecting this tragedy in hindsight, there are a number of reasons a jury could reasonably determine that Defendants should bear all of the responsibility for Ms. Wagner's injuries. Defendants were negligent from every vantage point, and the jury had discretion to determine their actions were the only proximate causes of the injuries.

Nevertheless, Defendants sought to shift responsibility to their mentally retarded client, Ms. Arzola, who started the fire. Defendants fail to acknowledge the evidence that:

(1) Four J's bore responsibility for Ms. Arzola's access to the lighter;

(2) Four J's knew that Ms. Arzola was seriously troubled and needed extra supervision;

(3) Four J's failed to remove Ms. Wagner first, according to fire escape plans; and

(4) Four J's bore responsibility for the lack of adequate egress.

Any one of these reasons is an independently sufficient basis to determine that Defendants had not proven, by a preponderance of the evidence, that Ms. Arzola's actions were a proximate cause of Ms. Wagner's injuries, and that Defendants actions were a sole or superseding cause. The first two reasons would have prevented the injuries by preventing the fire. The last two reasons would have prevented the injuries by removing the clients from the danger. *See Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 451-52 (Tex. 2005) (plurality opinion) (explaining that subsequent conduct by another party can interrupt or "supersede" a different actor's negligence). Either way, the jury could determine that Four J's was responsible.

Question No. 1 required the jury to make determinations about proximate cause and to determine whether any causal connection had been destroyed by a "new and independent cause." In light of the Court's Charge, we will summarize the evidence that the jury was entitled to credit.

**A. Four J's bore responsibility for Ms. Arzola's access to the lighter.**

The jury could have found Four J's entirely responsible for Ms. Wagner's injuries based on the simple fact that it negligently monitored Ms. Arzola's access to an inherently dangerous product. Four J's clients were not supposed to have access to matches and lighters at all. Ms. Uduma testified that Four J's had a rule on this point:

> *Q.* What about clients, either at the home or at the activity center, possessing lighters and matches? Did you have a rule on that?
>
> *A.* Yes, sir.
>
> *Q.* And what was that rule?
>
> *A.* That the clients cannot have lighter.
>
> *Q.* Okay. What about matches?
>
> *A.* They cannot -- nobody gives them matches.

4 RR 144; *see also* 4 RR 143.

Ms. Uduma also explained to the jury that they accommodated clients who needed access to a lighter by having the staff handle the lighter for them:

> *Q.* Were cigarette lighters prohibited in the Beretta Court Home?
>
> *A.* Yes. We do not allow cigarette lighters. It's not prohibited, but we do not allow the clients to hold a cigarette lighter.
>
> *Q.* It's not prohibited, but we don't allow the clients to have a cigarette lighter. Is that your testimony?
>
> *A.* That's my testimony.

*Q.* Are there circumstances where a client might be permitted to hold a cigarette lighter in the Beretta Court Home that you owned?

*A.* No.

*Q.* So doesn't that make it prohibited?

*A.* It doesn't because the staff or clients that smoke, we train the employees to hold the cigarette lighter so that they will be able to go outside and light it for them and then retain the cigarette lighter.

1 RR 61-62.

Given Ms. Arzola's behavioral history, it would have been particularly dangerous to permit Ms. Arzola to have access to a lighter. Ms. Uduma knew this and explained that they did not allow Ms. Arzola to "keep" a cigarette lighter:

*Q.* Dr. Lockwood never approved Ms. Arzola having a cigarette lighter in her personal possession, did he?

*A.* No, he did not. And that's why we did not allow her to keep a cigarette lighter.

1 RR 62.

Because the rules prohibited clients from keeping lighters, the jury could easily have concluded that it was Four J's negligence that was the sole cause of the fire. Ms. Uduma could not refute this possibility:

*Q.* If Esperanza Arzola had a cigarette lighter, Ms. Uduma, on the night of the fire, the only place she could have gotten it from is from Four J's; isn't that right?

*A.* I wasn't there, and you don't want me to say anything based on hearsay. So I was not there. I don't know.

*Q.* You don't want to speculate that your company may have been the one that provided Ms. Arzola with the incendiary device that killed someone and later caused injuries that we have seen pictures of that were lifelong permanent scar. You don't want to admit that, do you?

*A.* No, that's not right.

000424

4 RR 158-59. The jury also heard that no one ever patted down Ms. Arzola or checked her room, even though she was on medications for psychotic behavior and had previously attempted suicide. 3 RR 64-65.

Four J's negligently allowed an inherently dangerous product to find its way into the hands of a client with a child's mental capacity and a violent track record. By negligently monitoring its clients' access to lighters, Four J's violated its own rules and the common law standard of care. But for this negligence, there would never have been a fire.

While this negligent act is not the only "but for" cause of the injuries, the jury could have determined that Four J's was in so superior a position to prevent the fire that holding its mentally incompetent client responsible for her subsequent actions would be inherently unjust. The jury reasonably rejected Four J's attempt to escape or shift liability because a person under its care did something that Four J's was charged with preventing.

**B. Four J's knew Ms. Arzola was seriously troubled and needed extra supervision.**

Four J's was also negligent in failing to properly supervise Ms. Arzola. Four J's knew of her deeply disturbed nature—both historically and on the night of the fire, and Four J's failed to take any steps to ensure that Ms. Arzola was not a danger to herself or others.

First, the jury heard from a psychologist that Ms. Arzola was severely impaired mentally and had a troubled past, coupled with mental disorders such as schizophrenia and bipolar disorder. The problems afflicting Ms. Arzola were extensive. Dr. Gollaher testified:

- Ms. Arzola has an intelligence level in the retardation range (her IQ is 40, whereas the average U.S. population has an IQ ranging from 90-110). 3 RR 278.
- Because of her extremely low IQ, she cannot live on her own and will need assistance for the rest of her life. 3 RR 280.

000425

- She was sexually abused by her parents and placed into a group home at age 9. 3 RR 281.
- She has difficulties with impulse control and aggression. 3 RR 281.
- She has been diagnosed with schizophrenia and bipolar disorder. 3 RR 281.
- She admitted to using crack cocaine, marijuana and sharing needles. 3 RR 281-82.
- She prostituted herself for money or favors. 3 RR 282.
- She displayed bipolar, manic and psychotic behavior. 3 RR 283.
- On a psychological assessment test, she tested "seriously impaired." 3 RR 284-86.
- She had a history of hitting, attempting to stab others, and destroying property. 3 RR 287.
- Her behavioral problems are "severe," and her aggression had the potential to harm herself or others. 3 RR 287.
- She cannot correctly state the alphabet. 3 RR 287.
- She has attempted to commit suicide by cutting herself. 3 RR 287-88.

Additionally, Dr. Gollaher testified about Ms. Arzola's inability to understand her actions, the charges against her, and the criminal trial process:

- Ms. Arzola thought she had "murdered her home." 3 RR 288.
- She said she had tried to kill people because they are not nice to her, but she denied that anyone had died in the fire. 3 RR 289.
- In a second interview, she admitted to setting a fire but again denied that anyone had died. 3 RR 289.
- She was very confused about the concept of guilty. 3 RR 289.
- She did not understand the role of a judge or her defense lawyers. 3 RR 291.

For these reasons, Dr. Gollaher concluded that she was not competent to be criminally tried. 3 RR 298. The criminal judge granted Ms. Arzola's Motion Suggesting Incompetency, Mental Retardation and Insanity, *see* **Tab B** (PX 57), and ultimately determined she was not competent.

Given these issues, it is not surprising that the Four J's staff members who knew Ms. Arzola best were scared of her. Ms. Irondi testified:

> *Q.* During your experience with Ms. Esperanza Arzola, was she capable of hurting people?
>
> *A.* I think so, because I know she fought with one of the, one of the staff sometime, pulled her hair.
>
> *Q.* Did you feel safe with her in the house?
>
> *A.* No.
>
> *Q.* You did not?
>
> *A.* Not really.

3 RR 115-16.

Similarly, Ms. Udemezue testified that, around Ms. Arzola, she was "very scared":

> *Q.* And did you have a good relationship with Jenny also?
>
> *A.* I don't have problems. I don't know. She sings for me. She -- I don't know, I'm very, very close to all of them.
>
> *Q.* Did that also include Esperanza Arzola?
>
> *A.* Esperanza is, is -- she, she is something else. She acts up all the time. Maybe because of her health condition. So I'm not close to her. I distance myself from her. Whatever she say I should give her, I give her. That's it.
>
> *Q.* Now, you were -- was she ever aggressive toward you?
>
> *A.* Yeah, she was. Yeah, at times she is.
>
> *Q.* Were you afraid of her?
>
> *A.* I was very scared.

000427

*Q.* Why?

*A.* Well, the lady, all those ladies that were there before me, told me if -- I should be very, very careful of Esperanza and that she, she can do and do. Anything she wants in the house, I should give her. And I should be careful because she can beat me up, she can kill me here and nobody -- they told me all that. So I was scared of her. And also there was -- the, the lady that left before me, the one that had –

*MR. PLUMMER:* Objection, hearsay.

3 RR 167-68.

Four J's not only had direct experience with Ms. Arzola, but it also had a detailed Individual Service Plan, describing Ms. Arzola's history and her extensive problems and behavioral issues. *See* **Tab A** (PX 44). Critically, that Plan outlined a number of behaviors that required extra supervision to ensure everyone's safety:

<u>Behaviors:</u>

1. Esperanza is non-compliant most of the time.
2. Inappropriate behaviors observed were elopement, fighting with staff and consumers, destroying property, and verbally abusing staff and peers.
3. Esperanza has a history of illicit drug use, sexual promiscuity, sexual abuse, suicidal attempts, pica, mood swings and non compliance.
4. Esperanza participates in a behavior therapy program targeting deceleration of aggression, self injury, property destruction, and eloping

Given this history, Four J's employees knew to be especially vigilant with Ms. Arzola. They had heightened reason to be vigilant on the night of the fire, because Ms. Arzola had been acting out. 3 RR 176-78. First, she broke a window. 3 RR 176. The staff member, Ms. Udemezue, had to call "everybody", including Ms. Arzola's case manager. 3 RR 176. Then, while all this was going on, Ms. Arzola said she wanted to be taken to the hospital. 3 RR 178-79. Dismissing this sign, Ms. Udemezue told her that she would take her to the hospital tomorrow. 3 RR 178-79. Ms. Arzola then went to her room and closed her door. 3 RR 179-80. In this troubled state, she was all alone.

While Ms. Arzola was alone in her room with the door closed, Ms. Udemezue busied herself with the cooking and laundry. 3 RR 179 ("I was busy doing -- because I still have to cook the food that they will take to the day-hab. I still have to wash their clothings, you know. So I continue with what I was doing. I didn't know she went inside to plan."). Ms. Udemezue was not watching Ms. Arzola or aware of what she was getting into behind closed doors.

The jury could consider this evidence to reach a number of conclusions about what happened next. First, it could determine that Ms. Arzola should be held to a lower standard of care than Four J's, because she was not competent to understand her actions or their consequences. It was not foreseeable to Ms. Arzola that if she set a fire that someone could be hurt. Indeed, this point was not something she could understand even in *hindsight*. In two separate interviews with a psychologist, Ms. Arzola denied that anyone died on the night of the fire. 3 RR 288-89. This was not a self-defensive attempt to absolve herself of liability, as she confessed to setting a fire; she just was not competent to understand what happened next. *Id.* Based on the extensive evidence about Ms. Arzola's mental state, the jury could have determined that she was not negligent or that the consequences of her actions were not a proximate cause because they were not foreseeable.

The jury could also determine that Four J's was in the sole position of preventing Ms. Arzola from starting a fire, such that Four J's negligence trumped Ms. Arzola's actions. Four J's knew about (1) the long list of details making up Ms. Arzola's troubled past; (2) her psychotic mental state and behaviors; (3) her previous suicide attempts; (4) her medications; (5) her antisocial and aggressive behavior on September 4, 2008; (6) her denied request to be taken to the hospital; and (7) her decision to go to her room and close the door. A jury could reasonably determine that this body of knowledge made Four J's—and not its client—solely responsible.

**C. Four J's failed to remove Ms. Wagner first, according to fire escape plans.**

Even if the jury believed that Ms. Arzola was responsible for causing the *fire*, it could reasonably believe that Four J's subsequent actions were a superseding cause of the *injuries*. Perhaps the saddest piece of testimony was Ms. Udemezue's confession that she panicked instead of trying to remove her most helpless clients from the house:

*Q.* When did you first become aware of the fire?

*A.* I heard the big, the alarm, you know, go off. So I heard a big bang, boom, like somebody pulled iron or something. I heard a big bang, you know. Then my mind went outside. I said again, let me find out what's happening. I rushed outside. When I rushed outside, I saw -- because Esperanza's, Esperanza's window is very close to the front door. So I, I kind of saw the -- it was -- I mean, the fire was too much. I couldn't believe myself. And I rushed back. I came inside. I shut the door. I was confused. I didn't know what to do. I went to Elisha's room. When I went to Elisha's room, all of them they were sleeping. I started shaking her. Excuse me. I'm sorry. (Crying.) I shook her.

*Q.* After you shook her, what happened?

*A.* She got up. I took her outside. I took her outside. So when I took her outside, I came back. Already, Esperanza had already opened that door. So when I came back, I was, like, going towards Jenny and -- Jenny and Tanya's room. When I came back, there's -- I looked at that door. I started panicking when I looked at Esperanza door. And it dawned on me that all of us, because the fire is very close to Esperanza's -- the window is very close to Esperanza -- the front door. So when I saw that and I don't have the key, and my hands, my legs started shaking.

*Q.* So are you saying that you realized – are you saying that you realized that the back door, the exit, is that what you are talking about?

*A.* Yes.

*MR. PLUMMER:* Objection, leading.

*THE COURT:* Overruled on this one.

*Q.* (By Mr. Sparks) Are you saying that you realized the back door, the exit, was not an option for you to leave out of, had you been able to get Jenny and Tanya?

*A.* I got only one door there. If that fire gets to that front door, that's it. We are finished. The garage door is broken. That door and the garage, you know, one

small door. I don't have the key. I have access to just only one door. So when I looked at that thing and I said, if anything happens, me too, I will get burned. That was when my hands and legs started shaking. I became -- I started panic.

*Q.* What happened after that, ma'am?

*A.* Then I couldn't use the house phone because I was actually -- I was moving around. All the calls I made was on my Cricket phone. All the calls I made, all the calls I made was on my Cricket phone. Then I had to use the same Cricket phone. When I stepped -- it was then that I started calling Esperanza, Esperanza. Then we went out together. I was in front of that door, using my Cricket phone. Well, my hands were shaking, my legs. I was shouting and nobody -- because that place is a lonely place, you know. You hardly see people moving around. But I went to the neighbors. I was shouting. Nobody came out. Then I knew the time -- I runs across to the other side to -- was shouting so that people will come out and come and help me. But I can't remember. That was the last thing. Even when the, when the, the 911 came, I passed -- I think -- I didn't know anything again. I was -- I woke up in the ambulance.

*Q.* So you passed out?

*A.* Yeah.

3 RR 181-82.

Ms. Udemezue testified that she could have gotten Ms. Wagner out, except that she panicked:

*Q.* And as you had been instructed, you could have gone in Jenny's room, lifted her up, put her on, on the floor on, on a comforter or blanket, and drug her out, right? If she was real heavy, right? You could have done that.

*A.* I could have. I could have done that.

...

*Q.* So all the training in the world would not have helped you in this situation because you panicked; is that right?

...[overruled objection and question read back]

*A.* Yes. ...

3 RR 213-15; *see also* 3 RR 248-49 (fire extinguisher was not used).

Had Ms. Udemezue had the wherewithal to follow the rules, she would have removed Ms. Wagner first:

*Q.* If Jenny is not the first person removed from the home, that means that Four J's rules were not followed, right?

*A.* Correct.

*Q.* That means one of Four J's employees didn't do their job, right?

*A.* Correct.

*Q.* The standard of care, I think you are telling us, requires that Jenny be removed first, right?

*A.* Correct.

4 RR 39.

This evidence easily serves as a basis for the jury to determine that Ms. Wagner could have safely escaped the fire if Four J's had acted reasonably in evacuating its clients. Had Four J's acted according to the standard of care, this would be a property damage case. It was Four J's negligence that turned this case into one for wrongful death and personal injuries.

This is no minor point, as the jury was specifically asked about "negligence, if any, [that] proximately cause[d] the injuries in question." Court's Charge, Question 1. The jury might have determined that Ms. Arzola caused the fire, but that only Four J's negligence caused the injuries. The Pattern Jury Charges note that some cases arise in factual settings where there is a meaningful distinction between causing an "occurrence" and causing an "injury," and this is such a case. *See, e.g.*, Texas Pattern Jury Charge 4.1 comment ("Use of 'occurrence' or 'injury'"). The jury was well within its discretion to determine from the evidence that Ms. Arzola did not proximately cause "the injuries in question."

000432

Additionally, the Court's Charge instructed the jury that it could consider whether a cause was a "new and independent cause," which "destroys the causal connection" and "thereby becomes the immediate cause of such occurrence." A new and independent cause supersedes prior causes and relieves the prior actor of liability. *See Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450-51 (Tex. 2006) (plurality opinion). The instruction's purpose is "to advise the jurors, in the appropriate case, that they do not have to place blame on a [particular actor]" if the true cause for the accident lies elsewhere. *Dillard v. Texas Elec. Co-op*, 157 S.W.3d 429, 432 (citing *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995)).

Here, the jury could reasonably determine that Four J's negligence in failing to remove Ms. Wagner first according to its fire safety plans cut off any negligence in setting the fire. This conclusion flows logically from an instruction that tells the jury that one cause can "destroy the causal connection" of another cause and "become the immediate cause." *See* Court's Charge, Question No. 1. The jury could rely on the new and independent cause instruction to reach a common sense conclusion—using their lay intuition about causation. *See Dillard*, 157 S.W.3d at 433 (quoting *Galveston, H. & S.A. Ry. v. Washington*, 94 Tex. 510, 63 S.W. 534, 538 (1901)) ("We must look at the court's charge as practical experience teaches that a jury, untrained in the law, would view it[.]'"). The instruction was agreed to by all parties, and it dovetailed perfectly with the evidence of Four J's subsequent negligence. The jury's verdict is well supported.

**D. Four J's bore responsibility for the lack of adequate egress.**

Finally, the evidence about the lack of adequate egress gave the jury another basis to determine that Four J's negligence was a superseding cause of the injuries. Evidence about the lack of egress permeated the trial. It is succinctly summarized by Ms. Wagner's liability expert, who concluded the locked back door was a breach of the standard of care:

*Q.* In a residential group home facility, such as the one we saw at Beretta Court, is there an industry standard of care with relation to fire exits, how accessible those exits should be in the event of a fire?

*A.* All means of egress should be clear of obstacles, to include a locked door. But should be even clear of obstacles in the way. Even a chair in front of them is not permitted.

*Q.* And would a deadbolt lock that requires key access in the event of an emergency, a fire, is that something that would meet the standard of care in your industry in a residential group home?

*A.* The only way it would meet the standard of care is if all residents in the home had access to the key and that they could mentally and physically be able to open up the door with the key. That would be acceptable.

*Q.* And you know, certainly, from Jenny's Wagner's condition that she never could have met that criteria in the Beretta Court Home.

*A.* No.

3 RR 247-48.

Ms. Udumezue testified that she panicked *because of* the lack of egress: "I panicked because I, I got just one exit. I would have tried my best if I had another door in that house." 3 RR 215. In addition to the locked back door, she testified that the garage door was broken and could not be used to escape. 3 RR 215. She had only one way to get four mentally disabled people out of the house. 3 RR 215.

Just as with Ms. Udumezue panicking, the lack of egress was another reason the jury could have determined that Four J's negligence was a superseding cause of the injuries. Had Four J's not been independently negligent in maintaining a house with multiple incapacitated residents and only one way out, the residents might have all been safely removed. Once again, the jury could reasonably believe that Ms. Arzola's actions only caused the fire—not the injuries.

000434

The jury had substantial evidence to consider in making these determinations. Its verdict can be explained with a number of reasons, any one of which is a sufficient basis to deny the motion for new trial. In these kinds of cases, jurors need not agree on every detail or reason a party is negligent, so long as they agree on the legally relevant result. *See Dillard*, 157 S.W.3d at 434. Here, where the jury had at least four separate bases to determine that Four J's negligence was a sole or superseding cause of the injuries, its verdict should be left intact.

**CONCLUSION & PRAYER**

Plaintiff Patti J. Wagner respectfully prays that this Court deny Defendants' motion for new trial. Plaintiff respectfully requests any and all additional relief to which she may be entitled.

Respectfully submitted,

BECK, REDDEN & SECREST, L.L.P.

By: */s/ Russell S. Post*
Russell Post
State Bar. No. 00797258
Constance H. Pfeiffer
State Bar No. 24046627
1221 McKinney, Suite 4500
Houston, TX 77010-2010
(713) 951-3700
(713) 951-3720 (Fax)

L. Lee Thweatt
State Bar No. 24008160
Joseph D. Terry
State Bar No. 24013618
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, TX 77046-0102
(713) 600-4710
(713) 600-4706 (Fax)

**ATTORNEYS FOR PLAINTIFF PATTI J. WAGNER, AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT**

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2012, a true and correct copy of the foregoing Plaintiff's Brief on Jury's Failure to Find Negligence in Question 1 was properly forwarded to the following counsel of record in accordance with the Texas Rules of Civil Procedure through the Texas.gov electronic filing system or by e-file or fax addressed as follows:

James C. Plummer
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Ste. 270
Houston, TX 77006
(713) 522-3605 – Fax

David W. Holman
THE HOLMAN LAW FIRM, P.C.
24 Greenway Plaza, Ste. 2000
Houston, TX 77046
(713) 400-4841 - Fax
***Attorneys for Defendants,***
***Four J's Community Living Center, Inc.***
***and Anthonia Uduma***

Shelton Sparks
Tiffany Harvey
SHELTON SPARKS & ASSOCIATES
706 Cordell St.
Houston, TX 77009
(713) 862-4913 – Fax
***Attorneys for Intervenor***

*/s/ Russell S. Post*
Russell S. Post

000436

# TAB A

FOUR J'S COMMUNITY LIVING CENTERS, INC.
HOME AND COMMUNITY BASED SERVICES PROGRAM

## ANNUAL INDIVIDUAL SERVICE PLAN

**NAME:** Esperanza Arzola
**CASE NUMBER:** 140
**HCS ADMISSION DATE:** August 08, 2005

**DATE OF STAFFING:** August 4, 2008
**DATE OF BIRTH:** 02/14/83
**CARE ID NUMBER:** 10135936

**CONSUMER'S ADDRESS AND TELEPHONE NUMBER:**
16335 Beretta Ct
Missouri City, Texas 77489
(281) 438-0878

**LEGAL STATUS:** Adult without Guardian

**LEVEL OF CARE:** 1
**LEVEL OF NEED:** 5-Limited

**CORRESPONDENT INFORMATION:**
Ms. Luz Carver, Advocate
P.O. Box 13
Alto, Texas 75925
(936) 853-8275 Work Phone

Esperanza's annual service plan meeting was held at the office of Four J's Community Living Centers, Inc. located at 9207 Country Creek Drive, Houston, Texas 77036. The following services were reviewed at the time of the meeting and are summarized in this report. The services identified in this Individual Service Plan are developed from the results of the assessments and information available at the time and Esperanza's strengths, personal goals, and needs necessary to allow Esperanza to continue to reside in the community and prevent her re-institutionalization.

**ENROLLMENT INFORMATION**
Esperanza was enrolled in Four J's Community Living Centers Inc. Home and Community Based Services program on August 8, 2005 from Corpus Christi State School. Esperanza is not adjudicated incompetent by the court system, and therefore, is her own legal guardian. Esperanza's Rights of the Individual were reviewed with her at the time of her enrollment and address again during this staffing.

Esperanza and her state school IDT arranged for Esperanza to visit numerous HCS programs and she chose Four J's Community Living Centers, Inc. to provide her HCS services. Esperanza's choice of residence [illegible]. She requested a 4-bed HCS residence. Her preference was for a four-bedroom, two-bathroom home in a residential neighborhood and the 8354 S. Meadow Bird Circle Drive home was chosen. The

PLAINTIFF'S
EXHIBIT
44

neighborhood offers access to community facilities such as the grocery store, post office, restaurants, recreation and shopping.

**BACKGROUND INFORMATION**

According to previous reports, Esperanza was born at home in Durango, Mexico with an attending midwife. The pregnancy was normal with no exposure to tobacco; alcohol or any other drugs. Birth was full term, labor and delivery was also normal. The breathing was spontaneous and the birth weight not recorded.

No neonatal problems were noted. Developmental milestones were met at the following times: Esperanza crawled at eight months, spoke her first words as eighteen months, walked at two years of age and was toilet trained at two and a half years of age. Mental retardation was first noted at the age nine as a result of a testing at school. At that time, she was assessed and placed in special education classes due to the handicapping condition of mental retardation. It is reported that Esperanza would fight with other children because she had difficulty understanding them. When Esperanza transferred to Middle School, she had irregular attendance and then stop going to school. While at Richmond State School, Esperanza was enrolled in Lamar Consolidated School District and attended classes there for four hours per day.

The history obtained from Richmond State School reveals that at age 12, Esperanza was admitted to the hospital overnight for sexual abuse. No further details of this incident were available nor the perpetrator of the abuse situation identified. Esperanza stated that she began drinking beer at age 14 and indicates that she has had experience with tobacco, cocaine and other substances. Esperanza stated she has had multiple sexual partners. Records also indicate that she has had several sexually transmitted diseases in the past and possibly has traded sexual favors for drugs.

She is the third of seven children born to Margarita Arzola and Jose del la Luz Arzola. Mrs. Arzola worked as a housekeeper and Mr. Arzola worked as a construction worker. Her siblings are as follow: Felipe, Ernesto, Norma, Maricruz, Leobardo, and Pedro Arzola. Four of her siblings were placed in foster care. One family has adopted the two sisters and the two brothers by another family/ Esperanza's parents moved to Dallas from Mexico in 1992. (Family may still be residing in Dallas or may have returned to Mexico.) Records indicate that Esperanza was emotionally, physically, and sexually abused by both biological parents to the extent of their parental rights being terminated in November of 1998. Esperanza accused her father of sexually abusing her on several occasions and Esperanza has no desire to resume relationship with her father. Records from TDPRS also indicated that Esperanza's mother, Margarita Arzola, may have prostituted Esperanza in the past, or at least, failed to protect her from engaging in risky sexual behaviors. Records from TDPRS indicated that they first became aware of a neglectful situation involving the Arzola children in 1993 following a report by a neighbor. According to the reports, Mrs. Arzola was aware that her husband was sexually abusing the children, but continued to live with him. At Esperanza's previous placement, Richmond State School, they allowed periodic phone contact between her and her parents, in spite of the requested restriction from the LAR, Dallas County Child

Protective Services. As a result, Esperanza exhibited sever bouts of self-abuse and depression. Reportedly, the parents would verbally assault Esperanza, blaming her for their termination of parental rights and for the scrutiny of law enforcement into their home. In addition, her parents facilitated an unauthorized departure from Richmond, where they picked her up and took her back to the Dallas area. It was at this time when Esperanza became infected with herpes as a result of the sexual activity between her and her father. Esperanza reportedly was hospitalized in DeSoto, Texas in 1995 to treat sexual abuse. She had multiple contacts with Dallas Juvenile Justice Department for running away, evading arrest, and manifestation of prostitution, probation violation, and assault. She has a long history of multiple placements:

- Letot Center 9/12-9/17/97
- YMCA Casa Del Los Amigos Shelter, eloping after three weeks placement
- Returned to Letot Center
- Buckner Center in Dallas 10/97, eloping after two or three weeks
- Haven Residential Treatment Center until 11/4/97
- Kaufman County (Texas) Children's Emergency Shelter for ten days
- East Texas Open Door (Marshall, Texas) until 4/17/98
- Willoughly Juvenile Center in Marshall
- Dallas County Juvenile Detention Center until 7/13/98
- Richmond (Texas) State School 7/13/98-7/11/00
- Corpus Christi (Texas) State School 11/12/01-8/8/05 (placed at San Antonio [Texas] State Hospital 9/16-10/14/04 after using scissors to attempt to stab a staff member)

**DETERMINATION OF MENTAL RETARDATION**

The most current psychological evaluation dated 12/01/04 indicates that Esperanza was tested on 01/08/98 utilizing the Woodcock-Munoz where she received a Broad Cognitive Ability LSTD Score of 45. The Wechsler Intelligence Scale for Children was used on 05/15/98. Esperanza's scores were as follows: VIQ<45, PIQ<45 and FSIQ<40, placing her in the Mild range of Mental Retardation. Esperanza's level of adaptive functioning was assessed on 02/13/95 using the Adaptive Behavior Evaluation Scale. She achieved an Adaptive Behavior Quotient of 67.

**ROBERT'S ADDRESS AND TELEPHONE NUMBER:**

16335 Beretta Court
Missouri City, Texas 77489
(281) 438- 0878

**GUARDIAN'S NAME / ADDRESS AND TELEPHONE NUMBER:**

Esperanza is an adult without a guardian.

**PARTICIPANTS:**

This meeting was attended by the following people who also signed the signature sheet.

DEF 183

| **Name:** | **Relationship to the individual** |
| --- | --- |
| Williams Nnali | Case Manager |

| | |
|---|---|
| Julie Etukudoh | RN |
| Esperanza Arzola | Consumer |
| Kirk Lockwood | Psychologist |
| Doris Onuwa | Trainer, Four J activity Center. |

**OTHERS WHO CONTRIBUTED TO THE PLAN BUT DID NOT ATTEND THE MEETING:**

| Name: | Relationship to Individual | Method of contribution | Date |
|---|---|---|---|
| Chima Anyanwu | Direct care staff | Personal Data Assessment | 07/31/08 |

**CONTACTS THAT NEEDS TO BE MAINTAINED:**

| Name: | Relationship | Address | Phone No |
|---|---|---|---|
| Ms Luz Carver | Advocate | P.O.Box 13, Alto TX 75925 | (936) 853-8275 |

**DIAGNOSIS:**
Mild Mental Retardation, Dysthymia, Polysubstance Abuse, and Personality Disorder with features of Borderline, Histrionic and Antisocial, Morbid Obesity, Seizure Disorder, and Deformity, right foot (calcaneal varus). Esperanza does have a history of seizure but has not had one since December 2002.

**Diet:** Weight Maintenance with fresh fruit snack at 10 a.m.

IMPORTANT THINGS TO KNOW ABOUT ESPERANZA

1. Esperanza's health is stable.
2. Esperanza has an advocate.
3. Esperanza is toilet trained.
4. Esperanza is fully ambulatory.
5. Esperanza is able to feed herself.
6. Esperanza is a legally completed adult.
7. Esperanza can verbalize her wants and needs.
8. Esperanza has mild visual impairment (20/25 bilateral visual acuity, related to hyperopia that can be corrected with glasses).
9. Esperanza has a moderate- to- severe mixed hearing loss for the right ear and moderate –to-mild conductive hearing loss for the left ear.
10. Esperanza communicates in complex sentences and complies with complex requests in English and Spanish.
11. Esperanza independently performs all self- care tasks (i.e. dressing, bathing, grooming, and tooth brushing), although staff may occasionally be required to assist her to perform them.
12. Esperanza is toilet trained with occasional enuresis.
13. Esperanza actively participates in training and social activities.
14. Esperanza frequently initiates interactions with staff and other consumers.
15. Esperanza has limited reading and writing skills.
16. Esperanza performs simple food preparation tasks.

17. Esperanza can travel independently on a city bus.

Likes and Dislikes:

Likes.

1. Esperanza likes going to dances, parks and movies.
2. Esperanza enjoys listening to the radio.
3. Esperanza enjoys watching movies.
4. Esperanza likes conversing with peers.
5. Esperanza enjoys playing video games.
6. Esperanza likes working on the computer.
7. Esperanza likes to wear her hair short.
8. Esperanza likes to wear jeans, t-shirts and shorts.
9. Esperanza enjoys sports and likes to play basketball, volleyball, and kickball.
10. Esperanza enjoys cooking and can operate stove and microwave.
11. Esperanza enjoys Mexican, Chinese and sea food.
12. Esperanza likes going out to eat.

Dislikes:

1. Esperanza dislikes being talked to disrespectfully.
2. Esperanza dislikes BBQ and oven fried chicken.
3. Esperanza dislikes having to wait for anything she requests.

Behaviors:

1. Esperanza is non-compliant most of the time.
2. Inappropriate behaviors observed were elopement, fighting with staff and consumers, destroying property, and verbally abusing staff and peers.
3. Esperanza has a history of illicit drug use, sexual promiscuity, sexual abuse, suicidal attempts, pica, mood swings and non compliance.
4. Esperanza participates in a behavior therapy program targeting deceleration of aggression, self injury, property destruction, and eloping

**INVENTORY FOR CLIENT AND AGENCY PLANNING**

Esperanza was administered an Inventory for Client and Agency Planning (ICAP) by Anthonia Uduma on January 29, 2007. Her service score was 62 and her ICAP Service level was 6, which means that she requires regular personal care and/or close supervision. Her level of need is 5.

**MR/RC ASSESSMENT**

Esperanza's MR/RC assessment was completed on 06/30/08 as a purpose code 3. Her current LOC is a 1 and her LON is 5. The effective date is 07/12/2008 and the expiration date is 07/11/09. Esperanza has a broad independence of 492 and a general maladaptive score of -25.

## LEGAL STATUS

The case manager assessed Esperanza's legal status on 08/01/08. Esperanza is able to make decisions, which promote her health, safety and welfare. She is able to express preferences, choices and provide input in the interdisciplinary team process in the areas of living arrangement and leisure activities. She is also able to provide input in the areas of HCS and generic services. She is able to give informed consent or register complaints. She is able to exercise her rights by receiving and opening mail and expressing her wants and needs.

The team agrees that Esperanza is capable of being her own legal guardian and the IDT has agreed that the Esperanza has an advocate, Luz Carver, who continues to assist Esperanza with her decision-making. Therefore, no application for a legal guardian is necessary at this time.

## CASE MANAGEMENT

Case Management services were identified in the amount of 12 months during the previous IPC plan year. As at 08/03/08 12 months have been utilized for coordination of the development and implementation of Esperanza's ISP, coordination of the delivery of her IPC, coordination and monitoring of the delivery of her waiver and generic services, integration of various aspects of services delivered under the waiver and through other resources, recording of her progress, maintenance of her records and arrangement of transportation.

## DISCUSSION AND DELIBERATION:

Case manager informed the IDT that the 12 months allotted for case management last year were utilized to monitor the following objectives:

- ☐ The Case manager will monitor all services at least quarterly: Quarterly reviews were completed on October 2, 2007, January 3, 2008, April 2, 2008 and July 2, 2008. Services reviewed included Case Management, Residential Support Services, Nursing, Day Habilitation, Vision, Annual Physical Examination, Dental, Lab work, Immunization, Weight and Blood Pressure, Psychiatry and Psychology. No significant problems were addressed during this year. Case manager addressed the issues as they arose.

- ☐ The Case Manager will meet face to face with Esperanza Arzola at least monthly: The following Face to Face contacts were made this past year:
  - 09/01/07- At the Riverside Hospital.
  - 10/1/07- At Four J activity Center.
  - 11/01/07- At Esperanza's residence.
  - 12/01/07- At the Four J activity Center.
  - 01/02/08- At Esperanza's residence.
  - 02/01/08- At the Four J activity Center.
  - 03/01/08- At Esperanza's 16335 Beretta CT residence.
  - 04/01/08- At Case Manager's office.
  - 05/01/08- At Esperanza's residence.

DEF 186
000443

- 06/02/08 At the Four J activity Center.
- 07/01/08 At Esperanza's Residence.
- 08/01/08 At Case Manager's office

☐ Case Manager will coordinate/monitor non-waiver services as needed when identified in the ISP to support a personal outcome: No non-waiver services this quarter.

This plan year the IDT is recommending 12 months of Case Management of this IPC period. Case Management will be utilized to provide for coordination of the development and implementation of Esperanza's ISP, coordination of the delivery of her IPC, coordination and monitoring of the delivery of her waiver and generic services, integration of various aspects of services delivered under the waiver and through other resources, recording of her progress, maintenance of her records and arrangement of transportation.

**RECOMMENDATION:**

1. Continue 12 months of case management services for the implementation of the services identified above.
2. Complete a monthly face to face visit with Esperanza Arzola to monitor Esperanza's training and services outcomes:
   a. Coordinating the development and implementation of her ISP.
   b. Coordinating the delivery of her ISP.
   c. Coordinating and monitoring the delivery of HCS program services and services from other sources.
   d. Integrating various aspects of services delivered under the HCS program and through other sources.
   e. Recording her progress or lack of it.
   f. Developing a pre-discharge plan.
   g. Record keeping
   h. Arranging transportation.
3. Case manager should document a quarterly review of Esperanza's achievements of training and service outcomes.

**JUSTIFICATION FOR SERVICES:**
The team agreed that 12 months of Case Management services is justified as Case manager will need to have a face to face meeting at least once a month and document accordingly. Time is also needed to coordinate the activities of Esperanza within the community. The 12 month is also a mandatory service and necessary to ensure compliance with the *HCS Consumer Principles for Evidentiary Certification*. This service does not replace existing natural supports or other non-program sources.

**RESIDENTIAL ASSISTANCE**
Residential Support Services were ordered in the amount of 365 days for the current IPC Plan year. The team is recommending that 365 days of Residential Support Services be continue throughout the end of the IPC plan year.

DEF 187

000444

Esperanza's location is 4-Person Home. She receives Residential Support Services including direct personal assistance with activities of daily living, assistance with meal planning and preparation; securing and providing transportation; assistance with housekeeping, grocery shopping, grocery list preparation, laundry, cooking, self administration of medication supervision, money management, general shopping, grooming, recreation and other services as needed.

These services are provided in a four-bedroom, two-bathroom residence owned by Four J's Community Living Centers. Esperanza has three housemates. An awake residential support service staff is assigned and present in the home whenever Esperanza is present is the home.

Esperanza was assessed in Toxins and Personal Care Items Fire Evacuation Skills, and Hot Water Mixing, on 07/31/08. *The Toxins and Personal Care Items assessments* indicate that Esperanza is independent in how to use the items appropriately and safely and independent in knowing not to ingest the products. *The Fire Evacuation Skill assessment* indicates that Esperanza is independent in all areas including choosing the primary and alternate escape routes, staying at the designated area, and identifying the fire alarm sound and device. *The Hot Water Mixing assessment* indicates that Esperanza is independent in identifying hot and cold water, mixing hot and cold water and to adjusting the water temperature.

The Daily Living Skills Assessment indicates that Esperanza demonstrated strengths in most areas, but deficits were noted in some areas of meal planning, cooking, civic awareness and responsibility, money management, and some areas of sexual awareness.

Esperanza is able to complete all of her basic self-help skills, but does require some reminders in the areas of oral hygiene and grooming. Esperanza speaks both Spanish and English and is able to follow both simple and complex verbal instructions. Esperanza enjoys cooking and can operate a stove and microwave. She is able to care for her own personal possessions and helps with household tasks, such as vacuuming, sweeping, and mopping. She understands the concept of exchanging money and can travel independently on a city bus. Esperanza expresses her wants and needs effectively with little assistance from others. Esperanza likes socializing, listening to the radio, going out to eat, dances, movies and attending activities/events and talking to her advocate, Luz Carver. She likes to wear her hair short. She enjoys Mexican, Chinese and Seafood. Esperanza likes to wear jeans, t-shirts and shorts. She dislikes BBQ and oven fried chicken. Esperanza also dislikes having to wait for anything she requests.

Esperanza enjoys sports and likes to play basketball, volleyball, baseball, and kickball. She enjoys going to the park and playing pinball machines. Esperanza has a history of illicit drug use, running away, sexual promiscuity, fighting, profanity, sexual abuse, and self-abuse, suicidal attempts, pica, mood swings and non-compliance.

DEF788

000445

Esperanza is considered to be intellectually functioning within the moderate range of mental retardation. She posses all of her self-help skills; however, independent living, socialization, and behavior management skills are noted as priority needs.

**RECOMMENDATIONS:**

1. Continue 365 days of Residential Support Services for direct personal assistance with daily living skills, assistance with meal planning and preparation; securing and providing transportation; assistance with housekeeping; reinforcement of counseling and therapy activities; assistance with medications; and facilitating inclusion in community activities, social interaction, participation in leisure activities, and development of socially valued behaviors.
2. Identity Esperanza's location as a 4-Person Home.
3. Discontinue training in the areas of meal planning and sexual awareness skills.
4. Commence training on household management skills with effect from September 1, 2008. In Goal #1, Esperanza will dress up her bed once daily and in goal #2, Esperanza will tidy up his room once weekly.
5. Reassess Esperanza's skills including Daily Living Skills, Hot Water Mixing, Fire Evacuation, Toxins, and Personal Care Items prior to the annual ISP meeting.

**DISCUSSION AND DELIBERATIONS:**

The IDT reviewed Esperanza's Residential Outcomes and recommendations. The case manager informed the IDT that Esperanza's weight has reduced considerably. He also informed the IDT that Esperanza has been on her current goals for 2 years and had done very well as well as improved considerably. The IDT agreed that household management skills will further assist Esperanza to acquire necessary skills for living independently in the community. The psychologist pointed out that Esperanza's weight loss can be attributed in part to her not taking Risperdal anymore as it often contributes to weight gain. Esperanza's trainer also informed the IDT that her weight loss can also be attributed to her daily exercise.

The case manager also informed the IDT that staff has reported that Esperanza has adjusted well to the environment, although behaviors have been displayed over the past month. The residential staff reports that Esperanza has displayed behaviors of physical and verbal aggression to staff and peers, noncompliance, injury to herself and attempted elopements though the frequency reduced considerably. The IDT addressed Esperanza's behaviors and informed her of the importance of self-control to remain successful in the community. The IDT noted that the psychologist continues to work with Esperanza to address her behavioral problems.

**JUSTIFICATION FOR SERVICES:**

The team agreed that 365 days of Residential Support Services are justified, as Esperanza has a history of illicit drug use, elopement, sexual promiscuity, fighting, profanity, sexual abuse, self-abuse, suicidal attempts, pica, mood swings and noncompliance. Esperanza also has the following diagnoses of Bi-Polar Affective Disorder with Psychotic features, Polysubstance abuse, tobacco abuse and sexual promiscuity. Over the years, she has displayed some episodes of depression which have resulted in initiation of suicide precautions and physically aggressive and generally noncompliant. The IDT has also

DEF 189

agreed that due to the fact that Esperanza has displayed some of these behaviors since her admission, it is imperative that a Residential Support Staff is available and awake to provide Esperanza with maximum supervision. The IDT has discussed and agreed that once Esperanza becomes upset, she would attempt to elope or display physical aggression toward staff, peers, or self. The IDT also agreed that Esperanza requires the assistance of awake staff during the night to assist her to the restroom to prevent her from soiling her clothing or bedding throughout the night. The team agreed with the recommendations.

Esperanza is unable to reside with family members or her advocate. Esperanza does not have residential support needs that can be funded through Direct Medicaid Card services. This service does not replace existing natural supports or other non-program sources as these supports and sources are not available. The team has consider the use of ongoing community services and resources to meet as many of Esperanza's needs as possible in the same way and during the same hours as the community at large uses these generic services.

**NURSING**

**Background Information:**

Esperanza is a 25 year old Hispanic female diagnosed with Mild Mental Retardation, Dysthymia, Polysubstance Abuse, and Personality Disorder with features of Borderline, Histrionic and Antisocial, Morbid Obesity, Seizure Disorder, and Deformity, right foot (calcaneal varus). Esperanza does have a history of seizure but has not had one since December 2002. Her current medications are Bromocriptine 2.5mg, 1 tab po BID; Depakote ER 500mg, 1 tablet po BID; Lamictal 100mg, 1 tab po q am, Detrol La 4mg, 1 tablet po q am; Depoprovera Injection 150mg q 3 monthly; Trazodone 100mg, 2 tabs po q hs; Thorazine 100mg, 1 tab po TID; Cogentin 1mg, 1 tab po BID; Invega 9mg, 1 tab po q am; Chantix 1 mg, 1 tablet po q am. Her current diet is weight maintenance with fresh fruit snack at 10 a.m. and her current weight is 210 lbs. She has no known food/drug allergies, but is sun sensitive. Her immunizations are current.

**ANNUAL EXAMINATIONS COMPLETED DURING THE YEAR.**

On September 19, 2007, Esperanza completed an annual physical examination, lab work and PPD. The result of the PPD planted read after 48 hours was negative. Blood drawn and send to Lab for testing. Standing order for OTC medications signed by the pcp. A return visit for result of the lab work given on 9/26/07

On 5/03.08, Esperanza was seen by Dr. Mabatah for annual vision Examination today, the visual acuity on both eyes are 20/20; Normal visual fields. Findings and recommendations: Hypernopia – Glasses needed as necessary for reading and watching T.V. One year return visit recommended.

**MEDICAL APPOINTMENT COMPLETED DURING THE YEAR.**

On 8/16/07, Patient was seen at the Methodist Hospital for swallowed foreign body, Depression and suicidal gesture. Abdominal X-Ray done shows negative (No object found). Blood test results - WNR.

On 8/31/07, Esperanza was admitted into Riverside Hospital for increase behaviours and suicidal attempts. Medications changes made during hospitalization, her mood stabilized. Was discharged on the 9/07/07.

On September 18, 2007. Esperanza was seen by Dr. Ravichandran for f/u and post hospitalization. On evaluation mental state stable no change in medications. A return appointment given in 3 weeks.

On 26 September, 2007. Esperanza was seen by the pcp Dr. Egbunike for a follow up on labs results. On evaluation result of CMP, CBC, LFT, Lipids panel anf Thyroid panel were all within normal Range. A return appointment given in 1 year.

On 10/01/07. Esperanza was seen by the Neurologist Dr. Bhat for a follow up. On evaluation patient to continue with Depakote ER and Lamictal.Blood drawn for LFT, Chemistries, CBC and Depakote Level – within Normal Range. A return appoint given in 2/4/08

On 10/23/07, Esperanza was seen by the psychiatrist Dr. Ravichandran for a follow up visit. There is no new medication prescribed. Patient to continue with the same meds. A return appointment given in 1 month.

On 11/26/07, Esperanza was see at Grace Family Midical for generalized body rashes. On evaluation, Rabies diagnosed. New px: Elimite Cream 60gms.Apply on all body part at 7pm and wash off at 7am. Wash all bedding with hot water including towels. A return call given in two weeks.

On 11/28/07, Esperanza was seen by the psychiatrist Dr. Ravichandran for follow up visit and medication refills. Patient to continue with the present psychotropic medications. A return appointment given in 1 month.

On 12/10/07, Esperanza was seen at the Grace Family Medical for flu vaccine. Had FLU vaccine Lot# U2173 AA, Manuf: Sanofi Pasteur and expiring 06/2008 given at left Deltoid muscle.

On 01/03/08, Esperanza was seen by the psychiatrist Dr. Ravichandran for follow up and medication refills. No change in medication regime.

On 01/25/08, Esperanza was seen by the NP-C Esther Mgbeike for WWE and follow up. Pap smear collected and send for test. Lab results were WNR. A return visit given for one year.
On 02/04/08, Esperanza was seen by the psychiatrist, Dr Ravichandran for follow up visit and medication refills.A return appointment given in 1 month.

On 2/04/08, Esperanza was seen by DR. Bhat The Neurologist, for a follow up visit, No breakthrough seizures reported Serum Depakote level on 10/10/07- within normal

range.No change in medication regime to continue with the present medication.Patient to return call in 06/02/08.

On 02/13/08, Esperanza was seen by the Grace family medical for C/O cold symptoms. Cough, chest congestion, New px: Zpak as directed, Ceron DM syrup tid prn. Tylenol ES 2 tabs q 6 hours prn. A return visit given in 2 weeks.

On 03/04/08, Esperanza was seen by the psychiatrist Dr. Ravichandran for a follow up visit and medication refills. No change in meds regime. A one month return appointment given.

On 3/12/08. Esperanza was seen for a follow up visit of cold symptoms. On evaluation cough resolved.

On 04/07/08, Esperanza was seen by the Psychiatrist DR. Ravichandran for a medication refills. A new script given. A return visit was given in one month.

On 4/25/08, Esperanza was seen at planned parenthood for injection of Depoprovera, However, this injection was not given as patient was sexually active.Patient is to abstained from sex in 2 weeks before the injection of DMPA. Nurse will monitor patient for abstinence.

On 5/06/08, Esperanza was seen today by the NP-C to Dr Rubashkin for initial Psychiatric consultation. On evaluation there is no change in medication regime. A follow up visit given in one month.

On 5/14/08, Esperanza was seen at Planned Parenthood clinic. Had DMPA 150mg given at left deltoid muscle. A return appointment given in 3 months.

On 6/02/08, Esperanza was seen by Dr. Bhat, the neurologist, patient to continue with the present medications. A return appointment given in 10/02/08.

On 6/6/08 Esperanza was seen Dr. Rubashkin NP-C for f/u and medication refills. On evaluation behavior is under control. To return call in 2 weeks.

On 06/20/08. Esperanza was seen by NP-C Guelline for follow up in behaviors management. Patient is to continue with the present medications.

On 07/31/08, Esperanza was transported by the Ambulance to Ben Taub Emergency room for Adjustment Disorders; h/o MR; UTI. New px: Cipro 250mg, 1 tablet po q 12 hours X 3 days. A follow up visit Recommended.

**<u>Self Administration of Medication Assessment:</u>**
The self-administration of medication assessment was completed on August 04, 2008. The nurse recommended that Esperanza's medication be administered with supervision.

DEF192

000449

**RECOMMENDATIONS:**

1. Esperanza should complete follow-up visits as ordered/recommended by Dr. Ravichandrian, psychiatrist, to monitor psychotropic medications and behaviors through 08/2009.
2. Esperanza should complete an initial dental exam/cleaning with Dr. Bean, dentist, by 10/08 and as needed/recommended by the dentist through 08/2009
3. Esperanza should complete an annual vision exam by 04/09.
4. Esperanza should complete a WWE by 10/09.
5. Esperanza should receive a Depo-Provera by 10/09.
6. IPC should reflect 12 hours of nursing:

**DISCUSSION AND DELIBERATION:**
Esperanza's medical needs and outcomes were reviewed. The nurse informed the team that Esperanza's health is stable. The IDT agreed with the recommendations.

**JUSTIFICATION FOR SERVICES:**
The team agreed that 12 hours of nursing services is justified based on the HCS Consumer Principles for Evidentiary Certification requirement that the nurse participate in ISP meeting as well as Esperanza's diagnoses of Mild Mental Retardation, Dysthymia, Polysubstance Abuse, and Personality Disorder with features of Borderline, Histrionic and Antisocial, Morbid Obesity, Seizure Disorder, and Deformity, right foot (calcaneal varus). Esperanza does have a history of seizure but has not had one since December 2002.
The 12 hrs should be distributed as follows:

- 6 hours- 30 minutes face to face visit monthly to monitor medication tolerance, weight, vital signs, and general nursing assessment and seizure disorders.
- 1 hour – administer initial dose of new medications and to monitor side effects and to complete an assessment of self-administration of medication.
- 1 hour – in-service new/current staff on medications and diagnosis.
- 2 hours- follow up with medical /other profession.
- 1 hour- participation in, annual staffing, and interim staffing through 10/2009.

The IDT agreed that the recommended nursing hours are needed due to the fact that Esperanza is currently taking psychotropic medications and requires monthly monitoring of her vital signs, weight, and medication side effects. The IDT has also agreed that the nurse is required to inservice current and new staff as well as administered new and increased doses in current medications. The nurse will also make necessary follow-up contact with Esperanza's primary care physician and psychiatrist as needed.

Esperanza does not have any current nursing needs that can be funded through Direct Medicaid Card services. This service does not replace existing natural supports or other non-program sources as these supports and sources are not available.

**DAY HABILITIATION**
Day Habilitation Services were identified in the amount of 255 days for the current IPC Plan Year. The team is recommending that Day Habilitation services remains at 255 days through the end of the IPC Plan Year.

Esperanza was enrolled in Four J's Development Center for day habilitation services on August 8, 2005. She attends the center five days a week, 7 hours per day and attends on all possible days. Esperanza is transported to the day habilitation site via the staff of Four J's Community Living Centers Inc. Home and Community Base Service Program. While at the day habilitation program, she participates in activities designed to assist in acquisition, retention, and improvement of adaptive skills, socialization and activities of daily living. Esperanza was trained in the area of avoiding and resolving conflicts and exercise skills. These goals paid off as Esperanza lost over 40 pounds this period. She is presently on the independent stage. However, it is recommended that she continues on this goal for another year as to get used to doing so habitually.

Esperanza enjoys interacting with staff and peers. She likes listening to the radio and eating out. She has a fondness for Mexican and Chinese food and junk food. She enjoys dances and other social outings. She greets visitors by making eye contact and she will generally smile. Behaviorally, Esperanza is non-compliant daily. She has eloped on several occasions. She has displayed physical and verbal aggression with staff and peers. She has also displayed self-injurious behaviors. She also hates waiting for anything she requests, as she then will become agitated.

The Day Habilitation Assessment was completed on 08/1/08. Esperanza demonstrated strengths in most areas of the Four J's assessment, but she did display weaknesses in the areas of Money Skills and Writing Skills. These are the two areas we will address first. She also displayed weaknesses in the areas of Attending Skills, Time Concepts, and Prevocational Skills. Esperanza was compliant throughout the completion go the assessment.

Upon review of Esperanza's performance during the assessment, the following formal habilitation programs recommended: Money Skills and Writing Skills.

**RECOMMENDATIONS:**
1. Continue to attend Four J's Development Center 5 days a week, 7 hours each day.
2. The IPC should reflect 255 days of day habilitation to provide day habilitation activities away from Esperanza's residence, completion of assessments, and contact with Esperanza's representatives related to the provision of day habilitation and participation in interdisciplinary team meetings.
3. Continue habilitation training in the areas of avoiding and resolving conflicts and exercise skills.
4. Continue Implementing Behavior Therapy Program.

**DISCUSSION AND DELIBERATIONS:**
The team accepted the recommendations as written. Esperanza's trainer informed the IDT that Esperanza has made a tremendous improvement in handling conflict and exercising. She recommended that running the same program with Esperanza for another year will further enhance her skills and improve her independence in the community.

**JUSTIFICATION FOR SERVICES:**
The team agrees that 255 days of day habilitation services is justified based on Esperanza's need for day activity services to provide assistance in acquiring, retaining, and/or improving her social and adaptive skills necessary for her integration and participation in the community. Esperanza has problem with retreating from conflict. This often lands her in trouble with other consumers and staff. At the same time, Esperanza remains overweight despite losing so many pounds recently. Therefore, the recommended training goals will address these necessary needs.
Esperanza does not appear to be appropriate for community employment at this time nor is she eligible for services through a DAHS program. Therefore, this service does not replace existing natural supports or other non-program sources as these supports and sources are not available.

**FINANCES:**
Case manager informed the IDT that the financial director informed him that Esperanza Arzola received an SSI benefit of $637.00 monthly. Out of this amount the sum of $536.90 is paid for her room and board. A monthly allowance of $10.00 is also given to Esperanza.

**DISCUSSION AND DELIBRATION.**
The IDT reviewed the financial information. The IDT agreed that Esperanza is not able to handle all her money. Therefore, the IDT agreed that director should pay Esperanza's room and board as at and when due. The IDT also agreed that $10.00 should be given to Esperanza every month.

**ADAPTIVE AIDS**
Adaptive Aids services were not utilized the previous year.

**DISCUSSION AND DELIBERATION:**
No adaptive aids are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**JUSTIFICATION FOR SERVICES:**
No adaptive aids services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**DIETARY:**
Esperanza does not currently utilize any dietary services.

**DISCUSSION AND DELIBERATION:**
No dietary services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**JUSTIFICATION FOR SERVICES:**
No dietary services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**SPEECH/LANGUAGE PATHOLOGY:**
Esperanza does not utilize these services at this time.

**DISCUSSION AND DELIBERATION:**
No speech/language pathology services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**JUSTIFICATION FOR SERVICES:**
No speech/language pathology services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**OCCUPATIONAL THERAPY**
No occupational therapy service funds are currently utilized by Esperanza Arzola.

**DISCUSSION AND DELIBERATION:**
No occupational therapy services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**JUSTIFICATION FOR SERVICES:**
No adaptive aids services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**PHYSICAL THERAPY**
Esperanza Arzola does not utilize any physical therapy services at this time.

**DISCUSSION AND DELIBERATION:**
No physical therapy services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**JUSTIFICATION FOR SERVICES:**
No physical therapy services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**AUDIOLOGY:**
Esperanza Arzola does not utilize any audiology services at this time.

**DISCUSSION AND DELIBERATION:**
No audiology services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**JUSTIFICATION FOR SERVICES:**
No audiology services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**RESPITE:**
Esperanza Arzola does not utilize any respite services at this time.

**DISCUSSION AND DELIBERATION:**
No respite services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**JUSTIFICATION FOR SERVICES:**
No respite services are being recommended at this time. The team will meet anytime during the year to add the services if needed and recommended.

**PSYCHOLOGY**
Psychology services were ordered in the amount of 6 hours during the current IPC plan year. The team is recommending that psychological service remain at 6 hours for the current IPC plan year.

The consulting psychologist, Kirk Lockwood, completed a psychological update on 8/3/08.

Results of Last evaluation:
Intellectual Functioning:
Date: 5/15/98
Test: Wechsler Intelligence Scale for Children.
Verbal IQ < 45
Performance IQ < 45
Full Scale IQ < 40
Adaptive Behavior:
Date 2/13/95
Test: Adaptive Behavior Evaluation Scale
Adaptive Behavior Quotient = 67

Current ABL = 1 Potential ABL = Undetermined.
These results appear to be valid and continue to accurately reflect Esperanza's current level of functioning. Retesting is not indicated at this time.

Summary of Strengths and Needs:
Esperanza is fully ambulatory. Esperanza has a mild visual impairment (20/25 bilateral visual acuity, related to hyperopia that can be corrected to 20/20 with glasses). She has a

DEF 197

000454

moderate- to-mild conductive hearing loss for the left ear. She communicates in complex sentences and complies with complex request and complies with complex requests both in English and Spanish. Esperanza independently performs all self care tasks (i.e., dressing, bathing, grooming and tooth brushing), although staff may occasionally be required to prompt her to perform them. Esperanza is toilet trained with occasional enuresis.

Esperanza actively participates in training and social activities. She frequently initiates interactions with staff and with other consumers. She has limited reading and writing skills. Esperanza performs basic household chores. Esperanza can perform simple food preparation tasks.

Esperanza participates in a behavior therapy program targeting deceleration of aggression, self injury, property destruction, and eloping. The following table describes her performance in this program 2007- 2008:

| Day Mean Incident/Day | | | |
|---|---|---|---|
| | BL (9/21- 30/05) | 6/1/07- 6/30/08 | % Decrease(Increase) from BL. |
| Aggression | 0.4 | 0.04 | 90 |
| Self-Injury | 0.3 | 0.02 | 93 |
| Property Destruction | 0.4 | 0.03 | 92 |
| Eloping | 0.5 | 0.02 | 96 |

Esperanza has a psychiatric diagnosis of bipolar disorder NOS. Esperanza receives Depakote ER (anticonvulsant used as a mood stabilizer) 500 mg BID, Thorazine (antipsychotic) 100mg TID, Invega (antipsychotic with a different mechanism) 9mg QD, Cogentin (antiparkinsonian) 1 mg BID, and Trazodone (antidepressant) 200mg HS to treat manifestations of her psychiatric disorder, specifically, aggression and self injury.

Summary and Conclusions:
Based upon direct observations, interviews with staff who are responsible for Esperanza on a daily basis, and review of available records, Esperanza appears to be functioning within the mild range of mental retardation. Her adaptive behavior level is currently 1 with an undetermined potential.

**RECOMMENDATION:**

1. To continue Esperanza's behavior therapy program targeting deceleration of aggression, self-injury, property destruction, and eloping.
2. The IPC should reflect 6 hours for the following psychological services over the year:
   - 4 Hours for quarterly monitoring of her behavior therapy program in order to ensure proper program implementation and inservice of staff.
   - 2 Hours for attendance at IDT meeting in order to review progress on behavior therapy program, review recommendations, discuss ideas for revisions, and discuss issues related to psychological well being.

DEF 198

**DISCUSSIONS AND DELIBERATIONS:**
The team reviewed the psychologist Behavior Therapy Program. The team agreed that a Behavior Therapy Program targeting deceleration of aggression, self-injury, property destruction, and eloping would be implemented. The recommendations were accepted.

**JUSTIFICATION FOR SERVICES:**
The team agreed that 6 hours of psychology services is justified based on Esperanza's need for quarterly monitoring (4 hours) as well as attendance at IDT meeting in order to review progress on the behavior therapy program, review recommendations, discuss ideas for revisions, and discuss issues related to psychological well-being (2 hour).

**DENTAL**
Dental service was ordered in the amount of $240.00 for current IPC plan year. Through 08/1/08, $240.00 dental services have been utilized. The IDT has agreed that $300.00 of dental service would be on the IPC this plan year.

On 10/10/07, Esperanza was seen by the dentist Dr. Beans for dental examination and cleaning. On evaluation the general condition of teeth good, condition of gums fair, Mild gingivitis noted. Oral hygiene fair. Recall appointment given in 6 months.

On 04/15/08, Esperanza was seen by the Dentist Dr. Beans for dental examination and cleaning. The general condition of teeth good, Conditions of gums fair. Mild gingivitis noted. Oral hygiene good. A return visit given in 6 months.

**RECOMMENDATIONS:**

1. Esperanza should complete a six moth dental exam/cleaning with Dr. Bean, dentist, by 10/08 and as needed/recommended by the dentist through 08/2009.
2. Esperanza's IPC should reflect $300 for dental.

**DISCUSSION AND DELIBERATIONS:**
The reviewed Esperanza's past dental record from Corpus Christi State School and recommendations were accepted.

**JUSTIFICATION FOR SERVICES:**
The team agrees that $300.00 for dental services is justified based Esperanza's need for dental exams and cleanings. It is routine community practice to obtain a cleaning and exam every 6 months in order to maintain and monitor good oral hygiene. Each dental examination and cleaning costs $150.00. Therefore two procedures will require $300.00. Esperanza does not have any other means to cover the cost of these services other than her personal funds. Therefore, this service does not replace existing natural supports or other non-program sources as these supports and source are not available.

**ADDITIONAL ISSUES ADDRESSED BY THE INTERDISCIPLINARY TEAM**

1. Is Esperanza's current legal status appropriate in that she can make informed decisions regarding her health, safety, and welfare and express choice and preference as it relates to her service needs? **Yes. An assessment of Esperanza's legal status was completed by the case manager on 8/1/08 and addressed by the IDT at the annual meeting. The IDT has agreed that Esperanza is capable of making informed decisions regarding her health, safety, and welfare as well as expressed her choice and preferences.**
2. Is Esperanza's HCS enrollment appropriate considering her choices and needs? **Yes, Esperanza has expressed her choice and needs and has agreed that she should be enrolled into HCS. The IDT agrees that the HCS program can meet Esperanza's needs as outlined in this report.**
3. Is Esperanza's current residence type of Residential Support Services appropriate considering her choices and needs? **Yes, Esperanza expressed her wishes to receive Residential Support Services in her present home to meet her needs and outcomes. In regards to her needs, the residential type is appropriate with an awake staff to ensure her health, safety, and welfare as describe in this report.**
4. Were Esperanza's preferences regarding the location of the home and furnishings in the home in which she resides promoted? **Yes, Esperanza expressed her preferences for her to continue to live in her present home with her furnishing. She informed the team that everything regarding the residence was to her liking.**
5. Were Esperanza's preferences regarding a housemate promoted? **Yes, Esperanza has agreed to the current housemates living in her residence at this time.**
6. Do the residence, neighborhood, and community in which Esperanza resides meet her needs and choices and provide an environment that assures her health, safety and welfare? **Yes. Esperanza's needs are met in her current environment. Esperanza does not have any special needs. The IDT reviewed the Environmental Safety Checklist completed on 6/12/08. The environment assures her health, safety and welfare.**
7. Does Esperanza require any adaptive aids at this time? **No. Esperanza does not require any adaptive aids at this time.**
8. Does Esperanza require any minor home modifications at this time? **No. Esperanza does not require any minor home modifications at this time.**
9. Has the Interdisciplinary Team addressed the use of ongoing community services and resources to meet Esperanza's needs? **Yes. The team has considered the use of ongoing community services and resources to meet as many of Esperanza's needs as possible in the same way and during the same hours as these generic services are used by the community at large. Esperanza's Medicaid card will be used for the purchase of her medications as needed. Esperanza's family is not able to provide ongoing routine services to her in place of HCS services. Esperanza does not have any other friends, church, or community organizations that are able to contribute to meeting her waiver needs.**

10. Did the case manager inform IDT members about transfer options available, that they have a right to transfer Esperanza Arzola to another provider at anytime? **Yes. The team reviewed and discussed with Esperanza Arzola and his legal Guardian the transfer options available. Esperanza Arzola and his IDT chose to remain with Four J's as the provider.**

**<u>CONSUMER'S STRENGTHS</u>**

1. Esperanza's health is stable.
2. Esperanza has an advocate.
3. Esperanza can perform most of her self-help skills.
4. Esperanza is toilet trained.
5. Esperanza is ambulatory.
6. Esperanza is able to feed herself.
7. Esperanza can read and write.

**<u>TRAINING AND SERVICE OUTCOME</u>**

**I. RESIDENTIAL ASSISTANCE TRAINING OUTCOMES**

**A. RESIDENTIAL ASSISTANCE**

GOAL #I: **Daily Living Skills**

OBJECTIVE #1: Esperanza will dress up her bed once daily

CRITERIA: with no more than 4 verbal prompts each session, 20 of 30 successful sessions per month for 3 months. The number of promptings will be reduced any quarter that Esperanza consistently meets criteria until she can accomplish the task independently.

GOAL #II: Household Maintenance skills

OBJECTIVE #1: Esperanza will tidy up her bedroom.

CRITERIA: Once weekly with no more than 4 verbal prompts, 3 of 4 successful sessions per month for 3 months. The number of promptings will be reduced at the end of any quarter that Esperanza consistently meets criteria until she can accomplish the task independently.

**II. DAY HABILITATION TRAINING OUTCOMES**

GOAL #1: AVOIDING AND RESOLVING CONFLICTS

OBJECTIVE #1: Esperanza will ignore offensive behaviors of others, once daily independently, 10 of 20 successful sessions per month for 3 months.

GOAL #2: EXERCISE SKILLS

OBJECTIVE #1: Esperanza will exercise in the a.m and p.m for 30 mins once daily with 4 verbal prompts, 10 of 20 successful sessions per month for 3 months.

**TRAINING AND SERVICE OUTCOMES**

**III. SERVICE GOALS**

GOAL #1: PHYSICAL EXAM AND LABWORK
STRATEGY: The nurse will ensure that Esperanza obtains a physical with lab work by 09/2008.

GOAL #2: PPD SKIN TEST
STRATEGY: The nurse will ensure that Esperanza completes a PPD skin test by 09/2008.

GOAL#3: WELL WOMAN EXAM
STRATEGY: The nurse will ensure that Esperanza completes a well woman exam by 1/2009.

GOAL#4: DENTAL EXAM AND CLEANING
STRATEGY: The nurse will ensure that Esperanza completes a dental exam and cleaning by 10/2008 and as needed/recommended by the dentist through 08/2009.

GOAL#5: PSYCHIATRIST
STRATEGY: The nurse will ensure that Esperanza completes all follow-up visits with the psychiatrist as needed/recommended through 08/2009.

GOAL #6: VISION EXAMINATION
STRATEGY: The nurse will ensure that Esperanza obtains an annual vision exam by 05/2009.

GOAL #7: DEPO-PROVERA INJECTIONS
STRATEGY: The nurse will ensure that Esperanza obtains a Depo-Provera injection by 10/05 and every three months thereafter through 08/2006.

GOAL #8: SELF ADMINISTRATION OF MEDICATION ASSESSMENT
STRATEGY: The nurse will complete a Self Administration of Medication Assessment for Esperanza by 7/08.

GOAL #9: PSYCHOLOGY QUARTERLIES
STRATEGY: The psychology will complete quarterly reviews on Esperanza's BTP to address her targeted behavior through 08/2009.

**ESPERANZA ARZOLA #140 – DOB 02/14/1983**
**DATE OF ADMISSION 08/08/05**
**16335 BERETTA COURT**
**MISSOURI CITY, TX 77489**

## ESPERANZA'S DIAGNOSIS

Mild Mental Retardation, Dysthymia, Polysubstance Abuse, and Personality Disorder with features of Borderline, Histrionic and Antisocial, Morbid Obesity, Seizure Disorder, and Deformity, right foot (calcaneal varus). Esperanza does have a history of seizure but has not had one since December 2002.

**Diet:** Weight maintenance diet with fresh fruit snack at 10.00am.

# Important things to know about Esperanza:

1. Esperanza's health is stable.
2. Esperanza has an advocate.
3. Esperanza is toilet trained.
4. Esperanza is fully ambulatory.
5. Esperanza is able to feed herself.
6. Esperanza is a legally completed adult.
7. Esperanza can verbalize her wants and needs.
8. Esperanza has mild visual impairment (20/25 bilateral visual acuity, related to hyperopia that can be corrected with glasses).
9. Esperanza has a moderate- to- severe mixed hearing loss for the right ear and moderate –to-mild conductive hearing loss for the left ear.
10. Esperanza communicates in complex sentences and complies with complex requests in English and Spanish.
11. Esperanza independently performs all self- care tasks (i.e. dressing, bathing, grooming, and tooth brushing), although staff may occasionally be required to assist her to perform them.
12. Esperanza is toilet trained with occasional enuresis.
13. Esperanza actively participates in training and social activities.
14. Esperanza frequently initiates interactions with staff and other consumers.
15. Esperanza has limited reading and writing skills.
16. Esperanza performs simple food preparation tasks.
17. Esperanza can travel independently on a city bus.

Likes and Dislikes:

Likes.

1. Esperanza likes going to dances, parks and movies.
2. Esperanza enjoys listening to the radio.
3. Esperanza enjoys watching movies.
4. Esperanza likes conversing with peers.
5. Esperanza enjoys playing video games.
6. Esperanza likes working on the computer.
7. Esperanza likes to wear her hair short.
8. Esperanza likes to wear jeans, t-shirts and shorts.
9. Esperanza enjoys sports and likes to play basketball, volleyball, and kickball.
10. Esperanza enjoys cooking and can operate stove and microwave.
11. Esperanza enjoys Mexican, Chinese and sea food.
12. Esperanza likes going out to eat.

Dislikes:

1. Esperanza dislikes being talked to disrespectfully.
2. Esperanza dislikes BBQ and oven fried chicken.
3. Esperanza dislikes having to wait for anything she requests.

Behaviors:

1. Esperanza is non-compliant most of the time.
2. Inappropriate behaviors observed were elopement, fighting with staff and consumers, destroying property, and verbally abusing staff and peers.
3. Esperanza has a history of illicit drug use, sexual promiscuity, sexual abuse, suicidal attempts, pica, mood swings and non compliance.
4. Esperanza participates in a behavior therapy program targeting deceleration of aggression, self injury, property destruction, and eloping

# TAB B

**ANNIE REBECCA ELLIOTT**
**District Clerk**
**State of Texas**
**County of Fort Bend**

Fax Number: **713-778-9759**

Attention: **DR. KAREN GALLAHER-SINCLAIR**

Date: **March 6, 2009**

Number of pages faxed including this page: **6**

***CIVIL/CRIMINAL INFORMATION:***

Cause No. --51163, 51272, 51271

**STATE OF TEXAS vs. ESPERANZA V. ARZOLA**

***OTHER INFORMATION:***

**INDICTMENT AND MOTION AND ORDER SUGGESTING INCOMPETENCY, MENTAL RETARDATION AND INSANITY AND REQUEST FOR EXAMINATION**

From: Shelly David
Deputy District Clerk SHELLY DAVID

**CRIMINAL RETURN**

Received By:____________________ Date:____________

CONFIDENTIALITY NOTICE

The information contained in this facsimile message and accompanying documents is legally privileged and confidential information intended only for the use of the individual or entity named herein. If you have received this telecopy in error, please immediately notify us by telephone and return the original message to us at the address shown below via United States Postal Service. Thank you.

**301 Jackson Street Richmond, Texas 77469 (281) 342 - 3411**

PLAINTIFF'S EXHIBIT 57

EXHIBIT

crim161
Revised
2007/01

51272
51271
NO. [redacted] 51103)

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| V. | § | 268TH JUDICIAL DISTRICT |
| ESPERANZA V. ARZOLA | § | FORT BEND COUNTY, TEXAS |

**MOTION SUGGESTING INCOMPETENCY, MENTAL RETARDATION AND INSANITY AND REQUEST FOR EXAMINATION**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes Esperanza V. Arzola, Defendant, and files this motion suggesting incompetency, mental retardation and insanity and request for examination of Esperanza V. Arzola, Defendant, will respect to the issue of the competency, mental retardation and insanity of Defendant to stand trial herein, and shows as follows:

1. There is an issue in this cause regarding whether Defendant is "competent" to stand trial herein, as such term is defined by Article 46B.003 of the Texas Code of Criminal Procedure.

2. Request is hereby made that one or more disinterested experts be appointed as provided by Article 46B of the Texas Code of Criminal Procedure to examine Defendant with regard to the competency of Defendant to stand trial and Defendant's mental status and insanity.

3. Request is further made for Defendant to be examined by a psychiatrist or expert of the Defendant's own choice under Article 46B.021(f) of the Texas Code of Criminal Procedure.

4. In the event the Court determines that there is evidence to support a finding of incompetency, an incompetency trial is requested as provided by Article 46B of the Texas Code of Criminal Procedure

FILED
2009 MAR -4 PM 3:02
Annie Rebecca Elliott
CLERK DISTRICT COURT
FORT BEND CO. TX

Respectfully submitted,

LEE D. COX
COUNSEL FOR DEFENDANT
201 SOUTH ELEVENTH STREET
RICHMOND, TEXAS 77469
TELEPHONE: (281) 342-3321
FACSIMILE: (281) 341-8458
TBA NO.: 00790520

**CERTIFICATE OF SERVICE**

This is to certify that on 3/4/09, 2009, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Fort Bend County, Texas, by hand delivery.

LEE D. COX
COUNSEL FOR DEFENDANT

**ORDER FOR A SETTING**

On ____________________, 2009, the Defendant filed a Motion Suggesting Incompetency, Mental Retardation and Insanity and Request for Examination. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for ____________________, at __________.

Signed on ____________________, 2009.

FILED
2009 MAR -4 PM 3:02
Annie Rebecca Elliott
CLERK DISTRICT COURT
FORT BEND CO. TX

______________________________
JUDGE PRESIDING

51272
51271
NO. 51270

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
|---|---|---|
| V. | § | 268TH JUDICIAL DISTRICT |
| ESPERANZA V. ARZOLA | § | FORT BEND COUNTY, TEXAS |

**ORDER**

On March 3, 2009, came to be considered Esperanza V. Arzola's Motion Suggesting Incompetency, Mental Retardation and Insanity and Request for Examination, and said motion is hereby:

(GRANTED) (DENIED).

The Court appoints ______________________ to conduct these evaluations.

Signed March 3, 2009

JUDGE PRESIDING

FILED
2009 MAR -4 PM 3:02
Annie Rebecca Elliott
CLERK DISTRICT COURT
FORT BEND CO., TX

MICHAEL ELLIOTT
PC- 28.02 (d) (2)
CJIS- 20990005

THE STATE OF TEXAS

VS.

ESPERANZA ARZOLA

| | |
|---|---|
| D.O.B.: 02/14/1983 | SPN NO.: 00135041 |
| FELONY CHARGE: ARSON INTEND DAMAGE HABITAT/PLACE OF WORSHIP / F1 | DA ENTRY NO.: 08253002 |
| CAUSE NO: 51163 | ARREST DATE: 09/06/2008 |
| DISTRICT COURT NO: 434 | DATE OF OFFENSE: September 04, 2008 |
| AGENCY: HFD ARSON DIVISION | AGENCY NO.: 080951 |
| BAIL AMOUNT: $10,000.00 | PRIOR CAUSE #: — |
| RELATED CASES: AGG ASLT W/DW, MURDER | CO-DEF: unknown |

G.J. WITNESSES: [illegible handwriting]

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The duly organized Grand Jury of Fort Bend County, Texas, presents in the District Court of Fort Bend County, Texas, that in Fort Bend County, Texas, **ESPERANZA ARZOLA**, hereafter styled the Defendant, heretofore on or about September 04, 2008, did then and there

PARAGRAPH A

start a fire with intent to damage or destroy a habitation owned or occupied by Antonia Uduma and / or Godfrey Uduma and / or Amuche Udemezue, knowing that it was located on property belonging to another, and said habitation was generally located in said county at 16,335 Beretta Ct., Missouri City, Texas.

It is further presented that during the commission of the above described offense, the Defendant did then and there use and exhibit a deadly weapon, to wit: fire and a cigarette lighter, that in the manner of its use and intended use was capable of causing serious bodily injury or death.

PARAGRAPH B

start a fire with intent to damage or destroy a habitation owned or occupied by Antonia Uduma and / or Godfrey Uduma and / or Amuche Udemezue, knowing that it had within it property belonging to another, and said habitation was generally located in said county at 16,335 Beretta Ct. Missouri City, Texas.

It is further presented that during the commission of the above described offense, the Defendant did then and there use and exhibit a deadly weapon, to wit: fire and a cigarette lighter, that in the manner of its use and intended use was capable of causing serious bodily injury or death.

PARAGRAPH C

start a fire with intent to damage or destroy a habitation owned or occupied by Antonia Uduma and / or Godfrey Uduma and / or Amuche Udemezue, and he was reckless by consciously disregarding whether the burning would endanger the life of some individual or the safety of the property of another, and said habitation was generally located in said county at 16,335 Beretta Ct., Missouri City, Texas.

It is further presented that during the commission of the above described offense, the Defendant did then and there use and exhibit a deadly weapon, to wit: fire and a cigarette lighter, that in the manner of its use and intended use was capable of causing serious bodily injury or death.

PARAGRAPH D

start a fire with intent to damage or destroy a habitation owned or occupied by Antonia Uduma and / or Godfrey Uduma and / or Amuche Udemezue, knowing that it was within the limits of an incorporated city, to-wit: Houston, and said habitation was generally located in said county at 16,335 Beretta Ct., Missouri City, Texas.

It is further presented that during the commission of the above described offense, the Defendant did then and there use and exhibit a deadly weapon, to wit: fire and a cigarette lighter, that in the manner of its use and intended use was capable of causing serious bodily injury or death.

FILED
2009 MAR -2 PM 1:06
[signature]
CLERK DISTRICT COURT
FORT BEND CO. TX

AGAINST THE PEACE AND DIGNITY OF THE STATE.

[signature]
FOREMAN OF THE GRAND JURY

INDICTMENT ([redacted]L/DA)

THE STATE OF TEXAS

VS.

ESPERANZA ARZOLA

MIKE ELLIOTT
PC- 22.02(a)(2)
CJIS- 13150005

| | |
|---|---|
| D.O.B.: 02/14/1983 | SPN NO.: 00135041 |
| FELONY CHARGE: AGG ASSAULT W/DEADLY WEAPON / F2 | DA ENTRY NO.: 09057039 |
| CAUSE NO: 51271 | ARREST DATE: NA/GJ |
| DISTRICT COURT NO: 434 | DATE OF OFFENSE: September 04, 2008 |
| AGENCY: HFD ARSON DIVISION | AGENCY NO.: 080951 |
| BAIL AMOUNT: $10,000.00 | PRIOR CAUSE #: |
| RELATED CASES: MURDER, ARSON | CO-DEF: |
| G.J. WITNESSES: | |

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The duly organized Grand Jury of Fort Bend County, Texas, presents in the District Court of Fort Bend County, Texas, that in Fort Bend County, Texas, **ESPERANZA ARZOLA**, hereafter styled the Defendant, heretofore on or about **September 04, 2008**, did then and there intentionally, knowingly, and recklessly cause bodily injury to JENNY WAGNER by starting a fire with a cigarette lighter to a piece of paper on a bed inside a residence located at 16,335 Beretta Ct., Missouri City, Texas, in which Jenny Wagner was located at the time which the said fire was ignited, and the defendant did then and there use and exhibit a deadly weapon, to-wit: fire and a cigarette lighter, that in the manner of its use and intended use was capable of causing serious bodily injury or death, during the commission of said assault.

FILED
2009 MAR -2 PM 1:06
CLERK DISTRICT COURT
FORT BEND CO., TX

AGAINST THE PEACE AND DIGNITY OF THE STATE.

FOREMAN OF THE GRAND JURY

INDICTMENT [redacted]L/DA)

THE STATE OF TEXAS

VS.

MIKE ELLIOTT
PC- 10.02(b)(1)
OJTS- 5990019

ESPERANZA ARZOLA

| | |
|---|---|
| D.O.B.: 02/14/1983 | SPN NO.: 00135041 |
| FELONY CHARGE: MURDER / F1 | DA ENTRY NO.: 09057038 |
| CAUSE NO: 51272 | ARREST DATE: NA/GJ |
| DISTRICT COURT NO: 434 | DATE OF OFFENSE: September 04, 2008 |
| AGENCY: HFD/ARSON DIVISION | AGENCY NO.: 080951 |
| BAIL AMOUNT: 150,000.00 | PRIOR CAUSE #: |
| RELATED CASES: AGG ASLT W/DW, ARSON | CO-DEF: |

G.J. WITNESSES: *[handwritten]*

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The duly organized Grand Jury of Fort Bend County, Texas, presents in the District Court of Fort Bend County, Texas, that in Fort Bend County, Texas, ESPERANZA ARZOLA, hereafter styled the Defendant, heretofore on or about September 04, 2008, did then and there

PARAGRAPH A

intending to cause serious bodily injury to an individual, the said Defendant did then and there commit an act clearly dangerous to human life, to wit: start a fire with a cigarette lighter to a piece of paper on a bed in a residence located at 16,335 Beretta Ct., Missouri City, Texas, thereby causing the death of an individual named Tanya James.

PARAGRAPH B

intentionally and knowingly commit the felony offense of Arson of a residence loacted at 16,335 Beretta Ct., Missouri City, Texas, and while in the course of and furtherance of the commission of said offense of Arson did then and there commit an act clearly dangerous to human life, to wit: start a fire with a cigarette lighter to a piece of paper on a bed inside a residence located at 16,335 Beretta Ct., Missouri City, Texas, with at least 4 individuals inside the residence at the time which the said fire was ignited and did thereby cause the death of said individual named Tanya James.

AGAINST THE PEACE AND DIGNITY OF THE STATE.

FOREMAN OF THE GRAND JURY

INDICTMENT ████████ (L/DA)

FILED

BBB MAR -2 PM 3: 51

000470

**NO. 2009-40925**

| | | |
|---|---|---|
| PATTI J. WAGNER, AS GUARDIAN OF JENNI WAGNER, AN INCAPACITATED ADULT, Plaintiff, | § | IN THE DISTRICT COURT |
| v. | § | HARRIS COUNTY, T E X A S |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA, AND GODFREY UDUMA, Defendants. | § | 269TH JUDICIAL DISTRICT |

**DEFENDANTS' BRIEF ON JURY'S FAILURE**
**TO FIND NEGLIGENCE ON ESPERANZA ARZOLA**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants, Four J's Community Living Center, Inc. and Anthonia Uduma, file this brief on the jury's failure to find negligence on Esperanza Arzola, as follows:

## INTRODUCTION

Plaintiff and Intervenor sued Defendants for injuries to Jenny Wagner and the death of Tanya James in a fire at the Four J's Community Living Center. Esperanza Arzola started the fire. Yet the jury found no negligence on Esperanza Arzola. In their motion for new trial, Defendants argued that the jury's failure to find any degree of negligence on Esperanza Arzola was so against the great weight and preponderance of the evidence as to be clearly wrong and require a new trial. This brief discusses that issue and responds to the briefs filed by the Plaintiff and Intervenor, which briefs argued that the act of Esperanza Arzola setting the fire was not a proximate cause of the injuries, or that the Defendants' negligence was a superseding cause. For the reasons discussed, Defendants ask this Court to grant a new trial.

## ARGUMENT

### 1. Esperanza Arzola's mental disability does not excuse her negligence

As a preliminary matter, it is necessary to discuss Esperanza Arzola's mental disability. Throughout the trial, and in their briefs, Plaintiff and Intervenor focused on Esperanza Arzola's mental deficiencies, even to the point of presenting evidence that she was declared incompetent to stand trial in the later criminal case. In her testimony, Patty Wagner said, "I don't know how you can blame someone who has all the problems that Esperanza seemed to have. I don't think she was mentally competent in being able to understand consequences for her actions." (Tr. Vol. 1, 10-17-11, at 24). However, it is important to note that in a civil case, unlike a criminal case, a person's mental deficiencies do not excuse negligence.

Although Texas has not addressed the issue directly, the majority of jurisdictions hold that disabled persons, like Esperanza Arzola, are subject to tort liability under the reasonable person standard of care. *See, e.g.*, *Jankee v. Clark County*, 235 Wis. 2d 700, 733-34, 612 N.W.2d 297, 312 (Wis. 2000) ("Wisconsin, like the majority of states, holds mentally disabled defendants to the reasonable person standard of care."); Prosser & Keeton, THE LAW OF TORTS § 135, at 1072 (5th ed. 1984) ("Mentally disabled persons usually have been classed with infants, and held liable for their torts."). The rule has its origins in the 17th Century. *Jankee*, 612 N.W.2d at 312.

The rule is explained in the Restatement (Second) of Torts, as follows:

> Unless the actor is a child, his insanity or other mental deficiency does not relieve the actor from liability for conduct which does not conform to the standard of a reasonable man under the circumstances.

*Id.* at § 283B; *see also* § 895J ("One who has deficient mental capacity is not immune from tort liability for that reason."). The rule has arisen because the difficulties in drawing the line on who will or will not be responsible. *Id.* at § 283B, cmt. b. Thus, those with mild disabilities, and those with severe disabilities, including lunacy, are all held to the same reasonable person standard. The Restatement further explains:

> Insane persons are commonly held liable for their intentional torts. While there are very few cases, the same rule has been applied to their negligence. As to mental deficiency falling short of insanity, as in the case of stupidity, lack of intelligence, excitability, or proneness to accident, no allowance is made and the actor is held to the standard of conduct of a reasonable man who is not mentally deficient, even though it is in fact beyond his capacity to conform to it.

*Id.* at § 283B,[1] cmt. b.

Indeed, the jury charge in this case did not provide a lesser burden for Esperanza Arzola, but held her to the same burden of ordinary care as the Defendants. Thus, it cannot be argued that Esperanza Arzola can be excused for her negligence or relieved of responsibility for her negligence because of her mental disability.

**2. Esperanza Arzola's act of setting the fire was a proximate cause of the injury**

It is undisputed that Esperanza Arzola set the fire that caused the injuries to Ms. Wagner and the death of Ms. James (Tr., Vol. 2, 10-18-11, at 40, 51-52, 207-12, 288-89). Plaintiff and Intervenor do not argue that Esperanza Arzola's acts in setting the fire were not negligent. Instead, Plaintiff and Intervenor argue that Ms. Arzola's conduct was not the proximate cause of the injuries. They are mistaken.

---

[1] Texas has cited the rule, but did not apply it because the case involved a four year old child. *See Yarborough v. Berner*, 467 S.W.2d 188, 190 (Tex. 1971) (holding that four year old child could not be negligent).

Proximate cause has two elements—cause in fact and foreseeability. *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 222 (Tex. 2010). "Cause in fact," or "but-for" causation, "is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.*; *Southwest Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 274 (Tex. 2002) ("To establish cause in fact, or 'but for' causation, Gil–Perez must show that Southwest Key's negligence was a substantial factor in bringing about his injury and without which no harm would have been incurred."). Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex. 1998).

Esperanza Arzola's act in setting the fire was the but-for cause of the injuries. Her act in setting the fire was a substantial factor in bringing about the injuries, without which the harm would not have occurred. And the fact that people would be injured or killed by fire is certainly foreseeable. Thus, there would be no basis for the jury to conclude, if it did, that Esperanza Arzola's negligence was not a proximate cause of the injuries.

**3. The conduct of Four J's or Mrs. Uduma was not a new and independent, superseding, cause**

Plaintiff and Intervenor also argue that Defendants' negligence in providing Arzola access to the lighter, or in failing to supervise Arzola, or in failing to remove Ms. Wagner or Ms. James from the fire was a "new and independent cause" that superseded the negligence of Esperanza Arzola. That is also incorrect.

There are four reasons why the alleged negligence of the Defendants was not a new and independent, supersededing cause.

First, a superseding cause must not only be "unforeseeable, but its consequences unexpected." *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 451 (Tex. 2006). Here, all of the alleged acts of negligence by the Defendants were part of the foreseeable chain of causation begun when Arzola started the fire, or that led to Arzola starting the fire.

Second, a superseding cause "is one that alters the natural sequence of events and produces results that would not otherwise have occurred." *Id.* Here, the same results occurred from the concurring negligence of Arzola and Defendants, as alleged.

Third, "[a]n intervening force will not break a causal connection if that force was itself probable or foreseeable by the original wrongdoer." *Id.* Certainly, an ordinary person setting a fire could foresee that people could be injured or killed if they could not exit the group home in time.

Finally, a superseding cause must cause "injury different from that which might have been expected at the time of the original negligent act." *Id.* at 451-52. Or, as the Supreme Court held in another case, "where the risk resulting from the intervening act is the same risk resulting from the original actor's negligence, the intervening act cannot be classified as a superseding cause." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 859 (Tex. 2009). Here, the same injuries and risks resulted from both Arzola's act and Defendants' alleged acts or omissions.

Thus, Four J's or Mrs. Uduma's acts or omissions were not new and independent causes that superseded Esperanza Arzola's negligence.

**4. Because the jury's finding of no negligence of Esperanza Arzola is against the great weight and preponderance of the evidence, this Court should grant a new trial**

Esperanza Arzola's negligence in setting the fire was the but-for cause of the Plaintiff's and Intervenor's injuries. Yet, the jury found that Esperanza Arzola committed no negligence. That finding is so against the great weight and preponderance of the evidence as to be "clearly wrong." *See Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988).

In such cases, where the jury's finding of no negligence is clearly against the great weight and preponderance of the evidence, the Court should grant a new trial. *Id.*; *Caterpillar Tractor Co. v. Cropper*, 767 S.W.2d 813, 816 (Tex. App.—Texarkana 1989, (on remand) writ denied), 777 S.W.2d 79 (Tex. 1989) ("In the face of these admitted facts, a failure to find any negligence on Cropper's part is against the great weight and preponderance of the evidence."); *see also Castro v. Hernandez-Davila*, 694 S.W.2d 575, 577 (Tex. App.—Corpus Christi 1985, no writ) (holding that jury's finding of no negligence on Davila, who caused the collision, was so against the great weight and preponderance of the evidence as to be manifestly unjust and require a new trial); *Dellolio v. Brown*, 399 S.W.2d 425, 427-28 (Tex. Civ. App.—Houston 1966, no writ) (holding that jury's failure to find negligence and proximate cause on Mrs. Brown was so against the great weight and preponderance of the evidence that the judgment must be reversed and remanded); *Guffey v. Borden, Inc.*, 595 F.2d 1111, 1112-14 (5th Cir. 1979) (holding that where Guffey clearly failed to act as an ordinary prudent man and the jury failed to attribute any degree of negligence to Guffey, the trial court erred in failing to grant a new trial).

Where the Court grants a new trial because of factual insufficiency, or against the greater weight, the Court should delineate its reasons for doing so. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *see In re Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d 204, 209 (Tex. 2009) (holding that a court must state its reasons for granting a new trial). For that reason, in the proposed Order Granting New Trial (attached), Defendants have set forth the reasons for granting new trial, based on the arguments addressed in this brief.

## CONCLUSION

Because the jury's failure to find negligence on Esperanza Arzola is so against the great weight of the evidence as to be clearly wrong and manifestly unjust, this Court should grant a new trial.

Respectfully submitted,

PLUMMER & KUYKENDALL

James C. Plummer
Texas Bar No. 16075700
4203 Montrose Boulevard, Suite 270
Houston, Texas 77006
Telephone 713.522.2887
Facsimile 713.522.3605

THE HOLMAN LAW FIRM, P.C.

*s/David W. Holman*
David W. Holman
Texas Bar No. 09902500
24 Greenway Plaza, Suite 2000
Houston, Texas 77046
Telephone 713.400.4840
Facsimile 713.400.4841
Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2012:

This document was filed via Texas.gov electronic filing system, and the required number of copies was forwarded to the Court by regular mail or express mail.

This document was forwarded to the following via Texas.gov electronic filing system and/or electronic mail:

*Attorneys for Plaintiff*

Mr. L. Lee Thweatt
Mr. Joseph D. Terry
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, Texas 77046
Telephone 713.600.4710
Facsimile 713.600.4706

Mr. Russell S. Post
Ms. Constance H. Pfeiffer
BECK, REDDEN & SECREST, LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone 713.951.3700
Facsimile 713.951.3720

*Attorneys for Intervenor*

Mr. Shelton Sparks
Ms. Tiffany Harvey
SHELTON SPARKS & ASSOCIATES
706 Cordell Street
Houston, Texas 77009
Telephone 713.862.5533 Facsimile 713.862.4913

*s/David W. Holman*
David W. Holman

NO. 2009-40925

| | | |
|---|---|---|
| PATTI J. WAGNER, AS GUARDIAN OF JENNI WAGNER, AN INCAPACITATED ADULT, Plaintiff, | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | HARRIS COUNTY, T E X A S |
| | § | |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA, AND GODFREY UDUMA, Defendants. | § | 269TH JUDICIAL DISTRICT |

**ORDER**

This Court has considered the pleadings, arguments and trial briefs of the parties on the issue of a new trial in this cause. The Court is of the opinion that the Defendants' Motion for New Trial should be granted.

The reason for the Court's grant of new trial is that the jury's failure to find negligence on Esperanza Arzola, who started the fire that was the cause-in-fact of the injuries to Jenny Wagner and the death of Tanya James, is so against the great weight of the evidence as to be clearly wrong and manifestly unjust. *See Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988). It is, therefore

ORDERED that the Court's Final Judgment entered on January 13, 2012 is vacated and this case is to be placed on the Court's docket for a new trial.

SIGNED this ___ day of _________, 2012.

_______________________________
Judge Presiding

Filed 12 March 23 P3:55
Chris Daniel - District Clerk
Harris County
ED101J016794256
By: Kathy Bell

NO. 2009-40925

| | | |
|---|---|---|
| PATTI J. WAGNER, AS GUARDIAN OF JENNI WAGNER, AN INCAPACITATED ADULT, Plaintiff, | § § § § § | IN THE DISTRICT COURT |
| v. | § § | HARRIS COUNTY, T E X A S |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA, AND GODFREY UDUMA, Defendants. | § § § § | 269TH JUDICIAL DISTRICT |

**ORDER**

This Court has considered the pleadings, arguments and trial briefs of the parties on the issue of a new trial in this cause. The Court is of the opinion that the Defendants' Motion for New Trial should be granted.

The reason for the Court's grant of new trial is that the jury's failure to find negligence on Esperanza Arzola, who started the fire that was the cause-in-fact of the injuries to Jenny Wagner and the death of Tanya James, is so against the great weight of the evidence as to be clearly wrong and manifestly unjust. *See Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988). It is, therefore

ORDERED that the Court's Final Judgment entered on January 13, 2012 is vacated and this case is to be placed on the Court's docket for a new trial.

SIGNED this 27th day of March, 2012.

[signature]
Judge Presiding

Filed 12 April 10 A9:50
Chris Daniel - District Clerk
Harris County
ED101J016820569
By: jeanetta spencer

**CAUSE NO. 2009-40925**

| | | |
|---|---|---|
| **PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT,** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiff,** | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| **FOUR J's COMMUNITY LIVING CENTER, INC.; ANTHONIA UDUMA; and GODFREY UDUMA,** | § | |
| **Defendants.** | § | **269TH JUDICIAL DISTRICT** |

# MOTION FOR RECONSIDERATION OF ORDER GRANTING NEW TRIAL

Plaintiff Patti J. Wagner ("Ms. Wagner"), appearing as guardian of Jenny Ann Wagner ("Jenny Ann"), files this motion for reconsideration of the order granting a new trial.

## INTRODUCTION

Counsel for Plaintiff Patti J. Wagner come before the Court with the greatest humility. After careful and conscientious review of several post-trial motions, the Court has set aside the jury's verdict on the rarest of grounds: factual sufficiency. That standard allows for a new trial only if the evidence is so overwhelming that the verdict can be described as "manifestly unjust." *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 664-65 (1951). It requires this Court to be convinced that the jury was motivated by "something other than conscientious conviction." *Lehmann v. Wieghat*, 917 S.W.2d 379, 385 (Tex. App.—Houston [14th Dist.] 1996, writ denied). We have failed the Court, failed our client, and failed this jury—which worked conscientiously to return a just and fair verdict in light of the evidence and the Court's instructions—by failing to explain the reasonable basis for their verdict. With greatest respect, we ask the Court to allow us an opportunity to make amends for that failing. The jury verdict should not have been set aside. No matter what one thinks of Ms. Arzola's conduct in setting a fire, the *subsequent* negligence of Four J's caused the *injuries*. For that reason alone, the jury's verdict was fair and just.

## ARGUMENT

In their trial brief, Defendants maintained that "[i]t is undisputed that Esperanza Arzola set the fire that caused the injuries to Ms. Wagner." That is not accurate. It is undisputed that Ms. Arzola ***set the fire***, but the jury heard extensive evidence establishing that only Four J's negligence ***caused the injuries***. This distinction is no small point, and it was a serious omission in Defendants' response. This Court may focus only on Defendants' negligence after the fire, because the jury heard extensive (and in some cases undisputed) evidence allowing it to find that Four J's post-fire negligence was the *only* cause of the "injuries in question."

Defendants completely ignored the distinction between causing an "occurrence" and causing an "injury," and they completely ignored the evidence making this distinction critical in this case. Further, they mistakenly treated the new and independent cause instruction as an abstract legal question, failing to acknowledge that the evidence must be judged by the law given in the Court's Charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). This Court gave that instruction at Defendants' request; they should not be heard to argue it does not apply.

This motion addresses serious mistakes in Defendants' analysis of the Court's Charge, and it highlights where Defendants have no answer to the evidence supporting the verdict. Finally, it points out that Defendants' proposed order was deficient—and that the deficiency relates directly to the illegitimacy of their factual sufficiency challenge to the verdict.

### I. Defendants Ignored the Distinction Between Causing a Fire and Causing Injuries.

The jury was specifically asked about "negligence, if any, [that] proximately cause[d] the *injuries in question*." Court's Charge, Question 1 (emphasis added). This question was proper, as it focused the jury's attention on the ultimate harm. No one was complaining about damage to the house, which was undoubtedly caused by Ms. Arzola. The issue was distinctly different: *Who negligently caused injuries to a person who should have safely escaped?*

000482

Ms. Wagner made this point in her trial brief, noting that the Pattern Jury Charges recognize that some cases arise in settings where there is a meaningful distinction between causing an "occurrence" and causing an "injury." This is such a case. Even though Ms. Arzola set the fire, the jury could find that only Four J's caused the "injuries in question."

Defendants said nothing about this distinction, conceding by their silence that there can be a difference between causing a fire and causing "injuries in question." They focused on the standard of care applicable to mentally retarded persons, which is a straw man. It is no answer to say that Ms. Arzola can be found negligent when the real issue is causation. Equally important, Ms. Arzola's mental retardation informs the standard of care for *Defendants*, who were charged with supervising their clients and safely removing Ms. Wagner from danger before anyone else.

## II. Defendants Ignored the Fact Issues Regarding Foreseeability.

Defendants next argued (without analysis) that Ms. Arzola's act of setting the fire was a proximate cause. *Their framing of the question fails to account for their subsequent negligence.* The right question is: Is it foreseeable that a professional caregiver who is trained in fire safety, who has a fire extinguisher, and who (supposedly) conducts regular fire drills, would not even try to extinguish the fire or remove her first-priority client to safety? The jury could fairly find that even if Ms. Arzola was responsible for setting the fire, she should not have foreseen that the Defendants would respond so inadequately that they would expose their residents to danger.

In analogous circumstances, a jury found that a party who set a fire did not proximately cause injuries because it was unforeseeable that rescue efforts would be botched by a malfunctioning fire truck. *See City of Bishop v. S. Texas Elec. Co-op., Inc.*, 577 S.W.2d 331, 335 (Tex. App.—Corpus Christi 1979, no writ). That verdict was upheld because, while setting a fire furnished a condition that made injuries possible, the jury was free to find the subsequent "failure" to act was unforeseeable and thus the "efficient cause" of the injuries. *Id.* at 336.

000483

There is absolutely room for a jury to conclude that these injuries were unforeseeable, especially given the unique facts of this case. Not every fire causes injuries, and it is not necessarily foreseeable that a small fire set in one part of a house will injure people in another part of the house—particularly when a professional caregiver has both the time and the training to remove them to safety. Even holding Ms. Arzola to the "ordinary person" standard of care, this jury could certainly find it unforeseeable that a caregiver would abdicate her duty to remove Ms. Wagner from harm's way. This is precisely the sort of fact-finding where jurors are entitled to use common sense in assigning fault. *See Glover v. City of Houston*, 590 S.W.2d 799, 801 (Tex. Civ. App.—Houston [14th Dist.] 1979, no writ) (citing *Enloe v. Barfield*, 422 S.W.2d 905 (Tex. 1967); *Farley v. MM Cattle Co.*, 529 S.W.2d 51, 756 (Tex. 1975) (citing Prosser, LAW OF TORTS § 41 at 237 (4th ed. 1971)). This jury conscientiously took upon itself that solemn duty, and its common-sense verdict was both rational and just. It is entitled to respect.

**III. Defendants Incorrectly Analyzed the New and Independent Cause Instruction.**

The most egregious mistake in Defendants' trial brief (and perhaps the most misleading) was treating the "new and independent cause" instruction as if it were an abstract legal question. The posture of this case does not allow for that. The new and independent cause instruction was given in the Court's Charge without objection. Indeed, this inferential rebuttal theory was pleaded in Defendants' Live Answer and included in the Court's Charge at Defendants' request. The evidence is therefore measured by the Court's Charge and not some other legal framework, and in that evaluation, the instruction is given a common-sense meaning.

The only question now is whether the jury had evidence from which it could determine that Defendants' negligence operated to "destroy" any "causal connection" that might exist between setting the fire and the grievous injuries that ensued. Defendants refused to say one word about this evidence in their trial brief—for good reason. The answer is absolutely "Yes."

**A. The Evidence Is Measured by the Court's Charge.**

Defendants mistakenly focused their argument on abstract legal propositions rather than the law as it was stated in the Court's Charge. But when a party does not object to the charge, the charge becomes the controlling framework for sufficiency review: "[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (citing TEX. R. CIV. P. 272, 274, 278, 279; *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985); *Allen v. American Nat'l Ins. Co.*, 380 S.W.2d 604, 609 (Tex. 1964)). This rule precludes Defendants from requesting a new and independent cause instruction and later arguing that the jury could not rely on this instruction to reach its verdict.

Further, inferential rebuttal instructions cannot be narrowed after the fact with technical legal rules that do not correspond to the common and ordinary meaning of the words used in the jury instructions. As the Supreme Court explained in reference to another inferential rebuttal theory in *Dillard v. Texas Elec. Coop.*, 157 S.W.3d 429 (Tex. 2005), even if inferential rebuttals are classically associated with specific situations, "the instruction's language is not so limiting. The instruction merely informs the jury that it may consider causes of the occurrence other than the negligence of the parties." *Id.* at 433. The holding in *Dillard* is fatal to Defendants' theory.

Here, too, the "new and independent cause" instruction allowed the jury to find that Defendants' negligence after the fire started "destroys the causal connection" between any negligence of Ms. Arzola and the ensuing injuries. *See* Question 1. Indeed, the instruction's purpose is "to advise the jurors, in the appropriate case, that they do not have to place blame on a [particular actor]" if the true cause for the accident lies elsewhere. *Dillard*, 157 S.W.3d at 432 (citing *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995)). This instruction allowed the jury to determine the true cause of the injuries, and it did so conscientiously.

**B. Defendants Completely Ignored the Evidence About What Caused the *Injuries*.**

The most striking omission in Defendants' trial brief was that they did not say one word about the evidence of post-fire negligence. They did not cite the record at all in support of their argument about causation. If the "great weight" of the evidence contradicts the jury's verdict, where is it? It should trouble the Court that Defendants relied only on abstract legal propositions and ignored the evidence. A new trial sufficiency argument should not be divorced from the Court's Charge and the record.

By contrast, Ms. Wagner devoted *half* of her trial brief to post-fire causation evidence. Under the standard of review, where all evidence in support of the jury verdict must be credited, this post-fire evidence of negligence cannot be ignored. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Defendants ignored the obligation to consider "all of the evidence in the case," *id.*, and as a result, they utterly failed to demonstrate that "the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Id.*

**1. Four J's failed to remove Ms. Wagner first, according to fire escape plans.**

The evidence of Four J's subsequent negligence provided ample basis for the jury to find that Four J's negligence was a superseding cause of the "injuries in question." Ms. Udemezue confessed that she panicked instead of trying to remove her most helpless clients from the house:

*Q.* When did you first become aware of the fire?

*A.* I heard the big, the alarm, you know, go off. So I heard a big bang, boom, like somebody pulled iron or something. I heard a big bang, you know. Then my mind went outside. I said again, let me find out what's happening. I rushed outside. When I rushed outside, I saw -- because Esperanza's, Esperanza's window is very close to the front door. So I, I kind of saw the -- it was -- I mean, the fire was too much. I couldn't believe myself. And I rushed back. I came inside. I shut the door. I was confused. I didn't know what to do. I went to Elisha's room. When I went to Elisha's room, all of them they were sleeping. I started shaking her. Excuse me. I'm sorry. (Crying.) I shook her.

*Q.* After you shook her, what happened?

*A.* She got up. I took her outside. I took her outside. So when I took her outside, I came back. Already, Esperanza had already opened that door. So when I came back, I was, like, going towards Jenny and -- Jenny and Tanya's room. When I came back, there's -- I looked at that door. I started panicking when I looked at Esperanza door. And it dawned on me that all of us, because the fire is very close to Esperanza's -- the window is very close to Esperanza -- the front door. So when I saw that and I don't have the key, and my hands, my legs started shaking.

*Q.* So are you saying that you realized – are you saying that you realized that the back door, the exit, is that what you are talking about?

*A.* Yes.

*MR. PLUMMER:* Objection, leading.

*THE COURT:* Overruled on this one.

*Q.* (By Mr. Sparks) Are you saying that you realized the back door, the exit, was not an option for you to leave out of, had you been able to get Jenny and Tanya?

*A.* I got only one door there. If that fire gets to that front door, that's it. We are finished. The garage door is broken. That door and the garage, you know, one small door. I don't have the key. I have access to just only one door. So when I looked at that thing and I said, if anything happens, me too, I will get burned. That was when my hands and legs started shaking. I became -- I started panic.

*Q.* What happened after that, ma'am?

*A.* Then I couldn't use the house phone because I was actually -- I was moving around. All the calls I made was on my Cricket phone. All the calls I made, all the calls I made was on my Cricket phone. Then I had to use the same Cricket phone. When I stepped -- it was then that I started calling Esperanza, Esperanza. Then we went out together. I was in front of that door, using my Cricket phone. Well, my hands were shaking, my legs. I was shouting and nobody -- because that place is a lonely place, you know. You hardly see people moving around. But I went to the neighbors. I was shouting. Nobody came out. Then I knew the time -- I runs across to the other side to -- was shouting so that people will come out and come and help me. But I can't remember. That was the last thing. Even when the, when the, the 911 came, I passed -- I think -- I didn't know anything again. I was -- I woke up in the ambulance.

*Q.* So you passed out?

*A.* Yeah.

3 RR 181-82.

Ms. Udemezue testified that she could have gotten Ms. Wagner out, except that she panicked:

> *Q.* And as you had been instructed, you could have gone in Jenny's room, lifted her up, put her on, on the floor on, on a comforter or blanket, and drug her out, right? If she was real heavy, right? You could have done that.
>
> *A.* I could have. I could have done that.
>
> ...
>
> *Q.* So all the training in the world would not have helped you in this situation because you panicked; is that right?
>
> ... [overruled objection and question read back]
>
> *A.* Yes. ...

3 RR 213-15; *see also* 3 RR 248-49 (fire extinguisher was not used).

This testimony was undisputed. The jury was not free to disregard this testimony. Indeed, the verdict reflects that the jury properly credited it.

There was more than just general evidence about Ms. Udemezue panicking. There was also evidence that she failed to follow the standard of care with regard to who she helped first. Had Ms. Udemezue followed the rules, she would have removed Ms. Wagner first:

> *Q.* If Jenny is not the first person removed from the home, that means that Four J's rules were not followed, right?
>
> *A.* Correct.
>
> *Q.* That means one of Four J's employees didn't do their job, right?
>
> *A.* Correct.
>
> *Q.* The standard of care, I think you are telling us, requires that Jenny be removed first, right?
>
> *A.* Correct.

4 RR 39. This fatal confession means that Ms. Wagner should have escaped uninjured. Because several people escaped safely, the jury was entitled to find that Ms. Arzola's negligence did not proximately cause the injuries of the very person who should have escaped first.

On this point, there is no contrary testimony. No one testified that they could not remove Ms. Wagner. Instead, Ms. Udemezue admitted she *did not try to remove Ms. Wagner.* We can all sympathize with her panicked state, but the fact remains that her negligence cut off the causal chain from the negligence in setting the fire. If Four J's had acted according to the standard of care, this would be a property damage case. It was Four J's *subsequent* negligence that turned this case into one for wrongful death and personal injuries. The jury was entitled to reach precisely that conclusion, and on this point, Defendants have no answer.

**2. Four J's bore responsibility for the lack of adequate egress.**

The jury could have also found that everyone would have escaped safely—and perhaps even that Ms. Udumezue would not have panicked—if Defendants provided adequate egress. Evidence about the lack of egress permeated the trial. Ms. Wagner's liability expert summarized this evidence succinctly:

> *Q.* In a residential group home facility, such as the one we saw at Beretta Court, is there an industry standard of care with relation to fire exits, how accessible those exits should be in the event of a fire?
>
> *A.* All means of egress should be clear of obstacles, to include a locked door. But should be even clear of obstacles in the way. Even a chair in front of them is not permitted.
>
> *Q.* And would a deadbolt lock that requires key access in the event of an emergency, a fire, is that something that would meet the standard of care in your industry in a residential group home?
>
> *A.* The only way it would meet the standard of care is if all residents in the home had access to the key and that they could mentally and physically be able to open up the door with the key. That would be acceptable.
>
> *Q.* And you know, certainly, from Jenny's Wagner's condition that she never could have met that criteria in the Beretta Court Home.
>
> *A.* No.

3 RR 247-48.

000489

Ms. Udumezue testified that she panicked *because of* the lack of egress: "I panicked because I, I got just one exit. I would have tried my best if I had another door in that house." 3 RR 215. In addition to the locked back door, she testified that the garage door was broken and could not be used to escape. 3 RR 215. She had only one way to get four mentally disabled people out of the house. 3 RR 215.

What did Defendants say about the lack of egress in their trial brief? *Not one word.* They ignored it because the lack of egress can *cut off* Ms. Arzola's negligence in starting the fire. Imagine a group home with plenty of exits and with unlocked doors. In that scenario, one can easily imagine that Ms. Udumezue would have remained calm enough to remove Ms. Wagner. Ms. Udemezue said as much when she admitted she panicked *because* she only had one exit. 3 RR 215. There was no evidence that it would have been impossible to remove everyone if there were adequate egress. Therefore, the jury could reasonably determine that if Four J's had provided adequate egress, there would have been no physical injuries.

These kinds of scenarios are *exactly* what juries weigh when they determine causation. The jury was entitled to imagine what would have happened if Four J's had working doors, and its verdict reflects its collective judgment that adequate egress would have prevented the injuries. That fact-finding is unassailable, which is why Defendants did not even try.

For either of these reasons—Ms. Udemezue's abdication of her duties or Defendants' failure to provide adequate egress—the jury had a common-sense, rational basis to determine that Defendants' negligence was a new and independent cause of the injuries. This conclusion flows logically from an instruction that one cause can "destroy the causal connection" of another and "become the immediate cause." *See* Question 1. The jurors were entitled to rely on the Court's instruction to reach a common-sense conclusion, using their lay intuition about the concept of causation. *See Dillard*, 157 S.W.3d at 433. Their verdict was perfectly rational.

Instead of grappling with this evidence, Defendants simply argued that the fire was a "but-for cause" of the injuries (which is undisputed), and cited a string of inapplicable cases. *See* Defendants' Trial Br. at p. 6. The cases they cited involved reversals in negligence cases where the disputed fact issue was not causation but *breach*. Those cases are irrelevant, and they confirm that Defendants cannot answer the evidence in support of the verdict.

**IV. Defendants Provided a Deficient Order That Betrays Their Deficient Challenge.**

Because this Court signed Defendants' proposed order, we must note that the order reflects the flaws in Defendants' analysis and it fails to meet the standards for new trial orders. First, the order betrays the Defendants' conclusory focus on the cause-in-fact element of proximate cause to the exclusion of the foreseeability element—where the evidence in this case easily supports the verdict. The order states that the fire was a "cause-in-fact of the injuries to Jenny Wagner." This is not disputed, and more importantly, it does not lead to the conclusion that the verdict is against the great weight of the evidence. This Court would need to be convinced that, on this record and given the unique facts of this case, it would be manifestly unjust for the jury to determine Ms. Wagner's injuries unforeseeable or to find that Defendants' subsequent negligence cut off Ms. Arzola's liability. The order is silent on those issues.

Second, while Defendants knew an order granting a new trial must "specify the reasons," *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 215 (Tex. 2009), they nevertheless provided a deficient order. According to the supreme court, "[t]he reasons identified should be clearly identified and reasonably specific." *Id.* The order fails to do that. An order granting a new trial because the evidence is "against the great weight of the evidence" is just as vague as an order granting a new trial "in the interest of justice." It is a reason that is simply a shorthand phrase for a much more complicated analysis. But it can also conceal misguided analysis or be a façade for no analysis at all.

Thus, the supreme court has set out specific requirements for factual sufficiency review in *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986), building safeguards into the process to demonstrate a reviewing court's analysis and ensure the standard is correctly applied:

> [C]ourts of appeals, when reversing on insufficiency grounds, should, in their opinions, detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. Further, those courts, in their opinions, should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict.

*Id.*; *see also Citizens Nat'l Bank in Waxahachie v. Scott*, 195 S.W.3d 94, 96 (Tex. 2006).

Trial courts operate under the same constraints: "Trial courts and courts of appeals should be subject to the same standard for a simple reason: no court is free to substitute its judgment for that of the jury." *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987). This test ensures that a court does not inadvertently "substitute its judgment for that of a jury, because the court cannot exercise its constitutional authority to the detriment of the right of trial by jury, which is of equal constitutional stature." *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988).

A new trial motion seeking to set aside a jury's verdict based on a sufficiency point puts a trial court in a precarious position. The motion has the potential to erode and compromise the right to trial by jury. *See* R. Jack Ayres, Jr., *Judicial Nullification of the Right to Trial By Jury By "Evolving" Standards of Appellate Review*, 60 BAYLOR L. REV. 337, 344 (2008). Mindful of these constitutional concerns, the supreme court has granted review in a mandamus proceeding where it is being asked to clarify that trial courts must clearly demonstrate that they have given due consideration to the evidence supporting the verdict before granting a new trial. *See In re United Scaffolding, Inc.*, No. 10-0526 (oral argument heard on 10/06/2011).

000492

Although the supreme court has not yet issued its opinion in *In re United Scaffolding*, we note that the order Defendants proposed in this case is functionally identical to the order being reviewed in the supreme court. Both orders grant a new trial on the basis that the verdict was against the great weight of the evidence, but neither order explains "with specificity, why it has substituted its judgment of the facts and the credibility of the witnesses for that of the jury." *See In re United Scaffolding, Inc.*, 315 S.W.3d 246, 253 (Tex. App.—Beaumont 2010, pet. granted) (Gaultney, J., dissenting).

We do not raise this issue as a technical matter, nor are we interested in mandamus relief. Our sole objective is to encourage the Court to press the Defendants' grounds for a new trial more critically. The supreme court requires "clearly identified and reasonably specific" grounds for ordering a new trial to ensure that the trial court has a "valid basis" for granting a new trial. *In re Columbia Med. Ctr.*, 290 S.W.3d at 212. The analysis in Defendants' trial brief was demonstrably incorrect and divorced from the evidence, and if they had presented this Court with "clearly identified and reasonably specific" grounds that tracked the analysis in their trial brief, those flaws would be unmistakable. There is a reason they gave the Court such an oblique order; the reasons given in their trial brief provided no "valid basis" for the order. *Id.*

This Court has shown admirable diligence with the many post-verdict issues in this case. This final ruling deserves a fresh look simply because constitutional considerations are at stake when a careful and conscientious jury verdict is set aside. We respectfully submit that reviewing the evidence in support of the jury's verdict, using the guidance of *Dillard* and the methodology in *In re King's Estate* and *Pool*, leads to the conclusion that the jury's verdict is sound.

## CONCLUSION & PRAYER

The Court should grant this motion for reconsideration and reinstate its Final Judgment. Plaintiff respectfully requests any and all additional relief to which she may be entitled.

Respectfully submitted,

BECK, REDDEN & SECREST, L.L.P.

By: /s/ *Russell S. Post*
Russell Post
State Bar. No. 00797258
Constance H. Pfeiffer
State Bar No. 24046627
1221 McKinney, Suite 4500
Houston, TX 77010-2010
(713) 951-3700
(713) 951-3720 (Fax)

L. Lee Thweatt
State Bar No. 24008160
Joseph D. Terry
State Bar No. 24013618
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, TX 77046-0102
(713) 600-4710
(713) 600-4706 (Fax)

**ATTORNEYS FOR PLAINTIFF PATTI J. WAGNER,
AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT**

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2012, a true and correct copy of the foregoing Plaintiff's Motion for Reconsideration was properly forwarded to the following counsel of record in accordance with the Texas Rules of Civil Procedure through the Texas.gov electronic filing system or by e-file or fax addressed as follows:

James C. Plummer
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Ste. 270
Houston, TX 77006
(713) 522-3605 – Fax

David W. Holman
THE HOLMAN LAW FIRM, P.C.
24 Greenway Plaza, Ste. 2000
Houston, TX 77046
(713) 400-4841 - Fax
***Attorneys for Defendants,***
***Four J's Community Living Center, Inc.***
***and Anthonia Uduma***

Shelton Sparks
Tiffany Harvey
SHELTON SPARKS & ASSOCIATES
706 Cordell St.
Houston, TX 77009
(713) 862-4913 – Fax
***Attorneys for Intervenor***

/s/ *Russell S. Post*
Russell S. Post

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| **PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **v.** | § | |
| | § | |
| **FOUR J's COMMUNITY LIVING CENTER, INC.; ANTHONIA UDUMA; and GODFREY UDUMA,** | § | |
| | § | |
| **Defendants.** | § | **269TH JUDICIAL DISTRICT** |

# ORDER

On this day, came on to be heard Plaintiff's Motion for Reconsideration of the order granting a new trial. The Court is of the opinion that the motion should be GRANTED.

It is, therefore, ORDERED, ADJUDGED, and DECREED that the Court's order granting a new trial is VACATED and Defendants' Motion for Judgment Notwithstanding the Verdict or, In the Alternative, Motion for New Trial and Defendants' Motion to Modify, Correct or Reform the Judgment are hereby DENIED.

______________________________
Judge Presiding

______________________________
Date

**NO. 2009-40925**

| | | |
|---|---|---|
| PATTI J. WAGNER, AS GUARDIAN OF JENNI WAGNER, AN INCAPACITATED ADULT, Plaintiff, | § § § § § | IN THE DISTRICT COURT |
| v. | § § | HARRIS COUNTY, T E X A S |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA, AND GODFREY UDUMA, Defendants. | § § § § | 269TH JUDICIAL DISTRICT |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER GRANTING NEW TRIAL**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants, Four J's Community Living Center, Inc. and Anthonia Uduma, file this response to Plaintiff's motion for reconsideration, as follows:

## 1. INTRODUCTION

In her motion for reconsideration, Plaintiff argues that Esperanza Arzola's negligence in starting the fire in the group home that injured Ms. Wagner and killed Ms. James was *superseded* by Defendants' "subsequent" conduct[1] in: (1) Ms. Udemezue "panicking" and failing to remove Ms. Wagner from the fire; and (2) in failing to provide proper egress. *See* Motion for Reconsideration, at 6-11. In that argument, the Plaintiff does not argue that Esperanza Arzola was not negligent in causing the fire, and, in fact, the Plaintiff concedes

[1] In focusing only on Defendants' "subsequent" conduct, the Plaintiff is not focusing on pre-fire conduct, such as Plaintiff's allegations of improper training or equipment. Moreover, the failure to provide proper egress is an allegation of conduct that occurred prior to, rather than subsequent, to the fire.

that the fire was the cause-in-fact of the injuries to Ms. Wagner. *Id.* at 11 ("The order states that the fire was 'the cause-in-fact of the injuries to Jenny Wagner.' This is not disputed . . ."). In that argument, Plaintiff also does not argue that Esperanza Arzola's mental disability excused her negligence. Thus, the primary issue raised by Plaintiff's motion for reconsideration is whether it was unforeseeable to an ordinary person setting a fire in a residential group home that one might panic and not be able to remove all the residents safely. Under Texas law, Esperanza Arzola's setting the fire was a foreseeable cause of the injuries to Ms. Wagner. The Court properly granted a new trial because the jury's finding of no negligence on Esperanza Arzola, the person who started the fire that injured Ms. Wagner, was so against the great weight of the evidence as to be clearly wrong and manifestly unjust.

## ARGUMENT

### 1. Cause of injuries

Plaintiff first argues that the Defendants focused on the cause of the fire, and not the cause of the injuries. That is incorrect. Defendants argued that Esperanza Arzola's negligence was the cause of the injuries to the Plaintiff. *See* Defendants' Brief on Jury's Failure to Find Negligence on Esperanza Arzola, at 3-4. The evidence revealed that Ms. Wagner's injuries were caused by the fire. And, as noted above, Plaintiff concedes that Esperanza Arzola's negligence was the cause-in-fact of Ms. Wagner's injuries. *See* Motion for Reconsideration, at 11.

## 2. Ms. Udemezue's "panic" was foreseeable

Plaintiff maintains that Ms. Udemezue's "panic" was unforeseeable and thus should be a superseding cause. Under Texas law, that position is incorrect.

" 'Foreseeability' means that the actor, as a person of ordinary intelligence, should have anticipated the dangers his or her negligent act created for others." *Dallas County Mental Health and Mental Retardation v. Bossley*, 968 S.W.2d 339, 344 (Tex. 1998). To be foreseeable, it is not necessary for the wrongdoer to foresee the exact manner in which the injuries occur. *Id.* Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex. 1998). In a landmark opinion, the Texas Supreme Court stated:

> To make a negligent act the proximate cause of an injury it is not essential that the particular injurious consequences and the precise manner of their infliction could reasonably have been foreseen. If the consequences follow in unbroken sequence from the wrong to the injury, it is sufficient that if at the time of the original negligence the wrongdoer might by the exercise of ordinary care have foreseen that some similar injury might result from the negligence.

*Atchison v. Texas & P. Ry. Co.*, 143 Tex. 466, 473-74, 186 S.W.2d 228, 231-32 (Tex. 1945).

In the present case, in an "unbroken sequence," the fire started by Esperanza Arzola cooperated with the negligence of Ms. Udemezue to proximately cause the injury to Ms. Wagner. An ordinary person in Esperanza Arzola's position could certainly foresee that starting a fire in a residential group home could result in injuries caused by fire to those who were not rescued in time.

Plaintiff claims that the "panic" in Ms. Udemezue which was caused by her reaction to the fire was unforeseeable. Plaintiff cites no cases for that proposition, or for the proposition that "panic" caused by an actor's conduct can be a superseding cause. There is authority to contrary.

The Restatement (Second) of Torts recognizes that such panic is not unforeseeable and does not supersede the original cause:

> An act done by another in normal response to fear or emotional disturbance to which the actor's negligent conduct is a substantial factor in subjecting the other is not a superseding cause of harm done by the other's act to himself or a third person.

RESTATEMENT (SECOND) OF TORTS, § 444 (1965); *see. e.g. Sommers v. Baja Foods, Inc.*, 2004 WL 2384340, at *7 (Cal. App. 2 Dist. 2004, no pet.) (unpublished) ("Furthermore, the law of proximate cause permits a defendant to be found liable when its actions foreseeably cause another to panic and the panicked reaction results in the plaintiff's injury.").

The only case that Plaintiff cites to support her position is *City of Bishop v. South Texas Elec. Co-op., Inc.*, 577 S.W.2d 331, 335-36 (Tex. Civ. App.—Corpus Christi 1979, no writ). That case is a Palsgrafian foray into unforesseability. In *City of Bishop*, an electric company started a grass fire on the King Ranch. There was no one in the vicinity at the time of the fire. *Id* at 333. The workers called in volunteer firemen. The volunteer firemen brought a "GI" truck out to fight the fire, but when the water was running low in that truck, they went back to the station for another fire truck. They moved the new fire truck near the firebreak. When the fire was "perilously close" to the fire truck, the firemen attempted to drive the truck away, only to have it malfunction and fail to start, for reasons unrelated to the

fire. The truck was subsequently engulfed in flames and destroyed. The City sued the electric company for property damages to the fire truck.

In contrast to the present case, the Court held that it would have taken a "prophetic ken" for the electric company defendant to anticipate the combination of events that led to the fire truck's destruction. *Id* at 335. The equipment malfunction on the fire truck was so "improbable" that it could not have been foreseen. *Id* at 336.

On the other hand, the *City of Bishop* opinion recognized that certain dangers could have been reasonably anticipated, like the fact that firefighters would respond to the fire and that a fire truck could be immobilized by "hidden tree stumps, bailing wire, or ground ruts," and so forth. *Id* at 335. So too here, certain dangers could have been reasonably anticipated by an ordinary person setting a fire in a residential group home—such as that people would panic and that not all residents would be safely evacuated. The very injuries anticipated by setting a fire in a residential group home—that is, injuries caused by fire—are the very injuries suffered by Ms. Wagner.

**3. Ms. Udemezue's "panic" was not a "superseding" cause**

In conjunction with her foreseeability argument, Plaintiff argues that the unforeseeable "panic" of Ms. Udemezue superseded the negligence of Esperanza Arzola. That is also incorrect under Texas law.

A "new and independent cause" which is sufficient to supersede the original wrongdoer's negligence is "the act or omission of a separate and independent agent, *not reasonably foreseeable*, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question." *Columbia Rio Grande Healthcare,*

*L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009) (emphasis added).[2] If the act or omission is caused by the act of the original wrongdoer, like the panic in Ms. Udemezue caused by the fire, the subsequent act or omission cannot be a superseding, new and independent cause. *Id.*

If, as here, it is reasonably foreseeable that the fire could cause a rescuer to panic, then the negligence of the rescuer is a concurring cause, not a superseding cause. The Texas Supreme Court has held:

> If the act or omission alleged to have been a new and independent cause is reasonably foreseeable at the time of the defendant's alleged negligence, the new act or omission is a concurring cause as opposed to a superseding or new and independent cause.

*Id* at 857.

Moreover, in looking at whether the second defendant's negligence superseded the first defendant's negligence, the Court looks at a number of factors, taken from the Restatement:

> (a) the fact that the intervening force brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

[2] Plaintiff also argues that because a new and independent charge instruction was submitted, the jury was entitled to follow that instruction. However, that instruction does not change the evidence or transform Defendants' acts into new and independent causes when the evidence is to the contrary.

> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>
> (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
>
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Id.* at 857-58 (citing RESTATEMENT (SECOND) OF TORTS § 442 (1965)).

Applying those factors, Ms. Udemezue's panic could not be a superseding cause, as a matter of law. First, a superseding cause must not only be "unforeseeable, but its consequences unexpected." *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 451 (Tex. 2006). Here, all of the alleged acts of negligence by the Defendants were part of the foreseeable chain of causation begun when Esperanza Arzola started the fire.

Second, a superseding cause "is one that alters the natural sequence of events and produces results that would not otherwise have occurred." *Id.* Here, the same results occurred from the concurring negligence of Arzola and Defendants, as alleged.

Third, "[a]n intervening force will not break a causal connection if that force was itself probable or foreseeable by the original wrongdoer." *Id.* Certainly, an ordinary person setting a fire could foresee that people could be injured or killed if they could not exit the residential group home in time.

Finally, a superseding cause must cause "injury different from that which might have been expected at the time of the original negligent act." *Id.* at 451-52. Or, as the Supreme Court held in *Hawley*, "where the risk resulting from the intervening act is the same risk

resulting from the original actor's negligence, the intervening act cannot be classified as a superseding cause." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d at 859 (Tex. 2009). Here, the same injuries and risks resulted from both Arzola's act and Defendants' alleged acts or omissions.

Thus, Defendants' acts or omissions were not new and independent causes that superseded Esperanza Arzola's negligence. The harm created by her negligence was exactly the same harm that resulted from Esperanza Arzola's negligence, which is injuries due to fire.

**4. The order is proper**

Finally, the Plaintiff argues that the Court's order granting new trial is improper. In *Columbia Medical Center of Las Colinas*, the Texas Supreme Court stated for the first time that a court must give its reason for granting a new trial. *In re Columbia Medical Center of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204 (Tex. 2009). The Court did not provide much guidance in this regard, but stated that broad statements, such as "in the interest of justice" are not sufficiently specific and that the reason should be "clearly identified and reasonably specific." *Id.* at 215.

Here, in its Order Granting New Trial, the Court provides the precise reason for the grant of the new trial, and includes the primary case authority relied upon:

> The reason for the Court's grant of new trial is that the jury's failure to find negligence on Esperanza Arzola, who started the fire that was the cause-in-fact of the injuries to Jenny Wagner and the death of Tanya James, is so against the great weight of the evidence as to be clearly wrong and manifestly unjust. *See Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988).

That Order identifies for the Plaintiff and any reviewing court exactly why the Court granted new trial.

Plaintiff suggests that this language is insufficient because it is like the order in *In re United Scaffolding*, which is now under review by the Texas Supreme Court. *See In re United Scaffolding, Inc.*, 315 S.W.3d 246 (Tex. App.—Beaumont 2010, pet. granted). In that cited case, the majority of the Beaumont court of appeals held that the order granting new trial was sufficiently specific, but the dissent disagreed. However, whatever the Supreme Court may hold about that order, that holding would not apply here. There, the order stated only that the jury's finding was against the great weight of the evidence, **but it did not say why.** Here, the Court's order provides the specific reason for granting the new trial, which is all the Supreme Court requires.

## CONCLUSION

This Court correctly granted new trial. Plaintiff has failed to present sound reasons for reconsideration of that order. For that reason, the Defendants request that Plaintiff's Motion for Reconsideration be, in all things, denied.

Respectfully submitted,

PLUMMER & KUYKENDALL

James C. Plummer
Texas Bar No. 16075700
4203 Montrose Boulevard, Suite 270
Houston, Texas 77006
Telephone 713.522.2887
Facsimile 713.522.3605

THE HOLMAN LAW FIRM, P.C.

s/David W. Holman
David W. Holman
Texas Bar No. 09902500
24 Greenway Plaza, Suite 2000
Houston, Texas 77046
Telephone 713.400.4840
Facsimile 713.400.4841

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2012:

This document was filed via Texas.gov electronic filing system, and the required number of copies was forwarded to the Court by regular mail or express mail.

This document was forwarded to the following via Texas.gov electronic filing system and/or electronic mail:

*Attorneys for Plaintiff*

Mr. L. Lee Thweatt
Mr. Joseph D. Terry
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, Texas 77046
Telephone 713.600.4710
Facsimile 713.600.4706

Mr. Russell S. Post
Ms. Constance H. Pfeiffer
BECK, REDDEN & SECREST, LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone 713.951.3700
Facsimile 713.951.3720

*Attorneys for Intervenor*

Mr. Shelton Sparks
Ms. Tiffany Harvey
SHELTON SPARKS & ASSOCIATES
706 Cordell Street
Houston, Texas 77009
Telephone 713.862.5533 Facsimile 713.862.4913

s/David W. Holman
David W. Holman

Filed 12 May 3 P4:10
Chris Daniel - District Clerk
Harris County
ED101J016861789
By: Charlie R. Tezeno

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| **PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT,** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiff,** | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| **FOUR J's COMMUNITY LIVING CENTER, INC.; ANTHONIA UDUMA; and GODFREY UDUMA,** | § | |
| **Defendants.** | § | **269TH JUDICIAL DISTRICT** |

# REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION OF ORDER GRANTING NEW TRIAL

Plaintiff Patti J. Wagner ("Ms. Wagner"), appearing as guardian of Jenny Ann Wagner, files this reply in support of her motion for reconsideration of the order granting a new trial.

Possibly the most difficult thing a judge is asked to do is to reconsider a hard decision. We recognize that reality, and we did not make the request lightly. But the Defendants' response has confirmed that they were not entitled to relief on their factual sufficiency challenge to the jury's verdict, they cannot defend it with reference to the evidence and jury charge at this trial, and they are unwilling to provide a detailed order explaining it because they realize such an order would expose the fallacy of their position. The Court should set aside its new trial order and reinstate its judgment, giving effect to the conscientious work of this jury.

No litigant should ask a court to set aside a jury verdict on the theory that it is contrary to the great weight of the evidence unless that litigant can "detail the evidence" and "clearly state" why the verdict is "so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). Plaintiffs' motion challenged Defendants to identify the evidence that supports their great weight argument. Mot. at 6. But in a telling confession of weakness, their response does not cite *one scintilla of evidence*. The "response" is non-responsive.

There is a reason the Defendants hide from the evidence. Based on the evidence at trial, this jury reasonably found that any negligence of Ms. Arzola in starting the fire did not "cause" the "injuries in question," because the Defendants negligently failed to prevent those injuries *after the fire started.* Evidence at trial proved overwhelmingly that the Defendants' caregiver panicked and failed to remove the plaintiffs from the burning house and that Defendants failed to provide a safe means of egress from the house. But for that negligence, the "injuries in question" never would have occurred. That evidence is a perfectly rational basis for the jury's verdict. Defendants ignore it—as well as the jury instructions that entitled the jury to reach this verdict.

As the motion for reconsideration pointed out, when there is no objection to the jury instructions the factual sufficiency of the evidence must be evaluated under the charge as given. That is a bedrock principle of Texas law, which Defendants do not contest. Yet their response is devoted entirely to abstract legal rules that were not in the charge, ignoring the jury instructions in direct violation of the rule that "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *see also* 4 RR 215 (no charge objections).

First, in Question 1(3), this jury was asked whether the negligence, if any, of Ms. Arzola proximately caused the "injuries in question." By focusing on the *injuries,* not the *occurrence*, Question 1 shifted the jury's attention from the fire as a general event to causation of the injuries actually suffered by the plaintiffs. This is a long-recognized distinction in Texas charge practice because some acts of negligence may be found to cause *occurrences*, but not the ultimate *injuries* (and by contrast, some acts of negligence may be found to cause the injuries even if they did not cause the underlying occurrence). Defendants ignore this settled distinction because it is fatal to their argument: Even if Ms. Arzola's conduct caused the original "occurrence" (*i.e.*, the fire), the jury could rationally conclude that it did not cause the ultimate "injuries."

000508

Second, as the motion for reconsideration pointed out, this jury was instructed that when multiple causes are involved, one cause may "destroy the causal connection" of another and "become the immediate cause." Question 1. Defendants invited this jury instruction themselves, so they certainly cannot complain about it now. *See General Chemical Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993) (party cannot complain when it "requested the very issues that it now seeks to avoid"). That instruction went beyond basic legal principles on causation and affirmatively instructed the jury that one cause could "destroy the causal connection" of another, which is perfectly consistent with the jury's evaluation of the evidence regarding Defendants' negligence after the fire had started. This is a highly rational basis for the jury's verdict.

As the motion for reconsideration pointed out, it is no answer to suggest, after the fact, that this instruction (the PJC instruction on "new and independent cause") can be given a limited, technical interpretation. The Supreme Court has specifically rejected that approach to verdicts, holding that instructions like this one are given their plain and ordinary meaning and juries are entitled to view them as a layman would, using common sense. *Dillard v. Texas Elec. Coop.*, 157 S.W.3d 429, 432-33 (Tex. 2005). This is precisely the sort of case *Dillard* had in mind when it held that such an inferential rebuttal instruction advises jurors "that they do not have to place blame" on a particular actor if the ultimate cause of the injury lies elsewhere. *Id.* at 432. This jury did exactly what the Supreme Court has held it was entitled to do, given the evidence and the unobjected-to jury instructions. Little wonder that Defendants ignore both the instruction and the *Dillard* rule. Their response, pp. 5-8, simply defies *Osterberg* and *Dillard*.

What, then, is Defendants' argument that the evidence proving Ms. Arzola caused the "injuries in question" is so overwhelming that any other verdict would be "manifestly unjust"? *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 664-65 (Tex. 1951). It has nothing to do with the actual evidence or jury instructions, but with abstract legal principles. It is wrong.

Defendants have devoted their response entirely to abstract legal principles as if the question before the Court were a summary judgment motion or a request for jury instructions. But that is not the issue. The question is whether this jury, acting under these jury instructions, had a reasonable basis to render its verdict. Nothing in the abstract legal principles cited by the Defendants' response is even remotely relevant to that question. It is all well and good to discuss the abstract concepts of "foreseeability," "superseding cause," and "new and independent cause," but none of that discussion assists the Court in determining whether this jury was entitled to weigh the evidence in this case and conclude that Ms. Arzola's conduct did not cause the injuries (especially to the extent that Defendants rely on rules that were not set forth in the jury charge). Their response flies in the face of the *Osterberg* rule, which has been Texas law for generations. Equally important, their response assumes that these abstract legal principles dictated a verdict as a matter of law, leaving no room for the jury to weigh these causation concepts and determine that Ms. Arzola's conduct was not a cause of the "injuries in question."

This fallacy is especially evident when the one focuses on the precise acts of negligence that support the jury verdict. First, with respect to Ms. Udemezue's panic after the fire started, Defendants simply rely on general propositions of foreseeability and cite a Restatement section for the principle that subsequent panic in reaction to negligent conduct is not a superseding cause *as a matter of law*. Resp. at 3-4. This approach is misguided because these precise concepts were not set forth in the jury instructions, so Defendants' argument violates the *Osterberg* rule. But equally important, Defendants' argument confuses the difference between general legal rules and a jury's right to reach conclusions based on the evidence. Plaintiffs do not disagree with the abstract legal propositions about foreseeability cited by Defendants, but none of them dictates the conclusion that this jury was *required* to find Ms. Arzola's conduct a proximate cause of the "injuries in question." They simply represent the legal rules that guide that determination.

Likewise, the Restatement provision simply stands for the proposition that panic is not a superseding cause defense *as a matter of law*. But Plaintiffs are not arguing it as a matter of law; we are arguing that the jury was entitled to weigh Ms. Udemezue's panic after the fire started in its fact-bound determinations about causation. If the jury had found Ms. Arzola responsible and she wished to set aside that verdict on the basis that Ms. Udemezue's subsequent panic was a superseding cause as a matter of law, Defendants would be correct. But that is not the issue. The jury weighed all this evidence and was rationally entitled to find that Ms. Arzola's conduct in starting the fire did not cause the injuries, but that Ms. Udemezeu's panic caused them.

The Restatement supports that conclusion, as it recognizes that a panic-stricken response to the prior negligence of one party, "if done by a third person, may subject him to liability to the person harmed." RESTATEMENT (SECOND) OF TORTS § 443 cmt. c. Weighing concurring causes and determining whether the subsequent acts of negligence "destroyed the causal connection" from Ms. Arzola's conduct in starting the fire is a classic jury function. The Restatement itself makes clear that in this situation "the question should be left to the jury":

> If ... the negligent character of the third person's intervening act or the reasonable foreseeability of its being done is a factor in determining whether the intervening act relieves the actor from liability for his antecedent negligence, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, *the question should be left to the jury*.

RESTATEMENT (SECOND) OF TORTS § 453 cmt. b (citations omitted) (emphasis added).

Defendants' response to the other act of negligence highlighted in Plaintiffs' motion—their failure to provide a safe means of egress—is even worse. They dismiss it in a footnote because it is "an allegation of conduct that occurred prior to, rather than subsequent, to the fire." Resp. at 1 n.1. But obviously, for causation purposes, it is irrelevant that Defendants' "conduct" occurred "prior to" the fire. Its causal effect on the "injuries in question" occurred *after* the fire, cutting off any safe means of escape—a perfectly rational basis for the jury's verdict.

In simplest terms, Defendants are unwilling to face the evidence and jury instructions, despite the fact they they secured a new trial on a factual sufficiency ground that requires courts to find the jury's verdict was "manifestly unjust," *In re King's Estate*, 244 S.W.2d at 664-65, based on "the court's charge, not some other unidentified law." *Osterberg*, 12 S.W.3d at 55. Plaintiffs are not aware of a single case in which a similar ruling has been made in a situation involving concurring causes, and Defendants have not cited any. As we have pointed out, Defendants' motion for new trial cited only cases in which a failure to find *negligence* was contrary to the great weight and preponderance of the evidence—they did not involve situations in which a court held that a jury was obligated to find *causation* among concurring causes. Defendants' response does not deny the point, and does not attempt to rehabilitate their cases. Thus, while Defendants try to distinguish the *City of Bishop* case (in which a similar verdict was upheld because the jury was free to find that a party that set a fire was not the proximate cause of the injuries but that the subsequent negligence of other parties constituted the ultimate cause), they cannot cite any cases of their own on similar facts. They are adrift on a sea of abstract rules.

Defendants' reliance on abstract legal propositions, divorced from the evidence and the jury instructions, reveals that their argument is simply a request for the Court to play fact-finder. That is why they are unwilling to tender an order that attempts to "detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias.' *Pool*, 715 S.W.2d at 635. They cannot do so. Plaintiffs respectfully urge the Court to reconsider its order granting a new trial.

**CONCLUSION & PRAYER**

The Court should grant the motion for reconsideration and reinstate its Final Judgment. Plaintiff respectfully requests any and all additional relief to which she may be entitled.

Respectfully submitted,

BECK, REDDEN & SECREST, L.L.P.

By: /s/ *Russell S. Post*
Russell Post
State Bar. No. 00797258
Constance H. Pfeiffer
State Bar No. 24046627
1221 McKinney, Suite 4500
Houston, TX 77010-2010
(713) 951-3700
(713) 951-3720 (Fax)

L. Lee Thweatt
State Bar No. 24008160
Joseph D. Terry
State Bar No. 24013618
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, TX 77046-0102
(713) 600-4710
(713) 600-4706 (Fax)

**ATTORNEYS FOR PLAINTIFF PATTI J. WAGNER, AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT**

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2012, a true and correct copy of the foregoing Plaintiff's Reply in Support of Motion for Reconsideration was properly forwarded to the following counsel of record in accordance with the Texas Rules of Civil Procedure through the Texas.gov electronic filing system or by e-file or fax addressed as follows:

James C. Plummer
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Ste. 270
Houston, TX 77006
(713) 522-3605 – Fax

David W. Holman
THE HOLMAN LAW FIRM, P.C.
24 Greenway Plaza, Ste. 2000
Houston, TX 77046
(713) 400-4841 - Fax
***Attorneys for Defendants,***
***Four J's Community Living Center, Inc.***
***and Anthonia Uduma***

Shelton Sparks
Tiffany Harvey
SHELTON SPARKS & ASSOCIATES
706 Cordell St.
Houston, TX 77009
(713) 862-4913 – Fax
***Attorneys for Intervenor***

/s/ *Russell S. Post*
Russell S. Post

P01
REHRY

NO. 2009-40925

| | | |
|---|---|---|
| PATTI J. WAGNER *et al.*, | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| FOUR J'S COMMUNITY LIVING CENTER, INC. *et al.*, | § | |
| | § | |
| *Defendants*. | § | 269TH JUDICIAL DISTRICT |

**ORDER**

Pending before the Court is Plaintiffs' Motion for Reconsideration of Order Granting New Trial. The Court heard argument on this Motion at an oral hearing on May 4, 2012. After considering the motion, Defendants' response, Plaintiff's reply, the arguments of counsel, and the applicable law, the Court concludes that the motion should be denied.

Therefore, Plaintiffs' Motion for Reconsideration of Order Granting New Trial is ***DENIED***.

This case is ***ASSIGNED*** to trial to begin at 8:30 a.m. on Monday, June 4, 2012.

***SIGNED*** at Houston, Texas this 4th day of May, 2012.

[signature]

Hon. Dan Hinde
Judge, 269th Judicial District Court

1
dismy

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| PATTI J. WAGNER, AS GUARDIAN OF JENNI WAGNER, AN INCAPACITATED ADULT Plaintiff, | § § § § § | IN THE DISTRICT COURT |
| v. | § § | 269th JUDICIAL DISTRICT |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA Defendants | § § § | HARRIS COUNTY, TEXAS |

**OR ER ON MOTION TO DISMISS**

Pending before the Court is Defendants' Motion to Dismiss Defendant Anthonia Uduma pursuant to Tex. Civ. Prac. & Rem. Code §74.001, et seq. and the failure to comply with the requirements of Tex. Civ. Prac. & Rem. Code §74.351, et. seq.

The court, having reviewed the motion and any response, and upon arguments of counsel, finds that the motion should be DENIED.

Signed this this 23rd day of August, 2012.

JUDGE PRESIDING

FILED
Chris Daniel
District Clerk
AUG 23 2012
Time ______ Harris County, Texas
By ______ Deputy

K: Uduma (Wagner) Order - Motion to Dismiss Uduma 2.wpd

CAUSE NO. 2009-40925

| | | |
|---|---|---|
| PATTI J. WAGNER, AS GUARDIAN OF JENNI WAGNER, AN INCAPACITATED ADULT Plaintiff, | § § § § § | IN THE DISTRICT COURT |
| v. | § § | 269th JUDICIAL DISTRICT |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA Defendants | § § § | HARRIS COUNTY, TEXAS |

**NOTICE OF APPEAL OF ANTHONIA UDUMA**

Defendant Anthonia Uduma hereby gives notice of her appeal, pursuant to Tex. Civ. P. Rem. Code §74.00a, et seq., from the trial court's interlocutory order as follows:

1. Order on Motion to Dismiss, dated August 23, 2012, denying Defendant Anthonia Uduma's motion to dismiss pursuant to Tex. Civ. P. Rem. Code §74.351, et seq.

Ms. Uduma appeals to the Fourteenth Court of Appeals.

Respectfully submitted,

By: James C. Plummer

James C. Plummer, TBA #16075700
Amar Raval, TBA #24046682
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Suite 270
Houston, Texas 77006
(713) 522-2887
(713) 522-3605 (Fax)

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing Notice of Appeal was served by hand delivery, certified mail, return receipt requested, or by fax transmission on August 24, 2012, to:

L. Lee Thweatt, Esq.
Joseph D. Terry, Esq.
Terry & Thweatt, PC
One Greenway Plaza, Suite 100
Houston, TX 77046

Russell Post, Esq.
Connie Pfeiffer, Esq.
Beck, Redden & Secrest, LLP
1221 McKinney St., Suite 4500
Houston, TX 77010

James C. Plummer

James C. Plummer

**Local Rule Notice of and Assignment of Related Case In Original Proceedings**

As required by the Local Rules Relating to Assignment of Related Cases to and Transfers of Related Cases between the First and Fourteenth Courts of Appeals, I certify that the following related appeal or original proceeding has been previously filed in either the First or Fourteenth Court of Appeals:

X None

☐ Caption: ______________________

Trial court case number: ______________________

Appellate court case number: ______________________

James C. Plummer (digitally signed)

[Signature of certifying attorney or pro se party]

______________________

[Date]

**Note:** See Local Rules for the definitions of "underlying case," "related," and "previously filed."



# MANDATE

## Court of Appeals
## First District of Texas

NO. 01-12-00796-CV

ANTHONIA UDUMA, Appellant

V.

PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT, Appellee

Appeal from the 269th District Court of Harris County. (Tr. Ct. No. 2009-40925).

**TO THE 269TH DISTRICT COURT OF HARRIS COUNTY, GREETINGS:**

Before this Court, on the 27th day of August 2014, the case upon appeal to revise or to reverse your judgment was determined. This Court made its order in these words:

> This case is an appeal from the interlocutory order signed by the trial court on August 23, 2012. After submitting the case on the appellate record and the arguments properly raised by the parties, the Court holds that there was no reversible error in the trial court's order. Accordingly, the Court **affirms** the trial court's order.
>
> The Court **orders** that the appellant, Anthonia Uduma, pay all appellate costs.

The Court **orders** that this decision be certified below for observance.

Judgment rendered August 27, 2014.

Panel consists of Justices Jennings, Sharp, and Brown. Opinion delivered by Justice Sharp.

**WHEREFORE, WE COMMAND YOU** to observe the order of our said Court in this behalf and in all things to have it duly recognized, obeyed, and executed.

September 4, 2015

Date

CHRISTOPHER A. PRINE
CLERK OF THE COURT

REPORTER'S RECORD
VOLUME I

TRIAL COURT CAUSE NO. 2009-40925

| | | |
|---|---|---|
| PATTI J. WAGNER, as Guardian of JENNY ANN WAGNER, an Incapacitated Adult | ) | IN THE DISTRICT COURT |
| V. | ) | OF HARRIS COUNTY, TEXAS |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA and GODFREY UDUMA | ) | 269TH JUDICIAL DISTRICT |

-------------------------------

PRETRIAL MOTIONS, VOIR DIRE,

STATEMENT OF FACTS

-------------------------------

On the 17th day of October, 2011, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Dan Hinde, Judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by machine shorthand.

Annette Peltier, CSR, RPR, CLR
Deputy Official Court Reporter
Harris County, Texas

000522

A P P E A R A N C E S

FOR THE PLAINTIFF, PATTI J. WAGNER, as Guardian of JENNY ANN WAGNER, an Incapacitated Adult:

    MR. L. LEE THWEATT
    TBA NO. 24008160
    MR. JOSEPH TERRY
    TBA NO. 24013618
    Terry & Thweatt, P.C.
    One Greenway Plaza, Suite 100
    Houston, Texas 77046
    Phone: 713.600.4710


FOR THE INTERVENOR:

    MR. SHELTON SPARKS
    TBA NO. 06507160
    Shelton Sparks & Associates
    706 Cordell Street
    Houston, Texas 77009
    Phone: 713.862.4913


FOR THE DEFENDANTS:

    MR. JAMES C. PLUMMER
    TBA NO. 16075700
    Plummer & Kuykendahl
    4203 Montrose, Suite 270
    Houston, Texas 77006
    Phone: 713.522.3605

I N D E X

VOLUME I

| | Page | Vol. |
|---|---|---|
| Announcements.......................... | 4 | 1 |
| Pretrial Motions....................... | 12 | 1 |
| Voir Dire by the Court................. | 54 | 1 |
| Juror Instructions to the Panel....... | 60 | 1 |
| Voir Dire by the Plaintiff............ | 67 | 1 |
| Voir Dire by the Intervenor........... | 88 | 1 |
| Voir Dire by the Defendant............ | 115 | 1 |
| Jury Seated........................... | 227 | 1 |
| Jury Instructions..................... | 231 | 1 |
| Plaintiff's Opening Statement......... | 242 | 1 |
| Intervenor's Opening Statement........ | 254 | 1 |
| Defendant's Opening Statement......... | 265 | 1 |
| Plaintiff's Witnesses | | |
| PATTI WAGNER | | |
| Direct Examination by Plaintiff... | 275 | 1 |
| Direct Examination by Intervenor.. | 304 | 1 |
| Cross-Examination by Defendant.... | 312 | 1 |
| Redirect Examination by Plaintiff. | 325 | 1 |
| Adjournment........................... | 352 | 1 |
| Court Reporter's Certification........ | 353 | 1 |

EXHIBITS PREADMITTED

| | Page | Vol. |
|---|---|---|
| Plaintiff's 1-33, 35-37, 39-40, 43-37, 50-53...... | 48 | 1 |
| Intervenor's 1, 2, 4-8, 10, 11, 15-24.............. | 49 | 1 |
| Defendant's 2-4, 7, 10-12, 15, 16, 18-25, 36, 37, 59, 64, 66-68, 70...................... | 50 | 1 |

000524

THE COURT: All right. This is Cause Number 2009-40925, Patti J. Wagner, as Guardian of Jenny Wagner, an Incapacitated Adult, et al, versus Four J's Community Living Center, Inc., et al.

Can I have appearances, please, for the record?

MR. THWEATT: Good morning, Your Honor. Lee Thweatt and Joe Terry for the plaintiff, Patti Wagner, and on behalf of her daughter, Jenny Wagner.

THE COURT: All right.

MR. SPARKS: Shelton Sparks and Tiffany Harvey for the Intervenor.

THE COURT: All right.

MR. PLUMMER: Jim Plummer and Amar Raval for the defendants, Four J's Community -- Community Centers, and Anthonia Uduma.

THE COURT: All right. Thank you.

MR. PLUMMER: And our legal assistant, Ms. Trevino.

THE COURT: Thank you.

All right. Plaintiffs ready for trial?

MR. THWEATT: Yes, Your Honor.

THE COURT: Intervenors ready for trial?

MR. PLUMMER: Yes, Your --

THE COURT: Excuse me. Intervenors ready for trial?

MR. SPARKS: Yes, Your Honor.

THE COURT: Defense ready for trial?

MR. PLUMMER: Yes, Your Honor.

We do have a motion that --

THE COURT: We're going to take that up in a moment. All right?

All right. First things first. I think we've already talked about this, the time limits. I've set this for four days. So each side will get seven hours to present their own witnesses and cross-examine the opposing side's witnesses.

Let's talk here briefly: Mr. Thweatt, Mr. Sparks, how much time do you need for voir dire?

MR. THWEATT: Your Honor, my partner, Joe Terry's going to be handling voir dire.

MR. TERRY: 35, 40 minutes, Your Honor, will be fine.

THE COURT: And is that just for yourself or to be split with Mr. Sparks?

MR. TERRY: Just for myself, Your Honor.

MR. SPARKS: Judge, I think no more

than 20 minutes.

THE COURT: How much time do you need, Mr. Plummer?

MR. PLUMMER: Judge, I believe 35, 40 minutes will be fine.

THE COURT: All right. What I'll give is 50 minutes for plaintiffs and intervenors to split and 50 minutes, equal time, for you.

Do y'all want any warnings, a five-minute warning or anything like that?

MR. TERRY: Sure, Your Honor. That would be fine.

THE COURT: Well, do you want a five-minute warning?

MR. TERRY: Yes, sir.

MR. SPARKS: Yes, sir.

THE COURT: Do you want a warning, Mr. Plummer?

MR. PLUMMER: Yes, Your Honor. Five minutes will be fine for me.

THE COURT: Mr. Thweatt, how much time do you need for opening statement?

MR. THWEATT: I think about 40 minutes would be --

THE COURT: You need 40 minutes on this

000527

one?

MR. THWEATT: I'll cut it down to 30, Judge.

THE COURT: Mr. Sparks?

MR. SPARKS: 20 minutes.

THE COURT: All right. I'll give plaintiffs and intervenors 45 minutes total.

Do y'all, again, want a warning of any kind?

MR. SPARKS: Yes.

MR. THWEATT: Yes.

THE COURT: 45 minutes sufficient, Mr. Plummer?

MR. PLUMMER: More than sufficient, Your Honor.

THE COURT: Do you want a warning?

MR. PLUMMER: Yes, Your Honor.

THE COURT: Five minutes.

MR. PLUMMER: Five minutes is plenty.

THE COURT: And we'll worry about the time limits for closing argument when we get there.

Just to let y'all know what to expect: With our new jury facility right next door, we expect -- I expect to get the jury here by about 9:30, maybe, at the latest, 9:45. So we've got a lot of work to do in

000528

the next 40 minutes because I don't make them wait.

As soon as we get the jury cards, they will be distributed to you. If we're still in the middle of arguing motions in limine and whatnot, they'll be handed to you. If we're done, obviously, you'll have more time to do that. But we'll get those cards to you as soon as we get them.

Once they arrive in the hall, they need some time to use the restroom and whatnot. We'll break what we're doing here, and I will go out and greet them in the hallway informally to welcome them to the court, thank them for their service, and encourage them to speak up during voir dire. That will give y'all a few extra minutes to go over their cards.

Then we'll bring them in. Counsel will conduct their voir dire examination from that podium that's standing right there. The court reporter will be over kind of behind where Mr. Plummer is, along the rail to the gallery. So I can't have y'all walking back and forth back there, especially since my court reporter, unfortunately, is injured. I don't want anyone tripping over her injured foot.

So you'll conduct your voir dire from that podium. We'll do the entire panel examination. Don't worry about motions to strike for cause during the

panel examinations. Just do your panel examination and then we'll take a break for the panel while we'll call back any jurors who you need to bring back for an individual interview.

What will happen is when Mr. Plummer's done with his panel examination, I'll call the lawyers up here, then I'll ask you to give me just the numbers of any jurors that you need to call back for an individual interview. So be thinking about that. Don't wait until I call you up to start thinking about who y'all need to talk to again.

Unless I ask for an explanation, you don't need to give me an explanation. Just give me the numbers. Then we'll do the break while we're bringing them back in one by one.

Again, don't worry about motions to strike for cause during the individual interviews. Let's just get all those individual interviews taken care of. Then after that, we'll worry about motions to strike for cause.

I'll ask you again, each -- each party, give me the numbers of any jurors that you're moving to strike for cause. Again, unless I ask you for an explanation, don't start giving me your argument because, basically, I want to see if there are any

000530

double or triple strikes of people who, you know, looks like everybody agrees on.

Then I'll ask you, okay, do you agree on any of plaintiff's, do you agree on any defendants', and then we'll argue the ones that are in dispute.

After that, you'll get about 10 to 15 minutes to do your peremptories, and I will bring the jury back in and impanel the jury.

I've brought -- I've ordered a panel of 48 jurors; so it will start from Juror Number 1 to my extreme right on the front row of the gallery, all the way to Juror Number 16 on the front row to my extreme left. We start with Juror Number 17 on the second row and go all the way to Juror Number 32, and then Juror Number 33 on the far right, all the way to Juror Number 48. So that's how we'll handle that.

One thing we do here, you're going to find out, if you haven't already figured out, I value the jury's time very highly and I try to make sure that we use their time as efficiently as possible. So we're going to be working very hard to make sure that as much of the time during the day is spent with them in the box, presenting witnesses, evidence, and argument to them, as possible.

Sometimes, obviously, we have to

000531

have -- we have to have conferences outside the presence of the jury. We have some unique technology here that allows us to do that without having to shuffle the jury back and forth to the jury room or without requiring us to whisper up here under our breaths and it also allows us to have the conferences on the record. It's a white noise system.

What will happen is I will turn on the white noise system, y'all will come up here, you'll speak directly and in a regular voice towards this microphone here. I'll speak towards my microphone. The court reporter will be able to record it.

Meanwhile, the speakers over the jury box will be broadcasting white noise; so all the jurors can hear is white noise. I've interviewed every jury after every trial I've had in this court to make sure it works; and every time they told me they could not understand what was being said between the lawyers and the judge during these conferences. It's an amazing timesaver, and it allows us to get through that stuff pretty quickly. This is what it sounds like, incidentally.

All right. I didn't look too closely at your charges. If y'all are all in agreement on the charge, that's one thing; it will be easy. If y'all

haven't agreed on the charge, I'll need you to each e-mail your latest version of the charge to Mr. Garibay in Word format so that I can put the charge together as quickly as possible. His e-mail is on the website, the Justex website; so it should be pretty easy. Make sure you cc the opposing counsel and whatnot.

I know we've got some motions to take care of. Before we do that, have y'all discussed your motions in limine, your exhibits, your deposition objections to winnow down what's truly in dispute and what y'all can agree on?

MR. THWEATT: Yes.

PRETRIAL MOTIONS

THE COURT: All right. The first one we're going to take up is Plaintiff and Intervenor's Joint Motion to Strike Defendant's Combined Third Amended Answer and Defendant's First Amended Answer, Plea in Intervention.

And I gather that what I was handed just before we started, entitled Defendant's Motion for Leave to File Third Amended Answer and First Amended Answer to Plea in Intervention, is also on the table.

Do I understand that correctly?

MR. PLUMMER: Correct, Judge.

THE COURT: All right. Let's start

with the Motion to Strike.

Mr. Thweatt, do you want to present this or, Mr. Sparks, are you going to present this?

MR. THWEATT: I'll be happy to present it, Your Honor.

As the Court has seen from our motion submitted, we object to the untimely filing of the defendant's amended answers submitted on October the 5th, 2011. The Court's pleadings deadline in this case expired on December the 3rd, 2010; and the discovery cutoff expired back in February of 2011.

Under Rule 63, there has to be -- well, Rule 63 very plainly permits late amendments, provided leave is sought. I would note that there was no leave sought until this morning, I believe.

And I believe in our motion we've stated the surprise that these late amendments present to us.

Essentially, Judge, we're having a dispute about whether this is a Chapter 74 medical malpractice case or not. We don't believe that the facts of this case to this point in any of the pleadings or the depositions that have been exchanged indicate that it is a medical malpractice case.

It's a case about fire. It does not

000534

involve the delivery of medicine. There's no doctor or nurse or the administration of any kind of healthcare at issue in this case.

We were surprised to see that Chapter 74 was being invoked. Mr. Plummer has noted in his response that I did file on behalf of plaintiff expert reports that were submitted, basically to guard against the possibility that this Court might consider it as a Chapter 74 claim.

Just the fact that this case involves a Chapter 74 healthcare provider does not, by necessity, mean that it's a Chapter 74 claim. And the remedy for not filing expert reports in a case that can be considered a healthcare liability claim -- we don't believe that it is; but if the Court later determined that it was, would be dismissal with prejudice.

So we have a catch 22 decision to make there. We made it. Nonetheless, just because we have made it -- we certainly did not submit expert reports that were filed by any physician, any nurse, nothing like that. What we submitted were expert reports from a gentleman who works at the Center for Mental Retardation here in Houston and the fire -- the former fire chief here in town.

We just don't believe that these

000535

defenses should be applicable. They're way late on this, nobody's conducted discovery on this, and the reason for that is because the discovery deadline and all the deadlines that you enforced in your Motion for Summary Judgment -- or their Motion for Summary Judgment, which you denied, is untimely.

I well remember the first time I was before you, Your Honor, in this case. You emphasized to me the importance of deadlines in this case; and we've tried to comply with those since then, especially so.

Beyond that, everything is stated in our motion; and we don't think that these answers ought to be -- or these defenses should be before this Court.

THE COURT: How does asserting the damage caps in Chapter 74, which is basically, I think -- isn't that the effect that allowing the answers to have -- that it's the only consequence of allowing the answers, is it raises this prospect of the damage caps? Is there anything else that Chapter 74 would do to change this case?

MR. THWEATT: That's certainly one of them.

I'm not exactly clear from their answer. They say that the plaintiff and intervenor failed to comply with the other provisions of

000536

Chapter 74. I'm not exactly sure what they mean by that. They haven't defined exactly what they mean in their answer or -- and, for that reason, I don't know what the other consequences could be.

I do know that there is a section -- and we've cited this in our motion -- that a Chapter 74 case requires a physician to testify on causation. There's a section in the code of that.

We did not designate a physician because we don't believe that this is a Chapter 74 healthcare liability claim; and the only way we could overcome that prejudice now, Judge, is to ask for more time. We're not going to do that. I don't expect the Court would grant that anyway at this late point. That's certainly one way that we could be prejudiced and they would be prejudiced, potentially, if the Court determines, or a later Court determines on appeal, determines that expert testimony's required to establish causation in this case.

Maybe it won't be, and maybe it will be. But that's an open question that could have potential implications after this trial concludes; so it is a big issue for us. It's something that, on the current state of the evidence in the pleadings, could not have been anticipated; and that's certainly one of

000537

the reasons why we objected to it.

And I think I've highlighted that as a potential reason in the draft order --

THE COURT: Okay. Well, I'm trying to get down to the brass tacks of what the consequences of allowing an amendment to assert Chapter 74 would be since, obviously, they've long since waived any right to move to dismiss for an inadequate expert report.

So I mean, you know, you've argued that it reshapes the litigation. You've told me that it may require you to present a -- a specific kind of expert on causation, and there's the damage caps.

Is there anything else of consequence to the effect of Chapter 74 on this case if they're allowed to keep this amendment?

MR. THWEATT: Yes, there is.

We have two defendants in this case. Ms. Anthonia Uduma is being sued in her capacity as a property owner; and she owns -- she was the 100 percent owner of the property that burned and we also have her company that she owns 100 percent, Four J's Community Living Center, Inc.

Let's assume for the sake of argument, Your Honor, that the jury comes back and they say it's 50/50 or they say it's more of a liability case against

Four J's than it is against Ms. Uduma.

In that case, in addition to the caps, we're going to have to reshape the way we're going to present our evidence to make sure that more liability is placed on Ms. Uduma so that she is jointly and severally liable for any verdict that this jury renders.

And that's -- that's a different animal than coming in here and just trying a premises case, just trying a Chapter 74 case against the defendant, Four J's Community Living Center, Incorporated.

And we'll do our best to do that, Judge; but, I mean, they submitted this October the 5th. And, you know, 12 days before trial it is not -- we couldn't have conducted any discovery, as it was. But that -- Mr. Sparks and I have discussed it is going to require a reshifting of emphasis during the evidentiary portion of this trial to establish the liability, not just damages, to make sure that most of the liability is established on Ms. Uduma so that she's jointly and severally liable because, if not, it may be a pure victory.

We might have -- let's say the jury comes back and says 90 percent on Four J's. Well, then we're left with a damage award that's capped and another defendant who's only ten percent on the hook for -- if

000539

at all because of joint and several liability.

So that's a pretty significant strategic shift, in our view. It does have consequences for both the plaintiff and the intervenor. I'm hoping I've made that argument on behalf of both of us.

If there's anything else that needs to be added...

MR. SPARKS: Yes.

THE COURT: Anything to add?

MR. SPARKS: No, sir.

THE COURT: All right. Mr. Plummer, your response?

MR. PLUMMER: Judge, first of all, you know, I don't dispute the late filing. I mean, I -- we acknowledge that.

When we took over, we looked at the file. And years ago what we -- they said, I would have agreed with, that this is not a Chapter 74 case. But it is now -- under the current Court's interpretation of Chapter 74, this is clearly a Chapter 74 case.

I gave the Court -- and I'll give the Court another copy. I've given counsel a copy of a July, 2011, opinion by the Texas Supreme Court involving a nursing home that was sued because of a spider bite.

And the Court determined -- and

000540

particularly the language in defining a health liability claim -- that not just medical negligence applies, but safety issues in the statute apply. Okay? And that included that nursing home that does similar work as us.

Now, Mr. Thweatt has also commented -- and I want to direct this quickly -- about the dismissal with prejudice result.

The Court's correct that they have timely filed expert reports. There's no requirement, as I understand it, for any doctors' opinions or any healthcare providers' opinions. The special issues that they've crafted are appropriate, as far as I can tell on these facts in this case. Okay? So there would not be that result.

There is -- the only result I -- of Chapter 74 would be the damage cap, number one, and number two, there's the -- the -- we've raised limitations against the intervenor and there's a -- there's a portion of the limitations statute in the Medical Liability Act that would apply, but we don't think we need that on the facts of this case. I think we're entitled to limitations -- to assert our limitations to the defense and succeed on that, regardless of which one applies.

But it is clearly a Chapter 74 case,

Judge.

And I want to give the Court two other cases; Marks versus St. Luke's Hospital, which is 2008, and Diversicare, which is 2005. I've highlighted all these; and I think counsel has highlighted copies, also.

One's a nursing home; one's a bad bed in a hospital. But they're all premises cases, just like this.

THE COURT: And what is your argument that Four J's falls within the statutory definition of a healthcare provider?

MR. PLUMMER: Just like -- first of all, they're governed by the Health and Safety Code and the Texas Administrative Code, Section 40 -- I mean, Title 40, Section 9.151. That's number one. And it sets out the criteria for their -- the governance of that operation of a group home. That's number one.

Number two, they do the same sort of thing as a nursing home. There are people there who don't necessarily have health problems but are attended to healthwise, we deliver medications, we -- our -- our customers and our clients are daily medicated, when appropriate and as instructed by a physician. They get psychotherapy. They get physical therapy. They get vocational training. They get the same sorts of things

as people in a nursing home would, the difference being that our clientele are mentally retarded and have developmental disabilities, physical disabilities, and in a nursing home folks are -- tend to be older and on the decline. Okay? But other than that, it's the exact same circumstance as a nursing home.

And the -- and the Court's opinion in the initial case I've given the Court is directly on point.

And then on the surprise issue, I believe the way the expert reports were prepared -- and we've attached the first two pages of those experts' report. Each one says I have been informed by Mr. Thweatt that this is the Chapter 74 claim and, therefore, I'm doing my expert report consistent with the requirements of Chapter 74. So there's no surprise, none whatsoever. The proof is the same, that they have to make in this case, as they would in a Chapter 74 case. And the issues, the jury issues, the issues that go to the jury are exactly the same.

So I -- I am not sure -- perhaps had we gone to trial without raising this, I would have waived my entitlement to invoke Chapter 74; but the legislature has been clear and the Supreme Court has been clear that it applies in this context.

Some people might call it expansive, but it doesn't matter because that's what the Court says. And we would ask the Court leave to file our amended answers and assert the appropriate Chapter 74 against principally the damage cap.

THE COURT: Do you have a license, certification, registration, or charter from the State of Texas?

MR. PLUMMER: Yes, Your Honor.

THE COURT: Where is that? Is that attached to your Motion for Leave?

MR. PLUMMER: It is not attached to my Motion for Leave. What do we have -- in may be one of our exhibits.

Our operation is approved by DADS. And what's DADS again? The Department of Aging and Disabilities.

We're also governed by -- we're a part of the Home and Community-Based Services Program out of the Department of Health.

THE COURT: I asked do you have a license, certification, registration, or charter by the State of Texas.

MR. PLUMMER: We have a charter as a corporation, Judge. We have a license to operate our

000544

group home.

I did not attach one to the -- to the -- to the response, but I believe we may have something that shares that with the Court.

Judge, let me give you what we have as Exhibit 1 and Exhibit 3. These aren't the certifications that license us to operate; but they are certifications that identify our capacity, particularly Exhibit 3 -- excuse me -- I think particularly Exhibit 1. But we can certainly get that for the Court this morning; and we certainly have testimony of that to bring, Your Honor.

I also have, Judge, a copy of Chapter 9 of the -- of the Texas Administrative Code that also governs us.

THE COURT: Mr. Thweatt, if bites from bugs in one's bed are considered healthcare liability claims, why isn't this -- why doesn't [sic] the facts alleged in this case come under the Supreme Court's understanding of the healthcare liability claim?

Mr. Thweatt: Because of this language here, Your Honor, which the Supreme Court has -- has not rejected.

I've cited this in our motion, the case of Valley Baptist Medical Center versus Stradley, a case

000545

out of the Corpus Christi Court of Appeals, similar cases also out of the Austin Court of Appeals and the Houston First Court of Appeals.

It says as follows: (Reading) We hold that a safety claim can be categorized as a healthcare liability claim only when it is against a healthcare provider or physician or a claimed departure from accepted standards of safety directly related to healthcare. Holding otherwise and finding all safety claims against healthcare providers or physicians to be healthcare liability claims, regardless of whether they directly relate to healthcare, would be an arbitrary and legislatively unauthorized expansion of the healthcare liability statute.

I think the other distinguishing factor, Your Honor, in those cases that Mr. Plummer has handed to you, there were not two defendants. There was not a separate premises owner. In this case there is.

We have the owner of the company, Ms. Anthonia Uduma, who owned this facility, personally and 100 percent herself, and then we have this company. And that's a very important factor that's different in these cases that Mr. Plummer has cited.

THE COURT: Mr. Plummer?

MR. PLUMMER: Judge, with regard to

000546

Ms. Uduma, I think he's correct. Chapter 74 wouldn't apply. She's just a premises owner. She owns the building.

With regard to the case cited by counsel, the three cases that we've given the Court prevail over that case. That was a court of appeals opinion.

The spider bite case was clearly a premises type case.

THE COURT: No. The Supreme Court held it's a healthcare liability case.

MR. PLUMMER: I understand, but the issue was maintaining the safety of the premises.

One of the allegations they said is you didn't keep the premise free from insects, you didn't use pesticides on a regular basis to protect against that. That was the kind of issue that they raised.

And the Court said, sorry, safety, that portion of the definition of a health liability claim involving safety, an undefined term in the statute, is broad.

And where you have a claim against a facility that provides healthcare, in its context it includes the broader premises issues related to safety.

And then the Diversicare case also says

the same thing, and that was decided by the Court in 2005.

And then, of course, the other one that I mentioned and cited similarly involved claims that traditionally we would not consider health liability claims but the Court has read the statute broadly to encompass them. It doesn't encompass Ms. Uduma. It does encompass Four J's Community Center.

THE COURT: All right. Y'all give me five minutes. I'll be right back.

(Break taken from 9:04 a.m. to 9:10 a.m.)

THE COURT: Mr. Thweatt, Mr. Sparks, do y'all want a continuance?

MR. PLUMMER: No.

MR. THWEATT: No, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: No.

THE COURT: Okay. All right. Motion to Strike is denied. The Motion for Leave is granted. I'll ask you again: Do you want a continuance?

MR. THWEATT: No, Your Honor.

MR. SPARKS: No.

THE COURT: And I just wanted to make sure -- I wasn't trying to game y'all or anything. I

believed you the first time, but I didn't want you to think that how I was going to rule is going to depend on whether he said you wanted a continuance or not. And that's why I was asking again, just to make sure.

MR. SPARKS: Judge, could I be correct -- you said the Motion to Strike was --

THE COURT: Denied.

MR. SPARKS: -- denied?

THE COURT: Motion for Leave to amend is granted.

MR. SPARKS: Then we do want a continuance, Judge.

THE COURT: How much time do you need?

MR. SPARKS: 40 days.

THE COURT: 40 days? I don't know if I've got trial time.

In light of the -- Mr. Sparks' request for a continuance, which I am going to grant, Mr. Thweatt do you have anything to say on how much time you need for a continuance?

MR. THWEATT: Judge, may I confer with Mr. Sparks?

THE COURT: Yes.

(Off the record conference.)

MR. THWEATT: Your Honor, one question

000549

of clarification: Is your ruling applicable to both defendants or just to Four J's Community Living Center in light of Mr. Plummer's comments to the Court?

THE COURT: Mr. Plummer, are you --

MR. PLUMMER: Judge, primarily to Four J's. It doesn't apply to Ms. Uduma.

THE COURT: So you're not asserting Chapter 74 as to Ms. Uduma?

MR. PLUMMER: Well, as the -- as the owner of the property.

THE COURT: Well, what does that mean? She's a defendant. Is -- are you going to claim any -- any defenses, any rights, any applicability of Chapter 74 to Ms. Uduma?

MR. PLUMMER: No, Your Honor.

THE COURT: All right.

MR. SPARKS: Then if that's the case, we won't -- we won't need the continuance, Judge.

THE COURT: All right. Okay. So let's move on. We've got to move quickly here.

First of all, I've got plaintiff's Motion in Limine, defendant's Motion in Limine. I didn't see an intervenor's Motion in Limine.

Did you have any Motions in Limine?

MR. SPARKS: No, we didn't, Judge.

000550

We'll adopt those from the plaintiff.

THE COURT: All right. Looking first at the Motions in Limine of the plaintiff, which of these do you contest, Mr. Plummer?

MR. PLUMMER: Mr. Raval will respond, Your Honor.

THE COURT: Which do you contest?

MR. RAVAL: Your Honor, 23 and 24.

THE COURT: All right. So plaintiff's Motions 1 through 22 are granted as agreed.

23, Mr. Thweatt? This is your motion, isn't it?

MR. THWEATT: It is, Your Honor. I think the facts in this case may show -- well, they will show, if the Court permits it, that Ms. Wagner entered into a foster care agreement with Four J's Community Living Center after this fire; and we don't believe that's relevant.

We also believe that such agreements will improperly introduce collateral source into this case. There's a number of issues related to Social Security, Medicaid, those types of things, that could flow from that; and that's the basis of our motion in that regard.

THE COURT: How would the collateral

000551

source evidence come into play if that agreement comes into evidence?

MR. THWEATT: Well, there's been description from Ms. Wagner in her testimony that she received Social Security benefits. She's a Medicaid -- her daughter's a Medicaid recipient. That's what we're worried about here.

She's now the guardian, just at Four J's used to be -- I'm sorry -- just as -- the caretaker just as Four J's used to be. We don't want the jury knowing about collateral source because of --

THE COURT: But my question is: How does the October 2nd, 2008, agreement raise collateral source? I don't understand the connection to the collateral source.

MR. THWEATT: Because it's referenced within the agreement.

THE COURT: Okay. So the payments from the Social Security.

MR. THWEATT: Yes.

THE COURT: I see. All right.

Response?

MR. RAVAL: Your Honor, I think we can redact anything, as necessary, in the agreement. Second of all, the main reason we're objecting to this -- for

one thing, we plan to discuss the agreement and Ms. Wagner's care after the fire. It goes directly to the issue of damages and mental anguish.

Second of all, we do plan on -- if not the agreement itself, a portion of the agreement, it talks about the rights of the patient and the rights of the individual. That's something that predates the fire. But specifically regarding this agreement, it is -- we believe we can redact any issue about payment and that it is relevant to her continuing care.

THE COURT: How is it relevant? What material issue or fact is made more likely or less likely by the admission of this agreement into evidence?

MR. RAVAL: The agreement is relevant to show -- it goes to her damages. It goes to her mental anguish damages, that -- and the testimony we expect that is going to come forward about what her behavior was like after the fire, what -- what her sleeping patterns were, and other things.

The -- again, the agreement itself, with payment redacted, we believe, is relevant to --

THE COURT: How is the agreement itself relevant? What does it matter that after the agreement -- or after the fire there was an agreement between Four J's and -- and Ms. Wagner?

000553

MR. RAVAL: The fact that she was willing to continue staying on with Four J's for a period after the fire of about eight or nine months or getting treatment and care from people connected to Four J's is relevant to the damage issue.

THE COURT: How? I -- you're not -- just telling me it's relevant isn't showing me it's relevant.

How does that make any issue about damages more likely or less likely?

MR. RAVAL: If -- if she were -- in some way blamed Four J's for what happened, it is less likely that she would have continued getting services from employees or people connected to Four J's. She continued to do so for a period after the fire of about eight or nine months.

THE COURT: So the fact that she continued to do business means that the plaintiff didn't have any damages?

MR. RAVAL: No. It goes strictly to the mental anguish damages, that if she blamed Four J's for what happened in the fire, it's more likely that she would have stopped employing them. She, in fact, continued to employ them and use their services. That is relevant to mental anguish.

000554

THE COURT: Mr. Thweatt, any response?

MR. THWEATT: Well, the testimony at her deposition, Judge, was that she continued to use them -- her services because, really, she didn't know where else to turn, not because she was satisfied or happy with the services that had been provided, particularly up to the fire on September 4th, 2008.

So we certainly dispute that there's any sort of ratification that -- of Four J's by our client postfire, and we just feel like it's going to be evidence that's not going to be contributing to any sort of fact at issue.

What matters here is what happened on September 4th, 2008, not what happened subsequent to that.

THE COURT: All right. 23 is granted.

24, Mr. Thweatt?

MR. THWEATT: Your Honor, there was an investigation into this fire by a State agency. I think the outcome of that investigation was inconclusive, and we don't believe that an agency's determination, even if it were conclusive or -- or it found no negligence on behalf of Four J's, is something that the jury should be considering in this case. It's not relevant. Even if it is somehow relevant, it's substantially more

prejudicial than probative.

A State agency is, in my mind, very similar to a law enforcement agency investigating a car accident. The Courts routinely exclude those unless there's some sort of proper foundation laid for those, and it's just -- it's just not something we think the jury ought to be concerning themselves with in this case.

THE COURT: So your -- the grounds of your objection are what, relevance?

MR. THWEATT: Relevance, inadmissible hearsay, and 403. That's what I cited.

THE COURT: Response?

MR. RAVAL: Intervenor is attempting in their exhibits to admit parts of this [sic] statements from some of the witnesses that were interviewed by the State agency that conducted this investigation.

So some of these apparent hearsay statements are being attempted to be admitted as evidence.

Second of all, the report itself, we agree, is not determinative of any issue with regard to negligence but it's instructive to the jury. The fact that the results were inconclusive shows that there's not some kind of adverse finding against Four J's.

The jury's entitled to understand that there was an investigation done, people were interviewed, what they said, what they told the -- what the agency was told by these employees and other witnesses, and what the end result was.

THE COURT: Why does it matter to the jury -- since the end result was it was inconclusive, why does it matter to the jury? How does it help the jury?

MR. RAVAL: Otherwise, the jury may make the inference that there was some kind of adverse result.

THE COURT: Well, are you asking to exclude the investigation or just the report?

MR. THWEATT: The report, the investigation's conclusions, all of it. We don't want any of it.

THE COURT: No evidence that there was an investigation?

MR. THWEATT: That's correct, not by the Texas Department of Aging and Disability Services.

MR. RAVAL: In addition, Your Honor, we believe that their experts relied on this agency report in making some of their conclusions.

MR. THWEATT: My experts haven't

000557

testified. They haven't been deposed in this case, and we're not sure what -- what they're going to say about that at all. And we'll certainly abide by the Court's ruling.

THE COURT: 24 is granted if -- and this is just an order in limine. So if for some reason you feel like a door has been opened or you need to get into it, you can ask to approach the bench and we'll take it up again.

MR. RAVAL: Yes, Your Honor.

THE COURT: All right. Turning to defendant's Motions in Limine, which are in dispute?

MR. THWEATT: Your Honor, we've agreed to defendant's Motion in Limine 2 and 3. I believe there are five of them.

THE COURT: Well, I've got -- the Motions in Limine from defendants I've got were filed March 11th. Are these your latest and greatest?

MR. RAVAL: Your Honor, we filed an amended Motion in Limine sometime last week.

THE COURT: And do you have a copy for me?

MR. RAVAL: I do, Your Honor.

THE COURT: Okay. So you agree to 2 and 3?

MR. THWEATT: We do, Your Honor.

THE COURT: Mr. Sparks, is that consistent with your view?

MR. SPARKS: Just a second, Your Honor.

Yes, sir.

THE COURT: Okay. So 2 and 3 are granted as agreed. Start with Number 1.

MR. RAVAL: Your Honor, regarding Number 1, it's our understanding that Ms. Wagner used a wheelchair accessible van before the fire because of her existing disabilities. If there's a request for damages pertaining to or retrofitting a wheelchair accessible van out of some kind of claim about injuries related to the fire, it's our contention that was a preexisting condition and that is not evidence of damages related to this fire.

THE COURT: There's a dispositive motion. That's denied.

4?

MR. RAVAL: Your Honor, one of the witnesses that we've -- will appear will -- by deposition is Dr. Karen Gollaher. She conducted a site evaluation of Esperanza Arzola, the person who started the fire in this case, one of the clients at the home.

Any conclusions or competency

000559

evaluations by Dr. Gollaher strictly pertain to the criminal trial and Ms. Arzola not being competent to stand trial. That's not relevant to what happened -- what goes on in this trial, and also we say it's overly prejudicial under Rule 403.

THE COURT: How is it unfairly prejudicial?

MR. RAVAL: A determine -- determination that Ms. Arzola was unfit to stand trial in a criminal trial has nothing to do with whether or not she's a responsible third party in this case. It's a different standard of proof.

THE COURT: So, she was declared incompetent to stand trial? She wasn't -- she wasn't diagnosed as criminally insane or anything like that? Is that what you're saying?

MR. RAVAL: That's my understanding, Your Honor.

THE COURT: Okay.

MR. RAVAL: And to this day, she has not stood trial.

THE COURT: Response?

MR. THWEATT: Your Honor, she can't be determined, according to Dr. Gollaher's testimony, as criminally insane until there is a determination that

she's competent to stand trial. And Dr. Gollaher was appointed by the criminal district court in Fort Bend County to determine whether or not she was capable mentally of understanding the charges against her, of assisting with her defense, and Dr. Gollaher determined that she was not.

From that point, she was sent to a psychiatric institution, where she remains today, and will be there forever until qualified personnel determine that she's competent to stand trial.

So I just wanted to provide some background on that for the Court.

They are -- they have designated Esperanza Arzola as a responsible third party; and I believe the evidence in this case, at least in the depositions thus far, indicates that they believe she is solely responsible for the fire.

Because of their position, we think it's very important that the jury know -- I mean, I -- if -- were I them, I'd be waving around the indictment and the criminal charges throughout this trial.

If they're going to do that, I think we need to be permitted to respond to that and to rebut it with a showing that, look, that was a charge based upon law enforcement, not upon any psychiatric or

psychological evaluation of this woman.

There's a lot that they knew about Ms. Arzola before the fire, and we'll address that. This issue is important to us, to show that, look, they're trying to blame somebody who's been determined incompetent to stand trial for something that they had a duty to prevent and care for. And that's our position.

MR. RAVAL: May I respond, Your Honor?

THE COURT: Just a moment. I'm trying to get my arms wrapped around this.

She's been declared incompetent to stand trial. This declaration occurred sometime after the fire.

MR. THWEATT: Correct.

THE COURT: You're saying that's not relevant; is that right?

MR. RAVAL: That's correct, Your Honor.

THE COURT: Okay. Mr. Thweatt, how is her postfire competency relevant to any of the claims or defenses in this case?

MR. THWEATT: Because the psychologist who made that determination, as part of the decision-making process, reviewed her entire psychological profile, much of which -- well, all of which occurred before the fire.

And then she also conducted an interview in the prison. That's what occurred after the fire. But the vast majority of it that she took into consideration and referenced in her report was prefire conduct, prefire behavior that Esperanza Arzola described.

And most of that -- much of that came from Four J's, Judge. She went and got it from Ms. Arzola's defense -- criminal defense attorney who had Four J's as a reference. So she considered that when she made her determination; and we think because of that, her determination is highly probative on the issue of whether or not Ms. Arzola should be blamed or -- responsible for this fire.

THE COURT: And do I understand your argument is that really comes up because they're going to -- you believe that Defense is going to try and convince the jury that she is 100 percent to blame for this or that, because there was a criminal act, they're somehow absolved of liability for any of their responsibility? I'm trying to understand.

MR. THWEATT: Well, I think the pleadings -- the pleadings that they have filed, Judge, say that the criminal act absolves them from punitive damage responsibility. They've certainly have pled

000563

that.

But in terms of the ultimate liability question, Ms. Uduma has testified that she does not believe that she personally is responsible for the fire or that her company is -- is responsible for the fire. And her testimony indicates unequivocally that Esperanza Arzola is the reason why these injuries resulted.

THE COURT: I'm going to deny Number 4.

Your reply?

MR. RAVAL: Your Honor, related to that issue, we believe it's irrelevant, where Ms. Arzola is currently located. The fact that she is currently not competent to stand trial or that she is awaiting the ability to stand criminal trial or where she is is not relevant to anything in this trial.

THE COURT: Response, Mr. Thweatt?

MR. THWEATT: I think the sole evidentiary issue there, Your Honor, is that she is still -- there was some suggestion by prior counsel for the defendant that Ms. Arzola could be out on the streets, the charges could have been dismissed. We don't know exactly what happened to her. That was the comment in a deposition, and that's just not true.

Ms. Arzola is presently institutionalized; and the only evidentiary issue there

000564

is that I don't want them suggesting to this jury that she's never stood trial, she's never faced charges, anything like that. It's a small point, but it depends on how expansive that limiting motion is read by the Court. That's my concern.

I don't want them suggesting that, you know, there's never been a determination on whether she did it or not and that kind of thing. That's my worry there.

THE COURT: 5 will be granted. Obviously, if for some reason we need to talk about her current location, you can approach the bench, and we can revisit that.

MR. THWEATT: Thank you, Your Honor.

THE COURT: By the way, Mr. Sparks, I apologize. I didn't ask for your input on any of this. Did you have anything to add on anything?

MR. SPARKS: I didn't, Judge.

THE COURT: I apologize.

MR. SPARKS: Except for the fact, Judge, in the -- the issue regarding the competency and the sanity. I think you may have raised what Mr. -- Dr. Gollaher indicated under the Code of Criminal Procedure is that in order for her to make a determination of sanity, she'd first have to make the

000565

determination that she was competent.

And if a determination of incompetency is made, they can't even evaluate the issue of sanity. So that situation was something she could not consider.

THE COURT: All right. Thank you. All right.

Turning to exhibit lists... I've got the exhibit list of plaintiff, Patti J. Wagner, as guardian of Jenny Ann Wagner which was filed, looks like, March 11th.

Is this your latest and greatest, Mr. Thweatt?

MR. THWEATT: No, Your Honor. We have an amended exhibit list. The only change, we've added Exhibit 58.

THE COURT: Do you have a copy of your latest and greatest for me?

MR. THWEATT: I do.

THE COURT: While he's doing that, I've got the second amended exhibit list of intervenor, Wylette Taylor, filed October 11th.

Mr. Sparks, is this your latest and greatest?

MR. SPARKS: It is, Judge.

THE COURT: And then from Defense I've

got an October 13th first amended exhibit list. Is that your latest and greatest?

MR. RAVAL: Your Honor, we have a second amended; but the only difference is we withdrew some exhibits.

THE COURT: Okay. Do you have a copy of your second amended for me, or is it in your notebook that you submitted?

MR. RAVAL: I believe it is.

THE COURT: Okay. That's fine. I got it. I just want to make sure I'm up to speed.

All right. First things, we're going to look at Plaintiff's exhibits. My practice is I admit exhibits that are not objected to pretrial. If there's an objection, usually we just do those exhibits the old-fashioned way during the course of trial unless it's truly one of those objections that I can rule on without foundational testimony, like whether or not it was responsive to a particular discovery request and, therefore, should have been disclosed or whatnot.

So looking at the second amended exhibit list of Plaintiff, can you tell me which ones you do not object to?

MR. RAVAL: We agree to Exhibits 1 through 33, 35, 36, 37, 39 and 40, 43 through 48.

000567

MR. THWEATT: By the way, I should have said, we withdraw Plaintiff's Exhibit 48, Your Honor.

THE COURT: All right. Please continue.

MR. RAVAL: 50, 51, 52, 53, and that's all of them. We have objections to the remaining exhibits.

THE COURT: Okay. Lois, will you let the jury know we'll be about another ten minutes, please.

Okay. So Plaintiffs agree to 1 through 33, 35 to 37, 39 to 40 -- I'm sorry. Defendants agree to 1 to 33, 35 to 37, 39 to 40, 43 through 47, and 50 to 53?

MR. RAVAL: Correct, Your Honor.

THE COURT: All right. Then do you want to offer those into evidence, Mr. Thweatt?

MR. THWEATT: I do.

THE COURT: Am I pronouncing that correctly?

MR. THWEATT: It's Thweatt, Your Honor.

THE COURT: Excuse me. I'll get it right by the end of trial.

MR. THWEATT: Thank you, Your Honor.

THE COURT: So 1 through 33, 35 to 37,

000568

39 to 40, 43 to 47, and 50 to 53 are admitted.

(Plaintiff's Exhibits 1 through 33, 35 through 37, 39, 40, 43 through 47 and 50 through 53 are offered and received in evidence.)

MR. RAVAL: Your Honor, we're also okay with 58, the stipulation.

THE COURT: 58 is admitted.

(Plaintiff's Exhibit 58 is offered and received in evidence.)

THE COURT: Okay. Next we'll look at the Intervenor's.

MR. SPARKS: Judge, if I may, you asked me about -- if the second was the latest and greatest. Actually, I have a fourth that we need to disclose. I want to give you that copy there.

THE COURT: Okay. Sure. Thank you.

All right. Looking at Intervenor's fourth amended exhibit list, can you tell me which ones you agree to?

MR. RAVAL: Your Honor, we're agreeing to Exhibits 1, 2, 4 through 8, 10 through 12, and 15 through 24.

THE COURT: So that's 1, 2, 4 through 8, 10 to 12, and 15 to 24?

MR. RAVAL: Correct, Your Honor.

000569

THE COURT: Do you want to offer those, Mr. Sparks?

MR. SPARKS: I do, Judge. Judge, we also would like to -- we're going to withdraw the -- Number 12.

THE COURT: Number 12 is withdrawn. So, Intervenor's Exhibits 1, 2, 4 through 8, 10, 11, and 15 through 24 are admitted.

(Intervenor's Exhibits 1, 2, 4 through 8, 10, 11, and 15 through 24 offered and received in evidence.)

THE COURT: And then looking at Defendant's second amended exhibit list, Mr. Thweatt, Mr. Sparks, can you tell me which ones you agree to?

MR. THWEATT: Your Honor, we agree to Defendant's Exhibits 2, 3, 4, 7, 10, 11, 12, 15, 16, 18 through 25, 36 and 37, 59, 64 through 68 -- I'm sorry -- 65 was withdrawn, it looks like on my sheet. So 66 through 68 and then 70.

THE COURT: 2 through 4, 7, 10 through 12, 15 and 16, 18 through 25, 36 and 37, 59, 64, 66 through 68, and 70?

MR. THWEATT: Correct, Your Honor.

THE COURT: And, Mr. Sparks, you're in agreement on those?

MR. SPARKS: I am, Judge.

THE COURT: All right. Do you want to offer those?

MR. RAVAL: We offer those, Your Honor.

THE COURT: All right. So Defendant's Exhibits 2 through 4, 7, 10 through 12, 15 and 16, 18 through 25, 36 and 37, 59, 64, 66 through 68, and 70 are admitted.

(Defendant's Exhibits 2 through 4, 7, 10 through 12, 15 and 16, 18 through 25, 36 and 37, 59, 64, 66 through 68, and 70 offered and received in evidence.)

THE COURT: I'm told that the jury has arrived. They're out in the hallway. So we're going to go ahead and launch into voir dire. We'll deal with any objections to deposition excerpts after the jury's been excused for the day.

We should probably -- we will take a lunch break. It depends on how quickly we get through the panel examination on when in the process we're going to do it. We'll also do opening statements.

And, Mr. Thweatt, you should be ready with your first witness to get going today. We usually at least start with the first witness today.

We will probably end 4:30 or so, maybe

000571

4:45 today. It's a long day for the jury. But after today, we go until 5:00 every day, get a midmorning break at around the 10 o'clock hour, a midafternoon break around the 3 o'clock hour. Those will be about 15-minute breaks. We start at 8:30. We'll get a lunch break -- I forgot to give you-all the schedule earlier.

Make sure you look at your jury card information to make sure you've got pages for all 48 jurors, please. There was a copying mixup.

MR. PLUMMER: Judge, is it likely we're to do opening statements and all that by lunchtime?

THE COURT: No. If we complete jury selection without having taken a lunch break, then we'll take our lunch break between jury selection and opening statements. And we may have to take our lunch break during the voir dire process, but I don't see us finishing jury selection so soon that we can launch into opening statements and finish that before lunch.

MR. THWEATT: Your Honor, one -- one note: Juror Number 46 appears to be Judge Elrod.

THE COURT: Yes.

MR. THWEATT: Okay. Just so the Court's aware.

THE COURT: All right. You get about five minutes to move your chairs around, so -- and make

000572

sure you leave room for my court reporter to move over there.

(Break taken from 9:42 a.m. to 9:49 a.m.)

THE COURT: All right. Back on the record.

I just visited with the jury out in the hallway informally to thank them for their service, welcome them to the court, and remind them to speak up and say what they have to say during the jury selection process, pointed out to them that until a verdict is rendered, this is the only time that they get to talk to the lawyers. Of course the time the lawyers are talking to them, it's a one-way street.

So right now any of them that have unavoidable scheduling conflicts are letting Deputy Dewey, the bailiff, know. She'll communicate that information to me, and then I'll relay it to you.

Generally, I let y'all voir dire any jurors on those type of things unless it's something I think I particularly really need to do or if it's something that's so obvious that we can take care of it without voir diring them.

I rarely grant hardship exceptions, especially those that would count as an exemption since

000573

exemptions are already provided for and all they have to do is claim them before coming down.

But occasionally we have situations or the parties may agree that someone should be excused for whatever reason, so that's fine. So we're about to get that information, and then I'll also -- I've got to do my mandated instructions to the jury before y'all start your examination.

At one point I will ask the lead lawyer for each party to introduce themselves, their co-counsel, and their clients. I'll then briefly voir dire as to if anybody knows or recognizes or thinks they know or thinks they recognize the people that are introduced.

Oftentimes, I'll leave it at that. Every once in awhile I may do follow-up voir dire on it, but be ready to follow up voir dire if...

All right. Juror Number 1 has informed the bailiff that she has no one to pick up her children from school. Juror Number 21 has a critically ill mother-in-law who may need to be taken off of life support on Wednesday. Again, this is not official. This is what they've told the bailiff. And then Juror Number 37 has a business trip on Wednesday and Thursday. That doesn't count, but y'all may want to ask some

questions of Juror Number 1 or Juror Number 21.

MR. THWEATT: Your Honor, as you introduce the parties -- I note that Ms. Uduma is not here, and it may be difficult for the jury to know whether they recognize her or not if she's not physically present.

THE COURT: They recognize the name. I mean, that's -- we'll just deal with it.

MR. PLUMMER: Judge, the 37 or 38 that has --

THE COURT: 37 had a business trip on Wednesday and Thursday.

All right. Bring in the jury, please.

THE BAILIFF: Yes, sir.

(Jury panel in courtroom.)

VOIR DIRE BY THE COURT

THE COURT: Thank you. Please be seated.

Ladies and gentlemen, I want to welcome you again to the 269th District Court. I am Dan Hinde. I'm the judge of this court.

Before we begin the proceedings, I'd like to introduce the Court's staff to you. As you're going to see them throughout this trial, I thought it would be nice for you to put some names to the faces you

000575

will see.

You've already met the court's bailiff, Lois Dewey. She is the best in the business. She's been the bailiff of this court since the late 1980s. I am the third judge who has worked for her.

Those of you who become members of the trial jury in this case are in for a very pleasant treat. I get feedback from jurors all the time. Sometimes they're complimentary of me, sometimes they're complimentary of the lawyers. They're always complimentary of Bailiff Dewey. She is the best in the business, and so you're very fortunate that you'll get to work with her if you become a member of the trial jury.

You'll also see our court reporter, Annette, over here to my right just on the other side of the rail from y'all. It's her job to take down everything everybody in this courtroom says. In order for her to do that in a way that has meaning for people who want to read the transcript later, we're going to have to follow a few formalities that we don't often observe when we're talking to each other informally.

First of all, when you respond to a question, we need you to use your voice. Hand gestures, shoulder shrugs, head nods, things of that nature, while

000576

meaningful to those of us here in the courtroom because we can see it, don't show up very well on the transcript and are hard for people to understand later who are reading the transcript. So when you respond, we need you to use your voice.

We also need you to use words when you respond. Oftentimes when we're talking to each other, we'll use sounds like "huh-uh" or "uh-huh" or "mh-mmm." Again, she can try and write those down; but they're not going to have any meaning to people who are reading them later. So when you respond, please use words.

We also need people to avoid talking over each other. Again, this is something that's common in informal speech. You're talking to a friend or a family member and you know what they're trying to say, you start answering before they finish their sentence because you know what each other's saying.

When two people are talking, it makes life very difficult for the court reporter. It's hard enough, if you can imagine writing down every syllable a single person says. But when two people are talking at the same time, it is nearly impossible.

So when you are -- when you are talking, please wait until me or the lawyers have finished saying what we have to say and then start your

response.

And the lawyers and I will do the same. We will wait until you are done, and then we'll start responding.

We also need you, when you respond, to give your juror number. That way we know precisely who is talking. We also would ask that you would raise your hand. If you have an answer to a question, raise your hand, we'll call on you.

When you are called on, then give your juror number. "I'm Juror Number 50, and my answer is yes," or "I'm Juror Number 60, and my answer is no."

You've also met the Court's coordinator, Mr. Alex Garibay, over to my extreme left. He and my assistant clerk, Di, here have a lot of work to do. This court has about 1700 active cases pending before it besides the one that we're going to try today.

Now, we can do it. I've got a great staff; and we do a pretty good job, I think, of making sure that all the cases get the attention that they need in order for them to move forward. But sometimes it requires multitasking. So you'll see Mr. Garibay and Ms. Purvis entering and exiting the courtroom from time to time.

It's not because they're not interested

000578

in this case or that they don't value your time. It's that they have to go back to their offices and do some work on some of the other cases. So please don't take it the wrong way. They're really trying to do their best to make sure all cases get the attention they need to move forward and get to resolution.

Now, many of you may have been through the jury selection process before. For those of you who have not, I thought I would take a few moments to describe it to you.

In Texas, as in all other states in the United States, the parties to a lawsuit generally have a right to a trial by jury. The right to a jury trial is one of the oldest rights in our legal system. In fact, it's older than the right to vote.

The origins of our legal system's right to a jury trial go back to at least the 1200s in England. One of the aspects of a trial by jury is the jury selection process, a procedure which we call voir dire.

"Voir dire" is a French phrase that means to tell the truth. Although we often call this part of a trial jury selection, it is more accurately described as a process of juror deselection.

The parties do not pick the jurors they

000579

want on the jury so much as they strike a limited number of jurors from serving on the trial jury.

The first 12 jurors on the panel who are not struck for cause or struck by what is called a peremptory strike are empaneled as the trial jury for the case.

Now, this part of the trial is the only time when jurors can talk to the lawyers until after the verdict is rendered. It is, therefore, helpful for each of you to be candid and to speak up.

Now, in a moment I will administer an oath to you, give you some instructions, and ask a few preliminary questions. After that, the lawyers will ask you some questions as a group.

Once we have completed the group questioning, we will take a break, at which time we may ask a handful of you to come back in one by one to answer some follow-up questions.

After that break, we will bring you all back in and the clerk will read the names of the members of the trial jury and those people will come forward, sit in the jury box, and we'll proceed.

Now, I need to administer an oath to you; so please raise your right hands.

(Jurors sworn to the voir dire oath by

000580

the Court.)

THE COURT: Thank you.

I now have some additional instructions to give you. Please listen carefully and let me know if you don't understand.

JUROR INSTRUCTIONS

THE COURT: Members of the jury panel, we are here to select a jury. 12 of you will be chosen for the jury. Even if you are not chosen for the jury, you're performing a valuable service that is your right and duty as a citizen of a free country.

Before we begin, please turn off all phones and other electronic devices. While you are in the courtroom, do not communicate with anyone through any electronic device. For example, do not communicate by phone, text message, e-mail message, chat room, blog, or social networking websites such as FaceBook, Twitter, or MySpace.

I will give you a number where others may contact you in case of an emergency. Do not record or photograph any part of these court proceedings. It is prohibited by law.

If you are chosen for the jury, your role as jurors will be to decide the disputed facts in this case. My role will be to ensure that this case is

tried in accordance with the rules of law.

Here is some background about this case:  This is a civil case.  It is a lawsuit, that is, not a criminal case.

The plaintiff is Patti J. Wagner, the guardian of Jenny Ann Wagner.  There's also -- excuse me.  I'm a little out of sorts.

There's also another plaintiff, Wylette Taylor, who is guardian of Derrick James.

The defendants are a company called Four J's Community Living Center, Inc., and Anthonia Uduma.

I've got some instructions I need to give you.  Every juror must obey these instructions. You may be called into court to testify about any violations of these instructions.  If you do not follow these instructions, you will be guilty of juror misconduct and I might have to order a new trial and start this process over again.  This would waste your time and the parties' money and require the taxpayers of this county to pay for another trial.

Here are the instructions:  One, to avoid looking like you are friendly with one side of the case, do not mingle or talk with the lawyers, witnesses, parties, or anyone else involved in the case.  You may

exchange casual greetings like "hello" and "good morning." Other than that, do not talk with them at all. They have to follow these instructions, too; so you should not be offended when they follow the instructions.

Two, do not accept any favors from the lawyers, witnesses, parties, or anyone else involved in the case. And do not do any favors for them. This includes favors such as giving rides and food.

Excuse me, ma'am? Are you a juror?

UNIDENTIFIED PERSON: No.

THE COURT: Okay. Come forward.

(Discussion off the record.)

THE COURT: Number three, do not discuss this case with anyone, even your spouse or a friend, either in person or by any other means, including by phone, text message, e-mail message, chat room, blog, or social networking Web sites such as FaceBook, Twitter, or MySpace. Do not allow anyone to discuss the case with you or in your hearing.

If anyone tries to discuss the case with you or in your hearing, tell me immediately. We do not want you to be influenced by something other than the evidence admitted in court.

Four, the parties, through their

000583

attorneys, have the right to ask you questions about your background, experiences, and attitudes. They're not trying to meddle in your affairs. They're just being thorough and trying to choose fair jurors who do not have any bias or prejudice in this particular case.

Five, remember that you took an oath that you will tell the truth. So be truthful when the lawyers ask you questions, and always give complete answers. If you do not answer a question that applies to you, that violates your oath. Sometimes a lawyer will ask a question of the whole panel instead of just one person. If the question applies to you, raise your hand and keep it raised until you're called on.

Do you understand these instructions? If not, please raise your hand.

(No response.)

THE COURT: I see no hands.

At this time I'd like the lawyers to introduce themselves to you, along with their clients.

Mr. Thweatt.

MR. THWEATT: Good morning, ladies and gentlemen. I'm Lee Thweatt. I represent this lady here, Patti Wagner, and on behalf of her daughter, Jenny. This is my law partner, Joe Terry. He'll be the one speaking with you this morning.

THE COURT: Mr. Sparks.

MR. SPARKS: Good morning. How are you doing? My name is Shelton Sparks, and this is Tiffany Harvey. We represent Derrick James; and this is his guardian, Wylette Taylor.

THE COURT: Mr. Plummer.

MR. PLUMMER: Good morning, ladies and gentlemen. My name is Jim Plummer. I, along with my associate, Amar Raval, and our legal assistant, Gabriella Trevino, represent Four J's Community Living Center and Anthonia Uduma.

Ms. Uduma will be here following jury selection and will attend the entirety of this trial.

THE COURT: Thank you.

I have a question for all of you. First of all, do any members of the panel know, think they know, recognize, or think they recognize any of the lawyers who introduced themselves or their colleagues to you just a moment ago? If so, please raise your hand.

(Hands raised.)

THE COURT: Yes. You're Juror Number 42?

PROSPECTIVE JUROR 42: Yes.

THE COURT: Stand up, please.

Who do you know or recognize?

000585

PROSPECTIVE JUROR 42: I don't know him, but I recognize Mr. Thweatt because he's a member of my church.

THE COURT: And what church do you go to?

PROSPECTIVE JUROR 42: Christ the King Lutheran.

THE COURT: All right. Thank you.

Yes, Juror Number 46.

PROSPECTIVE JUROR 46: I recognize several of the lawyers, particularly I recognize Mr. Plummer, but only from seeing them in a professional context. I don't have a personal relationship with any of the lawyers.

THE COURT: All right. Thank you.

Any other people?

Yes, ma'am, Juror Number 6.

PROSPECTIVE JUROR 6: Mr. Plummer.

THE COURT: Okay. How do you know Mr. Plummer?

PROSPECTIVE JUROR 6: He represented my sister.

THE COURT: Okay. And how long ago was that?

PROSPECTIVE JUROR 6: Probably about

000586

ten years ago.

THE COURT: I'm sorry?

PROSPECTIVE JUROR 6: Probably about ten years ago.

THE COURT: Okay. Thank you.

Anyone else?

Yes, Juror Number 10.

PROSPECTIVE JUROR 10: Yes. Mr. Plummer.

THE COURT: Okay.

PROSPECTIVE JUROR 10: He represented my business.

THE COURT: When was that?

PROSPECTIVE JUROR 10: In years -- probably two years ago.

THE COURT: Two years ago?

PROSPECTIVE JUROR 10: Uh-huh.

THE COURT: Has that representation completed?

PROSPECTIVE JUROR 10: Yes.

THE COURT: Okay. When did it finish?

PROSPECTIVE JUROR 10: Probably last year.

THE COURT: Probably last year?

PROSPECTIVE JUROR 10: Uh-huh.

000587

THE COURT: Okay. All right. Thank you.

Anyone else?

(No response.)

THE COURT: All right. Does anyone know, think they know, recognize, or think they recognize any of the parties who were introduced to you a few moments ago?

(No response.)

THE COURT: I see no hands.

All right. The attorneys will now proceed with their -- their questions on examination for the panel.

Mr. Thweatt.

MR. THWEATT: Your Honor, Mr. Terry's going to handle that for us.

THE COURT: Okay. Mr. Terry, you may proceed.

MR. TERRY: Thank you, Your Honor.

VOIR DIRE BY THE PLAINTIFF

MR. TERRY: Good morning.

PROSPECTIVE JURORS: (As a group) Good morning.

MR. TERRY: Good morning.

PROSPECTIVE JURORS: (As a group) Good

000588

morning.

MR. TERRY: There we go. There we go. That's exactly what I need from you guys this morning. I need you to talk -- I need you to tell me how you feel. I need your opinions, your biases. There's no right or wrong answer in what we're doing here today, and let me tell you why that's really important.

This is a very important case, a very serious case, and there's very serious allegations and very serious injuries, what we're dealing with here today. Okay?

Because we all have feelings and biases when we walked through that door today, every single one of us -- you didn't form them when you got in here this morning. You came in with them, and it's how we grew up, it's where we grew up, it's how we were raised.

We all have different opinions and biases based on different situations. That's just who we are; and that's what makes us this community, if you will. Okay?

It's very important that you tell us about those biases and those opinions. There's no right or wrong answer here today. Okay?

Now, if I were to ask you some questions down at the water cooler, or if I was to run

into you at a Stop-and-Go and ask you some questions, I'm sure there's some of you I couldn't get to shut up, probably.

Just because you get in here, doesn't mean you have to clam up. It doesn't mean you have to hold things inside. If you have something -- if you have an answer to one of our questions, anyone's questions here today, please let us know. Raise your hand. If I didn't see your hand raised, say, "Mr. Terry, hey. What about me? I've got something to say." Okay?

That's what we need from you here today, because eventually 12 of you are going to be up here and this case is going to be in 12 of your hands.

And again, very serious allegations, very serious injuries; and this is my client's only shot. Okay?

I want to tell you a little bit about the case just to make sure that -- that you -- no one knows about it or no one's recognized the facts.

On September 4th, 2008, there was a house fire. And in this house were housed mentally incapacitated, mentally retarded individuals, four of them. The house was owned by Four J's Community Living Centers, Inc.; and that was owned by Ms. Anthonia Uduma.

000590

Now, why we're here today is because our client, Jenny Wagner, who was mentally retarded, had cerebral palsy, couldn't function without help. That's why she was at this house. She was badly burned and had injuries from smoke inhalation. Okay?

Now, her mother, Ms. Jenny Wagner [sic] is here today. She's acting as Jenny's guardian in this lawsuit.

Now, a lot of you might think, well, if Jenny was the one who was injured, then why isn't she here today?

Well, lawyers -- we made the decision not to bring Jenny to these proceedings, and she will be presented during Ms. Wagner's questioning. And so the 12 people who are in the jury box will get to see Jenny. And again, that's a decision we made based on her injuries and her mental state; and we hope that you understand that decision.

Now, this fire was started by another resident with a cigarette lighter. The plaintiffs allege that she shouldn't have had access to this cigarette lighter.

This case received a lot of publicity. It was in the papers, and it was on TV.

Is there anyone here who remembers,

knows someone involved in the fire, knows anything about the fire other than what I just told you right now?

(No response.)

MR. TERRY: Okay. Thank you.

I want to ask you some general questions. Is everyone here in agreement -- or think it's important that a president or CEO of a company should be held responsible for the actions that the company takes? Is everyone here in agreement with that?

PROSPECTIVE JURORS: (As a group) Yes.

MR. TERRY: Okay. What about this: Does everyone here think it's important that companies shouldn't put the act of making money over safety?

PROSPECTIVE JURORS: (As a group) Yes.

MR. TERRY: What about corporate responsibility in today's day and age, corporate responsibility, corporate accountability; does everyone think in today's age, that that's pretty important?

PROSPECTIVE JURORS: (As a group) Yes.

MR. TERRY: Now, what about the individuals that run these companies -- say, for example, the president and the CEO; who here is in agreement that those individuals should be held personally responsible, held accountable for the actions of the corporation?

000592

MR. PLUMMER: Excuse me, Your Honor. I'm going to object.

May we approach the bench?

THE COURT: Yes.

(Bench conference.)

MR. PLUMMER: Judge, he's making a general statement that's just not consistent with what the law is.

THE COURT: Uh-huh. Sustained.

MR. PLUMMER: Okay.

(Open court.)

THE COURT: You may continue.

MR. TERRY: I'm sorry. There was a hand raised?

UNIDENTIFIED PROSPECTIVE JUROR: I said I disagree with that.

MR. TERRY: Okay. And Mr. -- Mr. McCraw?

PROSPECTIVE JUROR MCCRAW: Yes, sir.

MR. TERRY: Why is that?

PROSPECTIVE JUROR MCCRAW: Well, mainly because in a lot of -- a lot of people in -- in positions of responsibility and power, you can't be 100 percent held accountable with what people under you do. I mean, if -- if I -- if I enact -- if I'm a CEO of

000593

a company and I enact certain policies, I can't guarantee that everybody's going to follow that all the time.

MR. TERRY: Would you agree with me, sir, that --

PROSPECTIVE JUROR MCCRAW: If I were the CEO of a company and somebody under me got me in trouble and it honestly wasn't my fault, I would -- I'd be really concerned.

MR. TERRY: And I guess you would have to look at the evidence and the facts that surround whatever happened. Would you agree with that?

PROSPECTIVE JUROR MCCRAW: Yeah. If they're in order to be presented correctly, yeah.

MR. TERRY: Okay. Who here, I guess, would agree with Mr. McCraw?

(Hands raised.)

UNIDENTIFIED PROSPECTIVE JUROR: I have a question as to interaction.

MR. TERRY: Yes, sir.

UNIDENTIFIED PROSPECTIVE JUROR: Would you please rephrase your question so I can -- are you --

MR. TERRY: Sure, sure.

The question was, again: Who here would agree that, say, CEOs and presidents of a

000594

corporation should be held personally responsible?

UNIDENTIFIED PROSPECTIVE JUROR: Okay. That's what I wanted to know. And when you say "personal liability," are you saying that beyond the corporate shield, beyond any insurance, that after something happens, that you -- if you didn't get enough, you go after the CEO and take his home? You're talking about personal, individual liability?

MR. TERRY: Yes, sir.

UNIDENTIFIED PROSPECTIVE JUROR: Okay. I disagree with it.

MR. TERRY: Okay. And why is that?

UNIDENTIFIED PROSPECTIVE JUROR: I believe there have to be certain limits. I think there are ways that you can hold people accountable and responsible beyond stripping them of all their assets.

MR. TERRY: What if the facts showed there was, I guess, knowledge on the part of the president and CEO?

UNIDENTIFIED PROSPECTIVE JUROR: That would be different.

UNIDENTIFIED PROSPECTIVE JUROR: Yeah.

MR. TERRY: So it depends on the facts and the situation?

UNIDENTIFIED PROSPECTIVE JUROR: It

000595

does.

MR. TERRY: Depends on the evidence presented?

UNIDENTIFIED PROSPECTIVE JUROR: Right.

(Hands raised.)

MR. TERRY: Yes, ma'am.

PROSPECTIVE JUROR HARRISS: I disagree -- or I agree with your statement. I disagree with the other guy.

MR. TERRY: Okay. And -- and that's -- you -- you agree with the statement that --

PROSPECTIVE JUROR HARRISS: There's too many cases of the CEOs, the guys at the top, set the tone for the company. If they want everybody in their company to be honest and aboveboard, they're honest and aboveboard and they make sure that their staff and everybody down the chain of command understand that. We've had too many examples of CEOs that are less than ethical, who -- or would turn a blind eye to whatever they're -- you know, they're hired -- you know, their staff below them are doing.

So I just believe that, you know, the CEO -- you get to the top because you have certain skills. You're getting paid boucoups of money. You're going to take that risk and you're going to take that

000596

accountability and that responsibility.

MR. TERRY: Thank you. Ms. Harriss?

PROSPECTIVE JUROR HARRISS: Yes.

MR. TERRY: Thank you.

I want to move on to another topic. I understand we have a limited amount of time here today to get to talk to you.

And it's called the burden of proof. It's what we, as the plaintiff, the group that brought the lawsuit, what we have to prove to you, the jury, in order to hold the defendants liable.

That burden of proof is called preponderance of the evidence. Okay? And what that means is -- and you'll see it in a jury charge.

THE COURT: The Court will instruct the jury on the burden of proof.

Ladies and gentlemen, the term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence.

For a fact to be proved by a preponderance of the evidence, the jury must find the fact is more likely true than not true.

You may continue.

MR. TERRY: Judge, do you mind if I give an example of tipping of the scales?

THE COURT: Be careful.

MR. TERRY: Okay. As an example of that, what I like to use when I talk to juries like yourself, is the scales of justice.

If we, as the plaintiff, are able to put, say, one drop of water to tilt the scales into our favor --

THE COURT: Mr. Terry, I gave the definition. That's not consistent with my definition.

MR. TERRY: All right. Sorry, Your Honor.

What a lot of you might be familiar with is the burden across the street, and that is beyond a reasonable doubt. That is the standard used in criminal cases.

That requires a lot higher burden than what we're dealing with here today, as the judge has explained to you what that standard is.

My question to you is: Is there anyone here who would not be able to look at the evidence and -- and view it in a preponderance of the evidence standard versus a reasonable doubt -- beyond a

000598

reasonable doubt?

(No response.)

MR. TERRY: So everyone here is fine with looking at the facts, liability, and damages by the standard as the judge has instructed you, and that is preponderance of the evidence? Everybody -- everyone's fine with that?

PROSPECTIVE JURORS: (As a group) Yes.

MR. TERRY: Next I'd like to talk to you about the damages portion of this case. And as we explain to a jury, a lawsuit is made up of two -- two, I guess, issues: Number one, liability, who done it, whose fault is it; number two would be damages, say, how badly is someone injured, what are their medical bills.

Again, those are viewed by a preponderance of the evidence standard.

One of the elements of damages in this case is going to be pain and suffering. This is a burn case, and so judging -- excuse me -- pain and suffering in that aspect, it's going to be difficult for some of you because pain and suffering is not an objective form of damages. We don't have a machine that we could plug Jenny in and spit out a number, and so that might be hard for some of you to come up with a number.

A machine can't judge hope, can't judge

pain, can't inspire a dream. You, as the jury, are the individuals to do that because only human beings can truly judge another human being's loss.

My question to you is -- and I'll start with the front row over here (indicating) -- would you -- who here on the front row disagrees with this statement: If supported by the evidence, a person is entitled to an award for pain and suffering? Who disagrees with that statement?

(No response.)

MR. TERRY: Nobody? Okay.

Over here (indicating), front row, tell me, please, who disagrees with this statement: If supported by the evidence, a person is entitled to an award for pain and suffering.

Does anyone on the front row here disagree with that statement?

PROSPECTIVE JURORS: (As a group) No.

PROSPECTIVE JUROR DOMINGUEZ: I disagree that they would be entitled.

MR. TERRY: Okay. Juror Number 11?

PROSPECTIVE JUROR DOMINGUEZ: Uh-huh.

MR. TERRY: Ms. Dominguez?

PROSPECTIVE JUROR DOMINGUEZ: Yes.

MR. TERRY: Okay. And can you explain

that, please?

PROSPECTIVE JUROR DOMINGUEZ: Just that I think there should be a chance that they could be given a reward; but I think it's possible to endure pain and suffering without having, like, an award that's entitled to you.

MR. TERRY: And maybe I chose the words poorly. If supported by the evidence --

PROSPECTIVE JUROR DOMINGUEZ: Uh-huh.

MR. TERRY: I guess what you're telling me, even if it's supported by the evidence, someone might not be entitled to -- or get an award for pain and suffering, even if the evidence shows it?

PROSPECTIVE JUROR DOMINGUEZ: Well, you mean the evidence shows that they -- that they have suffered unfairly or --

MR. TERRY: That they suffered pain and suffering, that they experienced pain and suffering.

PROSPECTIVE JUROR DOMINGUEZ: Sure. I mean, I just -- I think my problem is with the word "entitled" maybe.

MR. TERRY: Okay. Okay. And that's fine. So I guess what you're saying is there is the possibility that if the evidence would show it, not that they're entitled to it, but you could award it?

PROSPECTIVE JUROR DOMINGUEZ: Sure.

MR. TERRY: Okay. The second row, I'll ask the same question with Ms. Dominguez's suggestion.

Please tell me who disagrees with this statement: That is, a person can be awarded money damages for pain and suffering if supported by the evidence. Who disagrees with that?

(No response.)

MR. TERRY: Nobody?

Second row over here (indicating). Again, same -- same sentence. Who here on the second row would not be able to award money damages for pain and suffering even though it was supported by the evidence that was shown?

(No response.)

MR. TERRY: Okay. Thank you.

Finally, last row, Jurors 33 through 40, same sentence: If supported by the evidence, would you be able to award money damages for pain and suffering? Who disagrees with that statement?

(No response.)

MR. TERRY: Thank you.

Lastly, Jurors 41 through 48, again, same state -- same statement, would you be able to award money damages for pain and suffering or -- scratch that.

000602

I'm sorry.

The statement being, a person is entitled or should be awarded damages, money damages, for pain and suffering. Who disagrees with that statement?

(No response.)

MR. TERRY: Thank you.

Lastly, I want to talk to you a little bit about what's called punitive damages. And these are damages that are separate from the damages we will be seeking on behalf of Jenny Wagner. These are damages that are intended to, say, punish a company to deter or prevent the type of conduct which brought the initial lawsuit -- for example, in this case, to deter future fires, to try to prevent future fires.

Is there anyone here -- and we'll just say the first three rows over here (indicating): Is there anyone here who would not be able to award punitive damages even though supported by the evidence?

(No response.)

MR. TERRY: So everyone here would be able to -- if supported by the evidence, to award punitive damages; is that correct?

PROSPECTIVE JURORS: (As a group) Yes.

MR. TERRY: Over here (indicating),

same question: Is there anyone on these three rows who would not be able to award punitive damages even though supported by the evidence?

PROSPECTIVE JUROR 25: I just have a question.

MR. TERRY: Yes, ma'am. Juror 25?

PROSPECTIVE JUROR 25: I think so, yes.

MR. TERRY: Okay.

PROSPECTIVE JUROR 25: Certainly if the -- if the facts and circumstances rise to the level of the burden -- but when you're talking about punitive damages, is -- you're looking for those damages from the corporation as well as the individual?

MR. TERRY: Yes.

PROSPECTIVE JUROR 25: I would try to follow the law, obviously; but it would really depend on what those circumstances are and how much of that control was in the hands of the individual before I feel they should be punished.

MR. TERRY: Okay.

PROSPECTIVE JUROR 25: A corporation, I may hold to -- you know, not so much; but that individual is going -- it's really going to be based on the facts.

MR. TERRY: Okay. So going in, you

000604

would have trouble, at least just with the individual versus the corporation? I guess you would hold the individual to a higher standard?

PROSPECTIVE JUROR 25: I would really try to follow the law; but honestly, you know, I -- it's so hard with what you're giving us. And some of the things that we've talked about -- you know, yeah, I think CEOs and corporations should be responsible. But what are the acts? Were the acts within the delegation of duties to other people, or were they unforeseen? What -- so I would have a hard time maybe, and I'm -- and I really mean that based on the facts -- to punish an individual as opposed to the corporation, depending on what role that individual truly played and the knowledge and access and whatnot.

MR. TERRY: Okay.

PROSPECTIVE JUROR 25: Just trying to be fair.

MR. TERRY: No. And I greatly appreciate that, I really do.

Had a question over here (indicating), Juror Number 33?

PROSPECTIVE JUROR 33: I pretty much feel the same way that she does, but the evidence would definitely have to support it.

000605

MR. TERRY: Okay. Now, do you also -- or do you hold, say, the individual to a kind of a higher standard or proof, I guess? You would require more evidence against the individual as opposed to the company?

PROSPECTIVE JUROR 33: Yes.

MR. TERRY: Okay.

PROSPECTIVE JUROR 12: I feel the same way, also.

MR. TERRY: Juror Number 12?

PROSPECTIVE JUROR 12: Yes.

MR. TERRY: Whatever you say.

Mr. Jones?

PROSPECTIVE JUROR JONES: Yes.

MR. TERRY: Okay. Okay. Who here --

UNIDENTIFIED PROSPECTIVE JUROR: Hello.

MR. TERRY: There we go.

PROSPECTIVE JUROR 40: I feel the same way, also.

MR. TERRY: Number 40? Okay.

Let's just go ahead and just do it by the rows.

Anyone else agree with that statement -- with these individuals who say, yeah, we're going to hold the individual to kind of a higher, you

000606

know, standard of proof. We're going to make you, plaintiff, give us more evidence to prove that the individual is liable?

UNIDENTIFIED PROSPECTIVE JUROR: I think you'd have to add me to that group.

MR. TERRY: Okay. Hold your hands up for me, please, so I can get your numbers.

And that is -- let's see. Mr. Keats?

PROSPECTIVE JUROR KEATS: Yes.

MR. TERRY: Okay. And --

PROSPECTIVE JUROR HILL: Mr. Hill.

MR. TERRY: Mr. Hill. Thank you.

Second row -- or I'm sorry. Ma'am, you would be Ms. Mowery?

PROSPECTIVE JUROR MOWERY: Yes.

MR. TERRY: Okay. Thank you.

Second row? Okay. Juror --

PROSPECTIVE JUROR 20: 20.

MR. TERRY: Juror 20?

PROSPECTIVE JUROR 20: (Nods head.)

MR. TERRY: Thank you.

And Juror 17, thank you, ma'am.

And on the last row, one, two, three. Got it. Thank you, guys.

I guess same question over on this

000607

side: Who here would require the plaintiff to prove -- to show more evidence on punitive damages as opposed to proving the company was negligent? Do you understand that question? Okay.

In this section (indicating), Number 41. Okay.

Have some questions? Yes, ma'am.

UNIDENTIFIED PROSPECTIVE JUROR: Okay. Repeat that again, because to me it sounded like it was backwards.

MR. TERRY: Sure, and it probably was.

Basically the question is: Who would require us, as the plaintiffs, to show more evidence as to punitive damages as against the individual than the company?

(Hands raised.)

MR. TERRY: Yes, sir.

UNIDENTIFIED PROSPECTIVE JUROR: We do have folks that -- well, maybe the law will explain what is meant by punitive damages.

MR. TERRY: I'm sorry, sir?

UNIDENTIFIED PROSPECTIVE JUROR: There are a few folks, sir, that are not familiar with the word of law. Please explain what is meant.

MR. TERRY: Okay. Again, punitive

000608

damages are those damages that are separate and apart from what we were seeking on behalf of Jenny Wagner, who was burned in the fire. Punitive damages are those damages which are intended to go against the defendants in this case to deter the type of conduct which brought on the basis for this lawsuit -- i.e., the fire that occurred.

We're saying it could have been prevented; and we'd like to deter that, basically. That is punitive damages in a nutshell.

Any further questions in that regard?

After I've provided that explanation, has anyone changed their mind as to the question I asked?

(No response.)

MR. TERRY: Guys, that's all I have for you right now. Again, we really appreciate you being here. As a jury, you have the power to take children away from their parents, as a jury you have the power to put people to death. Here you have the power to do what's just and right, and we appreciate it. Thank you.

THE COURT: Mr. Sparks?

MR. SPARKS: Thank you, Judge.

VOIR DIRE BY THE INTERVENOR

MR. SPARKS: Your Honor, counsel,

ladies and gentlemen, good morning. How are y'all doing?

PROSPECTIVE JURORS: (As a group) Good morning.

MR. SPARKS: I'm Shelton Sparks; and we represent Derrick James, who is the heir to Tanya James. And Tanya James is not here and she won't be. She died in the fire. Wylette Taylor is the guardian for Derrick James because he has special needs, and he won't be here at all. But this photo back here is a photo of Tanya James, and we represent the heir to her in reference to the pain and suffering she endured prior to her dying.

Couple of questions... Mr. Terry did a good job, but there were some people that indicated they knew some of the people involved. I just want to get an understanding of some of those relationships before we go forward.

I think -- is it Juror Number 6, Ms. Soto?

PROSPECTIVE JUROR SOTO: Uh-huh.

MR. SPARKS: You indicated you knew Mr. Plummer: Is that right?

PROSPECTIVE JUROR SOTO: Yes, yes.

MR. SPARKS: Now, would it be fair, in

000610

your opinion, to sit on this jury to make a determination about the liabilities and responsibilities and accountabilities of somebody else that he's representing, having previously represented you? Do you think that would be fair?

PROSPECTIVE JUROR SOTO: (Nods head.)

MR. SPARKS: You could sit that relationship aside you've had with Mr. Plummer previously and, if you were on this jury, render a verdict based on the evidence and nothing else?

PROSPECTIVE JUROR SOTO: I believe so.

MR. SPARKS: You think you can?

PROSPECTIVE JUROR SOTO: (Nods head.)

MR. SPARKS: We have your word on that?

PROSPECTIVE JUROR SOTO: Uh-huh.

MR. SPARKS: And there was another young lady. And I'm kind of bad with the names, and we've kind of got you guys numbered. I think you're Number 10?

PROSPECTIVE JUROR RODRIGUEZ: Yes, sir.

MR. SPARKS: Could you help me, please? What's your name?

PROSPECTIVE JUROR RODRIGUEZ: Frances Rodriguez.

MR. SPARKS: Ms. Rodriguez, how are you

000611

today?

PROSPECTIVE JUROR RODRIGUEZ: Fine.

MR. SPARKS: Not going into the nature and depth of the relationship you had with Mr. Plummer when he represented you. You indicated, I thought, that it may have been within the past couple of years?

PROSPECTIVE JUROR RODRIGUEZ: Uh-huh.

MR. SPARKS: Do you think, if you were to sit on this jury, having had that experience with him being your lawyer and him representing other clients, that you could be a fair representation [sic] to listen to the evidence and make a determination based on it and only it and nothing about your prior relationship with him?

PROSPECTIVE JUROR RODRIGUEZ: No, I don't think so, because -- which is going to make it fair, you know.

MR. SPARKS: And that's what we want.

PROSPECTIVE JUROR RODRIGUEZ: And it's two separate things.

MR. SPARKS: Okay.

PROSPECTIVE JUROR RODRIGUEZ: It's not personal in each way --

THE COURT: Can you speak up, ma'am?

PROSPECTIVE JUROR RODRIGUEZ: It's not

000612

personal on each way. It's just like, you know, trial.

MR. SPARKS: Yeah.

PROSPECTIVE JUROR RODRIGUEZ: I mean, you know, I -- it's just like my business, you know. My employees are -- if they're relatives, they're my employees, nothing personal there. So we're just --

MR. SPARKS: Right.

So you don't think you would be a fair representation to sit on this panel; is that correct?

PROSPECTIVE JUROR RODRIGUEZ: It would be okay.

MR. SPARKS: Thank you very much, ma'am. Appreciate that.

Was there another person that indicated they knew Mr. Plummer besides Juror Number 46?

How are you doing, Judge?

UNIDENTIFIED PROSPECTIVE JUROR: Terrific. How are you?

MR. SPARKS: Fine, ma'am.

Anybody else?

There was another -- I believe a lady indicated she went to church with Mr. Thweatt; is that correct?

UNIDENTIFIED PROSPECTIVE JUROR: Yes.

MR. SPARKS: Let me ask you, ma'am:

000613

Not getting into how frequently he comes to church, anything about that relationship, if you were to sit on this panel, you think would cause you to be more fair to the side that Mr. Thweatt is on versus the side that Mr. Plummer represents?

UNIDENTIFIED PROSPECTIVE JUROR: No. I don't know Mr. Thweatt. I just recognize him.

MR. SPARKS: Okay. Okay. So that would have no bearing whatsoever in your deliberations on the evidence.

UNIDENTIFIED PROSPECTIVE JUROR: Not at all.

MR. SPARKS: Is that correct?

UNIDENTIFIED PROSPECTIVE JUROR: That's correct.

MR. SPARKS: Okay. Thank you very much.

There was -- oh, Juror 26, how are you doing?

PROSPECTIVE JUROR 26: I'm fine.

MR. SPARKS: Good, good. I saw you shaking your head, nodding; and I wasn't certain if it was in reference to the comments that was made by the young lady next to you, Juror 25, or one of the other jurors.

000614

Do you recall when you did that at all?

PROSPECTIVE JUROR 26: I know I did earlier when we were talking; but, I mean, I think it's really hard to take sides either way until the evidence is presented to me --

MR. SPARKS: Yes, ma'am.

PROSPECTIVE JUROR 26: -- in my opinion. So --

MR. SPARKS: So your statement is although you were agreeing on some things and maybe not necessarily on the others --

PROSPECTIVE JUROR 26: Yes, sir.

MR. SPARKS: -- you're the type of person that you wouldn't make a decision --

PROSPECTIVE JUROR 26: Exactly.

MR. SPARKS: -- about any of the facts in this case until you heard all evidence; is that correct?

PROSPECTIVE JUROR 26: Exactly, exactly.

MR. SPARKS: And that's basically what we're kind of looking for this morning.

Juror Number 5. Is it Mr. Keats?

PROSPECTIVE JUROR KEATS: Keats, yes.

MR. SPARKS: How are you, sir?

PROSPECTIVE JUROR KEATS: How are you doing? Fine.

MR. SPARKS: Good morning to you.

You had some comments about corporate responsibility, I guess. Is that a fair assessment?

PROSPECTIVE JUROR KEATS: Not exactly, no.

MR. SPARKS: Share with me what you had some concerns about in reference to Mr. Terry's talking about the corporation --

PROSPECTIVE JUROR KEATS: As far as -- you know, it's easy to accuse and then find enough evidence maybe to get some jury to make a big award and strip someone of their assets in spite of the fact they may not really have had much to do, although they're -- it's under their purview and responsibility as a CEO or whatever, they -- you know, purging them -- if you hurt their corporation, they're going to get hurt anyway.

There are ways of punishing people, but I don't believe you should go after their personal assets unless you can truly show there's a higher burden of proof they really were complicit in bringing about the -- whatever evil the corporation has supposedly committed.

MR. SPARKS: The law says there are

000616

situations that may allow it and situations that may not. If, in fact, you sat on this jury panel and we were to prove to you the situation that did allow it, do you think you could follow the law in that regard or your feelings and your values wouldn't allow you to do that?

PROSPECTIVE JUROR KEATS: If you're talking about going after somebody personally for something they -- without having to prove that they really and truly were on board and knew what was going on -- is that what you're saying?

MR. SPARKS: No, that's not what I'm saying. What I'm saying is, and what we're saying: People can do business in various forms in our society. Some people can set up a corporation and that corporation acts as an entity but it's run by people. And if the corporation acts up, there are provisions in the law that allow the corporation to be held accountable and the person who ran it.

And if, in fact, we prove that both the corporation was at fault and the owner of the corporation, by law, was also deemed to be at fault, then you could hold both of them accountable.

PROSPECTIVE JUROR KEATS: I could, yeah. I mean, I don't think you should be able to act

000617

irresponsibly and in an antisocial manner through your corporation --

MR. SPARKS: Okay.

PROSPECTIVE JUROR KEATS: -- if that's your intent. But you really have to show me that the -- I mean, how many corporations are just sort of a -- an entity that, perhaps, somebody controls that doesn't know that much about or they just, you know, started it to buy their insurance for their fleet of cars or whatever or a management company to --

MR. SPARKS: Yes, sir.

PROSPECTIVE JUROR KEATS: -- put a little layer of --

MR. SPARKS: And I don't mean to cut you off, but the gentleman sitting next to you -- is it Mr. Hill?

PROSPECTIVE JUROR HILL: Right.

MR. SPARKS: How are you, sir?

PROSPECTIVE JUROR HILL: All right.

MR. SPARKS: Good. When Mr. Keats was speaking up earlier, you kind of raised your hand on some things. Are you in agreement with what he says?

PROSPECTIVE JUROR HILL: I kind of believe that you're going to have to prove that that person was incompetent enough to not know what was going

on because I'm going to say the man that's supposed to be running the show better know what's going on.

And if he's saying he's incompetent and he didn't know, then you're not going to punish him. I'm sorry.

MR. SPARKS: All right. Let me see a show of hands on the front row who adheres to the statement made by Mr. Hill.

(Hands raised.)

MR. SPARKS: You're Ms. -- Juror Number 1?

PROSPECTIVE JUROR 1: Yeah.

MR. SPARKS: How are you doing today? You agree with that assessment?

PROSPECTIVE JUROR 1: Yes.

MR. SPARKS: Any other hands on row number one? What about row number two?

UNIDENTIFIED PROSPECTIVE JUROR: I'm sorry. I -- could you repeat it? I think I've gotten confused.

UNIDENTIFIED PROSPECTIVE JUROR: Thank you.

UNIDENTIFIED PROSPECTIVE JUROR: Yeah.

MR. SPARKS: Well, I was asking did you agree with the statement made by Mr. Hill, who was

000619

saying that -- if I may paraphrase him -- that it had to be a lot of proof showing to him that the person running the show, the corporation, didn't know what was going on?

UNIDENTIFIED PROSPECTIVE JUROR: That's right.

MR. SPARKS: And if they were incompetent, he would think that something was wrong with them and he would think -- he would hold them liable for their actions of their company.

UNIDENTIFIED PROSPECTIVE JUROR: I agree with that.

MR. SPARKS: You agree with that? Can I get your number?

PROSPECTIVE JUROR 20: Number 20.

MR. SPARKS: Number 20?

All right. What about you, sir, Mr. -- Mr. -- Juror Number 19, Mr. Talton?

PROSPECTIVE JUROR TALTON: Right. I agree with that.

MR. SPARKS: You agree with that?

PROSPECTIVE JUROR TALTON: Yeah.

MR. SPARKS: What about you, Mr. -- Juror Number 18. I can't read my own handwriting here. How are you doing, sir?

000620

PROSPECTIVE JUROR 18: The person that died was a kid?

MR. SPARKS: No, sir. It was a -- she was a woman. She also had special needs, and she was an adult.

The child is her heir and is bringing this cause of action on her behalf, and he is unable to be here because of his disabilities. And his court-appointed guardian is here on his behalf.

PROSPECTIVE JUROR 18: Well, when they got burned, was any of them -- was it a kid? Was it a child that got burned?

MR. SPARKS: No, sir.

PROSPECTIVE JUROR 18: They were both adults?

MR. SPARKS: They were chronologically adults. However, based upon the psychological problems that they had, they didn't have the ability, like you and I, to be able to function and do some of the things that we do. And they were in special -- in a special care situation.

How does that make a difference in your mind?

PROSPECTIVE JUROR 18: Well, I mean, just a kid dying, you know, getting burned up, kind of

000621

horrible. An adult dying and getting burned up is kind of horrible, too, you know; and I think it's just bad. It's a bad thing. I was just wondering if they were -- if they were kids, that's all, because the way that young man over there was sounding made it sound like they were children.

MR. SPARKS: Yes, sir. Yes, sir. No. These -- these were adults.

What about on the third row? Mr. Jones?

UNIDENTIFIED PROSPECTIVE JUROR: Yes.

MR. SPARKS: You believe -- you think like Mr. Hill? Mr. Hill's right here in the front row --

UNIDENTIFIED PROSPECTIVE JUROR: Yeah, yeah, right.

MR. SPARKS: -- saying that the company, the business -- he would hold them to a higher standard.

UNIDENTIFIED PROSPECTIVE JUROR: Yes, sir.

MR. SPARKS: All right. Mr. Jones, Number 12, how are you, sir?

PROSPECTIVE JUROR JONES: I'm fine.

MR. SPARKS: Good, good. On some of

000622

the -- the background information we get, we get a chance to look at it and kind of surmise the experts and -- I mean, not the experts -- but the experiences that those individuals had in life and some of the -- the relationships they had and what they do on a day-to-day basis and how they may bring that information to the jury pool if so selected. It's sort of like bringing spices to a gumbo, kind of put everybody's in there and come up with something very good. And that would be the jury, hopefully get a verdict based on that.

Based on your information, we didn't get one of our ingredients; and I wanted to ask you -- you had down, I think, that you're an inspector?

PROSPECTIVE JUROR JONES: Yes, sir.

MR. SPARKS: Is that right?

PROSPECTIVE JUROR JONES: Uh-huh.

MR. SPARKS: What do you inspect, if I may ask?

PROSPECTIVE JUROR JONES: I'm on 24-hour call. Whenever there's a big fire in the city, I'm, like, one of the -- I'm the first one to go in.

MR. SPARKS: Okay. So you work with the fire department?

PROSPECTIVE JUROR JONES: Correct.

000623

MR. SPARKS: Okay. Are you employed through the City of Houston?

PROSPECTIVE JUROR JONES: I am.

MR. SPARKS: Okay. All right. What are -- what are your thoughts in terms of corporate responsibility?

PROSPECTIVE JUROR JONES: Well, I agree with Mr. Hill. I mean, if there's a responsibility higher up, it would have to really be shown beyond a shadow of a doubt that he was aware of it, to make sure -- especially if you're going after him personally.

But if it can't be proved, I believe it would be the corporation, in my opinion.

MR. SPARKS: Now, you said something about a shadow of a doubt. That's another burden of proof that we like to talk about.

Now, the judge indicated all we're held to is preponderance of the evidence over here in a civil matter. Shadow of a doubt, beyond a reasonable doubt, that's more of a criminal standard that's applicable across the street. Okay?

PROSPECTIVE JUROR JONES: Do you think it would be criminal if he allowed it to happen?

MR. SPARKS: Well --

THE COURT: This is not a criminal

case. This is a court that handles civil lawsuits, and so we're addressing the civil lawsuit that was filed in this matter.

PROSPECTIVE JUROR JONES: Okay.

MR. SPARKS: And that kind of goes back to, I think, what Ms. -- Juror Number 10, Ms. Rodriguez [sic].

PROSPECTIVE JUROR DOMINGUEZ: Dominguez.

MR. SPARKS: Ms. Dominguez?

PROSPECTIVE JUROR DOMINGUEZ: Yes.

MR. SPARKS: -- was saying about entitlement. You know, she kind of had a problem with entitlement.

And it's not necessarily that people are entitled to something. It's just that the law provides that if you're injured as a result of someone else's negligence and you so find as a jury that that person should be awarded something to reimburse them, to make them whole, then you can make that determination.

An entitlement is not something that they're entitled to. However, you have the power to make an award based upon the evidence that you find to what degree they were damaged, injured, hurt, harmed in any kind of way.

Juror 25, yes, ma'am, you were asking some questions about punitive damages?

PROSPECTIVE JUROR 25: Uh-huh.

MR. SPARKS: All right. Is there anything in your professional relationship, cases you've worked on, that would cause you to be a little bit more -- well, not a little bit more; but would cause you to take those relationships into the facts of this case if you were to sit on this jury panel?

PROSPECTIVE JUROR 25: I'm not sure I'm following your question.

MR. SPARKS: Can I rephrase it?

PROSPECTIVE JUROR 25: Please.

MR. SPARKS: You're an attorney, right?

PROSPECTIVE JUROR 25: Yes.

MR. SPARKS: Okay. So you've worked on cases through your profession. Fair assessment?

PROSPECTIVE JUROR 25: Predominantly criminal cases.

MR. SPARKS: Anything about those relationships with plaintiff or defendant, not knowing what side of the bar you're on, that would cause you to be -- would cause you to have a predisposition toward the relationship on this case, if and so [sic] you were on this panel?

000626

PROSPECTIVE JUROR 25: Honestly, I probably have predispositions; but I respect the law. So I would do my best to follow the instructions of the judge. I do have opinions.

My background being criminal, I understand the differences in the burdens of proof, punitive damages. As mentioned before, that might be my -- for the individual, might be where I really have to adhere to the letter of the law and the judge's instructions because I -- you know, my heart is already sad for what happened. But at the same time, that punishment segment for the individual, knowing that it's an incorporated -- knowing that it's a corporation, I would definitely listen to the facts. I would need the facts, I'd need the patterns, I would need to know what happened, how it happened, but I would do my best, obviously, to follow the law.

But as far as -- you know, when it comes to punitive --

MR. SPARKS: You're struggling?

PROSPECTIVE JUROR 25: Through my practice and my life, I try to be very fair and reasonable; but I'm not going to deny that I'm opinionated.

I don't know that it would be a

000627

struggle. It's sort of a conflict, but I would defer to the law. I mean, I took oaths to uphold the law.

MR. SPARKS: That's important.

Everybody in here who's got an opinion, just raise your hand.

(Hands raised.)

MR. SPARKS: All right. And that's okay. We don't -- we don't expect you guys to come in here and just leave your opinions and your life experiences and your -- your -- your expertises at the door.

All we want you to do is say, based on those relationships, would I be a fair person to sit on this case, in this particular court, on this particular day.

And if you can be, we welcome you. But if you can't be, just tell us because it's not personal. We're not everything for everybody. This may not be the one for you because if your experiences would cause you to lean for us, that would probably be unfair to them. And if it would cause you to lean for them, certainly that would be unfair for us, right? All we want is fairness.

And what we're doing right now is trying to figure out who could be and who couldn't be.

THE COURT: You have five minutes.

MR. SPARKS: Thank you, Your Honor.

So having said all that, anybody here think this case wouldn't be good for them? Raise your hand.

(Hands raised.)

MR. SPARKS: You don't think it would be a good one for you, sir?

PROSPECTIVE JUROR 12: Yes, sir. I'm in a situation right now with my brother-in-law; he's in a special needs home and having some problems.

MR. SPARKS: You're Number 12, sir?

PROSPECTIVE JUROR 12: Yes, sir.

MR. SPARKS: Okay. And what about you, Mr. McCraw, is it?

PROSPECTIVE JUROR MCCRAW: I just think I'm a little too bias -- I mean, honestly, I think I'm a little too bias to even serve on a civil jury.

MR. SPARKS: Okay.

PROSPECTIVE JUROR MCCRAW: Criminal courts, no problem; but I have a -- I'm predispositioned to... just like the whole rigamarole with award, blame, and --

MR. SPARKS: Okay.

PROSPECTIVE JUROR MCCRAW: -- you know,

000629

I'm -- I could apply the reasonable doubt and the law, but the civil stuff really gets me going.

MR. SPARKS: And you were shaking your head, Juror 25. Is that how you feel, too?

PROSPECTIVE JUROR 25: Because --

MR. SPARKS: I just need a yes or no. I'm sorry. I don't have a lot of time. The judge has got me on a short leash right now.

PROSPECTIVE JUROR 25: Yeah. I'm pulled because it's such a sad case and because my heart breaks with the families. But going after an individual -- I'm stuck on the punitive.

MR. SPARKS: Okay. Don't get stuck there. Okay.

Anybody else? We have Number -- Number 9?

PROSPECTIVE JUROR 9: 9, yeah.

Being -- I'm retired from the Houston Fire Department now; but back then and seeing burnt people, you know, it's -- it would be hard --

MR. SPARKS: Yes, sir.

PROSPECTIVE JUROR 9: -- to see that. Being also -- I retired as one of the chief fire marshals, City of Houston. And so I guess I have a lot of questions to ask as far as, you know, codes and stuff

000630

like that.

MR. SPARKS: Yes, sir.

PROSPECTIVE JUROR 9: And I just -- I would try to be as fair as I could be. That's all I could say.

MR. SPARKS: Thank you.

Yes, sir. Give me your number, please.

UNIDENTIFIED PROSPECTIVE JUROR: Yeah.

MR. SPARKS: I don't mean to cut you off, but I don't have all the names.

UNIDENTIFIED PROSPECTIVE JUROR: I understand.

THE COURT: What's your Juror Number, sir?

PROSPECTIVE JUROR 30: 30.

MR. SPARKS: 30?

PROSPECTIVE JUROR 30: 30.

MR. SPARKS: I'm sorry. Go ahead.

PROSPECTIVE JUROR 30: Your aspect [sic] between corporate and an individual responsibility does not quite sit well with me.

MR. SPARKS: All right. Thank you.

PROSPECTIVE JUROR 30: Okay.

MR. SPARKS: Yes, sir. What's your Juror Number?

000631

PROSPECTIVE JUROR 21: 21. I'd be very biased on this, as well.

MR. SPARKS: Did you say 21?

PROSPECTIVE JUROR 21: Yes, sir.

MR. SPARKS: Okay. Was -- with regard to -- what would biases be, if I may ask?

PROSPECTIVE JUROR 21: Just with the burn victims.

MR. SPARKS: Okay. Okay.

Yes, ma'am. Give me your number. I can't --

PROSPECTIVE JUROR 36: I think I'm 29.

MR. SPARKS: 29? You're that young?

PROSPECTIVE JUROR 36: I wish I was.

MR. SPARKS: All right. 26?

PROSPECTIVE JUROR 36: 26.

THE COURT: No. I think you're 36, ma'am.

MR. SPARKS: I like 29. Go ahead. Tell me your --

PROSPECTIVE JUROR 36: I guess my issue is I'm a professor of business and I teach business ethics, as well as management. So I have very set --

MR. SPARKS: Yes, ma'am.

PROSPECTIVE JUROR 36: -- ideas on

000632

things.

MR. SPARKS: I didn't hear the last part. I'm sorry.

PROSPECTIVE JUROR 36: I just said, I teach business ethics and I teach management and I'm pretty bias --

MR. SPARKS: Yes, ma'am.

PROSPECTIVE JUROR 36: -- towards my -- what I know.

MR. SPARKS: Well, being bias toward what you know may not be bad. What about being bias towards one of us?

PROSPECTIVE JUROR 36: I'd probably be bias toward the victim because I'm a firm believer in corporate responsibility. And it doesn't matter who did the crime; you're still responsible as the CEO.

MR. SPARKS: Okay. Thank you.

UNIDENTIFIED PROSPECTIVE JUROR: Same bias.

MR. SPARKS: Same for you?

Anybody else on that back row believes like the professor?

Yes, ma'am. Tell me -- you're 29?

PROSPECTIVE JUROR 29: 29.

MR. SPARKS: You're 29?

000633

PROSPECTIVE JUROR 29: I'm 29.

MR. SPARKS: You're 29. Okay. Ms. 29, how are you doing?

PROSPECTIVE JUROR 29: I could be bias because I worked 13 years with special needs and handicapped children.

MR. SPARKS: Yes, ma'am. Okay.

Now, I thought I saw some folks that worked in physical therapy and stuff, a lot more so than we normally get. Raise your hands and give me your number.

(Hands raised.)

MR. SPARKS: Number 1?

PROSPECTIVE JUROR 24: 24.

MR. SPARKS: 24?

Anybody else?

What's your number, ma'am?

PROSPECTIVE JUROR 16: 16, I think.

MR. SPARKS: 16.

And I thought there was somebody else.

Let me ask you: Is it Ms. Biller [sic]?

PROSPECTIVE JUROR BILLINGS: Billings.

MR. SPARKS: Billings? I'm sorry.

PROSPECTIVE JUROR BILLINGS: Yes, sir.

MR. SPARKS: Your relationship in physical therapy, would it cause you to bring one thought process versus another if you were to sit on this panel?

PROSPECTIVE JUROR BILLINGS: I work with Alzheimer's patients, and so I possibly -- because I would fight for them. And I think if I feel that they did something, I might be more swayed towards...

MR. SPARKS: Well, let me ask you this question: Can you set aside your relationships with your professional life to listen and make a determination just based on the facts that are presented here today?

PROSPECTIVE JUROR BILLINGS: Sure, yes.

MR. SPARKS: Is that a "yes"?

PROSPECTIVE JUROR BILLINGS: Yes.

MR. SPARKS: Not a wobbly yes, but yes?

PROSPECTIVE JUROR BILLINGS: Yes.

MR. SPARKS: All right. Thank you so much.

THE COURT: You need to wrap it up.

MR. SPARKS: All right. Number 24, your thoughts?

PROSPECTIVE JUROR 24: I do home health; and I do occasionally see patients that are in,

000635

like, group homes. And I'm not sure I can --

MR. SPARKS: You don't think you'd be a good juror on this panel based on that experience?

PROSPECTIVE JUROR 24: Huh-uh.

MR. SPARKS: All right. Thank you very much.

The judge has reigned me in, ladies and gentlemen. I really appreciate having this opportunity to speak with you. I may not get another one as we go throughout the trial, but we really appreciate you coming down. You do our system a great service, and we can't thank you enough.

THE COURT: Mr. Plummer.

Mr. PLUMMER: Thank you, Your Honor.

VOIR DIRE BY THE DEFENSE

MR. PLUMMER: Gentlemen, ladies and gentlemen of the jury panel, I want to welcome you-all here; and I thank you for the opportunity today to visit with you, to talk about your feelings and attitudes about this case.

Your Honor, can we have the screen down?

THE COURT: Yes.

MR. PLUMMER: Again, my name is Jim Plummer. I practice law here in Harris County. And

000636

I'm going to give a little bit to you about this lawsuit and about the process and ask you some questions about your feelings about this process. Okay?

First of all, Ms. Wagner here is the parent of Jenny Wagner and is here as the plaintiff in this lawsuit and -- along with Ms. Taylor here, who is the representative of her nephew, I believe, who was the son of Ms. James, who died in the fire.

I represent -- we represent Four J's Community Living Center, which is a center -- part of a center that provides a residential group home for folks with various kinds of disabilities, mental retardation and physical disabilities.

Everybody understand that?

They are regulated and governed by various State agencies, and they are part of the DADS program which is the -- I always forget -- it's the Department of Aging and Disability program.

Anybody here familiar with DADS?

(Hands raised.)

MR. PLUMMER: Okay. Anybody else?

The CEO and the owner of Four J's Community Living Center is a lady by the name of Anthonia Uduma. Anybody know Ms. Uduma?

(No response.)

000637

MR. PLUMMER: Okay. Before I go any further, let me tell you what my perfect jury would be: My perfect jury would be 12 guys who played on the basketball team with me in high school because I believe that they would respect me and respect what I do and respect my -- my client and decide issues in my favor. It's the perfect jury.

But un -- but fortunately, the process doesn't work that way. The process requires that we get 12 of you citizens, ordinary citizens, who bring your common sense and your own experience to bear, listen to the evidence, and then decide based on that evidence and the question that the Court's going to give you at the end of this.

Does everybody understand that's going to be the role of the jurors in this matter? Everybody understand that?

PROSPECTIVE JURORS: (As a group) Yes.

MR. PLUMMER: All right. So I have to ask you some questions to -- to judge and gauge your -- whether you're qualified or whether or not you're the right person to sit on this jury. Okay?

The first thing -- let me have the first slide, please.

The first thing -- question I want to

000638

ask everybody is: Ms. Uduma is not present here now, and part of the reason she's not present here is I want candid responses from you-all without being influenced by who the -- the party is or the person is or how they look or that sort of thing.

For example, Jenny's not here today. Jenny Wagner's not here today.

Anybody going to hold it against Ms. Uduma, if they were picked as a juror, if she is not here during this part of the jury selection process?

PROSPECTIVE JURORS: (As a group) No.

MR. PLUMMER: Okay. Okay. Okay.

Now, this lawsuit has been filed because of an absolute tragedy. Nobody in his right mind would think of this, the loss that was suffered, as anything other than a tragedy; and I want to put that tragedy in context.

There was a group home on Beretta Court in the southwest part of town that was owned by Ms. Uduma but run by Four J's Community Living Center. It -- it was a four-person home. That meant that it could have four residents there, each of whom was either physically disabled or mentally retarded or had a variety of disabilities. Okay?

The routine -- and Four J's provided

24-hour care. That meant that they fixed meals for the clients or customers -- "clients," I think was the term they used, or "individuals" they used. They fixed meals for them. They took them to an activity center during the daytime where they had various kinds of therapy, they brought them home, and cooked dinner.

For those clients who needed the care of -- their personal care was taken care of, bathing and showering and things of that sort. Dinner was made.

They slept there, and the next day the routine would -- would reoccur where they got some activity.

Now, there's a philosophical reason in trying to integrate them -- these folks with disabilities into the community as best you can, but that's one of the reasons for the group home.

On September 4, 2008, the routine started. They went to the activity center. And at about 4 or 5 o'clock, they come back to [sic] the activity center to Beretta Court. Dinner was done. And at some point in time in the evening, one of the residents, one of the clients, Arzola -- Esperanza Arzola, lit a match, lit a lighter that she had hidden in her bra, in a bedroom and started a fire.

That fire consumed the house over a

000640

period of time.  At the time of that fire, the caregiver who was there was a lady by the name of Amuche Udemezue. Amuche Udemezue had been trained that when an emergency like a fire occurred, you get your weakest person out first, and you get those who are ambulatory, those who could walk on their own -- you shout to them and lead them out, but you want to get the weakest person out first.

Jenny Wagner was in that category.  She couldn't walk.  She had cerebral palsy.  She was blind. She needed to be carried out.

And Udemezue, on that day, panicked, didn't follow her training, and left two of the residents in the house.  Jenny Wagner was burned significantly.  Ms. James died.

Now, that's a quick overview of what happened that night.

I need to ask each of you-all:  Is there anybody here, just on those facts, just on those facts, who would favor one side or the other in this particular lawsuit if they served as a juror?

UNIDENTIFIED PROSPECTIVE JUROR:  Can I ask a question?

MR. PLUMMER:  Yes, sir.

UNIDENTIFIED PROSPECTIVE JUROR:  You

000641

said there was four individuals, right? They were handicapped, right?

MR. PLUMMER: All of the residents, all of the clients, the consumers --

UNIDENTIFIED PROSPECTIVE JUROR: Right.

MR. PLUMMER: -- were disabled.

UNIDENTIFIED PROSPECTIVE JUROR: Okay.

MR. PLUMMER: But they had different levels of disability.

UNIDENTIFIED PROSPECTIVE JUROR: Got you there.

MR. PLUMMER: And then there was one staff person who was there who spent the night.

UNIDENTIFIED PROSPECTIVE JUROR: Okay.

MR. PLUMMER: It was a 24-hour house; so they provided 24-hour care.

UNIDENTIFIED PROSPECTIVE JUROR: I guess my question is: You had one staff person to take care of all of them, right?

MR. PLUMMER: Correct.

UNIDENTIFIED PROSPECTIVE JUROR: Okay.

MR. PLUMMER: And that was within the regulations at that time. Okay?

PROSPECTIVE JUROR 13: Sir?

MR. PLUMMER: Yes, sir.

000642

PROSPECTIVE JUROR 13:  Number 13.

MR. PLUMMER:  Yes, sir.

PROSPECTIVE JUROR 13:  When you first started speaking, I believe you said that Ms. Uduma --

MR. PLUMMER:  Uduma.

PROSPECTIVE JUROR 13:  -- is the owner of the house --

MR. PLUMMER:  Correct.

PROSPECTIVE JUROR 13:  -- and Four J's ran the service.

MR. PLUMMER:  Correct.

PROSPECTIVE JUROR 13:  Is she a part of Four J's or has an interest it?

MR. PLUMMER:  Yes.  She is the owner of Four J's.

PROSPECTIVE JUROR 13:  Okay.

MR. PLUMMER:  And she also has the -- owns the house but leases it to Four J's.

PROSPECTIVE JUROR 13:  Okay.

MR. PLUMMER:  By the way, would that create a problem for you?

PROSPECTIVE JUROR 13:  No.  I just wanted a clear understanding.

MR. PLUMMER:  I'm sorry.  Yeah, that's the relationship.

000643

PROSPECTIVE JUROR 13: Okay.

MR. PLUMMER: Okay? Anybody else?

(Hands raised.)

MR. PLUMMER: Yes, sir.

UNIDENTIFIED PROSPECTIVE JUROR: Were there smoke detectors in the home?

MR. PLUMMER: There were smoke detectors, there was a smoke alarm, there was a fire extinguisher and train -- and Ms. Udemezue had been trained and drilled on fire -- there were fire drills, there was training, and each resident had a safety plan, individual safety plan, where they talked about their limitations, what needs to be done in an emergency -- like a hurricane, flooding, bad weather, fire. All those things were in each resident's folder and were reviewed regularly and gone over regularly. Okay?

MR. SPARKS: Judge, may we approach?

THE COURT: Do you have an objection?

MR. SPARKS: I have a point I'd like to bring to the Court's attention.

THE COURT: Mr. Thweatt?

(Discussion at the bench without a court reporter.)

MR. PLUMMER: Yes, sir. Mr. -- you are Number 40?

000644

PROSPECTIVE JUROR 40: Yeah.

MR. PLUMMER: What is your name, please, sir?

PROSPECTIVE JUROR JONES: Charles Jones.

MR. PLUMMER: Mr. Jones, yes, sir.

PROSPECTIVE JUROR JONES: Shouldn't it be more than one person at night to control the situation on the basis of it's at night? Shouldn't it be more than one people -- well, that many people to get out of there if it's a fire hazard -- is one person going to get all these people out if it's a fire?

MR. PLUMMER: That's a legitimate question, and I think that's a legitimate inquiry. But the regulations were such that it was determined that one person, even under an emergency situation like a fire, could get all four residents out safely.

Now -- and let me add to that: The only one who couldn't ambulate by themselves was Jenny Wagner. Okay?

And the drills that were done, the fire drills that were done, showed that everybody could be evacuated within two minutes or three minutes or thereabouts.

PROSPECTIVE JUROR JONES: Well, that's

000645

good during the daytime or at night or where people are sleeping or awakened to get out; or was it done when they was already awake?

MR. PLUMMER: Legitimate question. I think the evidence will show it was done at various times.

PROSPECTIVE JUROR JONES: Okay. But you didn't answer my question.

THE COURT: I think the answer, sir, right now is the members of the trial jury will have an opportunity to observe the exhibits and listen to the witnesses who are presented and will be able to evaluate the facts based on the evidence presented. Right now we're just in the process where we're talking about the jurors' views on certain things.

MR. PLUMMER: Yes, ma'am.

UNIDENTIFIED PROSPECTIVE JUROR: I'm not certain if this would bias me, but I don't think that panic is an excuse for not following the rules.

MR. PLUMMER: And if -- I'm not suggesting that it is, but I'm just trying to lay out that -- that portion of the facts so that you understand them. Okay?

UNIDENTIFIED PROSPECTIVE JUROR: Okay.

MR. PLUMMER: Yes, ma'am. You are



Ms. DeLeon?

PROSPECTIVE JUROR DELEON: Yes.

How long had the attendant, the person that was in charge there that night -- how long had she been working for?

MR. PLUMMER: She had been working there for about a year, year and a half, as best I can recall; but you-all will get those facts.

PROSPECTIVE JUROR DELEON: Right. I didn't --

MR. PLUMMER: That's not a problem.

The important thing I want to find out from you-all is: Just based on those facts -- tragic accident, as -- as someone said, saddens my heart. Based on just those facts, is there anybody here who feels that the corporation or the owner of the house, for that matter, ought to be responsible, is legally liable? And if so I need to know it.

(Hands raised.)

MR. PLUMMER: Yes, ma'am.

UNIDENTIFIED PROSPECTIVE JUROR: I believe they're liable.

MR. PLUMMER: Okay. Number 34?

UNIDENTIFIED PROSPECTIVE JUROR: Hmm, I think.

000647

UNIDENTIFIED PROSPECTIVE JUROR: No, she's 36.

THE COURT: She's 36, Mr. Plummer.

PROSPECTIVE JUROR 36: I'm 36.

MR. PLUMMER: Okay. Okay. Anybody here who, in addition to -- is it Hilburn?

PROSPECTIVE JUROR HILBURN: It is.

MR. PLUMMER: Anybody here who -- on this side of the room (indicating) shares Mrs. Hilburn's views?

PROSPECTIVE JUROR HILL: I do now.

MR. PLUMMER: Mr. Hill?

PROSPECTIVE JUROR HILL: Yeah.

MR. PLUMMER: Okay. And is that Mr. -- is that Mr. Keats, also?

PROSPECTIVE JUROR KEATS: Yeah. I believe they're liable.

MR. PLUMMER: Beg your pardon?

PROSPECTIVE JUROR KEATS: When you walk on the premises, the people that own the premises are liable. Is that not true?

MR. PLUMMER: No, it's not.

PROSPECTIVE JUROR KEATS: Oh, okay.

MR. PLUMMER: But, I mean, you're entitled to that view. You're entitled to that view.

000648

And so I want to know how many people feel like Mr. Hill and Mr. Keats and Mr. Dixon -- is it Mr. Dixon?

PROSPECTIVE JUROR DIXON: Yeah.

MR. PLUMMER: Okay. On the first row -- anybody else on the first row feel like those three gentlemen?

Second row?

(Hands raised.)

MR. PLUMMER: Yes, sir. You are?

PROSPECTIVE JUROR 23: 23.

MR. PLUMMER: 23? You are Mr. --

PROSPECTIVE JUROR PAPE: Martin Pape, Pape.

MR. PLUMMER: Mr. Pape?

PROSPECTIVE JUROR PAPE: Yeah.

MR. PLUMMER: Anybody else other than Mr. Pape on the second row?

PROSPECTIVE JUROR TAFT: I'm number 20, Taft.

I'm not sure -- I suspect that the corporation -- I'm not sure. Was there a criminal proceeding of any sort?

MR. PLUMMER: Well, the person who started the -- the fire, Esperanza Arzola, is no longer

000649

in a group home setting. I -- I probably -- I don't know if I can go any further than that at this point in time.

THE COURT: Ladies and gentlemen, all relevant evidence -- all evidence that's relevant to the facts or issues that are raised by this lawsuit will be admitted during the course of this trial.

I realize a lot of you are curious about a lot of details, but those of you who become members of the trial jury will have a chance to review the evidence that's presented by the parties that's relevant and admissible.

So to the extent -- if you feel like the lawyers aren't answering all your questions, just understand that right now that's not really the point of this part of the trial, about going into the specific details of the case or the evidence that will be presented. We're here really to evaluate certain issues surrounding jury selection.

MR. PLUMMER: Ms. Taft, thank you, ma'am.

Anybody else on the second row feel as Mr. Dixon and Mr. Hill feel on the first row?

(No response.)

MR. PLUMMER: And Mr. Pape.

000650

Third row?

UNIDENTIFIED PROSPECTIVE JUROR: Your Honor --

MR. PLUMMER: Mr. Jones, you feel the same way?

PROSPECTIVE JUROR JONES: I do.

MR. PLUMMER: The mere fact that it was -- the house was owned by Ms. Uduma and the company provided the group home services, they're responsible regardless of what the law says?

PROSPECTIVE JUROR JONES: No, that's not what I'm saying.

MR. PLUMMER: Okay.

UNIDENTIFIED PROSPECTIVE JUROR: That's not what I said, either.

MR. PLUMMER: Okay.

UNIDENTIFIED PROSPECTIVE JUROR: Correct.

UNIDENTIFIED PROSPECTIVE JUROR: That's not what I said, either.

MR. PLUMMER: Okay.

UNIDENTIFIED PROSPECTIVE JUROR: I -- well, let me --

UNIDENTIFIED PROSPECTIVE JUROR: Start over.

000651

MR. PLUMMER: I didn't intend to twist that around.

PROSPECTIVE JUROR HILL: You sure did.

MR. PLUMMER: Well, Mr. Hill, tell me what --

PROSPECTIVE JUROR HILL: If I walk on your premises and it's your premises, it's a place of your business, you're going to keep it safe for me; and if it's isn't, you're liable, buddy.

MR. PLUMMER: Okay. And -- all right. And is that everybody -- was that everybody else's viewpoint?

UNIDENTIFIED PROSPECTIVE JUROR: Yes.

MR. PLUMMER: Pretty much Mr. Keys [sic]; is that right?

PROSPECTIVE JUROR KEATS: Yeah. I mean, if you hold yourself out to be capable of taking care of somebody, then I guess, if you don't, you have a liability.

MR. PLUMMER: Okay. Now, let me add something to that. There's going to be a dispute about whether or not the care and training was reasonable under the circumstances. Okay?

It's our view that the training and the care was proper and reasonable except that, when a

crisis occurred, the employee who had been trained to act and protect these folks and get them out panicked and collapsed. Okay?

You understand that?

Now, under that circumstance, Mr. Keats, would you feel that the company remains liable, regardless?

PROSPECTIVE JUROR KEATS: No. I -- I mean, I --

MR. PLUMMER: Mr. Dixon, do you feel that way? Mr. Hill?

PROSPECTIVE JUROR HILL: I do, yeah.

MR. PLUMMER: Mr. Keats?

UNIDENTIFIED PROSPECTIVE JUROR: You put it that way --

PROSPECTIVE JUROR KEATS: You know, I'd have to hear more. I can't tell you.

MR. PLUMMER: Okay. And you are --

PROSPECTIVE JUROR 21: 21.

MR. PLUMMER: Okay. 21, you are Mr. Tarr?

PROSPECTIVE JUROR 21: Correct.

MR. PLUMMER: All right. Mr. Pape, how do you feel about that?

PROSPECTIVE JUROR PAPE: And I agree.

MR. PLUMMER: Okay. Ms. Tate -- yeah, Ms. Taft.

PROSPECTIVE JUROR TAFT: Okay. And I'm sorry?

MR. PLUMMER: Reasonable precautions were made to protect against harm and injury by fire -- training, alarm systems, things of that sort.

PROSPECTIVE JUROR TAFT: Uh-huh.

MR. PLUMMER: Okay? But the -- but the tragedy still occurred. Okay?

And one of the reasons the tragedy occurred is that the person who had been trained to address that issue panicked and -- and collapsed or fainted or what have you. Okay?

Under those circumstances, is the owner of the property or the company still responsible, in your eyes, regardless?

PROSPECTIVE JUROR TAFT: I think quite possibly, yes.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR TAFT: And it depends on all of the circumstances.

MR. PLUMMER: Okay. I think it's -- you know, I -- we've had this 34 and 36 issue before. You are Number 36 --

000654

PROSPECTIVE JUROR 36: I think I'm 36.

MR. PLUMMER: You're 36. Okay.

And you are nodding your head, Ms. Hilburn; is that right?

PROSPECTIVE JUROR HILBURN: Yeah.

MR. PLUMMER: You're in agreement with that?

PROSPECTIVE JUROR HILBURN: I would just probably agree that it's the corporation's responsibility.

MR. PLUMMER: And would you say that, from your perspective, Ms. Hilburn, that the corporation guarantees that safety and, if something happens, the corporation's responsible, regardless?

PROSPECTIVE JUROR HILBURN: Yes.

MR. PLUMMER: Okay. Now, just in front of you is a gentleman in the blue shirt. You were nodding your head.

You believe that the corporation guarantees your safety?

UNIDENTIFIED PROSPECTIVE JUROR: Right.

MR. PLUMMER: Okay. Tell me your name again.

PROSPECTIVE JUROR TARR: Last name's Tarr.

000655

MR. PLUMMER: Tarr, Mr. Tarr. Okay.
How many feel, on the first row, the same way Ms. Hilburn feels, on the first row?
(Hands raised.)
MR. PLUMMER: And, Mr. Hill, you feel that way?
PROSPECTIVE JUROR HILL: That a corporation's responsible, yes.
MR. PLUMMER: They guarantee your safety?
PROSPECTIVE JUROR HILL: I hope so.
MR. PLUMMER: Okay.
UNIDENTIFIED PROSPECTIVE JUROR: I'd agree.
MR. PLUMMER: Mr. Dixon?
PROSPECTIVE JUROR DIXON: Well, I don't -- I don't -- I can give a reason why I think they should be responsible, but it would -- I mean, I think they should be responsible. I'm not going to say guarantee your safety, but be responsible.
MR. PLUMMER: Well, they guarantee nothing will happen to you.
PROSPECTIVE JUROR DIXON: No. You can't guarantee that.
MR. PLUMMER: Okay. Mr. Keats?

000656

PROSPECTIVE JUROR KEATS: You can't guarantee nothing's going to happen.

MR. PLUMMER: Anybody else on the first row feel that way? Anybody on the second row feel that they guarantee your safety? Third row? Ms. Jones, okay.

I have denied -- have not intended to ignore this side of the room.

UNIDENTIFIED PROSPECTIVE JUROR: That's okay.

MR. PLUMMER: And I think what I'm going to try to do is to see if I can follow up on some of the statements made on the other side of the room and find out how you feel about those things.

And I'm going to ask Mr. Jones and the other gentleman who was a fire marshal to hold off for a moment, and I'm going to ignore you-all for just a moment. Okay?

UNIDENTIFIED PROSPECTIVE JUROR: Okay.

MR. PLUMMER: Anybody on the first row feel like Ms. Hilburn over here?

(Hands raised.)

MR. PLUMMER: Yes, ma'am.

UNIDENTIFIED PROSPECTIVE JUROR: I feel very strongly that corporations -- they set up their

000657

policies and procedures to do all the right things. They should be held liable -- even if they've done the right things, they should be held liable.

MR. PLUMMER: So they should be held liable, regardless?

UNIDENTIFIED PROSPECTIVE JUROR: Right.

MR. PLUMMER: Because the loss happened?

UNIDENTIFIED PROSPECTIVE JUROR: Yes.

MR. PLUMMER: Now, the gentleman sitting behind you with the cap on, your name, again, sir?

PROSPECTIVE JUROR OLIVER: Oliver.

MR. PLUMMER: Mr. Oliver, what's your number, please, sir.

PROSPECTIVE JUROR OLIVER: I think it's 30.

MR. PLUMMER: Okay. Mr. Oliver, you feel like this young lady in front of you, right?

PROSPECTIVE JUROR OLIVER: Yes, I do. I still believe that.

MR. PLUMMER: Okay. Okay. Regardless of the instructions the Court gives you, that's the way you feel, and that's the way you're going to approach this trial?

000658

PROSPECTIVE JUROR OLIVER: Of course.

MR. PLUMMER: Okay. Now, sitting next to you -- Rick, can you pronounce your last name for me?

PROSPECTIVE JUROR MANIVONG: Manivong.

MR. PLUMMER: Manivong?

PROSPECTIVE JUROR MANIVONG: Yes.

MR. PLUMMER: Do you feel the same way?

PROSPECTIVE JUROR MANIVONG: I feel the same way.

MR. PLUMMER: Okay. First row, beyond you, young lady, you two at the end; how do you-all feel about that?

UNIDENTIFIED PROSPECTIVE JUROR: I don't think that a corporation is necessarily liable for the actions of its employees. I mean, you set up, you try and do things, an individual does something, that's on the -- that's on the individual. If you have the policies in place, there's only so much you can do.

If we get into the trial, then I'll listen to the facts; and I'll make my decision based on that.

MR. PLUMMER: Okay. And you feel the same way?

UNIDENTIFIED PROSPECTIVE JUROR: I completely agree, yeah.

000659

MR. PLUMMER: Okay. You're a physical therapist, right?

UNIDENTIFIED PROSPECTIVE JUROR: Yeah. PTA, Physical Therapist's Assistant.

MR. PLUMMER: And you deal with Alzheimer's patients; is that correct?

UNIDENTIFIED PROSPECTIVE JUROR: (Nods head.)

MR. PLUMMER: Okay. And you're trained on how to deal with them in various contexts; is that correct?

UNIDENTIFIED PROSPECTIVE JUROR: (Nods head.)

MR. PLUMMER: Okay. We'll come back to that in a second, I think.

Yes, sir. You had your had your hand up.

UNIDENTIFIED PROSPECTIVE JUROR: I do. I agree with this gentleman. I think -- my take on it is that the company goes into their business with all intentions of doing everything correct or making all the reasonable efforts, then I'd have to hear the -- the facts.

MR. PLUMMER: Okay. Okay. Second row -- let's see. You know, I -- this chart is -- it's

hard to keep track with this chart when you're standing up here and you-all are answering these questions for me.

Ms. Schuman? And -- and the row that Ms. Schuman's on: Any here feel, other than the two gentlemen on the end, the same way as the two gentlemen on the end? That's a long question to say.

You feel -- it's a long question to say. I've forgotten what the original question was, but here it is: Do you feel that the corporation's responsible, regardless of what it did to prevent these sorts of things, if this tragedy occurred? Second row, anybody feel that way?

UNIDENTIFIED PROSPECTIVE JUROR: I have a question.

MR. PLUMMER: Yes, ma'am.

UNIDENTIFIED PROSPECTIVE JUROR: Didn't you say that the law is not necessarily that way, or that's not the --

MR. PLUMMER: Let me -- let me -- let me correct -- let me correct that and say this -- this: The judge is going to instruct you as to what the law is. And -- and briefly, the issue's going to be whether or not there was negligence and the judge is going to instruct you what negligence is and he's going to

000661

instruct you on what proximate cause is. Okay?

And he's going to instruct you on the credibility of evidence and all those things, but the bottom line is: People come in with preconceived notions. And one of the preconceived notions, as we've already heard expressed -- and it's a legitimate notion. I'm not being critical of it -- is that some people feel -- and I need to know if you feel this way, that if it happened on my watch, I'm responsible regardless of what I've done. Understand? Okay.

So I need to know on the second row, other than these two gentlemen down here, anybody feel that way?

(Hands raised.)

MR. PLUMMER: Yes, ma'am.

PROSPECTIVE JUROR 32: Based on what I've heard so far, I believe that the -- the corporation is responsible.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR 32: Somebody has to be --

MR. PLUMMER: Well --

PROSPECTIVE JUROR 32: -- based on the information that I've heard so far.

MR. PLUMMER: Okay. And you are Juror

000662

Number?

PROSPECTIVE JUROR 32: 32.

MR. PLUMMER: Last row, and I'm going to ask Judge Elrod if you'll -- you know, I don't need to ask you the -- the same questions -- same questions.

Anybody else feel that just because it happened on my watch, you've got to be responsible, legally responsible? Anybody feel that way or the company is legally responsible?

Now, I just heard Juror 32 say something that I want to ask you-all -- the rest of you-all about.

Now, Ms. Napoli?

PROSPECTIVE JUROR NAPOLI: Napoli.

MR. PLUMMER: Ms. Napoli said, somebody's got to be responsible.

Question: How many of you-all feel that when a tragedy like this occurs, somebody is legally responsible?

UNIDENTIFIED PROSPECTIVE JUROR: Oh, yeah.

MR. PLUMMER: This side, first row, Mr. Hill, Mr. Dixon, Ms. Keys -- Mr. Keats. Yes, ma'am. And this is Ms. DeLeon?

PROSPECTIVE JUROR DELEON: Right.

000663

MR. PLUMMER: Okay. Second row, how many feel that way?

(Hands raised.)

MR. PLUMMER: You are Juror Number?

PROSPECTIVE JUROR 18: 18.

MR. PLUMMER: 18?

PROSPECTIVE JUROR 19: I'm 19.

MR. PLUMMER: 19?

PROSPECTIVE JUROR 19: I agree.

MR. PLUMMER: Mr. Pape. Okay.

PROSPECTIVE JUROR 20: 20.

MR. PLUMMER: Anybody else on the second row?

And -- and that's regardless of what the evidence is.

Last row, Mr. Jones, Ms. Hilburn?

PROSPECTIVE JUROR 38: 38.

MR. PLUMMER: 38? Ms. Dominguez, okay. And I think there was another hand down there. Yes, Juror Number 34.

PROSPECTIVE JUROR CORREA: Correct. Correa is the last name.

MR. PLUMMER: Ma'am?

PROSPECTIVE JUROR CORREA: Correa is the last name.

000664

MR. PLUMMER: Ms. Correa. Yes, ma'am. Thank you.

Yes, sir, Mr. Keats.

PROSPECTIVE JUROR KEATS: When you asked if somebody's responsible, does that include the person with the lighter? Who are you talking about?

MR. PLUMMER: Yes.

PROSPECTIVE JUROR KEATS: Okay. Then I would agree somebody's responsible, liable, too. I mean, you can sue the person with the lighter, but probably don't have any money, but...

MR. PLUMMER: Okay.

PROSPECTIVE JUROR KEATS: I'm not sure.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR KEATS: Is it back to the same old question, is the owner of the house and the corporation, are they liable? Is that really what you're asking?

MR. PLUMMER: That's the question, yes.

PROSPECTIVE JUROR KEATS: That's really what you're asking?

MR. PLUMMER: Yes.

PROSPECTIVE JUROR KEATS: They're liable. I don't know the extent to...

UNIDENTIFIED PROSPECTIVE JUROR: I

000665

don't know to the extent. I'd have to hear more.

MR. PLUMMER: Okay. Okay. Okay.

Four J's Community Center and Ms. Uduma believe that they've done nothing wrong, and they intend to vigorously defend themselves in this lawsuit.

And what I need to know is how many of you-all feel -- would hold that against Four J's Community Center and Ms. Uduma for vigorously seeking the truth and defending themselves in this lawsuit. If you would, raise your hand.

(No response.)

MR. PLUMMER: Okay. Let me -- I want to gauge and get some information from you about some other aspects of this matter.

Second question I want to ask you-all is do you, your spouse, or anyone in your life that influences your decisions do any of the following: Firefighter?

Mr. Jones.

And you are?

PROSPECTIVE JUROR SCHROEDER: Don Schroeder, Number 9.

MR. PLUMMER: Mr. Schroeder.

Yes, ma'am. You're Juror Number 30 --

PROSPECTIVE JUROR 47: 47.

000666

MR. PLUMMER: 47.

PROSPECTIVE JUROR 47: My husband's a state trooper.

MR. PLUMMER: He's a what?

PROSPECTIVE JUROR 47: State trooper.

MR. PLUMMER: Okay. First row?

PROSPECTIVE JUROR ATKINS: Yeah, Juror Number 2, Mr. Atkins. My wife's an attorney.

MR. PLUMMER: Okay. Number 1?

PROSPECTIVE JUROR 1: My brother-in-law's a judge here.

MR. PLUMMER: Okay. Civil or criminal?

PROSPECTIVE JUROR 1: Civil.

MR. PLUMMER: Okay. Anybody on -- any other people on this side of the aisle, on this side of the aisle?

(Hands raised.)

MR. PLUMMER: Yes, sir.

PROSPECTIVE JUROR 30: I used to be a reservist in the state of Louisiana.

MR. PLUMMER: Okay. All right. And you are number?

PROSPECTIVE JUROR 30: I'm 30.

MR. PLUMMER: Okay. Yes, sir.

UNIDENTIFIED PROSPECTIVE JUROR: I have

one brother that's a doctor and another one that's a nurse.

MR. PLUMMER: Okay. All right. All right. Yes, ma'am.

PROSPECTIVE JUROR TAFT: Brother that's a firefighter.

MR. PLUMMER: Okay. Here in Harris County?

PROSPECTIVE JUROR TAFT: Uh-huh.

MR. PLUMMER: Okay. You are?

PROSPECTIVE JUROR TAFT: Taft.

MR. PLUMMER: Ms. Taft.

(Hands raised.)

MR. PLUMMER: Yes, sir, Mr. Jones.

PROSPECTIVE JUROR JONES: My brother's a doctor.

MR. PLUMMER: Okay.

(Hands raised.)

MR. PLUMMER: Yes, sir.

PROSPECTIVE JUROR 28: My brother's an attorney.

MR. PLUMMER: And you are?

PROSPECTIVE JUROR 28: 28, I believe.

MR. PLUMMER: And your name?

PROSPECTIVE JUROR FARRELL Farrell.

000668

MR. PLUMMER: Mr. Farrell. Okay.

UNIDENTIFIED PROSPECTIVE JUROR: I have a question.

MR. PLUMMER: Yes, ma'am.

UNIDENTIFIED PROSPECTIVE JUROR: Do they need to be in this country?

MR. PLUMMER: Not necessarily. If they are -- if -- if they're in -- if their decisions influence your decision, your outlook --

UNIDENTIFIED PROSPECTIVE JUROR: You mean, their opinion?

MR. PLUMMER: Their opinion, yeah, and what they do for a living influences your outlook...

UNIDENTIFIED PROSPECTIVE JUROR: No.

(Hands raised.)

MR. PLUMMER: Okay. Yes, ma'am.

UNIDENTIFIED PROSPECTIVE JUROR: My father-in-law's a firefighter and one of my professors practices law formerly.

MR. PLUMMER: Okay. Your father-in-law's a firefighter in Harris County?

UNIDENTIFIED PROSPECTIVE JUROR: No. He's actually a retired firefighter in Tarrant County.

MR. PLUMMER: Okay. Anybody else on this side?

000669

You can't -- you can't ignore and forget your experiences and relationships, but I need to ask the question anyway.

For those of you-all who've answered affirmatively to that question, can you set aside what you've been told and taught and heard and the tales you've been told and the tragedies you've been told about if you're selected as a juror in this case and decide the issues in this case solely based on the evidence that comes from the stand and the exhibits and documents that come into evidence? Can each of you-all do that?

PROSPECTIVE JURORS: (As a group) Yes.

MR. PLUMMER: Okay. Thank you.

One of the things you-all -- all have detected by now is that I go second. The plaintiffs go first, the intervenor goes first [sic], but Four J's Community Center and Ms. Uduma go last. That's the way the system's structured.

They put -- they -- they get a chance to do opening statements first, they put on evidence first, they do closing arguments first, and we go second.

What I want to find out from each of you is that knowing that, would each of you reserve

making up your mind until you've heard all the evidence, not just who went first and who told the story the first time? Can you do that?

PROSPECTIVE JURORS: (As a group) Yes.

MR. PLUMMER: Okay. Thank you. Thank you.

I want to get a sense of one other thing about some of you-all, and I'm going to try to go down this fairly quickly.

Can I see the next one?

I want to get an idea who of you -- do you-all watch or listen to any of the following programs up there? Well, you know, the first one is NPR.

Anybody here watch NPR or listen to NPR? Okay. Can I see hands, please?

(Hands raised.)

MR. PLUMMER: Okay. You're number is?

PROSPECTIVE JUROR 8: 8.

UNIDENTIFIED PROSPECTIVE JUROR: What is NPR?

MR. PLUMMER: National Public Radio.

Number 8 -- if you would, as I come to you, just call out your number.

PROSPECTIVE JUROR 3: 3.

MR. PLUMMER: Number 3.

000671

Mr. Keats.

PROSPECTIVE JUROR 5: 5, yeah.

MR. PLUMMER: 5.

Ms. --

PROSPECTIVE JUROR 20: 20.

MR. PLUMMER: 20.

Yes, ma'am?

PROSPECTIVE JUROR 17: 17.

MR. PLUMMER: 17? Okay.

Second row? Anybody else on the second row?

(No response.)

MR. PLUMMER: Third row?

UNIDENTIFIED PROSPECTIVE JUROR: Yeah, just a question or just NPR --

MR. PLUMMER: NPR is the first one I'm asking about.

Okay. Anybody else on the first row on this side?

(No response.)

MR. PLUMMER: Second row, Ms. Schuman, Mr. Farrell.

PROSPECTIVE JUROR 48: Number 48.

MR. PLUMMER: Number 48.

And -- and Ms. Elrod. Okay. All

000672

right.

Bill Maher; how many of y'all watch Bill Maher? Okay.

UNIDENTIFIED PROSPECTIVE JUROR: I've seen it --

MR. PLUMMER: Okay.

UNIDENTIFIED PROSPECTIVE JUROR: -- on a regular basis.

MR. PLUMMER: What about PBS TV?

(Hands raised.)

MR. PLUMMER: Okay. What about Oprah Winfrey and Ellen DeGeneres; anybody watch those two shows?

(Hands raised.)

MR. PLUMMER: Can I see hands? Okay. All right. Good, good, good.

Second question: Is there anybody here familiar with the Jessica Tata case?

UNIDENTIFIED PROSPECTIVE JUROR: Yes.

MR. PLUMMER: Okay.

UNIDENTIFIED PROSPECTIVE JUROR: Yes.

MR. PLUMMER: Let me get numbers. Let me start off by just getting numbers. Number 1, Number --

PROSPECTIVE JUROR 3: 3.

000673

MR. PLUMMER: -- Number 3.

Anybody else on the first row?

PROSPECTIVE JUROR 7: 7.

MR. PLUMMER: Number 7.

PROSPECTIVE JUROR 17: 17.

MR. PLUMMER: Beg your pardon?

PROSPECTIVE JUROR 17: 17.

MR. PLUMMER: 17.

PROSPECTIVE JUROR 19: 19.

MR. PLUMMER: 19.

PROSPECTIVE JUROR 20: 20.

MR. PLUMMER: 20.

5?

PROSPECTIVE JUROR 5: 5. I think so. I'm not sure.

MR. PLUMMER: Second row?

PROSPECTIVE JUROR 36: 36.

MR. PLUMMER: 33. No, no. 36.

PROSPECTIVE JUROR 36: 36.

MR. PLUMMER: No. Haven't we decided on what your number is yet?

UNIDENTIFIED PROSPECTIVE JUROR: Yeah. She's 36.

MR. PLUMMER: She's 36.

And 35.

PROSPECTIVE JUROR 35: I've only seen it on TV, what was on TV.

MR. PLUMMER: I understand. You have some familiarity with it.

UNIDENTIFIED PROSPECTIVE JUROR: Just on TV.

MR. PLUMMER: Okay. And Mr. Jones?

PROSPECTIVE JUROR JONES: Yes.

MR. PLUMMER: Okay. On this side (indicating)?

PROSPECTIVE JUROR 9: 9.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR 11: 11.

MR. PLUMMER: 11?

PROSPECTIVE JUROR 12: 12.

MR. PLUMMER: 12?

PROSPECTIVE JUROR 14: 14.

MR. PLUMMER: 14.

15?

PROSPECTIVE JUROR 15: 15.

MR. PLUMMER: Second row?

PROSPECTIVE JUROR 25: 25.

MR. PLUMMER: 25?

PROSPECTIVE JUROR 28: 28.

MR. PLUMMER: 28?

000675

PROSPECTIVE JUROR 29: 29.

MR. PLUMMER: 29?

PROSPECTIVE JUROR 30: 30.

MR. PLUMMER: 30.

Bottom row, last group?

PROSPECTIVE JUROR 43: 43.

MR. PLUMMER: 43?

PROSPECTIVE JUROR 45: 45.

MR. PLUMMER: 45 and 46 and 47. Okay.

Having -- being familiar with the Jessica Tata case, is there anybody here who feels that that would have an influence on how they looked at this case and decided the issues in this case? If so, would you raise your hand?

PROSPECTIVE JURORS: (As a group) No.

MR. PLUMMER: Everybody understands that that was a different set of circumstances, different facts?

PROSPECTIVE JURORS: (As a group) Yes.

MR. PLUMMER: Okay. Thank you.

I want to -- I want to -- each of you to try to answer this question for me: Well, I need to know how you -- how you'd answer this question, whether you strongly agree, agree, disagree, or strongly disagree. Okay?

000676

People of foreign origin are less trustworthy.

Number 1.

PROSPECTIVE JUROR 1: Strongly disagree.

MR. PLUMMER: Okay. Number 2?

PROSPECTIVE JUROR 2: Strongly disagree.

MR. PLUMMER: Number 3?

PROSPECTIVE JUROR 3: Strongly disagree.

MR. PLUMMER: Number 4?

PROSPECTIVE JUROR 4: Number 4.

MR. PLUMMER: Thank you, sir. Number 5?

PROSPECTIVE JUROR 5: 3, disagree.

MR. PLUMMER: Okay. Number 6?

PROSPECTIVE JUROR 6: Disagree.

MR. PLUMMER: Number 7?

PROSPECTIVE JUROR 7: Disagree, disagree.

MR. PLUMMER: Okay. Number 8?

PROSPECTIVE JUROR 8: Disagree.

MR. PLUMMER: Number 9?

PROSPECTIVE JUROR 9: Disagree,

disagree.

MR. PLUMMER: That's number three. Okay.

PROSPECTIVE JUROR 9: Right.

MR. PLUMMER: Number 10?

PROSPECTIVE JUROR 10: Disagree.

MR. PLUMMER: Number 11?

PROSPECTIVE JUROR 11: Strongly disagree.

MR. PLUMMER: Number 12?

PROSPECTIVE JUROR 12: Strongly disagree.

MR. PLUMMER: Number 13?

PROSPECTIVE JUROR 13: Strongly disagree.

MR. PLUMMER: 14?

PROSPECTIVE JUROR 14: Strongly disagree.

MR. PLUMMER: 15?

PROSPECTIVE JUROR 15: Strongly disagree.

MR. PLUMMER: 16?

PROSPECTIVE JUROR 16: I disagree.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR 17: Strongly

000678

disagree.

MR. PLUMMER: Okay. 18?

PROSPECTIVE JUROR 18: Number 3.

MR. PLUMMER: Okay. 19?

PROSPECTIVE JUROR 19: Number 4.

MR. PLUMMER: 20?

PROSPECTIVE JUROR 20: Strongly disagree.

PROSPECTIVE JUROR 21: I disagree.

MR. PLUMMER: 20 -- 21?

PROSPECTIVE JUROR 21: 21. (No answer.)

MR. PLUMMER: 22?

PROSPECTIVE JUROR 22: Strongly disagree.

MR. PLUMMER: 23?

PROSPECTIVE JUROR 23: Disagree.

MR. PLUMMER: 24?

THE COURT: Mr. Plummer, you need to return to the podium, please.

MR. PLUMMER: Yes, sir. Yes, sir. Number 24?

PROSPECTIVE JUROR 24: Disagree.

MR. PLUMMER: Okay. 25?

PROSPECTIVE JUROR 25: Strongly

000679

disagree.

MR. PLUMMER: 26?

PROSPECTIVE JUROR 26: Strongly disagree.

MR. PLUMMER: 27?

PROSPECTIVE JUROR 27: Strongly disagree.

MR. PLUMMER: 28?

PROSPECTIVE JUROR 28: Disagree.

MR. PLUMMER: Okay. 29?

PROSPECTIVE JUROR 29: Disagree.

MR. PLUMMER: Okay. 20 -- 30?

PROSPECTIVE JUROR 30: Disagree.

MR. PLUMMER: 31?

PROSPECTIVE JUROR 31: Disagree.

MR. PLUMMER: 32?

PROSPECTIVE JUROR 32: Disagree, disagree.

MR. PLUMMER: Okay. 33?

PROSPECTIVE JUROR 33: Strongly disagree.

MR. PLUMMER: 34?

PROSPECTIVE JUROR 34: Strongly disagree.

MR. PLUMMER: 35?

000680

PROSPECTIVE JUROR 35: Strongly disagree.

MR. PLUMMER: 36?

PROSPECTIVE JUROR 36: I have to ask a question.

MR. PLUMMER: Yes, ma'am.

PROSPECTIVE JUROR 36: Does it -- is that a general question or certain countries?

MR. PLUMMER: Let me come back to that one.

PROSPECTIVE JUROR 36: And I ask that --

MR. PLUMMER: No, no. That's a good question. That's a good question. I'll come back to that, but as a general proposition.

PROSPECTIVE JUROR 36: I disagree.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR 36: Strongly disagree.

MR. PLUMMER: And you are 36?

37.

PROSPECTIVE JUROR 37: (Nods head.)

MR. PLUMMER: 38?

PROSPECTIVE JUROR 38: Strongly disagree.

000681

MR. PLUMMER: 39?

PROSPECTIVE JUROR 39: Disagree.

MR. PLUMMER: 40?

PROSPECTIVE JUROR 40: Strongly disagree.

MR. PLUMMER: 41?

PROSPECTIVE JUROR 41: Strongly disagree.

MR. PLUMMER: 42?

PROSPECTIVE JUROR 42: Strongly disagree.

MR. PLUMMER: 43?

PROSPECTIVE JUROR 43: Disagree.

MR. PLUMMER: 44?

PROSPECTIVE JUROR 44: Disagree.

MR. PLUMMER: 45?

PROSPECTIVE JUROR 45: Disagree.

MR. PLUMMER: 46?

PROSPECTIVE JUROR 46: Strongly disagree.

MR. PLUMMER: 47?

PROSPECTIVE JUROR 47: Strongly disagree.

MR. PLUMMER: 48?

PROSPECTIVE JUROR 48: Strongly

000682

disagree.

MR. PLUMMER: Now, let me answer Ms. Hilburn's question. Let's suppose that the origin -- country of origin is Nigeria. Anybody here -- just raise your hand. Well, I don't want to go through the numbers again; but anybody strongly feel one way or the other on either -- on that scale?

Ms. Hilburn?

PROSPECTIVE JUROR HILBURN: I'm bias in that way because they are rated as one of the most unethical countries that conducts business in the world. They're in the top five list.

MR. PLUMMER: Okay. Anybody feel like Ms. Hilburn?

(Hands raised.)

MR. PLUMMER: Okay. Mr. Hill?

PROSPECTIVE JUROR KEATS: Keats.

MR. PLUMMER: Mr. Keats.

The second row? Mr. Jones on the last row. Anybody on the second row?

(No response.)

MR. PLUMMER: Third row?

(No response.)

MR. PLUMMER: Front row over on this side, to my left? Anybody feel that way?

(Hands raised.)

MR. PLUMMER: Yes, sir.

UNIDENTIFIED PROSPECTIVE JUROR: I didn't hear.

MR. PLUMMER: I'm sorry. Ms. Hilburn said that she's bias against folks -- and correct me if I'm wrong -- from Nigeria because they have -- the country has a reputation as being the most unethical --

PROSPECTIVE JUROR HILBURN: In the top ten most unethical countries in the world.

MR. PLUMMER: In the top ten of the most unethical countries in the world. Do you feel that way?

UNIDENTIFIED PROSPECTIVE JUROR: I wouldn't jump to that conclusion and assume that. I would look at the individual.

MR. PLUMMER: So you wouldn't feel -- you wouldn't feel strongly --

UNIDENTIFIED PROSPECTIVE JUROR: Just because they're -- because I have friends from Nigeria. I wouldn't jump to that conclusion.

MR. PLUMMER: But I need to ask this question, because, I mean, it -- you would want to disclose that if you were sitting in our shoes; is that correct?

000684

UNIDENTIFIED PROSPECTIVE JUROR: Yeah, but --

MR. PLUMMER: Second row, anybody feel that way?

(No response.)

MR. PLUMMER: Third row, anybody feel that way?

(No response.)

MR. PLUMMER: Okay. Thank you.

THE COURT: You have five minutes, Mr. Plummer.

Mr. PLUMMER: Thank you, Your Honor.

One more question, and I need to run through the list. Clients in a residential facility should be bodily searched regularly to prevent harm to others. Agree, disagree, strongly, one way or the other?

PROSPECTIVE JUROR 1: Depends on if the individual requires them to be searched, if they're known to be violent or they're known to -- yeah, if they're known to be violent in any way.

MR. PLUMMER: Let me put it in another context.

No history of setting fires at all. Okay? Do they -- do you require they be bodily searched

000685

for lighters when there's absolutely no indication in the past of any fire bug activity or things of that sort?

PROSPECTIVE JUROR 1: Well, you just said that they have a history of --

MR. PLUMMER: If they have no history.

PROSPECTIVE JUROR 1: Oh, if they have no history.

MR. PLUMMER: Right.

Should they been strip-searched every time they come in?

PROSPECTIVE JUROR 1: No.

MR. PLUMMER: Number 2?

PROSPECTIVE JUROR 2: Strongly disagree.

MR. PLUMMER: Number 3?

PROSPECTIVE JUROR 3: Disagree.

MR. PLUMMER: Number 4?

PROSPECTIVE JUROR 4: Disagree.

MR. PLUMMER: Number 5?

PROSPECTIVE JUROR 5: Disagree.

MR. PLUMMER: Number 6?

PROSPECTIVE JUROR 6: Disagree.

MR. PLUMMER: Number 7?

PROSPECTIVE JUROR 7: Disagree.

000686

MR. PLUMMER: Number 8?

PROSPECTIVE JUROR 8: Disagree.

MR. PLUMMER: Number 9?

PROSPECTIVE JUROR 9: Disagree.

MR. PLUMMER: Number 10?

PROSPECTIVE JUROR 10: Disagree.

MR. PLUMMER: Number 11?

PROSPECTIVE JUROR 11: Agree in some conditions.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR 11: It depends.

MR. PLUMMER: Okay. Number 12?

PROSPECTIVE JUROR 12: Disagree.

MR. PLUMMER: Number 13?

PROSPECTIVE JUROR 13: Disagree.

MR. PLUMMER: 14?

PROSPECTIVE JUROR 14: Disagree.

MR. PLUMMER: 15?

PROSPECTIVE JUROR 15: Disagree.

MR. PLUMMER: 16?

PROSPECTIVE JUROR 16: Disagree.

MR. PLUMMER: 17?

PROSPECTIVE JUROR 17: Oh, no, strongly disagree.

MR. PLUMMER: 18?

PROSPECTIVE JUROR 18:  Disagree.

MR. PLUMMER:  19?

PROSPECTIVE JUROR 19:  Disagree.

MR. PLUMMER:  20?

PROSPECTIVE JUROR 20:  I disagree.  But my father is in a residential facility and he does have to be checked every time he comes back in for lighters.

MR. PLUMMER:  Okay.  So you disagree but you --

PROSPECTIVE JUROR 20:  I disagree, but -- but I have a little bit of bias --

MR. PLUMMER:  Okay.

PROSPECTIVE JUROR 20:  -- there.

MR. PLUMMER:  Okay.  Next number?

PROSPECTIVE JUROR 21:  21.  It depends on the facility.

MR. PLUMMER:  Okay.  Group home, four-person group home.

PROSPECTIVE JUROR 21:  I agree.

MR. PLUMMER:  Okay.

PROSPECTIVE JUROR 22:  I agree.

MR. PLUMMER:  Okay.

PROSPECTIVE JUROR 23:  Disagree.

MR. PLUMMER:  Mr. Pape, what's your number again?

000688

PROSPECTIVE JUROR PAPE: 23.

MR. PLUMMER: Okay.

24?

PROSPECTIVE JUROR 24: Disagree.

MR. PLUMMER: 25?

PROSPECTIVE JUROR 25: Disagree.

MR. PLUMMER: 26?

PROSPECTIVE JUROR 26: Disagree.

MR. PLUMMER: 27?

PROSPECTIVE JUROR 27: Disagree.

MR. PLUMMER: 28?

PROSPECTIVE JUROR 28: Strongly disagree.

MR. PLUMMER: 29?

PROSPECTIVE JUROR 29: Agree.

MR. PLUMMER: 30?

PROSPECTIVE JUROR 30: I agree.

MR. PLUMMER: 31?

PROSPECTIVE JUROR 31: Disagree.

MR. PLUMMER: 32?

PROSPECTIVE JUROR 32: Disagree.

MR. PLUMMER: 33?

PROSPECTIVE JUROR 33: Disagree.

MR. PLUMMER: 34?

PROSPECTIVE JUROR 34: I have a

000689

question --

MR. PLUMMER: Yes, ma'am.

PROSPECTIVE JUROR 34: -- because I haven't formed my opinion yet. You're saying clients in a residential facility, but you're not saying what clients in that residential facility. So that will --

MR. PLUMMER: I'm sorry. I'm not saying what?

PROSPECTIVE JUROR 34: Any client?

MR. PLUMMER: The people who live -- the clients who live in the home, the group home.

PROSPECTIVE JUROR 34: In the group home for this particular case?

MR. PLUMMER: Correct.

PROSPECTIVE JUROR 34: I agree.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR 35: Agree. I'm sorry. Disagree.

MR. PLUMMER: Disagree?

PROSPECTIVE JUROR 36: Agree.

MR. PLUMMER: Okay. And 36 -- 37?

PROSPECTIVE JUROR 37: Disagree.

MR. PLUMMER: 38?

PROSPECTIVE JUROR 38: Agree -- disagree.

000690

MR. PLUMMER: 38.

39?

PROSPECTIVE JUROR 39: Agree.

MR. PLUMMER: Mr. Jones?

PROSPECTIVE JUROR JONES: Strongly agree.

MR. PLUMMER: Okay. 41?

PROSPECTIVE JUROR 41: Strongly disagree.

MR. PLUMMER: 42?

PROSPECTIVE JUROR 42: Disagree.

MR. PLUMMER: 43?

PROSPECTIVE JUROR 43: Agree.

MR. PLUMMER: 44?

PROSPECTIVE JUROR 44: Disagree.

MR. PLUMMER: 45?

PROSPECTIVE JUROR 45: Disagree.

MR. PLUMMER: 46?

PROSPECTIVE JUROR 46: I think it depends on what the policies and procedures are and the contracts and what the industry standard is, all of those things which we do not yet know.

MR. PLUMMER: Okay. So I can take that as a pass on that question?

PROSPECTIVE JUROR 46: It's -- it

000691

depends on persons more knowledgeable than me to know whether or not they should be strip-searched or not. And your question is strip-searched, but your question up there (indicating) says "bodily searched."

MR. PLUMMER: I'm sorry. I'm sorry.

PROSPECTIVE JUROR 46: But anyway, I think it depends on what the industry standard is, what the agreement is of the parties.

MR. PLUMMER: Let me add something to that because I'm going to have to sit down in a second. Let me add that part of the theory behind group homes is to maintain the integrity of the clients, though they have these disabilities; and that means that they have rights, personal rights, due process rights, rights to be free from confinement and things of that sort.

PROSPECTIVE JUROR 46: Right.

MR. PLUMMER: And we believe the rules are you can't strip search them. Okay?

PROSPECTIVE JUROR 46: Well, that's what I expect the evidence to tell me at the trial --

MR. PLUMMER: Okay.

PROSPECTIVE JUROR 46: -- is that -- somebody would get up there and explain that this is the -- to maintain their personal privacy, and you don't give up your privacy rights and --

000692

MR. PLUMMER: Correct.

PROSPECTIVE JUROR 46: -- I expect there will be some witnesses, if I hear the trial. I don't want to predecide the issue.

MR. PLUMMER: I appreciate that.

47?

PROSPECTIVE JUROR 47: I'm going to abstain.

MR. PLUMMER: Okay.

48? 48?

PROSPECTIVE JUROR 48: Disagree.

MR. PLUMMER: Okay. Ladies and gentlemen --

(Hands raised.)

MR. PLUMMER: Oh, yes, sir?

UNIDENTIFIED PROSPECTIVE JUROR: One question: When I look at this question, I'm thinking more along the lines of a pat-down than I am a strip searching. If you're talking about a strip search, I disagree. But if you're talking about, like, a pat-down, I can agree to that, because that's just -- you don't know the mental capability -- I don't know the mental capabilities you're talking about here, but you're talking about mentally-challenged people don't necessarily know the dangers of what they've got ahold

of.  So I could agree to a pat-down.

MR. PLUMMER:  Okay.  As opposed to a strip search?

UNIDENTIFIED PROSPECTIVE JUROR:  Oh, yeah.

MR. PLUMMER:  And Number 34 agrees with you.

UNIDENTIFIED PROSPECTIVE JUROR:  A strip search I disagree with; but if it's just, like, a pat-down, no problem.

THE COURT:  Thank you, Mr. Plummer.

MR. PLUMMER:  Thank you, Your Honor.

Ladies and gentlemen, thank you for your kindness.

THE COURT:  Counsel, please approach the bench.

Okay.  Ladies and gentlemen, we're going to take a break.  It's about the lunch hour.  And sometimes these breaks take -- breaks take a little bit longer than I planned for.  I really try and do that.

But since it's about the lunch hour, what we're going to do is we're going to take a longer break so that y'all can go down, if you would like to, and have lunch down in the cafeteria.

I'm going to ask five of you to -- to

hold back. We're going to -- we have five of you that we need to talk to on a one-on-one basis. And so before y'all head for the elevators, wait for Deputy Dewey to come on out and let y'all know who needs to stick around.

You don't have to go to the cafeteria for lunch. There are other eating establishments in the area; but I tell you what, it's going to be an awful lot easier on you if you go down there. The line may be a little long, but you won't have to re-enter through the metal detectors to get back into the courthouse. All you have to do is just go right out to the elevator.

You are now in a different building than you were in when you first reported for jury duty; so you won't have to worry about trying to figure out where you are downtown. We've got a pretty good menu down in the cafeteria. I don't get any share of the profits from the cafeteria; so I'm not steering you down there to do anything like that.

But we're going to take a break. It's just shy of 12 noon. We're going to start back up at 1:15. So those of you who are not sticking around, just make sure you're back -- well, actually, everybody make sure you're back at 1:15 up here in the court -- the hallway outside the courtroom. We're on the 13th floor

000695

of the Harris County Civil Courthouse.

Again, Deputy Dewey will be out in the hallway here momentarily. She can give you tips on that. Thank you.

(Prospective Jury Panel exits the courtroom.)

THE COURT: Thank you. Please be seated.

All right. I'll point out to y'all that the quicker we get through this, the more time you'll have for your lunch break. So just keep that in mind.

(Prospective Juror Keats enters the courtroom and takes the stand.)

THE COURT: Mr. Thweatt -- I'm sorry, Mr. Terry.

MR. TERRY: Thank you, Your Honor. Mr. Keats, when I was questioning you earlier about holding an individual to a -- as -- comparing an individual to a corporation and how you would kind of rate the standard of proof or how much evidence I would have to show in order to hold that individual liable instead of the corporation, I believe your response was that you were going to require a higher, I guess, burden of proof from me as to the individual versus the

000696

corporation.

PROSPECTIVE JUROR KEATS: Yes, I would say so.

MR. TERRY: Am I correct?

PROSPECTIVE JUROR KEATS: I would say so.

MR. TERRY: Okay. No further questions, Your Honor.

THE COURT: Mr. Sparks, do you have any questions?

MR. SPARKS: I have no questions.

THE COURT: All right. Mr. Plummer?

Mr. PLUMMER: No questions.

THE COURT: All right. Let me ask you a question. First of all, we didn't talk about it in voir dire; but when we're talking about punitive damages, we're actually talking about something called exemplary damages. That's the way the law talks about it here in Texas.

And the law for exemplary damages requires that whoever the defendant is, liability and the amount of exemplary damages must be proved not by a preponderance of the evidence but by clear and convincing evidence, which is a higher standard of proof than preponderance of the evidence.

000697

Understanding that the law already requires a higher standard of proof for any defendant, whether they're an individual or a corporation, would that change your view or would you still require something higher than clear and convincing evidence for an individual as opposed to a corporation?

PROSPECTIVE JUROR KEATS: No. I -- I -- clear and convincing evidence would be -- I mean, it's not, like, a death penalty case; but it could be the economic death penalty for an individual and serious consequences.

I -- I -- if you can show that -- that an individual is equally culpable or complicit in allowing a situation to happen, I think they should be responsible.

But I -- you know, frankly, I just don't trust the way courts have worked over the years; and I think a lot of people have been unfairly targeted and some companies have been unnecessarily plundered. I don't say that as a bias against the court process or anything else. It's just that, I mean, there are -- people -- people are people. They make mistakes, things happen, and there's just no guarantees in life. And you can't always -- I mean, there's just not always a big payday for every bad thing that happens, necessarily.

000698

I believe people should be punished for willful, obvious negligence that they could have prevented or for, you know, hiding behind a corporate veil to just extract money and hopefully, you know, ignore problems. I mean, I -- it's hard -- you know, I don't know what to tell you.

I would try to do things as fairly, as I could; but I -- if you're giving me a blanket instruction and say that there's a liability here and I know that, regardless of what I may have heard, I can give a yes or no answer and if -- and if the -- if the corporation gets hit, then we're going to go wipe out this person and do I not -- do you not get a choice to weigh those two scenarios, where maybe there is a difference between the owner or the officer of the company and what they knew or did and the company itself? I'm not sure...

THE COURT: Well, first of all, I'll tell you something that you hear lawyers and judges say all the time in this process. There's no wrong answer. So I'm glad that you're candid with me about your views and feelings. What we do when we assess exemplary damages, we look at each individual defendant who is being accused of conduct that could open them up for exemplary damages; and the jury is asked the question as

to each particular defendant, whether they should be found liable for exemplary damages by clear and convincing evidence.

PROSPECTIVE JUROR KEATS: Okay. You know, I would say, if you give me clear and convincing evidence, rather -- yes. I mean, I've -- I've -- I would go with that. I mean, it's not -- it's not all that iffy. I'm not -- I don't have a prejudice to protect somebody any more than I do to hurt them.

I just -- you know, give me the facts and show me clear and convincing evidence. And if exemplary damages are for punishment or for whatever, okay. I mean, if it's warranted, I don't have a philosophical problem with that, with the wording "punitive" or "exemplary damages."

But, you know, I -- I just -- you can't be frivolous about it, you know, or just assume that there are always more deep pockets to pick because I think that hurts the whole -- society.

I mean, you just have to be careful about how you, you know, award judgments and who you blame and how much. I don't take it lightly, but I -- I can't give you a general answer other than a preponderance of the evidence. That doesn't mean that I -- you know, that I absolutely would not, you know,

000700

hold an individual liable.

THE COURT: Well, like I said, for exemplary damages, the standard of proof is by clear and convincing evidence, not the lower preponderance of the evidence.

Mr. Terry, do you have --

PROSPECTIVE JUROR KEATS: Yeah, I think I understand that, clear and convincing, yeah.

THE COURT: Mr. Terry, do you have any follow-up questions?

MR. TERRY: No, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: Yes, Your Honor.

Mr. Keats, knowing that this is a civil matter in which a jury will be asked to award damages, if and so they find, do you think that this would be an appropriate case for you to sit in, knowing that we're looking at the company and the individual, based on statements you made about individuals and companies?

PROSPECTIVE JUROR KEATS: Sure. Yes. I think I could. I mean, I -- as I say, I don't have a preconceived idea that, you know, well, somebody got hurt and then we have to -- I mean, I'd have to listen to both sides. I don't know why I couldn't do that.

I don't -- I'm not against awarding

000701

damages, exemplary or whatever, when warranted. So yeah, I would say, yes. I --

MR. SPARKS: So based on the statements you made about deep pockets and things of that nature, do you think it would be inappropriate in a situation where someone was severely burned and someone died that going into a deep pocket would be appropriate?

PROSPECTIVE JUROR KEATS: It might be appropriate. Depends on who the deep pocket is.

I mean, did they really have anything to do with it? I know that -- gosh, years ago I had a friend during the great depression in the Eighties staying at my house and she was a real estate broker, as am I. And a man with whom she was associated did something unethical, and then a lawyer called me up and he wanted to sue me due to some vicarious liability theory because I was the deep pocket.

It happened that my friend, who was broke and living with me, didn't have any money. But since I provided a place for this broker to live and work, then, therefore, I was responsible for something that -- somebody they sponsored.

I mean, I knew nothing about it. Anyway, that's going a little far. But, I mean, I'm just aware that things like that can be construed to --

000702

to confer liability upon people who are quite innocent. You know what I mean?

MR. SPARKS: You made a statement, also, sir, did you not, about some problems in reference to the court system itself and -- and in reference to the possibility of awarding money judgments and things of that nature.

The question, once again, is: Do you think this type of case is one that it might not be in your best interest to sit in with your preconceived ideas and notions?

PROSPECTIVE JUROR KEATS: No, huh-uh. I would just say, in fairness to both sides, that I'm not one to be easily manipulated. I mean, you just have to convince me with facts and rational arguments and not emotional ones for me to make a decision. That's all.

I mean, I just want you to know who I am; and I'll do the best I can, you know.

MR. SPARKS: All right. Thank you.

MR. PLUMMER: No questions, Your Honor.

THE COURT: All right. Thank you. Have a good lunch. We'll see you back at 1:15.

PROSPECTIVE JUROR KEATS: Thank you.

(Prospective Juror Keats leaves the courtroom.)

000703

(Prospective Juror DeSoto enters the courtroom and takes the stand.)

THE COURT: Ms. DeSoto, if you could have a seat right here in this chair next to me. We've got a microphone, that way we make sure everyone hears what you tell us. Thank you.

Mr. Terry?

MR. TERRY: Ms. DeSoto, looking back at my notes -- and I didn't take very good notes, and that's why I need to ask you a little bit more.

I understand that Mr. Plummer's firm represented your sister?

PROSPECTIVE JUROR DESOTO: Yes.

MR. TERRY: Okay. And that was about -- did you say ten --

PROSPECTIVE JUROR DESOTO: I think it was about ten years ago.

MR. TERRY: Okay. Do you know what kind of action it was?

PROSPECTIVE JUROR DESOTO: Well, she was involved in an accident.

MR. TERRY: Okay. Personal injury?

PROSPECTIVE JUROR DESOTO: Uh-huh, personal injury.

MR. TERRY: Okay. Did you have any

interaction with Mr. Plummer's firm during that time?

PROSPECTIVE JUROR DESOTO: I think I might have met him at one time at his office because we went over there, but it wasn't more than just the one time.

MR. TERRY: Were you a witness or anything like that to the case?

PROSPECTIVE JUROR DESOTO: No, I wasn't.

MR. TERRY: Okay. Just again, the fact that your sister was represented by Mr. Plummer, would that in any way affect your testimony [sic] in regards to the case today -- in other words, that this might not be the case for you because of that connection -- or would you be able to come in and see the facts as they are?

PROSPECTIVE JUROR DESOTO: I'm really not sure. I can --

MR. TERRY: So you have a --

PROSPECTIVE JUROR DESOTO: Yeah. I mean, I think -- well, it has nothing to do personally because -- I mean, she didn't get anything out of it. Her leg was amputated. She didn't get awarded for her pain and suffering.

MR. TERRY: Okay.

000705

PROSPECTIVE JUROR DESOTO: So I don't know.

MR. TERRY: So that might, I guess, affect your judgment in this case or bias --

PROSPECTIVE JUROR DESOTO: Yeah.

MR. TERRY: -- as to one side or the other?

PROSPECTIVE JUROR DESOTO: I think so.

MR. TERRY: No further questions, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: Good afternoon, ma'am.

PROSPECTIVE JUROR DESOTO: Hi.

MR. SPARKS: Having said you think it would, that bias would be toward Mr. Plummer; is that correct?

PROSPECTIVE JUROR DESOTO: Uh-huh.

MR. SPARKS: Thank you.

THE COURT: Mr. Plummer?

Mr. PLUMMER: No questions, Your Honor.

THE COURT: All right. Thank you. Have a good lunch. We'll see you after lunch.

PROSPECTIVE JUROR DESOTO: Okay. Thank you.

(Prospective Juror DeSoto exits the

000706

courtroom.)

(Prospective Juror Schroeder enters the courtroom and takes the stand.)

THE COURT: Mr. Schroeder, if you could come up here and have a seat in the chair next to me. We've got a microphone. That way everyone hears what you tell us.

PROSPECTIVE JUROR SCHROEDER: Okay.

THE COURT: Thank you.

PROSPECTIVE JUROR SCHROEDER: Yes, sir.

THE COURT: Mr. Plummer?

MR. PLUMMER: Mr. Schroeder?

PROSPECTIVE JUROR SCHROEDER: Yes, sir.

MR. PLUMMER: Mr. Schroeder, you're a fireman?

PROSPECTIVE JUROR SCHROEDER: Well, I'm retired now, yes, sir.

MR. PLUMMER: Once a fireman, always a fireman?

PROSPECTIVE JUROR SCHROEDER: Yes, sir. That's true.

MR. PLUMMER: And you understand that there are going to be -- you're going to hear evidence here in the courtroom and documents and things of that sort and testimony, and then when you go back to the

000707

jury room, if you're one of the jurors who deliberate, people may turn to you because of your expertise.

PROSPECTIVE JUROR SCHROEDER: Yes, sir.

MR. PLUMMER: You were a fire marshal --

PROSPECTIVE JUROR SCHROEDER: I understand, yes, sir.

MR. PLUMMER: Yes. You fought the suppression?

PROSPECTIVE JUROR SCHROEDER: I understand. Yes, sir.

MR. PLUMMER: And you can't -- I can't ask you to forget your common sense.

PROSPECTIVE JUROR SCHROEDER: Yes, sir.

MR. PLUMMER: But -- but, you know, one of the concerns I have is that if you go back there, you will use your expertise when you're not on the stand and I can't cross-exam you and ask you a question about that.

PROSPECTIVE JUROR SCHROEDER: Right. Yes, sir.

MR. PLUMMER: Can you make that separation?

PROSPECTIVE JUROR SCHROEDER: I would to the best of my ability.

000708

MR. PLUMMER: Okay. But people are going to ask you questions.

PROSPECTIVE JUROR SCHROEDER: Right.

MR. PLUMMER: Okay. Well, let me add to that.

One of their experts is Eddie Corral.

PROSPECTIVE JUROR SCHROEDER: Yes, sir. I know Chief Corral real well, yes, sir.

MR. PLUMMER: I'm sure you do because he was chief for a good while and on the force for a while.

PROSPECTIVE JUROR SCHROEDER: Right.

MR. PLUMMER: And because you know him, he's got credibility with you. He's like my basketball team analogy that I used earlier.

PROSPECTIVE JUROR SCHROEDER: Right.

MR. PLUMMER: Are you inclined to believe Chief Corral, regardless of what the cross-examination is or the scrutiny is made of his opinions?

PROSPECTIVE JUROR SCHROEDER: No. I wouldn't -- I mean, I'd have to look at it myself.

MR. PLUMMER: Okay. Okay.

PROSPECTIVE JUROR SCHROEDER: I mean, I trust in Chief Corral and what he says and stuff; but

he's not 100 percent right all the time, either.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR SCHROEDER: Just like me or whoever.

MR. PLUMMER: One of the things nobody talked about in voir dire is the notion of proximate cause. Okay? The legal causation for a particular event. Okay?

Are you familiar with that expression by any chance, "proximate cause"?

PROSPECTIVE JUROR SCHROEDER: A little bit, yes, sir.

MR. PLUMMER: Have you ever been involved in lawsuits before?

PROSPECTIVE JUROR SCHROEDER: No. I -- yeah. I was on a jury. Is that what you mean?

MR. PLUMMER: Well, no. As a litigant.

PROSPECTIVE JUROR SCHROEDER: No. Nobody's ever -- God, no.

MR. PLUMMER: You haven't sued anybody?

PROSPECTIVE JUROR SCHROEDER: No. Oh, no.

MR. PLUMMER: Okay. Well, what I'm worried about, an undisclosed expert being in the jury room.

000710

PROSPECTIVE JUROR SCHROEDER: Yes, sir. That's understandable.

MR. PLUMMER: Should I be worried about it?

PROSPECTIVE JUROR SCHROEDER: Now, if they ask my opinion, I'm going to give them my opinion.

MR. PLUMMER: Well, your opinion is an educated opinion.

PROSPECTIVE JUROR SCHROEDER: I know. I know.

MR. PLUMMER: That's what concerns me.

PROSPECTIVE JUROR SCHROEDER: Well, if there's certain things that was not brought out and there are certain things that were brought out that I don't see eye to eye and -- I know state regulations and I know the only way to change those is you've got to have major catastrophes to change them.

MR. PLUMMER: Correct. Correct.

PROSPECTIVE JUROR SCHROEDER: And my biggest thing --

MR. PLUMMER: Let me give you a simple example.

PROSPECTIVE JUROR SCHROEDER: Okay.

MR. PLUMMER: One argument may be that the house should have had sprinklers. They ain't

000711

required for a four-bedroom home.

PROSPECTIVE JUROR SCHROEDER:  Right.

MR. PLUMMER:  And the house could be safe without them; but you may feel the house needed to have sprinklers, based on your experience.

PROSPECTIVE JUROR SCHROEDER:  Right.

MR. PLUMMER:  Do I have to worry about you going back there, giving your opinion in that regard?  And you can be honest with me.

PROSPECTIVE JUROR SCHROEDER:  I would say yes, because, I mean, I would think they would -- in a situation, if you just had a house that had four individuals, they were just -- let's use my father-in-law right now.

He just got through with surgery, so he's in a rehabilitation place.

MR. PLUMMER:  Right.

PROSPECTIVE JUROR SCHROEDER:  And I would not have to worry about him because he still can get around and stuff.  But in a situation like what you were talking about earlier with --

MR. PLUMMER:  Ms. Wagner, she couldn't get around.

PROSPECTIVE JUROR SCHROEDER:  Right. And seeing what I've seen in the past and just with that

one lady there with -- I assume it was still four people that were there?

MR. PLUMMER: Uh-huh.

PROSPECTIVE JUROR SCHROEDER: I just can't agree with that --

MR. PLUMMER: Okay.

PROSPECTIVE JUROR SCHROEDER: -- because of the situations, not knowing, basically the -- the health of the lady that was supposed to get them all out. I couldn't -- in other words, I couldn't just say it was all her fault.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR SCHROEDER: There's no way.

MR. PLUMMER: Okay. Thank you, sir. Appreciate it.

PROSPECTIVE JUROR SCHROEDER: Okay.

THE COURT: Mr. Terry?

MR. TERRY: Thank you, Judge.

Despite your experiences and your background --

PROSPECTIVE JUROR SCHROEDER: Yes, sir.

MR. TERRY: -- I guess -- and correct me if I'm wrong, but what you were just trying to say was you have to look and wait and see all the facts that

000713

are going to be presented today before you make a decision on anything.

PROSPECTIVE JUROR SCHROEDER: That's true.

MR. TERRY: And you will follow the law given to you by the judge, despite what biases you bring in?

PROSPECTIVE JUROR SCHROEDER: That is true.

MR. TERRY: No further questions, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: Briefly.

Mr. Schroeder, the bottom line is you could be fair, could you not?

PROSPECTIVE JUROR SCHROEDER: I could be fair, yes, sir.

MR. SPARKS: Thank you.

THE COURT: All right. Now you may go. Have a good lunch. We'll see you back about 1:15.

(Prospective Juror Schroeder exits the courtroom.)

(Prospective Juror Rodriguez enters the courtroom and takes the stand.)

THE COURT: Ms. Rodriguez, if you could

000714

come forward and have a seat in the chair right next to me. We've got a microphone there. That way everyone can hear what you have to say.

Mr. Terry?

MR. TERRY: Ms. Rodriguez, looking back at my notes, I see -- I remember that Mr. Plummer had represented you in the past, correct?

PROSPECTIVE JUROR RODRIGUEZ: Uh-huh. Yes.

MR. TERRY: Okay. And it was in regards to a business deal or some sort of business litigation?

PROSPECTIVE JUROR RODRIGUEZ: Yes.

MR. TERRY: Okay. What kind of matter?

PROSPECTIVE JUROR RODRIGUEZ: A fire.

MR. TERRY: A fire?

PROSPECTIVE JUROR RODRIGUEZ: Yes.

MR. TERRY: In?

PROSPECTIVE JUROR RODRIGUEZ: In a building.

MR. TERRY: Okay. And what happened?

PROSPECTIVE JUROR RODRIGUEZ: Well, we had some people working, doing work for this company. We sent the guys over there, and a fire occurred.

MR. TERRY: Okay.

000715

PROSPECTIVE JUROR RODRIGUEZ: But, you know, we don't think it was our fault, the guy's fault, you know; but, you know, we left it in his hands and he took care of it.

MR. TERRY: Okay. So basically someone was accusing you or somebody sued you --

PROSPECTIVE JUROR RODRIGUEZ: Yes.

MR. TERRY: -- based on this fire?

PROSPECTIVE JUROR RODRIGUEZ: Yes.

MR. TERRY: They said that your people started it?

PROSPECTIVE JUROR RODRIGUEZ: Yes, yes.

MR. TERRY: Got you.

Based upon Mr. Plummer's representation of you in that case --

PROSPECTIVE JUROR RODRIGUEZ: Uh-huh.

MR. TERRY: -- would you come into the courtroom today with a bias more towards Mr. Plummer because he helped you out in that situation, versus being able to listen to the facts and judge it on that basis?

PROSPECTIVE JUROR RODRIGUEZ: No. I -- I wouldn't. I would see both sides, you know; and then I would go from there. Then I would decide, you know. I wouldn't -- I would be fair, you know.

000716

MR. TERRY: Okay. No further questions, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: Yes, sir.

Ms. Rodriguez, when I spoke to you earlier, I was under the impression, when you were sitting out here, that you stated, having a relationship with Mr. Plummer, you didn't think it would be in your best interest to sit on this jury.

Was I mistaken?

PROSPECTIVE JUROR RODRIGUEZ: Okay. Can you explain it again, the question?

MR. SPARKS: Yes, ma'am.

When you were sitting out here --

PROSPECTIVE JUROR RODRIGUEZ: Uh-huh.

MR. SPARKS: -- after you indicated you knew Mr. Plummer and he had been your attorney, when I got up and I started asking about the people who said they knew some of the people --

PROSPECTIVE JUROR RODRIGUEZ: Yes.

MR. SPARKS: -- you indicated that -- in my opinion, that you thought that in this particular case, since he had previously represented you, you would not be a good juror in this particular case.

PROSPECTIVE JUROR RODRIGUEZ: I didn't

say I wasn't a good juror.  You know, I -- maybe -- you know, the way I said it --

MR. SPARKS:  Not in terms of good, meaning the quality of your person, but maybe based upon having a prior relationship may give you a predisposition toward a person who was previously representing you, particularly in a case involving a fire.

PROSPECTIVE JUROR RODRIGUEZ:  Uh-huh.  Well, you know, like I said, it's just -- you know, I have to see both sides, you know, to --

MR. SPARKS:  Yeah.  Yes, ma'am.

PROSPECTIVE JUROR RODRIGUEZ:  -- I mean, to -- to say my -- you know, my opinion.

MR. SPARKS:  But can I ask you this question?

PROSPECTIVE JUROR RODRIGUEZ:  Yes.

MR. SPARKS:  Having seen both sides, if you had to make a decision one way or the other with the fact that maybe, if you needed him again, if you ruled against him, your fees would go up or anything like that?  Would that be of concern to you?

PROSPECTIVE JUROR RODRIGUEZ:  No.

MR. SPARKS:  No?

Would it be of concern to you if you

ruled against him in this particular case that he may not want to represent you again in the future if you needed him again?

PROSPECTIVE JUROR RODRIGUEZ: No. I wouldn't think so because he's very professional.

MR. SPARKS: So with that in mind, you think that if you were selected on this jury, him having previously represented you, we wouldn't be at a disadvantage, my client and Ms. Wagner, would we?

PROSPECTIVE JUROR RODRIGUEZ: Okay. What was that again?

MR. SPARKS: Would we be at a disadvantage, if you sat on this jury, having had a prevent relationship with Mr. Plummer?

PROSPECTIVE JUROR RODRIGUEZ: No. If -- if it was just another lawyer, I would be -- I would feel the same thing.

MR. SPARKS: No unusual allegiances to him.

PROSPECTIVE JUROR RODRIGUEZ: No. It's professional.

MR. SPARKS: Thank you.

MR. PLUMMER: No questions, Your Honor.

THE COURT: All right. Thank you. Have a good lunch. We'll see you back about 1:15.

000719

(Prospective Juror Rodriguez leaves the courtroom.)

(Prospective Juror Jones enters the courtroom and takes the stand.)

THE COURT: Mr. Jones, if you could come forward and have a seat in this chair next to me. We've got a microphone right there. That way everyone can hear what you have to say. I know you've got a booming voice. That way we can make sure -- Mr. Plummer.

MR. PLUMMER: Thank you, Your Honor.

Mr. Jones, you're with the fire service?

PROSPECTIVE JUROR JONES: The City of Houston Code Enforcement.

MR. PLUMMER: I'm sorry. Code Enforcement?

PROSPECTIVE JUROR JONES: Uh-huh.

MR. PLUMMER: And I think you said, did you not, that you were a fire marshal?

PROSPECTIVE JUROR JONES: Well, I'm on call exactly this week for -- whenever there's a big fire, I've got to go out and -- you know, be the first one out with the firemen.

MR. PLUMMER: So after the suppression

000720

guys leave, you go in?

PROSPECTIVE JUROR JONES: Correct.

MR. PLUMMER: Do you investigate or do you --

PROSPECTIVE JUROR JONES: Make sure it's safe --

MR. PLUMMER: Okay.

PROSPECTIVE JUROR JONES: -- for anybody else to come in.

MR. PLUMMER: Okay. That's -- so -- so if it's -- if the buildings's a dangerous building after the fire --

PROSPECTIVE JUROR JONES: Yeah.

MR. PLUMMER: -- you red tag it?

PROSPECTIVE JUROR JONES: Yes. And I'm the one that says either you have to tear it down or fence it.

MR. PLUMMER: Okay. Now, before that, your background was as a fireman?

PROSPECTIVE JUROR JONES: No. Code Enforcement.

MR. PLUMMER: Code Enforcement?

PROSPECTIVE JUROR JONES: Inspector.

MR. PLUMMER: Okay. I'm sorry. I was confused.

000721

Now, I believe you said -- your information sheet said your wife's an assistant chief?

PROSPECTIVE JUROR JONES: Yes.

MR. PLUMMER: With the fire department?

PROSPECTIVE JUROR JONES: No, with permits. You have to go through -- if you want any permits or anything with the City, or plans, you've got to go through her department.

MR. PLUMMER: Okay. You -- if -- if -- it's fair to say that you have this specialized knowledge through your employment --

PROSPECTIVE JUROR JONES: Uh-huh.

MR. PLUMMER: -- about codes and about requirements for buildings, multifamily buildings and things of that sort?

PROSPECTIVE JUROR JONES: Correct.

MR. PLUMMER: What I'm concerned about is that when we have experts give reports and testify, I can cross-examine them.

PROSPECTIVE JUROR JONES: Uh-huh.

MR. PLUMMER: But if you serve on the jury and go back there to deliberate, based on the testimony, you would end up being a secret expert that I wouldn't have a chance to talk to about your opinions before you do that.

000722

PROSPECTIVE JUROR JONES: Correct.

MR. PLUMMER: Do I have a reason to be concerned about that because you know all -- what you know?

PROSPECTIVE JUROR JONES: Well, for this trial you have a reason to be concerned because I have issues right now with my brother-in-law that's in a facility --

MR. PLUMMER: Okay.

PROSPECTIVE JUROR JONES: -- that have -- has some issues that --

MR. PLUMMER: About how they're taking care of him?

PROSPECTIVE JUROR JONES: Yes, yes.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR JONES: And I'm, more or less, bias to that --

MR. PLUMMER: Okay.

PROSPECTIVE JUROR JONES: -- because of those -- negligence.

MR. PLUMMER: Okay.

PROSPECTIVE JUROR JONES: Uh-huh.

MR. PLUMMER: So as we start this trial off --

PROSPECTIVE JUROR JONES: Uh-huh.

000723

MR. PLUMMER: -- we're behind the eight ball, from your standpoint; is that right?

PROSPECTIVE JUROR JONES: Okay. Yes.

MR. PLUMMER: Okay. Thank you, sir. I appreciate your candor.

THE COURT: Hold on a second.

Mr. Terry?

MR. TERRY: Mr. Jones, you understand that the defendant we're dealing with in this matter is obviously totally separate from --

PROSPECTIVE JUROR JONES: Correct.

MR. TERRY: -- the entity in which your brother-in-law is staying; is that correct?

PROSPECTIVE JUROR JONES: Uh-huh.

MR. TERRY: Okay. So, you know, what might be -- whatever they were doing that you don't see as right with your brother-in-law obviously, you know, might not be the fact with the defendant we're dealing with in this case?

PROSPECTIVE JUROR JONES: Correct.

MR. TERRY: You understand they're separate?

PROSPECTIVE JUROR JONES: Uh-huh. Uh-huh.

MR. TERRY: So would you be able to

000724

listen to the facts as they're presented by the evidence that comes from the stand and make your -- make a decision as regards to what you hear instead of what's happening to your brother-in-law? Would you be able to do that?

PROSPECTIVE JUROR JONES: It would be hard. It would be hard.

MR. TERRY: I understand it might be hard.

PROSPECTIVE JUROR JONES: Yeah.

MR. TERRY: I mean, there's going to be a lot of hard decisions to be made during this trial.

But would you be able to listen to the evidence and make your decision based on that evidence and not what's going on with your brother-in-law?

PROSPECTIVE JUROR JONES: I could try. I could try. But I have to be honest with you, I mean, it's just a situation now that when -- let me give you this -- what's happening: The facility -- he had an infection on his toes. The doctor had to cut them off. Six months later, infection up his leg, had to cut off up to his knee.

And right now, between my wife and myself, we're going through some changes. I don't know if I could be fair to either side right now, going

through what I'm going through right now.

MR. TERRY: Okay. So I guess you're not fair to either side, meaning -- I mean, you have biases on both sides?

PROSPECTIVE JUROR JONES: Right, right now, because --

MR. TERRY: So it's not just you're behind the eight ball as far as the defendants; as far as the plaintiff, we're behind the eight ball, as well?

PROSPECTIVE JUROR JONES: Yeah, correct, both sides.

MR. TERRY: No further questions, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: Yeah.

Mr. Jones, the concerns you have about your brother-in-law --

PROSPECTIVE JUROR JONES: Uh-huh.

MR. SPARKS: Was he diabetic?

PROSPECTIVE JUROR JONES: Yes.

MR. SPARKS: And that disease sometimes lends towards individuals having to have amputations?

PROSPECTIVE JUROR JONES: Correct.

MR. SPARKS: Certainly no situation with there being a fire at the facility, to your

knowledge?

PROSPECTIVE JUROR JONES:  No fire, that's correct.

MR. SPARKS:  So to the degree that this deals with injuries related to a fire versus something that's sort of maybe a genetic malfunction or a disease giving rise to the amputation, is there any way you could be in a position to set your personal situation with your brother-in-law aside from the reality that we're going to try to present based on the facts of this case?

PROSPECTIVE JUROR JONES:  Well, in my opinion, it was negligence on his part, also.  It wasn't a fire, but it was the way they was taking care of him.  He wasn't properly cared for.

MR. SPARKS:  Okay.

PROSPECTIVE JUROR JONES:  And that's why right now is -- I wouldn't want to put myself in a position to swear it either way because of the issues in my mind and what I'm thinking about the situation.

MR. SPARKS:  Okay.  Okay.  More of an emotional versus professional?

PROSPECTIVE JUROR JONES:  Correct, correct.

MR. SPARKS:  But if, in fact, you were

selected to the jury as a professional --

PROSPECTIVE JUROR JONES:  Uh-huh.

MR. SPARKS:  -- you could separate the two?  Fair enough?

PROSPECTIVE JUROR JONES:  I could try, but I -- I couldn't be for sure.

MR. SPARKS:  Thank you.

PROSPECTIVE JUROR JONES:  Uh-huh.

THE COURT:  Thank you for your time. Have a good lunch.  We'll see you back at 1:15.

(Prospective Juror Jones leaves the courtroom.)

(Prospective Juror Schuman enters the courtroom and takes the stand.)

THE COURT:  Ms. Schuman, if you could come forward and have a seat in this chair next to me. We've got a microphone right there.  That way everyone hears what you tell us.  Right up here.

Mr. Terry?

MR. TERRY:  Thank you.

Ms. Schuman, looking back on my notes, I saw something that I wanted to ask you some questions about.

PROSPECTIVE JUROR SCHUMAN:  Sure.

MR. TERRY:  And that is your responses

when I was asking you about corporate responsibility and individual responsibility.

And from my notes, it looks like, I guess, that you are in agreement that -- I guess you have a bias towards the individual as opposed to a company, meaning you would side more with an individual and -- in protecting their assets versus holding a company responsible? Do you recall that line of questioning?

PROSPECTIVE JUROR SCHUMAN: I do. I do.

MR. TERRY: Okay. And I believe my notes are everywhere; so I'm trying to get some clarification.

PROSPECTIVE JUROR SCHUMAN: I don't know that -- "bias" seems such a strong term for me. It's -- I'm just of the opinion that, you know, that's the reason that most companies incorporate, is to protect themselves from that personal liability.

And it's not -- I really -- it's that punitive thing. I mean, you're punishing someone individually for what might have fallen under the purview of their corporate responsibilities.

MR. TERRY: Okay. So no matter what amount of evidence that I can show to you as far as the

000729

individual's concerned, you have this in the back of your mind that, look, you know, the company's the one who's going to be responsible, it's not going to be the individual, and I'm not going to hold them responsible?

PROSPECTIVE JUROR SCHUMAN: I -- it's not no matter what. I really would look at the evidence.

But I do -- I mean, with my experience practicing law, I don't -- not a lot in civil, criminal attorney -- but I spent about 11 months -- that's all I could last in the civil firm -- because a lot of the time, it was just how much money can we get, how much money can we get? And I'm just very sensitive, you know.

If the corporation failed, believe me, I think they should be held responsible. I firmly feel that way with the climate going on now.

But that individual, whether it's the CEO, you know, financial officer or whatever it is, you know, how much -- how much do you hold them personally liable based on -- based on the -- the obligations, responsibilities, liabilities of the corporation?

MR. TERRY: Okay. So when I'm making that argument as opposed to the individual, I'm already -- I'm starting behind? I'm already losing that

000730

race as the plaintiff?

PROSPECTIVE JUROR SCHUMAN: I hate to say it that way because I want to be fair. I want to respect what the judge says, what the law is, what the evidence shows. I -- you know, I -- I've kind of always wanted to be known as the fair-minded attorney. I try to be reasonable.

But personally, take my -- I'm not here as an attorney. Yeah. I have a hard time punishing someone individually because I think their intent was to incorporate themselves to protect against that. But I'm not going to say I can't do it if I'm instructed.

MR. TERRY: But you -- again, your attorney aside, your attorney hat's off and your individual hat's on, as far as my arguments against liability on the individual, I'm already behind that race without hearing anything else?

PROSPECTIVE JUROR SCHUMAN: My opinion, you're behind -- you're running -- you're barred by my opinion, but -- but I would do my best to put my personal opinion aside. And that's really the best I can do. I'm -- I'm -- you know, it -- if it's -- if it's fair damages, pain and suffering, injuries -- I mean, this is a hard case. It's breaking my heart already looking at -- you know, even the one who's the

guardian, but the mom -- I mean, you know, the whole mother thing, losing your children, having them injured, I don't care what age they are, you can tell I get emotional about it. So I can feel for them, and I think they should be compensated.

But the question is by whom and how much and why.

But -- but that punitive part of it -- I'm a criminal defense attorney. You know, the punishment thing is hard for me to -- it has to be legitimate, fair, and reasonable; and that's probably the best I can give you guys.

MR. TERRY: No further questions, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: Briefly, Judge.

You indicated you're a criminal defense lawyer; is that correct?

PROSPECTIVE JUROR SCHUMAN: Uh-huh.

MR. SPARKS: And people are held responsible criminally all the time for acts involving corporations. You're aware of that; is that fair?

PROSPECTIVE JUROR SCHUMAN: (Nods head.)

MR. SPARKS: And no one's asking you to

make that type of assessment here.

PROSPECTIVE JUROR SCHUMAN: Right.

MR. SPARKS: What we're asking you in a nutshell is whether or not your training and your professionalism can be set aside to listen to the evidence and make a decision?

Now, the judge is going to give you an instruction; but he can't instruct you how to rule or render your opinion with 11 other people.

PROSPECTIVE JUROR SCHUMAN: Correct.

MR. SPARKS: And what we're concerned about is whether or not your experiences and your professional life could impact upon 11 other people based upon your misgivings about punitive damages.

And if that's the case, just let us know, because it might be appropriate in terms of your feelings across the street; but over here it's just a different animal. And we want to make sure that we're not subjecting the jury panel to, as Mr. Plummer would say, an additional expert where we don't get a chance to cross-examine and you're back there influencing the jury.

PROSPECTIVE JUROR SCHUMAN: And I would do my best to do that. I would tell you that I can do that, put all that aside and listen to what I'm

000733

instructed -- what the law is, what the instructions are, what the burdens are, more importantly the facts, how the facts fall, you know, do they establish the -- the liability.

Of course I'm going to try to do that, because I -- I -- I take an oath. And again, I try to be fair and reasonable.

As far as influence? You know, I've interviewed my jurors postverdict sometimes. You never know who that influence is going to be. And -- and, you know, if there's an opinionated person, doesn't matter -- people are -- if people are followers, they're going to follow someone who speaks up and, you know, may exert more of a conversation or position.

I can't say I'm not going to be that person, if, in fact, the -- the evidence, the facts, the testimony, you know, pushes me to one side. It -- I'm going to stand up for what I believe, and that you can count on. But I will do it within the limits of the law.

I'm not going to use my background or experience, you know; and -- and I do have my opinions on certain things. Like I say, you know, working in that civil firm was hard for me because to me they lacked an element of fairness.

It wasn't that the burdens weren't as strong. I couldn't hold the -- you know, the adversaries to the same standards that you do in a criminal courtroom. But I could put that aside.

MR. SPARKS: But would you be trying to hold us to a higher standard since it's a civil case similar to what you --

PROSPECTIVE JUROR SCHUMAN: No. I understand those differences. And I understand what positions you are all in and I respect that. And I could also see all of your professionalism and your dedication to the case and those two ladies sitting there.

So I -- I would hold you to -- to whatever burden you need to prove.

MR. SPARKS: Thank you.

THE COURT: Mr. Raval?

MR. RAVAL: No questions, Your Honor.

THE COURT: You understand -- obviously we didn't want to talk about it during the panel examination. When we're talking about punitive damages, actually in Texas we're talking about exemplary damages and that in Texas there's a higher standard of proof to -- to merit award of exemplary damages than preponderance of the evidence.

000735

You've heard of us talk about preponderance of the evidence during the panel examination.

But actually, in order to prove liability for exemplary damages and to prove the amount of exemplary damages, the claimant has to establish their right to any amount by clear and convincing evidence, not simply preponderance of the evidence.

Understanding that there's a higher level of standard of proof for exemplary damages, will you be able to follow my instructions, look at the evidence, and make a decision as to each defendant on their own, whether they should be liable for exemplary damages and, if you decide they should be, the amount of exemplary damages based on that standard of proof?

PROSPECTIVE JUROR SCHUMAN: I -- I will make every effort, absolutely. I'm not going to say no. I'm going to interpret and then apply -- interpret the facts and evidence and then apply your instructions, knowing the clear and convincing evidence standard.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR SCHUMAN: That's the best that I could do.

THE COURT: Have a good lunch. We'll see you back at 1:15.

000736

PROSPECTIVE JUROR SCHUMAN: Thank you.

(Prospective Juror Schuman leaves the courtroom.)

(Prospective Juror McCraw enters the courtroom and takes the stand.)

THE COURT: Mr. McCraw, if you could come forward and have a seat in this chair here next to me, please.

All right. Mr. Terry.

MR. TERRY: Thank you, Judge.

Mr. McCraw, looking back on my notes, some of the questions I asked, I want to talk to you a little bit about that.

And they're kind of all over the place; but when I was asking you questions in regards to individuals and then corporations and holding individuals responsible, you said that was something you -- you couldn't do.

Did I remember that correctly?

PROSPECTIVE JUROR MCCRAW: That is pretty adamant.

MR. TERRY: Okay. So that's a bias that you walked in here today; and no matter what I show to you, no matter what amount of evidence, that's something that is not going to change your mind?

PROSPECTIVE JUROR MCCRAW:  The whole time I'm going to be sitting here thinking blame is a matrix.  It's not something that falls on any single -- especially not a person.

MR. TERRY:  Okay.  So there's no amount of evidence I can show you -- you're going to think what you're going to think, and that's it?

PROSPECTIVE JUROR MCCRAW:  Pretty much.  That's my only concern.  That's my only bias, is that I'm -- I've -- I'm pretty set on that belief.

MR. TERRY:  So you really wouldn't be fair for this trial?

PROSPECTIVE JUROR MCCRAW:  Correct.

MR. TERRY:  Okay.  No further questions, Your Honor.

THE COURT:  Mr. Sparks?

MR. SPARKS:  Thank you, sir.

I mean, I didn't have any questions, sir.

THE COURT:  All right.  Mr. Raval?

MR. RAVAL:  Do you think you can make a decision in this case, if you're on this jury, based on the evidence that you see and hear in this case or not?

PROSPECTIVE JUROR MCCRAW:  I would actually go as far as to say that if I were a part of

the jury, I would make it -- I mean, if I -- if I make the jury, it's going to -- my bias is going to become part of me as a juror and it may bleed over to others, as well

MR. RAVAL: Thank you for your honesty.

THE COURT: Mr. McCraw, you understand that as a citizen you have the same right to a jury trial as every -- the parties in this case? You understand that?

PROSPECTIVE JUROR MCCRAW: Yeah.

THE COURT: You understand that we created the jury system over 800 years ago because we decided that having one person make these decisions was more dangerous than having 12 citizens bring their own common sense to a decision to decide what the facts are? You understand that?

PROSPECTIVE JUROR MCCRAW: Yes.

THE COURT: Okay. Do you understand it's important in order for the system to work to make sure that everyone gets that fair shot, that we have people who will come in and lay their biases aside and will listen to the evidence and make a fair and just decision on whatever dispute is presented to them?

PROSPECTIVE JUROR MCCRAW: And I'm comfortable with doing that in most every aspect of my

life except for when it comes to delivering awards, especially monetarily, on something that is this complicated as blame.

I mean, I would have no qualms in a lot of other trials; but it would be -- it would be a -- it wouldn't be easy for me to put myself in the position that I would need to be in on a case like this in order to deliver fairness.

And that's the -- that's the -- the brilliance of the system is the fairness; and that's the only reason why I'm speaking up, saying I don't -- I want a fair trial for everybody, and I just don't think that -- it would be a challenge to set aside the bias and -- and be as fair as I would need to be.

THE COURT: Okay. Thank you. Have a good lunch. We'll see you back at 1:15.

(Prospective Juror McCraw leaves the courtroom.)

THE COURT: All right. Mr. Terry, any motions to strike? Just give me the numbers, and we'll argue them, if we need to, afterwards.

MR. TERRY: 6, 25, 41.

THE COURT: And, Mr. Sparks, any -- any additional motions to strike?

MR. SPARKS: Yes, Judge. 5 and 25, 41.

000740

THE COURT: Any others?

MR. SPARKS: No, sir.

THE COURT: All right. Mr. Plummer?

MR. RAVAL: Number 3 and Number 14.

THE COURT: Okay. All right. All right. We'll start here.

MR. RAVAL: And, Your Honor, also Number 9 and Number 12.

MR. PLUMMER: And, Judge, can we talk about Judge Elrod?

THE COURT: She -- we're not going to get to her, based on the number of folks here that -- you know, I've got one, two, three, four, five, six, seven -- even if I granted the hardships, we're not going to get to her.

MR. PLUMMER: My gut is she'd love to serve, but --

THE COURT: There was never anything said during voir dire that would even approach a reason to strike her.

MR. PLUMMER: No, no, no. That's not what I'm saying. She would love to serve because she's part of the system. She would love to see it from this side. So I was going to discuss that with the Court.

But, you know, I'd love to have her on

000741

the jury, to be honest.

THE COURT: Well, unfortunately, we're not going to get to her based on the motions to strike that I have.

MR. PLUMMER: Okay.

THE COURT: Let's start here: First of all, the Plaintiffs and Intervenors have moved to strike 5, 6, 25, and 41. Do y'all oppose any of those, Mr. Plummer; or are there any that you agree to? Make it easier.

MR. RAVAL: We can agree to Number 41 and Number 5.

THE COURT: All right. And the Defendants have moved to strike 3, 9, 12, and 14.

Mr. Terry and Mr. Sparks, are there any of those that you can agree to?

All right. Hearing no argument, we'll start first with Plaintiff's motion to strike Number 6.

Mr. Terry?

MR. TERRY: Yes, Your Honor. This was Ms. DeSoto, who was represented by Mr. Plummer's firm. I believe when we asked her on the stand, she said that she would be leaning towards Mr. Plummer.

THE COURT: Mr. Plummer or Mr. Raval, whoever's going to argue.

000742

MR. RAVAL: Your Honor, she did indicate that she believed she could be fair.

THE COURT: All right. 6 is granted.

Next is 25 on the Plaintiff's side.

MR. TERRY: Yes, Your Honor. That was Mrs. Schuman who we just heard from.

And I know she was kind of all over the board, but I believe she did state at one point -- you know, when I asked her what -- am I going to be behind, losing this race?

And she said, yes, personally from my opinions, yes, you will be.

And really, that's what we're here for, Your Honor, is her opinions and her bias. You know, is that something she's really going to be able to set aside and listen to the facts? I doubt it.

THE COURT: 25 is denied.

All right. Defendant's motion to strike Number 3. Mr. Raval.

MR. RAVAL: Your Honor, Mr. Dixon, Number 3 indicated in answer to a question that he could not be fair based on the facts as he heard them.

THE COURT: That one's denied.

Number 9?

MR. RAVAL: Number 9 is Mr. Schroeder.

000743

He indicated that he knew one of the people who will be testifying as an expert witness. He also said that he knew -- had knowledge of the statutes and the codes and that he would not be able to put that evidence aside. It's part of what he knows.

He also indicated that he would have required -- I believe he indicated that he would require sprinklers in a home like this. That's another indication that he would not be able to be unbiased in this case.

THE COURT: Response?

MR. TERRY: Your Honor, when I asked him, given your background and your history, would you be able to set that aside and listen to the facts and make your decision based upon those facts, he answered yes.

THE COURT: All right. 9 is granted.

MR. SPARKS: Judge, I --

THE COURT: 9 is granted. I mean, I understand you've got some more argument; but I listened to him --

MR. SPARKS: I respect that.

THE COURT: -- and I'm trying to give y'all at least a little bit of a break here. But I won't cut you off --

000744

MR. SPARKS: No problem.

THE COURT: -- in the future. I'm just working here.

Number 12, Mr. Raval?

MR. RAVAL: Number 12: Mr. Jones indicated that because of the situation with his brother-in-law and his special needs that he had some concerns about bias. And though he did say he was bias towards both sides, I'm concerned that his personal experience with home healthcare would lead him to be bias in this case.

Additionally, he has specialized knowledge about investigating postfire loss; and though he works more on the code -- or used to work more on the code enforcement side, his specialized knowledge may be carried into the jury room.

THE COURT: Response?

MR. TERRY: Again, Your Honor -- again, when I asked him whether or not he could set that aside and deal with the facts and make a decision based on the facts that he heard here, I believe he said yes, that was a possibility he could.

And I understand he went both ways. I said, "Are we both behind the eight ball?" He said, "Yes." So I don't think there's a bias, that he can go

000745

one way or the other here.

THE COURT: Mr. Sparks?

MR. SPARKS: My feelings on this is that he was struggling, just like Venireman 25 was, yet he said he could be fair; and I think he can be.

THE COURT: Thank you.

12 is granted.

14, Mr. Raval?

MR. RAVAL: Your Honor, Juror 14, Ms. Harriss, has indicated in response to questioning that based on the facts as she heard them this morning, she would hold the corporation and/or the individual liable. She has indicated her bias and would not be able to be an unbias juror in this case.

THE COURT: Response?

MR. TERRY: Your Honor, I don't remember that questioning. In fact, I specifically -- if I recall correctly, Mr. Plummer asking, "Look, can everyone here be fair, given the particular facts and the situations." And they said yes. So I just don't remember when she said that, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: Judge, I didn't get anything from Ms. Harriss that I thought that she would be bias toward either side, Judge.

THE COURT: All right. 14 is denied.

All right. All right. We need to talk about Juror Number 21 whose mother-in-law is ill and may need to be taken off of life support.

In light of the fact -- first of all, before I do that -- so we've got Jurors Number 5, 6, 9, 12, and 41 are struck for cause.

Does anybody object to me giving a hardship strike to Juror Number 21?

MR. RAVAL: No, Your Honor.

MR. TERRY: Your Honor, we like him. I mean, he's a good juror.

MR. THWEATT: What specifically did he say to the Court about his --

THE COURT: His mother-in-law is gravely ill and that it looks like they may be taking her off of life support on Wednesday. And I told the jury we'd be going at least until Thursday. The case will probably go to deliberations Thursday afternoon.

MR. TERRY: That's fine, Your Honor.

MR. SPARKS: Judge, I think, under the circumstances, I'd be the last to oppose it.

THE COURT: All right. So 21 is also struck.

So we have six jurors struck for cause,

000747

5, 6, 9, 12, 21, and 41.

41's outside the strike zone, anyway; so that's five jurors within the strike zone. Your current list should go up through and include Juror 29. Double-check my math. Y'all need to get your preemptory strike lists into Di or Alex, whoever's up here, by 1:15.

(Lunch recess)

THE COURT: Let's bring the jury in, please.

(Prospective jury panel enters the courtroom.)

THE COURT: Thank you. Please be seated.

Ladies and gentlemen, thank you for being so prompt and getting back so quickly. I do appreciate it.

The clerk will now call the names of the jurors who will serve on our trial jury today. As your name is called, please come forward. We've got a swinging door right there, right there, and right there (indicating). Come forward up around and into the jury box, and please sit in the order in which you are called.

THE CLERK: The first person is

Maria DeLeon, Ameenah Campbell, Luke Reed, Kendrah Billings, Felicia Chuang, Oliver Talton, Robert -- I'm sorry -- Cecilia Taft, Robert Horvath, Martin Pape, Jacqueline Murphy, Betty Zavala, Brandon Farrell.

THE COURT: All right. Ladies and gentlemen, I need to administer another oath to you.

Will you please raise your right hands?

(Jury sworn by the Court.)

THE COURT: All right. Thank you.

Ladies and gentlemen of the panel, I want to thank you once again for taking time of out of your busy day to come forward and perform your service as jurors.

We know it is not always convenient for everyone, but it is crucial that we have good people like you and good people like the members of the trial jury who will come down and perform this service for your fellow citizens.

In Harris County we have a one jury service call rule, which means once you are called from the jury assembly building to a particular court, if you are not selected for the trial jury in that court, you have completed your jury service and will be released and can leave.

We have work release forms issued by

the District Clerk's Office. It's an official piece of paper showing you were here in the 269th Judicial District Court today in case you've got a subordinate, a boss, a significant other who needs proof that you were here instead of playing hooky, we've got official government paperwork that, yes, you did spend the day in the 269th District Court. Those work release forms will be available to anyone who needs them out in the hallway after you're excused.

I'd also like to extend my welcome to my good friend and fellow colleague on the Bench, Judge Elrod, Juror Number 46.

Judge Elrod's one of the really, really good judges in the state of Texas. She is a judge of the United States Court of Appeals for the Fifth Judicial Circuit, which means she's really, really important. But she came down here today just like every one of you to perform her service as a citizen; and I think that's important for y'all to recognize, that when it comes to jury service -- I don't think very many of you knew that she was a judge.

She was just like y'all, and I think that's a credit to her, I think it's a credit to my profession as a judge, but I think it's also a credit to you that she wanted to be a part of this as much as

you-all were a part of this.

So, Judge Elrod, thank you for coming down and gracing our courtroom with your wonderful presence. It's always a joy to have you.

With that, you're all excused. Thank you.

(Prospective Jury panel excused.)

THE COURT: Thank you. You may be seated.

All right. First of all, ladies and gentlemen, you should find a juror badge on the rail in front of your seat. You're about to hear some instructions I'm going to give you that require some formalities that people need to observe when they're interacting with jurors.

In order for them to know that you are a juror so that they know what to do, we need you to wear those juror badges whenever you're in the courthouse or really even whenever you're in the vicinity of the courthouse. That way no one accidentally slips up.

You should have also found a notebook in your chair when you went to your chair. That notebook has pen, paper, and a pamphlet in it. The pamphlet has some instructions I'm going to read to you.

000751

The pamphlet also has court contact information for you-all so if you need to contact us, for whatever reason, you know how to contact us. So hold on to that pamphlet. It is yours to keep.

I'm going to read those instructions to you. You can listen to me read them to you; or you can read along, as you like. I may intersperse some editorial commentary as we go along.

JURY INSTRUCTIONS

THE COURT: Members of the jury, you have been chosen to serve on this jury. Because of the oath you have taken in your selection for the jury, you become officials of this court and active participants in our justice system.

I'm going to read these instructions to you. Some of them have -- you have heard before and some are new, so just be patient and bear with em.

Number 1, turn off all phones and other electronic devices. Now, silent mode is not good enough. It needs to be turned off.

While you are in the courtroom and while you are deliberating, do not communicate with anyone through any electronic device. For example do not communicate by phone, text message, e-mail message, chat room, blog, or social networking Web sites such as

000752

FaceBook, Twitter, or MySpace.

Do not post information about the case on the Internet before these court proceedings end and you are released from jury duty. Do not record or photograph any part of these court proceedings. It is prohibited by law.

2, to avoid looking like you are friendly with one side of the case, do not mingle or talk with the lawyers, witnesses, parties, or anyone else involved in the case. You may exchange casual greetings like "hello" and "good morning." Other than that, do not talk with them at all. They have to follow these instructions, too; so you should not be offended when they follow the instructions.

3, do not accept any favors from the lawyers, witnesses, parties, or anyone else involved in the case and do not do any favors for them. This includes favors such as giving rides and food.

4, do not discuss this case with anyone, even your spouse or a friend, either in person or by any other means, including by phone, text message, e-mail message, chat room, blog, or social networking Web sites such as FaceBook, Twitter, or MySpace.

Do not allow anyone to discuss the case with you or in your hearing. If anyone tries to discuss

000753

the case with you or in your hearing, tell me immediately. We do not want you to be influenced by something other than the evidence admitted in court.

5, do not discuss this case with anyone during the trial, not even with the other jurors, until the end of the trial. You should not discuss the case with your fellow jurors until the end of the trial so that you do not form opinions about the case before you have heard everything.

After you have heard all the evidence, received all my instructions and heard all the lawyers' arguments, you will then go to the jury room to discuss the case with the other jurors and reach a verdict.

6, do not investigate this case on your own. For example, do not try to get information about the case, lawyers, witnesses, or issues from outside this courtroom, go to places mentioned in the case to inspect the places, inspect items mentioned in this case unless they are presented as evidence in court, look anything up in a law book, dictionary, or public record to try to learn more about the case, look anything up on the Internet or try to learn more about the case -- that means no Googling or Web searching -- or let anyone else do any of these things for you.

This rule is very important because we

000754

want a trial based only on evidence admitted in open court. Your conclusions about this case must be based only on what you see and hear in this courtroom because the law does not permit you to base your conclusions on information that has not been presented to you in open court.

All the information must be presented in open court so the parties and their lawyers can test it and object to it. Information from other sources, like the Internet, will not go through this important process in the courtroom.

In addition, information from other sources could be completely unreliable. As a result, if you investigate this case on your own, you could compromise the fairness to all parties in this case and jeopardize the results of this trial.

7, do not tell other jurors about your own experiences or other people's experiences. For example, you may have special knowledge of something in the case, such as business, technical, or professional information. You may even have expert knowledge or opinions, or you may know what happened in this case or another similar case.

Do not tell the other jurors about it. Telling other jurors about it is wrong because it means

000755

the jury will be considering things that were not admitted in court.

8, do not consider attorneys' fees unless I tell you to. Do not guess about attorneys' fees.

9, do not consider or guess whether any party is covered by insurance unless I tell you to.

10, during the trial, if taking notes will help focus your attention on the evidence, you may take notes using the pen and paper provided in your notebooks. Do not use any personal electronic devices to take notes. If taking notes will distract your attention from the evidence, do not take notes. Your notes are for your own personal use. They are not evidence.

Do not share or read your notes to anyone, including other jurors. You must leave your notes in the jury room or with the bailiff. The bailiff is instructed not to read your notes and to give your notes to me promptly after collecting them from you.

I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. You may take your notes back into the jury room and consult them during the deliberations, but keep in mind that your notes are not evidence.

000756

When you deliberate, each of you should rely on your independent recollection of the evidence; and you should not be influenced by the fact that another juror has or has not taken notes.

After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

11, I will decide matters of law in this case. It is your duty to listen to and consider the evidence and determine fact issues that I may submit to you at the end of the trial.

After you've heard all the evidence, I will give you instructions to follow as you make your decision. The instructions also will have questions for you to answer. You will not be asked and you should not consider which side will win. Instead, you will need to answer the specific questions I give you.

Every juror must obey my instructions. If you do not follow these instructions, you will be guilty of juror misconduct; and I may have to order a new trial and start this process over again.

This would wasted your time and the parties' money and would require the taxpayers of this

county to pay for another trial.

Do you understand these instructions? If not, please raise your hand. I see no hands.

Please keep these instructions and review them as we go through this case. If anyone does not follow these instructions, tell me.

Now, again, I told you the pamphlet has court contact information on it; so if you need to contact us when you're away from court, you'll be able to do so. So hold on to those pamphlets.

I want to talk to you about how things are going to proceed.

You-all have had a chance to have a lunch break. The lawyers have not yet. They worked entirely through that break where y'all had a break. So after I'm done giving you these instructions, we're going to take a 30-minute break.

Lois, the bailiff, will show you where the jury room is. That will also give you-all an opportunity to contact family, friends, let them know that you're on the jury and to make whatever scheduling accommodations you might need to make with work or home life to adjust accordingly.

So rather than making people wait until the end of the day wondering in suspense whether you

000758

were picked for the jury or not, you can call them in a few minutes.

How the schedule's going to proceed after that: After we come back from that break, the parties will give their opening statements. The first witness will be called.

We are probably going to break today around 4:30, 4:45. You're in a different building than you started out with. So you need some time to gain your bearings about where you are and whatnot. And it's been a long day, I know. Y'all were supposed to report at 8:00 a.m. this morning; so we'll break a little early.

Tomorrow we start at 8:30; and every day from here on out, we start at 8:30. If you are not familiar with driving into downtown at that hour, it will take you longer than you expect; so please plan your commute accordingly so you're here in plenty of time for us to start promptly at 8:30.

We usually take one midmorning break around the 10 o'clock hour, we take a lunch break of about an hour and 15 minutes or so, and then we take one midafternoon break around 3 o'clock or so, and then starting tomorrow and the rest of the trial we'll finish up at about 5:00 each day.

000759

I tell you that so you kind of have an idea how things are going to go, when you might be able to check in with the office or check in with family as the trial proceeds.

I told you out in the hallway -- and I'm serious about this -- we really do our best in this court to maximize your time, make sure that we're using your time as productively and efficiently as possible.

One of the things we do is the use of technology to help along with that. You may have seen in movies or plays or television series, every once in awhile in the middle of a trial for some reason or another, the lawyers and the judge have to talk to each other outside the presence of the jury.

Oftentimes you see it in one of two ways, either the lawyers come up to the bench and the judge huddles over with them and they whisper to each other so that the jury can't hear them or the judge excuses the jury, the jury shuffles off to the jury room for an unknown amount of time, then the bailiff gathers the jury back up and lines them back up and brings them back in.

Both of those methods are pretty inefficient, all the -- all things being equal. We've got some technology that helps us really make that a

much more efficient process.

When we have those conferences outside the presence of the jury, y'all will be able to stay in the jury box, and I will turn on some white noise. There are some speakers above your jury box that ordinarily project to you what's being said over the microphones.

When I turn the white noise on instead, you'll hear white noise. It sounds like this (indicating).

It's used to drown out what the lawyers and I are saying to each other. We're not doing it to annoy you or harass you or make you uncomfortable. We're using it in order to speed things up. That way we're not expending extra time, y'all shuffling back and forth, wondering whether you can go use the restroom or brew another pot of coffee or anything like that. So it is a great time-saver.

I've had some jurors say why can't we get some music or some good tunes on it. It's not in the County budget. You know, it's a little tight right now; so unfortunately, we're stuck with the white noise. But it is a great time-saver.

When I turn that on, y'all can stand up, if you need to, to stretch, twist around,

whatever -- you know, shake the numbness out of your legs. I understand that. But I ask you not to talk because our court reporter is still trying to take down everything we're saying.

You'll see she has some headphones on, but she can still hear voices behind her if y'all are talking. And again, it makes her job very, very difficult if y'all are talking while we're doing that.

So I'd ask while you stand up and stretch during those conferences that you not talk to each other.

All right. We're going to take, like I said, a lunch break for the lawyers and, frankly, for me, as well, and for my court reporter. It will be about 30 minutes. It's about 1:40 now. We'll start back up at ten after 2:00.

So those of you who need to make some phone calls, you'll be able to make some phone calls. You can do that and make whatever arrangements you need to make for the rest of the day. All right? See you in 30 minutes.

You can ask the bailiff a question.

(Jury out.)

(Recess.)

MR. THWEATT: Your Honor, for some

000762

reason, we're having a technology problem with the laptops. We can do it the old-fashioned way if it doesn't work, but I understand that your bailiff is somewhat experienced with this.

THE COURT: I'm sorry. You've got -- what do you mean? You're having some technology issues?

MR. THWEATT: My display is not showing up on the screen, for whatever reason. I don't know why.

MR. PLUMMER: We can try to help you.

(Discussion off the record.)

MR. THWEATT: Your Honor, if we could have the screen.

THE COURT: It will come down after the jury comes in.

MR. THWEATT: All right.

THE BAILIFF: All rise.

(The following proceedings were had in open court, jury present.)

THE COURT: Thank you. Please be seated.

We'll now start opening statements.

Mr. Thweatt.

PLAINTIFF'S OPENING STATEMENT

MR. THWEATT: May it please the Court,

000763

counsel.

Good afternoon, ladies and gentlemen. My name is Lee Thweatt, and I have the distinction of representing Ms. Jenny Wagner. And I'm going to show you a picture of Jenny.

That's, again, from a very early age.

Her mother, Ms. Patti Wagner, is here. Jenny, you'll hear, is a very special person.

She was born back in 1973. And I know that because she's about a month younger than I am -- or about a month older than I am. Excuse me.

But from a very early age, she was diagnosed with cerebral palsy. She's been legally blind for all of her life. She has profound mental retardation. She's been unable to walk. She cannot feed herself. She is totally dependent upon others to care for her and has been basically for her entire life.

That care person and that caretaker has been her mother and, before he passed away, her father, Bob.

We're going to show you a picture now of Jenny in grade school. Despite her disabilities, Jenny was able to attend school. Her parents made sure that that was part of her therapy and routine.

And that young lady up there at the

very top in the middle portion is Jenny when she was in grade school.

Jenny's mother and her father took her to school. That's where she received special education courses. You can see that she's in a class with disabled folks, as well.

And she stayed in school until she was 22 years old. She actually did -- did accomplish and receive a diploma. It's not like a diploma that you and I might expect or appreciate, but it shows that her family was committed to her and to her health and well-being.

This is a picture of Jenny and her father, Bob, as Jenny aged. As I said, Bob died of a heart attack back in December of 2007. And Patti and Bob were married for many, many years.

You'll hear about the life that they had when Patti takes the stand today.

I'm going to show you Jenny, as well. We're going to bring her in the courtroom. She's going to be right here, and I'm going to ask Patti to come down and introduce her.

And -- and you've already heard that Jenny was very badly burned. She had second- or third-degree burns over about 20 to 30 percent of her

000765

body. You'll see pictures, and you'll see Jenny herself to see exactly what the condition of her physical stature is right now. It will disturb you. I wish I didn't have to show you that, but it's part of our duty under the law that you understand exactly what she's been through.

And we're not going to make a huge issue of this. That's why we didn't have Jenny in here to start off with the trial. She'll be -- very briefly, so she's comfortable.

And her grandparents are actually here visiting from out of town to assist Patti with this trial. You'll hear they have a very close family.

Jenny's aunt, Joan, lives next door to Patti in an apartment out in Katy and they have a little two-bedroom apartment where the two of them spend their days.

I told you that until Jenny was about 22 years old she was in a public school. Once she turned 22, you'll hear Patti tell you-all that Patti and Bob were encouraged to put Jenny in a full-time residential facility.

I don't know how many of you have ever had the burden of caring for somebody 24/7 for over two decades, but it can be very overwhelming and -- to the

point where you're not able sometimes to -- to do what's best for them.

And so upon that recommendation, they placed Jenny in a facility in San Antonio called The Willows. She started there in 1995. At the time, The Willows was the largest privately-held facility in the state of Texas dedicated to caring for persons with mental retardation. It's now closed.

But in May of 2002 Jenny was placed into Four J's Community Living Center, Inc.; and that's one of the defendants in this case.

Ms. Anthonia Uduma is another defendant in this case. Ms. Uduma owns 100 percent of Four J's Community Living Center, Inc. She's the president and CEO.

She also owns many houses here in Houston and in Beaumont and in Corpus Christi. She buys these houses on her own. She's the sole owner. And then she leases them to her company. It's over 30 houses.

Ms. Uduma, of course, as the president and CEO of a company that is solely dedicated to taking care of persons with mentally retarded [sic] and profound disabilities, knows who's going to be staying in those homes.

One of them was located in Missouri City, and the address is 16335 Beretta Court. You will hear that that was a four-bedroom home.

If you were to drive by it before it burned down, you probably wouldn't have ever thought anything twice about it. It looks just like any other bedroom home in any other bedroom community. It's got a front yard and backyard and a nice wood fence. There's nothing remarkable about it at all.

But what is remarkable about it was that on September the 4th, 2008, after Jenny had been there since 2002 -- that's when she first moved into that residence -- a fire started there.

You heard some about that fire, and we're going to get very indepth into what happened.

But here's the basic facts: One of the resident there, a lady named Esperanza Arzola, who's also mentally retarded -- she had a known history of schizophrenia, bipolar disorder, suicidal acts, and suicidal ideations.

She was on antipsychotic medication. She had a history of aggression towards staff who worked at Four J's and a history of property destruction and other violent actions. All of that was known to Four J's and to Ms. Uduma prior to the fire of September

000768

the 4th, 2008. Ms. Arzola was a very deeply disturbed person.

Now, they're going to tell you, I'm sure, that under the law, she was her own legal guardian; and that's true. We're going to show you, though, that she was not able to care for herself.

She never should have had the kind of access to a cigarette lighter that she did come in fact -- in fact, come in contact with and use to start this fire.

You're going to hear from the staff member who was working on duty that night, September the 4th, 2008. Her name is Amuche Udemezue. I may have mispronounced that.

THE COURT: Mr. Thweatt, please return to the podium.

MR. THWEATT: I'm sorry, Your Honor.

She will take the stand in this case. She will tell you, despite what you heard from Mr. Plummer in jury selection, that she was not properly trained on how to respond to a fire.

The pictures that we're going to show you in this case -- and we'll go through them right now, just a few of them, just to orient you -- this is a map of the house (indicating) taken from a Houston arson

investigation.

And you can see there how closely the residents there [sic]. Esperanza Arzola, that's where the fire started. Then you have Tanya James. That's Mr. Shelton Sparks' client, for all -- for all intents and purposes. She died in the fire.

Then we have Jenny. That's Jenny's room (indicating), the living room, and then there's another lady named Alicia Campbell.

Ms. Campbell and Ms. Esperanza Arzola were both able to walk. All four of them were mentally retarded. Tanya James and Jenny Wagner were the most severely disabled in that home.

Ms. Amuche Udemezue will tell you, she placed everybody in bed. Earlier that evening, Ms. Arzola became upset at Amuche, for reasons that you'll hear about. She kicked out a window. She tried to run away. She was basically misbehaving.

And when I say "misbehaving," I mean in the sense that she's not able to, in our estimation, appreciate what she was doing.

She then took a cigarette lighter, lit her mattress on fire. The house was equipped with smoke detectors.

You'll hear how Amuche basically

000770

responded. She never rendered assistance to Jenny or to Tanya. That's undisputed. She may have explanations for that. Maybe Ms. Uduma or Four J's, Incorporated, will have explanations for that.

But there's no question that Jenny Wagner laid in her bed while smoke and flame locked around her and she was completely helpless in that bed.

The only reason she survived was because the fire department got there in time to rescue her.

Ms. James survived for about 15 or 16 hours in critical condition at Memorial Hermann Hospital, and then she succumbed to her injuries.

My client, Jenny, was in the hospital at Memorial Hermann for almost 30 days in critical condition. You will hear that she had extraordinary care there.

She had skin graft surgeries. You'll here about it. It's -- it's something I wish I didn't have to describe.

She was then discharged back into her mother's care, and Patti took her home. Patti shuffled her back and forth between doctors to care for her burns and for her injuries.

000771

Patti will tell you that Jenny received so much in the way of medication, morphine, hydrocodone, that she was addicted to it by the time she was discharged. She went through withdrawals just like you hear about street addicts going through. She went through sweats.

Jenny no longer sleeps in her bed in her apartment because her mother will tell you it reminds her of what happened in that room that night. She sleeps, instead, now, in a recliner.

I think probably the most remarkable thing you're going to hear in this case is that despite what Four J's knew about Esperanza Arzola before this fire and despite what Ms. Uduma knew, as the property owner, about the people who were going to be living there and who she was charged with taking care of and ensuring their safety, that Four J's and Ms. Uduma are going to take this stand and they're going to swear under oath that they hold no responsibility for these injuries.

They're going to place all of the blame for this incident squarely upon Esperanza Arzola. She's already testified to that in her deposition when I questioned her. I don't expect her to change her testimony on the stand here in this trial.

000772

We think that the evidence will show you that that's outrageous and offensive.

We're going to ask at the conclusion of this trial to reconcile the egregious conduct with the injuries that resulted.

Jenny Wagner has about $91,000 in medical bills that she incurred as a result of the treatment from these burns. She has permanent disfigurement, permanent scarring. Her mother takes care of her now, 24/7.

We're going to ask that you award compensation for those kinds of injuries to her person, to the pain and the suffering that she experienced.

Even though Jenny has the mental capacity of a two-year-old, she's able, like any two-year-old, to understand and appreciate what pain is. Those of us with children know that, and we're going to ask you to consider that.

And we're going to ask you to confront in this trial profound questions about the meaning of life, about who is important in our society, about who should be hold -- held responsible for caring for those people, whose duty under the law and under common sense and justice it was to make sure that Jenny Wagner and Tanya James were safe and to prevent this from

000773

happening.

There's no question in this case that Esperanza Arzola was the one who lit the cigarette lighter. We're not here to talk about that, though. That's not what the law says I have to prove in order to recover against someone else.

What I have to show is that they could have seen -- foreseen it, that they failed to act reasonably, and we're going to do that.

I'm also going to ask you at the conclusion of this trial to award exemplary damages. In Texas that's what we call punitive damages.

Exemplary damages are designed, as the word may suggest, to make an example, to show our society and our community that this should never happen.

There's a whole bunch of factors that the judge will get into later about when you can award those and when you can't, but it's that kind of a serious case.

Chapter 31 verse 8 and 9 of Proverbs tells us we must speak for those who cannot speak for ourselves [sic]. We have to stand up for the rights of the poor and the destitute. I'm not a biblical scholar, but I do know that.

And I will give Jenny a voice in this

trial. I will give her mother a voice. And at the end of it, I'm going to ask that you go back into that deliberation room and you give her a voice, too.

We look forward to showing you this evidence.

THE COURT: Mr. Sparks?

MR. SPARKS: Thank you, Judge, Counsel.

INTERVENOR'S OPENING STATEMENT

MR. SPARKS: Good afternoon, ladies and gentlemen. How are y'all doing?

We have gone through the laborious process of voir dire, and now we have the fine distinction of being able to present our full case to the 12 of you.

We understand that at the beginning of the morning when we started communicating we couldn't give you a lot of the depth that you may have wanted in order to answer some of the questions that we asked you.

It was not that we didn't want to give it to you, it's just that we had to determine, out of the 48, which 12 would sit to hear the evidence. Now that that decision and that determination has been made, you will get the opportunity here, the depth and the breadth of the evidence from the Plaintiff, the Intervenor, and the Defendants.

000775

And based upon that evidence, you will render a verdict, and we hope and we pray that it is based upon all the evidence and the information that you find that we've presented and that you find also in the best interests of our clients.

Now, Mr. Thweatt talked about Jenny Wagner being over with Four J's on Beretta Court; and so was Tanya James. Tanya was there.

Tanya James had been a resident at Beretta Court since 2002. And she and Jenny were the anchors, if you would, of that facility. Periodically other people would come and go out of that four-woman home, but the two that remained there and stayed there and had been there the longest was Jenny and Tanya James.

Some would leave, some would come, for various reasons.

In 2005 Esperanza Arzola came to that facility. And when she got there, she became problematic.

And when I say "problematic," I mean, she started acting out. She started leaving the facility. She started engaging in disruptive behavior. She started acting violently toward the staff members. She started acting violently toward herself, and they

000776

had to try to figure out what to do with her.

One of the things that was of a concern is that you had these four women -- Jenny Wagner, Tanya James, and whoever the other two was, and one caretaker -- trying to keep up with all four of them.

And Esperanza was the higher-functioning of the two of them and so she could kind of do what she wanted to do and she had the physical capacity to impose her will on the caretakers. And they were afraid of her because she had physically assaulted some -- or more than a few of them. She had physically assaulted herself. She had threatened to kill herself, and she had threatened to kill other people.

Knowing all this, they kept her in the facility; but there's something else you need to know. Not only did they keep her there at the facility, this so-called 24/7 -- actually, during the day, they would all leave and go to a day-hab facility, which is also owned by Anthonia Uduma. She owned the home, the corporation, and the day care facility that they went to.

Now, at the day care facility, they would be there for five to seven hours a day. A van would come by, load them up, take them to the day care

facility. They'd be there for five to seven hours at the -- they'd get a meal, get some kind of training, they'd get some attention, and their needs would be met.

Then the van would pick them up, take them back to the home.

When they got back to the home, the one caretaker would provide their food, their medication, clothing, got them ready for bed, and it would start all over again.

At the day-hab facility that was owned by Ms. Uduma, all the other people from the other homes and facilities that she had would also congregate there. And when they would congregate there, those individuals who wanted to could smoke.

It wasn't unreasonable. It wasn't unusual. It was common practice that Esperanza was a smoker. They knew she smoked. They allowed her to smoke.

So they knew she had access to cigarettes and they knew she had access to fire, yet when we asked them about whether or not it was reasonable to do a cursory pat-down to see whether or not when she left the -- the day-hab facility and came back to the home she had anything that could be of harm to herself or other people, you're going to hear that

000778

Ms. Uduma says, "Oh, that's against her rights," her rights not to be patted down or to be determined whether she had any objects that would be destructive to herself or others.

Even though she had a history and a propensity to do this, they felt that her right not to have to endure that little challenge, if you would, superseded the rights of our clients.

Our clients were sitting there in a home with Esperanza Arzola, who's a ticking time bomb; and they didn't want to engage her to determine whether or not other contacts she had made with people in the day facility would have generated an item of danger, if you would, that when she came back to the Beretta Court property, would harm our clients.

And ultimately it did. Ultimately it did.

You're going to hear about the fire. But as important to the fire, you're going to hear about due to Esperanza Arzola's frequency to elope -- which is a term they used -- but she'd just leave when she wanted to, go out in the neighborhood, smoke, hang out with people. They had to run around, find her, bring her back.

What they decided to do was -- well, a

000779

couple of options they had was to bring in another facilitator to assist the one that was there to make sure she didn't leave, would be two people with four women as opposed to one. They made a management decision.

By that, I mean this: What they decided to do was to close off one of the exits in the home or lock it off, mind you, to the point where she couldn't leave when she wanted to.

So here you have this facility, this home, this care home that has a -- a -- a front door, a back door, and a garage. The back door -- you're going to learn that once they got certified, that it had a -- it was a designated exit, fire exit, if you would, that they had in the home in the case of an emergency to be able to safely get these women out without any injury or damage to them. Yet, what they decided to do was lock it and block it off.

And not only did they lock it and block it off, but they did it with a dead bolt lock that you needed a key in order to open.

Now, mind you, we've got women here who have mental retardation, who have special needs in terms of their ability to -- to be mobile -- she's wheelchair-bound -- and you've got Esperanza Arzola,

000780

who's a problem child, and then you have another individual that comes and goes.

And in this case, it was a lady named Alicia Campbell. And she also was somewhat high-functioning. And she was a physically challenging [sic] person, too, because she had a little bit higher function. And she kind of wanted to do what she wanted to do.

So the caretaker's got two high-strung women, and then she's got the other two she's got to care for around the clock.

And so they decided to put these two with Jenny Wagner and Tanya James. And so in order to keep the high-functioning ones within the -- the parameter of the home, rather than bringing somebody else in to help, the care staff, they put a dead bolt lock on the door.

Now, they're going to tell you that, oh, yeah, well, the staff there, we came in and we did fire drills and -- and you're going to hear from her and you'll look at some of the documents and how fast and how swift they were able to get four people -- Jenny Wagner, Tanya James, Alicia Campbell, and all them -- out of the house in mega seconds sometimes. And -- and they all went out the front door.

000781

But they never went out -- or challenged trying to do the fire drill out the back door because the back door was always locked, always locked.

And as fate would have it, September 4th, 2008, Esperanza Arzola sets the house on fire. The lone staff there panics. The training she had been designed to do or had been trained to do or had been told to do -- just signs the documents and say you've done it -- she don't know what to do.

She doesn't go get the fire extinguisher. She thought about going out -- taking them out the back door, but the back door's locked.

And guess what? She didn't even have the key. She did not have the key to the back door; so she panics.

And what does she do?

She did a thing called self-preservation. She left. She left.

She left Jenny in the house. She left Tanya in the house, and Tanya didn't make it.

What you're going to hear from us is that Tanya, when -- 1997, Tanya was taken into the Harris County Guardianship Program and she was removed from her family. Her mother had some medical issues. She got separated from her sister.

000782

But before she left, when she was 14 years old, she had a son named Derrick James. And Derrick has some special needs. And her sister, Wylette Taylor, is his guardian.

And Wylette tried for years to find out where her sister was. They wouldn't give her the information because she needed a lawyer to find out. That was privileged information. It was HIPAA-protected, where is her sister.

On a -- on a fluke, Derrick had his healthcare provider changed from one company to another. They went to see a doctor.

And he said, "I had a client named Tanya James. And it's ironic that your son -- nephew is Derrick James."

And Wylette Taylor says, "I've got a sister named Tanya James. Where is she?"

And he says, "Well, she used to be with Four J's on Beretta Court; but it caught on fire and she died."

And from there, Wylette Taylor started a search, trying to find out what happened to her sister. And you're going to hear from her in terms of what she found as she went over on Beretta Court.

Two years later, the house is still

000783

standing, still standing, clothing in it, the door's not secured, the windows open, just open to the world. People can come in and out, and they have been. And she went up in there and found information about her sister.

And what we submit to you is that this corporation, Four J's, was derelict in its duties to Tanya James, Jenny Wagner, in addition to the property owner, Ms. Anthonia Uduma -- she owned that house.

And the law says that a property owner has the duty to inspect and discover any known or unknown dangerous conditions on the property and to fix them or warn of their presence.

That locked door was a dangerous condition, and Ms. Uduma knew or should have known it existed. She had the authority and the ability to go in and do an inspection.

She owned it. She leased it to her company. She -- she -- she had all her people there. They knew it. She had contractors come by, do work on the property.

They informed her of it; and she's going to tell you, "I didn't know. I did not know that existed. I'm not responsible because I didn't know. Sure, some of my people might have known; but I didn't. And since I didn't know, I ain't responsible."

000784

But we submit to you there's a concept called respondeat superior that says an individual's -- who works for a company that does wrong that is negligent, the company is negligent, and we're going to prove that to you.

And we ask that you -- we ask that you consider the 23 hours that Tanya James suffered. They found her in a bathtub gasping. She had soot, she had carbon monoxide all in her lungs. She didn't make it, and -- but she suffered until she died.

And of that, the law says an individual has a right to a survivorship claim. They can bring a cause of action -- although dead, they can bring a cause of action that they endured prior to their death; and that cause of action survives them and can be brought before a court of law by an heir. That heir is Derrick James.

And Derrick is not in a position to be here today because of his own special needs, but he's represented by his aunt and the sister of Tanya James. And that's Wylette Taylor.

Thank you.

MR. PLUMMER: May it please the Court.

THE COURT: Mr. Plummer?

000785

DEFENDANTS' OPENING STATEMENT

MR. PLUMMER: Counsel, ladies and gentlemen, I started off my voir dire examination to explain to you-all that this was -- this lawsuit arises out of a very tragic set of events that occurred back in September of 2008.

And I maintain that there's no other way to describe what happened to Jenny Wagner or what happened to Tanya James as other than tragic, and there's no way to discuss that without being emotional about it and without having feelings for what they went through.

Ms. Uduma, her staff, the entirety of her staff, were -- were overwhelmed by what had happened and stepped up to comfort the family as much as they could -- the Wagner family as much as they could after this tragic event.

But the mere tragedy and the emotion of that is not what this lawsuit is all about, and I believe the evidence is going to clarify, rather than the emotion and the argument that Counsel has made -- show the other side of what happened out there that particular day and that particular night.

Four J's Community Centers is an agency that provides residential care for

developmentally-disabled individuals. Most are mentally retarded. Many have other kinds of disabilities.

It's regulated by the Texas Department of Mental Health, Mental Retardation. It's regulated by the Department of Aging and Disabilities. It is regulated by several other groups and agencies that are concerned about the well-being of the disabled in our society.

Years ago -- it's based upon a philosophy that, to the extent we can, we want to bring the disabled back into the community rather than warehouse them in institutions, as they did in the olden days -- bring them back into a residential setting as much as possible and give them as much of a normal life as possible and enhance their skills to the limits of their abilities.

And Four J's is a company that does that for its clients and its consumers.

Because it's regulated by these various agencies, it has a litany of requirements and rules that it has to comply with. And you will see from the evidence the way they attempt to comply with many of these rules.

There are, first of all, case managers assigned to each individual consumer of Four J's. There

000787

are supervisors who monitor what happens and what transpires at the various homes that Four J's operates.

There are individual safety plans for each individual consumer and client at their facilities. There are individual plans, development plans, for each client; and they have a detailed list of the physical and emotional needs of each of the patients and each -- each of the clients.

Now, Four J's, as part of its compliance with the regulatory compliance and as a prudent business, has its own procedures that it follows to train its staff to properly care for its folks.

Those include in-service -- in-service training sessions with staff, personnel. Those include conferences on a regular basis about the well-being of a particular staff person's clients at the particular homes; and they're all documented. They're all documented.

It also includes complying with the regulatory requirements of local agencies or State agencies about the configuration of the home, whether the home is suitable for the clients who come to the homes and who have a variety of different kinds of disabilities.

The questions that you're going to be

000788

asked to address at the end of this trial should be based upon the evidence that you hear rather than what I say as a lawyer or what Mr. Sparks says as a lawyer, as -- or what Mr. Thweatt says as a lawyer.

They're going to have to be answered based upon the evidence and the testimony that's credible that you hear.

Let me tell you what I understand from the facts occurred on the 4th of September, 2008.

When -- after coming home from attending the activity center at Four J's -- oh, by the way, let me also digress a second.

I think the other aspect of this trial that you-all need to be aware of is that the emphasis on what someone owns or what's -- how many homes that they operate under this is a red herring and is a ruse. And I think the evidence is going to show that, but don't be carried away by that. Look at what the evidence shows about how this particular home was run.

The evidence is going to show that the house had at least three, if not four, exits for ingress and egress in the event of an emergency.

It's also going to show that the staff was trained that in the event of a fire, you -- there's a priority you apply to how you address and get the

000789

clients out of the home or how you address and get the consumers out of the home, one of which was attend to the most vulnerable first.

It's also going to show -- and ironically, a few months before that, that there was a training session where Amuche, who was the caregiver that evening, that night, was counseled with and trained on and talked about what would you do in the event there was a fire and Jenny was in the house. Okay? What would you do?

And she was taught that if it -- you know, obviously in an emergency situation, you don't have time to lift her up or put her in her wheelchair or put her in her overhead lift. You get her down on the floor, you put her on a blanket, and you drag her out; or if -- if -- if that wasn't a possibility, you get her down and you go out the window. Ignore a minor injury. Your goal is to protect Jenny. That was the training she was given, Amuche was given; and that was the training other employees were given in circumstances where you had someone with the level of disability of somebody like Jenny.

For somebody like Tanya James, who was -- who could walk but needed guidance, you then take them, lead them by the hand; and for the others who were

000790

ambulatory and higher-functioning consumers, you would shout "fire, fire," and they would head out.

Now, that was the training; and it was just -- not just one time in June of 2008, but it was periodic. It was also contained in the individual safety plan for Jenny, for Tanya, and for the other residents, something that was gone over on a regular basis.

Now, the real challenge -- the real challenge that you-all as jurors are going to have is going to be understanding that you can train somebody regularly. In fact, you can probably train somebody every day; but you can't guarantee that they're going to be able to -- to comply with that training if they panic or collapse or faint or something of that sort. And that's what happened that night.

Esperanza Arzola lit the bedroom on fire by a lighter that no one was aware of that she had. And there was no reason to be aware or be alerted to her having any kind of issues with fire.

She was a troubled kid. Many of the kids in this environment have disabilities and -- and problems -- perhaps none of the same nature of Esperanza, but they have problems.

But none of her history, a history that

follows an individual from -- from facility to facility, had anything in there that indicated a problem with fire; but she started this fire.

And -- and after having gotten Arzola out of the house, rather than follow the procedure she had been taught, Amuche went and got Campbell out from the farthest part of the house where there was no fire at all.

I can't explain to you why she did that. I can tell you that Ms. Uduma and Four J's trained her another way to do that, that that wasn't the way she was trained to do it.

So when you -- when you assess responsibility, when you compare the responsibility of the parties, you need to understand that there's a distinction between how much a business or a corporation can bring to bear on its employees in terms of training and the expectation that they'll follow through on that in an emergency situation.

The evidence is also going to show that -- and you'll be confronted with evidence that addresses issues of credibility -- that is, believability.

You will hear different versions of some of the things that occurred that evening. For

000792

example, you will hear testimony by Amuche about what she did and what she didn't do or what training she had and what training she didn't have. And you're going to be called upon to assess that credibility.

And I think the evidence is going to show that by the totality of the circumstances, the -- and those circumstances include events that are -- that you see and hear in the courtroom but also events that you are told about from the witness stand about what's happened.

You can assess whether or not someone is being credible and honest with you because that's what you've got to decide the facts are in this case, based upon credible testimony and credible evidence.

You've heard some -- some statements by -- by Mr. Sparks and Mr. Thweatt about the circumstances of the house.

I believe he said something about the back door having a double-sided dead bolt -- it did -- that was blocked. It wasn't.

But you -- again, what I say and what he says and what the other lawyers say is not evidence. You-all have to decide. You-all will have to listen to it and make that decision from there.

At the end of the testimony and the end

of the evidence, you're going to be asked to assess responsibility, and you're going to be asked to compare the conduct of various parties in this.

You're going to be asked to make judgments about what conduct, if any, was negligent and whose conduct was that that was negligent.

The Court will instruct you on that, the Court will give you written questions on that, and you'll have to make those decisions. But it will be based upon what you hear from this witness stand and the documents that come into evidence.

The tragedy of what happened in September of '08 meant that, you know, Tanya James lost her life and Jenny Wagner suffered so -- severe burns. But that mere tragedy should not cause you to lose sight of your obligation to the Court and the -- and the -- consistent with the oath you take to decide the issues based upon the instructions the Court gives you and decide this issue in this case fairly to all parties.

With that, I am going to stop so that we can get to the evidence and start telling you through evidence what, in fact, happened.

Thank you, ladies and gentlemen.

THE COURT: Mr. Thweatt, call your first witness.

000794

MR. THWEATT: Your Honor, we call my client, Patti Wagner.

(Patti Wagner sworn by the Court.)

THE COURT: Have a seat, please.

MR. SPARKS: Judge, we'd like to invoke the Rule, if possible.

THE COURT: All right. The Rule has been invoked. The lawyers and witnesses are instructed that they are not to discuss the testimony of any witnesses to any other witnesses until such witnesses have been called. The Rule exception applies to parties, spouses of parties, and to any witnesses whose presence in the courtroom are necessary for their own testimony.

Basically that means, witnesses, don't talk to each other about your testimony until you've been excused as a witness.

You may proceed.

All right. Excuse me. If you are a witness, you need to leave the courtroom.

MR. PLUMMER: Excuse me, Your Honor. That's Mr. Uduma. I believe spouses of the parties are permitted to stay in.

THE COURT: All right. You may proceed, Mr. Thweatt.

PATTI WAGNER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. THWEATT:

Q.   State your full name, please, Patti.

A.   Patti Joan Fillebeck Wagner.

Q.   You're Jenny Ann Wagner's mother?

A.   Yes, sir.

Q.   Where do you and Jenny live?

A.   We live at 22400 Westheimer Parkway, Apartment 911.

Q.   You said that was an apartment?

A.   Yes, sir.

Q.   How big is that apartment there?

A.   We have a two bedroom apartment now.

Q.   Is it on the ground floor?

A.   Yes.

Q.   Why is that?

A.   It's handicap accessible.

Q.   And Jenny has been in a wheelchair for all of her life; is that right?

A.   She got her first wheelchair when she was three.

Q.   Let me show you a picture.

Is that (indicating) your daughter?

000796

A. Yes, sir.

Q. How old was she in that photo?

A. That picture, she's about five.

MR. THWEATT: And that's Plaintiff's Exhibit 1 for the record.

Q. (BY MR. THWEATT) Has anyone lived together with you and Jenny in your apartment in Katy?

A. No, sir.

Q. Does anyone live nearby you?

A. My sister is in the same complex.

Q. What's her name?

A. Joan Davis.

Q. Are you married?

A. I'm a widow.

Q. What was your husband's name?

A. Robert Michael Wagner.

Q. How long were you and Bob, as you've described him to me, married?

A. We were married for -- we celebrated our 37th wedding anniversary just before he died.

Q. When did he pass away?

A. December 27th, 2007.

Q. Did you and your husband, Bob, have any other children besides Jenny?

A. We adopted our son in 1986. He's 25.

000797

Q. And what's his name?

A. Dustin James Wagner.

Q. Can you tell the jury where he lives?

A. Dustin actually lives with one of his college buddies in Katy.

Q. Your parents brought Jenny to the courthouse today; is that correct?

A. Yes, sir.

Q. And where do they live?

A. They live in Omaha, Nebraska.

Q. What are their names, please?

A. Frank Fillebeck, F-I-L-L-E-B-E-C-K, and Mary Joan Fillebeck.

Q. Have they had to come and travel down to your apartment in Katy to help you with Jenny since the fire in September of 2008?

A. Several times.

Q. Do you work, Ms. Wagner?

A. Not anymore.

Q. What did you used to do?

A. I was a secretary and an administrative assistant.

Q. Where did you work?

A. For a long time I was at Memorial Lutheran School and Church as the administrative assistant. And

then after Bob died, I went back to work there as the church secretary.

Q. How many years did you work there?

A. I started there in probably '9 -- '94.

Q. Why don't you work there now?

A. I need to take care of Jenny. It's a full-time job.

Q. Would you tell the jury, please, Ms. Wagner, what mental and physical disabilities your daughter has.

A. Jenny has been diagnosed with spastic cerebral palsy, all four extremities, which means arms and legs are involved; and she's unable to use them except for her hand, with minor use left in it.

She has severe to profound mental retardation and optic nerve damage, which means her vision -- she's legally blind because the optic nerves were damaged at birth, which means that she can only see spots, I guess is the best way I can describe it.

Q. Is she able to speak?

A. She can, yes, sir.

Q. Can she have conversations in a way that normal people without disabilities can --

A. No, sir.

Q. -- have --

A. I'm sorry. No, sir.

000799

Q. Can you give the jury an example of the kinds of things she can say?

A. Jenny expresses her needs in one or two words. Basically, you ask her choices; and she can make the choice: "Are you hungry?" "Yes." "Do you want to -- a hamburger, or do you want a cheeseburger?" And she'll say, "cheeseburger."

If she means "yes," in some circumstances she'll repeat the question. If she means "no," she does say "no."

Basically, she has more understanding than expressive language, I guess is the best way to say it.

Q. Did Jenny attend school as she was growing up?

A. Yes, sir.

Q. And can you tell the jury about that?

A. After Jenny was diagnosed with the cerebral palsy and the mental retardation, we found a center -- she was in a pilot program in Omaha, Nebraska, for infant stimulation. She was 18 months old.

From there, she went to an integrated preschool for a year on -- at a pilot program in Bellevue, Nebraska. And then she attended the J. P. Lord School for the handicapped for preschool at the same time.

When she turned six -- pardon me. When she

000800

turned six, she attended a school for the physically and mentally handicapped children in Bellevue, Nebraska.

Later on, we moved down here to Houston -- or to Dallas, and she was in school in Lewisville and in Dallas. All of the classes were for the handicapped children.

She -- her final education down here, of course, was at Katy High School. They had the special education classes there.

Q. Let me show you another picture. This is Plaintiff's Exhibit Number 3.

How old is Jenny in that picture there?

A. That one, she's probably about ten.

Q. Was Jenny close to your husband and her father?

A. Yes, sir.

Q. Let me show you this photo here, Plaintiff's Exhibit Number 5.

How old is Jenny in that photo; do you remember?

A. I think she's 17 or 18 in that one.

Q. What kind of challenges, Ms. Wagner, did you face raising Jenny as a child?

A. Well, of course, physically, with the handicap... Jenny is severely multiply-handicapped, of course; and so there's basically absolutely nothing she

000801

can do for herself except to feed herself finger foods.

And so, consequently, any movement that you -- if -- to move from room to room or place to place, someone else always has to do that.

Educationally, you know, we missed all of the milestones -- no long division at eight, no driving a car, those kinds of things that are natural milestones.

And socially, especially as she got older and we moved away from Nebraska, where my family lived, it limited how much time outside the home that Bob and I could spend together because even with our -- our son there, especially after we adopted him, one would have to be with Jenny at all times and then the other would be able to go and do things with our son -- Little League, T ball, those kinds of things.

And so those last years, I think, Bob and I had one vacation. It was an overnight stay.

Q. Did Jenny ultimately graduate from high school at Katy?

A. They say "graduate," but basically you're aged out.

The State of Texas allows a child to go to a public school until the year they turn 22. Jenny was 22 on January 8th, 1995. Pardon me. And so her last

000802

official school day would have been sometime that May of 1995.

Q. And as I've described to the jury, Jenny then went to live at a facility called The Willows; is that correct?

A. She went to live at The Willows in August of '95.

Q. And can you describe for the jury the decision process that you and your husband went through in order to place her in that facility and whether -- all the things you considered to do that.

A. Yeah.

When Jenny was first diagnosed, we were told to take her home and decide what we were going to do with her.

That's when we looked around, and we found programs that we could get for her to -- to help her and -- and get developmental -- her developmental needs expanded.

About the time she turned 16, then the question is have you thought what are you going to do with her if you're no longer there to take care of her. And so basically you start looking around and trying to find out what the next step is.

If you're fortunate, you have family that

000803

are able, besides being willing, to step in and -- and become the second set of parents; and sometimes you don't.

So Bob and I made the decision that Jenny's handicaps were so profound that she -- we had to look for some place for long-term care.

Q. And how long did Jenny remain at The Willows facility when she moved in in 1995?

A. Jenny was at The Willows from 1995 until we moved her to the Four J's house in 2002.

Q. And how did you come to select Four J's in 2002 for Jenny?

A. When Jenny was in high school, we put Jenny on waiting lists to -- for services. And one of the waiting lists that you can put them on is HCS, which is Home and Community Services.

In 2002 we received a call from Texana, which is the Fort Bend County oversight, people who look over and place -- help place people in Jenny's situation. I guess that's the best way I can explain it.

Anyway, they called us and said, "We have a group home available. We have a company that has a group home available, and are you interested in -- in moving Jenny?"

One of the things we knew not to do was ever take her off the waiting list because Jenny was living in San Antonio and we wanted her closer to home. By then, my husband was traveling. He was a contract computer expert. And it was fly in on Friday night, drive to San Antonio on Saturday, and fly out on Sunday.

So we jumped at the chance that we could move Jenny closer to home.

Q. And ultimately Jenny came to live at 16335 Beretta Court in Missouri City, correct?

A. That's correct.

Q. All right. How many other residents with mental disabilities were in the home, that you remember, when you first moved Jenny into the Beretta Court house?

A. Two.

Q. Did that number change at any time?

A. Evidently. I don't know when.

Q. Okay. Did you and your husband visit Jenny while she was at the Beretta Court house?

A. Yes, sir.

Q. And can you describe some of those visits for the jury, with detail?

A. Usually they were day visits, or on holidays we would pick her up and bring her back to the house. My husband was still traveling, and so we would pick her up

000805

on Saturdays and generally go out to the mall.

At the time Jenny had a wheelchair that didn't collapse; and so consequently, there was no way to use her chair that she was using at The Willows -- I mean, pardon me -- at Four J's in our car. So we bought a travel chair.

And unfortunately, the travel chair is not very uncomfortable [sic] for an extended period of time. So our visits usually, when we went to the mall, would last between two and four hours, depending on how Jenny was -- was -- how comfortable she was; and then we would take her back to the house.

Q. Ms. Wagner, during the holidays, did you and your husband ever have occasion to bring Christmas presents to Jenny there at the house or to other residents?

A. Yes, sir.

Q. Do you remember ever meeting Tanya James at the house?

A. We met her the first -- the first day.

Q. Did you ever meet Ms. Esperanza Arzola?

A. I don't know. I don't recognize the name.

Q. I want to talk about the fire that happened on September the 4th, 2008, Ms. Wagner.

A. Yes, sir.

000806

Q. How did you first become aware that your daughter had been burned in that fire?

A. On the morning of 2000 -- or on the morning of September 5th, I had gone to work. It was about 7:30 in the morning. I had gone in to the workroom to make coffee. I was the secretary at Memorial Lutheran Church.

I came back to my desk, and there was a message on my cell phone. It was from Ngozi Obichuku, who was Jenny's case manager. The message basically said, "Ms. Wagner, I just want you to know Jenny's alive. She's at Hermann -- or Memorial Hermann Hospital in the burn unit."

Once I heard that, I called my sister and told her what -- what was said.

And she -- she says, "Okay. Get the pastor."

And so... I'm sorry.

Q. Did you go to the hospital then with your sister and the pastor?

A. My sister and the pastor decided that the pastor would drive me to the hospital and Joanie would meet me there. Joanie was in Katy at the time, and we were working down by the Galleria -- I was working down by the Galleria. So Pastor St-Onge, from the church, drove

000807

me to the hospital.

Q. Would you tell the jury what you saw when you first came into Jenny's room at Memorial Hermann Hospital on September 5th, 2008?

A. Jenny was already in the burn ICU upstairs. She was laying on the hospital bed. It was propped up. She had bandages that went around her head and covered the whole side of her -- her face and her neck. Her arms and hands were -- were completely bandaged on both arms and hands, and she had bandages around her chest.

She had an I.V. in her groin, and she had a respirator that -- that she was breathing from. There was a tube coming out of her that was connected to some kind of vacuum pump, and it was pumping the lining of her lungs out. There was blood and black soot that was pumping this out.

She was connected to a heart monitor, and it was monitoring her oxygen level on her finger. She was -- there was something else, the heart monitor, and -- and a blood pressure cuff on her -- on her ankle.

Q. How long did Jenny remain in the hospital, Memorial Hermann?

A. Jenny was released from the hospital on October 2nd.

Q. Did you ever have a thought while you were there

000808

at the hospital whether your daughter was going to survive, Ms. Wagner?

A. The first week, that's the first question I would ask. And then after the first week, it was, "When can I bring her home?"

Q. What kind of medication do you recall Jenny receiving for treatment of her burn injuries at Memorial Hermann?

A. Jenny was on a morphine drip.

Q. Was she on a constant morphine drip?

A. Yes, sir.

Q. Was Jenny able to speak with you while she was in the hospital to tell you how she was feeling and specifically whether she was in pain?

A. Not for the first two weeks. She had the respirator; and they were keeping her, I think, unconscious.

Q. Can you tell the jury what you saw at Memorial Hermann Hospital with regard to the care and treatment of Jenny's burn injuries?

A. They allow the family to come in periodically throughout the day. In the evening, they -- they tell the family, "You might as well go home" because that's when they do the debridement. That's when they scrape the dead skin off from the burns; and they don't want

family around, I guess. You can wait in the waiting room, but... until the next visiting time.

What -- what they have to do -- twice a day they would close down the center when they would -- they would remove bandages and -- and clean the wounds and then replace bandages.

Q. Did you ever hear Jenny scream when that happened?

A. Not Jenny. We were never in there when they replaced her bandages.

Q. During your daughter's nearly month-long hospitalization, were you able to see with your own eyes the way Jenny was responding to the treatment, whether or not she was in pain?

A. They explained about watching the -- the heart monitor and -- and the respirating monitor, and you could see the different levels. That's -- that's how they would monitor and gauge pain for people who are unconscious.

Later on, once they took out the respiratory tube and the feeding tube and they started giving her her food by mouth, we could hear Jenny grinding her teeth. And that always was an indication that she was very uncomfortable and in pain in some way.

Q. When Jenny was finally discharged on October the

000810

2nd, 2008, where did you take her?

A. I took her back home to my apartment. I was living in a one-bedroom apartment at the same complex at that time.

Q. So you had to move and get a bigger place; is that right?

A. After a year. I had to wait for a two-bedroom handicap apartment to open up if I wanted to stay in the complex.

Q. Can you describe for the jury, Ms. Wagner, the kind of care that you provided to your daughter once you got her home to your apartment in Katy?

A. Basically, we had to learn how to do the bandage changes. We had to administer her -- her medication, make sure everything was cleaned and sterile; and then, of course, had to change her diapers and give her sponge baths.

Q. Did your daughter have skin graft surgeries while she was at Memorial Hermann?

A. Yes, sir.

Q. Do you know how many?

A. All I can tell you is that there was, I think, seven stripes on her thighs where they removed the skin to make the skin grafts. I'm not sure exactly how often or how much they could use at a time.

000811

Q. Do you know with -- after they removed the strips of skin from her thighs, do you know where those strips were placed on her body?

A. Yes, sir.

Q. Can you tell us, please?

A. Yes. Jenny had skin grafts on her left breast, on her upper arm here (indicating).

Q. And that's her right arm?

A. Her right arm, yes, sir. Her right arm here (indicating) and here (indicating), on her knuckles and wrists over here (indicating). On her left arm they cut the burn out over here (indicating), and -- and they were able to staple that closed. But then down here (indicating), she had skin grafts. And on here (indicating), they -- they had skin grafts on her knuckles here (indicating) they were worried about wouldn't take because the bones had -- were showing. Of course, there's not a lot of muscle or fat there. So we had to be very careful about those skin grafts.

Across her stomach, they were able to staple some of the burned -- after they excised it, they were able to staple some of that; but there was a section over here (indicating) that was skin graft.

And then on her -- I'm sorry; I got confused. It's her -- her right breast that has the

000812

skin graft; and the left breast, there's a -- an incision about that long (indicating) where they cut the burn out.

Q. Ms. Wagner, I want to show you and the jury some photos from Plaintiff's Exhibit Number 29 that were taken at a facility called EdiCare Professional -- EdiCare Professional Healthcare Services?

A. They --

Q. I'm sorry?

A. Those were taken at my house.

Q. No, no. These photos here (indicating) were taken by someone --

A. From EdiCare.

Q. -- from EdiCare.

A. Yes.

Q. They may have been taken at your house.

A. Yes, sir.

Q. Okay. And I just want you to tell the jury a little bit about the kind of wound care that EdiCare was providing to Jenny as of October the 4th, 2008.

Do you remember what EdiCare was doing for your daughter?

A. Yes, sir.

EdiCare supplied a visiting nurse that came in once a day to do the morning skin grafts and to

000813

monitor her vital signs and conditions so that, you know, in case something had gone wrong in the next -- you know, the prior 24 hours, we would know.

And in -- in doing that, the morning -- the morning shift change was usually done -- or the morning dressing change was usually done by the nurse from EdiCare, and my sister Joan and then my mother and I did the after -- the evening.

Q. Okay. We just saw Jenny's legs as of October the 4th, 2008.

I want to show you another photo from Plaintiff's Exhibit 29 taken by EdiCare. Is this (indicating) your daughter's stomach?

A. Yes, sir.

Q. And does this photo indicate that there are staples or stitches in your daughter's stomach?

A. There's staples.

Q. How long were those staples removed, or were they in until they were removed?

A. The staples -- the following week. We had to take Jenny to the burn doctor's office, Dr. Wainwright's office. And I believe... maybe it was two weeks -- a week or two later that they finally removed all the staples.

Q. Later in that same --

A. Later in the -- in October.
Q. Okay. Later in that same exhibit underneath that picture is a picture -- is that a picture of your daughter's chest as it was reflected on October the 4th, 2008?
A. Yes, sir.
Q. And are those also staples that we see there, that you saw?
A. Yes, sir.
Q. Okay. Show you another picture from Plaintiff's Exhibit 29 taken on October the 4th, 2008.
That appears to be your daughter's arms; is that correct?
A. Yeah. I think that must be -- where's the thumb? Yeah. I think -- is that the right arm? I'm looking for the thumb, the top one. The bottom one is her other arm and hand. That must be left.
Q. And you and your sister would change Jenny's bandages?
A. And my mother, yes.
Q. How long did your mother travel down from Nebraska? How long did she stay to help you?
A. They stayed through the beginning of February.
Q. 2009?
A. Yes.

000815

Q. Let me show you a picture that was also taken by EdiCare appearing in Plaintiff's Exhibit 29, taken in November, 2008, bottom one there.

Is that your daughter's neck and side of her face and her ear?

A. Yes, sir.

Q. I want to ask you, Ms. Wagner: When you first saw how your daughter's neck and the side of her face and her hand was burned, what perception did you have with relation to how she was positioned in the fire?

A. When they first took the bandages off her face, which was before other bandages -- this was still at the hospital -- my mom and I had come in. Usually two of us went in together to visit Jenny.

And my mom and I had come in. And we were -- we were looking at her face, and -- and we could -- it looked like you could see her hand print over her -- her face. This side of her face (indicating) was what was burned, and this side (indicating) was not.

Q. That's the right side?

A. Yes, sir.

Q. That's the right side of her face?

A. Yes, sir.

Q. And her left hand is the one you're describing?

000816

A. Yes, sir.

MR. THWEATT: Your Honor, with the Court's permission, I'd like to have Jenny Wagner come into the courtroom now.

May I retrieve her?

THE COURT: Yes.

(Jenny Wagner comes into the courtroom.)

MR. THWEATT: All right. Thank you, sir.

Q. (BY MR. THWEATT) Patti, is this your father?

A. Yes, sir.

MR. THWEATT: Okay. Your Honor, I'd like to ask Ms. Wagner to step down and...

THE COURT: Okay.

MR. THWEATT: Thank you.

Q. (BY MR. THWEATT) All right, Patti. As quickly as you can, I'd like you to show the jury the current state of Jenny's scarring from this fire. Okay?

A. All right.

PATTI WAGNER: Jenny, hold your head up one second.

A. Face scars are hard to -- to get soft and to eliminate easily, and they sometimes have keloids; and it's -- it's tissue, basically.

000817

She has --

PATTI WAGNER: I'm sorry, Sweetheart.

A. -- tissue down here and right here (indicating). This ear (indicating) had been burned, and -- and we have to be very careful about pressure on that ear a lot. And -- and then her eyelid here, over here (indicating), was burned.

Q. (BY MR. THWEATT) What kind of care do you provide daily to make sure that pressure and agitation does not occur?

A. She's massaged and -- and lubricated every time we change her diapers. Okay. This is her right arm --

PATTI WAGNER: Sweetheart, I need your arm. Thank you, Darling.

A. This is where the grafting was taken here and here and on her wrist and her knuckles here (indicating). And then I need to --

PATTI WAGNER: Let me have your arm. Let me have your arm. I know. Let Mommy see. No? Just one minute. Just one minute. Thank you. Thank you.

A. The knuckles here (indicating) were where they had grafted. She's not going to let me...

Q. (BY MR. THWEATT) That's on her left one?

A. Yeah.

000818

PATTI WAGNER: That's okay. That's all right.

MR. THWEATT: All right. Mr. Wagner, do you want to take her out?

(Jenny Wagner leaves the courtroom.)

Q. (BY MR. THWEATT) Are you ready to continue?

A. Yes, sir.

Q. I'm going to ask you about an excerpt from your daughter's medical record that's been previously admitted as Plaintiff's Exhibit Number 29.

You mentioned a Dr. Wainwright at Memorial Hermann Hospital; is that right?

A. Yes, sir.

Q. And as I understand it, he was Jenny's primary burn physician; is that correct?

A. That's correct.

Q. Okay. Talk to you about a note from Memorial Hermann's home burn care plan.

It says "Medications" there. Can you read that, Ms. Wagner?

A. Yes. It's Vicodin.

Q. Okay. (Reading) One to two tabs as needed for pain.

Was Jenny -- when she got home to your care, was she taking Vicodin to address pain?

000819

A. Yes, sir.

Q. And how often did you give that to her?

A. Every four hours.

Q. And how long did that continue?

A. Every four hours for probably the first two weeks, at least, and then maybe every six hours thereafter.

Q. When did you administer -- you said every four hours, but is there a timing in particular during the day when you change bandages and that kind of thing when it's particularly important?

A. The morning bandage change was always done for -- by my sister, of course, and the nurse from EdiCare.

Heidi would call, and we would administer the -- when she was a half an hour from our home, and we would administer the Vicodin then to make sure that she was well medicated before they did the change.

Q. Now, at some point Jenny had to stop taking morphine and Vicodin to address her pain; is that right?

A. That is correct.

Q. Okay. And how did she respond to that physically?

A. She had severe hot flashes. She -- her body would become drenched, and she wouldn't sleep. She

000820

would be restless. And Jenny doesn't cry; she grinds her teeth.

Q. Did you see her grinding her teeth?

A. Often.

Q. Where does Jenny sleep now?

A. Jenny sleeps in her comfy chair. It's a recliner, and she calls it her comfy chair.

Q. And why does she sleep there instead of the bed?

A. I think she equates the bed with pain.

Q. If you put her in her bed, will she go to sleep?

A. No.

Q. Let me show you Plaintiff's Exhibit 23, Ms. Wagner. Where is that?

A. That's --

Q. Is that the chair that Jenny sleeps in?

A. Yes. That's her comfy chair, uh-huh.

Q. Okay.

Show you Plaintiff's Exhibit 24. Can you describe what we see in Plaintiff's Exhibit 24, please?

A. There's a -- a quilted pad that you see just on top of the sheet. Underneath that quilted pad, we have a -- a pillow to help her bottom, to keep from getting bed sores.

On top of the quilted pad is a waterproof throwaway pad to protect from urine on -- on the chair.

000821

On the top -- on the back of the chair is the -- I think that is the pink blanket.

We have several blankets that we put next to this side (indicating) of her head to cushion the ear and to help keep her head more in alignment when she sleeps.

Q. Let me show you Plaintiff's Exhibit 25.

Can you tell us what this is here?

A. Yeah. That's my -- that's my cart. On it at the top... the bag contains wipes that we use when we wipe her bottom. Cetaphil is the cream that I use on her burns to massage them and to keep them supple so that they don't dry out and split open.

Behind that is Vaseline that we put on her bottom, a spray bottle of bleach, and some baby powder. Underneath that, more wipes and Kleenexes and the green pads I was telling you about before.

In the drawers are heavier pads that I put in her pants when she's going to be home -- a long time from home, an hour or two; and then at the bottom are, I guess you would call them, adult pull-ups, instead of diapers now. We use those.

Q. Ms. Wagner, how long was it until Jenny was finally released from medical care for the treatment of her burn injuries?

000822

A. We saw Dr. Wainwright for the last time toward the end of February. I think it was around the 23rd of --

Q. Of 2009?

A. -- of 2009.

Q. How -- how do you transport Jenny? If you have to get her to an appointment or something like that, how do you do that?

A. I have a collapsable wheelchair, but -- that I can take apart and put in -- fold up and put in the trunk. Then I lift her into my car.

Q. You physically lift her into your car?

A. Yes.

Q. What kind of car do you drive?

A. I have a Ford Focus.

Q. He how old are you now, Ms. Wagner?

A. I'm 59.

Q. Do you worry, because of your age, whether you'll have the physical ability to lift Jenny for the foreseeable future?

A. Yes. I thank God every morning when I get up that I still have a strong back.

Q. Ms. Wagner, you understand that as a result of Jenny's care for the treatment of her burns, Memorial Hermann and UT physicians, where Dr. Wainwright works,

000823

and various other medical providers incurred -- or sent charges for Jenny's medical care?

Do you understand that?

A. Yes.

Q. And I want to show you Plaintiff's Exhibit 58, which is just a summary.

Now, can you see there the total, $91,553.98?

A. Yes, sir.

Q. Is that your understanding of what has been incurred for Jenny's medical care as a result of these injuries?

A. For the burns, yes, sir.

Q. And there's a -- part of that -- most of it is fee for services because there's prescriptions, as well, and about $1,081.12. Is that for the Vicodin and materials you had to purchase afterwards to treat her pain?

A. I believe so.

Q. Where did you fill Jenny's prescriptions at?

A. For the Vicodin, at Walgreens next door to us.

Q. I'm going to ask you whether or not you know who Anthonia Uduma is.

A. Yes, sir.

Q. Do you understand her to be the president and

000824

CEO of Four J's Community Living Center, Incorporated?

A. Yes, sir.

Q. Did Ms. Uduma ever call you on the telephone after your daughter was burned to talk to you about what had happened in this fire?

A. I think so. I think she just called to say -- ask how we -- yeah. I think there was one time. I think so. I --

Q. Did she ever apologize to you for what had happened to your daughter?

A. No.

Q. Do you understand that Ms. Uduma and her company have blamed Esperanza Arzola solely for this fire? Do you understand that?

A. That's my understanding, yes.

Q. How does that make you feel?

A. I -- I -- I don't know how you can blame someone who has all the problems that Esperanza seemed to have had. I don't think she was mentally competent in being able to understand consequences for her actions.

Q. Thank you, Ms. Wagner.

A. Uh-huh.

MR. THWEATT: Pass the witness, Judge.

THE COURT: Mr. Sparks?

MR. SPARKS: Briefly, Judge.

000825

DIRECT EXAMINATION

BY MR. SPARKS:

Q. Good afternoon, Ms. Wagner.

A. Good afternoon.

Q. When you were summoned to the hospital, Memorial Hermann? Was that on the 4th or the 5th of September?

A. The morning of the 5th.

Q. The morning of the 5th?

A. Around 7:30.

Q. And you went there with your pastor and were met there by your sister; is that correct?

A. That's correct.

Q. Did you ever get a chance to see or find out about Tanya?

A. Yes, sir, I did. I asked, and I -- and I went to her room. I wasn't allowed to go in, but I could see her from the doorway.

Q. And describe to the jury what you saw in terms of Tanya.

A. You couldn't see much of Tanya. Tanya was totally encased in bandages and hooked up to machinery. That's -- you saw bandages.

Q. You know, you mentioned that when you first went to -- took Jenny to Beretta Court, that that was the first time you had met Tanya James; is that correct?

000826

A.   Uh-huh.  Well, the day we visited Beretta Court, my husband and I, Jenny was still at The Willows; but we met with Ms. Uduma and the current case manager at that time, Ms. Wilson.  And they took us to Beretta Court to see the house before we made the final decision.

And at that time, we met Tanya and another housemate who was living there.

Q.   Were you ever made aware that Jenny and Tanya had a special bond together?

A.   They were original roommates of Jenny's.  She and the other young woman who was there at that time were her original roommates, yes.

And my understanding is that their bedrooms were right down in the same hallway, next to each other.

Q.   And were you of the opinion that during that time period before Esperanza Arzola arrived on the scene that there was peace and harmony at that home?

A.   Yeah.  Bob and I would pick up Jenny on Saturdays, like I said, or on holidays to bring her home on holidays; but, you know, on Saturdays we would do our mall walk.

Part of our routine was to pick up cookies to take to Tanya and -- and Delores, the other roommate at that time -- and bring them cookies.  And Tanya and Delores would be sitting on the couch, and Jenny would

be in her wheelchair next to them.

We would call ahead so that they would be able to change Jenny to new diapers and have her ready for us to take out.

And Delores would stand up and hug Bob and always say, "Jenny's daddy" and -- and "cookies." And Tanya would come and -- and take the cookies and put them on the table.

And the first year we brought Christmas presents for Tanya and Delores and a Christmas tree for their house, and -- and they were excited because they had presents and something to open. And, in fact, we were -- we were wondering if they were going to let them open them or how long they would last under the tree. But, yes, it was a quiet atmosphere when we would pick Jenny up.

Q. Now, during the time period after 2005 when Ms. Esperanza Arzola arrived on the scene, you were still Jenny's guardian, were you not?

A. I've been her guardian since we legally had to be, yes, sir.

Q. And would it be safe to say that you had a -- I may not be putting it in the right words, and please correct me if I'm wrong -- you had a yearly staffing or update or some type of review --

A. Yes, sir.

Q. -- if you would, regarding Jenny's stay at the Beretta Court facility?

A. That is correct.

Q. All right. And at any point in time when you -- who would you have that staffing meeting with? Let me ask that question, first.

A. Generally, the case manager, whoever was the current case manager at that time for Jenny. Myself; if my husband was in town, he would be there, too; also, the person in charge of the day hab at that time; and then also there would be a report from the nurse on staff at the day hab facility.

Q. Did -- did you ever have an occasion, ma'am, to go visit the day hab?

A. We've picked up Jenny at the day hab a couple of times.

Q. What was your impression of it?

A. There were two, and I don't remember what year they changed over.

The -- the first year that -- or the first two years, maybe, that they were at the -- Jenny was at Beretta Court, Four J's had another building that was close to -- oh, I got my B's mixed up. It was in a different area than the one -- it was closer to the

Galleria area. I can't remember which street it was on.

But anyway, I would go there on Wednesdays to take Jenny out to lunch and pick her up at that day hab.

After a couple of years, they moved to another facility, which was larger and had more rooms. It had a courtyard in the middle of it and parking lots on either side of it.

I -- they would bring Jenny to me. I never actually went inside the rooms.

Q. So you never really had an occasion to go in and see what activity was taking place?

A. Not at the actual day hab there. I could see some of the clients in the courtyard.

Q. Would they just be milling around or was there an apparent degree of instruction being given or what was your assessment on what Jenny was doing?

A. My understanding was that it was time to be outside.

Q. Did you ever see people smoking?

A. Yes, sir.

Q. I'm sorry?

A. Yes, sir.

Q. What was the purpose of this yearly and annual review that you had with the case worker for Jenny and

000830

the individual from the -- the day hab?

A. At an annual review, they go over the plans for the coming year on educational goals, physical goals. They review her physical condition and -- and get input from the parent on -- or guardian on what we would like to see happen.

Q. Was there ever an occasion where you were either verbally or in writing given information that assured you that the safety of Jenny was paramount to the people at Four J's as she existed at the 16335 Beretta Court facility and when she also went to the day hab facility?

A. I'm not sure about anything specific to the day hab. I -- I guess I never asked or was -- you know, it -- it was an assumption.

Q. Okay.

A. As for the house, I know that there was paperwork that we received when we moved Jenny into it; and I think that part of it was a promise on their part to ensure the safety and well-being of Jenny, yes.

Q. Now, did -- at any point in time during these annual reviews, did Ms. Anthonia Uduma or anybody else from Four J's share with you that there was an individual named Esperanza Arzola who had taken up residency there?

A. No. I don't -- I didn't -- I didn't recognize

000831

the name. I cannot say that they did not tell Bob. I don't know.

Q. Were you ever made aware, ma'am, that there was an individual at the facility who had moved in who was creating havoc in the home?

A. We can't be told that.

Q. You can't be told that?

A. No. HIPAA.

Q. You were never told that?

A. We can't be.

Q. You can't be.

A. It's illegal. We cannot know. That's -- that's personal information, and that can't be shared with -- with us. That's why we had to rely on them to place clients in the home with Jenny who are compatible with us and Tanya's special needs.

Q. So it was your understanding, then, that the individuals at Four J's, when they were coupling up or quadding up the individuals in the home, were trying to take into consideration -- or you thought they were taking into consideration people who would be compatible with the needs of Jenny, the needs of Tanya, and their personalities?

A. That definitely happened at first, because Tanya and Delores and Jenny were placed together.

000832

Q. So you were never made aware that somebody who was later placed there had attempted to commit suicide?

A. You can't be told that. We can't be told that.

Q. You were never made aware that she was eloping [sic] from the facility?

A. No, sir. That's -- that can't be shared.

Q. You were never made aware that they put a padlock on the back door to try to keep her from leaving the facility?

A. No. I can't honestly say that I looked at the door myself and saw a padlock. I didn't pay attention to -- it's a sliding glass door. I never really looked at it; so I don't know when a padlock was placed on it.

But I certainly was never told that a padlock was necessary because of another client in the house. We wouldn't have left Jenny there.

MR. SPARKS: No further questions, Judge. I pass the witness.

THE COURT: Mr. Plummer?

MR. PLUMMER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PLUMMER:

Q. Ms. Wagner, let me understand this: Mr. Sparks asked you were you ever told if there was a padlock on the back door. And I think you indicated you never

recall being told that; is that right?

A. Yes, sir.

Q. And, in fact, there was no padlock on the back door; is that right?

A. I -- I -- I don't remember.

Q. Seeing one?

A. No. But, then, I didn't ever open the back door, either.

Q. Okay. All right. Did you say, also, that there was a sliding back door --

A. I think -- pardon me.

Q. Did you say there was a sliding back door in the back of the house?

A. I thought it was.

Q. Okay. There was a photograph up -- we had it up earlier -- of your cart.

A. Yes.

Q. Do you recall that?

And I think that was the place where you kept at hand those things you needed to care for Jenny; is that right?

A. That is correct.

Q. It's convenient? I mean, obviously it's a burden and a responsibility, trying to take care of her all during the day and the evenings; is that right?

A. Yeah. It was on wheels. It was convenient.
Q. Okay.
A. And I would just resupply it as I needed it.
Q. Okay. I believe you mentioned the Vaseline and some other kind of salve that you put on her cheek to keep the scarring from keloiding and getting hard?
A. Cetaphil.
Q. Cetaphil?
A. Yes, is what I personally used.
Q. Other than the Cetaphil and the Vaseline, any other care that you were providing that is demonstrated on the cart that results directly from the burn injuries she suffered as opposed to her condition?
A. No.
Q. Now, Mr. Sparks has asked you about an annual staffing --
A. Uh-huh.
Q. -- when Jenny was -- was a consumer at Four J's.
A. Uh-huh.
Q. Is -- was it annual, or was it more often than annual?
A. Annual.
Q. Okay. And you participate -- you participated in it and, when your husband was alive, he participated, also; is that right?

000835

A. If he was in town, yes.

Q. If he was in town.

And in addition to that, if you couldn't attend in person, you attended the conference of staffing by phone; is that right?

A. Yes.

Q. Okay. And usually those staffings were documented?

A. Eventually.

Q. Okay. And did they also include a fairly detailed assessment of Jenny's current status and -- and what her future needs are, what your desires were toward her development, and things of that sort?

A. Eventually.

Q. Okay.

A. A document was created after the staffing where the case manager would go back and type up all the notes that were taken during the staffing, and then she would compile them --

Q. Okay.

A. -- and put them in Jenny's file.

Q. Okay. And would you get a copy of that -- that memoranda?

A. Yes. Yeah, usually.

Q. Okay. And did it also contain her -- Jenny's

individual emergency plan and planning with regard to that?

A. An individual -- for the house at Beretta Court?

Q. No, for Jenny.

A. An individual -- I'm sorry. In what aspect? Do you mean what would -- they were supposed to do in case of a -- no.

Q. Okay. Okay.

At any point in time before the fire, did you complain about the care Jenny was getting in your annual plan?

A. No.

Q. Is it fair to say we can assume, then, that from what you observed and saw, Jenny was getting good care?

A. From what I would -- observed and saw and was told, yes.

Q. Okay. Okay.

Now, your -- one of your principal contacts about Jenny was the case manager; is that right?

A. She was the contact person.

Q. The contact person?

A. Yes.

Q. And what was her name? What was her name?

A. At the time of the fire, it was Obichuku. I'm sorry. I just went blank. Ms. Obichuku.

Q.   Okay.

A.   What's her first name?  I'm so sorry.  Ngozi.

Q.   Ngozi?

A.   Ngozi Obichuku.

Q.   Okay.  And Ms. Obichuku would -- would keep in touch with you, relay information about Jenny.

And how else would she carry on her case management functions vis-à-vis information to you?

A.   She would call me if something came up and she needed to speak to me about it.

Q.   Okay.

A.   Other than that, she would -- we would have our annual staffing.  Usually we spoke.

Q.   Was she pretty responsive?

A.   If I had a question, she would answer it, yes.

Q.   Okay.  All right.

And she's the one who called you the morning of the 5th?

A.   Yes, sir.

Q.   Okay.  And did she tell you that there had been a fire at the house or did she just tell you Jenny was in the burn unit?

A.   She said they were -- there was a fire at the house and Jenny was taken to Memorial Hermann and she was in the burn unit there.

Q. At that time did she tell you what she thought or how she thought the fire had occurred?

A. Not at that phone call, no.

Q. Okay. At any subsequent phone call with Ms. Obichuku, did she tell you how the fire was caused?

A. Not on a phone call, no. We saw each other at the hospital the same day.

Q. And you subsequently discovered that the fire was started by a -- another client, Ms. Arzola, right?

A. Yes. Ms. Obichuku had told me that at the hospital.

Q. Okay. And that she had started it in her bedroom; is that correct?

A. I don't believe she told me where she started it.

Q. Was it your understanding that Ms. Arzola had been injured or not injured in the fire, or did you have any understanding one way or the other?

A. Ms. Arzola?

Q. Yeah.

A. The only two that I knew that were injured in the fire were Tanya James and Jenny.

Q. Okay. The other residents got out?

A. That was what I was -- yeah, understood to be true, yes.

000839

Q.   Okay.  Now, the -- the caregiver who was at the house that evening --

A.   Uh-huh.

Q.   -- Amuche --

A.   Uh-huh.

Q.   -- had you met her before?

A.   I believe so.

Q.   Okay.  And did you get a chance to talk to her that night or the next day at the hospital?

A.   Oh, no.

Q.   Okay.  Now, at some point in time, Ms. Wagner, you sued Amuche Udemezue in this lawsuit; is that correct?

MR. THWEATT:  Your Honor, I object to relevance.

THE COURT:  Overruled.

Answer the question.

A.   I believe at -- maybe the very first document had her name on it.  I don't -- I don't know.

Q.   (BY MR. PLUMMER)  Okay.  So you don't recall exactly when you sued Ms. Udemezue as one of the responsible parties in this matter?

A.   There was never a -- a court trial.  It was all part of this case that we're doing today.

Q.   I understand.

And as part of this case that we're doing today, when you filed the lawsuit, had -- and if you don't know about this, you know, just tell me that.

A. Uh-huh.

Q. Do you recall and do you remember when your lawyers filed suit against Amuche Udemezue in addition to Ms. Uduma, Mr. Uduma, and Four J's?

A. I believe that was on the first court document that was filed.

Q. Okay. Okay. Okay. And the reason she was included in that is because you-all thought she was the responsible party in this; is that right?

MR. THWEATT: Objection, Your Honor, it calls for speculation and calls for invasion of the attorney/client privilege, and relevance.

THE COURT: Sustained.

MR. PLUMMER: We'll move on, Your Honor.

Q. (BY MR. PLUMMER) I believe Mr. Sparks asked you some questions about Arzola, Ms. Arzola, and whether or not you'd ever been told that she would be coming into the home.

Do you remember that?

A. Well, yeah. Just a few minutes ago he asked questions about her.

000841

Q.  Right.

And in -- in -- I believe you said that that had not -- nobody had told you she would be coming in there; is that right?

A.  I -- I -- I said I didn't recognize the name.

Q.  Okay.  But you were informed, were you not, of a new roommate coming in when Arzola came in; is that right?

Well, let me approach --

A.  Yeah.

MR. PLUMMER:  May I approach, Your Honor?

THE COURT:  Me or the witness?

MR. PLUMMER:  The witness.

THE COURT:  Yes.

Q.  (BY MR. PLUMMER)  Let me show you what's been marked as Defendant's Exhibit 36 and ask if you would take a second and look at that and tell me whether you can recognize that document.

A.  (Complying.)

Q.  And tell me whether you can recognize your signature or initials on the next page.

A.  (Complying.)  It's my signature.

Q.  Okay.  And this is a -- a staffing report, is it?  Or what is it called, an Interim Individual Service

Plan?

A. Yes, sir.

Q. And informing you about the new roommate that was coming into the house?

A. I believe so.

Q. Okay. And you --

A. I'm sorry. Sir, I didn't read it all. May I?

Q. I'm sorry.

THE COURT: Mr. Plummer, you can just leave it there. All right?

MR. PLUMMER: Thank you, Your Honor.

A. Yes, sir. That's what it says.

Q. (BY MR. PLUMMER) Okay. And it gave you the option to say yes or no to the new roommate coming in; is that correct?

A. That probably is true.

Q. And if you said yes, the roommate comes in; if you said no, the roommate doesn't come in? Is that right?

A. I don't know. I probably -- if I was ever asked yes or no -- I knew I was informed, but I don't know if I was ever -- I did not raise an objection.

Q. Okay.

A. I guess that's -- that's it.

Q. Okay. All right. Okay. Thank you, ma'am, on

that.

A. Uh-huh.

Q. Now -- now for eight or nine months after the -- after Jenny -- Jenny was hurt in the fire and got out of the hospital, who did you have as the caregiver for Jenny?

A. Myself for the primary caregiver.

Q. Okay. And what about the case manager who helped manage the -- the care of Jenny; who was that?

A. Ngozi Obichuku.

Q. And Ms. Obichuku is -- was part of Four J's; is that correct?

A. That is correct.

Q. And then after about eight or nine months, you found somebody else, some other facility, through whom Jenny's care was managed; is that correct?

A. Yes.

Q. Okay.

A. Yes. They oversaw her services.

Q. Oversaw her services?

A. Yes.

Q. Okay. Thank you, ma'am.

Has Jenny been fitted with a dental appliance to address her teeth grinding?

A. No.

000844

Q. Okay. Now, that's been part of the recommendation for a while; is that correct?

A. That was part of the recommendation on a document from Four J's, yes.

Q. From Four J's?

A. Yes. Her current --

Q. Beg your pardon?

A. -- dentist -- we address that through pain medication.

Q. Okay.

A. And as long as she's medicated well enough, then -- then it is -- there's no teeth grinding.

We had discussed that, and that was one of the things we had talked about. And that's while she was at Four J's. Whether or not Four J's followed through on it... I don't think so.

Q. Well, I -- I guess the -- the reason for my question is: You -- you mentioned that she continues to grind her teeth occasionally now; is that right?

A. When she's in pain, yes, sir.

Q. And -- and I -- it's not just because of her burn injuries that have healed; but it's because of her -- the nature of her condition, the spasms and things of that sort; is that correct?

A. That is correct.

000845

Q. Okay. So it's not related necessarily to her burn injuries; is that right?

A. That is correct.

Q. Okay. I'm sorry.

MR. PLUMMER: Your Honor, at this point in time, we pass the witness.

THE COURT: Mr. Thweatt?

MR. THWEATT: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. THWEATT:

Q. Ms. Wagner, you just heard Mr. Plummer describe that Jenny's burned injuries have healed.

Do you believe that Jenny's healed from this fire?

A. There will always be problems at the sites of the skin grafts. If the skin becomes dry, it will crack. So that has to be addressed all the time.

On her -- her donor sites, the thighs, if -- if she becomes too hot, they get red and -- and sore, like a sunburn.

And so those are things that are ongoing issues that will continue to be...

Q. Were you ever told before this fire by anyone from Four J's that Jenny refused to sleep in her bed and that, instead, she had to sleep in a recliner like she

does now?

A. There was no recliner at Beretta Court.

Q. Were you ever told by anyone at Four J's that Jenny couldn't sleep in her bed when she was there?

A. No, sir.

Q. And now she can't or doesn't sleep in her bed; is that right?

A. That is correct.

Q. Have you ever heard or seen Jenny have a physical or a verbal response to things like sirens?

A. There are things that will startle her excessively, I guess is the best way... and she will spasm.

Q. What would those be?

A. That would be one of those things.

Q. Sirens?

A. Sirens, yes, sir.

Q. Have you ever heard her ask about Tanya James after this fire?

A. I've heard her -- Jenny speaks in kind of strange ways, and she'll talk to herself. On occasion, she'll say something like -- well, actually what she says is, "Is Tanya crying?"

Q. I want to ask you, Ms. Wagner: You told Mr. Plummer that after this fire, Four J's still had

some involvement with Jenny for a period of eight to nine months; is that right?

A. That is correct.

Q. Okay. Can you tell us -- well, don't tell me. Tell the jury how that interaction after this fire and the terrible injuries that your daughter suffered, how that came to be, how Four J's was still involved in your daughter's life.

A. I -- well, the first instance was I needed a way to get Jenny home from the hospital. My family refused to help me -- the one time that they refused to help me was to put her in a car and bring her home because they were worried about Jenny being hurt. And so they insisted I call Ngozi and ask them to bring Jenny home from the hospital -- from the hospital on the day that she was released.

And later on, Ms. Uduma and the nurse from Four J's came to my house and -- and checked over Jenny.

And Ms. Uduma said, "She needs a hospital bed."

At the time we were -- we were dressing her wounds on my bed, which is a -- you know, just a regular double bed, which meant it's that far off the ground (indicating).

And dressing her wounds took two people. We

000848

wanted to do it efficiently and quickly. And so one would stand next to the bed and on one side and do that half of her body and the other one would climb onto the bed and do the other half of her body.

And once Ms. Uduma realized how we were taking care of her, she -- she ordered a hospital bed from -- for Jenny.

They supplied Beabo (phonetics) -- my mind just went -- Shelipido (phonetics), I believe that's her last name -- to come in and help me during the day. I think that started around December.

Beabo was a young woman who would come in and take care of Jenny under the day hab services that Ms. Uduma could help, in order for me to be able to go to my sister's apartment and rest or to go to the grocery store.

Q. Ms. Wagner, I want to show you defense Exhibit 36 again. Mr. Plummer showed this to you.

This recommendation here that Four J's made on their documents, it says Jenny's new roommate is acceptable to be her roommate.

Do you see that there? Do you see that on the document?

A. Yes, sir, I see that.

Q. And you were never provided any other

000849

information from Four J's about Tanya James after -- I'm sorry -- this date of staffing, which indicates March 18th, 2008; is that right?

A. Do you mean the new roommate?

Q. You were never provided any other document related to Esperanza Arzola after March 18th, 2008; is that correct?

A. No, sir. I -- you can't share personal, private information with other people.

Q. All right. Had you been told that a Four J's document created on April the 15th, 2008, just one month afterwards -- I'm sorry. Wrong one.

Had you been told that Ms. Esperanza Arzola had had a history of suicide attempts and property damage and violence against staff and was taking antipsychotic medications and those kinds of things, would you have ever agreed to permit your daughter to be housed in the same residence as someone with those kinds of challenges and disabilities?

A. No, no.

MR. THWEATT: Pass the witness, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: I have no questions, Your Honor.

000850

THE COURT: Mr. Plummer?

Mr. Plummer: Nothing further of this witness, Your Honor.

THE COURT: Thank you, ma'am. You may step down.

Ladies and gentlemen, we're going to go ahead -- this is a good stopping point. We're going to stop a little bit earlier than I told you before just because it just makes more sense to stop now than to put on a witness for just ten more minutes.

Again, reminder, we start tomorrow morning at 8:30 sharp. So I need y'all to be here in plenty of time so that we can bring you in at 8:30 for the very next witness. The closer we stay to schedule, the better we do at making sure that this trial is completed according to the schedule I gave you right before jury selection.

So please, as I said before, if you're not used to driving into downtown at that hour of the morning, it's going to take you longer than you expect to get here. So please plan accordingly so you can be here.

Deputy Dewey can give you information about mass transit, if you'd like to take mass transit, also tell you about the various parking -- the parking

facilities in the area. The County has a County-owned parking garage immediately behind this courthouse, which is that direction (indicating). It's connected to this courthouse by an underground tunnel with its own secure access with metal detectors.

The lines down there, I'm told, in the mornings are almost nonexistent, so it's very easy, very efficient to get through. That's where I tell my wife to park whenever she comes down to visit me with the kids during the day. I ask her to go ahead and park in that parking garage.

Again, I don't get a cut of the parking fees or anything like that. I'm not trying to steer you that direction. That's the best option.

But if you want to look at other options, Deputy Dewey can give you some information about that.

With that, we'll see y'all tomorrow morning at 8:30.

(Jury out.)

THE COURT: Thank you. Please be seated.

Mr. Thweatt, who do you plan to call tomorrow?

MR. THWEATT: Your Honor, we'll call

Ms. Wylette Taylor tomorrow and, after that, Ms. Uduma, as well as a couple of the employees who worked there at the home.

THE COURT: Do you think you're going to finish up tomorrow, or will you go into Wednesday?

MR. THWEATT: I think we'll go into Wednesday, Your Honor.

THE COURT: All right. All right. As of now, Plaintiffs and Intervenor's have used one hour of their seven hours. Defense has used 17 minutes of their seven hours.

I'd like to finish up -- well, we weren't able to finish it before. First of all, are there any objections to deposition designations I need to rule on? I never really asked that.

MR. RAVAL: There are, Your Honor.

THE COURT: Okay. All right. Let's go in -- first we're going to do any objections to Plaintiff's designations, since they're up first.

What I need you to do is I need you to have the transcript of whichever witnesses we're talking about and come up here and we'll -- I'll review those objections. All right?

MR. RAVAL: Okay.

MR. PLUMMER: Now, Judge, or in the

morning?

THE COURT: No, now.

MR. THWEATT: I may be able to short-circuit a lot of this with regard to our designations. We're going to designate Dr. Karen Gollaher and Rick Overholt. Neither of those witnesses -- the deposition testimony that we designated, none of those were objected to during their depositions. They had previous counsel --

THE COURT: Okay. Slow down.

You've just got two witnesses you're calling by deposition?

MR. THWEATT: That's correct.

THE COURT: Mr. Sparks, are you calling anyone by deposition?

MR. SPARKS: No, Judge.

THE COURT: Your two witnesses are Dr. Gollaher and --

MR. THWEATT: A gentleman named Joe Overholt.

THE COURT: Okay. All right. Well, I need to know what the objections are before I can say whether or not they've been waived or not. So --

MR. THWEATT: I understand.

THE COURT: -- I understand what you're

000854

saying, but we'll just take those up.

Now, what I do have in front of me are an October 13th Objections to Plaintiff's Deposition Excerpts.

MR. RAVAL: Those are the most recent.

THE COURT: Okay. So we only need to look at the Gollaher and Overholt?

MR. RAVAL: Correct, Your Honor.

THE COURT: So, if I could have those transcripts...

MR. THWEATT: May I approach, Judge?

THE COURT: Yes.

Just while they're getting ready, Mr. Sparks, Mr. Thweatt, do you have any objections to any defense deposition designations? I don't see any in my file, but I just wanted to --

MR. THWEATT: My understanding is they're not going to designate any.

THE COURT: Have y'all filed any deposition designations?

MR. RAVAL: No. I believe everyone that we're going to designate is coming live.

THE COURT: Okay. All right. That's fine.

So we've just got two witnesses to take

000855

care of.

All right.  Let's start with Dr. Gollaher.

What's the first objection, Mr. Raval?

MR. RAVAL:  The first objection is to relevance; and it's that first section, Page 15, Lines 14 to 16.  But I -- I think I can, again, short-circuit some of our objections to Dr. Gollaher.

The general nature of our objections to her deposition excerpts are what we discussed this morning, which is we don't believe that her testimony regarding Esperanza Arzola's fitness for a criminal trial or criminal proceedings is relevant to anything in this trial.

And the excerpts that we refer to regarding relevance are -- the first two objections are specific to that objection.

THE COURT:  Okay.  So let's just -- I just want to go one by one and make sure the record's clear.

Page 15, Lines 14 to 16.  Your objection is relevance?

MR. RAVAL:  Correct.

THE COURT:  Mr. Thweatt, your response?

MR. THWEATT:  First of all, Judge,

there was no objection made during the deposition; and as I've indicated there weren't any --

THE COURT: Is relevance an objection to form or an objection that a question's leading?

MR. THWEATT: I believe that -- to answer your question, yes, Your Honor. If there's going to be an objection to relevance, it needs to be made during the testimony, is my understanding.

THE COURT: Well, I asked -- I mean, you guys -- under the potted plant rule, you get to object to form, you object to leading, and you object to the responsiveness of the answer or you assert a privilege. That's my question.

I mean, which of those four things should this objection have been?

(No response.)

THE COURT: All right. That's the answer?

All right. The objection's sustained.

16, Line 19 to 17 [sic] and Line 6 -- again, relevance is your objection?

MR. RAVAL: Correct, Your Honor.

THE COURT: Okay. Hold on. Let me read it.

What's the relevance of this testimony,

Mr. Thweatt?

MR. THWEATT: Your Honor, the relevance of Dr. Gollaher's inquiry is to -- is to make sure that these defendants are not going to be permitted to blame this fire on Esperanza Arzola without the jury fully and completely understanding that she was deemed incompetent to stand trial in this case and they -- and that Dr. Gollaher considered all of the psychological and psychiatric history in her file that was in place before the fire occurred as she made that determination.

THE COURT: What is the relevance of whether her attorneys were present during the interview or where the interview took place? That -- I'm talking about this specific designation.

MR. THWEATT: I'm sorry, Your Honor. I thought you were asking me a different question. One moment, please. 16, Line 19?

I'll withdraw that designation, Your Honor.

THE COURT: All right.

MR. RAVAL: Your Honor, the next portion is Page 18, Lines 24 and 25; and our objection is hearsay.

THE COURT: Why isn't this hearsay, Mr. Thweatt?

000858

MR. THWEATT: Well, it's effect on the listener, the exception there.

THE COURT: The objection's sustained.

Next one, Mr. Raval?

MR. RAVAL: Your Honor, the next one is Page 49, Lines 8 through 16. And our objection there is relevance.

THE COURT: Okay. Here's what we'll do on this: I'm concerned that -- first of all, I'll overrule the relevance; but I am concerned that the answer in Line 10 may be misleading because I didn't -- this Court didn't pay for testimony.

Any responses to my concern?

MR. THWEATT: Perhaps the parties could enter into a stipulation that this Court -- that is, the 269th District Court -- did not pay for the services but, rather, it was the criminal district court of Fort Bend County.

THE COURT: Response?

MR. RAVAL: We can agree to that.

THE COURT: Okay. If y'all want to do a stipulation to take care of that -- because I do think that who pays for an expert's time is relevant. That's common testimony. So y'all take care of it by stipulation.

000859

Next, Mr. Raval?

MR. RAVAL: Your Honor, the next portion is Page 86, Lines 4 through 24; and our objection is leading.

THE COURT: The objection's overruled.

MR. RAVAL: And our final portion is Pages 88 through 90; and the same objection, leading.

THE COURT: The objection's overruled.

MR. RAVAL: That concludes our objections to Dr. Gollaher's deposition excerpts.

THE COURT: Okay. So the next one is Overholt?

MR. RAVAL: Yes, Your Honor.

THE COURT: Okay. Now, tell me who Overholt is.

MR. RAVAL: Your Honor, Rick Overholt was hired a few years before the fire to install a fire alarm system at the house at Beretta Court. Annual inspections were done by Mr. Overholt's company.

And the Plaintiffs and Intervenor are, in particular, going to refer to a particular report that was done in 2005 in which Mr. Overholt's son made some notes on -- on a report indicating that the back door was locked and there was no access.

THE COURT: Okay. So that's who

000860

Mr. Overholt is.

MR. RAVAL: Correct.

THE COURT: All right. First objection?

MR. RAVAL: Our first objection we're withdrawing at Page 5. That was a -- a mistype.

THE COURT: All right. Next?

MR. RAVAL: Next objection is Page 16, Lines 1 through 9; and our objections are leading, relevance, and speculation.

THE COURT: Overruled.

MR. RAVAL: Our next objection is to Page 28, Lines 7 through 12.

THE COURT: Grounds?

MR. RAVAL: The ground is hearsay; and this is in reference to this particular report of 2005 prepared by Mr. Overholt's son.

And this portion and the next few deposition excerpts are referring to handwriting by Mr. Overholt's son on the report. So there are multiple layers of hearsay concerns.

THE COURT: Okay. Do y'all have a business records affidavit on this?

MR. THWEATT: I'm sorry, Your Honor?

THE COURT: I mean, on this report? Is

there a business records affidavit on this report?

MR. THWEATT: It was produced by the Defendants and by Mr. Overholt in his capacity as a retained witness to us at his deposition.

THE COURT: Okay. Well, have you laid a predicate for a business records document then?

MR. THWEATT: In the deposition I believe we have, Your Honor.

THE COURT: Okay. I'll give you a second. Try and figure out where you've laid that foundation for me, please.

MR. THWEATT: All right.

Your Honor, on Page 7 of Mr. Overholt's deposition -- or I'm sorry -- Page 8 of his deposition, I've indicated that Mr. Overholt -- quote, (reading) You've handed me some documents. You want to just identify them for the record?

He goes through some documents. Oh, I'm sorry. On Page 9 he indicates he's brought a total of seven documents that were responsive to the subpoena that was served ahead of his deposition, and I -- I marked all of those as Exhibit Number 2 to his deposition.

We then went into what he does for a living, and he described what he does. And the

Defendants designated this gentleman as an expert. That's why we deposed him on February 17th, 2011.

On Page 26 I've handed him Exhibit Number 3. He identifies it on Line 18 -- or I'm sorry -- Line 20, Page 26.

(Reading) Yes, it's an inspection form. It's filled out during the inspection by one of my technicians.

Question: "And the tech appears to be Christopher Overholt?

Answer: "Correct.

Question: "Is he related to you?

"He's my son.

"All right."

And we went through that.

We asked what Omni charges for that kind of inspection. We identified whose handwriting was on it, and there were no objections to any of this during the time of the deposition.

So he's identified it as a business record from Omni; and he's the one who produced it to me at his deposition, Your Honor.

Now, I also think that, if I'm not mistaken, that's -- we submitted that as part of our exhibits that were previously admitted in this trial.

000863

THE COURT: Is it admitted? Which exhibit is it?

MR. THWEATT: I'm sorry. We offered it. They objected to it. Plaintiff's Exhibit 34, which has not been admitted.

I would also highlight that as an exception to the hearsay rule we can use this document to show notice. And that's really what it's being offered for.

This document was provided as of October the 4th, 2005; and it states in the middle of it, (reading) The rear exit door, key dead bolt is locked with no key access. And the customer's name there is Four J's Care.

So one of the reasons why we're offering it, Your Honor, is to show that Four J's had notice of this condition by the people that they hired for fire inspection and testing at that home.

THE COURT: All right. As to Page 28, Lines 7 through 12, the objection is sustained in part and overruled in part. I'll allow the testimony for the limited purpose of showing notice.

Are these going to be video recorded depositions that you're going to play?

MR. THWEATT: Dr. Gollaher's was

videotaped. Mr. Overholt's was not.

THE COURT: All right. Remind me before you start Mr. Overholt's deposition that I'll need to give an instruction as to that particular set of lines.

MR. THWEATT: Yes.

THE COURT: All right. Next?

MR. RAVAL: Your Honor, the next portion is Page 28, Lines 19 through 23; and the objection is also hearsay on that.

THE COURT: Anything -- any additional argument, Mr. Thweatt?

MR. THWEATT: Not beyond what we've already stated. I think -- I hope I've described for the Court what Mr. Overholt's position was and what this document related to sufficiently.

THE COURT: It will be the same ruling as to Lines 19 through 23 as -- as I -- same ruling as the ruling was for Lines 7 through 12.

MR. RAVAL: Your Honor, the next portion is Page 19 -- Page 29, Line 18, to Page 30, Line 2; our objection is also hearsay.

And if I could just direct the Court on Page 29 -- in answer to a question, starting on Line 11 to about Line 14, Mr. Overholt is, I believe, explaining

000865

that particular notes on this report don't -- may not meet the business record exception. It doesn't look like it was something ordinarily done in the course of business.

THE COURT: Well, have I completely overruled your hearsay objection or have I said I'll let it in for a limited purpose?

MR. RAVAL: Yes, sir.

THE COURT: Okay. All right. Let me read this, please.

Mr. Thweatt, your response to Page 29, Line 18, through Page 30, Line 2?

MR. THWEATT: Well, he's talking about a conversation that he had with his employee, his son, and describing the effect on -- on -- effect of that conversation on him.

So my response is effect on listener exception, I think, should apply, as well as the business record predicate that we've laid previously that was sustained in part and overruled in part.

THE COURT: The objection to Page 29, Line 18, to Page 30, Line 2 is sustained.

Next, Mr. Raval?

MR. RAVAL: Next is Page 30, Line 8 to Line 23; and the objection is hearsay.

THE COURT: The objection's sustained.

MR. RAVAL: Next portion is Page 31, Line 10 to Line 24.

THE COURT: Response, Mr. Thweatt?

MR. THWEATT: Your Honor, once again, we urge that there was no objection during the time that his testimony was taken; and we don't think that the hearsay exception would apply to that, even if one was made. But that's my response.

THE COURT: This one will be sustained, in part, overruled to show notice, again, just like Page 28, Lines 7 to 12 and 19 to 23.

MR. RAVAL: Your Honor, the next portion is Page 32, Line 19, going to Page 32 -- 33, Line 11. The objection is hearsay.

THE COURT: Response, Mr. Thweatt?

MR. THWEATT: Well, I think on Page 33, Your Honor, Line 12, I asked him to clarify how he knew that -- how he knew what we were talking about.

And I said, (reading) Did you know that from the -- from your time of working at Omni?

He answered yes; so he established that he had personal knowledge of this. It's not hearsay.

THE COURT: The objection's sustained.

MR. RAVAL: Your Honor, the next

000867

portion is Page 33, Line 25, going to Page 34, Line 2. The objection is speculation.

THE COURT: Overruled.

Next?

MR. RAVAL: Page 35, Line 14 to Line 21; and the objection is hearsay.

THE COURT: Overruled.

MR. RAVAL: Next portion is Page 40. The objection is form, leading.

THE COURT: Overruled.

MR. RAVAL: Next is Page 42, Lines 14 to 16. The objections are hearsay and relevance.

THE COURT: How is this not hearsay, Mr. Thweatt?

MR. THWEATT: I think it pretty clearly is, Your Honor.

THE COURT: The objection's sustained.

MR. RAVAL: Next is Page 43, Line 10, going into evidence of subsequent remedial measures and relevance. Should be Line 10 to Line 16.

THE COURT: Thank you.

Response, Mr. Thweatt?

MR. THWEATT: Well, he doesn't identify, Your Honor, why the installations were put in place. So we don't know whether it, in fact, was a

000868

subsequent remedial measure or whether it was just some other motivation for the company.

And until that's established, I don't think that the objection is timely yet. And subsequent remedial measures, you've got to demonstrate that the effort was taken in order to remedy the issue at hand. And that hasn't been demonstrated by Four J's as of yet.

THE COURT: What are you offering it to prove?

MR. THWEATT: Offering it to show that a reasonable and prudent company who's taking care of mentally disabled people certainly had the opportunity to address their helplessness, even in a fire, by installing overhead systems such as overhead sprinklers and that the -- and that they did not.

THE COURT: The objection's sustained.

MR. RAVAL: Your Honor, the last objection is to Page 49, Lines 14 through 17. The objections are relevance and speculation.

THE COURT: 49, Lines 14 to 17?

MR. RAVAL: Correct.

THE COURT: Okay. I think there must be some mixup because the transcript I'm looking at, Line 14 is in the middle of a question.

MR. RAVAL: I think it should be 12 to

000869

15.

THE COURT: 12 to 15?

MR. RAVAL: I think so, Your Honor, yes.

THE COURT: Overruled.

MR. RAVAL: That concludes our objections.

THE COURT: All right. Mr. Thweatt, you can retrieve the transcripts. Thank you.

MR. THWEATT: Thank you.

THE COURT: Is there anything else we need to take up before we break for the day?

(No response.)

THE COURT: Okay. I haven't had a chance to tell y'all this. I want to make sure y'all know beforehand. Sometimes it seems I'll come back from a break or I'll come in in the morning, ready to bring the jury in, and one or both sides ask if they can take up some matters outside the presence of the jury, which I understand things come up from time to time.

If that's going to be the case, you need to tell me beforehand. Don't wait until I come in here, ready to call the jury in, to tell me, oh, wait, we've got some stuff we need to take care of.

I should be here no later than 8:15

tomorrow morning. So if there's something we need to take up before I bring the jury in, find Deputy Dewey, go to the customer service area of this court, find one of my clerks, and just ask them to let me know that they'd like -- that y'all would like to talk to me before I bring the jury in and I'll come out and we can take care of it as -- you know, 8:15, 8:20.

Same goes for when we're on breaks. If for some reason something comes up and you need to talk to me before we bring the jury back from a break, don't wait until the break is over to tell me. Let me know earlier so that we can make sure that we go ahead and start on time and I can address those issues.

Anything else?

MR. SPARKS: Judge, there is something. We have two witnesses, Amuche Udemezue, and, I think, Chika Irondi, who were former employees of Four J's. Both of them have given depositions in this matter.

And at the depositions and after the depositions, both of them felt that there were threatening comments made to them in their native language -- and I'm not certain what that is, but all of them are Nigerian -- that were made -- threatening comments were made to them.

And we anticipate them coming tomorrow

000871

to testify; and I'd like to bring to the Court's attention their concern about their safety, one, and the threats that are being made because they are testifying against their former employer.

THE COURT: All right. Thank you.

I don't need to tell any of the lawyers what their ethical duties are. I've got good lawyers on all sides representing all parties; so I'm not concerned about that.

Obviously, there are penal statutes against tampering with witnesses and making threats; and so if -- you know, if -- if any of the -- if there's any evidence of that, we can take care of it accordingly, either through my contempt powers or through a referral to the District Attorney's office.

The courthouse is safe. I've got a bailiff; and when she feels like she needs backup, we've got three other bailiffs on this floor, plus 20-some-odd sheriff's deputies in this courthouse alone. So I don't think that there will be anything like that.

But if you would like to talk to the bailiff after we close today, you know, to give her more details -- she's obviously a licensed peace officer and basically has more expertise in how to secure a courtroom than myself. I -- I'm the expert in

000872

administering justice. She's the expert in law enforcement when it comes to those types of things.

So I understand you'd want to bring that to my attention. I'll just say, you know, if something happens, we'll deal with it appropriately; but I'm sure I'm not going to have any problems with any of the lawyers here.

And obviously, you know, if things change, we'll take care of it immediately.

MR. SPARKS: Yes, sir. Thank you.

THE COURT: Anything else?

All right. Y'all are excused. Have a good night. See y'all tomorrow morning bright and early.

(Proceedings recessed for the day.)

000873

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF HARRIS )

I, Annette Peltier, Deputy Official Court Reporter in and for the 269th District Court, Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $__________ and was paid by ____________________.

WITNESS MY OFFICIAL HAND this the __________ day of ____________________, 2011.

Annette Peltier

Digitally signed by Annette Peltier
DN: o=VeriSign, Inc., ou=VeriSign Trust Network, ou=www.verisign.com/repository/RPA Incorp. by Ref.,LIAB.LTD(c)98, ou=Persona Not Validated, ou=Digital ID Class 1 - Microsoft Full Service, cn=Annette Peltier, email=apeltiercsr@hotmail.com
Date: 2011.12.12 19:11:04 -06'00'

___________________________
Annette Peltier, Texas CSR 3253
Expiration Date: 12/31/12
Deputy Official Court Reporter
Harris County, Texas

VOLUME 3 OF ___
REPORTER'S RECORD
CAUSE NO. 2009-40925

| | | |
|---|---|---|
| PATTI WAGNER, AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT<br>Plaintiff | * | IN THE DISTRICT COURT OF |
| VS. | * | HARRIS COUNTY, T E X A S |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA AND GODFREY UDUMA<br>Defendants | * | 269TH JUDICIAL DISTRICT |

JURY TRIAL

OCTOBER 18, 2011

On the 18th day of October, 2011, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Dan Hinde, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by stenographic machine shorthand.

KATHLEEN KEESE,CSR
Official Court Reporter
269th District Court

A P P E A R A N C E S:

Mr. L. Lee Thweatt
SBN: 24008160
Mr. Joseph D. Terry
SBN: 24013618
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, Texas 77046-0102
713.600.4710

COUNSEL FOR PLAINTIFF

Mr. James C. Plummer
SBN: 16075700
Mr. Amar Raval
SBN: 24046682
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Suite 270
Houston, Texas 77006
713.522.2887

COUNSEL FOR DEFENDANT

Mr. Shelton Sparks
SBN: 06507160
SHELTON SPARKS & ASSOCIATES, L.L.C.
706 Cordell Street
Houston, Texas 77009
713.862.5533

Ms. Tiffany C. Harvey
SBN: 24067343
THE LAW OFFICE OF TIFFANY HARVEY
706 Cordell Street
Houston, Texas 77009
832.498.7076

COUNSEL FOR INTERVENOR

# I N D E X
VOLUME 3
OCTOBER 18, 2011

| | | | | Page |
|---|---|---|---|---|
| PROCEEDINGS .................................. | | | | 6 |

WITNESSES:

| | Direct | Cross | Voir Dire | Vol |
|---|---|---|---|---|
| WYLETTE TAYLOR | 6 | 30 | | 3 |
| | 43 | | | 3 |
| ANTHONIA UDUMA | 47 | 103 | | 3 |
| CHIAKA IRONDI | 107 | 114 | | 3 |
| | | 116 | | 3 |
| | | 126 | | 3 |
| RICK OVERHOLT by deposition | 130 | | | 3 |
| AMUCHE UDEMEZUE | 162 | 189 | | 3 |
| | | 191 | | 3 |
| | | 230 | | 3 |
| KEVIN KERN | 231 | 255 | | 3 |
| | | 256 | | 3 |
| | 264 | 265 | | 3 |
| DR. KAREN GOLLAHER by deposition | 267 | | | 3 |

| | Page |
|---|---|
| Plaintiff rests ............................ | 307 |
| Intervenor rests ........................... | 307 |
| Motion for Directed Verdict ................. | 308 |
| Ruling ...................................... | 314 |
| Motion by Defendant ......................... | 314 |
| Ruling ...................................... | 317 |
| Court Reporter's Certification .............. | 320 |

PLAINTIFF'S EXHIBIT INDEX

| NO. | DESCRIPTION | ID | OFFER | ADMIT | VOL |
|---|---|---|---|---|---|
| 41 | Four J's tax return | 81 | 81/88 | | 3 |
| 42 | Four J's tax return | 81 | 81/88 | | 3 |
| 44 | Esperanza Arzola Annual Individual Service Plan | 56 | | | 3 |
| 49 | Dr. Kirk Lockwood's notes | 54 | 54/56 | 56 | 3 |
| 53 | Kevin Kern resume | 234 | 235 | 235 | 3 |
| 54 | | 304 | 304 | 304 | 3 |
| 56 | | 304 | 304 | 304 | 3 |
| 57 | | 304 | 304 | 304 | 3 |

* * * * * * *

DEFENDANT'S EXHIBIT INDEX

| NO. | DESCRIPTION | ID | OFFER | ADMIT | VOL |
|---|---|---|---|---|---|
| 23 | Minutes of Staff In-Service Training | 223 | | | 3 |
| 29 | Amuche Udemezue's Service Logs regarding Esperanza Arzola | 217 | | | 3 |

* * * * * * *

INTERVENOR'S EXHIBIT INDEX

| NO. | DESCRIPTION | ID | OFFER | ADMIT | VOL |
|---|---|---|---|---|---|
| 3 | Inspection report | 304 | 305 (Limited Admission) | 306 | 3 |
| 19 | Certified Copy of Wylette Taylor's Birth Certificate | 14 | | | 3 |
| 25 | Pictures taken in 2010 of Beretta Court | 25 | 26 | 27 | 3 |

* * * * * * * *

P R O C E E D I N G S

*THE COURT:* Good morning, please be seated.

*BAILIFF:* All rise.

*(The jury present, proceedings resumed in open court as follows.)*

*THE COURT:* Thank you. Please be seated.

Mr. Thweatt, call your next witness.

*MR. THWEATT:* Your Honor, I believe Mr. Sparks is going to call his client.

*THE COURT:* All right.

*MR. SPARKS:* Yes. Tanya Wylette Taylor.

*BAILIFF:* Stand here. Face the Judge. He will swear you in.

*(Witness placed under oath.)*

*THE COURT:* Please be seated.

You may proceed.

WYLETTE TAYLOR,

having been placed under oath, testified as follows:

DIRECT EXAMINATION

BY MR. SPARKS:

*Q.* Ms. Taylor, please state your name for the record.

*A.* Wylette Taylor.

*Q.* Ms. Taylor, you are here in a capacity of the guardian for Derrick James, are you not?

*A.* Yes.

*Q.* Tell the Court, or the jury, if you would, how you became his guardian.

*A.* I went to probate court, and I asked for guardianship.

*Q.* And Derrick has been in your care, custody and control for how long?

*A.* Seven years.

*Q.* Seven years?

*A.* Yes.

*Q.* And tell the jury how you first came to meet and know Derrick James.

*A.* Well, I've known Derrick all his life. We've grown up together. We stayed in the same household throughout most of his life until he was 16.

*Q.* And who do you know Derrick James' mother to be?

*A.* Tanya James.

*Q.* So Tanya James is Derrick James' mother; is that correct?

*A.* Yes.

*Q.* And who is Tanya James in relationship to

you?

*A.* My sister.

*Q.* Your sister?

*A.* Yes.

*Q.* Okay. And who is your -- do you have the same mother and father?

*A.* We have the same mother.

*Q.* Same mother?

*A.* Yes.

*Q.* Okay. And did you ever live together at one point in time?

*A.* Yes.

*Q.* Okay. Did you ever come to a point in time when you were separated from your sister?

*A.* Yes.

*Q.* When was that?

*A.* When I was 8.

*Q.* Okay. Tell the jury what you know about that situation.

*A.* CPS came in and took myself, Derrick and my other nephew, Eric, because my mom was having problems with, I guess, a boyfriend at that current time. And they separated us, but Tanya was old enough to stay so they let Tanya stay with mom.

*Q.* So did she ever come back to live with you

again?

*A.* No. We never lived together, but we've seen them because they stayed -- well, when we got back to our great aunt, Ms. Tigner --

*Q.* Yes.

*A.* -- they stayed around the corner. So we used to see them all the time.

*Q.* So who was the other nephew that you mentioned?

*A.* Eric James.

*Q.* Who was the parent of Eric?

*A.* Felicia James.

*Q.* And who was Felicia in relation to you?

*A.* My oldest sister.

*Q.* So in terms of your siblings, you have Felicia James, who is your older sister; is that correct?

*A.* Yes.

*Q.* And then Tanya James?

*A.* Yes.

*Q.* And then you?

*A.* Yes.

*Q.* And Felicia James' child is --

*A.* Eric James.

*Q.* And Tanya's child is --

*A.* Derrick James.

*Q.* And you mentioned an aunt, Ms. Tigner. Is that right?

*A.* Yes.

*Q.* How was she related to you? Was she related to -- was she your mother's sister or what?

*A.* Yes.

*Q.* She was your mother's sister, okay.

Now, how did you come to know about Tanya James, in reference to the Four J's incident and the fire giving rise to the lawsuit we have today?

*A.* Well, I asked about Derrick's ACH program service. And when I switched it, they recommended him to see a psychologist by the name of Dr. Lockwood. And upon us arriving, Dr. Lockwood informed me that he used to have a patient by the name of Tanya James but she had died. And I was, like -- you know, I was inquisitive. So I looked into it a little further.

*Q.* And what did you find out and where did you look?

*A.* The first step I took, I called the coroner's office, the vital statistics, you know, to see if they had a Tanya James in their records that

had passed away in 2008. And, of course, I spoke with the lady and she told me that they did.

*Q.* And what did you do after that?

*A.* I went and got her death certificate.

*Q.* Okay. And did you learn anything from it?

*A.* On the death certificate, it said that she died in, in a fire intentionally set and of smoke inhalation. And I was, you know, I was, like, wow, she burned to death, you know. So I kind of spoke with my husband about it. And he informed me that, you know, I should look into it a little further. So I seen the address on the death certificate, so I went out to the house.

*Q.* And when you went out there, what did you, what did you see? What, what did you observe? What did you find, if anything?

*A.* I seen a badly burned structure of a house, still standing two years later. And I took the pictures of the outside. I took pictures of the inside. I seen the medicine, people's medicines still laying on the floor, clothes everywhere, garbage everywhere, like someone had been there doing shelter or just, you know, whatever they were doing in there. And I was like, wow, two years later, it's still open to the public. Anybody can just walk in,

you know. That's what I am thinking to myself when I am taking pictures. And it was eerie. But at the same time, I kind of felt like, you know, okay, I felt, I felt her presence there a little, you know. Because I kept going to this one particular bathroom over and over. No matter how many times I walked around the house, I kept going back to this one particular bathroom which later I found out that's where she was found, in that one particular bathroom.

Thank you.

*(Crying.)*

*Q.* (By Mr. Sparks) There have been some questions in reference to the idea that Tanya, having been over at the Beretta Court property since sometime in 2002, that she didn't have a family. You are aware of that question being raised, are you not?

*A.* Yes.

*Q.* And there has been some question regarding the idea of whether or not Derrick James is actually the heir to this Tanya James here. You are aware of that, correct?

*A.* Yes.

*Q.* And while you were at the property, did you find anything?

*A.* I found a binder that had -- it was closed.

And the spelling of the name was T-o-n-y-a James. And I was like, well, you know, I didn't really want it to be hers. But when I opened it, it was hers. It had all her information in it, and I found that picture in the -- when I first opened it, it was that picture and I knew it was her (indicating).

*Q.* And that binder has been marked as Exhibit 1 in your deposition. And this is -- is this a true and accurate copy of what you found?

*A.* Yes.

*Q.* And in this binder, is this the picture that you made reference to?

*A.* Yes.

*Q.* And when you saw this picture, did you recognize this individual to be your sister?

*A.* Yes.

*Q.* And that's the same picture that has been blown up and is right there; is that correct?

*A.* Yes.

*Q.* And so you knew that to be your sister?

*A.* Yes.

*Q.* Now, I also want to show you, if I may, some documentary evidence regarding some certificates.

Now --

*THE COURT:* Is this document in

evidence?

*MR. SPARKS:* It is, Your Honor.

*THE COURT:* Which exhibit are you referring to?

*MR. SPARKS:* This is Exhibit 19. We are going to put in 19, 20, 21, 22, 23, 25.

*Q.* (By Mr. Sparks) Can you see that on your screen?

*A.* Yes.

*Q.* What is that?

*A.* My birth certificate.

*Q.* That's your birth certificate?

*A.* Yes.

*Q.* At the bottom, can you show the jury where -- that's your name; is that correct?

*A.* Yes.

*Q.* And your date of birth is what?

*A.* 2/26/76.

*Q.* And the person there who is your mother is whom?

*A.* Mary Lee James.

*Q.* Mary Lee James? Okay. And she was from?

*A.* Missouri.

*Q.* Missouri?

*A.* Arkansas. I mean Missouri.

*Q.* And your father is whom?
*A.* Wiley Taylor.
*Q.* Is that his proper spelling of his name?
*A.* Yes.
*Q.* Now, I want to show you next, if I may, the certificate of birth of Tanya James.
*A.* Uh-huh.
*Q.* Tanya Chevette James. And who was her mother?
*A.* Mary Lee James.
*Q.* And where was she born?
*A.* She was born at Jefferson Davis Hospital in Houston.
*Q.* Okay. Where was Mary Lee James from?
*A.* Missouri.
*Q.* Missouri.
Does that look like the same signature that's on your birth certificate?
*A.* Yes.
*Q.* And you have known your mother's handwriting, and would you recognize it when you saw it?
*A.* Yes.
*Q.* Does that look like the handwriting of your mother?

*A.* Yes.

*Q.* I want to next show you the birth certificate of Derrick Leon James. Can you see that?

*A.* Yes.

*Q.* And what hospital was he born?

*A.* Jefferson Davis.

*Q.* And who is listed as his mother?

*A.* Tanya Chevette James.

*Q.* And on there, who is listed as the grandmother, in the right-hand corner?

*A.* Mary Lee Taylor.

*Q.* And does that look like the signature of your mother?

*A.* Yes.

*Q.* Now, on your birth certificate, it was Mary Lee --

*A.* Taylor.

*Q.* -- Taylor. Right?

*A.* Yes.

*Q.* And -- I'm sorry, on your birth certificate it was Mary Lee James.

*A.* In the column where it says "parent"?

*Q.* Yes.

*A.* It's Mary Lee James. But her signature is Mary Lee Taylor.

*Q.* Okay. And when, when you were born, she was married to your father; is that correct?

*A.* Yes.

*Q.* When Tanya James was born, she was not; is that right?

*A.* Yes.

*Q.* That's why y'all have different last names?

*A.* Yes.

*Q.* And that's why Derrick has the last name of his mother; is that correct?

*A.* Yes.

*Q.* Now, on the Application for Guardianship -- Tanya was taken into the Harris County Guardianship Program, was she not?

*A.* Yes.

*Q.* And I want to show you this document, which was filed in probate court back in, looks like July of 1997, the Application for Guardianship of Person. Do you see the name there where it says for Tanya, in the left-hand corner --

*A.* Yes.

*Q.* -- Tanya James at 2702 Little York?

*A.* Yes.

*Q.* Do you see where it says Mary Taylor, the mother?

*A.* Yes.

*Q.* Is that the right spelling of your mother's name?

*A.* No.

*Q.* Did you ever know her to live at that address, 4199 Trail Lake?

*A.* Yes.

*Q.* How did you know that to be an address where she was at?

*A.* I used to pick her up.

*Q.* What kind of facility was that?

*A.* It was a group home.

*Q.* Group home?

*A.* Yes.

*Q.* On the next page to this document, it has at the bottom "family." Do you see that?

*A.* Yes.

*Q.* And the siblings of Tanya James are whom?

*A.* Felicia James and Wylette Taylor.

*Q.* And that Wylette Taylor on the right-hand side, was that you?

*A.* Yes.

*Q.* Did you ever live at 2417 Rosalee?

*A.* Yes.

*Q.* Number 1?

*A.* Yes.

*Q.* And 2702 Little York, do you recognize that address?

*A.* No.

*Q.* No?

What about Elvira Tigner, does that name sound familiar to you?

*A.* Yes.

*Q.* Who was she?

*A.* Our aunt.

*Q.* Your aunt?

*A.* Uh-huh.

*Q.* Is that address of 3102 Nagle, do you recognize that address?

*A.* Yes.

*Q.* How do you recognize that address?

*A.* That's where we lived.

*Q.* That's where you lived?

*A.* Uh-huh.

*Q.* So once you found these documents, did it confirm to you that the same person of this Tanya James that passed away in the fire on September 5th of 2008 is the same Tanya James that's in that picture, who is the same Tanya James that is your sister?

*A.* Yes.

*Q.* Now, I want to show you the death certificate of Mary Lee Taylor. Do you see that?

*A.* Yes.

*Q.* And the individual who is listed on there as her daughter giving the information, is that you?

*A.* Yes.

*Q.* And this is the death certificate of Tanya James.

*MR. SPARKS:* Bring that down a little bit.

*Q.* (By Mr. Sparks) Can you see that she's got two spellings of her name? Is that correct?

*A.* Yes.

*Q.* T-a-n-y-a and T-o-n-y-a. Is that right?

*A.* Yes.

*Q.* And on the documents at Four J's, her name was spelled T-o-n-y-a. Is that correct?

*A.* Yes.

*Q.* But on the documents you guys had, it was T-a-n-y-a?

*A.* Yes.

*Q.* But in your mind, the same -- it was still your sister?

*A.* Yes.

*Q.* I want to show you a photo, if I may, of -- tell me if you recognize this photo and who are the persons therein.

*A.* My mother and my sister.

*Q.* I'm sorry?

*A.* My mother and my sister.

*Q.* Okay. Can you point to and identify each individual; and for that individual you identify, describe a piece of clothing they are wearing?

*A.* The lady in the green jacket is our mother, and the lady in the white sweater is my sister.

*Q.* When you say "the lady in the green," is it with the purple on with the heart around her chest, is that Mary Lee James?

*A.* Yes.

*Q.* And the lady who she has her arm, in the white, is that Tanya James?

*A.* Yes.

*Q.* That's your mother and sister?

*A.* Yes.

*Q.* That's the same individual that's right here on this photo here (indicating)?

*A.* Yes.

*Q.* The same individual whose photo that you found in this book here when you went out to the

facility at Beretta Court?

*A.* Yes.

*Q.* Now, you are aware, are you not, that there were pictures taken by the Houston Fire Department on September the 4th of 2008?

*A.* Yes.

*Q.* And you have seen those documents; is that right?

*A.* Yes.

*Q.* I want to ask you, have you seen this one before?

*A.* Yes.

*Q.* And are you of the opinion, based on the information from the Houston Fire Department, that that was Tanya James that was taken from the Beretta Court property?

*A.* Yes.

*THE COURT:* Which exhibit are you referring to?

*MR. SPARKS:* Judge, I am referring to photos from Intervenor's Exhibit Number 1.

*THE COURT:* Okay. Just for the record, make sure we are keeping of track of which exhibits we are referring to.

*MR. SPARKS:* Yes, sir. And there are

approximately four or five of these, the same exhibit number, Judge.

*Q.* (By Mr. Sparks) And you have seen this one before too; is that correct?

*A.* Yes.

*Q.* And this is also from the same batch of photos we got from the fire department, right?

*A.* Yes.

*Q.* You have seen this before, yes?

*A.* Yes.

*Q.* All these are photos of the various burns and things that Ms. James had on September 4, 2008; is that correct?

*A.* Yes.

*Q.* Do you recognize that one?

*A.* Yes.

*Q.* What about that one?

*A.* Yes.

*Q.* Is that of a foot?

*A.* Yes.

*Q.* It looks like a foot, if I am not mistaken. Right foot. Do you recognize that?

*A.* Yes.

*Q.* Now, were you ever --

*MR. SPARKS:* And, Judge, also for the

record, I want to go to Intervenor's Exhibit 25. I have a couple pictures from there.

*THE COURT:* 25 is not in evidence.

*MR. SPARKS:* All right. I thought we had agreed to that; but if we haven't, that's fine.

*THE COURT:* Is there an objection to Exhibit 25?

*MR. PLUMMER:* Yes, Your Honor.

*THE COURT:* All right.

*Q.* (By Mr. Sparks) When you went out to the facility, you said you took some photos. Is that correct?

*A.* Yes.

*Q.* Have you seen those photos since then?

*A.* Yes.

*Q.* And they were made by you?

*A.* Yes.

*Q.* Would you recognize them to be photos that you took at the facility of Beretta Court?

*A.* Yes.

*Q.* Would you recognize them again if you saw them?

*A.* Yes.

*Q.* Would they be true and accurate photos that were taken by you on -- do you know what date they

were taken?

*A.* I forgot the date, the exact date. But it should be stamped on the pictures.

*THE COURT:* I need you to speak up, please, ma'am.

*THE WITNESS:* Okay.

*A.* It should be stamped on the pictures, though.

*MR. SPARKS:* Judge, I want to approach the witness, see if she recognizes these, if I may.

*THE COURT:* Yes.

*Q.* (By Mr. Sparks) Would you take a look at Exhibit 25, if you would, and tell the jury, or tell the Court, whether or not you recognize those photos and, if so, how you recognize them.

*(Referenced documents tendered to the witness.)*

*A.* Yes, I do. These are the pictures that I took.

*Q.* (By Mr. Sparks) Are they a true and accurate reflection of what you saw when you took the pictures on the day that they were taken?

*A.* Yes.

*MR. SPARKS:* Judge, I would like to tender these to counsel.

*(Referenced documents tendered to counsel.)*

*MR. SPARKS:* They have been previously provided. I would like to offer them into evidence at this time.

*THE COURT:* Do you have an objection, Mr. Plummer?

*MR. PLUMMER:* Your Honor, just one second, if I can look at them, please.

The objection we have -- we have no objections to most of them. There is one we have an objection to, on the grounds of relevancy.

*THE COURT:* All right. Approach the bench, please.

*(Bench discussion.)*

*THE COURT:* All right. What's the relevance of this one, Mr. Sparks?

*MR. SPARKS:* Judge, Elisha Campbell was a resident, one of the four individuals that was the tenants there at the Beretta Court property. This shows that she was there, and this also shows what was left at the facility when my client went out and took these pictures and also found the binder.

*THE COURT:* Okay.

*MR. PLUMMER:* I don't see the relevance

to this particular photograph. There is no debate that she was a resident. That was not an issue. So it's redundant, if nothing else. But it is a mere photo. It is not relevant, has no bearing.

*THE COURT:* The objection is overruled. All of Exhibit 25 is admitted.

*MR. PLUMMER:* Very well, Your Honor.

*(Open court.)*

*THE COURT:* Objection overruled. Exhibit 25 is admitted.

*(Intervenor's Exhibit 25 is received in evidence.)*

*Q.* (By Mr. Sparks) Ms. James, I want to show you this photo. Tell the jury what it is a picture of, if you would.

*A.* It's the picture of the outside of the house.

*Q.* Would you speak up, please?

*A.* A picture of the outside of the house.

*Q.* Over on Beretta Court?

*A.* Yes.

*Q.* And you took this photo yourself, did you not?

*A.* Yes.

*Q.* And this here?

*A.* Is also the outside of the front of the house.

*Q.* And do you recognize this photo?

*A.* Yes. That's in the garage.

*Q.* And what about this?

*A.* That's in one of the bedrooms down the hall. I think the front bedroom.

*Q.* I show you this picture.

*A.* That's the bathroom.

*Q.* That's the bathroom?

*A.* Yes. The one that I kept going back to.

*Q.* And when you went out there, obviously you didn't have any restraint to allow you entrance into the property. Is that correct?

*A.* No.

*Q.* Now, let me show you this document here. What is this?

*A.* That is a medication packet of one of the clients that lived there.

*Q.* That was still there some, almost two years later?

*A.* Yes.

*Q.* Open to the public?

*A.* Yes.

*Q.* Can you describe this photo here?

*A.* That's the kitchen area.

*Q.* And that one?

*A.* This is the living room area where in the back, I guess, they stored clothes; but it, I guess, during the fire the wall got torn down or whatever. You can see the closet area. But this is the living room area.

*Q.* Does that look familiar to you?

*A.* Yes.

*Q.* You took that photo?

*A.* Yes.

*Q.* Any idea what it is of?

*A.* That's, like, a walkway going into the kitchen area.

*Q.* Now, do you know whether or not Ms. James had a will?

*A.* No, she didn't.

*Q.* And do you know whether or not she had any, any debts when she passed away?

*A.* Not that I'm aware of.

*Q.* And do you know of any reason why her estate needed to be administrated?

*A.* No, not that I am aware of.

*Q.* The only heir that you knew that she had was Derrick James; is that correct?

*A.* Yes.

*Q.* Did you know whether or not she owned any property?

*A.* No, she didn't.

*MR. SPARKS:* Pass the witness, Your Honor.

*THE COURT:* Mr. Thweatt?

*MR. THWEATT:* No questions, Your Honor.

*THE COURT:* Mr. Plummer?

*MR. PLUMMER:* Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PLUMMER:

*Q.* Ms. Taylor, let me understand this a little bit. I believe you said Ms. James was removed from the home -- or you were removed from the home she lived in when you were about 8 years old. Is that correct?

*A.* Yes.

*Q.* And after that, at some point in time, she lived around the corner from you. Is that correct?

*A.* Yes.

*Q.* What was her living arrangement then?

*A.* She was staying with my mother.

*Q.* What was her health condition like at that point in time?

*A.* As far as I knew she was fine, besides her mental stability.

*Q.* Okay. So she was mentally retarded her whole life; is that correct?

*A.* Yes, she was mentally challenged.

*Q.* It wasn't the result of any kind of traumatic injury, anything of that sort?

*A.* No. She was born that way.

*Q.* Okay. Now, how long was it that you lived around the corner from her?

*A.* Up until they took her away from my mom.

*Q.* And how old you were you then?

*A.* 16, I believe. 16, 17.

*Q.* Was she older than you?

*A.* Yes.

*Q.* How much older?

*A.* Five, between five years or so.

*Q.* So she was about 20 or 21 when they took her away from her mother?

*A.* Yes.

*Q.* When you say they took her away, who took her away from your mother?

*A.* Adult Protective Service.

*Q.* Okay. Why did they take her away from your mother?

*A.* My mom had a mentally --

*Q.* A breakdown?

*A.* Yeah.

*Q.* Okay. Was she put in a group home, your mother put in a group home after that?

*A.* Yes.

*Q.* Okay. And was that in Houston?

*A.* Yes.

*Q.* Okay. So at about -- when Ms. James is about 21 or thereabouts, was -- she was taken away from your mother's home and put in a group home. Is that correct?

*A.* I was unaware where they were putting her.

*Q.* Okay. You were 16. Okay. All right.

Now, from 16 years old to the time Ms. James died, is it fair to say that you had no contact with your sister?

*A.* Correct.

*Q.* How many years was that?

*A.* I don't know.

*Q.* How old are you now?

*A.* 35.

*Q.* Okay. Okay. So from the time you were 16 to, what, your early 30s, you had had no contact with your sister?

*A.* No.

*Q.* Now, I believe you said your sister had a child, and that was Derrick. Is that correct?

*A.* Yes.

*Q.* And was Derrick born with disabilities?

*A.* Yes.

*Q.* Physical or mental?

*A.* Mental.

*Q.* Okay. Do you recall how old Derrick was when he was diagnosed with his disabilities?

*A.* He was born that way also.

*Q.* Okay. And for a while, he stayed in the same household as you; is that correct?

*A.* For a while we all stayed in the same household with my mother.

*Q.* When was it that you ceased to live with Derrick?

*A.* When my aunt -- Derrick is very -- had gotten aggressive, and my aunt couldn't control him anymore. So I believe around 16, she gave him back to Child Protective Services.

*Q.* Okay. And when he went with Child Protective Services, do you recall where he lived then?

*A.* No.

*Q.* How long was he with Child Protective Services?

*A.* Up until the time that I became aware of where he was. Once I became old enough to where I could look for him, I called his caseworker, and his caseworker gave me the address to where he was. And I used to get him on weekends and holidays. And once they, I guess, that particular place where he was closed down, and they switched him to another place. And this place had enrolled him into a home community based service program.

*Q.* Was that the HCS Program?

*A.* Yes.

*Q.* Home and Community-based Services Program?

*A.* Yes.

*Q.* Okay.

*A.* And once had they enrolled him into that, I guess they wasn't doing what they supposed to do, and the lady from the HCS Program contacted me. And that's how I ended getting Derrick.

*Q.* When you got Derrick, you became his foster parent?

*A.* At that particular time, yes.

*Q.* How old was Derrick about that time?

*A.* 21, I believe. 21, 22.

*Q.* How severe is his retardation?

*A.* He is severely.

*Q.* Okay. Can you give me a general idea of what he can and can't do?

*A.* He can walk, he can talk, he can feed hisself. I have to bathe him. I have to dress him. I help him brush his teeth because I'm trying to get him to do it on his own. I take him to his doctor's appointments and things. He can't function on his own. You know, like if I wanted him to catch the bus to the doctor, he won't be able to do that.

*Q.* Okay. And he's been that way since birth?

*A.* Yes.

*Q.* What about the aggression, how is that? Has he -- has that been reduced, his level of aggression, or do you medicate for that?

*A.* We medicate for it.

*Q.* What medications?

*A.* He takes about 14 different pills. I know he takes Depakote. Carbatrol. Clonidine. Clonazepam. 1 milligram, 2-milligram. He takes a lot of different medications. I can't -- I know he takes Seroquel, 100, 200 and 400-milligram. And I can't think of the rest of them.

*Q.* Okay.

*A.* But he takes a lot of them.

*Q.* Okay. Now once you made this discovery, I think you said some doctor told you, Dr. Lockwood --

*A.* Lockwood.

*Q.* -- told you he had a patient that had died.

*A.* Yes.

*Q.* Once you made this discovery and discovered it was your sister that you believe died in this fire, Derrick filed this lawsuit; is that right?

*A.* Yes.

*Q.* Okay. And the lawsuit was already going on, but you all intervened in this lawsuit; is that right?

*A.* Yes.

*Q.* Do you remember the date it was filed?

*A.* I'm not sure of the date.

*Q.* Okay.

*MR. PLUMMER:* Judge, we would ask the Court to take judicial notice of its file and the Plea in Intervention that was filed in this matter, and that Plea in Intervention was filed September 3, 2010.

*THE COURT:* Any objection?

*MR. SPARKS:* No objection, Judge.

*MR. THWEATT:* No, Your Honor.

*THE COURT:* The Court will take judicial

notice.

*MR. PLUMMER:* Okay. May I approach the witness, Your Honor?

*THE COURT:* Yes.

*Q.* (By Mr. Plummer) Let me show you a copy of the Court's filed Plea in Intervention. And can you tell me who the person is that filed that lawsuit, in paragraph 1?

*A.* Derrick -- in paragraph 2?

*Q.* I'm sorry, 1 or 2.

*A.* Derrick James.

*Q.* I'm sorry. Tell me that again.

*A.* Derrick James.

*Q.* Okay. Now, at the time he filed this lawsuit in September, he was not competent to handle his own affairs; is that right?

*A.* That's correct.

*Q.* Okay. And you had not been appointed his guardian; is that correct?

*A.* Not at that point, no.

*Q.* By the way, is your name anywhere on this Plea in Intervention?

*A.* No.

*Q.* Take your time. You can look through it, if you would like.

*A.* No.

*Q.* Okay. Thank you, ma'am.

*A.* Uh-huh.

*Q.* Now, subsequently, after this was filed, that's when you became a guardian, sometime, I guess, in December?

*A.* Yes.

*Q.* That's because Derrick was incompetent, legally incompetent to handle his affairs; is that right?

*A.* Yes.

*Q.* And your guardianship gives you the right to handle his affairs?

*A.* Yes.

*Q.* And you filed a subsequent Amended Plea in Intervention in December or thereabouts; is that correct?

*A.* Yes.

*Q.* To your knowledge, is -- well, how long had it been since Derrick James had seen his mother?

*A.* He hadn't seen her since they took her away, since Adult Protective Service took her.

*Q.* So he was about what age then?

Was he still a child, small child?

*A.* Yeah. He wasn't a small kid. He was like,

what, 12, 13, I believe.

*Q.* Okay. You never went to see Tanya James at Beretta Court, correct?

*A.* I was unaware where she was at the time.

*Q.* So I assume that's a yes.

*A.* Yes.

*Q.* And you never went to see her at the facility she stayed at before she went to Beretta Court; is that correct?

*A.* Yes.

*Q.* And other than what you have tried to learn about since this lawsuit was filed, you know nothing about the living arrangement of Tanya James at Beretta Court; is that correct?

*A.* No.

*Q.* You do know what was in the binder that you recovered, correct?

*A.* Yes.

*MR. PLUMMER:* Can I see Exhibit 1, please?

*(Referenced document tendered to counsel.)*

*Q.* (By Mr. Plummer) By the way, in your inquiry about what happened to Tanya and how it happened, you became aware that Esperanza Arzola,

another resident, started the fire; is that correct?

*A.* That wasn't until after I retained the lawyer that I found out that.

*Q.* Okay. But that's still your understanding, that she started the fire?

*A.* Yes.

*Q.* And -- okay. Now, when you got this binder, did you look through it?

*A.* Yes.

*Q.* And you read through it?

*A.* Yes.

*Q.* And it had an Individualized Emergency Plan in it; is that correct?

*A.* Yes.

*Q.* And that Individualized Emergency Plan was for Tanya; is that correct?

*A.* Yes.

*Q.* And part of that was a fire evacuation procedure; is that correct?

*A.* Yes.

*Q.* This was, this was a, the binder for her at the Beretta Court; is that right?

*A.* Yes.

*Q.* And in the Individualized Emergency Plan, it talked about what to do in the event of a hurricane,

what to do in the event of a flood, tornadoes. It even had what to do in the event of nuclear war and terrorism. Is that correct?

*A.* Yes.

*Q.* And the fire procedure in there, fire evacuation procedure, said that the staff should lead Tanya out physically by her hand, proceed to a designated safe haven across the street and comfort Tanya with reassuring words. Is that what it says?

*A.* Yes.

*Q.* It also describes the circumstances in which she lives in that four-member home, right?

*A.* Yes.

*Q.* The copy you got also had progress notes in it, didn't it?

*A.* Yes.

*Q.* And the progress notes include progress notes from Amuche Udemezue; is that correct?

*A.* Yes.

*Q.* These are basically a diary of what was done every day?

*A.* Yes.

*Q.* By the staff?

*A.* Yes.

*Q.* Now, in addition to the lawsuit that you,

the intervention you filed, you, you -- by the way, in addition to Esperanza Arzola as being the person you discovered who started the fire, you also felt that Amuche Udemezue was also responsible for starting -- for this loss; is that correct?

*A.* Yes.

*Q.* And you sued her initially also; is that right?

*A.* Yes.

*Q.* And that lawsuit was filed with the original intervention back in September of 2010, right?

*A.* Yes.

*Q.* And you remember that she gave, Amuche Udemezue gave a deposition in February of 2011, right?

*A.* I was unaware what date; but, yes, I'm aware she gave one.

*Q.* And shortly after that, you dismissed her from it; is that right?

*A.* My lawyers did. I didn't, but yes.

*Q.* You know she was dismissed from the lawsuit?

*A.* Yes.

*Q.* So originally you accused her of being responsible for not saving your sister, and then you let her go. Is that right?

*A.* Yes.

*Q.* What are you asking this jury to do for you in this lawsuit?

*A.* I just want justice --

*Q.* Okay.

*A.* -- for what was done. I mean, she was unable of capable of doing it on her own. And if I don't get a dime, I would like to have a head stone for my sister. I go to the grave site and see nothing but grass. If I could get a head stone out of all this, I would be fine.

*Q.* Thank you, ma'am.

*MR. PLUMMER:* Pass the witness.

*THE COURT:* Mr. Sparks?

*MR. SPARKS:* Couple questions, Judge.

REDIRECT EXAMINATION

BY MR. SPARKS:

*Q.* When you were appointed guardian for Derrick, that was in December 2010, was it not?

*A.* Yes.

*Q.* And subsequent to that, you filed an amended -- First Amended Plea in Intervention; is that right?

*A.* Yes.

*Q.* And in that Amended Plea in Intervention,

you filed as Wylette Taylor, guardian of Derrick James; is that right?

*A.* Yes.

*Q.* And that was in also December of 2010; is that correct?

*A.* Yes.

*Q.* And you also filed an application and got permission from the Probate Court Number 4, who granted you a guardianship, to have the authority to contract and act on behalf of Derrick James; is that right?

*A.* Yes.

*Q.* And it also gave you back authority to when the original lawsuit was filed in this matter, which was September of 2010; is that right?

*A.* Yes.

*Q.* And all that was within the -- strike that, Judge.

And that's the authority that you are operating on today; is that right?

*A.* Yes.

*Q.* Now, Mr. Plummer asked you what are you looking for out of this. Are you looking for anything? I mean, you are not trying to get anything for yourself, are you?

*A.* No.

*Q.* This is all on behalf of your nephew?

*A.* Yes.

*Q.* On this document that -- I mean, on this book that you found there, that Mr. Plummer was asking you questions about it --

*A.* Yes.

*Q.* Did you also see in there where it says what the policy of Four J's is?

*A.* Yes.

*Q.* Do you see that?

*MR. SPARKS:* Let me publish this for the jury, Judge.

*THE COURT:* Which exhibit is that?

*MR. SPARKS:* This is Intervenor's Exhibit 2?

*THE COURT:* Thank you.

*Q.* (By Mr. Sparks) Let's see if I can get this. Can you read that?

*A.* Yes.

*Q.* Can you read it out loud for the jury?

*A.* "It is the policy of Four J's Community Living Center to provide a safe environment for all consumers. In the event of a disaster or an emergency, safety of the consumer and preservation of

life is" -- what -- is the -- I can't see.

*Q.* All right. That's okay.

*A.* My glasses are foggy.

*Q.* Okay. Now, do you think that that policy was followed in reference to the situation giving rise to your sister's death?

*A.* No.

*MR. SPARKS:* Pass the witness, Judge.

*THE COURT:* Mr. Plummer?

*MR. PLUMMER:* Nothing further, Your Honor.

*THE COURT:* Mr. Thweatt?

*MR. THWEATT:* Nothing, Your Honor.

*THE COURT:* Thank you, ma'am, you may step down.

*(The witness was excused from the witness stand.)*

*THE COURT:* Call your next witness.

*MR. THWEATT:* Your Honor, call Anthonia Uduma, please.

*THE COURT:* Raise your right hand.

*(Witness placed under oath.)*

*THE COURT:* Have a seat, please.

*You may proceed.*

ANTHONIA UDUMA,

having been placed under oath, testified as follows:

DIRECT EXAMINATION

BY MR. THWEATT:

*Q.* Ms. Uduma, would you state your full name, please.

*A.* My name is Anthonia Uduma.

*Q.* Are you the corporate representative for Four J's Community Living Center in this trial?

*A.* Yes, I am.

*Q.* You are also appearing in this trial in your individual capacity because you have been personally sued as the owner of the house that burned down. Is that right?

*A.* That's what I understand.

*Q.* You understand your house burned down September 4, 2008, do you not?

*A.* Yes, I do.

*Q.* As the corporate representative of Four J's Community Living Center, Inc., you don't believe that Four J's has any responsibility for this fire or the injuries that resulted. Isn't that right?

*A.* I believe Four J's did everything that it is supposed to do to make sure that the employees do what they are supposed to do in case of fire. I

believe we did everything that needed to be done.

*Q.* And because you believe that, Ms. Uduma, you don't believe that Four J's has any responsibility for this fire or the injuries that resulted; isn't that correct?

*A.* Based on the effort the company made to make sure that the employees were trained and equipped to handle emergencies, I don't believe they are responsible for the fire.

*Q.* Let me ask it very simply this way, Ms. Uduma, do you believe that Four J's, your company, has any responsibility for the fire or the injuries that resulted?

*A.* Morally, I believe we are responsible. Legally, I don't believe we are responsible.

*Q.* You believe you are morally responsible but not legally responsible. Is that your testimony?

*A.* Yes.

*Q.* The reason that you believe you are morally responsible is because you know what happened that night should not ever have happened. Isn't that correct?

*A.* That's correct.

*Q.* But the reason you are drawing a distinction between the morality and the legality is because if

you tell this jury you are legally responsible, you know they have the ability to issue a verdict against your company. Isn't that correct?

*A.* That's not correct.

*Q.* You don't believe that you personally have any responsibility for this fire or the injuries that result either, do you?

*A.* I morally believe -- I mean, I morally believe we are partly responsible for the fire. But legally, I have looked at everything. The company have looked at everything. The state have looked at all the documents. And they find that there no way where we are legally responsible for the fire.

*Q.* That wasn't my question, Ms. Uduma.

My question is this: I want to know whether you believe that you personally, separate and apart from your company, have any responsibility for this fire and the injuries that resulted.

*A.* No.

*Q.* Do you believe that you have any moral responsibility, personally as separate and apart from this company, for the injuries and the fire that resulted?

*A.* No. [sic.]

*Q.* So it's just your company that has a moral

responsibility; is that right?

*A.* That's right.

*Q.* But your company doesn't have a soul, does it? The company doesn't have feelings, does it?

*A.* It's an entity.

*Q.* It can't, right?

*A.* Yes.

*Q.* Are you aware that although Esperanza Arzola was arrested and charged with arson on the night of the fire, she was later deemed incompetent to stand trial by a judge in Fort Bend County?

*A.* I'm not aware of that.

*MR. PLUMMER:* Judge, may we approach?

*THE COURT:* Yes.

*(Bench discussion.)*

*MR. PLUMMER:* Withdraw our objection.

*THE COURT:* All right. Have a seat.

*(Open court.)*

*Q.* (By Mr. Thweatt) Ms. Uduma, instead of accepting responsibility for either yourself or for your company for this fire, you are asking this jury to blame Esperanza Arzola for the fire and the injuries that resulted; isn't that right?

*A.* I'm asking the jury to look at all the evidence and then determine whether Four J's did

everything we are supposed to do, that should have been done.

*Q.* Are you aware that your attorneys filed a motion to designate Esperanza Arzola as a responsible party for this fire?

*A.* That's correct.

*Q.* And, therefore, you are asking this jury to blame her for this fire, are you not?

*A.* She's a competent adult who is just mild mental retardation, and she set up the fire and she accepted setting the fire.

*Q.* You believe that she was a competent adult?

*A.* Yes. And that's why she did not have a guardian.

*Q.* And, therefore, because you believe that she was competent, you are asking this jury to blame her for the entirety of the fire and the injuries; is that right?

*A.* It's not a word about blame. So I'm just letting the jury know who set the fire.

*Q.* Was she to blame for the injuries that resulted, in your opinion?

*A.* I don't know about the word "blame."

*Q.* Was she responsible for the injuries that resulted, in your opinion?

*A.* She was responsible. She is the one that set the house on fire.

*Q.* You don't believe that this fire resulted from anything that any doctor did or failed to do; isn't that right?

*A.* That's correct.

*Q.* You don't believe this fire resulted from anything any nurse did or failed to do; isn't that right as well?

*A.* That's correct.

*Q.* And you are not a doctor, right?

*A.* I'm not.

*Q.* You are not a nurse, right?

*A.* I'm not.

*Q.* You are an accountant by training; isn't that correct?

*A.* That's correct.

*Q.* Now you would agree that the occurrence of this fire was certainly a safety issue at Four J's, was it not?

*A.* No, I don't.

*Q.* You don't agree that the fire was a safety issue?

*A.* I don't.

*Q.* You don't believe that the fire was a

healthcare issue at Four J's, do you?

*A.* I don't.

*Q.* You do not?

*A.* I do not.

*Q.* Do you believe that this fire was directly related to any healthcare issue at Four J's?

*A.* No, I don't.

*Q.* Before this fire occurred, you and Four J's knew that Esperanza Arzola had a history of violence toward your staff; isn't that correct?

*A.* That's correct.

*Q.* You knew that she had tried to commit suicide on several occasions?

*A.* Yes.

*Q.* You knew that Esperanza Arzola was bipolar before this fire?

*A.* Yes.

*Q.* You knew that Esperanza Arzola was schizophrenic before this fire?

*A.* I'm not sure of that diagnosis, but --

*Q.* Have you reviewed the notes of Dr. Kirk Lockwood?

*A.* No, I did not.

*Q.* Do you know who -- who is Dr. Kirk Lockwood?

*A.* Dr. Kirk Lockwood is, is a psychologist that

the company contracted to develop behavior plans for Esperanza and other clients that were with Four J's. And his job was to take a look and train the employees and instruct them on what to do if aggression -- if there is aggression or if Esperanza tries to do aggression or tries to elope. He practically wrote down all the plans that the employees should follow.

*MR. THWEATT:* Your Honor, I would offer Dr. Kirk Lockwood's notes to Four J's Community Living Center as a --

*THE COURT:* Which exhibit are you referring to?

*MR. THWEATT:* Exhibit 49, Your Honor. I apologize. We offer those into evidence at this time.

*THE COURT:* Any objection?

*MR. RAVAL:* Your Honor, we renew our objection as to hearsay.

*THE COURT:* Approach the bench.

*(Bench discussion.)*

*THE COURT:* Have you established a hearsay exception?

*MR. THWEATT:* It goes to notice, Your Honor.

*THE COURT:* Notice of what?

*MR. THWEATT:* She testified she did not know that Ms. Arzola was schizophrenic.

*THE COURT:* Do you have any evidence that she received those notes? Have you established any of that?

*MR. THWEATT:* I can ask her.

*THE COURT:* Right now, the objection is sustained.

*(Open court.)*

*THE COURT:* The objection is sustained.

*MR. THWEATT:* May I approach the witness, Your Honor?

*THE COURT:* Yes.

*Q.* (By Mr. Thweatt) Ms. Uduma, I'm handing you Plaintiff's Exhibit 49, previously marked. Do you recognize that document?

*A.* Yes.

*Q.* Would you tell the jury what it is?

*A.* This is notes of Dr. Lockwood, psychological doctor. But this document doesn't usually come to me. It goes to the case managers. They are the ones that handles all these documents.

*Q.* The case manager is someone that works for your company, correct?

*A.* That's correct.

*Q.* This document, Plaintiff's Exhibit 49, indicates that it is addressed to Four J's Community Living Center, Incorporated, right?

*A.* That's correct.

*Q.* And it's dated August 3, 2008?

*A.* Yes.

*Q.* Which was about a month before the fire?

*A.* Yes.

*Q.* All right.

*MR. THWEATT:* Your Honor, at this time we offer Plaintiff's Exhibit 49 into evidence.

*MR. PLUMMER:* Counsel, may I see it, please?

*(Referenced document tendered to counsel.)*

*MR. PLUMMER:* Thank you.

No objection, Your Honor.

*THE COURT:* 49 is admitted.

*(Plaintiff's Exhibit 49 is received in evidence.)*

*Q.* (By Mr. Thweatt) All right. Ms. Uduma, I'm showing you Esperanza Arzola -- Plaintiff's Exhibit 44. This is Esperanza Arzola's Annual Individual Service Plan; isn't that right?

*A.* Yes.

*Q.* This document is prepared by Four J's, true?
*A.* This document was prepared by the case manager and the IBT members. And the IBT members is made up of the case manager, the nurse, the psychologist, that they have directors, and the direct care staff.
*Q.* I'm just asking whether it was prepared by Four J's. And it was, wasn't it?
*A.* Yes.
*Q.* All right. And we go to -- on page 2 of Plaintiff's Exhibit 44, you see the portion that I have highlighted there that says "the history obtained from Richmond State School"?
*A.* Yes.
*Q.* I'll continue reading. "Reveals that at age 12 Esperanza was admit to hospital overnight for sexual abuse. No further details of this incident were available, nor the perpetrator of the abuse situation identified. Esperanza stated she began drinking beer at age 14 and indicates that she has experience with tobacco, cocaine and other substances."

Did I read that correctly?
*A.* Yes.
*Q.* "Esperanza stated that she had multiple

sexual partners. Records also indicate that she has had several sexually transmitted diseases in the past and possibly traded sexual favors for drugs." Continuing on in that paragraph: "Records indicate" --

*MR. THWEATT:* Highlight this here.

*Q.* (By Mr. Thweatt) "Records indicate that Esperanza was emotionally, physically and sexually abused by both biological parents to the extent of their parental rights being terminated in November of 1998."

Do you see that there?

*A.* Yes.

*MR. THWEATT:* Highlight this portion here.

*Q.* (By Mr. Thweatt) "According to the reports, Ms. Arzola" -- Esperanza's mother -- "was aware that her husband was sexually abusing the children but continued to live with him."

Do you see that there?

*A.* Yes.

*Q.* That was known to Four J's before this fire, wasn't it?

*A.* Yes.

*Q.* Highlight this for you, on page 3 of

Plaintiff's Exhibit 44.

"Esperanza exhibited severe bouts of self-abuse and depression. Reportedly, the parents would verbally assault Esperanza, blaming her for their termination of parental rights and for the scrutiny of law enforcement into their home."

*A.* Yes.

*Q.* Did I read that correctly?

*A.* Yes.

*Q.* "In addition, her parents facilitated an unauthroized departure from Richmond, where they picked her up and took her back to the Dallas area. It was at this time when Esperanza became infected with herpes as a result of the sexual activity between her and her father."

Do you see that?

*A.* Yes.

*Q.* That also was known to Four J's before this fire, correct?

*A.* Yes.

*Q.* It does appear in this document, Plaintiff's Exhibit 44, a long history of multiple placements, a variety of different homes. Do you see that there?

*A.* Yes.

*Q.* You know that Esperanza, before this fire,

was taking several antipsychotic medications, do you not?

*A.* Yes.

*Q.* She was taking antidepressants before this fire?

*A.* No.

*Q.* She was not?

*A.* She was not on antidepressant for fire. She was on antidepressant for depression and for all that behavior dealing with that issues.

*Q.* I'm not asking whether she was on antidepressants for fire.

*A.* Oh, I'm sorry.

*Q.* I'm asking whether she was taking antidepressants. And she was, wasn't she?

*A.* Yes, she was.

*Q.* You knew that Esperanza's mother had prostituted her when she was younger. You knew that according to the service plan, didn't you?

*A.* Yes. That's what the history said.

*Q.* And you are here telling this jury, despite all of those things that we have just heard about, that Esperanza Arzola was competent on September 4, 2008 when she set that fire?

*A.* Yes.

*Q.* Your company knew all of those things, as well, about Esperanza Arzola, didn't they?

*A.* Could you repeat that?

*Q.* Your company knew all of those things about Ms. Arzola, in addition to yourself; isn't that right?

*A.* The company knew about it.

*Q.* And so did you, right?

*A.* The case managers knew about it.

*Q.* Were cigarette lighters prohibited in the Beretta Court Home?

*A.* Yes. We do not allow cigarette lighters. It's not prohibited, but we do not allow the clients to hold a cigarette lighter.

*Q.* It's not prohibited, but we don't allow the clients to have a cigarette lighter. Is that your testimony?

*A.* That's my testimony.

*Q.* Are there circumstances where a client might be permitted to hold a cigarette lighter in the Beretta Court Home that you owned?

*A.* No.

*Q.* So doesn't that make it prohibited?

*A.* It doesn't because the staff or clients that smoke, we train the employees to hold the cigarette

lighter so that they will be able to go outside and light it for them and then retain the cigarette lighter.

*Q.* So the staff can have cigarette lighters?

*A.* Yes.

*Q.* Can staff have pistols?

*A.* No.

*Q.* Can staff have knives?

*A.* For cooking, we have knives at the house where we have to lock it up because of Esperanza's self-injurious behavior.

*Q.* Her self-injurious behavior, meaning she tried to kill herself several times before the fire, right?

*A.* I know of two times. I don't know of several times.

*Q.* On at least two occasions before this fire, Ms. Arzola tried to kill herself; isn't that right?

*A.* Yes.

*Q.* And that's the reason why you would never permit a weapon in the Beretta Court Home that you owned. Is that right?

*A.* The reason the weapon -- we went by what the psychologist put on the behavior therapy plan, and that was that all sharp objects need to be locked up,

all liquid need to be locked up. And we did all that. So we went step-by-step from what Dr. Lockwood put on the behavior plan.

*Q.* Dr. Lockwood never approved Ms. Arzola having a cigarette lighter in her personal possession, did he?

*A.* No, he did not. And that's why we did not allow her to keep a cigarette lighter.

*Q.* To your knowledge, was Ms. Arzola's room ever searched to make sure that she did not have a cigarette lighter so that she wouldn't hurt herself or somebody else?

*A.* The way the Home and Community-based Services is structured, the room belongs to her; but when she leaves to go to the bathroom, the staff will go in there and clean up the room and fix up the bed and fix up the dressers and hang her clothes. But in terms of searching her room, there was no reason to search there because they are barely going to her house to take care of her.

*Q.* You could certainly search a room to prevent, say, a suicide attempt, couldn't you?

*A.* Everything that Dr. Lockwood put on the behavior plan to prevent suicide attempt, we did not have it in the room or in the house. It was locked

and she was not allowed to go there. We bought her elastic belt. So there was nothing in the room that the staff -- warned the staff to go and search.

*Q.* Ms. Uduma, I'm just asking whether it was possible for Four J's to search her room to make sure that she didn't hurt herself or someone else. That was possible, wasn't it?

*A.* If there was any reason for that, yes.

*Q.* Did Ms. Arzola ever receive a pat-down of her body by any Four J's staff to make sure that she didn't have a cigarette lighter on her clothing?

*A.* We cannot do that. It's just like somebody coming to my house and then search my body to search me. There was no reason for that.

*Q.* Except for the distinction, Ms. Uduma, is that you are the president of a company, you have a college degree, you don't have this history of psychotic behavior, suicide attempts, you are not on medications. That's a big distinction, wouldn't you agree?

*A.* I agree.

*Q.* All right. So neither you nor Four J's ever did anything to ensure that Ms. Arzola didn't have unsupervised access to a cigarette lighter. Isn't that correct?

*A.* That's not correct.

*Q.* You didn't search her person, right?

*A.* We are not allowed to search any of them.

*Q.* I'm not asking you why you didn't search her. I'm just highlighting that you didn't search her. Right?

*A.* No, we didn't. I did not because I didn't work at the house. But the staff is not allowed to search her.

*Q.* The staff never searched her, and the staff never searched her room, correct?

*A.* That's correct.

*Q.* All right. You knew personally, Ms. Uduma, that before the fire Jenny Wagner and Tanya James, due to their disabilities, were completely helpless in the event that a fire broke out in your house, didn't you?

*A.* The only person that was completely helpless was Jenny Wagner. Tanya James could walk and run.

*Q.* Didn't you hear Mr. Plummer, your attorney, read the Individualized Care Plan or emergency plan to Ms. Wylette Taylor a while ago?

*A.* Yes, I did.

*Q.* Didn't you hear him say that in the event of a fire, she has to be walked out of the house by

hand, comforted with reassuring words and taken to a safe place? Didn't you hear him say that?

*A.* Yes, he said that. But she was not helpless. I mean, if you tell her, Tanya, let's go, and grab her, she would go with you. If you are running, she would run with you.

*Q.* What about Ms. Wagner?

*A.* Ms. Wagner was the only one that needed total care.

*Q.* How do you know that Ms. James would do those kinds of things if you were never at the house?

*A.* Because I see her. Sometimes I visit the house, and I see how they did her.

*Q.* If a fire broke out, you knew that Tanya James and Jenny Wagner were totally reliant on others to help them escape your house; isn't that correct?

*A.* That's correct.

*Q.* Neither Jenny nor Tanya were ever to be left alone in the event of a fire; isn't that right?

*A.* That's correct.

*Q.* That's what your Individualized Emergency Plan from Four J's says, doesn't it?

*A.* Yes.

*Q.* In fact, the rule at Four J's is that a Four J's employee is, quote, never supposed to leave

your consumers unattended. Isn't that correct?

*A.* Yes.

*Q.* That's something that you knew before this fire, right?

*A.* Yes.

*Q.* That's something your company knew before this fire, correct?

*A.* Yes.

*Q.* But there was only one staff member on duty the night of the fire; isn't that right?

*A.* Yes.

*Q.* Even though Four J's own documents in this case show the ratio is supposed to be one person -- one staff person per three consumers, generally. Isn't that correct?

*A.* That's not correct.

*Q.* That's not what your own documents say?

*A.* No.

*Q.* Let's take a look at Plaintiff's Exhibit 37.

I will enlarge this.

"Shift Assignments. Generally, the shift ratio of one staff to three consumers."

Isn't that what it says?

*A.* This is what it says. Because we have some houses that have only three clients. And before this

training documents were developed, the state had not passed a rule to expand it to four people in the house. Before it was just three people, three clients per house. So then when they cut the rate, they allowed the providers to add one more to make it four bedroom. So we still have many houses that have only three clients in it.

*Q.* Your policy, Ms. Uduma, right here in this document, Plaintiff's Exhibit 37, says, "Generally, the shift ratio of one staff to three consumers." That's what it says, doesn't it?

*A.* This is not a policy. This is a training guideline that we use to train the staff.

*Q.* You use this document to train residential staff, right?

*A.* Yes. We use it to train the residential staff, to inform them that the house that they are going to work belongs to the clients. So before they use the phone or use anything in the house, they have to get -- to take permission from the clients. So that's what this document was used, to train them on abuse and neglect.

*MR. THWEATT:* Your Honor, I object to the nonresponsive portion of the answer.

*THE COURT:* Please answer the question

that is asked.

*Q.* (By Mr. Thweatt) And if you have to put two people into the home, rather than one, to take care of the residents who live there, that costs Four J's money, doesn't it?

*A.* Yes. We have to pay the employees.

*Q.* It's more expensive for Four J's to staff two people in a house than one, right?

*A.* We just have to go by what is the --

*Q.* That's not my question, ma'am.

My question is: It's more expensive for Four J's to staff two people in a group home than one, isn't it?

*A.* Yes.

*Q.* Staffing two people in a home where at least one of the persons who lives there is completely helpless would increase the safety response for the staff members in the event of a fire, wouldn't it?

*A.* Could you repeat the question.

*Q.* Staffing two people, two employee, in the home, where at least one of those residents, like Jenny Wagner, was completely helpless in a fire would certainly increase the safety response of the staff there in the event of a fire. Isn't that right?

*A.* I don't really know if it would increase the

safety of that fire because of the panic, I mean, you still will have it.

*Q.* If there is only one staff member on duty, Ms. Uduma, when a fire occurs, at least one of the people in that house at Beretta Court obviously would have been left unattended; isn't that right?

*A.* If the staff panic and run outside, like the one that I had they ran, it would still leave the clients unattended.

*MR. THWEATT:* Objection, nonresponsive.

*THE COURT:* Please answer the question.

*Q.* (By Mr. Thweatt) Ms. Uduma, if there is only one staff member on duty the fire occurs --

*A.* Yes.

*Q.* -- and at about least one of the people in that house, like Jenny Wagner, is completely helpless in the event of a fire, somebody would have had to have been unattended while the staff member attended to her, correct?

*A.* Can you repeat that question again.

*Q.* Was Ms. Wagner able to walk?

*A.* No.

*Q.* In the event of a fire, somebody had to pick her up, stand up, her out of the bed and walk out of the house with her; isn't that right?

*A.* That's right.

*Q.* So the other three people who lived there in that house would have been left unattended, true?

*A.* Sir, I am misunderstanding your last question. If you can repeat the last part, then I will be able to answer.

*Q.* There are safety rules set up by Four J's to ensure that nobody gets burned or killed in the event of a fire, aren't there?

*A.* Yes.

*Q.* Those rules require that a staff member never leave Jenny Wagner unattended in the event of a fire, right?

*A.* Yes.

*Q.* Those rules also require that a staff member never leave Tanya James unattended in the event of a fire, correct?

*A.* No client should be left unattended in the case of a fire.

*Q.* And if there are four clients and one staff member, simple mathematics tells you, as an accounting major, someone with a master's degree in accounting, that one of those four people, at least, is going to be left unattended while the staff member tends to that person and gets them out of the house,

right?

*A.* That is why, when we are placing the clients in the home, we only put one person that requires total care. The other ones, you can at least shout or tell them run, they will be able to run. So that's why we structure the group homes like that.

*Q.* You asked for a clarification of my question. I provided it to you, Ms. Uduma. Do you understand my question that I am asking now?

*A.* I think so.

*Q.* Would you answer it, please?

*A.* I just did.

*Q.* Tanya and Jenny were both left unattended the night of that fire, weren't they?

*A.* That's what I was made to -- I was not there to know exactly what happened.

*Q.* Didn't you ask your employee what happened?

*A.* Yes, I did.

*Q.* Didn't she tell you that she panicked and she ran out of the house?

*A.* She sure did.

*Q.* Meaning she left Tanya and Jenny back by themselves, right?

*A.* Yes.

*Q.* Let me show you a picture from Plaintiff's

Exhibit 26. This is page 68 of Plaintiff's Exhibit 26.

There is a fire extinguisher in that kitchen in the home, wasn't there, the night of the fire, Ms. Uduma? Do you see that?

*A.* Yes.

*Q.* Here is another view of it. Plaintiff's Exhibit 26.

Nobody used that fire extinguisher that evening, did they?

*A.* I don't think so. I wasn't there.

*Q.* Didn't you ask her if she used the fire extinguisher?

*A.* She said she panicked and run out.

*Q.* She never told you she used the fire extinguisher, did she?

*A.* She did not.

*Q.* Does that look like a fire extinguisher that's been used to you?

*A.* I wouldn't know by just looking at the picture.

*Q.* Let me show you another picture from Plaintiff's Exhibit 26. This is page 76 of Plaintiff's Exhibit 26.

This is a picture of the rear door in

that home. You see that lock there?

*A.* Yes, sir.

*Q.* Requires a key to unlock it; isn't that right?

*A.* Yes, sir.

*Q.* It's a deadbolt lock with a key, true?

*A.* Yes, sir.

*Q.* See how the fire department has knocked the other doorknob off in their efforts to rescue the people who were inside? Do you see that?

*A.* Yes, sir.

*Q.* Did you give a key to the staff member on duty that night?

*A.* I don't usually give keys to the staff members. The supervisors will give keys. But I know when I took the fire marshal to that house, there was always a key in the drawer near the door, where they usually would get it out and open the back door for the fire marshal.

*Q.* Why did you take the fire marshal to the house?

*A.* Because when you have a four-bed, the HCS policy and procedure require that every year the fire marshal will have to come and do inspection to make sure that all the fire systems are working, that the

house is in compliance with the state fire code.

*Q.* Because you owned the house and you had to escort the fire marshal through the premises, right?

*A.* No. This was done by Four J's, but I usually take the fire marshals. It has nothing to do with group home, because the house was leased to the company.

*Q.* You had actual personal knowledge of the risk that a fire would present to Jenny and Tanya, didn't you?

*A.* No.

*Q.* You never had any personal knowledge of the risk that a fire would present to incapacitated persons staying in the home that you owned?

*A.* No. I know fire is bad, but --

*Q.* Well, if you know it's bad, don't you know, then, that it presents a risk to their person and their security and their safety and their health well-being?

*A.* Yes.

*Q.* Despite the knowledge of that risk, Ms. Uduma, you had never installed overhead sprinklers in the Beretta Court house that you owned, did you?

*A.* You keep referring to me. The house was

leased to the company.

*Q.* I'm asking you personally. You owned the house, right?

*A.* Yeah. When you --

*Q.* Despite your knowledge --

*MR. PLUMMER:* Excuse me, Your Honor. I object to arguing, to interrupting the witness and arguing with the witness.

*THE COURT:* Overruled.

*A.* When you lease a house to anybody --

*Q.* (By Mr. Thweatt) There is not a question pending.

Here's my question: Despite the knowledge, that you personally had, of the risk of fire that presented to Jenny and Tanya, you never installed overhead sprinklers in that house, correct?

*A.* I'm not responsible for --

*Q.* That's not my question.

*A.* No.

*Q.* My question is whether or not you installed overhead sprinklers in the house. And you didn't, did you?

*A.* No, I didn't.

*Q.* You agree with me that, as the owner of the house, you had a responsibility to keep that house

safe for the mentally retarded persons who you knew were living there, don't you?

*A.* Which I did.

*Q.* You agree with me that, as the president of Four J's Community Living Center, your company also had a responsibility to keep that house safe as well, right?

*A.* That's correct.

*Q.* You would agree with me that overhead sprinklers would have made the Beretta Court residence safer than it was on the night of the fire?

*A.* I don't think so.

*Q.* You don't think the sprinklers, which would dowse a fire that's growing, just like the sprinklers we have in our courthouse here, that would make that safer?

*A.* I, I don't know. Honestly, I don't know.

*THE COURT:* We're going to take our mid-morning break. It's 10:00 o'clock. We will start back up at 10:15.

*(Jury excused from the courtroom.)*

*(Recess.)*

*BAILIFF:* All rise.

*(The jury present, proceedings resumed in open court as follows.)*

*THE COURT:* Thank you. Please be seated.

Mr. Thweatt, you may continue.

*MR. THWEATT:* Thank you, Your Honor.

*Q.* (By Mr. Thweatt) Ms. Uduma, you agree that you could have installed a fire alarm system in your house that would have automatically notified the fire department in the event of a fire. You agree that could have been done, don't you?

*A.* The fire alarm was installed.

*Q.* It didn't automatically notify the fire department, though, did it?

*A.* It wasn't a requirement at that time --

*Q.* I'm not asking whether it was a requirement, Ms. Uduma. I'm asking whether or not it would automatically notify the fire department.

*A.* We followed all the rules and guidelines by the City of Houston and by the Department of Aging and Disability.

*Q.* Did it automatically notify the fire department or not?

*A.* The fire alarm, people installed it. We paid them to install it. They followed all the guidelines. So I don't know if it's supposed to notify the fire department or notify somebody else.

But I don't know. We contracted them to do it.

*Q.* Do you know a gentleman by the name of Rick Overton?

*A.* I don't know Rick Overton. I only met Rick during a deposition.

*Q.* I'm sorry. Rick Overholt. I misspoke.

*A.* I don't know the person. I only met him when we had the deposition. Because the person that always came to install all the fire alarm for Four J's knew what to do.

*Q.* I'm just asking whether or not you know him.

*A.* No, I don't. I met him during deposition.

*Q.* Rick Overholt works for OMNI Fire & Security, doesn't he?

*A.* That's what he said the day he came.

*Q.* And your testimony is you didn't know him before his deposition in this case; is that right?

*A.* That's right.

*Q.* Are you aware that Mr. Overholt has testified that he installed fire alarm systems in other houses that you owned that automatically notified? Are you aware of that?

*A.* His company, yes. OMNI Alarm.

*Q.* Are you aware that he also testified that he had interaction with you whenever he needed to access

your Beretta Court Home or any other homes that you owned?

*A.* He contact me when he schedule all the inspections and which houses they are going to go in.

*Q.* You could have installed overhead sprinklers but you chose not to, right?

*A.* That's not true.

*Q.* You could have installed a fire alarm system that notified the fire department automatically, but you chose not to, right?

*A.* That's not true.

*Q.* You didn't do those things because you didn't want to spend the money to do them, right?

*A.* That's not true.

*Q.* If you had done those things, don't you agree it would have been safer for the residents in the Beretta Court Home?

*A.* I don't know that.

*Q.* How many people does Four J's currently employ?

*A.* I don't know the exact number because I'm not in the payroll department.

*Q.* Is it more or less than a hundred?

*A.* No. It's more than a hundred, should be more than a hundred.

*Q.* When was the company founded?

*A.* The company was founded in 1996. And then incorporated in 1999.

*Q.* What is the net worth of the company?

*A.* Last year the company grossed 7.7 million.

*Q.* And in 2008, the company also grossed 7.7 million, correct?

*A.* I'm sorry. That was 2008 that it grossed 7.7 million.

*MR. THWEATT:* Your Honor, I'd offer Plaintiff's Exhibit 41 and 42 at this time.

*THE COURT:* Objection?

*MR. PLUMMER:* Yes, Your Honor.

*THE COURT:* Grounds?

*MR. PLUMMER:* Relevance. And -- may we approach?

*THE COURT:* Yes.

*(Bench discussion.)*

*THE COURT:* All right. So you are offering the tax returns for Four J's, and your objection is relevance?

*MR. PLUMMER:* Relevance and overly prejudicial. The only relevancy, possible relevance of financial information would be net worth information. So otherwise, all this is prejudicial,

and there is plenty of information in the tax return that has nothing to do with this lawsuit. So prejudicial, not relevant.

*THE COURT:* Like what, what is in here that has nothing to do with the lawsuit that would unfairly prejudicial?

*MR. PLUMMER:* Well, may I see a copy of the tax return, Judge?

*THE COURT:* Yes.

*(Referenced document tendered to the counsel.)*

*MR. PLUMMER:* Number one, schedules. I don't see how those are relevant to anything --

*THE COURT:* How are they unfairly prejudicial?

*MR. PLUMMER:* How much money this company makes has nothing to do with the issues before the Court. And before the jury. All the -- the only reason you offer this is to inflame the jury about somebody's income and success. It's not relevant to liability issues. It's not relevant to the damage issues. And it's only relevant, if anything, on the issue of exemplary damages. And only net worth information is relevant in that context, not gross income, not net income, not expenses, only net worth.

*THE COURT:* Okay. What other evidence do you have on net worth, Mr. Thweatt, besides these tax returns and her testimony?

*MR. THWEATT:* That's all, Your Honor.

*THE COURT:* So are, are you going to have an expert witness that is going to tie this or explain how you develop net worth from someone's tax returns or income statements?

*MR. THWEATT:* No.

*THE COURT:* What in those tax returns show Four J's net worth?

*MR. THWEATT:* Total assets, Judge. Item F on both of the returns, I believe, is probative to the issue of net worth.

*THE COURT:* Does this show anything about their liabilities?

*MR. THWEATT:* I believe every tax return would show that. I don't know -- there is a section for bad debts.

*THE COURT:* So nothing beyond the first page of each of these tax returns is really what you are --

*MR. THWEATT:* I think that's correct, Judge.

*THE COURT:* Why wouldn't limiting

Exhibits 41 and 42 to just the first pages of each return be relevant?

*MR. PLUMMER:* First of all, I'm not sure how a calculation of value and assets is germane. That's number one. I don't know whether it's a value --

*THE COURT:* That's an argument towards letting in the rest of the tax return, if I've got to look at the rest of the return to find out how they get to total assets.

*MR. PLUMMER:* I understand that, Judge. I don't think the tax return is relevant at all. But if the Court were to allow the tax return, I agree with the Court that the first page would be the only portion that should be admitted. But it would be admitted over my objection. We have already had testimony with regard to that. And that can be elicited -- this asset value can be elicited on testimony without the document being admitted into evidence.

*MR. THWEATT:* It also does go to show that the funds -- they had funds to spend money on safety as well.

*MR. PLUMMER:* That's not an issue.

*THE COURT:* All right. All right.

*MR. PLUMMER:* Judge, this is a classic case of somebody saying, look, you have got a lot of money and therefore you ought to pay. That's what this is about.

*THE COURT:* I understand that. But there are remedies in the Civil Practices and Remedies Code for cabining that through a motion to bifurcate. Nobody moved to bifurcate.

*MR. PLUMMER:* I understand that, Judge. But this is not the evidence that they need. And if they need it, all they have to do is to question her about that asset value. And if she testifies to what it shows, that's it. The document need not go into evidence.

*MR. THWEATT:* I can certainly agree to the first page of both exhibits, if that's a concern.

*MR. PLUMMER:* We aren't going to agree to any of it.

*THE COURT:* So the testimony she just gave plus Exhibits 41 and 42, that's the sum total of your evidence as to the net worth of Four J's?

*MR. THWEATT:* Well, I plan on asking her a few more questions, but I don't have any more documentary evidence, Judge.

*THE COURT:* All right. Right now, I'm

going to sustain the objection. I will allow you, obviously, if you need to use these documents to refresh the witness' recollection or if based on how her testimony proceeds you need to impeach her, I will reconsider their admissibility.

*MR. THWEATT:* Okay. Understand.

*THE COURT:* But right now, 41 and 42, the objections are sustained.

*MR. THWEATT:* Thank you, Your Honor.

*(Open court.)*

*Q.* (By Mr. Thweatt) Ms. Uduma, what is the net worth of Four J's?

*A.* I can't really remember what it was in 2008.

*Q.* What is it today? What is the net worth of Four J's today? If you were going to sell it to a potential buyer, how much would you tell them it's worth?

*A.* About 2 million or 4 million. Between 2 and 4 million.

*Q.* You base that upon the U.S. tax returns that Four J's has filed with the federal government?

*A.* No.

*Q.* What do you base it on?

*A.* I would base it on the fact that the, because of the bad economy the state has come back

and cut all the funding for it. So that is making it difficult even to pay the employees right now because of the bad economy.

*Q.* In 2008, it was worth more than 2 million, wasn't it?

*A.* I believe so.

*Q.* It was worth at least 4 million in 2008, wasn't it?

*A.* Maybe.

*Q.* Well, don't your tax returns reflect an asset value of at least $4 million for the company in 2008?

*A.* I don't remember what it --

*Q.* Would you like me to show your tax return to you for 2008 to refresh your recollection?

*A.* No. You already told me what it is.

*THE COURT:* You may approach the witness.

*MR. THWEATT:* Thank you, Your Honor.

*Q.* (By Mr. Thweatt) I'm handing you Plaintiff's Exhibit 41, Ms. Uduma.

*(Referenced document tendered to the witness.)*

*Q.* (By Mr. Thweatt) Do you see that number right there?

*A.* Yes.

*Q.* 4.3 million?

*A.* Yes.

*Q.* And I think you told us earlier that there were gross receipts in 2008 of 7.7 million, right? You told us that earlier in your testimony?

*A.* I think so. Because I got it confused.

*MR. THWEATT:* Your Honor, I will renew my offer of Plaintiff's Exhibits 41 and 42 at this time.

*THE COURT:* Your objection is sustained.

*MR. PLUMMER:* Thank you, Your Honor.

*Q.* (By Mr. Thweatt) The company has over a hundred employees, you told us. What about you personally? You are sued personally in this case. You understand that, right?

*A.* Yes. Which I don't really understand why. I understand I am being sued, right.

*Q.* Well, you understand you owned the house that burned down --

*A.* Yes.

*Q.* -- where one person unfortunately died, right?

*A.* Yes.

*Q.* What is your personal net worth?

*MR. PLUMMER:* Objection, relevance.

*THE COURT:* Come on up.

*(Bench discussion.)*

*THE COURT:* Have either the Plaintiff or the Intervenors pleaded for exemplary damages against Ms. Uduma in her individual capacity?

*MR. THWEATT:* We have.

*THE COURT:* Mr. Sparks.

*MR. PLUMMER:* Yes.

*THE COURT:* Then why isn't her net worth relevant?

*MR. PLUMMER:* They are entitled to net worth information in exemplary damages cases. It is just totally irrelevant in this case, but I understand the Court's question.

*THE COURT:* I've got a live claim for exemplary damages. How is it totally irrelevant?

*MR. PLUMMER:* I understand, Judge.

I withdraw my objection, Your Honor.

*THE COURT:* All right. Thank you.

Have a seat.

*(Open court.)*

*THE COURT:* The objection is overruled.

Kathleen, would you please restate the question.

*THE COURT REPORTER:* Question: What is your personal net worth?

*A.* I believe I never really sat down and calculated what my personal net worth is because most of the houses I lease, we owe mortgages on them, which is -- I don't really know without sitting down and adding it up.

*Q.* (By Mr. Thweatt) Are you a millionaire, Ms. Uduma?

*MR. PLUMMER:* Judge, I'm going to object to that --

*THE COURT:* Overruled.

*MR. PLUMMER:* -- on relevance.

*THE COURT:* Overruled.

*Q.* (By Mr. Thweatt) Are you a millionaire, Ms. Uduma, that's the question.

*A.* Am I what?

*Q.* Are you a millionaire?

*A.* No, I'm not.

*Q.* You pay yourself a salary of $26,000 per month from Four J's Community Living Center, correct?

*A.* Yes.

*Q.* You pay yourself a salary of $8,000 a month from Four J's Day Activity Center, another company you own. Isn't that also right?

*A.* That's right.

*Q.* And looking at Plaintiff's Exhibit 33, which was provided to me by your attorneys, there is a list of properties owned by Anthonia Uduma in the Houston area, right?

*A.* Yes.

*Q.* You also own properties in Corpus Christi and Beaumont, Texas, true?

*A.* True.

*Q.* Every property that is listed on this Plaintiff's Exhibit 33 is a house that you own and lease to Four J's, with the exception of this house here, 6519 Anthonia Lane in Richmond, Texas. That's your personal residence, isn't it?

*A.* There are some houses that we lease from other people, not just this one.

*Q.* This address here, 6519 Anthonia Lane.

*A.* That's my residence.

*Q.* That's your personal residence, that's where you live?

*A.* Yes.

*Q.* That's out in Richmond, right?

*A.* Yes.

*Q.* Does that house have ten bedrooms and seven and a half bathrooms?

*MR. PLUMMER:* Excuse me. Objection, relevance. May we approach?

*THE COURT:* Overruled.

*MR. PLUMMER:* Judge, may we be heard on this?

*THE COURT:* Come on up.

*(Bench discussion.)*

*MR. PLUMMER:* What does how many bedrooms she has in her personal house have to do with the issues in this lawsuit, Judge? It's not relevant. It's just designed to prejudice this lady before this jury. It's outrageous. It's ridiculous.

*THE COURT:* Your response, Mr. Thweatt?

*MR. THWEATT:* Everything that I do at trial is not designed to prejudice the Defendants. The question is whether it's substantially -- whether any prejudice is substantially outweighed by the probative effect. She has testified has never calculated her net worth. She doesn't know. The jury may have questions about what her net worth is. This is one of the ways that we can establish that with the size of her personal residence and any other assets that she may maintain.

*THE COURT:* Mr. Sparks, you have anything to add?

*MR. SPARKS:* I think it is actually relevant, and it goes to net worth when she says she doesn't know.

*THE COURT:* I think it's relevant. We're getting closer to where we are starting to get to where the probative value is out weighed. We're not quite there yet. So let's tighten this up and either bring it home or move on.

*MR. THWEATT:* Yes, Your Honor.

*MR. SPARKS:* Thank you, Your Honor.

*(Open court.)*

*MR. THWEATT:* Your Honor, may we have the question read?

*THE COURT:* Repeat your question.

*Q.* (By Mr. Thweatt) Ms. Uduma, the house that you own at 6519 Anthonia Lane in Richmond, Texas, has ten bedrooms seven and a half bathrooms, doesn't it?

*A.* Yes.

*Q.* And it's over 10,000 square feet, right?

*A.* Yes.

*Q.* You are the one hundred percent owner of Four J's Community Living Center, true?

*A.* True.

*Q.* You are the sole shareholder of that company?

*A.* Yes.

*Q.* You are the only corporate officer, right?

*A.* Yes.

*Q.* There have never been any other corporate officers of Four J's other than you, correct?

*A.* Correct.

*Q.* You are now the president and CEO, just like you always have been, right?

*A.* Yes.

*Q.* You control that company, don't you?

*A.* Yes.

*Q.* You are also the one hundred percent owner of the property located at 1635 Beretta Court, true?

*A.* True.

*Q.* There are no other owners, other than you, for that Beretta Court property, right?

*A.* Yes.

*Q.* There have never been any other owners in the past, other than you, of that property, correct?

*A.* It was bought from someone who used to own it.

*Q.* While you owned it. Nobody owned it jointly with you.

*A.* No.

*Q.* Has the property been rebuilt since the fire

on September 4, 2008?

*A.* There was modifications made to accommodate Jenny's need.

*Q.* No. That's not my question. Let me ask it again.

Has the property, Beretta Court, been rebuilt since the fire in September 2008?

*A.* No. No.

*Q.* If it were to be rebuilt, you would be the person to make that decision, true?

*A.* Yes.

*Q.* You pay the property taxes that are due and owing on that property, correct?

*A.* Yes.

*Q.* You and you alone are the person that took out the loan to finance the purchase of that Beretta Court house, right?

*A.* Yes.

*Q.* You lease that Beretta Court house to your company --

*A.* Yes.

*Q.* -- Four J's Community Living Center, right?

*A.* Yes.

*Q.* If you wanted to enforce that lease as a tenant, on behalf of your company, your company would

have to sue you to enforce the lease, right?

*A.* Could you repeat the question.

*Q.* If you wanted to enforce the lease that exists between you personally and your company as a tenant, all right, let's say Four J's Community Living Center, as a tenant, wants to enforce the lease between you and the company. Are you with me?

*A.* Okay.

*Q.* In order to enforce that lease, your company would have to sue you personally to do that, wouldn't it.

*A.* Maybe.

*Q.* Well, who else would they sue?

*A.* Yeah, they would sue me.

*Q.* And as president of that company, you would be the only person with authority to even authorize a lawsuit against yourself; isn't that right?

*A.* Yes.

*Q.* And, likewise, if you wanted to enforce that lease as the owner of the company -- I'm sorry, as the owner of the house and as --

*MR. PLUMMER:* Excuse me, Your Honor --

*THE COURT:* Let him finish his question.

*Q.* (By Mr. Thweatt) And, likewise, if you wanted to enforce that lease as the landlord, as the

owner of the house, you would have to sue your company, wouldn't you?

*MR. PLUMMER:* Judge, objection. Relevance and repetition.

*THE COURT:* Sustained.

*Q.* (By Mr. Thweatt) What's really happened here, Ms. Uduma, with regard to the property at Beretta Court, is that you own it and you control it, right?

*A.* I own it and I lease it out.

*Q.* And you control it, don't you?

*A.* Well, once I lease it out, so I did not control it anymore.

*Q.* Well, you control access to the Beretta Court property, don't you?

*A.* No, I did not.

*Q.* A company called OMNI Fire & Security Systems, we have talked about, installed the fire alarm system in that house, didn't they?

*A.* Yes.

*Q.* And they would inspect that property at least annually, true?

*A.* Yes.

*Q.* When there was something major with the alarm system or repairs, anything like that, OMNI

would call you rather than someone else at Four J's, wouldn't they?

*A.* Yes. They are supposed to.

*Q.* Before inspection of your property at Beretta Court, OMNI would call you and request to have you send a supervisor over there to let them in, right?

*A.* Yes.

*Q.* And OMNI inspects and handles all the fire alarm services for all of your more than thirty properties in the Houston area, don't they?

*A.* No.

*Q.* If Mr. Overholt testifies differently than that, is he going to be telling the truth?

*A.* No. We have -- out of the properties we have in Houston, it's not all of them that are four bedrooms that need four clients. And according to the Department of Aging and Disability rules and regulations, if you don't have four people in the house, you don't have to have a smoke alarm. So I only have about --

*Q.* You visited the Beretta Court property --

*MR. PLUMMER:* Excuse me, Your Honor. The witness hadn't finished answering the question.

*THE COURT:* Ask your next question.

*Q.* (By Mr. Thweatt) Ms. Uduma, you visited the Beretta Court property that you owned on many occasions, correct?

*A.* Yes.

*Q.* Based on upon everything you have talked about, you would agree that you control that property as the premises owner, don't you?

*A.* It was leased to Four J's, so Four J's controlled the --

*Q.* That's not my question.

My question is: Do you agree that you, as the property owner, control that premises?

*A.* No, I don't.

*Q.* And the reason you don't is because you think that Four J's, the company that you own one hundred percent of, was the premises occupier; is that right?

*A.* The Four J's that I own lease the property to the clients that lived in there.

*Q.* You agree that Four J's is responsible for the actions of its employees while they are at work?

*A.* No.

*Q.* You don't agree that as the president of the company, the company that you own, should be held responsible for the actions or inactions of its

employees?

*A.* Could you repeat the question.

*Q.* You don't agree, Ms. Uduma, as the president of the company that you are the one hundred percent owner of, that your employees at Four J's, if they do something wrong that your company cannot be held responsible for that?

*A.* In some instance.

*Q.* But just not this one?

*A.* No.

*Q.* Even though a person died? What could be more serious than that?

*A.* The reason I say that, because the Four J's as a company did everything that needed to be done in bringing outside help, training employees. The reason I am saying that Four J's is not responsible for it is because the staff panicked. So there is really no way you can determine what will happen in case of emergency. If the staff panicked, I don't think there is any way we could have prevented that.

*Q.* You know that one of the reasons you train employees is to prevent them from panicking in an emergency situation, you know that, don't you?

*A.* We train employees to --

*Q.* Ms. Uduma, I'm just asking whether or not

you know that the reason that you train employees is to prevent them from panicking in an emergency. Right?

*A.* That's correct.

*Q.* And so if your former employees take the stand in this case and they tell this jury that they weren't properly trained as to how to respond in the event of an emergency, I suppose you think that they will be lying to this jury. Is that right?

*A.* Yes. That's right.

*Q.* Ms. Uduma, do you agree that safety should never be sacrificed because of money?

*A.* Yes.

*Q.* If you had spent more money on this house, with overhead sprinklers and a fire alarm system that could have notified automatically to the fire department, the house would have been safer, wouldn't it have?

*A.* If the fire -- if the OMNI fire alarm system that I contracted had made a proposal that you need a sprinkler in this house or if the Department of Aging and Disability, when I sent all the documents of the people that's going to live in that house has told me, yes, this house will need a sprinkler system, I would have put it. But it's no way -- I'm not a fire

person. There is no way I would have known what is -- what -- that the alarm system needed to be monitored or not monitored. That's why I contracted OMNI Fire Alarm to do all that and give me all the recommendations.

*Q.* Ms. Uduma --

*MR. THWEATT:* May we have the last question read back, Your Honor?

*THE COURT:* No. Just ask another question.

*Q.* (By Mr. Thweatt) If you had put overhead sprinklers in that house, Ms. Uduma, and you had put a fire alarm system in that house that would have automatically notified the fire department, wouldn't you agree that that house would have been much safer on September 4, 2008 when that fire started?

*A.* Sir, sir --

*Q.* It's a yes or no question. You can either agree or disagree.

*A.* I don't know. I don't know, let me put it that way.

*Q.* You don't know?

*A.* No.

*MR. THWEATT:* I have no further questions, Your Honor.

*THE COURT:* Mr. Sparks?

*MR. SPARKS:* Just a few, Your Honor.

CROSS-EXAMINATION

BY MR. SPARKS:

*Q.* Ms. Uduma, how are you doing?

Isn't it true that you visited that home on many occasions, the Beretta Court property?

*A.* Yes. During the annual fire marshal inspection, I did.

*Q.* You are the one that gave access to the fire marshals, are you not?

*A.* No, I am not. The supervisor usually open the house. For me, I normally don't have keys to the house.

*Q.* So you didn't testify earlier that you took the fire marshal to the house and that keys allegedly to the back door were in a drawer?

*A.* The front door is what I am referring to. The supervisor opens the front door. I usually will go in with the fire marshal. They will do inspection on the fire system and everything, and then I will open the drawer and open the back door.

*Q.* So you are aware, then, that that deadbolt lock was on that back door?

*A.* Yes.

*Q.* And, in fact, you even unlocked that door with a key at one point in time, did you not?

*A.* Yes, I did.

*Q.* Now, out of all the properties that you have, did you not previously testify that this is the only property, allegedly, that had a deadbolt lock on it like this?

*A.* To my knowledge, yes.

*Q.* And isn't it the reason why that property was the only one that had it on there was to prevent Esperanza Arzola from eloping and leaving the property when she wanted to?

*A.* Well, I don't really know, because that would not be under my duties -- under my job.

*Q.* That wouldn't be under your job description?

*A.* The case managers and the supervisors may have been the one that started and determined that. I don't know if it was because of Esperanza. I don't remember.

*Q.* So you don't know why it was on there, but you were aware that it was on there?

*A.* Yes.

*Q.* And having opened the door on one, at least, occasion, if not more, then you never took any actions to remove it, did you?

*A.* No. Because I knew there was a key right there. Each staff had a pair of keys, the front door and the book door. Plus that one in the drawer in case they didn't have it. That's what the supervisors told me, and that's what the employees told me.

*Q.* Did you ever personally give them keys?

*A.* No, I don't handle that.

*Q.* You don't handle that?

*A.* No.

*Q.* So you don't personally know if what they told you is accurate, do you?

*A.* I know they have to have a key in order for them to get in because these clients that they have during the daytime. So each staff have to have a key to get into the house.

*Q.* I don't mean the front door. I'm talking about the back door.

*A.* They have two keys. So which one of the employees showed me when they have the fire that she still has her own.

*Q.* So you were certainly aware that that back door had a deadbolt lock on it, and you never did anything to remove it; is that correct?

*A.* Yes.

*MR. SPARKS:* Pass the witness, Your Honor.

*THE COURT:* Mr. Plummer.

*MR. PLUMMER:* Judge, we will reserve our examination until our case in chief.

*THE COURT:* You may step down.

*(The witness was excused from the witness stand.)*

*THE COURT:* Mr. Thweatt, call your next witness.

*MR. THWEATT:* Your Honor, we will call Chiaka Irondi.

*THE COURT:* Spell that for our court reporter, please.

*MR. SPARKS:* We have already, previously, given her the spelling of that name.

*BAILIFF:* Stand here. Face the Judge. Raise your right hand.

*(Witness placed under oath.)*

*THE COURT:* Have a seat, please.

You may proceed.

CHIAKA IRONDI,

having been placed under oath, testified as follows:

DIRECT EXAMINATION

BY MR. SPARKS:

*Q.* Good morning, Ms. Irondi. How are you today?

*A.* I'm fine.

*Q.* Please state your name for the record.

*A.* My name is Chiaka Irondi.

*Q.* Ms. Irondi, you reside in Fresno, Texas; is that correct?

*A.* Yes, I do.

*Q.* And are you a former employee of Four J's Community Living Center, Inc.?

*A.* Yes, I am.

*Q.* When did you start living -- working there, do you recall?

*A.* I think around, I tried to decide. It should be 2009 or 2008. I can't remember the actual date.

*Q.* Can you speak a little louder? I'm having a little problem hearing you.

*A.* Around 2009.

*Q.* Around 2009?

*A.* Yeah.

*Q.* So this fire took place in 2008.

*A.* So I left before the fire, so it should be 2008.

*Q.* 2008?

*A.* Yeah.

*Q.* Okay. And you started working there approximately 2006; is that correct?

*A.* Yes, 2006.

*Q.* Are you familiar with Tanya James?

*A.* Yes, I am.

*Q.* And what was your relationship with Tanya James?

*A.* Well, I'm her caregiver when I was working there. I used to be her caregiver, I take care of her.

*Q.* What kind of person was she?

*A.* She was a quiet, gentle lady.

*Q.* What about Jenny Wagner?

*A.* Jenny Wagner, I was her caregiver when I was there. She can't walk. She is in a wheelchair, so we assist her in everything.

*Q.* What about Esperanza Arzola?

*A.* Yeah. Esperanza is the only one that is aggressive among all the clients we have.

*Q.* When you say aggressive, what do you mean?

*A.* She can fight with stuff. She run away sometime. She easily gets annoyed, aggravated.

*Q.* Were you ever provided keys to the property at the Beretta Court --

*MR. PLUMMER:* Objection, Your Honor. Time period, relevance of the time period.

*THE COURT:* Rephrase your question.

*Q.* (By Mr. Sparks) When you were working there, were you ever given keys to the property, Beretta Court?

*A.* Yes. When I started working, I was given a front door key and a back door key. But later, the back door key was misplaced, couldn't find it before I left. Then when I left, I don't know if they ever found it or not.

*Q.* Did you ever make requests of anyone to have that key replaced?

*A.* Yeah. It was reported.

*MR. PLUMMER:* Excuse me, Your Honor. May I take this witness on voir dire?

*THE COURT:* No.

*MR. PLUMMER:* Is that a yes?

*THE COURT:* No. Do you have an objection?

*MR. PLUMMER:* Yes. I'm trying to pin

down the time period she is testifying to. She wasn't there during the time of the fire and she didn't work there --

*THE COURT:* I asked if you had an objection.

*MR. PLUMMER:* The objection is relevance of her answer -- the question and her answer because it isn't limited to a specific with time period.

*THE COURT:* Rephrase your question. Focus it up.

*Q.* (By Mr. Sparks) Prior to you leaving, you were aware that the back door key had been lost; is that right?

*A.* It was lost.

*Q.* By the key being lost, you guys didn't have access to open or close that door; is that correct?

*A.* Before I left.

*MR. PLUMMER:* Objection, Judge. Again, I don't know what time period she is talking about. Se was given a key, and I don't know what time period she is talking about in response to these questions.

*THE COURT:* Approach the bench.

*(Bench discussion.)*

*THE COURT:* Mr. Plummer, no more speaking objections. Do you understand me?

*MR. PLUMMER:* Yes, sir.

*THE COURT:* All right. I may have missed it. Have you gotten her to talk about all of the time period when she was working there?

*MR. SPARKS:* No, I haven't. But I can develop it, Judge.

*THE COURT:* Let's get that taken care of.

*MR. SPARKS:* Yes.

*(Open court.)*

*Q.* (By Mr. Sparks) Ms. Irondi, were you employed -- did you start your employment in June of 2006 with Four J's?

*A.* Yes, it is.

*Q.* Did you leave in February of 2008?

*A.* Yes. I left around that time, yeah.

*Q.* All right. Prior to you leaving in February of 2008 --

*A.* Uh-huh.

*Q.* -- the back door key was lost. Is that your testimony?

*A.* That's what I said.

*Q.* Okay. And had you made requests of anyone to have that key replaced before you left?

*A.* Before I left, I know it was reported to one

of the supervisors that the key is not available.

*Q.* Okay. Do you know how long it had been between the key being lost while you were there, prior to you leaving in February of 2008?

*A.* I can't recall.

*Q.* Would it have been weeks?

*A.* No, it's more than weeks.

*Q.* Months?

*A.* I think months.

*Q.* And without that key, the back door was inoperable; is that correct?

*A.* You can't open it without a key.

*Q.* Tell us about the garage door. Was that ever a problem?

*A.* Yeah. The garage door had a problem.

*Q.* What kind?

*A.* Like if you open it, somebody have to hold it for you to pass through. If not, it can (indicating), it can fall on you, you know.

*Q.* So the three entrance and exit doors of the property was the front door --

*A.* Yes. That was the only door we were using when I was there.

*Q.* And that was up until the period of time of February 2008.

*A.* Yeah, when I left.

*Q.* Because the back door key had been lost, correct?

*A.* Yeah.

*Q.* And the garage door, you couldn't go out of it without holding it up because it would fall on you?

*A.* Yes.

*Q.* So if there was a situation of an emergency, where you or any other individual caregiver had to move Jenny Wagner, Tanya James, Esperanza Arzola or Elisha Campbell out of the property, you certainly wouldn't have gone out the garage door. Is that what you're saying?

*A.* No. We would use the front door because we can't use the garage door. It's not safe to use the garage door.

*Q.* Not safe to use the garage door?

*A.* Yes.

*Q.* And it certainly wasn't operable to use the back door while you were there; is that correct?

*A.* We can't because we don't have a key.

*MR. SPARKS:* Pass the witness, Judge.

*MR. TERRY:* Did you --

*THE COURT:* Hold on.

*MR. TERRY:* I'm sorry, Your Honor.

*THE COURT:* Mr. Thweatt?

Mr. Terry?

CROSS-EXAMINATION

BY MR. TERRY:

*Q.* Ma'am, did you receive any safety training while working at Four J's?

*A.* What kind of safety training?

*Q.* For example, fire drills, fire evacuation.

*A.* I never.

*Q.* You never received that type of training at Four J's?

*A.* I was not given the training, but there was a paper they give for you to sign. But the training was not given.

*Q.* Okay. So I guess what you are saying is the people at Four J's presented you with a paper to sign --

*A.* Yes.

*Q.* -- to indicate that you had gone through training --

*A.* Yes.

*Q.* -- but you never actually went to training?

*A.* I never went through.

*Q.* While working at Four J's, did you ever feel

overwhelmed?

*MR. PLUMMER:* Judge, objection, leading.

*THE COURT:* Sustained.

*Q.* (By Mr. Terry) Ma'am, did you ever feel like you needed any help, additional help?

*A.* Sure, sure, I did.

*Q.* Okay. Why is that?

*A.* Because we have four clients. One in the wheelchair. And what's the -- Tanya, you have to assist Tanya too. So we feel that we need two staffs to do the work.

*Q.* Did you ever request to have additional staff?

*A.* Well, I didn't.

*Q.* Why is that?

*A.* I don't actually have -- I see that's the way they do it. All houses, that's the way it is.

*Q.* You basically do what you are told to do?

*A.* Yeah. Basically, yeah.

*Q.* During your experience with Ms. Esperanza Arzola, was she capable of hurting people?

*A.* I think so, because I know she fought with one of the, one of the staff sometime, pulled her hair.

*Q.* Did you feel safe with her in the house?

*A.* No.

*Q.* You did not?

*A.* Not really.

*MR. TERRY:* Pass the witness, Your Honor.

*THE COURT:* Mr. Plummer?

CROSS-EXAMINATION

BY MR. PLUMMER:

*Q.* Ms. Irondi, you left in February of 2008?

*A.* Yes.

*Q.* Between February of 2008 and September of 2008, did you go back to the Beretta Court house?

*A.* No. No. After I left, I never went back there.

*Q.* Okay. And is it fair to say that you left on sour terms?

*A.* I don't understand.

*Q.* Well, could you get another job at another --

*A.* I already do two jobs, so I already have a job. I work at Four J's and another place. So I left Four J's and concentrated on the other. Because I don't want two jobs again. I stopped two jobs. That's why I left Four J's.

*Q.* Were these two jobs as a caregiver?

*A.* Yeah. Always caregiver.
*Q.* Now when did you lose your key, your back door key?
*A.* I don't know exactly. I cannot tell you the dates or the month. I can't remember.
*Q.* Okay. Was it right after it was given to you?
*A.* No.
*Q.* Was it in January of 2008?
*A.* That's what I say, I can't tell you the month, the date. But I knew it was lost, it was misplaced.
*Q.* Okay. And you told somebody you misplaced your back door key and asked for another one; is that right?
*A.* Yeah. I'm not the only staff. The other staffs did too, that we don't have the back door key.
*Q.* So when you were given your front door and back door key, everybody else --
*A.* No. We just have one key for the back door. So we keep it in the house. We don't go out with it. We go out with the front door key.
*Q.* I'm sorry. I understood you to say that you were given a front door and a back door key.
*A.* No, no.

*Q.* Were you -- was there just one front door key?

*A.* One back door key. But every staff had the front door key.

*Q.* Now, is it -- did Ms. Ogbonna ever give you keys to the house?

*A.* Who?

*Q.* Inya Ogbonna.

*A.* That's the front door key, that was what he gave me.

*Q.* That was the only key she gave you?

*A.* Yes. He.

*Q.* He. Okay.

Arzola, Ms. Arzola, I believe you said, had pulled somebody's hair at one point in time, right?

*A.* (Indicating.)

*Q.* And you had training, some training to teach you how to deal with people that had aggression like Arzola; is that right?

*A.* No.

*Q.* You never talked to the psychologist, Dr. Lockwood?

*A.* Okay. Once in a while.

*Q.* You remember that now?

*A.* The psychologist.

*Q.* The psychologist.

*A.* The psychologist that come for the staff meeting, like a staff meeting.

*Q.* Okay. So he did teach you --

*A.* Sometimes he come and he discuss maybe one client in the house that is giving problems. Everybody don't attend. It's not compulsory.

*Q.* All right. It wasn't compulsory, you said. But you were a caregiver. Arzola was one of your wards in the house, is that correct, one of the clients in the house?

*A.* Uh-huh.

*Q.* Is that a yes?

*A.* That's a yes.

*Q.* And Dr. Lockwood's job, the psychologist --

*A.* Not specifically on her.

*THE COURT:* I need you to wait till he finishes his question.

*THE WITNESS:* Okay.

*THE COURT:* And we will wait until you finish your answer.

*Q.* (By Mr. Plummer) Long and short, Dr. Lockwood's responsibility was to help the staff understand how to deal with the patient's

psychological problems; is that right?

*A.* Yes.

*Q.* And he taught you all, including you, how to deal with Arzola; is that right?

*A.* Not specifically her, not just Arzola.

This is Esperanza, right, is that who we are talking about?

*Q.* Okay. Yes, Esperanza.

*A.* Okay. You are saying Arzola. Not specifically on her. It might be on any client from any house.

*Q.* All right. But, clearly, she was included in that group; is that correct?

*A.* Yeah, because she is included in the clients that I could see.

*Q.* Okay. You did attend a fire drill; is that right? Several fire drills. Is that correct?

*A.* No.

*Q.* Never?

*A.* Never.

*Q.* And I'm talking about the Beretta Court house.

*A.* No.

*Q.* All right. Let me show you what's been marked as Exhibit 15.

*MR. THWEATT:* Defendants' Exhibit 15?

*MR. PLUMMER:* Yes, Defendants' Exhibit 15.

*MR. THWEATT:* Thank you.

*Q.* (By Mr. Plummer) Do you see your signature on that document?

*A.* Like I say, we were given this to sign. But we were not physically -- nobody came to do it for us.

*Q.* Well, let me -- let's understand a couple things. One, Jenny Wagner had a Personal Emergency Plan in her binder at Beretta Court, right?

*A.* She did.

*Q.* She did?

*A.* Uh-huh.

*Q.* And that binder told you what you needed to do in the event of an emergency; is that correct?

*A.* The binder told me what? Come again.

*Q.* The binder explained to you what you needed to do in the event of an emergency for Jenny Wagner, right? You don't remember that?

*A.* I don't remember.

*Q.* Well, well, how about Tanya James. She had a Personal Emergency Plan in her binder, right?

*A.* I think each one of them should have that.

*Q.* Okay. And it told you what to do in the event of an emergency; is that correct?

Are you saying you never read those?

*A.* I did.

*Q.* Oh, so you do know what to do in the event of an emergency.

*A.* I'm checking this handwriting, if it is mine. That's not my handwriting.

*Q.* That is your signature on that fire drill report, right?

*A.* It doesn't look like my signature.

*Q.* And it's -- that's not your signature at all?

*A.* Huh-uh.

*Q.* Okay. So you never had attended or had any fire drills, right?

*A.* That's what I said. But I was given a paper to sign.

*Q.* Okay.

*A.* For fire drill.

*Q.* But that's not your signature right there?

*A.* That's what I am looking at. That's not how I sign.

*Q.* Well, you remember you gave deposition testimony --

*A.* I did what?

*Q.* You remember you gave sworn deposition testimony in this case, right?

*A.* I did. But I saw that paper. Maybe it's because it's on this screen.

*Q.* And you remember you were asked about that item, that particular exhibit there and your signature there?

*A.* Uh-huh.

*Q.* You remember that?

*A.* Uh-huh.

*Q.* Is that a yes?

*A.* I remember.

*Q.* And you said that that was your signature. Is that correct?

*A.* Yes. But remember I said I was given such a paper to sign but I did not get the training. I said that.

*Q.* Well, there are two issues that we are dealing with. One, is that your signature or is that not your signature?

*A.* Can I see the copy, because this screen --

*Q.* The copy is in evidence. This is a blowup of the original.

*A.* Can I see the paper? Because I'm not clear

with this.

*Q.* Let me show you what's been marked as Exhibit 15.

*A.* Uh-huh.

*(Referenced document tendered to the witness.)*

*Q.* (By Mr. Plummer) Is that your signature?

*A.* Okay. No. Can I sign for you, you see how I sign?

*Q.* Sure, but --

*A.* This is not my handwriting.

*Q.* You remember you were asked about that document in your deposition --

*A.* This is what you show me.

*THE COURT:* Ma'am, you need to wait till he finishes his question. You need to wait till I finish talking before you respond. I understand you are nervous, but it makes life very difficult for our court reporter when you talk over each other.

*THE WITNESS:* Okay.

*Q.* (By Mr. Plummer) Remember when you gave your deposition in February of 2011, and on page 51 down here, you were asked --

*THE COURT:* Step down Mr. Plummer.

*MR. PLUMMER:* I'm sorry, Your Honor.

*Q.* (By Mr. Plummer) Let me direct your attention to page 51. The question down here is asked, "Is that your signature on page 4?"
*A.* And I said, "Yes."
*Q.* And you said, "Yes."
*A.* Yes.
*Q.* Okay. Thank you, ma'am.
Never attended any fire drills, never attended any in-services where they talked about fire safety and how to evacuate clients and consumers of the home, never visited with the fire marshal and had any instructions from him. Right?
*A.* Never fire marshal.
*Q.* Never had any instructions from the fire marshal or from staff or other folks about how to evacuate the clients. Is that right? That what you are telling this jury?
*A.* I never had a training. That's what I am telling the jury.
*Q.* Never had a training but --
*A.* I was given the paper to sign that the training was given.
*Q.* Okay. Never had a training session, never had an in-service session where you were trained, right? You, in a group, were trained, right?

*A.* The in-service -- Lockwood? I don't remember the name of the psychologist that come to give us lecture once a month -- I do attend that in-service sometimes.

*Q.* Okay. So you only attended Lockwood's in-service sessions, never attended any in-service sessions where they talked about safety issues and evacuations, anything like that, right?

*A.* I don't recall that.

*Q.* And you never read the clients' and consumers' care plans in the home on how to evacuate?

*A.* I did.

*Q.* You did do that?

*A.* Yes.

*MR. PLUMMER:* Pass this witness, Judge.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Judge, no further questions.

*THE COURT:* Mr. Thweatt. Excuse me. Mr. Terry.

*MR. TERRY:* That's fine. Briefly, Judge.

RECROSS-EXAMINATION

BY MR. TERRY:

*Q.* Ma'am, how much did you make per hour while

working for Four J's?

*A.* I think it was 7.25.

*Q.* 7.25?

*A.* Yes.

*MR. TERRY:* No further questions, Your Honor.

*THE COURT:* Mr. Plummer?

*MR. PLUMMER:* Yes, Your Honor, just a second.

Nothing further, Your Honor.

*THE COURT:* All right. Thank you, ma'am. You are excused. Appreciate your time.

*THE WITNESS:* Okay.

*(The witness was excused from the witness stand.)*

*THE COURT:* Call your next witness, please.

*MR. THWEATT:* Your Honor, may we approach very briefly?

*THE COURT:* Yes.

*(Bench discussion.)*

*MR. TERRY:* We have a witness that -- Rick Overholt, that we are going to read the depo in. We think we can get it in before lunch. We just have one issue on what you sustained by way of the

objection on subsequent remedial measures. Our notes weren't clear last night. So if we can just clear that up briefly, we can read it.

*MR. THWEATT:* Starting on page 43.

*THE COURT:* 43, lines 10 through 16, I sustained the objection.

Now, how are we going to do the designations on page 28 and on page 31, which I am allowing in only to show notice? Have y'all discussed that with opposing counsel on how we are going to handle those?

*MR. THWEATT:* The objections you sustained in part and overruled in part?

*THE COURT:* Yes.

*MR. THWEATT:* We have not discussed that.

*THE COURT:* All right. Do the other parts and then let me know when you are about to do page 28 and page 31 so that I can give the jury their instruction prior to that testimony. But do all the rest of the deposition and leave that for the end, and let me know when you are at that point that I should give the instruction.

*MR. THWEATT:* All right. We will do all of that, and then we will stop and tell you. Okay.

*THE COURT:* Are y'all going to have any counters on this?

*MR. PLUMMER:* No, Your Honor.

*THE COURT:* All right. Have a seat. You may proceed.

*(Open court.)*

*MR. THWEATT:* Your Honor, we call Rick Overholt by deposition.

*THE COURT:* All right. Are y'all reading this?

*MR. THWEATT:* We are.

*THE COURT:* Ladies and gentlemen, the next witness is being called by deposition. A deposition is a proceeding that occurs before trial where lawyers have an opportunity to ask a witness questions and cross-examine the same witness. The witness is given the same oath that witnesses take here in court. They have the same responsibilities for telling the truth, and they are under the same consequences for not telling the truth.

Obviously, this is not Mr. Overholt. This is Mr. Terry. He is going to be reading the answers Mr. Overholt gave in the deposition.

You may proceed.

RICK OVERHOLT,

called by deposition, having been duly sworn, testified as follows:

PLAINTIFF'S DIRECT EXAMINATION OFFER

BY MR. THWEATT

*Q.* Would you tell us your name, please, sir.

*A.* Rick Overholt.

*Q.* Okay. Let me ask it this way. Did Ms. Smith, in her capacity as the lawyer for the defense in this case, ask you to prepare a written opinion of your -- a written report of your opinions in this case?

*A.* No.

*Q.* Have you ever testified as an expert witness in a civil litigation matter?

*A.* No, I haven't.

*Q.* Have you ever testified as an expert witness in a criminal litigation matter?

*A.* No.

*Q.* Okay. Today then would be the first time you've ever testified as an expert.

*A.* Yes, it would be.

*Q.* What do you do for a living, sir?

*A.* I'm in the alarm business, fire alarms, security alarms.

*Q.* And who do you work for?
*A.* OMNI Fire & Security.
*Q.* How long have you had that job?
*A.* Twenty-three years.
*Q.* And what is your job title there?
*A.* General manager.
*Q.* OMNI Fire & Security Systems, L.P., is that the current name of the company?
*A.* Yes.
*Q.* How many employees does OMNI have?
*A.* Fifteen.
*Q.* And it's located where?
*A.* 9811 North Freeway, Suite A101, Houston, Texas.
*Q.* And just briefly tell us what OMNI is in the business of.
*A.* We install and monitor and service fire alarms, security systems, cameras, access controls.
*Q.* Okay. And as I understand it, OMNI Fire & Security Systems installed a fire alarm system in the residence located at 16355 Beretta Court in Houston, Texas.
*A.* Correct.
*Q.* Did you have any personal involvement in the installation of that system?

*A.* In fact, I did the certification the day that the fire marshal inspected it when it was put into commission.

*Q.* And according to Deposition Exhibit No. 2, the installation certificate would have been completed on -- looks like November the 19th, 2001; is that right?

*A.* Yes.

*Q.* Just generally, for the ladies and gentlemen of the jury, tell us what you put into that home.

*A.* Basically a smoke detector in every room; pull station at the front and back door; two horn/strobes, one near the front door, one near the back door. And I believe -- I would have to refer back to the drawing. I believe there's also two or three strobes -- if you don't mind me looking while I answer that question.

*Q.* Certainly.

*A.* Strobe lights -- yes, two strobe lights in the bathrooms; heat detector in the kitchen; heat detector in the garage; a bell on the outside of the house.

*Q.* Do you know who asked you to install this fire alarm system?

*A.* The client dealt directly with my employee,

David Knapp. So he's the one who originally arranged installation with the Four J's owners.

*Q.* Okay. In this deposition room here today is a lady named Anthonia Uduma. Have you ever seen her before?

*A.* Yes, I have.

*Q.* And when did you first see her?

*A.* I believe the first time we met was when I was going out to do an inspection on one of the homes.

*Q.* What did you understand her relationship to be with the Beretta Court home?

*A.* Well, I understand her to be the principal owner of Four J's.

*Q.* Okay. Did she ever tell you that she was, in fact, the owner of the actual house?

*A.* I assumed about that. But she never told me those words, no.

*Q.* Okay. What is it about your on interaction with her that led you to that assumption?

*A.* Well, typically we do a lot of business with that vertical market, with residential care homes. And typically the owner of the company, they typically own the properties as well. They buy it and set it up.

*Q.* Is OMNI Fire & Security, are they in the business of installing overhead sprinkler systems?

*A.* No.

*Q.* Are you familiar with companies here in the Houston area who do such things?

*A.* We work closely with those companies.

*Q.* And that's because those fire sprinkler systems have to work in conjunction with the fire alarm system; is that right?

*A.* We -- we monitor those systems. The water flow and the valves and those sort of things are monitored by our equipment.

*Q.* Okay. But you would also agree with me that in a situation where you have people who might be in that facility who are completely helpless in the event of a fire that an overhead sprinkler system can be very effective in addressing the outbreak of a fire?

*A.* Yeah, a sprinkler can be effective. Yes.

*Q.* Just like a smoke alarm or a pull alarm can be as well?

*A.* Yes.

*Q.* The -- and how many -- let me ask you this. Can you tell me something about your educational background?

*A.* Associate's degree. I'm licensed as a fire technician, which was training. I have a NICET Level II in fire alarms, which is a national organization that certifies us for what we do.

*Q.* Okay. Have you ever published any articles, journals, or treatises on fire prevention systems?

*A.* No.

*Q.* Okay. Do you hold any certificates or training beyond your associate's degree related to fire alarm systems?

*A.* A NICET Level II -- I'm NICET Level II certified for fire alarms.

*Q.* And what does that mean?

*A.* Well, NICET is the national governing agency that governs fire alarm technicians and installers and even designers and planners.

So, a Level IV NICET person would be the guy that stamps the plan, like Tony Mitchell, this gentleman here. And a Level I would be a -- you know, an early technician and one level above an apprentice. So it's just a different stage of --

*Q.* And that abbreviation, can you tell us what it stands for?

*A.* I think it's National Institute of Engineering Certification Technologies. I'm not

exactly sure honestly.

*Q.* Are you aware that you've been designated by the defense in this case to act as an expert?

*A.* Yes.

*Q.* Do you know what you've been asked, if -- well, let me ask you this: Have you been asked to render any expert opinions by the defense in this case?

*A.* Just regarding what we did, just -- just relating to the fire alarm installation is the only thing I've been asked about.

*Q.* Okay. So you've not been asked to provide any opinions on whether the system you installed was sufficient or whether it was insufficient or anything like that; is that right?

*A.* Yeah. I thought we would do that here. No, we haven't discussed that.

*Q.* Okay. When you installed the system at the Beretta Court residence -- I say you. OMNI.

*A.* Yeah.

*Q.* Was OMNI aware of the types of clients who would be residing in that home?

*A.* No.

*Q.* Okay. That's not part of the job that you do, is to come in and evaluate whether this system

that you're installing is appropriate or not for the people who are going to be living there?

*A.* Well, it's -- we treat it as a personal care home. And, you know, that's a general classification. And it's actually the city that gives us the classification of the building.

*Q.* Okay.

*A.* And so we design the system to meet what the city said the purpose of the building was.

*Q.* I see. Okay. But you don't sit down with the customer and say, look, our understanding is that this home is going to be used for a personal care facility and because of that, have you considered A, B, and C options? Does anything like that happen in your conversations with the customer?

*A.* Typically in this case, no. It's a personal care home. And there's a standard that has to be met for personal care homes. We know what that standard is. And so we design it around that.

*Q.* And it's a minimum standard, right? You have to meet that standard and then you get the blessing from the city, correct?

*A.* Correct.

*Q.* Okay. There is certainly nothing preventing a customer who wants to employ your company from

exceeding the minimum standards set by the city, right?

*A.* Certainly not.

*Q.* Okay. You've reviewed the report of the former Houston Fire Chief, Eddie Corral, in this case?

*A.* Yes.

*Q.* Was there anything had in that report that you disagreed with?

*A.* There was a lot in that report.

*Q.* Yes, sir. I'm asking whether or not --

*A.* Yes.

*Q.* -- you disagreed with any portion of it.

*A.* There were areas in the report that were outside my scope of work, so ...

*Q.* Okay.

*A.* I don't feel like that my opinion -- my opinion would be personal and not professional on those items.

*Q.* I understand.

Have you ever acted as a fireman?

*A.* No.

*Q.* Have you ever acted as a fire marshal?

*A.* No.

*Q.* You told us you have an associate's degree.

What was that associate's degree in?

*A.* Programming, computer programming.

*Q.* Okay. All right. Have you been to the Beretta Court residence after this fire?

*A.* I have not.

*Q.* Do you know when the fire took place?

*A.* I believe 2008.

*Q.* Okay. Do you know whether any of your employees at OMNI have been out to the site of the fire since -- since the fire took place?

*A.* Not to my knowledge.

*Q.* Let me show you some pictures that were taken by the Houston Fire Department of the residence after the fire.

*A.* Okay.

*Q.* And I'm going to refer you to page 70 of -- it's called the Houston Fire Department Incident Report number. And it's got the report number listed there.

There's two color photographs that appear on page 70 of that packet of photos. And I'd like to direct your attention to the top photograph there. And there's a red device on the wall there. Is that what you refer to as a pull alarm?

*A.* A pull station is what we call that.

*Q.* Okay. And how -- just generally how does it operate?

*A.* You pull down the handle and it sets off all the sounders and flashing lights to it and advises the occupants to evacuate.

*Q.* Okay. Now there's smoke detectors that were installed in the Beretta Court residence. If those smoke detectors are activated, does the same thing happen automatically --

*A.* Yes.

*Q.* -- as the pull alarm might be pulled manually?

*A.* Yes.

*Q.* Okay. Can you tell us how quickly -- if smoke detectors detect smoke in the Beretta Court residence, how quickly would they have activated the strobes and the alarms?

*A.* Typically 30 seconds or less.

*Q.* And these alarms are extremely loud, aren't they?

*A.* Very loud.

*Q.* Can you give us an idea in terms of decibels?

*A.* 85.

*Q.* And without knowing anything about decibels,

what --

*A.* It hurts your ears.

*Q.* Okay.

*A.* It makes you want to get out of the building when you hear that.

*Q.* If you were sleeping, you would certainly hear it?

*A.* Absolutely.

*Q.* Okay. Now, there's -- it's a little bit better picture. I'm turning to page 69. There's an exit sign that you can see depicted on the door of -- or one of the doors of the residence. Is that sign something that would have been installed by OMNI?

*A.* No. We just do the electronics. We don't do the signage.

*Q.* Okay. There's another sign depicted on page 69.

*A.* That would be our sign.

*Q.* Okay. And that sign says what? Can you just read that for the record?

*A.* Yes. "Local alarm only. Call the fire department."

*Q.* Okay. Do you know how much it cost to install the fire alarm system there at the 16355 Beretta Court residence?

*A.* Approximately 2,000.

*Q.* And do you do the other fire prevention systems for Four J's other than the Beretta Court residence?

*A.* Yes, we do several homes for them.

*Q.* Do you have any idea how many?

*A.* I would say ten.

*THE WITNESS:* Does that sound close?

*A.* A lot. I didn't -- I could have checked before I left, but I didn't.

*Q.* Let me hand you Exhibit No. 3.

Mr. Overholt, can you identify this document, please?

*A.* Yes. It's an inspection form that was filled out during an inspection by one of my technicians.

*Q.* And the tech appears to be Kristopher Overholt?

*A.* Correct.

*Q.* Is he related to you?

*A.* He's my son.

*Q.* How old was Kristopher Overholt, your son, on October the 4th, 2005?

*A.* He was 21.

*Q.* All right. Was he working for you-all full

time at that point?

*A.* Part time. He was in college.

*Q.* Okay. And so when he goes out to inspect the system that was installed there back in 2001, we can see a number of things that he has to check here. How long does it take for him to complete this kind of inspection?

*A.* Typically it's about an hour.

*Q.* And what does OMNI charge for that kind of inspection?

*A.* At the time this was done, it was 125. It's more than that now.

*Q.* Okay. Is all the handwriting that on this document the handwriting of your son?

*A.* Yes.

*Q.* And how long did he work for OMNI?

*A.* Approximately five years.

*Q.* And you're the person who trained him, I presume?

*A.* Yeah, somewhat and my technicians. He went through an apprenticeship program.

*Q.* Where does Kristopher live now?

*A.* He lives in Austin.

*Q.* Okay. In the course and scope of your job duties at OMNI, have you ever inspected a home that

had a similar door such as that?

*A.* A door like that?

*Q.* Yeah.

*A.* Yes. Yes.

*Q.* And do you -- typically find a door like that with that type of lock system, do you note that on the inspection report as Kristopher did here?

*A.* Typically, no. Actually, inspecting the locks isn't part of our function. So the fact that he did that was just something that he just wanted to note outside of our regular scope of our inspection.

*Q.* Have you talked to him about why he put this note on this particular inspection report?

*A.* Yes.

*Q.* Now, once this report is prepared and completed and signed by the technician, who inspects the property? What is done with it?

*A.* A copy is provided to the owner along with the invoice.

*Q.* And at the bottom of this particular inspection report, it says: Owner/manager not present. Do you see that?

*A.* Yes.

*Q.* And it's got a little KO circled. Is that Kristopher's initials?

*A.* Yes, it is.

*Q.* And then he's -- he's also written down here: No one available to sign. Do you see that?

*A.* Yes.

*Q.* There's -- there is a signature on it. Is that his signature?

*A.* Yes, that's his. And then underneath it would be where the owner's would go. So if no one's available, we just write that note that we did the inspection, but there was nobody there at the time.

*Q.* If no one was available to sign, do you know how it is that Kristopher would have been allowed access to the -- this ticket -- this inspection report, are you able to discern whether or not the fact that the Zone I was disconnected, is that -- was that what would have prompted OMNI to come out to the house?

*A.* No. We were there for an -- a semiannual inspection, I believe it says. So we came out just to -- this form would indicate we just were there to do the inspection.

*Q.* And then just -- you have -- or it looks like Kristopher happened to show up on one of the days when one of the zones was disabled?

*A.* Correct.

*Q.* Does that mean it was -- the word disabled can mean a couple of things. It means somebody intentionally disabled it or it means it's just not functioning right. Do you know what the case would have been on this?

*A.* Well, the switch that we're talking about would have been manually moved to disable to stop the beeping.

*Q.* There's a door in this room here in this deposition. And if I open that door, it will just remain open. There's no self-closing mechanism on it. Is that what you're telling us?

*MR. THWEATT:* Page 34, line 3.

*A.* Correct.

*Q.* But in the Beretta Court residence, what OMNI had installed, if I'm understanding you right, is that there were self-closing mechanisms attached to each door in the house?

*A.* We didn't install it. Again, that was another observation that wasn't part of our scope of our inspection.

*Q.* Okay. They were either -- I'm sorry.

They were there either prior to or sometime before October the 4th, 2005?

*A.* Well, typically the fire marshal requires

those to be installed in personal care homes. That's part of the -- one of the things that's done by other trades.

*Q.* Okay. And because you work with the fire marshal's office, you know about that requirement?

*A.* Yeah. We've had jobs held up because they weren't there. So we couldn't get our system cleared yet.

*Q.* And by blocked open, that would seem to indicate that somebody had put like a brick in front of the door or something?

*A.* A chair whatever.

*Q.* Just to keep the door from closing?

*A.* Yes.

*Q.* All right. Okay. And, of course, again, if those doors are blocked open during a fire, then the self-closing mechanism would be frustrated, right?

*A.* Yes.

*Q.* Meaning that smoke would spread more rapidly through the house, right?

*A.* Correct.

*Q.* And meaning that the residents in the house could be more quickly consumed by smoke, true?

*A.* That would be the reason for the closers, yes.

*Q.* And so the reason why an OMNI inspector would note something like that on his inspection report is to basically communicate to the owner of the home that that is a safety concern, right?

*A.* That's why he wrote that.

*Q.* And you know that because you have talked to him, right?

*A.* Yes.

*Q.* Okay. Did OMNI's contract with Beretta -- with -- I'm sorry -- with Four J's, did that contract ever expire or ever -- not renewed?

*A.* No.

*Q.* And there was -- the contract calls for semiannual inspections; is that correct?

*A.* Yes.

*Q.* And if you'll look at the document that you've brought here, can you tell us what the last inspection report -- the date of it was?

*A.* Is that the last one? November 7th, 2007.

*Q.* And I see a couple of other reports that are -- one's dated January of 2003. We see one of -- in December 2003. And we see one October 2005. We see one dated October 2004. There's one dated October 2006. And then in the one between October the -- or -- I'm sorry. November 2006.

*A.* Yes.

*Q.* I misspoke there.

There's one dated November 2006. And then the last one, you said, is dated November 2007; is that right?

*A.* Yes.

*Q.* Can you tell us why there wouldn't have been another inspection sometime in 2007 or was there?

*A.* I could pull our computer records and see if there's a document that didn't make it into the file --

*Q.* Okay. Are you aware of any inspection that took place in 2008?

*A.* No.

*Q.* Did you look?

*A.* I did look. I saw that there was one November -- the year before. So it was probably coming up in November. And then the fire was in what month?

*Q.* September.

*A.* Then that's why. It burned before the 2008 inspection happened.

*Q.* I see.

Now, if we look at the inspection report that your son did for this residence, that one that

I'm talking about was dated October 4th, 2005. You see that?

*A.* Yes.

*Q.* And if we look at the photographs of the fire taken shortly after the fire in September of 2008, you can see on page 70 there that it doesn't appear that the situation changed regarding the rear exit door and the lack of key access. Would you agree with that?

*A.* No. There's a lot that could have happened. So I really can't make a statement to that.

*Q.* Okay. Well looking at the -- what you see depicted in the photograph, does that deadbolt lock there have the kind of lock where you can turn it manually and unlock it?

*A.* Doesn't appear to have, no. It looks like a keyed lock.

*Q.* Let me show you page 76 of the Houston Fire Department photos. It's a closer-up photo. Again, that photograph would indicate that you have to have a key to unlock the deadbolt, right?

*A.* Yes.

*Q.* Okay. And we can see there's significant damage done to the doorknob on that door. That kind of damage, if it existed, certainly should have been

reflected on this inspection report, right?

*A.* Yes.

*Q.* The type of fire alarm system that was in this house, is it the kind of system that automatically notifies the Houston Fire Department?

*A.* No. That's a local alarm there. It only sounds local sounders.

*Q.* So if the fire department is going to be notified, it's going to have to be by somebody calling them on the phone from the Beretta Court residence?

*A.* Yes.

*Q.* As opposed to, say, like a fire alarm system installed in this building, would that be something that's connected directly to the fire department or do you know?

*A.* Well, it depends on when it was installed. But in 2005, 2006 more fire departments started requiring monitoring. Previously they didn't require it in all buildings.

*Q.* Okay. Is that the kind of thing that a customer or consumer can order, though, if they want to?

*A.* Yes.

*Q.* How much does it cost?

*A.* The monthly fee for that is $32 a month.

*Q.* So if the owners of the 16355 Beretta Court residence had wanted to do so before this fire took place, could they have set up a fire alarm system that would have automatically notified the fire department in the event of a fire?

*A.* Yes.

*Q.* And they could have done that for $32 a month.

*A.* Plus some installation and phone line costs. That -- my fees would be 32, and then there would be fees for the phone lines.

*Q.* About how much would that be?

*A.* Typically about $80 for two dedicated phone lines.

*Q.* Per month?

*A.* Yes.

*Q.* So a total cost of, what, 110 or --

*A.* Yes.

*Q.* -- dollars or so --

*A.* Yes.

*Q.* -- per month?

*A.* Yes.

*Q.* And that would automatically notify the fire department in the event of a fire.

*A.* It would notify the monitoring center, who would then call the fire department, yes.

*Q.* Thereby increasing, one would expect, the response time of the fire department, right?

*A.* Yes.

*Q.* I mean, that's the purpose of it, to get them there as soon as they can, right?

*A.* Correct. Yes.

*Q.* Okay. Is that the kind of service that OMNI sells to its customer?

*A.* Yes, we do that service.

*Q.* Is that the kind of service, from your view of the paperwork, which would have been offered to the owner of the Four J's -- I'm sorry -- of the Beretta Court residence?

*A.* It would have been available. I can't tell you that we called them and tried to solicit that. But it certainly would have been available.

*Q.* Okay. And is that the kind of service that you've sold to other care home facilities here in Houston?

*A.* Yes.

*Q.* Okay. Are you still providing fire inspection services for Four J's Community Living Center?

*A.* At other locations?

*Q.* Yes.

*A.* Yes.

*Q.* And by adding monitoring services, do you mean the automatic notification of the fire department?

*A.* Yes.

And quite frankly that could have been required by the jurisdiction, because they're starting to do that now on some of the older properties. So they may have -- I'm not sure if it was because they wanted it or -- because I wasn't the one who spoke with them, so ...

*Q.* You just don't know why they did that?

*A.* I don't know.

*Q.* You don't know if it was in response to the fire or if it was in response to some code change, right?

*A.* Correct.

*Q.* Okay. Nonetheless, it's something that could have been done at the Beretta Court residence prior to September the 4th, 2008, true?

*A.* Yes.

*Q.* But you know from the paperwork that you've seen related to this property, it's something that

was not done prior to September 4th, 2008, correct?

*A.* Yes.

*Q.* And it's something you've seen done by other companies in the business of providing personal care services such as Four J's does?

*A.* Yes.

*Q.* And if something like that would have taken place -- a consult, I'll call it that. Is that what you call it?

*A.* Yes.

*Q.* Okay. If a consult would have taken place, is that the kind of thing that would have been reflected in OMNI's paperwork?

*A.* Not necessarily.

*Q.* Mr. Knapp at OMNI is the one who could speak to whether or not that occurred?

*A.* Yes.

*Q.* And I think I saw his name on one of these inspection reports, the one dated December 2003. Is that him?

*A.* That is him.

*Q.* Okay. And so if Four J's had wanted to do so, they could call Mr. Knapp and they could say, since we first installed this system in 2001, we're now caring for a client who is unable to walk, who is

unable to speak, who is unable to feed themself, who is blind and otherwise completely helpless in the event of a fire and because of that, we'd like for you guys to come out and evaluate whether the fire prevention or fire detection in our home here is adequate. That's something that Four J's could have done, right?

*A.* Yes.

*Q.* Looking at the inspection of the equipment, the last one dated November 2007, does it appear to you that there were any changes made from the original installation date in 2001 until the last inspection report we see here, November 2007?

*A.* Actually for 2001 -- here, I've got the document I need right here.

No, it looks like it's the same amount of equipment that -- as from the original install.

*Q.* If you look at page 68 of the Houston Fire Department photographs, you can see two pictures of a fire extinguisher there in the kitchen of the residence.

*A.* Yes.

*Q.* In is that the kind of fire extinguisher that would be appropriate for this residence?

*A.* Yeah. I'm not a licensed fire extinguisher

guy. So, honestly, I can't answer it.

*Q.* Okay.

*A.* It looks like it.

*Q.* And, of course, you'd expect that the people who worked there in the facility would know how to operate a fire extinguisher in the event of a fire as well, right?

*A.* I would think so.

*Q.* Doesn't make much sense to have a fire extinguisher in a house like that if you don't know how to use it when a fire breaks out, does it?

*A.* No.

*MR. THWEATT:* No further questions, Your Honor.

*THE COURT:* Mr. Sparks. Do you need that instruction now?

*MR. THWEATT:* Yes. Thank you.

*THE COURT:* Ladies and gentlemen, you are about to hear a little additional testimony. The testimony you are to hear you are to consider only for purposes of whatever notice you might consider it gave to the Defendants. You are not to consider it to be an actual truthful statement, just as a statement that the Defendants may or may not have received notice.

You may proceed.

*MR. THWEATT:* Thank you, Your Honor.

*Q.* And what is he doing there?

*A.* He's actually a fire probation engineer. And he is completing his Ph.D. in that field.

*Q.* Is he studying at the University of Texas for that?

*A.* Yes, he is.

*Q.* It looks like Kristopher's handwritten some comments. And I'd like to focus your attention on the portion of those handwritten comments that says: Rear exit door keyed, deadbolt is locked with no key access. Do you see that there?

*A.* Yes.

*Q.* And if we look at the photographs of the Beretta Court residence that were taken by the Houston Fire Department, you can see a rear exit door that's got the doorknob knocked off and then there's a deadbolt keyed lock. Do you see that?

*A.* Yes.

*Q.* Okay. Do you know why in the course of an inspection performed by OMNI that a rear exit door keyed, deadbolt is locked with no key access would be noted on a form like this?

*A.* The notes that are on there are items that the installer felt to bring to the client's

attention.

*Q.* You mean the inspector?

*A.* Yes.

*MR. THWEATT:* All right. Now page 31.

*A.* Yeah. Typically either one of the Four J's employees would meet us and open the door for us or they would leave a key for us.

*Q.* I see. And so I guess in a normal course of business, OMNI would leave the report with Ms. Uduma?

*A.* Yeah. If there was somebody at the site, we would leave it there. We would leave a copy at the control panel for the client and then mail one with the invoice.

*Q.* Let me ask you about this comment that Kristopher put on here. It says Zone I was disconnected upon arrival. And I can't make out what the next word says. Disabled, is that what that says?

*A.* Disabled, yes.

*Q.* What does that mean, Zone I was disconnected upon arrival and disabled?

*A.* If -- if one of the zones -- the smoke detectors are on a zone. The pull stations are on a zone. So if a zone goes into trouble, it starts to beep to get the attention, you know, to let someone

know there's an issue. And then to stop the beeping there's a switch on there that -- it leaves a yellow light illuminated. But it stops the beeping so it doesn't drive you crazy basically.

*MR. THWEATT:* No further questions, Your Honor.

*THE COURT:* Ladies and gentlemen, this is a good point for us to go ahead and take our lunch break. It's 11:45. We will start back up at 1:00 p.m.

*(Jury excused from the courtroom.)*

*(Lunch break.)*

*BAILIFF:* All rise.

*(The jury present, proceedings resumed in open court as follows.)*

*THE COURT:* Thank you. Please be seated.

*MR. PLUMMER:* Judge, may we approach?

*THE COURT:* Yes.

*(Bench discussion.)*

*MR. PLUMMER:* Judge, I have --

*THE COURT:* Mr. Plummer, you have had all lunch. You wait until we come back ten minutes late because we are waiting for a juror to ask to talk to me outside the presence of the jury. I warned you

yesterday, let us know beforehand, and not to do this.

What is the issue?

*MR. PLUMMER:* This is an old motion in limine. Sunday the newspaper had a big article on Medicaid fraud, and Monday they had a follow-up article. In today's paper, they had another article talking about Medicaid fraud, ambulances, healthcare centers and things of that sort. And I want to just ask the Court to limine out any reference to fraud, Medicaid fraud or things of that sort, which I think would be highly prejudicial. There has been no allegation of fraud. I don't anticipate counsel doing that. But just for the record, since this has been widely publicized in the last three days during this trial, I wanted to alert the Court to that, and counsel of that, so we don't have that kind of mistake.

*THE COURT:* I'm going to deny it. You could have predicted that earlier. You didn't have to wait. That's the kind of thing that, news comes up all the time. Lawyers have their ethical obligations. They know what they need to do. This is not the kind of thing we are going to handle through oral motions in limine at this stage in trial.

Have a seat.

*(Open court.)*

*THE COURT:* Call your next witness.

*MR. SPARKS:* Judge, I'm going to call Ms. Amuche Udemezue.

*BAILIFF:* If you will stand here, raise your right hand and face the Judge, the Judge will swear you in.

*(Witness placed under oath.)*

*THE WITNESS:* I so swear in this court that the evidence I shall give shall -- the testimony I shall give shall be the truth and nothing but the truth.

*THE COURT:* So help you God.

*THE WITNESS:* So help me God.

*THE COURT:* Have a seat.

You may proceed.

AMUCHE UDEMEZUE,

having been placed under oath, testified as follows:

DIRECT EXAMINATION

BY MR. SPARKS:

*Q.* Good afternoon, ma'am. How are you today?

*A.* Good.

*Q.* State your name for the record.

*A.* My name is Amuche Udemezue.

*MR. PLUMMER:* I'm sorry. I didn't hear

that --

*A.* Amuche Udemezue. Amuche Udemezue.

*Q.* (By Mr. Sparks) Ms. Udemezue, you are a former employee of Four J's, are you not?

*A.* Yes.

*Q.* And when did you first start working for them; do you recall?

*A.* Yeah. I think should be November of -- it was -- November of 2007.

*Q.* November 2007.

How did you find out about them being a potential employer?

*A.* A friend told me. So I went and I applied and got the job.

*Q.* Prior to working for them, had you worked anywhere else?

*A.* I kind of did part-time, you know, in a place. I went a couple of times before I got, like a month plus, before I got Four J's job.

*Q.* Now, when you got the Four J's job, approximately how long had you been living in Houston; do you recall?

*A.* Yeah. I came to -- I stayed one month plus in New Jersey, then I came down to Houston. So it should be -- I got to America, I came to America

September 8th or 28th. Then I, I stayed in New Jersey, October. October. Then I got to Houston in the -- November or so.

*Q.* Okay. So when you first came to the United States was in September of 2007?

*A.* Yes, sir.

*Q.* And you worked briefly for a company in October of 2007. Then you got hired on by Four J's in approximately November of 2007?

*A.* Yes.

*Q.* Now, when you first started employment with Four J's in November 2007, how long had it been from the date of hire that you were taken to the facility where you were assigned; do you recall?

*A.* I -- when, when, when I started, just immediately they took me to the -- when -- the first day, this -- I worked -- there's this kind of training, training or, you know, you watch on CD, you watch it. Then they took me to the house where I worked.

*Q.* Okay.

*A.* Then they let me know the supervisors. That was it.

*Q.* So once you filled out the application and got hired, you watched a CD at the office and then

they took you to the facility?

*A.* Yes.

*Q.* And was that facility at Beretta Court?

*A.* Yes.

*Q.* Was the address 16355 Beretta Court?

*A.* Yes.

*Q.* I'm sorry. 16355 Beretta Court.

*A.* It was Beretta Court.

*Q.* Now, when you arrived there, were you trained by anyone?

*A.* The, the lady that was working there before me trained me, kind of. Yes, sir.

*Q.* Okay. And how much training did she give you before you worked?

*A.* I think a day, two days. Then you start working on -- you are on your own, you start working.

*Q.* Okay. When you first started working there, do you recall how many clients were at that property?

*A.* At the initial stage, there were three. Then they let out another person, make it four, for four clients.

*Q.* Now, when you first hired on with the company and when you were doing the training, were you ever led to believe that that would be a three-person home, or did you have any idea about the

number of people that would be there?

*A.* I, I just went there. Three. But later the staff, because we are like three working, they now told me that another person is coming to occupy the other room, the other room.

*Q.* Did they ever tell you about that other person, who she was, what her background may have been, what her temperament was, what her medication level was, anything of that nature?

*A.* No, sir.

*Q.* Do you recall the people that were there when you first arrived?

*A.* Jenny was, Jenny Wagner was there. Tanya James was there. Esperanza Arzola was there.

*Q.* Tell the jury what type of person was Tanya James and what was your relationship with her.

*A.* I'm a caregiver. Tanya James, she needed total care. I give her shower, I do everything, I brush her teeth. I -- no. She can feed herself. I cook for her. I give her meds. I wash her clothes --

*Q.* I'm sorry. I didn't mean to cut you off. Continue. I'm sorry.

*A.* She, she -- whatever she wants and everything. She can't help herself. You have to

prompt her.

*Q.* Was she ever a problem for you at all?

*A.* She wasn't. It's just that she, she fond of hitting herself. If she alone, she will be beating herself. You have to separate her hands, that's all. If you don't, she hurt herself most of the time.

*Q.* What about Ms. Wagner, Jenny Wagner, how was --

*A.* She needed total care. You do everything. You feed her, you feed her. You wash her clothes. You bathe her. You do virtually everything for Jenny.

*Q.* And did you have a good relationship with Jenny also?

*A.* I don't have problems. I don't know. She sings for me. She -- I don't know, I'm very, very close to all of them.

*Q.* Did that also include Esperanza Arzola?

*A.* Esperanza is, is -- she, she is something else. She acts up all the time. Maybe because of her health condition. So I'm not close to her. I distance myself from her. Whatever she say I should give her, I give her. That's it.

*Q.* Now, you were -- was she ever aggressive toward you?

*A.* Yeah, she was. Yeah, at times she is.

*Q.* Were you afraid of her?

*A.* I was very scared.

*Q.* Why?

*A.* Well, the lady, all those ladies that were there before me, told me if -- I should be very, very careful of Esperanza and that she, she can do and do. Anything she wants in the house, I should give her. And I should be careful because she can beat me up, she can kill me here and nobody -- they told me all that. So I was scared of her. And also there was -- the, the lady that left before me, the one that had --

*MR. PLUMMER:* Objection, hearsay.

*THE COURT:* Focus your answer on the question he is asking.

*Q.* (By Mr. Sparks) When you first got hired and you were assigned to the Beretta Court property, how were you -- were you given a key to the facility?

*A.* Nobody gave me any key.

*Q.* I'm sorry?

*A.* Nobody gave me any key.

*Q.* How did you get into the facility when you arrived to work?

*A.* Usually, when I come to work -- when I

started, kind of -- the lady that trained me, she would come the same time. You know, she would come before us. She was already in the house. Then, you know, I don't have a car. I ride with the consumers, the clients to Beretta Court. So when I come, she is already there. Two days or so, she gave me training, she was already in the house. Then I enter the house with my clients. But then, when she stopped training me, I don't have the key. The driver, if I'm coming to work, I get the key from -- or they give it to the driver. They give it to the driver. When we get back, I ride with them. They now open the door, all of us will get in. That's the way I did it.

*Q.* Let me make sure I understand you. You indicated that when you first started working there, you didn't have a car, correct?

*A.* Throughout my period at Four J's, I didn't have a car. Throughout my period working at Four J's, I didn't have a car.

*Q.* And you would go over to the headquarters of the company?

*A.* Get a key.

*Q.* And catch a van over to --

*A.* Yeah. Usually they give it to the driver, or some of the staff, they will call me and tell me

they left the door open. If I get a ride, most of the time I go there, I get the key -- I will go to the workshop first, get the key and come to work. When the driver comes to drop the clients, I will give him back the key. That's the way it was.

*Q.* Was there ever an occasion where you showed up for work and you were locked out?

*A.* There was a time. I can't, I can't recall. But the thing, we have to -- I don't, I don't have the key to the house. At the initial stage. I later got the key. The lady that left, you know, gave me her own copy, the one she made for herself, she gave it to me.

*Q.* Okay. So you later did get a key?

*A.* Yeah.

*Q.* But it wasn't from the supervisors or the caseworkers?

*A.* No, no.

*Q.* And the key that you got, what doors did I open?

*A.* Just one key. Front door.

*Q.* Was there any problems with the garage door?

*A.* The garage door is broke. All of us, three of us that worked there all the time, Tuesdays -- I think Tuesdays and Fridays, they bring the trash out

on the street by the side of the curb. So what we do, if one -- because the garage door is broke, we bring the trash through the living room. When you do that, after doing that, you have to kind of freshen the room. You bring the, the trash through the living room, then through the front door. That's the way all of us -- because the garage was not -- was broke.

*Q.* Why didn't you take it out through the back door?

*A.* I don't have the key. I got only one -- and also, even if I -- no, you can't take -- you go around, back. It's not possible. I mean, like this -- it's not possible. I don't have the key to the back door.

*Q.* So you never had a key to the back door?

*A.* I never had. I don't even know how the key to the back door looks like.

*Q.* What -- did anything change in terms of the dynamics of the home and the relationship among the women and yourself when the fourth person came to that facility?

*A.* How, how -- I don't really get your question.

*Q.* Do you know the name of the fourth person

that showed up to the house?

*A.* Yeah. Elisha Campbell.

*Q.* Did -- what kind of person was she?

*A.* Well, she acts like Esperanza. Severally, she throw cups at me. She is aggressive. She can wake up in spite of the fact that you give her medicine, she can wake up. You know my momma, she start running all over the house, maybe trying to harm you or something.

*Q.* So she was also aggressive toward you?

*A.* Yeah.

*Q.* Were you afraid of her?

*A.* I was afraid of her. I was afraid of Esperanza, both of them.

*Q.* Did you ever communicate your fears and these aggressive actions that were taken by either one of them to the caseworker or any supervisor for Four J's?

*A.* We told them. We told them. And at times, the paperwork we do, we write it down. Most of the time, we write it? Most of the time, notes. We write it on it that all night, she wake up, she was aggressive, ranting. And that's it.

*Q.* Were you ever present when Esperanza left the facility without permission?

*A.* Most, most of the time she, she would just run away.

*Q.* What would happen when she ran away, how would y'all deal with that?

*A.* Well, at times, if she was trying to run away, we will call 911. Then most of the time, she will run away, they will look for her. They can't find her. We call 911 maybe next -- there was a time she ran away. I don't know. But most time she, she wants to run away from the from the house.

*Q.* Do you ever recall her destroying any property at the Beretta Court facility?

*A.* Yeah. She breaking, breaking. She does that all the time, breaking the windows.

*Q.* Now, on the day of September the 4th of 2008, when did you first arrive to the facility over at Beretta Court?

*A.* Surely, I, I don't -- what I use, I use my phone as my watch. I didn't -- once, because I ride with them, as soon as they come back, because I will behind schedule, kind of. I'm supposed to be there before they -- because I didn't have a car, I always ride with them. So when we came in, it's just give them snacks, go and cook. That is the first thing I will do, go and cook, so that I will meet up with the

medication time. So I don't check time. The only time I check time it is when I want to give medication. After that medication, I continue what I am doing.

*Q.* Okay. So when you arrived at the facility with the clients, that's as a result of you going over to the day-hab and getting a ride; is that correct? The day-hab center, is that --

*A.* Yes. I go to the day-hab and get a ride, yeah.

*Q.* Okay. So now, when you first saw Esperanza Arzola on September 4, 2008, would that have been at the day-hab facility?

*A.* Huh?

*Q.* When you first saw Esperanza, would that have been at the day-hab facility?

*A.* Yeah. Day-hab -- no. Yeah. Yeah. Day-hab.

*Q.* And you rode back in the van --

*A.* Yes.

*Q.* -- to the Beretta Court.

*A.* Yes.

*Q.* So when you got to the Beretta Court property, how did you get inside the property?

*A.* The -- okay. I think I got a key by -- the

lady had already given me the key, so I used my key to get in.

*Q.* Tell the jury what you started doing once you got inside the property in terms of prepping for your job and doing your job, now that you arrived at the location.

*A.* I brought all of them out of the van. We went inside. I sat them down, gave home juice and all that. And I went to cook, cook their meal. Then when I finish, I call all of them to the table. They ask -- then Elisha likes taking her bath every, every -- as soon as we come back. So I think she went, first of all, to take her bath or after feeding, eating, she went and took a shower.

Then Esperanza, after eating, I ask her to go and -- she say she doesn't, anything she likes she does. She say no. Then Tanya took her shower. Then I asked Stella. Then Jenny, I went to her room -- well, Tanya takes, I think, 9:00 o'clock or 10:00 o'clock medication. So after her shower, I left Tanya in living room or something. Then I went to Tanya's room to -- I already gave Esperanza her medication. I went to -- oh, not Tanya -- Jenny's room to clean her up. As I was cleaning Jenny up, Esperanza came in. She, she was, like, trying to hold

Jenny, trying to do stuff. And I told Esperanza, go to your room, I will come and see you later in your room. Go back to your room. I'm coming. Let me handle Jenny, okay. She said she wanted to help. I said no, no, you won't be able to handle Jenny. So she left, she went to her room.

*Q.* What happened after that?

*A.* I cleaned Jenny up. She got mad at me for saying that. So she, she kind of went to her room. I didn't know. I was busy. I finished cleaning Jenny, changed her clothings and all that. So I was doing what I was doing. And then the next thing I heard a big bang. You know. I was like, what's happening? And I went to Esperanza. I saw that she kind of broke the window. I was like -- I became scared.

*Q.* What did you do after that?

*A.* Then when she broke -- I can't recall. I can't recall what, really, the things I did, because a lot of things happened that night. So I kind of -- when she broke the window, I started calling. I started calling everybody. She is acting up. I called the case manager. When I called the case manager, he didn't pick up the phone. I called Inya. I called the nurse.

*Q.* Why did you call the nurse?

*A.* I have to call the nurse to ask them what do I -- because I saw a small scratch on her, on Esperanza's -- I don't remember. I can't remember whether it was hand or legs.

*Q.* So are you saying that when she broke the window, she may have injured herself?

*A.* Yeah.

*Q.* That's why you called the nurse.

*A.* Uh-huh.

*Q.* That was something you were instructed to do?

*A.* Yeah. If there is anything, you call the nurse. Yeah.

*Q.* Did you talk to the nurse?

*A.* Yeah.

*Q.* What did she instruct you to do?

*A.* I called the nurse. The nurse say I should give her a, I think she said -- I should go to first aid box and give her something, Tylenol, something. I can't remember. I can't recall. Then she was ask -- the nurse asked me what the cut was. I said it's just a minor cut, you know. Then she told me what to do, that I should clean it up with hydrogen peroxide. But I think I told the nurse, I already

done that, or after Esperanza -- I can't remember again -- was after she came to me and apologized that I went close to her. I can't remember again, but then --

*Q.* Let me ask you a question. I don't mean to cut you off, but I want to see if we can't get through this, okay?

Did you ever get a chance to put the hydrogen peroxide on her?

*A.* I can't recall. But then, she said -- I think I said I already did that. I can't remember. Esperanza calmed down, came and apologized. I am giving you hard time. I won't give you hard time no more. I think it was that time. I don't know because I was scared.

*Q.* What do you recall happened after that?

*A.* There was siren, kind of ambulance, fire service. I heard some noise, you know, outside. I said, let me check on what is happening. So I peeked outside, saw the, the van parked across the road. So I came back. So Esperanza now said, what was that? I said, it's like a house is on fire at the end of the road, you know. She, she now was saying she wants to go to hospital, you know. So I think --

*Q.* Now, after she told you she wanted to go to

the hospital, what did you think about that, and did you do anything in reference to it?

*A.* I told her that the nurse said she will take her to the hospital tomorrow.

*Q.* Okay.

*A.* You know, I told her that. So I came inside.

*Q.* What happened after that?

*A.* When I came inside, she's -- since she said that she, she, she is giving me hard time and all that, she was sitting at the -- in the living room. She now went back to her, to her -- I believed her because that's what she does, she will come and tell you, oh, I'm giving you a hard time, yeah, yeah, yeah. Then she will keep coming. So when she inside her room, I now continue with what I was doing in the house.

*Q.* Anything significant happen after that?

*A.* Yeah. When, when, when she got back to her room, I didn't know. I was busy doing -- because I still have to cook the food that they will take to the day-hab. I still have to wash their clothings, you know. So I continue with what I was doing. I didn't know she went inside to plan.

*Q.* So what happened significantly after that?

*A.* She now -- she -- I think she -- after that, she, she set the house on fire.

*Q.* Okay. When did you first become aware that there was a fire in the house?

*A.* I didn't know because she, she closed that door.

*Q.* When did you first become aware of the fire?

*A.* I heard the big, the alarm, you know, go off. So I heard a big bang, boom, like somebody pulled iron or something. I heard a big bang, you know. Then my mind went outside. I said again, let me find out what's happening. I rushed outside. When I rushed outside, I saw -- because Esperanza's, Esperanza's window is very close to the front door. So I, I kind of saw the -- it was -- I mean, the fire was too much. I couldn't believe myself. And I rushed back. I came inside. I shut the door. I was confused. I didn't know what to do. I went to Elisha's room. When I went to Elisha's room, all of them they were sleeping. I started shaking her.

Excuse me. I'm sorry. (Crying.)

I shook her.

*Q.* After you shook her, what happened?

*A.* She got up. I took her outside. I took her outside. So when I took her outside, I came back.

Already, Esperanza had already opened that door. So when I came back, I was, like, going towards Jenny and -- Jenny and Tanya's room. When I came back, there's -- I looked at that door. I started panicking when I looked at Esperanza door. And it dawned on me that all of us, because the fire is very close to Esperanza's -- the window is very close to Esperanza -- the front door. So when I saw that and I don't have the key, and my hands, my legs started shaking.

*Q.* So are you saying that you realized -- are you saying that you realized that the back door, the exit, is that what you are talking about?

*A.* Yes.

*MR. PLUMMER:* Objection, leading.

*THE COURT:* Overruled on this one.

*Q.* (By Mr. Sparks) Are you saying that you realized the back door, the exit, was not an option for you to leave out of, had you been able to get Jenny and Tanya?

*A.* I got only one door there. If that fire gets to that front door, that's it. We are finished. The garage door is broken. That door and the garage, you know, one small door. I don't have the key. I have access to just only one door. So when I looked

at that thing and I said, if anything happens, me too, I will get burned. That was when my hands and legs started shaking. I became -- I started panic.

*Q.* What happened after that, ma'am?

*A.* Then I couldn't use the house phone because I was actually -- I was moving around. All the calls I made was on my Cricket phone. All the calls I made, all the calls I made was on my Cricket phone. Then I had to use the same Cricket phone. When I stepped -- it was then that I started calling Esperanza, Esperanza. Then we went out together. I was in front of that door, using my Cricket phone. Well, my hands were shaking, my legs. I was shouting and nobody -- because that place is a lonely place, you know. You hardly see people moving around. But I went to the neighbors. I was shouting. Nobody came out. Then I knew the time -- I runs across to the other side to -- was shouting so that people will come out and come and help me. But I can't remember. That was the last thing. Even when the, when the, the 911 came, I passed -- I think -- I didn't know anything again. I was -- I woke up in the ambulance.

*Q.* So you passed out?

*A.* Yeah.

*Q.* You were aware that you guys had had some

training regarding fires; is that right?

*A.* Yes, sir.

*Q.* Who was the person who was primarily responsible for providing that training?

*A.* Rosemary.

*Q.* Do you know her last name?

*A.* I know her as Rosemary.

*Q.* Rosemary.

Do you know how many times she came and did training for you?

*A.* I can't recall. But I remember two times she came and did -- she held up her watch and did drills, you know. Fire drills. Fire -- before then, I didn't know because I just came from Africa and Africa is a different ball game. I didn't even know what fire drills was all about. So she said, fire, fire, you know. I remember Jenny was in the living room. I had to push her outside the door, at the door. Then she would say, go and get -- call Esperanza.

I remember the second time he came, he said I should -- in fact, I go to Esperanza's room, call her. I say, fire, fire. I run after her out the house. I remember vividly two times she came -- at times, she will come. She will just do the paperwork.

We will not do the fire deal.

*Q.* Let me stop you for just a second. Am I understanding that there were some times she came and you guys did an actual fire drill; is that correct?

*A.* Yes, sir.

*Q.* And at all times that you did the fire drill, were they always out of the front door?

*A.* Yes, just front door, yeah.

*Q.* Never attempted to leave out of the back door?

*A.* No. No, sir. Front door.

*Q.* Never tried to go out the garage?

*A.* No, sir. No. No key. No. It's broke. We don't use that.

*Q.* Was she aware that you didn't have access to those other two exits?

*A.* Well, the, the person that is doing all the job, all the job in the house, anything that is broke, you talk to him, is Inya. So Inya is aware that the doors, the garage doors -- even when the machines are broke, the washing machines are broke, when they bring -- he is the one that will bring people to come and repair it. It's true that he knows the garage door is not functioning.

*Q.* But my question is: Do you think Rosemary

was aware when she was doing the training, always taking out the front door, that the back door was not accessible?

*A.* I don't know whether she is aware, but we always go through the front door. That is the only door, just that one door. We go through it.

*Q.* You also stated, if I understand you correctly, that there were a couple times when she came out and she gave you some forms to sign?

*A.* Yeah. When, when -- end of the month, you go to meetings, we have to sign forms. If you don't sign it, you know, they not going to pay you. So all the forms that were put out, you have to sign it. At times, they give to the driver to get some paperwork for us to sign. So we signed them.

*Q.* So periodically, there was training over at the headquarters, and is it your testimony that that training primarily was done when you would go pick up your check?

*A.* Yes, sir.

*Q.* But my question, though, is: Out at the property at Beretta Court, was there an occasion when Rosemary showed up and gave you documents to sign regarding fire training that did not include a training?

*A.* Excuse me, sir?

*Q.* Did she show up and give you papers to sign regarding fire training, mock fire drills, but y'all didn't do no drills?

*A.* I remember she comes, but she is in there, in a hurry, you know, she will just tell you to sign, you know, fill -- you know, something she will write, you will sign, you know. She is in a hurry. I said I can recall two times we did a proper drill.

*Q.* So the, the ten months that you worked there, you think you had two quality trainings on fire drills?

*MR. PLUMMER:* Objection, misstates the testimony of this witness, Judge.

*THE COURT:* The jury will use its own recollection of the witness's testimony.

*MR. PLUMMER:* Okay.

*Q.* (By Mr. Sparks) You can answer the question, ma'am.

*A.* Sir?

*Q.* During the time period you were there, you think you had maybe two quality trainings on fire drill?

*A.* Yes, sir.

*Q.* Let me ask you this question: Did Rosemary

ever instruct you on the utilization of the fire extinguisher?

*A.* Nobody ever taught me how to use the fire extinguisher. I didn't know how to use it. It was just there, but I didn't know how to use it.

*Q.* What about when you went to pick up your check when they had different trainings and stuff, did they ever train y'all or talk to you about the utilization of fire extinguishers in the properties?

*A.* Nobody ever told me. The training, I sit there, they talk. Nobody ever taught us how to -- when fire starts, this is, you know, nobody.

*Q.* When you would go to those trainings, did you know you were going to be trained, or did you expect to pick up your check and it was sprung on you guys that before you get your checks you have to go to a lecture?

*MR. PLUMMER:* Objection, leading.

*THE COURT:* Overruled.

*Q.* (By Mr. Sparks) You can answer the question.

*A.* When we get to any paperwork, maybe you didn't sign it, you check it out, you didn't sign it, it's on that, you must sign it before you collect your check. All the paperwork, they would put it

forward, they will bring all the paperwork for you to you sign everything before you can collect your check for all purposes.

*MR. SPARKS:* May I have a minute, Your Honor?

*THE COURT:* Go ahead.

*Q.* (By Mr. Sparks) Let me make sure I understand your testimony, ma'am. After you went back in to the home, when you realized that Esperanza was coming out, the fire had become so engaged you didn't have an opportunity to make any attempt to get Jenny out nor Tanya James. Is that a fair statement?

*A.* Yeah. That's what I said. When I wanted to -- when I looked at that door, it was all out completely. I panic. That was what happened to me. My hands and legs were shaking. I didn't know what to do again. And it dawned on me that if I don't take time, we will all get burned in the fire.

*MR. SPARKS:* Pass the witness, Your Honor.

*THE COURT:* Mr. Thweatt.

Mr. Terry.

*MR. TERRY:* A couple questions, Your Honor.

*THE COURT:* Proceed.

CROSS-EXAMINATION

BY MR. TERRY:

*Q.* Ma'am, could you please look at the monitor and let me know, have you ever seen the Individualized Emergency Plan for Jenny Wagner?

*MR. TERRY:* This is Plaintiff's Exhibit 40.

*A.* Yeah. Yeah, that's information about Jenny. I have seen -- it's attached in the binder.

*Q.* (By Mr. Terry) I guess from your review of the document, you were familiar with the evacuation procedure for Ms. Wagner. And I'm looking here at the bottom, which basically says, "Place the cushioning materials on the floor beside the bed to ease in transfer onto the floor and prevent potential injury. Wrap Jenny in a sheet or blanket. Gently lower Jenny from the bed to the cushion on the floor. Get out of the home as quickly as possible to minimize smoke inhalation and burns. Raise Jenny's arms over her head and lift her enough to get her head off the floor. Gently drag Jenny by the arms and hands to the nearest exit."

Did I read that correctly?

*A.* Yes, sir.

*Q.* Okay. During the fire drills, or the two

fire drills that you remember, did you ever do anything like that?

*A.* No, sir.

*Q.* Did you ever do any sort of fire drill which involved placing Jenny on a cushion or a blanket and dragging her out?

*A.* No, sir.

*Q.* Okay. The two fire drills that you did that you do remember, what time of the days did those take place?

*A.* At times in the evening. It took place in the evenings because we usually get there -- you see, I don't work afternoon. About -- from weekdays, that they don't go to day-hab. So usually it took place in the evenings. Or at that times, weekends. We -- I can't recall. I can't recall the time it took place.

*Q.* When they took place, was everyone awake?

*A.* Yeah.

*Q.* Okay. Did the drills ever take place when everyone was asleep?

*A.* No. No, sir.

*Q.* Ma'am, do you recall how much you made while working at Four J's, per hour?

*A.* They pay me $7. $7.15.

*Q.* Thank you.

*MR. TERRY:* Pass the witness, Your Honor.

*THE COURT:* Mr. Plummer.

*MR. PLUMMER:* Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PLUMMER:

*Q.* Is it all right if I call you by your first name, Amuche?

*A.* Yes, sir.

*Q.* How do you pronounce your last name?

*A.* Udemezue.

*Q.* Okay. But I can call you Amuche. And you had a nickname also, Moochie; is that right?

*A.* Yes, sir.

*Q.* I want to first try to understand the environment that you worked in when you started working at Beretta Court. And what I have done is put a diagram up there to diagram the floor. You can see it in front of you on the monitor. Let me see if I can zoom it out a bit. And I want to see if we can agree on certain aspects of that house.

Does that pretty much suggest and identify the layout of the house?

*A.* Yes, sir.

*Q.* Okay.

*MR. PLUMMER:* Judge, may I approach the -- well, I can do it from here.

*Q.* (By Mr. Plummer) This was Esperanza's room; is that correct?

*A.* Yes, sir.

*Q.* This is Tanya's room?

*A.* Yes, sir.

*Q.* Next to that was the bath?

*A.* Yes, sir.

*Q.* Okay. And, by the way, you can watch it on the monitor right in front of you.

*A.* Okay.

*Q.* Can you see it there?

*A.* Yes, sir.

*Q.* Okay. Next to the bath was the kitchen; is that correct?

*A.* Yes, sir.

*Q.* Okay. And the front door was here; is that right?

*A.* Yes, sir.

*Q.* Okay. I'm going to go ahead and mark that front door so it's clear that we can identify it. Let me mark that door. I'm going to mark it in blue.

Was it about right here? Is that the

front door?

*A.* Yes, sir.

*Q.* Okay. And if you were to walk in the front door and you look straight back, you could see the back door; is that correct?

*A.* Yeah. Yes.

*Q.* Okay. So would the back door be about here? Straight back from the front door?

*A.* The, the, the back door should be somewhere here (indicating).

*Q.* Okay. When you say somewhere here, you mean to the -- on this side or this side of the --

*A.* Maybe somewhere here.

*Q.* Somewhere over here?

*A.* Yeah. Somewhere here.

*Q.* Okay. In this area?

*A.* A little bit --

*Q.* This way?

*A.* -- back. Yeah.

*Q.* This way?

*A.* Yeah, yeah.

*Q.* Okay. Can I mark that for back door right now? Would that be a right and accurate description?

*A.* Uh-huh.

*Q.* Is that a yes?

*A.* Uh-huh.

*Q.* Is that a yes?

*A.* Yes.

*Q.* Okay.

*THE COURT:* We need you to use words, not sounds like uh-huh or huh-uh.

*Q.* (By Mr. Plummer) I'm going to mark that back door right here. Is that right?

*A.* No, sir. A little more to the right.

*Q.* A little bit more to the right. Okay. Right here?

*A.* Yeah.

*Q.* I'm going to mark that corrected door in pink. Is that all right?

*A.* Okay, sir.

*Q.* Okay. Now --

*MR. PLUMMER:* Judge, may I ask the witness to step down? Well, actually, she can do it from the large --

*THE COURT:* Hold on. Slow down. Are you asking to approach the witness?

*MR. PLUMMER:* Yes, please, Your Honor.

*THE COURT:* You need to give her something?

*MR. PLUMMER:* Yes, sir.

*THE COURT:* All right. You can give her the pointer.

*Q.* (By Mr. Plummer) Let me give you the pointer and let you point on the big map, so I can mark it as you point.

Show me which -- where the entrance to Jenny's room was.

*A.* Jenny's room here.

*Q.* Right there? Okay. Would that be about here?

*A.* Yes.

*Q.* Okay. Let me mark that.

And the entrance to Esperanza's room?

*A.* Here.

*Q.* Okay. And what about the entrance to Tanya's room?

*A.* It should be somewhere here.

*Q.* Somewhere there?

*A.* Uh-huh.

*Q.* Would this be about right?

*A.* Yes.

*Q.* Okay. Now there was another door from the living room into Elisha's room; is that right? Do you see Elisha's room there?

*A.* Yeah.

*Q.* Can you show us where the door was to Elisha's room?

*A.* Here.

*Q.* Okay. Let me mark that.

*A.* Then this one should be somewhere here.

*Q.* Okay. Let me move -- I'm going to scratch out the one I have and mark it in another color a little bit further over. Point to it again so I can see again, the back door.

*A.* (Witness complies.)

*Q.* Okay. Very good. About right here?

*A.* Yes.

*Q.* Okay.

Now, if you would, Amuche, where was the door to the garage, from the house?

*A.* The door to the garage?

*Q.* Yes.

*A.* It was right -- you mean, the in and out door to the garage?

*Q.* The one that you go from inside the house into the garage.

*A.* Here. Because if you bringing out trash, you push it, you come to the living room.

*Q.* Where I marked it, is that correct?

*A.* Yeah.

*Q.* Okay. Now there was a door from the garage to the outside; is that correct?

*A.* From garage to outside?

*Q.* Right. On the far side of the garage. Do you remember that?

*A.* (Indicating.)

*Q.* Right there? Okay.

*A.* A small door.

*Q.* Now, let me -- may I ask you about -- were there any other doors from which you could get either in the house or out of the house, other than these, the front door, the back door and the garage door?

*A.* This one is inside. This one here should be the garage, the main gate for the garage.

*Q.* Correct. But there was also the other door on the left side of that garage; is that correct?

*A.* This one.

*Q.* Yes, okay.

Now, if you would, was there -- were there windows to Esperanza's room?

*A.* The window to Esperanza, I think right here.

*Q.* Okay.

*A.* A window.

*Q.* Okay. Let me mark that.

Would that be about here?

*A.* Yes, sir.

*Q.* Okay. What about Jenny's room.

*A.* Jenny's room will be --

*Q.* You could see it from the front door, is that right, when you walked in the front walkway?

*A.* Jenny's.

*Q.* You can't recall?

*A.* I'm trying to recall. Jenny's room. I think you can see. Yeah. Yes, sir.

*Q.* So would it be just to the right of the front door?

*A.* I can't recall that.

*Q.* Okay.

*A.* I can't recall.

*Q.* Now, what about Tanya's room? Was there a window in Tanya's room?

*A.* Tanya's room, sure. The outside, this way, facing the neighbors.

*Q.* Say that again. I'm sorry.

*A.* Tanya's window should be this way, facing the neighbors.

*Q.* So the window to Tanya's room would be over here?

*A.* Yes. At the back.

*Q.* Where?

*A.* At the back -- at the side, not in front.

*Q.* You mean where the kitchen is?

*A.* No. It should be somewhere here.

*Q.* So where I put the squiggly line, it should be somewhere in that general area; is that right?

*A.* Yes, sir.

*Q.* Okay. Okay. Now, let me understand -- you, you can take your seat, ma'am.

Let me understand what happened on the 4th, September of 2008. You arrive with the clients in the van; is that correct?

*A.* Yes, sir.

*Q.* And this was about 4:00 or 5:00 o'clock in the afternoon?

*A.* It should be around -- maybe after 6:00. I'm not too sure. I didn't check my time. Maybe after 5:00. I don't really know. I can't recall.

*Q.* Okay. It was after your shift started; is that correct?

*A.* Yes, sir.

*Q.* And your shift started at 4:00 o'clock in the afternoon, is that correct, or thereabouts?

*A.* Since I ride with them, my shift starts when I get there. That's when my shift starts.

*Q.* Okay. And that was somewhere after 4:00

o'clock, maybe 5:00 o'clock in the afternoon. Is that a fair statement?

*A.* That we arrived or when our shift supposed to start?

*Q.* When your shift was supposed to start.

*A.* Maybe it should be around 5:00. That's when the shift starts.

*Q.* All right. And you all arrive in the van to Beretta Court. And when you get there, you go in the front door, right?

*A.* Yes, sir.

*Q.* Use your key to go in the front door, right?

*A.* Yes, sir.

*Q.* And you take in all, all of the consumers, all of the clients; is that correct?

*A.* Yes, sir.

*Q.* Now, did you have any assistance with the driver, taking folks in the house?

*A.* Once you get them, you know, it has a -- what you call it -- remote that -- like Jenny -- the van has this remote for -- the ones, it brings it down, you push Jenny out of the, the, the van. But that's it. You bring all of them out, take them inside.

*Q.* You didn't have any trouble getting

everybody out of the van and into the house; is that correct?

*A.* No, sir. Yes, sir. Yes, sir. You is that correct. I say yes.

*Q.* Okay. Thank you.

By the way, you had been taught that the home at Beretta Court was to be considered the home of these clients; is that correct?

*A.* Yes, sir.

*Q.* And part of the reason for that is the whole principle behind the idea of a group -- this kind of group home was to try to integrate them as much as possible back into the community; is that right?

*MR. TERRY:* Objection, Your Honor, speculation, lack of foundation.

*THE COURT:* Rephrase your question.

*MR. PLUMMER:* Very well, Your Honor.

*Q.* (By Mr. Plummer) Did you understand what some of the theory was about the group home setting for these people?

*A.* How do you mean, theory?

*Q.* What do I mean by theory?

*A.* No. How do you mean, the setting. You know, it is just the -- made in such a way that it is to be a home, like for them -- to be a home, just

like your home, their own home.

*Q.* Okay. Okay.

*A.* Except that they need assistance.

*Q.* The only difference was they needed assistance; is that correct?

*A.* Yes, sir.

*Q.* Okay. So you bring everybody in. I assume -- and you correct me if I am wrong -- you take Jenny into the living room, and the other clients go their separate ways in the house. Is that a fair statement?

*A.* You don't, you don't, you don't -- yeah, you take -- yes, sir. You take Jenny in the room. For Tanya, you have to tell her what to do.

*Q.* Jenny?

*A.* Tanya, you have to tell her what to do.

*Q.* You tell Tanya what to do. When you say tell her what to do, did you tell her to go into the living room and have a seat and watch TV, or did you tell her to go to her room, or do you recall one way or the other?

*A.* You prompt her. At times, you prompt her, she gets what you are saying. But most time you have to help her out, take her to her room. You take her to her room.

*Q.* You use the term "prompt." Is that something you were trained to do by Four J's, to prompt the clients who needed it?

*A.* You don't need training. It's just, you prompt -- you tell her all the time. You don't say it once. You tell her, tell her, tell her.

*Q.* No, I understand that. But you are using a term that seems like it's a fairly specialized term, that you prompt certain clients because they need prompting.

*A.* Yes, sir. Yes, sir.

*Q.* You learned that through Four J's. They taught you that?

*A.* Yes, sir.

*Q.* And they taught you a whole lot of other things about how to take care of your clients safely; is that correct?

*A.* Yes, sir.

*Q.* So you prompt Tanya to go to her room. Who did you say took their shower first, or do you recall?

*A.* Elisha. Elisha is the first person. Once we come back, that is the first thing. It depends on -- at times, she will take her food before she goes to shower. At times, she will shower before she

comes to eat.

*Q.* To eat?

*A.* Yeah.

*Q.* Well, either way, things were normal. You proceeded to cook dinner for everybody. Did they all have special diets?

*A.* They said Esperanza is on diet, but when you cook she will tell you what she wants to eat and you must start cooking again. If she says she is not going to take this, this is what you are going -- she won't take what you cook, you a start all over again cooking. That's, that's it.

*Q.* By the way, Esperanza was, of the people in the house, the only one who didn't have a guardian; is that correct.?

*MR. SPARKS:* I object, Your Honor, speculation.

*THE COURT:* Lay your foundation.

*Q.* (By Mr. Plummer) Some of your -- some of the consumers had guardians; is that correct?

*A.* Can I have some water?

*Q.* Okay.

*A.* Thank you, sir.

*Q.* Sure.

Let me show you what's been marked as

Exhibit 44, which is the service plan for Esperanza Arzola. And let me ask you to take a second and look at that. And do you see on that service plan that she was without a guardian, she didn't need a guardian? Where it says "legal status," what does it say?

*A.* Adult without a guardian.

*Q.* Adult without a guardian?

*A.* Yes.

*Q.* So, of the folks in the house, she was a fairly high functioning individual; is that correct?

*A.* Yes, sir.

*Q.* She could communicate. She had her likes and dislikes?

*A.* Yes, sir.

*Q.* She could carry on a conversation? Is that a correct statement?

*A.* Yeah. At times, her conversation made sense. At times, it doesn't make sense.

*Q.* But she understood what she was doing in most instances, right?

*MR. TERRY:* Objection, Your Honor, calls for speculation.

*THE COURT:* Restate your question. Return to your place at the bar, please.

*Q.* (By Mr. Plummer) Is that correct?

*A.* Sir?

*MR. TERRY:* Objection.

*Q.* (By Mr. Plummer) From your perspective, did she understand much of what she was doing when she did it?

*A.* I wouldn't talk for Esperanza. But then, at times, she talked sense. And when she said she was not going, like, I'm not going to give you hard time, you know, at times you, you -- she will go and sleep, she will keep quiet. But at times, whatever she set her mind to do, she will do it. She, she is not steady. She is like this (indicating). She is unsteady.

*Q.* All right. You take folks in, you get everybody situated, you start doing -- fixing dinner; is that correct?

*A.* Yes, sir.

*Q.* And at some point in time, you start putting together the medication for the evening; is that correct?

*A.* Yes, sir.

*Q.* You had been taught how to do that, how to parcel out the medication?

*A.* Yes, sir.

*Q.* Was that for everybody in the house?
*A.* Yes, sir.
*Q.* And you had to get the medicine out of the medicine cabinet; is that correct?
*A.* Yes.
*Q.* It was a locked cabinet?
*A.* It's not locked.
*Q.* It wasn't locked?
*A.* No, sir.
*Q.* Was it -- by the way, did you have any knives that were there that could be harmful to somebody?
*A.* Because of Esperanza and Elisha Campbell, we don't use knife in the house.
*Q.* Okay. All right. What was it that you -- that first brought to your attention that there was a fire?
*A.* I didn't -- actually, I didn't know there was fire in the house. The fire -- the house was burning. I didn't know. She, she close that door. I didn't know the house was burning.
*Q.* But you did discover it was burning at some point in time, right?
*A.* Yes, sir.
*Q.* And when you say it was burning, it was

confined to Esperanza's room; is that correct?

*A.* Yes, sir.

*Q.* And you go to Esperanza's room because you heard a bang, I think you said; is that right?

*A.* I didn't go -- I went outside because of the, the, the siren we heard. So my mind went outside. There is something happening there. When I heard the big bang, I rushed outside. I went outside first. The second time, I just opened the door. When I opened the door, I stepped out to find -- I now saw the fire.

*Q.* When you say opened the door, you mean you opened the front door?

*A.* The front door.

*Q.* And you saw the fire through this window here?

*A.* Yes, sir. Yes, sir.

*Q.* All right. Now, when you saw the fire through that window, did you go to Jenny's room to get her out?

*A.* Sir, I didn't go to Jenny's room to get her out. I just -- when I saw the fire, I closed the door behind me.

*Q.* Let me stop you there. Let me understand this. You step out the front door.

*A.* Yes.

*Q.* You look to your right, I guess, or left --

*A.* Left.

*Q.* -- and see a fire in Jenny -- in Esperanza's room. And you close the front door behind you.

*A.* I came inside, closed the door.

*Q.* So you got back, went back inside.

*A.* Uh-huh.

*Q.* And then you walked -- did you walk or run all the way to Elisha's room?

*A.* Yeah. I went to -- I enter Elisha's room. I was like, do I go left or do I go right. And I said, let me get Elisha first. And I enter her room.

*Q.* Okay. And you shake Elisha, wake her up, shout fire, fire, get out?

*A.* I took her outside. Right outside. I took her outside and came back.

*Q.* You took her outside the front door?

*A.* Yes, sir.

*Q.* And came back in?

*A.* Yes, sir.

*Q.* By the way, at any point in time did you try the back door?

*A.* How will I go and try the back door when I don't have the keys?

*Q.* Well, that's not my question. My question is: Did you try to turn the knob and push the back door open, or pull it open?

*A.* No, sir. It's not, it's not, it's not open. All the things I do in that house, if I want to take them out for games or something, recreation, I go through the, through the front door to the back. It's only when we have -- maybe a light is having a problem, even Inya will come and open that door, because he have the key. I don't have the key to that back door.

*Q.* Okay. You get Elisha out and you go back in the house, is that correct, after you get Elisha out?

*A.* Yes, sir.

*Q.* And then you go past the wall to the living room, turn to the kitchen and turn down the hallway where you can see Esperanza's door, right?

Let me see if I can just do this. You first go from here over to here, right?

*A.* Yes, sir.

*Q.* And you take Elisha out, right?

*A.* Uh-huh.

*Q.* Then you go back in and come around over here, right?

*A.* Sir, I didn't get to that point.

*Q.* Well, how did you get Esperanza out?

*A.* I got -- already, by the time I took -- I woke Elisha up and Esperanza -- by the time I came inside, I saw Esperanza standing, standing.

*Q.* Where was she standing?

*A.* She was standing right here.

*Q.* If you can take the pointer --

*A.* Looking at the fire.

*Q.* If you take the pointer and show me on the big screen, where was Esperanza standing as you got Elisha out, please, ma'am.

*THE COURT:* You can step down and show us on the screen, please.

*A.* Esperanza was standing right here, somewhere here (indicating).

*Q.* (By Mr. Plummer) Okay. Now, did she follow you and Elisha out, or did she lead the way out, or what happened?

*A.* When I rushed in, when I came back, she was just standing there looking at the fire. Then I shouted, Esperanza, Esperanza, fire, fire. You know, I was like -- I moved.

*Q.* Show me where you moved with the pointer, if you don't mind.

*A.* I came in and I, I was like this point.

Then I looked at this door.

*Q.* Oh, that's the first time you looked at the door? You hadn't looked at it before?

*A.* When there was fire. When I came in, I looked at this, my eyes went to this door.

*Q.* Okay. But I'm -- Esperanza is there. Does she leave with you, or did she leave by herself when you shouted fire, fire?

*A.* She left.

*Q.* And where did you go at that point in time?

*A.* Then when I left -- I told her -- I thought of using the phone, calling 911. But then, when I looked at that door, my hands and legs started shaking. It dawned on me then, then that was when I decided to use my phone, my cell phone, to try to get 911.

*Q.* Okay. Were you in the house when you were doing this or outside?

*A.* I was, I was outside. Out, outside. I was outside when I was -- because I didn't want to, I didn't want to stay right there and do the call because I was, I was kind of confused then. And my hands and legs, my hands were just shaking, you know. You know, I was scared.

*Q.* Jenny weighed 85 pounds; is that right?

*A.* Sir, as a matter of fact, we had these things (indicating) but I will tell you the truth, I hardly read it. But at times -- not that I know everything in it. I don't know how many pounds she was.

*Q.* Well, you had lifted her up before, right?

*A.* Sir?

*Q.* You had lifted her up before?

*A.* I lift her up. She is very heavy.

*Q.* But you could lift her, right?

*A.* Yes, sir.

*Q.* And as you had been instructed, you could have gone in Jenny's room, lifted her up, put her on, on the floor on, on a comforter or blanket, and drug her out, right? If she was real heavy, right? You could have done that.

*A.* I could have. I could have done that.

*Q.* And the same thing, if you had gone in Tanya's room and told her fire, fire, wake up, and follow you out, right?

*A.* Yes, sir.

*Q.* And you had been taught to do that, hadn't you?

*A.* Sir, nobody taught me how to do that.

*Q.* Okay. By the way, having taken care of

Jenny for, what now, a year and a half -- was that about the time you had taken care of Jenny before this fire?

*A.* Sir, I took care of her for, like, maybe ten months or nine months.

*Q.* Ten months. So having taken care of Jenny for ten months and having taken care of Tanya for ten months, nobody really had to tell you to go in and pick Jenny up and take her out of the house, right? To protect her from the fire.

*A.* Yes, sir.

*Q.* Same thing with Tanya, right?

*A.* Yes, sir.

*Q.* So all the training in the world would not have helped you in this situation because you panicked; is that right?

*MR. SPARKS:* Objection, Your Honor, speculation.

*THE COURT:* Overruled.

*MR. PLUMMER:* Would you read the question back to her, please, ma'am.

*THE COURT:* No. You will ask me for readbacks.

*MR. PLUMMER:* I'm sorry, Judge.

*THE COURT:* Kathleen, would you read the

question back, please.

*THE COURT REPORTER:* Question: So all the training in the world would not have helped you in this situation because you panicked; is that right?

*A.* Yes. Not really, because -- yes. One, I panicked because I, I got just one exit. I would have tried my best if I had another door in that house.

*Q.* (By Mr. Plummer) Well, let's talk about that for a second. You had been trained that, if you had no other way out, to put Jenny in a blanket or Tanya in a blanket and roll out the window, right?

*A.* Sir, it was after the fire that I went to the workshop, they told me. I have never had -- I don't even know that you can go through the window. They were saying, and do you know that you can go through the window. Nobody told me that.

*Q.* Well, if you couldn't -- if you didn't think about going through the window, you certainly could have gone through the garage door, at least into the garage, away from the fire, right?

*A.* The garage door was broke. Nobody used that. I, I didn't even -- it's only Inya that I see with the maintenance man opening that door. We don't -- imagine if you are bringing out trash, you

come through the living room. Is it healthy? That's what I'm talking about.

*Q.* Well, I'm not worried about the healthy part of it. I'm worried about the safety part.

Could you have gone through this door?

*A.* That door, if you get through this door, there's another gate, kind of main garage door, right here. The main garage door.

*Q.* Okay.

*A.* This is not the exit.

*Q.* But it's a way out, right?

*A.* It's a way, but when you get here, the main garage door.

*Q.* And there's another door here; is that right?

*A.* Yes, sir.

*Q.* Okay. And all the training in the world didn't need to tell you that. You knew that, right?

*A.* I, I don't understand the question.

*Q.* Now, you have made much of -- by the way, you have made much of your, of Esperanza's, your fear of Esperanza, Amuche. You said quite a bit about how she frightened you and you were afraid of her. Is that right?

*A.* Yes, sir.

*Q.* Okay. And is it true that you kept a daily service log on each of your clients?

*A.* Yes, sir.

*Q.* Okay. And let me show -- may I approach, Your Honor?

*THE COURT:* Me or the witness?

*MR. PLUMMER:* The witness, Your Honor.

*THE COURT:* Yes.

*Q.* (By Mr. Plummer) Let me show you Defendants' Exhibit 29. These are the service logs that you kept; is that correct?

*A.* Yes, sir.

*Q.* And those are the service logs you kept on Esperanza; is that correct?

*A.* Yes, sir.

*Q.* And if you look at the first page and then look at the last page, tell me what period of time they cover.

*A.* This is June.

*Q.* Okay.

*A.* 2008.

*Q.* Okay.

*A.* This is July 2008.

*Q.* Okay. So for, for roughly a full month, isn't it true that not one time did you report in

those service logs your fear of Esperanza Arzola? Is that correct? And if you want to take a look at them, feel free to do so.

*A.* I told you here that at times we, we just make it -- we don't write that she was acting up. I said it -- I said because we got too much doing, at times if everything goes fine, maybe she was acting up, at the end of the day everything goes fine, we don't put all those -- it's not -- you don't put all that, you did that, you did that, you did that. You just write that you gave her medication and she was fine.

*Q.* Well, I guess the bottom line is, you never reported in the progress notes your fear of Esperanza; is that correct?

*A.* Yes, sir.

*Q.* Okay. Now you were trained when you first started working for Four J's; is that correct?

*A.* Yes, sir.

*Q.* You were trained on CPR?

*A.* Sir, nobody trained me on CPR. CPR is what I got, what I used my money to do. Based on that, they employ me. CPR and PMAB.

*Q.* PMAB?

*A.* Prevention and Management of Aggressive

Behavior.

*Q.* That was the Satori system?

*A.* There is the Satori, they gave us to train, they gave us what they have.

*Q.* The Satori was designed to teach you how to deal with aggressive clients?

*A.* Yes, sir.

*Q.* And the CPR, you say you paid for it yourself?

*A.* Yes, sir.

*Q.* Okay. They also, in addition, they trained you on how to care for your clients; is that correct?

*A.* It depends on the care you are talking about. Yeah, they, they -- yeah, they train me, yes, sir.

*Q.* Okay. Part of the training, of course, was the annual service record that was maintained at the house; is that correct?

*A.* The annual? Sir, I don't get your question.

*Q.* Well, that's all right. I will move on.

Now you also acknowledged that the house manager came by and -- every month and did fire drills; is that right?

*A.* Did what?

*Q.* And did fire drills.

*A.* Yes, sir.

*Q.* And they were timed; is that correct?

*A.* Yeah.

*Q.* And that was done by Rosemary; is that correct?

*A.* Yeah. Rosemary did it. But at times, we go to the workshop, they give us paperwork to sign. I told you before, and we sign, we must sign paperwork.

*Q.* I beg your pardon.

*A.* We signed those paperwork. There were a couple times, two times I remember vividly, she gave me training on fire drills.

*Q.* Well, whether you signed the paperwork or not, what's important is that you were given the fire drills and they were given to you every month. Is that correct?

*A.* At the initial, I can't -- I don't -- I can't recall, but at initial stage, I started that job, I was not doing fire drills.

*MR. PLUMMER:* Judge, may I approach the witness?

*THE COURT:* Yes.

*Q.* (By Mr. Plummer) Let me show us what's been marked as Defendants' Exhibit 55 and ask you if you will take a second and, first of all, confirm that

that's your writing.

*(Referenced document tendered to the witness.)*

*A.* That's my writing.

*Q.* (By Mr. Plummer) And your signature on that?

*A.* Yes, sir.

*Q.* And if you would, turn to the highlighted page.

*A.* (Witness complies.)

*Q.* If you would, is that your writing there, the highlighted language?

*A.* Yes, sir.

*Q.* Would you read the highlighted language to the jury, please.

*THE COURT:* Hold on. That exhibit is not in evidence.

*MR. TERRY:* Object, Your Honor, it's not in evidence.

*Q.* (By Mr. Plummer) Well, is it true that you have reported and said in your own hand that you were trained and had fire drills every month?

*A.* Yes, sir. I reported that, sir, but then she comes, she give you paperwork to sign. Yeah. I reported that. At times, she does the fire drill

proper.

*Q.* Okay. Every month, they were timed and recorded. Is that correct?

Whether you signed the paperwork or not, you went through a fire drill?

*A.* Yes, sir.

*Q.* Now, Amuche, you were sued in this lawsuit, were you not?

*A.* I was.

*Q.* Okay. And that -- you were first the -- you were served in this lawsuit September of 2010. Is that right, or thereabouts?

*A.* Sir, I can't recall the dates; but I know I was served.

*Q.* Okay. And if the Court's record shows you were served about that time, you wouldn't have any reason to argue with that, would you?

*A.* No, sir.

*Q.* Okay. And you were sued because the Intervenor and the Plaintiff allege that you were responsible also for this fire, right?

*A.* Yes, sir.

*Q.* Okay. And then, after you gave your deposition testimony, they dismissed you from this lawsuit, right?

*A.* Yes, sir.

*Q.* Was there ever any discussion -- oh, by the way, you never hired a lawyer, did you?

*A.* No, sir.

*Q.* Any discussion with Mr. Sparks or Mr. Thweatt about your dismissal before it happened, that you recall?

*A.* No, sir.

*MR. PLUMMER:* May I approach the witness, Your Honor?

*THE COURT:* Yes.

*Q.* (By Mr. Plummer) Let me show you what's been marked as Defendants' Exhibit 23 and ask, first of all, that you turn to the third page of this, and tell me whether you can identify your signature on the third page.

*(Referenced document tendered to the witness.)*

*A.* Yes, sir. That's my signature.

*Q.* (By Mr. Plummer) And which is it, the second or third from the top? Second from the top?

*A.* Sir, the name, the -- I don't know. The, the signature proper is not my signature. But the name looks like what I -- the, the, this (indicating) Amuche Udemezue looks like I wrote it, but this is

not my signature. This is not my signature.

*Q.* Okay. Okay. But the name this is your name?

*A.* Yeah.

*Q.* And you wrote your name there?

*A.* It looks like I am the one that wrote it.

*Q.* Okay.

*A.* I wrote it.

*Q.* Okay.

*A.* But the signature is not mine.

*Q.* Okay. Now, isn't it true that you attended an in-service training session in June of 2008?

*A.* Sir, I can't recall the in-service I attended. It's been a long time ago. But I know I attend every month. They do kind of training.

*Q.* And they do in-service, too; is that right?

*A.* If you call it in-service training, they do training every month --

*Q.* Okay.

*A.* -- before we collect our checks.

*Q.* Okay. At the in-service on June 6, 2008, do you recall -- well, let me put it to you this way: If you would, take a look at the Exhibit 23. And beginning -- if we can put 23 on the board.

And beginning with, beginning with the

portion down here that says, "She then called on Amuche," halfway down the page. Let me -- right here (indicating). Can you read that out to the jury, please, beginning here (indicating).

*A.* "She explained the procedures" --

*Q.* Just the line just above that. "She then called on Amuche."

*A.* "She then called Amuche to explain how she will rescue Jenny, Tanya --"

I don't know who is Spar- -- Spartans. I don't know her.

*Q.* Okay.

*A.* "She called Amuche to explain how she will rescue Jenny, Tanya --" should be Jenny, Tanya, Elisha and Esperanza.

*Q.* Okay.

*A.* "She explained the procedures. Ms. Uduma explained to her that Jenny should be rolled down on the floor. She even emphasized to her that, if possible, drag her through the window. Don't worry about minor injury. Your goal should be to get her out of the smoke alive. She then explained to her that the other individuals in the house are ambulatory. Wake them up and yell, 'Run, fire,' and grab Tanya by the hand and run. If the fire is

already too much, assist all the clients to fall on the floor and crawl on their stomach."

*Q.* So you went through and had those instructions and that training in June --

*A.* Sir.

*Q.* -- of 2008 before this event?

*A.* Sir, I would -- I'm here to tell you the truth. If -- I don't know where they got -- I did not -- I did not -- nobody, since I started attending in-service or everything, the monthly training, nobody has ever cited example with me or calling me, rolling, putting blankets on the floor, or telling me stuff, look at how you roll. Nobody. I don't know where this one is coming from. Nobody has ever, ever -- even if, look at Jenny, Tanya -- who is Spartans? I don't -- I don't even know her. Elisha. Nobody has ever done anything in this area (indicating). Nobody has ever trained me -- trained me.

*Q.* So nobody has ever gone through a fire drill and trained you what to do?

*A.* Ms. Uduma did not explain me. She did not train me. She did not say all these things she wrote here, they wrote here. I don't know where this -- this is breaking news to me. I don't know where it's

coming from.

*Q.* All right. Now, you said you, you earlier said you only had two fire drills that you could recall. But the truth of the matter is, you had them every month; is that right?

*A.* Yeah, it's a monthly thing.

*Q.* Okay.

*A.* When they started fire drills, it was a monthly thing.

*Q.* Okay. And you earlier said you attempted to -- you realized that you couldn't call 911 on your Cricket phone; but that's not true because you did make some phone calls that night, right?

*A.* Yes, I made phone calls.

*Q.* Okay. And you also said that you fell out at some point in time, but there was certainly ample opportunity before you fell out to rescue Jenny and to rescue Tanya; is that correct?

*A.* I fell out -- I would have -- if not for the door, if not for the door, it would have been a different story.

*Q.* Oh, you would have taken -- you would have gone to Jenny's room, lifted her up and walked out the back door. Is that what you are saying?

*A.* Because there is another -- yeah, that's

what I am saying. If there are two doors there, it would have been different. My mind was going to -- just one door in the house, that's where my mind was going. And that door, very -- the window, Esperanza's window is very close. That was where my mind was going.

*Q.* So you weren't able to think clearly under the emergency circumstance and you panicked; is that right?

*A.* I panicked. My hands and legs were shaking. I panicked.

*Q.* By the way, you talked about Esperanza's aggressiveness and all that. I think you earlier said that she might have been angry with you for telling her to go back to her room while you were cleaning up Jenny. Remember that?

*A.* Yes.

*Q.* The truth of the matter, is it, Amuche, is that Esperanza was extremely fond of Jenny; is that right?

*A.* Esperanza is not fond of anybody.

*Q.* Well, she has often wanted to assist in taking care of Jenny; is that correct?

*A.* How can Esperanza that cannot even help herself will be the one taking care of her? I don't,

I don't take that kind of -- Esperanza can't -- how can I allow her to come and be touching Jenny and doing stuff with Jenny?

*Q.* So you are saying that she wasn't fond of Jenny?

*A.* She, she, she -- I mean, she, at times, she -- she, she is just on her own. She is not fond of anybody. She is just on her own. But she can discuss -- I told you she can talk sense at times.

*Q.* The answer is yes or no?

*A.* Esperanza, I don't think -- no. No. No.

*Q.* Were you afraid, when she came in that evening and asked to assist you in taking care of Jenny, that she wanted to try to hurt Jenny?

*A.* Well, whether she is trying to hurt Jenny or not, I would not allow Esperanza to take my place, to be the one giving care to Jenny. I, I was -- they paid me, they paid me to give care to Jenny, not Esperanza. She is a client. Esperanza. That's why we are there giving her medication, feeding her, washing her clothes. She can't help herself.

*MR. PLUMMER:* Pass the witness.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Judge, no further questions.

*THE COURT:* Mr. Terry.

*MR. TERRY:* Briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. TERRY:

*Q.* Ma'am, do you think your job would have been easier on the night of the fire, had you had assistance of one additional caretaker?

*A.* Yes.

*MR. TERRY:* No further questions, Your Honor.

*THE COURT:* Mr. Plummer.

*MR. PLUMMER:* Nothing further of this witness, Your Honor.

*THE COURT:* All right. Thank you, ma'am, you may be excused. You can step down.

*(The witness was excused from the witness stand.)*

*MR. PLUMMER:* Judge, if you would, we would like her to remain under the rule.

*THE COURT:* We will ask that you wait to be recalled. You can wait out in the hallway.

All right. We're going to go ahead and take our mid-afternoon break. We will start back up at 10 after 3:00.

*(Jury excused from the courtroom.)*

*(Recess.)*

*BAILIFF:* All rise.

*(The jury present, proceedings resumed in open court as follows.)*

*THE COURT:* Thank you. Please be seated.

Call your next witness, please.

*MR. THWEATT:* Your Honor, call Kevin Kern.

*BAILIFF:* If you will stand here and face the Judge. Raise your right hand. He will swear you in.

*(Witness placed under oath.)*

*THE COURT:* Have a seat, please.

You may proceed.

KEVIN KERN,

having been placed under oath, testified as follows:

DIRECT EXAMINATION

BY MR. THWEATT:

*Q.* Mr. Kern, would you tell the jury who you are?

*A.* Kevin Kern.

*Q.* What do you do for a living, Mr. Kern?

*A.* I'm the Director of Residential Services for The Center in Houston.

*Q.* What is The Center?

*A.* It is a social service agency that provides residential vocational services for persons with intellectual and developmental disabilities.

*Q.* Where is The Center located?

*A.* We have a main campus in Houston, and then we also have a rural campus in Sealy area. We also have community group homes in the Houston community.

*Q.* Where is your office at?

*A.* I office at West Dallas and Shepherd in Houston.

*Q.* And if you could, just describe for the jury, if you were to walk on to the grounds of The Center's facilities there, what they would see, just so we can get an idea.

*A.* There is a six-story residential building, high-rise building as you drive onto the property. And then there are surrounding buildings that are used for day program services and things of that nature.

*Q.* How long have you worked at The Center serving persons with developmental disabilities here in Houston?

*A.* A little over four years.

*Q.* What are your -- your job title is Director

of Residential Services, correct?

*A.* Correct.

*Q.* Can you just describe the scope of your job duties and responsibilities there.

*A.* I am responsible for the overall operations of all the residential programs at The Center. That would include both campuses, as well as the community group homes. We also have a respite care program and a supported living program as well.

*Q.* How many people, in terms of residents, do you oversee?

*A.* Approximately 310.

*Q.* All right. How long have you worked in this industry?

*A.* About 11 years.

*Q.* Where did you work before you worked at The Center?

*A.* I worked for the Dr. Gertrude A. Barber National Institute in Erie, Pennsylvania.

*Q.* What did you do there in Pennsylvania?

*A.* I was a residential program supervisor.

*Q.* Job responsibilities similar to those that you have at The Center?

*A.* I was responsible for five community group homes in -- that were in the Erie community.

*Q.* When you say a community group home, can you tell the jury exactly what it is you are describing?

*A.* We have -- I had five community group homes that were under my direct service supervision. They were set up pretty much the same. Anywhere from four clients to a home, all the way -- I think my largest one had six in it. Varying different degrees of needs. Some were in wheelchairs, some were very independent. Just a variety.

*Q.* And these houses that you are describing, these are houses that you might envision in any residential suburban bedroom community, right?

*A.* Correct.

*MR. THWEATT:* Your Honor, may I approach the witness?

*THE COURT:* Yes.

*Q.* (By Mr. Thweatt) Mr. Kern, I'm going to hand you what's been marked as Plaintiff's Exhibit 53, and ask you if you recognize that document.

*A.* Yes, I do.

*Q.* Tell us what it is, please.

*A.* It's my resume.

*Q.* And is it current and up to date?

*A.* I now have a master's degree that's not

listed on here.

*Q.* What is your master's degree in, sir?

*A.* In public administration.

*Q.* All right.

*MR. THWEATT:* Your Honor, I offer Plaintiff's Exhibit 53 into evidence.

*(Referenced document tendered to counsel.)*

*THE COURT:* Any objection?

*MR. PLUMMER:* No objection, Your Honor.

*THE COURT:* It's admitted.

*(Plaintiff's Exhibit 53 is received in evidence.)*

*Q.* (By Mr. Thweatt) Are you a college graduate, Mr. Kern?

*A.* Yes, I am.

*Q.* Where?

*A.* Bellevue University.

*Q.* What did you obtain your degree in?

*A.* I have a bachelor of human and social services administration and masters of public administration.

*Q.* Do you hold any certifications within the State of Texas?

*A.* I'm certified as an assisted living

administrator. It's not really a state certification, but I have that certification.

*Q.* Do you hold any other certifications?

*A.* Not at this time.

*Q.* Okay. All right. You understand that I have retained you on behalf of my client, Jenny Wagner, to examine what happened related to a fire September 4, 2008 at a Four J's community home owned by Ms. Uduma and operated by Four J's Community Living Center? Do you understand that?

*A.* Yes, I do.

*Q.* We have paid for your time, right?

*A.* Yes.

*Q.* Not for your testimony, but for your time spent reviewing the files and coming here to testify is that correct?

*A.* That is correct.

*Q.* I want to speak with you, Mr. Kern, about the standard of care -- well, let me ask you this first: Let's tell the jury what you reviewed before you came here to testify. Just give a brief synopsis of the materials you were provided in relation to this matter.

*A.* I reviewed some documents from Four J's. Specifically the evacuation plans. I reviewed the

deposition of the employee that was working the evening of the fire, the arson report from the Houston Fire Department.

*Q.* Did you review documents related to the residents who lived there as well?

*A.* Yes, I did. Yes.

*Q.* What is your understanding as to how many residents lived at 16355 Beretta Court?

*A.* My understanding is that there were four residents.

*Q.* Okay. And do you have an understanding as to Jenny Wagner's condition, my client, at the time of the fire?

*A.* Yes, I do.

*Q.* Can you describe that, please?

*A.* From my understanding, she had profound mental retardation, has that. She has cerebral palsy, she's blind and basically is depending on staff for total care.

*Q.* And are you familiar with taking care of the needs of persons who are similarly situated as Jenny in your current job?

*A.* Yes, I am.

*Q.* And that's something you have been working in and around, those types of individuals, for your

professional career; is that right?

*A.* Eleven years.

*Q.* Have you ever actually supervised staff in a residential care facility like the one we see at Beretta Court?

*A.* Yes, I have.

*Q.* And do you currently supervise such facilities here in Houston on behalf of The Center?

*A.* Yes, I do.

*Q.* How many homes do you supervise now?

*A.* We have 11 group homes in our rural campus area, and we have five within the Houston community. And then we also have, under the HCS program, we have 34 foster care homes as well.

*Q.* All right. Mr. Kern, are you familiar with the standard of care for a residential care provider who is charged with attending to the needs of someone in Jenny Wagner's position?

*A.* Yes, I am.

*Q.* What does the standard of care require with regard to Jenny's personal safety, given her condition?

*A.* Well, safety is always the number one priority. But, but as a residential provider, service provider, really just meeting all of the

needs for each individual person, whatever those may be.

*Q.* And does the standard of care in your industry require an examination of not only, say, someone in Jenny's position, but how she might be situated in terms of other residents in a home that she is living under the same roof with?

*A.* Certainly whenever, whenever anybody is admitted into a facility, it changes the dynamics of the whole facility. So whenever anybody comes into a facility, you do have to kind of look and see how they complement each other and where those needs may lie. And that has to be done with each individual.

*Q.* Okay. Would you expect some sort of team meeting to examine how the dynamic between residents would occur?

*A.* Yes. Typically, what should happen is that each, each individual should have a care team that would consist of the case manager and, and various members of the team, people who are going to be providing direct care for those people that are moving into the home. And a discussion of where they are at, anything from dietary needs to, really, all of their needs should be discussed and a plan should be developed as to what needs to take place or how it

will be set in place to make sure that that happens.

*Q.* Okay. You have mentioned a little bit about safety is the priority. And I want to talk to you about what the standard of care in your industry requires in terms of inspections of, say, rooms where residents in a residential home may live. Can you tell the jury about that.

*A.* Sure. Certainly, clients do have rights and -- however, when their safety -- when safety is of concern, when someone feels that there is a safety risk, through past history of behaviors or whatever, safety trumps that, trumps some of those things. So you may, for instance, go into somebody's room. If, if you feel that there is a potential danger in that room, you would want to go in and make sure that there is nothing in there that is potentially hazardous or dangerous.

*Q.* Now, you understand that there was a woman named Esperanza Arzola living in the Beretta Court residence on the night of September 4, 2008?

*A.* Yes, I do.

*Q.* And can you describe your understanding of the types of mental issues that she was facing before this fire?

*A.* I know that she had a past history of

physical aggression, of self-injurious behaviors, elopement, verbal aggression.

*Q.* When you use the word elopement, that's -- when we hear the word elope, most of us think about getting married. Does that have a special meaning in your industry?

*A.* Yes, it does. Elopement in this industry, basically, is when somebody leaves the facility, the home, wherever the services are being provided, without permission or without letting anybody know.

*Q.* For someone like Esperanza Arzola who had those kinds of issues or concerns, what would the standard of care require in relation to permitting her access to an incendiary device such as a cigarette lighter or matches, something like that?

*A.* Certainly, someone with that history, I would say should not have any access to those types of things.

*Q.* And what does the standard of care require in your industry to prevent someone with Ms. Arzola's issues from coming into contact or perhaps smuggling an item like that into the residence?

*A.* Well, I think adequate -- making sure that you have adequate supervision, for sure. But then also having a behavior plan in place that will give

staff that are working directly with her directions, instructions, guidelines to follow if they should see certain types of behaviors. And, and it would possibly, more than likely, also involve room inspections if you felt that there was that potential.

*Q.* What about searches of the resident themselves, a pat-down to search for contraband items?

*A.* Again, if safety is -- if one feels that safety is at risk at that time, then safety should trump their right to not have that done, I guess.

*Q.* Does the industry standard require that safety of not only the resident who may be a threat to herself, but does it also require consideration of other residents in the home who really have nothing to do with that person's issues?

*A.* Absolutely.

*Q.* Persons, in your experience, that you have observed with bipolar disorder, the history of suicide, history of aggression, property destruction, verbal abuse, those kinds of things, what have you seen with regard to their ability to make rational and clear-headed decisions, in your experience?

*A.* Often they are not able to do that. They

are not able to realize the consequences of their actions at the time that they are upset.

*Q.* And I suppose, in your industry, you may have people like that who are even legally judged incapable of living without a guardian. Is that correct?

*A.* That is correct.

*Q.* In your industry, does that necessarily mean, just because they don't have a guardian, that they should be permitted access to things like cigarette lighters without supervision?

*A.* Absolutely not. Again, safety has to be the number one priority.

*Q.* I want to talk to you about staffing in a residential group home like the one we had at Beretta Court. What is the standard of care in terms of how many staff should be in a house with, say, four residents at any given time?

*A.* Well, it's -- there isn't a blanket answer for that. It's not a cookie cutter type of a situation. There are four-bedroom group homes that may be totally appropriate to have it single staffed. And that's the purpose of those team meetings, to see what the individual needs are of each client that lives in the home, because that's really what drives

and dictates what your staffing pattern should look like. In the case of Beretta Court, it's my strong opinion that that house most definitely needed to be double staffed.

*Q.* Why is that, sir?

*A.* Basically because of the individuals needs of those residents that lived in that home. One of them being -- requiring total care. Several of them that had behavioral issues or concerns. I would think it would be very difficult or next to -- it would be impossible to be bathing a client in the bathroom when you may have another client that's trying to leave the home or have a physical altercation with another resident. I don't know how you would do that safely.

*Q.* Have you ever seen situations where the presence of an additional staff member increased the overall safety of everybody in the home?

*A.* Absolutely.

*Q.* I want to talk to you about what the standard of care requires in terms of supervision.

You mentioned an example of the bathing a resident while other residents may be unsupervised within the home. What about in the event of an emergency situation, a fire or, you know, something

that requires evacuation of the home? In your industry, what is does the standard of care require with regard to being able to quickly and safely evacuate people who live in a group home?

*A.* The standard of care requires that, that one -- specifically within a four-bed HCS group home such as Beretta Court.

*MR. PLUMMER:* Excuse me. Can you repeat that?

*A.* Specifically when you are talking about a four-bed group home such as Beretta Court, each individual has to be able to -- one, the home needs to be sprinkled unless -- and when I say sprinkled, I mean they must have a sprinkler system in the home -- unless each of the individuals are able to evacuate within three minutes, which is a prompt evacuation score. And that has to be consistent across various shifts at different times of the day and night.

And it has to -- there are some certain protocols, such as a third shift drill shouldn't be done, say, ten minutes after they go to bed because you want them to be asleep. So a third shift drill should be ran after they have been asleep for two hours and not any later than two hours from when they normally would get up out of bed.

*Q.* (By Mr. Thweatt) These residents, in order to make this situation as realistic and perhaps even a little chaotic, should be dead asleep or deep asleep; is that correct?

*A.* Absolutely. Because fires happen at all different times of the day, obviously, so you want to make sure that you are looking at all scenarios.

Another thing that is very important is that the fire alarm itself be used for each of those drills because, for some people that have diminished capabilities, they may just associate that sound with the need to get out of the home and may equate that, versus just words saying, there is a fire, come on.

*Q.* And are those the kinds of drills that you have presided over in your capacity as the Director of Residential Services here in The Center?

*A.* Yes, as well as in Pennsylvania.

*Q.* Let me talk to you about what the standard of care requires in terms of priority of removal in an emergency situation. Can you talk about that in your industry, what that standard of care requires?

*A.* The standard of care would dictate that the person with the most degree of disability be removed from the home first because they are the one that are going to require the most. On the way out of the

home, you can also be verbally cuing residents that are able to follow those types of cues to exit the home as well. But you would always want to evacuate the person with the most severe degree of disability first.

*Q.* And is there a standard of care in your industry, sir, with regard to residents with mental or physical disabilities having access to things other than cigarette lighters, say, knives or items that they could use to harm themselves or others? Is there an industry standard that has to be met?

*A.* Well, again, that's the purpose of those individual team meetings. If you have clients that have a history of physical violence or physical aggression, then certainly you wouldn't want to leave things available to them that may cause that. On the other hand, if you have, if you have a house full of clients that do not display those types of behaviors, you may have those types of things out, such as like a kitchen knife, because they may very well be helping prepare some of their about meals. Again, it's individual specific. It's customized care, in a sense.

*Q.* In a residential group home facility, such as the one we saw at Beretta Court, is there an

industry standard of care with relation to fire exits, how accessible those exits should be in the event of a fire?

*A.* All means of egress should be clear of obstacles, to include a locked door. But should be even clear of obstacles in the way. Even a chair in front of them is not permitted.

*Q.* And would a deadbolt lock that requires key access in the event of an emergency, a fire, is that something that would meet the standard of care in your industry in a residential group home?

*A.* The only way it would meet the standard of care is if all residents in the home had access to the key and that they could mentally and physically be able to open up the door with the key. That would be acceptable.

*Q.* And you know, certainly, from Jenny's Wagner's condition that she never could have met that criteria in the Beretta Court Home.

*A.* No.

*Q.* And you are familiar -- well, you know from looking at the Houston Arson Fire Department photos in this case that there was a fire extinguisher in the Beretta Court home. You have seen pictures of that, have you not, sir?

*A.* Yes, I have.

*Q.* You have seen the pictures reflecting it was not used.

*A.* Yes, I did see that.

*Q.* Is there a standard of care with regard to training in how to use a fire extinguisher for a staff member charged with looking out for the interests of mentally and physically disabled persons in a group home?

*A.* Well, certainly, anybody who is working directly with your clients in your homes, you want them to be as protected as much as possible. And that's why there is fire extinguishers in the home. The standard of care would dictate that you would train those staff on the use of the fire extinguishers and make sure that they have the understanding of how to utilize it. Oftentimes, a small fire may be able to be put out before it becomes a significant event.

*Q.* Is training on how to use a fire extinguisher something that you require of employees and staff members of your facility here in Houston?

*A.* Yes, it is. That's part of our annual training, as well as our orientation.

*Q.* Now, you have outlined the standard of care

in a number of different ways with relation to what's supposed to happen inside of a house like Beretta Court. And I want to ask you whether you have an opinion, based upon your review of the materials you have been provided, as to whether or not the Four J's Community Living Center in this case met the standard of care.

*A.* I don't feel that they did.

*Q.* Why is that?

*A.* I think there were some significant safety issues that could have been addressed or should have been addressed. Mainly, some of the things that stuck out in reviewing the various documents was that it didn't appear to me that the staff had really any new employee orientation training or any training to specifically deal with each individual client in dealing with their individual behaviors, their individual needs.

I also don't think that the house was staffed at the level that it should have been. Especially when you take into account the, the degree of disability as well as the types of behaviors that the residents that lived in that home displayed.

I think they didn't meet the need, the standard when they had a door that had a lock that

required a key and yet not all the residents, if any of them, may have been able to, to operate that key to get out. As well as it doesn't appear that it was even available at all for even the staff. So --

*Q.* You know from your review of the materials and the discussions with me that the home itself at Beretta Court was owned by Ms. Anthonia Uduma, who was the President and CEO of Four J's. Are you aware of that?

*A.* I am.

*Q.* Just out of curiosity, do you see that kind of activity in your industry frequently, where the president or CEO might own a home and then lease it back to their home healthcare company?

*MR. PLUMMER:* Objection, relevance.

*THE COURT:* Overruled.

*A.* I am not familiar with that, no.

*Q.* (By Mr. Thweatt) Do you have an opinion, sir, as to whether the president and CEO of a company dedicated to caring for mentally retarded persons should appreciate and understand that if they buy a home that's going to house mentally retarded residents, should that person, based upon your knowledge, training, skill and experience, be able to appreciate and foresee the dangers that a fire would

create?

*MR. PLUMMER:* Objection, Your Honor.

May we approach?

*THE COURT:* Yes.

*(Bench discussion.)*

*MR. PLUMMER:* Judge, I object to the question and any possible answer from this witness for two reasons.

Number one, I don't think the proper -- that he has been shown competent to testify on that issue. His expertise is in group homes and not in this area. That's number one.

Two, they have supplied an expert report, and there is nothing in there in this regard.

*THE COURT:* Did you designate him to address this type of issue?

*MR. THWEATT:* We designated him as an expert to address both the property owner and the standard of care for a facility such as Four J's.

The report he is mentioning, Judge, under the rules cannot be used. It just can't be.

*THE COURT:* This was your Chapter 74?

*MR. THWEATT:* That's right.

*THE COURT:* So this was a report after expert designation. This was your Chapter 74?

*MR. THWEATT:* Correct. And he's not been deposed in this case.

*THE COURT:* Did you designate him in your disclosures as a testifying expert?

*MR. THWEATT:* Yes, we did.

*THE COURT:* Do you have that designation for me?

*MR. THWEATT:* I don't know that I have it with me, Judge. I really don't.

*THE COURT:* Anybody have their expert disclosures?

*MR. PLUMMER:* We will check.

*MR. SPARKS:* I think we have them.

*(Referenced document tendered to the Court.)*

*THE COURT:* These are Intervenor's designations.

This is it?

*MR. SPARKS:* That's all we have, Judge.

*MR. THWEATT:* Mr. Terry is telling me we don't have it listed. In light of that, Judge --

*THE COURT:* Do you want to move on?

*MR. THWEATT:* I will move on.

*THE COURT:* All right. Have a seat.

*(Open court.)*

*Q.* (By Mr. Thweatt) Mr. Kern, these residential group homes that you have described here in Houston, are those owned by The Center?

*A.* We lease the homes.

*Q.* Who do you lease them from?

*A.* Through apartment complexes, and we have, we have four apartment group homes that we lease through apartment complexes. And then we have a residential home that we purchased through a landlord.

*Q.* I'm sorry, you --

*A.* We purchased through an individual landlord.

*Q.* Okay. Do you coordinate the kinds of activities and the kinds of safety concerns that you have to carry in your industry in junction with the landlords you lease theses properties from?

*A.* Before we open a group home, whether it be in an apartment or a house, one of the first things we do before anybody even moves into the home, we do an environmental inspection to make sure that it meets the needs of the individuals that are going to be moving into the home. So that's done before they move in.

*Q.* Okay. And what's the purpose of that?

*A.* Just to make sure that, if we are agreeing to provide services, that we can and we can do so

safely.

*Q.* In other words, based on your knowledge, training, skill and experience, if you walked into a house that was going to be leased by The Center and it didn't have overhead sprinklers but you knew that all the residents in there were not going to be able to accomplish the prompt evacuation requirement that you set, what would you then do with regard to the landlord, the owner of the property?

*A.* We would either have to see if they would let us put them in or we would have to move on to another property.

*Q.* Would you make a request of the owner to modify the property to make it safe?

*A.* Well, the discussion with the owner would be done before we even decided to lease the home to begin with.

*Q.* Okay. All right.

*MR. THWEATT:* Your Honor, I'll pass the witness.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Briefly, Judge.

CROSS-EXAMINATION

By MR. SPARKS:

*Q.* Mr. Kern, you also reviewed the fire records

in reference to Tanya James; is that correct?

*A.* That's correct.

*Q.* And would the same applicable standards of care that you outlined in the examination with Mr. Thweatt apply to her?

*A.* Absolutely.

*Q.* And you know her to be a resident of the same facility; is that correct?

*A.* That's correct.

*Q.* And would your testimony also be the same in terms of the standard of care regarding the safety issues of that facility?

*A.* Yes, it would.

*MR. SPARKS:* Pass the witness, Judge.

*THE COURT:* Mr. Plummer?

*MR. PLUMMER:* Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PLUMMER:

*Q.* Mr. Kern, your homes are certified as ICF homes?

*A.* We have certification for ICF, HCS and assisted living.

*Q.* And HCS is what?

*A.* Home and Community-based Services.

*Q.* And the theory behind the Home and

Community-based Services program is to try to get the folks with disabilities out in the community as much as possible?

*A.* That's correct.

*Q.* And I believe you said that some of the homes that you use are in apartment complexes. Is that correct?

*A.* That's correct.

*Q.* That includes some HCS homes?

*A.* Yes.

*Q.* Okay. Yours is a highly regulated industry; is that correct?

*A.* Yes, it is.

*Q.* DADS one of the agencies that governs the activity that you do?

*A.* Yes.

*Q.* What is DADS?

*A.* The Department of Aging and Disability Services.

*Q.* And HCS has also some regulatory authority over what you all do for those homes; is that right?

*A.* That is correct.

*Q.* And similarly, the ICF has standards for the intermediate care facilities that you have, correct?

*A.* Correct.

*Q.* And foster homes, same thing?
*A.* Foster homes fall under our HCS licensing.
*Q.* And if you don't meet those standards, they shut you down; is that right?
*A.* Well, I mean, they don't automatically jump to that. They let you attempt to fix the problem first. But, ultimately, if you do not comply with the regulations, they can.
*Q.* That includes health and safety components to the regulations; is that correct?
*A.* That is correct.
*Q.* So if one of your group homes didn't meet the safety standards necessary for the safe housing of your clients, you would face closure; is that correct?
*A.* Again, they would give you the opportunity to fix the problem first through submitting plans of correction, and then they would come out and inspect the home again to make sure that you complied with the standards at that time. Closure is down the road if you continue to not meet the standards.
*Q.* If you are not in compliance, ultimately they shut you down, right?
*A.* Ultimately, that can be the case.
*Q.* And in none of the stuff you reviewed -- you

were given a lot of information by Mr. Thweatt. In none of the stuff you reviewed was Beretta Court threatened with being shut down, right?

*A.* I would disagree with that.

*Q.* What citation was issued to Beretta Court for not complying with safety standards?

*MR. THWEATT:* Your Honor, may we approach?

*THE COURT:* Do you have an objection?

*MR. THWEATT:* I do, Your Honor, relevance.

*THE COURT:* Come on up.

*(Bench discussion.)*

*THE COURT:* All right.

*MR. THWEATT:* Your Honor, you signed a limine order expressly telling counsel not to address this issue with regard to an investigation.

*THE COURT:* Which in limine was this?

*MR. THWEATT:* It was my last -- either 23 or 24.

*THE COURT:* Mr. Plummer?

*MR. PLUMMER:* If that limine applies to what I did, I withdraw my question.

*THE COURT:* All right. The question is withdrawn.

*MR. PLUMMER:* Thank you, Your Honor.

*(Open court.)*

*THE COURT:* The question is withdrawn.

*Q.* (By Mr. Thweatt) I believe you said, Mr. Kern, earlier that there were three things that you felt that were safety issues that weren't addressed; is that right?

*A.* I can't recall how many, but --

*Q.* Well, as I recall them, you said that there was inadequate new employee orientation?

*A.* Correct.

*Q.* And that it was understaffed?

*A.* Correct.

*Q.* And there was a locked door without a key?

*A.* Correct.

*Q.* Okay. I want to talk to you about the staffing issue. You earlier said that staffing is -- part of the standard of care for staffing is that, that there is a team meeting where they make a decision about what's appropriate staffing. Is that correct?

*A.* Among other things. But, yes, that should be something that's done.

*Q.* The staffing standards are written down in the HCS rules, right, the Administrative -- the Texas

Administrative Code provisions that apply to HCS housing, right?

*A.* I believe what's written down is that staffing ratios need to be appropriate based on the individual's needs.

*Q.* Okay. So if there is a team meeting that's put together and it's determined that two people are appropriate for a particular house, that's a judgment call that group makes; is that correct?

*A.* That's correct.

*Q.* Okay. And if there is a team meeting that staffs the occupants of a particular house and they a make a decision, the team makes a decision, that it's appropriate to have one person staffing that house, that's a judgment call also; is that correct?

*A.* Yes, it is.

*Q.* Okay. So it may vary depending on the circumstances the people involved and that sort of thing; is that correct?

*A.* I suppose it would, yes.

*Q.* Okay. So your judgment that there should have been double staffing is just your judgment and not necessarily in the judgment of the team that staffed this particular house, correct?

*A.* It's based on what I saw in the reports and

what I have seen in my 11 years of experience for people of similar disabilities and behaviors.

*Q.* By the way, the staffing is the team that makes -- does the staffing is composed of what kind of people?

*A.* Usually, the service coordinator or the case manager, the nurse, the -- it may or may not include the direct care staff. It can -- it would include the guardian if they have one. It can really -- it really depends on who the guardian or the individual person wants at their team. It can be anybody.

*Q.* Okay. But it's not a decision that's made by one person. It's made by a group of people?

*A.* Yes.

*Q.* And that's something that is recorded in the files of the constituents and the consumers at that home and in the records of the company; is that correct?

*A.* That's correct.

But I would will also like to comment on what I just said. The team makes team decisions all the time in regards to care; however, it is management's duty to make sure that they are not allowing the team to make decisions that they know, as the leader of that organization, cannot safely do.

They may know information that some of the members of that team would not know.

*Q.* Okay. But if the team is -- if the team has all the information available to management and makes a decision, it's still a judgment call; is that correct?

*A.* Ultimately, yes.

*Q.* Okay. Now, you said that -- I just want to run through and list a few things you talked about.

You talked about fire extinguishers and everybody ought to be trained on how to use them, correct?

*A.* Correct.

*Q.* If somebody panics and decides not to even approach the fire extinguisher, it wouldn't matter whether or not they have been trained one way or the other, would it?

*A.* My personal opinion is, if you don't know how to use something, that may create more panic than if you know that you do and that it's available.

*Q.* But if they panic and don't even attempt to use an item, it doesn't matter whether or not they have been trained a week, a day or an hour, does it?

*A.* It wouldn't.

*Q.* You said a sprinkler system, the standard

there is that a sprinkler system should be in a four-person group home if they can't evacuate within a certain period of time. Was that the standard?

*A.* Correct.

*Q.* And I think you said the standard was three minutes or four minutes?

*A.* Needs to be three minutes or less.

*Q.* Three minutes or less. Okay.

Okay. By the way, you did confirm, when you reviewed the various papers you looked at, that the alarm system went off, right?

*A.* Yes.

*Q.* Okay. By the way, if a door is opened -- excuse me. If a door is unlocked, regardless of the attachments to it, if you don't even try to go to it, it doesn't matter whether it has double key deadbolt or not. If it's unlocked, it's still a way to get out, right?

*A.* Well, the, the means of egress have to be unobstructed. So if the door is locked and no one has a key to get it unlocked, it's an obstructed means of egress and it's not available.

*Q.* Okay. But if it's unlocked?

*A.* If it's unlocked it's a means of egress.

*Q.* Okay. Thank you.

*MR. PLUMMER:* Pass the witness. Nothing further of this witness.

*THE COURT:* Mr. Thweatt.

REDIRECT EXAMINATION

BY MR. THWEATT:

*Q.* Mr. Kern, in your position, you told us earlier that you have supervised fire drills and conducted other sorts of training. Can you tell us whether there is a purpose to that training, if any, to reduce panic that a staff member might encounter in the event of an emergency?

*A.* Well, I just think knowledge is power. If somebody is comfortable with how to utilize anything, from CPR to a fire extinguisher to a lift or anything like that, that's going to make them more comfortable in their job.

*Q.* That's something you have seen in your capacity as the Director of Residential Services during the training that you have presided over; is that right?

*A.* That's correct.

*MR. THWEATT:* I don't have anything further, Your Honor.

*THE COURT:* Mr. Sparks?

*MR. SPARKS:* No further questions.

*THE COURT:* Mr. Plummer?

*MR. PLUMMER:* Just a few, Your Honor.

RECROSS-EXAMINATION

BY MR. PLUMMER:

*Q.* Mr. Kern, when was the last time you conducted a fire training session or fire drill?

*A.* Me specifically? Probably about five years.

*Q.* Okay. And five years ago, what was your position in the organization?

*A.* I was Program Supervisor for Residential Group Homes, and in that position, supervised the direct care staff that was also providing service coordination for the residents that were on my case load.

*Q.* Program Supervisor, is that like what you would call a program director?

*A.* It was probably closer to like a case manager role.

*Q.* Thank you, sir.

*MR. PLUMMER:* Nothing further of this witness, Your Honor.

*MR. THWEATT:* Nothing further, Your Honor.

*MR. SPARKS:* Nothing further, Your Honor.

*THE COURT:* Any reason this witness can't be excused?

*MR. THWEATT:* No, Your Honor.

*MR. SPARKS:* Not from us, Your Honor.

*MR. PLUMMER:* No, Your Honor.

*THE COURT:* All right. Thank you, Mr. Kern, you are excused. Have a good day.

Call your next witness.

*MR. THWEATT:* Your Honor, we will call Dr. Karen Gollaher by deposition.

*THE COURT:* You may proceed.

DR. KAREN GOLLAHER,

called by deposition, having been duly sworn, testified as follows:

PLAINTIFF'S DIRECT EXAMINATION OFFER

BY MR. THWEATT

*Q.* Good morning. Would you state your full name.

*A.* Karen Gollaher.

*Q.* And I understand, Dr. Gollaher, is your professional title; is that correct?

*A.* That's correct.

*Q.* All right. And can you tell us, you are a psychologist by training; is that right?

*A.* That's correct.

*Q.* Are you currently employed and in practice in psychology here in Houston, Texas?

*A.* Yes.

*Q.* I'd like, if you could, Dr. Gollaher, for you to describe briefly your training and educational background for us.

*A.* Okay. I obtained my doctorate in psychology at Pepperdine University. And the last year of your doctorate is an internship.

I completed my internship at Baylor College of Medicine in clinical psychology with an emphasis in forensics.

I went on to complete two fellowships, one at TIRR, the Institute for Rehabilitation & Research, which involved the National Institute of Mental Health Grant looking at brain injury. And I particularly focused on looking at the rehabilitation aspect of that, as well as criminal behavior resulting from that. Do you need more?

*Q.* Are you currently licensed in the State of Texas to practice psychology?

*A.* Yes, I have two license.

*Q.* And what is -- what are those two licenses, please?

*A.* I'm licensed by the Texas Board of Examiners

for Psychologists to be a psychologist, as well as the counsel in sex offender treatments to be a treater/provider and evaluator of sex offenders.

*Q.* Do you recall how long you've held those licenses?

*A.* I believe May of '97 is when I obtained my license as a psychologist. And then I was grandfathered in for the other license. It used to be a registration.

*Q.* Are you currently in good standing with the State of Texas?

*A.* Yes, sir.

*Q.* Doctor, I'm going to attach to your deposition transcript, Exhibit No. 1, which as I understand it is a current copy of your curriculum vitae.

*A.* Yes, sir.

*Q.* After looking at Exhibit No. 1, is that, in fact, a copy of your C.V.?

*A.* Yes, sir.

*Q.* All right. Is there anything that's out of date or inaccurate about it as far as you know?

*A.* No, sir.

*Q.* Okay. We are here today to discuss your work involving an individual named Esperanza Arzola.

Can you tell the ladies and gentlemen of this jury how you became involved with Ms. Esperanza Arzola?

*A.* I was court ordered to conduct a Competency Evaluation on this client, Ms. Arzola, in, I believe, March of 2009.

*Q.* Which court ordered you to conduct that Competency Evaluation?

*A.* I believe it was 268th District Court in Fort Bend County.

*Q.* All right. Can you explain to the members of our jury what a Competency Evaluation entails?

*A.* There's questions that's laid out by the statutes for me to address. In particular, I need to address whether or not the defendant can consult with their attorney in order to assist in their defense. They understand the charges and potential consequences against them.

And so in that process, there's at least one interview that's conducted with the defendant. Sometimes more than one interview.

There's a review of the Offense Report, or reports, if there's more than one charge.

There's a review of any other documentation. I do request psychiatric records from the defense counsel and the prosecutor. It's one of

these rare instances in which I get to talk to everybody. So I do request that, any psychiatric records I can get information to.

If there's a family member, I also, depending on the circumstances, may ask to speak with them.

If they're housed in the County Jail, I will also look at their medical records in the infirmary. And sometimes I end up talking with some of the sheriff's deputies in there who have seen the defendant and have observed certain behaviors.

*Q.* And the purpose of all your efforts, just to sum up, is to determine whether or not the person you're interviewing or evaluating is competent to stand trial in a criminal setting; is that correct?

*A.* That's correct.

*Q.* I see. So did you, in fact, interview Esperanza Arzola?

*A.* Yes, sir.

*Q.* And do you have a copy of a report that you prepared?

*A.* Yes, sir.

*Q.* And do you have that in front of you there?

*A.* Yes, sir.

*Q.* Okay. And let's go ahead and mark that

report as Exhibit No. 2 to your deposition.

I'll let you keep the original in front of you.

*A.* Okay.

*Q.* I'll refer to the exhibit as we question you.

First of all, can you just tell us: Is this the standard report that you might prepare after any Competency Evaluation that you conduct?

*A.* Yes, sir.

*Q.* Okay. In looking at it, it appears at the top that you've gone through some demographic information on Ms. Arzola; is that right?

*A.* That's correct.

*Q.* And the date of your evaluations, it looks like you conducted three of them; is that accurate?

*A.* That's correct.

*Q.* Okay. And then you prepared your final report May 31st, 2009, true?

*A.* That's correct. Well, that's when the final report went out.

*Q.* Okay. And we don't need you to read the report to us. But can you just, generally, tell us during that first evaluation on March that 27th, 2009, what occurred?

*A.* At that point, her defense attorneys indicated that I could not interview her alone. So they went with me for that initial interview.

I did speak with her about her ability to consent to just the evaluation itself which I'm required to do. I had some concerns about her understanding of what I was doing.

Since her attorneys were there, they did go ahead and agree for her to be evaluated and actually signed the form for me.

I then went through the interview process, trying to obtain as much history as I could.

Do you want me to go into detail about that?

*Q.* Yes. What did you learn about her history?

*A.* It's hard for me recall which piece of information I got at which interview.

*Q.* I understand.

*A.* At that point, we talked about her -- I start with the basics: Where was she born; what was her family composite of; were her parents together when she was born; did they stay together throughout her childhood, just to get some basic family origin.

We went through that information question. We went through -- I go through my standard

questions. Her education history, occupational, psychiatric and so forth.

Ms. Arzola had tremendous difficulty answering most of those questions. She was impulsive. Would just spew out information spontaneously. Her stories were inconsistent. Left a lot of gaps for me. And when I would try to clarify, I did not have great success in clarifying the history.

*Q.* You mentioned at the outset of your evaluation, you had some concerns about whether Ms. Arzola understood what was happening. And if you can, can you point to specifics that led you to have those concerns for the ladies and gentlemen of the jury.

*A.* I have a standard report or a Statement of Disclosure form that I read. And then if the defendant can read, I give it to them to look at so they can make sure that it matches what I've said.

And as I was reading it to her, she didn't understand all of the terms on there. Indicated, you know, just that I was going to do some interviews and I might do some testing and that this would go to the court and then the attorneys. She didn't seem to follow all that.

In fact, she seemed to keep asking

questions or talking about things that were not consistent with that. So I -- if I recall correctly, I asked her to tell me some of that back and she could not.

*Q.* Okay. Was it your understanding or did you have an understanding at the time of the evaluation whether Ms. Arzola was taking any medication?

*A.* Yes, I believe she was on medication at that first interview.

*Q.* Do you know what medication that was?

*A.* I can look at my report. It may be in there.

*Q.* Okay.

*A.* I don't recall.

*Q.* Please do so.

*A.* I don't see that in here.

*Q.* It looks like maybe on Page 2 of the evaluation, there's a paragraph that begins, "With regards to psychiatric history, she reported taking medication several times a day but could not report the names of her medication."

Beyond that information, do you know whether or not Ms. Arzola was taking any medication at the time you interviewed her?

*A.* On 3/27, it was my understanding that she

had been prescribed medication. I did not get to see her medical records at that time from the infirmary. But I had been told that she was not always compliant with the me.

In the latter two interviews, she was not taking medication.

*Q.* I see. And where did this interview take place?

*A.* The first interview took place in -- I believe it's the psychiatrist's office of the initial jail. The jail eventually was two pieces. And it was just a one-room office with chairs and a desk. And that's the one where the attorneys were present for her, the dense attorneys.

*Q.* And so the basic task that you are assigned by Judge Elliott in this case was to determine whether or not Ms. Arzola was mentally competent to stand trial for those charges; is that right?

*A.* Correct.

*Q.* And I note that there are three dates of evaluation. Can you describe for the jury whether or not that's the typical number that one might see in your shoes? Are there five of six evaluations? Are there usually just one? How does it work?

*A.* There's usually one; sometimes two. Three

is unusual for me.

*Q.* And so your -- was it your final evaluation on May the 21st, 2009? Is that the one you're referencing that was videotaped?

*A.* The 15th of May was videotaped, which was the second time. She was deteriorating, so I went back to see her one more time. But she refused to come to be videotaped on the 21st.

And because of the agreement that I could only see her in this videotaped room, I didn't get to see her on the 21st.

*Q.* I see. As a psychologist, how many Competency Evaluations do you think you have performed over the course of your career?

*A.* 100 to 150.

*Q.* And those would all be in the context of a person who's charged with a crime; is that right?

*A.* Yes, sir.

*Q.* And then you'd render an opinion about that person's competency?

*A.* Yes, sir.

*Q.* And provide that opinion to the criminal court?

*A.* That's correct.

*Q.* Okay. Can you describe, generally, what you

learned about Ms. Arzola's mental history?

*A.* It appears from what information I had that it stemmed back to early childhood. In terms of her intelligence level, which was quite low. It's in the retardation range.

Don't have a good number to give you because I had only one document that was provided from her past psychiatric history. I think I had a number of 40 at one point that was given to me.

*Q.* By 40, what do you mean? An IQ of 40?

*A.* An IQ of 40.

*Q.* And what would be the typical adult IQ?

*A.* The average IQ across the U.S. population would be 100, with what we call a standard deviation of 10. So we'd expect a large percentage of the population to be between 90 and 110 IQ.

*Q.* And the document or the history that you learned about with regard to Ms. Arzola reflected an IQ of 40?

*A.* Of 40. I believe I was told that by the defense attorneys. I don't believe I saw that on record. Again, I saw only one document of her past history that was provided.

*Q.* And you mentioned that an IQ level of 40 would be in retardation? Is that the word you used?

*A.* It would be in the mental retardation range. It's actually in the moderate level which is about 30, 35 to 50 or 55. There's some flexibility they give you in those numbers.

*Q.* Have you ever conducted inquiry into someone's IQ level?

*A.* Yes.

*Q.* How many times have you done that?

*A.* Thousands.

*Q.* Do you feel like you are qualified to render an opinion on someone's IQ level based upon your knowledge, training, experience and education?

*A.* Yes, sir.

*Q.* Okay. Because of that, if someone has a moderate level of mental retardation, are you able to describe that in lay terms for the jury in terms of what that means if they might observe that person?

*A.* I can still answer. Okay.

So someone in the moderate level is not someone who's going to be living independently. You know, there's a wide range of what we call adaptive functioning, when we look at an adaptive IQ, in terms of what types of activities of daily living can they do.

Can they put on their shoes and tie

them? Can they, you know, dress themselves? Can they cook for themselves? Hold a job. These are all some basic daily living skills that most of us do all the time.

For someone with retardation, mild on down, they are going to have deficits in that. But if we take two people of an IQ of 40, there might be discrepancies between what they can do.

So even though they have the same number on the IQ test, their functioning may be very different. But, again, we would not expect this person to be able to live on their own. They will need assistance for the rest of their life.

*Q.* What else did you learn about Ms. Arzola's mental history in your evaluation of her?

*A.* As I understand it -- again, you have to understand where my history is coming from, the one document, the attorneys and her. So it's limited, and I apologize.

As I understand it, beginning by age 9, there was various issues going on. At some point, CPS had stepped in and taken her out of the home because of sexual abuse by her mother and/or parents. It may have been both. And then she's placed into group homes.

She has a variety of behavior issues beginning at an early age as I understand it. Difficulties with impulse control; difficulties with aggression.

At some point, she's diagnosed with schizophrenia. There's even bipolar thrown out, I believe, at certain points. And I know there is an overlap with those diagnoses so that is not unusual. And that she received psychiatric care. She was placed into various facilities, as I understand it. Residential facilities.

It's not clear to me whether that was because of behavior or because of psychiatric or because she needed foster needs where she needed to reside or all of the above. It's not clear to me. Again, given my sparse information.

But that there was psychiatric hospitalizations or was the need for medication. And, again, she could not live on her own.

*Q.* Did she tell you anything with regard to her history of illegal drug use?

*A.* Yes, she did.

*Q.* And can you describe for us what she said?

*A.* She spontaneously blurted out when we started on that topic, the use of crack. She said

shared needles, shared drugs. I think marijuana, as well. She referred to weed that she used that was pretty extensive, according to her. But, again, I don't have a lot of detail to that because she's not a great source of historical information.

*Q.* Looking at your report on Page 2, there's a reference to prostitution. Do you recall what she told you about that?

*A.* Yes.

*Q.* Can you tell us, please?

*A.* She reported -- she didn't use the word prostitution. But she reported basically that she would have sex for favors or for money.

She described it again in the way that she described everything. She just kind of spontaneously blurts it out and then moves on. And when I try to do follow-up questions, I can't get a lot of detail.

*Q.* Have you previously diagnosed persons with bipolar disorder?

*A.* Yes, sir.

*Q.* Have you previously diagnosed persons with schizophrenia?

*A.* Yes, sir.

*Q.* Was there anything about your evaluations

and observations of Esperanza Arzola which led you to think that she was not bipolar?

*A.* No. I was not sure which one was the predominant diagnosis, but certainly she displayed some of the bipolar behavior, the manic behavior, some of the depressive behavior, as well as some of the psychotic behavior, which again, they often overlapped.

*Q.* I think I understand your testimony there. Let me see if I can capture it, and you tell me if I've got it wrong.

*A.* Okay.

*Q.* In your evaluation of Esperanza Arzola, you determined that she was both bipolar and schizophrenic; is that correct?

*A.* Well, I based it on a lot of it was her history. That was just when I'm talking to her.

*Q.* Okay. But you were not able to determine which was more predominant?

*A.* That's correct.

*Q.* Okay. There is a diagnosis section of your report on Page 3, Dr. Gollaher.

*A.* Yes, sir.

*Q.* And you've got Axes 1 through 5, it looks like. Would you describe what that -- what those

are?

*A.* There's a diagnostic and statistic manual that's been created by the American Psychiatric Association that gives us the five Axes in order to help capture what's going on for a person who has all kind of issues, psychiatric, learning disabilities and so forth.

Axis I is the major psychiatric disorders. This is where you see your psychosis such as schizophrenia, bipolar disorder. Your major depressive disorder.

Axis II is for mental retardation, as well as personality disorders. If someone has a full-blown personality disorder, it will go in Axis II.

Axis III is used to list any medical conditions someone may have, because again, that affects their status or what they need for treatment.

Axis IV would be psychosocial stressors. So what's going on that's stressful for them.

And then Axis V is what's GAF or the global assessment of functioning, which is really a subjective way of kind of assessing someone's overall functioning in social, psychological, emotional behavioral areas.

It ranges from 0 to 100, although, really 0 -- nobody has 100. So it's, again, very subjective. But you're trying to rate how severe someone is.

Someone who's higher functioning, meaning they're living on their own, they have job skills, they have relationships that are meaningful, they have an average IQ -- a low average IQ or above, they're going to be higher on that range. Someone who has mental retardation is going to be lower on that range, because they're not as good in social job skills and so forth.

*Q.* So 100 global assessment functioning score, GAF, that would be the highest functioning person that you could assess; is that right?

*A.* Correct. Although I don't know if I've ever seen anyone give anyone 100, so...

*Q.* And conversely, 0 would be the lowest; and you don't know if anybody's ever been assessed at 0?

*A.* Probably someone who's deceased would be a 0.

*Q.* Okay.

*A.* Yeah, it's just people get down to 20 and 15, but I've never seen a 0.

*Q.* All right. And did you make a determination

with regard to the GAF score assigned to Esperanza Arzola?

*A.* Yes, sir.

*Q.* And what was that?

*A.* 30.

*Q.* And that represents what?

*A.* Serious impairment.

*Q.* You noted in the preceding paragraph above diagnosis that Ms. Arzola has an extensive history of acting out behaviors such as hitting, attempting to stab others and property destruction.

And the next sentence goes on to say, "It is also noted that her behavior problems are characterized as severe, and her aggression was noted to possibly 'result in injuries to others and injuries to Esperanza from retaliatory aggression.'"

*A.* Correct.

*Q.* Where did you discern that history of behaviors?

*A.* This is from one document I did get that was provided by her attorneys about her psychiatric status. I believe it was a treatment plan. Individual Service Plan that had come from where she was residing at that time.

*Q.* And looking at Exhibit No. 3 to your

deposition, it looks like the third page of that document is entitled Four J's Community Living Centers, Inc., Home and Community-based Services Program. And there's another title there, Annual Individual Service Plan; is that right?

*A.* Yes, sir.

*Q.* All right. So you looked at this document, the Four J's document, is what I'll call it for short, to recite on Page 3 of your report; is that correct?

*A.* That's correct.

*Q.* You, it looks like, summarized some tests or quizzes that you may have given to Ms. Arzola to assist you in your Competency Evaluation; is that fair?

*A.* Sure.

*Q.* Okay.

*A.* Yes.

*Q.* How would you call it?

*A.* Just some mental status information I might give to anybody, including somebody like this.

*Q.* There is a recitation that she could not correctly state the alphabet.

*A.* Yes.

*Q.* Is that correct?

*A.* That's correct.

*Q.* You noted that she reported hearing auditory hallucinations for the first time since being incarcerated. Can you tell us what that means?

*A.* She heard voices. And, in particular, she heard voices telling her to hurt herself, so we call those command hallucinations. They're telling her to do something versus just some people will hear background sounds that aren't understandable. But she heard directions, according to her.

*Q.* And then she further described making attempts to kill herself in the past, as you've noted here, cutting her wrist with a comb?

*A.* Yes.

*Q.* And with glass?

*A.* Yes.

*Q.* All right. And then under areas of competency can you tell us what those areas are and what your findings were, please?

*A.* The first area is to rationally understand the charges and potential consequences of the proceedings that are pending.

In the first interview, she had indicated when I asked her why she was in jail, she indicated that she had murdered her home.

She then indicated she tried to kill her roommate and used a cigarette -- it says a letter. It should be lighter. She said she also tried to kill other people because they are not nice to her.

When asked if someone had died as a result of her actions, she denied this.

In the second interview, she again admitted to setting a fire in her room. This time she talked about being angry at one of the staff members at the group home. She did not seem to understand if someone had died at the fire.

We talked about, well, what would it mean if she was found guilty of these charges against her; and she was very confused about that. The whole concept of guilty; the whole concept of what might happen.

The second section that I looked at is her ability to disclose to her attorney any facts, any information, her mental state at the time. You know, she would, again, spontaneously give me information. Very talkative, but she could not give me a sequential story. You know, we all like stories that have a beginning, middle and an end; and that makes it easy for us to follow. And she could not do that. That's why I think at some point, I describe it as piecemeal.

I get snapshots of this story, but I don't get a continuous story from her.

*Q.* All right. And let me, if I could, briefly interrupt you and ask you to go back and explain something.

*A.* Sure.

*Q.* Under the first topic that you described.

*A.* Okay.

*Q.* There's a paragraph there on Page 4 of your report that states, "Ms. Arzola did not seem to truly understand the gravity of her action." And then you've listed some examples.

*A.* Yes.

*Q.* I think you told us earlier that your task in this case was to determine her competency for the trial.

*A.* That's correct.

*Q.* And is part of that discerning whether she can understand the gravity of what she's done?

*A.* Correct. She has to understand only what she has been accused of.

*Q.* Okay.

*A.* But what can happen if she's found guilty. Does she go to prison? Does she have probation? You know, what does that mean?

*Q.* All right. There's a third area that you've listed.

*A.* Yes.

*Q.* Could you describe that area of competency and what your findings were, Doctor?

*A.* This is a capacity to engage in a reasoned choice of legal strategies and options. And in this area, I do ask her about the various players in the courtroom. The judge, what's the judge do? What's her defense attorney do? What does the district attorney or prosecutor do? What's a jury? Get a sense of what is going on in the courtroom.

As well as her ability to understanded the four available pleas and participate in a plea bargaining process should that arise.

She indicated her attorney's job was to try to get her out of jail. The job of the judge was to try to represent her. When asked what this meant, she indicated she thought she was going to get a legal guardian, meaning the judge would appoint her one.

She then stated she had to be her own attorney, which she had two defense attorneys; so that was not accurate.

The job of the prosecutor or assistant district attorney -- she indicate she did not know who

this person was.

She did not understand the plea bargaining process. And when i went over available pleas, she didn't really seem to understand them. I tried -- if someone doesn't understand them, especially the no contest, not guilty by reason of insanity, I will review those.

They often have watched some TV show that has those two options, or at least the not guilty by reason of insanity and then come back to see what they have retained from that. I didn't seem to be able to teach her the basics of that.

The fourth section is understanding the adversarial nature.

*Q.* Let me stop you there, Doctor, quickly.

*A.* Yes.

*Q.* Do you have an understanding as to what Ms. Arzola's attorneys -- whether she entered a plea in this case?

*A.* I don't recall. She may have.

*Q.* Okay.

*A.* But I don't recall.

*Q.* Would that be reflected in your notes anywhere?

*A.* It might be.

*Q.* All right.

*A.* I don't always get told that. I mean, I may ask them because usually people will start with not guilty; but I don't always get told that information.

*Q.* All right. I think I interrupted you.

*A.* Okay.

*Q.* You were about to describe understanding the adversarial nature of the proceedings?

*A.* Yes.

*Q.* Okay. That's Page 5 of your report.

*A.* Sometimes with someone who seems obviously to have a lower cognitive functioning, I may ask them, have you ever been in front of the judge. Trying to understand what their experience has been in the courtroom. So that's where I start with her versus, you know, coming to the adversarial portion right away.

And she indicated she'd gone in front of the judge. She had been crying. He had almost released her she said because she had been crying. Don't know if that was true or not. I doubt it, but...

Asked her if her attorney was present when this occurred, she stated no. So she provides this, again, piecemeal picture of her being in front

of the judge. Again, didn't understand who the assistant district attorney was, so trying to go to the adversarial was incredibly limited.

The fifth section is how she would behave in court. Could she act appropriately. And I talked with them about how -- how do you act in the courtroom again. I may simplify it for someone's who's obviously got lower cognitive functioning.

And given what I observed in the interview process, I can often try to extrapolate that to how they would be in the courtroom.

She had difficulty sitting still. She moved a lot. She had difficulty following. If she didn't understand something, she might, you know, interrupt right where I'm at. It was very, again, disjointed process with her.

And I assume that's how it would be in the courtroom, because in a courtroom, there would be even more people, more noise, more distracters versus just her and me in the tapings. Well, her attorneys were at the first two.

The capacity to testify is the last section that the statute talks about that I need to review.

*Q.* And what were your findings from that?

*A.* The question is whether or not she could testify in court. And I put down, I do not believe she could. She can't follow the content or the train of thought of what's going on in the courtroom.

She doesn't understand some of the terminology. She has a tendency to just blurt things out. So those rules about, you know, your attorney speaks for you and all of that would be something she would not be able to follow is what I determined.

*Q.* All right. Next in your report you've listed psychiatric issues and medication.

*A.* Yes.

*Q.* Do you recall where you obtained that information from?

*A.* I think what I did is because I didn't have a medical chart, as I recall, because wasn't in there with her, I think what we did is called the nurses in the infirmary. And with the Court Order, they were able to tell me what medications she was taking or at least some basics.

*Q.* Now, I know you're not a psychiatrist.

*A.* That's correct.

*Q.* And just for the jury's purposes, a psychiatrist may prescribe medication; is that right?

*A.* That's correct.

*Q.* A psychologist, though, is nonetheless familiar with the types of medication that can be used to treat mental illness?

*A.* Correct.

*Q.* Okay. Are you familiar with the medications that are listed here?

*A.* Yes.

*Q.* And can you tell us what Trazodone is?

*A.* I can still answer? Okay.

Well, several of these medications, including Trazodone, they are used to treat mood disorder and the psychotic features.

It can also be used to help with aggression.

*Q.* What was the first?

*A.* The mood disorder.

*Q.* Mood disorder. Okay. Sorry.

*A.* So we have things like Trazodone and Depakote and all that that can be used to help when someone has difficulty managing their behavior. Perhaps is aggressive or impulsive.

Wellbutrin being a medication to help with the mood stability.

I can't recall. And then Cogentin and Risperdal are very common medications for people who

have the psychotic features of the schizophrenia, bipolar disorders.

*Q.* You've evaluated the impact of medication on Ms. Arzola's appearance, demeanor or ability to participate in the proceedings. And what were your findings there?

*A.* Either we have to put forth an answer to that question whether that would assist. And certainly, I think medication would be necessary, you know, for her to participate in the interviews. And they'll be essential to improve her functioning.

I don't know if that will be enough, however, for her to be able to go to court. Meaning I don't know if that will help her restore her to competency. I don't believe it will.

*Q.* All right. The report concludes with your overall findings, and could you summarize those for us, please?

*A.* I discuss certainly that she, at the point where, especially the last interview, she had did decompensated as we discussed and would not even come out of her cell.

So certainly she's not at the point when I saw her that she could go to court and assist in her own defense. She decompensated pretty quickly. It

was a few weeks. And so there was a lot of concern about her being on medication.

However, she was still confused earlier when more compliant with medication. Still had difficulty understanding the terms. And overall deemed her to not be competent to stand trial.

*MR. TERRY:* Your Honor, may we approach?

*THE COURT:* Yes.

*(Bench discussion.)*

*MR. TERRY:* We are at the point where we decided yesterday we would stipulate where we talked about the court to pay for the services. So you wanted us to stop so we could, I guess, explain it to the jury.

*THE COURT:* All right. Have y'all agreed on a stipulation?

*MR. TERRY:* I thought we had yesterday.

*MR. RAVAL:* We did. We may just have to -- at the beginning of the deposition, there is one sentence about the 268th District Court --

*THE COURT:* Y'all should have done this a day ago. Skip over that. Write out your stipulation. Mr. Thweatt can write out a stipulation and pass it to y'all, make sure it's fine. When you are done with this testimony, you can also read the

stipulation to the jury. All right.

*MR. TERRY:* Sorry, Judge.

*(Open court.)*

*MR. TERRY:* Page 85, line 14.

*Q.* If you will look at Exhibit No. 3 to your deposition.

*A.* Okay.

*Q.* I'll ask you to turn to the portion that's marked Page 1 of 15 of that document.

*A.* Okay.

*Q.* Just so that the jury is clear, you received this document here before you rendered your competency opinion; is that right?

*A.* That's correct.

*Q.* Okay. And at the top of the page that we're referencing here, it says Behavior Therapy Program Introduction Implementation Date. Can you read the date that appears after that?

*A.* August 4th, 2008.

*Q.* You understand that the fire that took place that resulted in Ms. Arzola's criminal charges took place on September the 4th, 2008?

*A.* It's September the 4th or September the 2nd.

*Q.* Yes.

*A.* Somewhere in that point.

*Q.* It's September the 4th?
*A.* September the 4th, okay.
*Q.* Yeah.
*A.* Thank you.
*Q.* And so this implementation date of August the 4th, 2008, would have been approximately one month prior to the fire made the basis of this lawsuit.
You understand that.
*A.* Yes, sir.
*Q.* Okay. And in this document that we see in Deposition Exhibit No. 3, there is a listing of the drugs that Ms. Arzola was taking or that she should have been taking according to this implementation date of August the 4th, 2008. Do you see that.
*A.* Yes, sir.
*Q.* My question is simply whether the drugs that are reflected in Exhibit No. 3 to your deposition are the same ones that you referenced on Page 2 of your report in the last paragraph there. Page 2.
*A.* Page 2?
*Q.* Yes.
*A.* Oh, I'm sorry. And where at on that page?
*Q.* In the last paragraph, the sentence beginning "Multiple medications."

*A.* Yes, I see that.

*Q.* Your report says, "Multiple medications were listed in her records, including, Cogentin, Lamictal, Depakote and Trazodone." Is that what that says?

*A.* Correct.

*Q.* And all of those drugs are listed in Deposition Exhibit No. 3, the portion that reflects what Esperanza is receiving?

*A.* Correct.

*Q.* Okay.

*A.* Same names.

*Q.* Can you see that on Page, it looks like, 13 of 15, that document there is signed by Kirk Lockwood, Ph.D., clinical psychologist?

*A.* Yes, sir.

*Q.* His signature in that case would tend to reflect to you that he is the one who prepared the preceding pages beginning with Page 1 through where his signature appears?

*A.* Yes, sir.

*Q.* All right. So that I understand it, the sources of information that you had at the time that you prepared your report, one of them was, of course, Ms. Esperanza Arzola; is that right?

*A.* Yes, sir.

*Q.* One of them was her defense attorneys?

*A.* Yes, sir.

*Q.* And the third one and final one was the Four J's report that we see as Deposition Exhibit No. 3?

*A.* There was a couple other things.

*Q.* Okay. Tell us what those are.

*A.* The records from the infirmary that they provided me.

*Q.* So that's No. 4.

*A.* And what was provided from the court in terms of the orders and Grand Jury Indictment.

*Q.* No. 5.

*A.* And there was Offense Report, as well.

*Q.* Okay. And you actually -- it looks like on Page 3 of your report, in the second sentence of that paragraph, it says, "A Four J's Community Living Center, Inc. Annual Individualized Service Plan, dated July 25th, 2007, noted that Ms. Arzola is her own guardian."

*A.* Yes.

*Q.* Do you see that?

*A.* Yes.

*Q.* All right. And so that we understand it perfectly, Deposition Exhibit No. 3 is a copy of that

report that you were looking at and referenced in your Competency Evaluation?

*A.* Yes, sir.

*Q.* Okay. And that also includes the findings that Dr. Kirk Lockwood, the clinical psychologist, has apparently rendered in this case?

*A.* Did he have findings?

*Q.* Well, his report --

*A.* Yes, sir. It's his report.

*Q.* Okay. I ask that because your competency report doesn't reference Dr. Kirk Lockwood. But these are, in fact, part of the records that you handed us today?

*A.* Yes, sir.

*Q.* Are you aware of any clinical psychologists who has disagreed with your opinion regarding Esperanza Arzola's incompetency to stand trial as of the date of your report?

*A.* No, I am not.

*MR. TERRY:* No further questions, Your Honor.

*THE COURT:* Do y'all have any cross-designations of this witness?

*MR. RAVAL:* We do not, Your Honor.

*THE COURT:* All right. You may step

down.

*MR. TERRY:* Your Honor, at this time, we would like to move to admit Exhibits 54, 56 and 57, which were exhibits to her deposition.

*THE COURT:* Any objection?

*MR. RAVAL:* No objection, Your Honor.

*THE COURT:* Plaintiff's Exhibits 54, 56 and 57 are admitted.

*(Plaintiff's Exhibits 54, 56 and 57 are received in evidence.)*

*THE COURT:* Call your next witness, please.

*MR. THWEATT:* Your Honor, we don't have any further witnesses.

We have a few exhibits -- or I believe Mr. Sparks has an exhibit he is planning on offering now.

*MR. SPARKS:* That is correct, Judge.

*THE COURT:* All right.

*MR. SPARKS:* At this time, we want to offer Exhibit Number 3 and Exhibit Number 4.

*THE COURT:* 4 is already in evidence.

*MR. SPARKS:* Sorry, Judge.

Then Exhibit Number 3.

*THE COURT:* Any others?

*MR. SPARKS:* No, Your Honor.

*THE COURT:* Any objection to Intervenor's Exhibit 3?

*MR. RAVAL:* Yes, Your Honor, as to hearsay.

*THE COURT:* Come on up.

*(Bench discussion.)*

*THE COURT:* All right. Do you have a copy of it?

*(Referenced document tendered to the Court.)*

*MR. SPARKS:* This is the report that was part of the Rick Overholt deposition testimony regarding the inspection that was done on October 5th of 2008, if I'm not mistaken, that indicated that, that the son had gone out and indicated that the back door had been locked and there was no accessible key.

*THE COURT:* Is this the one we had the dispute over yesterday with the deposition?

*MR. SPARKS:* Yes, Your Honor.

*THE COURT:* Did you lay foundation for its admissibility?

*MR. SPARKS:* My understanding is, Judge, that the -- once we read the information into the record regarding the deposition, once you allowed

their reading in, that it covered the foundational issues.

*THE COURT:* I allowed the testimony for the limited purpose for notice.

*MR. SPARKS:* That's what that document is.

*THE COURT:* You are offering this just for notice?

*MR. SPARKS:* Yes.

*THE COURT:* All right. Any response?

*MR. RAVAL:* Your Honor, our concern is that the handwriting of Mr. Overholt's son will be used by the jury for more than just notice. It's hearsay. Whether or not this document fits in a business records exception, which we don't believe it does, here's an additional level of hearsay as to the handwriting. It's a second level of hearsay.

*THE COURT:* All right. I will allow it for the limited purpose of notice, and I will instruct the jury accordingly.

All right. Have a seat.

*(Open court.)*

*THE COURT:* All right. Intervenor's Exhibit 3 is admitted.

*(Intervenor's Exhibit 3 is received in*

*evidence as stated below.)*

*THE COURT:* Ladies and gentlemen, you are only to consider Intervenor's Exhibit 3 as evidence or lack of evidence of notice to any of the Defendants. You are not to consider this for any other purpose other than that it might or might not have given them notice.

Anything else?

*MR. THWEATT:* Plaintiff rests, Your Honor.

*MR. SPARKS:* So does Intervenor, Your Honor.

*THE COURT:* All right. We're going to go ahead and break for the day. This is a good stopping point. So we will start up again tomorrow morning at 8:30 sharp. Y'all are doing great. Keep it up. Thank you.

*(Jury excused from the courtroom.)*

*THE COURT:* Thank you. You may be seated.

Okay. Here's your totals. Plaintiff and Intervenors have used 5 hours, 25 minutes. Defendants have used 1 hour, 53 minutes. So we're staying on schedule. Good work.

Any motions from defense?

*MR. PLUMMER:* Yes, Your Honor.

*THE COURT:* You may proceed.

*MR. PLUMMER:* Can we stand before the bench?

*THE COURT:* Just do it from there.

*MR. PLUMMER:* Okay.

*THE COURT:* That way she knows who is talking.

*MR. PLUMMER:* The Defendants would move for a directed verdict on the issue of limitations against the Intervenor Derrick James, including Taylor as guardian for Derrick James. And the basis for the limitations claim is twofold.

First, the loss occurred on August 4 -- excuse me, September 4, 2008. Two-year statute of limitations on a claim of that sort would run September 5, 2010, I think. The Intervenor filed a plea in intervention on September 3, 2010. That was two days before the running of the statute of limitations.

The reason the statute of limitations applies in this particular case against the Intervenor is that the intervention was filed on the party -- the named party in the intervention was Derrick Leon James, an individual who resides in Houston, Harris

County, Texas. There was -- Derrick James, I think all the evidence shows, is not competent and has not been competent for years and certainly wasn't competent in 2010. The intervention does not seek to assert a claim on behalf of Derrick James as next friend, as a guardian or in any other capacity for this individual. So in that sense, he had no capacity to retain counsel, no capacity to litigate, by statute and by rule. That's the first grounds.

It was -- arguably, it was an attempt to cure it with the first amended intervention. And the argument has been made that there is a relation back doctrine that relates back to the original filing. That is correct, had the original intervention been filed by Ms. Taylor as guardian for Derrick James. You can argue that the relation back doctrine would have applied under that circumstance.

However, Ms. Taylor was not a litigant and not a party in any capacity in September of 2010 when the intervention was was filed. So the statute of limitations ran before Ms. Taylor became a party. That's the first grounds for the application of the limitations.

The second ground for the application of limitations is Chapter 74. Chapter 74 has a hard

two-year statute of limitations. And I say hard two-year statute of limitations because disabilities of capacity do not extend the statute of limitations under Chapter 74 beyond two years, absolute two years. So the statute of limitations ran on September 5, 2010, before there was any curative effort.

I supplied the Court with three Chapter 74 Supreme Court opinions on Monday, I believe. And one of those, I think, addresses that issue because in one of those there was an intent to cure the failure to timely file an expert report by a subsequent appointment of guardian. The guardian had filed suit -- a suit had been filed within the statute. The guardian had not been appointed at that point in time. The appointment occurs, and the guardian argued that the Chapter 74 120-day expert report timing should count from the date of her appointment rather than from the date the suit was filed. And the court held that does not apply under Chapter 74.

Similarly, the statute of limitations is a hard two years, and they failed to meet that in this case.

So for those reasons, we would ask for directed verdict against against Intervenor.

*THE COURT:* Which provision of Chapter 74 are you referring to, which section?

*MR. PLUMMER:* Judge, I don't have it -- well, I don't have it in front of me, Judge. But I can pull it up in one second.

Just one second, Your Honor.

Judge, I can supply that to the Court within a short period of time.

Judge, I believe it's Section 10.01. And that may have been under the old statute. Let me see, under the current statute, if that is the same provision.

It's Section 74.251, Statute of Limitations on Healthcare Claims.

*THE COURT:* Can you show me in your first amended answer to the plea in intervention where you pled the application of this statute of limitations or any statute of limitations?

*MR. PLUMMER:* In our original answer, Judge, we asserted limitations, number one.

*THE COURT:* Right. But you amended, and you asked me for leave to amend. So the operative pleading is the first amended answer to plea to intervention, isn't it?

*MR. PLUMMER:* Yes, Your Honor.

It's in, it's in -- I think it's in the fifth defense, Your Honor, where we allege they failed to comply with all the prerequisites of Chapter 74.

*THE COURT:* Well, I see you pleading 74.301, 74.302 and 74.303. But where did you plead the affirmative defense of 74.251?

*MR. PLUMMER:* It's incorporated in the fifth defense, Your Honor.

*THE COURT:* Mr. Sparks, your response?

*MR. SPARKS:* Judge, a couple things. One, my understanding regarding the issue we talked about yesterday that it went, if anything, not to Anthonia Uduma but to Four J's in reference to the issue of Section 74.

We also respond in terms of the tolling statute. We think it's quite applicable in this matter because, although Derrick James may not have had capacity, he certainly had standing. Once we were able to get Ms. Wylette Taylor appointed his guardian, who at the time was not an heir and could not have brought a suit on his behalf, we cured the issue regarding the -- the capacity issue which now she has a right to represent him in the matter of which she is an heir of Tanya James.

*THE COURT:* You just referred to a

statute by its title. What did you call it, the what?

*MR. SPARKS:* I call it the tolling statute.

*THE COURT:* Okay. Thank you. What provision is that?

*MR. SPARKS:* I believe it's 16.01 if I'm not mistaken. 16.62.

*THE COURT:* Sixteen point?

*MR. SPARKS:* 16.062.

*THE COURT:* Thank you.

*MR. SPARKS:* Additionally, we think he didn't list that particular cause of action or defense that he is talking about in his last amended pleadings before the Court.

*THE COURT:* Mr. Plummer, why isn't the statute suspended for 12 months after Ms. James's death?

*MR. PLUMMER:* I don't believe the -- I don't believe Chapter 74 allows that, Judge.

*THE COURT:* Well, you have also pled the normal Chapter 16 limitations argument, right?

*MR. PLUMMER:* You mean with regard to Ms. Uduma? It may be. I'm not familiar with the tolling statute. I will need to look at the tolling statute.

*THE COURT:* The motions are denied.

*MR. RAVAL:* Your Honor, we have one additional motion, Your Honor.

*THE COURT:* Okay.

*MR. RAVAL:* Your Honor, the additional motion regards the premises liability claim brought by both Intervenor and Plaintiff against Ms. Uduma individually. Specifically, regarding the Texas Supreme Court *Timberwalk* case and the line of cases that followed that, including the *Del Lago Partners* case of 2010, the plaintiff and intervenor need to demonstrate a couple things with regard to a premises liability claim in which they are making a claim that criminal actions of a third party entitle them to relief. Those grounds are specifically that the landowner failed to provide adequate security, or in this case safety. They had to have been aware of the criminal activity that was occurring or that type of activity that was occurring.

In this case, they would need to prove that there was some kind of activity sufficiently similar to starting a fire, or having Ms. Arzola with a previous history of starting fires, sufficient to put Ms. Uduma individually as a landowner on notice and to provide additional safety and security for the

tenants at Beretta Court.

*THE COURT:* Is this motion just a negligent activity premises liability or are you saying it also applies to defective condition premises liability?

*MR. RAVAL:* Well, it certainly applies to the negligent activity.

As to the defective condition, I would assume that a similar argument applies as to notice, if she is not put on notice as to that type of condition. And, really, there was no condition being alleged as such. It's the activity --

*THE COURT:* A locked back door and no sprinklers is not a defective condition? At least, that is what they are alleging, isn't it?

*MR. RAVAL:* That is what they are alleging. But with regards to the activity, the -- allowing a resident access to a lighter or having a resident bring in a lighter and start the fire. With regard to that particular activity, there are some specific requirements about what kind of notice of criminal activity of other sorts or other types and how near it needs to be to that particular residence for the landowner to be on notice of that activity. Otherwise, there is no duty.

*THE COURT:* What are those requirements that you say they --

*MR. RAVAL:* Those four requirements are proximity, recency, frequency, similarity and publicity. Those five factors must be taken into consideration and provided for, for the landowner to have adequate notice and have the foreseeability to provide for adequate protection and security against the alleged criminal activity or dangerous condition.

*THE COURT:* Y'all's response?

*MR. TERRY:* Your Honor, as far as the four factors that counsel just mentioned, proximity, frequency -- I missed the last two. I think they can all be summed up in basically the testimony we just heard from the psychologist. And that is, the acts that Ms. Arzola undertook while she was at the Four J's Community Living Center and her history of, you know, of trying to escape, of beating on other -- or endanger -- making others feel in danger. I mean, she had a history of problems that was well-known to Four J's.

Now, did she ever try to light anything on fire? No. I don't think there is anything in the record that goes to that. But as far as what she was capable of doing and her criminal background, I think

that we more than meet the burden of putting Four J's on notice of what she was capable of doing.

*THE COURT:* The motion is denied.

Anything else?

*MR. RAVAL:* No, Your Honor.

*THE COURT:* All right. Mr. Plummer, who are you going to call tomorrow?

*MR. RAVAL:* Your Honor, we will be calling Inya Ogbonna of Four J's Community Living. We will also be calling Ngozi Obichuku of Four J's. And I believe we will be calling Ms. Uduma.

*THE COURT:* All right. I should have a draft charge for y'all possibly at the beginning of proceedings tomorrow; if not, sometime tomorrow morning, so y'all will have a chance to look it over. I would encourage you, especially if I get it to you before lunch, that whoever is going to be arguing the charges take some time over the lunch hour to look over it.

We will have to see how proceedings go, whether we will have a chance to talk about it informally or whether we will have to just do a formal charge conference at the close of the evidence. So I don't anticipate having a charge conference before tomorrow afternoon. But there's -- depending on how

things go, there is a chance that, if we have got enough time to allow y'all to review and absorb it and then argue it, we might argue the charge at the end of the day if all the evidence is completed. If not, we will do it on Thursday. So be on the lookout for that.

Is there anything else we need to take up today?

*MR. THWEATT:* Not from the Plaintiff, Your Honor.

*MR. SPARKS:* Nothing from the Intervenors, Your Honor.

*MR. PLUMMER:* Nothing from the Defendants, Your Honor.

*THE COURT:* All right. Y'all are excused.

Mr. Plummer, I think I barked at you a little bit too harshly earlier today. I apologize. I just have a pet peeve of lawyers who keep walking about the courtroom and sometimes crowding witnesses or jurors. I don't think I gave you fair warning about that, so I apologize about that.

*MR. PLUMMER:* No problem. And, Judge, I would apologize to the Court. Unfortunately, I am still old school. And back in the old day, that was

part of our technique. So I understand, Your Honor.

*THE COURT:* All right.

*(Conclusion of proceedings for the day.)*

* * * * * * * *

THE STATE OF TEXAS

COUNTY OF HARRIS

I, Kathleen Keese, Official Court Reporter in and for the 269th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $______________ and was paid by

__________________________________________________.

WITNESS MY OFFICIAL HAND this the 13th day of December, 2011.

/s/ Kathleen Keese
______________________________

KATHLEEN KEESE
TEXAS CSR NO. 758
Expiration: 12/31/12
Official Court Reporter
269th District Court
201 Caroline, 13th Floor
Houston, Texas 77002

VOLUME 4 OF ____
REPORTER'S RECORD
CAUSE NO. 2009-40925

PATTI WAGNER, AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT * IN THE DISTRICT COURT OF
Plaintiff *
*
VS. * HARRIS COUNTY, T E X A S
*
FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA AND GODFREY UDUMA *
Defendants * 269TH JUDICIAL DISTRICT

JURY TRIAL

OCTOBER 19, 2011

On the 19th day of October, 2011, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Dan Hinde, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by stenographic machine shorthand.

KATHLEEN KEESE,CSR
Official Court Reporter
269th District Court

A P P E A R A N C E S:

Mr. L. Lee Thweatt
SBN: 24008160
Mr. Joseph D. Terry
SBN: 24013618
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, Texas 77046-0102
713.600.4710

COUNSEL FOR PLAINTIFF

Mr. James C. Plummer
SBN: 16075700
Mr. Amar Raval
SBN: 24046682
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Suite 270
Houston, Texas 77006
713.522.2887

COUNSEL FOR DEFENDANT

Mr. Shelton Sparks
SBN: 06507160
SHELTON SPARKS & ASSOCIATES, L.L.C.
706 Cordell Street
Houston, Texas 77009
713.862.5533

Ms. Tiffany C. Harvey
SBN: 24067343
THE LAW OFFICE OF TIFFANY HARVEY
706 Cordell Street
Houston, Texas 77009
832.498.7076

COUNSEL FOR INTERVENOR

# I N D E X
VOLUME 4
OCTOBER 19, 2011

| | Page |
|---|---|
| PROCEEDINGS ................................ | 5 |

DEFENDANTS' WITNESSES:

| | Direct | Cross | Voir Dire | Vol |
|---|---|---|---|---|
| NGOZI OBICHUKU | 7 | 25 | | 4 |
| | | 45 | | 4 |
| | 67 | 73 | | 4 |
| | | 74 | | |
| INYA OGBONNA | 77 | 91 | | 4 |
| | | 95 | | 4 |
| | 98 | 99 | | 4 |
| | | 103 | | 4 |
| ANTHONIA UDUMA | 106 | 155 | | 4 |
| | | 169 | | 4 |
| | 178 | 190 | | 4 |

PLAINTIFF REBUTTAL WITNESS:

| | Direct | Cross | Voir Dire | Vol |
|---|---|---|---|---|
| PATTI WAGNER | 193 | | | 4 |

| | Page |
|---|---|
| Defendants' rest ............................ | 192 |
| Plaintiff & Intervenor rest ................. | 196 |
| Defendants' Motion for trial amendment ...... | 199 |
| Ruling ...................................... | 201 |
| Objections to the Charge of the Court | |
| By the Plaintiff ............................ | 203 |
| By the Intervenor ........................... | 212 |
| By the Defendants ........................... | 214 |
| Court Reporter's Certification .............. | 222 |

PLAINTIFF'S EXHIBIT INDEX

| NO. | DESCRIPTION | ID | OFFER | ADMIT | VOL |
|---|---|---|---|---|---|
| 52 | CV of Eddie Corral | Withdrawn | Page 219 | | 4 |

* * * * * * * *

DEFENDANT'S EXHIBIT INDEX

| NO. | DESCRIPTION | ID | OFFER | ADMIT | VOL |
|---|---|---|---|---|---|
| 9 | HHSC Annual Fire Safety review of Beretta Court Home 12/05/2007 | 183 | 183 188 | 189 | 4 |
| 19 | Amuche Udemezue training records for Jenny Wagner 05/13/2008 | 10 | | | 4 |
| 23 | Minutes for In-Service Training on 06/06/2008 regarding Emergency Evacuation and Fire Drill | 15 | | | 4 |
| 59 | Jenny Wagner HCS Progress Note 09/06/2008 | 26 | | | 4 |
| 71 | Drawing of the layout of the house | 5 | 5 | 5 | 4 |

* * * * * * * *

INTERVENOR'S EXHIBIT INDEX

None.

P R O C E E D I N G S

*THE COURT:* All right. I understand there is an issue you want to discuss.

*MR. RAVAL:* Your Honor, we want to admit Exhibit 1. This was the exhibit we reviewed yesterday -- Exhibit 71. It's a new exhibit.

*THE COURT:* Is there any objection?

*MR. THWEATT:* Yes, Your Honor. I believe that was a demonstrative.

That's what you are offering (indicating)?

*MR. RAVAL:* Yes.

*MR. THWEATT:* We object as to relevance. It wasn't offered, as well, during the witness' testimony. I think it would be confusing and misleading to the jury.

*THE COURT:* All right. This is the drawing of the layout of the house?

*MR. RAVAL:* Correct, Your Honor.

*THE COURT:* The objection is overruled. 71 is admitted.

*(Defendant's Exhibit 71 is received in evidence.)*

*THE COURT:* Is there anything else you need to take up with me?

*MR. RAVAL:* That's it, Your Honor.

*MR. SPARKS:* There is just one thing. Last night we left some of our material in the attorney ready room, and it's locked.

*THE COURT:* All right. We will get it unlocked for you.

Apparently we are still waiting on a couple jurors.

*(Break.)*

*BAILIFF:* All rise.

*(The jury present, proceedings resumed in open court as follows.)*

*THE COURT:* Thank you. Please be seated.

Mr. Plummer, call your first witness.

*MR. RAVAL:* Your Honor, defense calls Ngozi Obichuku.

*BAILIFF:* If you will stand here, raise your right hand, he will swear you in.

*(Witness placed under oath.)*

*THE COURT:* Have a seat, please.

You may proceed.

*MR. RAVAL:* Thank you, Your Honor.

NGOZI OBICHUKU,

having been placed under oath, testified as follows:

DIRECT EXAMINATION

BY RAVAL:

*Q.* Please introduce yourself to the jury.

*A.* Hi. Good morning. My name is Ngozi Obichuku.

*Q.* Can you spell that for us, please?

*A.* First name, N-G-O-Z-I. Last name is O-B-I-C-H-U-K-U.

*Q.* Ms. Obichuku, what do you do for a living?

*A.* I'm a care coordinator at Four J's.

*Q.* What does a care coordinator do?

*A.* I monitor services for clients that have mental retardation. I in-service staff on my clients' special needs and diagnosis and everything you need to know for the client.

*Q.* Were you a care coordinator at Four J's in 2008?

*A.* Yes.

*Q.* What clients were you responsible for at that time?

*A.* I was responsible for -- I'm sorry. Can you --

*Q.* Which clients did you have at Four J's in

2008?

*A.* I had several clients? You mean the Beretta Court Home?

*Q.* At Beretta Court.

*A.* Okay. I had Jenny Wagner as my client and Elisha Campbell as well.

*Q.* What was your job responsibility with regard to Jenny Wagner?

*A.* In 2008, I was a case manager. And that's something like a care coordinator. I'm an advocate for the client. I'm also -- my job duties were to in-service the staff like I do now, and also to render services make sure services are being monitored and making sure they are being rendered.

*Q.* At the Beretta Court Home in 2008, what staff did you work with, whether by in-service or dealing with them regarding Ms. Wagner's treatment?

*A.* I worked with, like, three or four different staff in that home.

*Q.* Do you remember who they were?

*A.* I remember Amuche was one. I don't remember the other three that were there at that time.

*Q.* When you say Amuche, are you referring to Amuche Udemezue?

*A.* Yes.

*Q.* What kind of client was Jenny?

*A.* Jenny was a great client. She was actually my favorite client. I had known her since 2004. Jenny was a client that was jovial; but if you don't know her, you will look at her and think that she is somebody that is quiet. But, I mean, she would do something, you know, that was very fascinating. She would listen to a song once and then she will sing all the song on the radio. She had a way of making people laugh. She really blessed my life and a lot of people's as well.

*Q.* How would you communicate with Jenny?

*A.* Jenny is not the type of client that if you communicate with her -- at least with me and most people on the staff, like, you know, if you are talking to her, you know, questioning, I would communicate with her like a joke. If I tell Jenny, hey, Jenny you want a cookie? I would say things to make her laugh, and then Jenny would normally answer back with a laugh and a joke at the same time.

*Q.* A minute or two ago, you were talking about doing in-service for some of the people that worked at Beretta Court; is that correct?

*A.* Correct.

*Q.* Okay. I'm going to want to ask you a couple

questions about that now.

Let me show you Defense Exhibit 19 and ask you if you recognize that.

*A.* Yes.

*Q.* What is this exhibit?

*A.* The in-service I gave for Jenny Wagner.

*Q.* Okay. Can you tell the jury what exactly is in-service? What does in-service mean at Four J's?

*A.* In-service can be on different things. But here, in particular, was our annual in-service that we did for each client.

What I did for Jenny was her -- we have staffings for, like, her services that she received for that year. Her IPC plan -- well, her service plan is usually in May, and I in-serviced the staff on that plan that I wrote along where the IBT team. The team came together and put a plan for Jenny, and I in-serviced the staff on that plan as well as her diet information, diagnosis, level of functioning as well as the evacuation plan, assessment of residential monitoring, like if she had a bowel movement or something like that, how often you should monitor her, and behaviors as well.

*Q.* Ms. Obichuku, you have been referring to a team. What team are you referring to with regard to

Jenny and her treatment?

*A.* That is the Interdisciplinary Team. For Jenny's services, it doesn't consist of only myself, but it consists of the guardian, which would be her mother, and it would also consist of the nurse and also specialized services. For some clients, if they have a psychologist the psychologist would be there. For some clients, if they have other services, like maybe OT or so, it depends on who was a part of their team. For Jenny, it was just the nurse, myself and her mom. And also consisted of the residential supervisors at times.

*Q.* Who attended the in-service training on May 13, 2008?

*A.* I can't read that first handwriting. And Anthonia Fobia, something like that. And Amuche. I don't know how to pronounce her last name.

*Q.* Amuche Udemezue?

*A.* Yes.

*Q.* Is that her signature, by the way?

*A.* Yes.

*Q.* Do you recognize that?

*A.* Yes.

*Q.* Have you seen it before?

*A.* Well, that -- it says her name, so that's

what -- yeah.

*Q.* The name above that, is that Ms. Uduma or is that a different Anthonia?

*A.* No, it's a different Anthonia.

*Q.* So are you saying you led this in-service training for everyone regarding Jenny?

*A.* Correct.

*Q.* We have a list of about nine different handouts that were given out. Are these handouts that you gave out to the people who attended this meeting?

*A.* I'm sorry? Say that again.

*Q.* We have a list of handouts on this page here, nine different categories of documents.

*A.* Yes.

*Q.* Do you see that?

*A.* Yes.

*Q.* Are those handouts you gave to everyone who attended the meeting?

*A.* Yes. We all went over that.

*Q.* One of the handouts was about Jenny's Individual Service Plan; is that right?

*A.* All of them are not necessarily handouts. Some of them have the same information on it. Like for special needs, they have the diagnosis, level of

functioning and all that. The emergency evacuation plan was a plan on its own.

*Q.* Do all these documents fit into the client binder?

*A.* Yes. And they are all sectioned off in dividers.

*Q.* And all this goes into one binder for the client at Four J's?

*A.* Yes, and it stays with them. We have one that stays at the home, and the other stays at the office.

*Q.* Do you keep a binder yourself?

*A.* Yes.

*Q.* Is that the one that stays at the office?

*A.* Correct.

*Q.* If we look at number 5, it talks about an emergency evacuation plan.

*A.* Uh-huh.

*Q.* Did you go over what the emergency evacuation plan should be with regard to Jenny at Beretta Court?

*A.* Yes.

*Q.* What was that instruction you gave everyone?

*A.* The emergency evacuation plan consists of emergencies. Like, for instance, if there is a fire,

if there is a hurricane, if there is a tornado, natural disasters, what the staff is to do for each client. We don't make it the same for all of our clients. We make it individualized based on the client. If a client is in a wheelchair, if they have behavior incidents, seizure disorder, how the staff is to know what to do in each circumstance. So we usually go over with the staff, step by step, the emergency plan. And then also allow them to ask questions if they need.

*Q.* What was the staff at Beretta Court supposed to do for Jenny in the event of a fire.

*A.* It depends. If there is heavy smoke, the staff are -- if she is out of bed -- or if she is in her wheelchair, if it is in the daytime or so, or if it is in the evening and she is in her wheelchair, the staff it is to wheel her out of the door. But if it's heavy smoke present and she is on her bed, the staff is to lower her from her bed with her draw sheet and lower her by picking her up from the shoulders and taking her to safety as soon as possible.

*Q.* Did you discuss that -- or was that discussed at a different meeting aside from this in-service training you gave in May?

*A.* Yes. That was the in-service I gave her. And then we also did it, I think, at our monthly -- probably like a month or so later, at our monthly meeting. We usually do that every month with the staff.

*MR. RAVAL:* Your Honor, may I approach the witness?

*THE COURT:* Yes.

*(Referenced document tendered to the witness.)*

*Q.* (By Mr. Raval) Ms. Obichuku, I'm showing you Defense Exhibit 23, and I would ask if you recognize that.

*A.* Yes.

*Q.* What's reflected in Defense Exhibit 23?

*A.* The minutes of staff in-service training held on June 6, 2008. That is that was one of our monthly meetings. We usually meet, like, the 7th, 6th, 8th, the first week of the month, for all of the staff. We bring them in for training.

*Q.* Did you attend this meeting in June 2008.

*A.* Yes.

*Q.* Did anyone who worked at Beretta Court attend this meeting?

*A.* I have to check and see. Usually everybody

is supposed to be there for the meetings, so. I see Anthonia's name.

*Q.* What page are you look looking at?

*A.* It says page 2, on the first set of the in-service.

*Q.* And if you could tell us which signature, which name you are looking at?

*A.* Anthonia, it's like --

*Q.* Is that near the bottom of the page?

*A.* Correct.

And then, let's see.

Okay. There is Amuche as well. Amuche Udemezue, it's the same person, on the last page, second.

*Q.* It says Muchie Udemezue?

*A.* Uh-huh.

*Q.* Is that referring to Amuche Udemezue?

*A.* Right. That's the shorter name for Amuche.

*Q.* Do you remember her attending this meeting?

*A.* Yes.

*Q.* Let me go back. What was discussed about the fire evacuation plan at Beretta Court at this meeting in June?

*A.* Well, there was actual -- let me see. I remember where we actually did a demonstration.

Actually, Ms. Anthonia was the one that was doing the demonstration. Ms. Anthonia Uduma, the program director, she was doing a demonstration of how to evacuate a client. She put a body on the table, and then she allowed the staff to practice on her and showed them how to drag a client in case of a fire, what to do in case of a tornado, look for the -- pulling somebody out of the windows. And then we had each of the staff practice.

*Q.* Ms. Obichuku, let me back up just a second.

Of the clients at Beretta Court, how many of them were able, as far as you know, to get out of the home by themselves?

*A.* All of them were able to -- I'm sorry, not all of them. Elisha was able to get out on her own, Esperanza as well. Tanya needed verbal prompts to get her out of the home. Jenny was the only one that really needed physical assistance to get out of the home.

*Q.* What kind of assistance did Jenny need in the event of a fire?

*A.* She needed staff to, you know, take her up out of her bed and escort her out as soon as possible to the nearest exit.

*Q.* Was that instruction reviewed in this

meeting in June of 2008?

*A.* Yeah. I remember that. Jenny was one of the examples that they used, Jenny and another client of ours named Rigo that they used, as if they were in a situation with fire. There were two clients that were in wheelchairs. Who would be the first client to evacuation first, and how would you evacuation them. And staff came up and some staff, they came and said you will let the client in the wheelchair go. And she let them demonstrate to show how they would safely evacuation the client.

*Q.* There is a note here on -- just below where it says "911" where it says, "She then called Amuche to explain how." Do you see that sentence?

*A.* No, I don't.

*Q.* It's in kind of the second half of that long paragraph.

*A.* On the first page?

*Q.* On the first page.

*A.* I'm sorry. Which paragraph?

*Q.* Let's look right here? Do you see that on the screen in front of you? Do you see where it says, "She then called"?

*A.* Okay. Yes.

*Q.* Do you remember Ms. Amuche giving some kind

of demonstration about how she was to evacuate Jenny?

*A.* I don't remember exactly, but I remember that she was there in the meeting and she was probably one of those that they, you know, escorted -- because she called upon almost all of the staff, and they all did the examples.

*Q.* And just to be clear, was Jenny one of those examples discussed at this meeting?

*A.* Yes.

*Q.* You understand that there was a fire that took place at Beretta Court just a few months after this?

*A.* Correct.

*Q.* Is it your understanding that these procedures that were discussed in June were not followed at that fire?

*A.* Yes.

*Q.* How do you know that?

*A.* Well, because the -- I think the day or so after the fire -- I don't know if it was the day after or two days after -- Amuche came to the office and she, you know -- I admit I was angry at her and asked her what happened. All of our staff asked what happened. And she just said I'm sorry --

*MR. SPARKS:* Objection. Calls for

hearsay.

*THE COURT:* Sustained.

*Q.* (By Mr. Raval) Is it your understanding that Ms. Udemezue followed the training she was given in June, at the time of the fire?

*A.* I'm sorry. Can you repeat the question?

*MR. THWEATT:* Objection, leading.

*THE COURT:* Sustained.

*Q.* (By Mr. Raval) Do you know if Ms. Udemezue followed her training she was given in June, during the fire?

*A.* She did not follow her training.

*Q.* What kind of employee was Ms. Udemezue, as far as you know?

*A.* She was a good employee. She actually attended all of the staff meetings, you know.

*Q.* How often were the staff meetings?

*A.* Once a month. But whenever we would in-service for, like, if a staffing took place, we would also have an additional meeting, as well, with the staff.

*Q.* Did you keep in touch with Jenny after the fire took place?

*A.* Yes.

*Q.* How did that happen?

*A.* Well, after the fire took place -- sorry, okay. Sorry. I'm getting emotional because Jenny was very dear to my heart. But after the fire took place -- (Pause). After -- sorry.

Thank you.

*(Crying.)*

After -- sorry. After the fire took place, Jenny stayed in the hospital for about a month. And then I still continued visiting her during that time. Monitoring her service, making sure that she was fine. And she moved -- after she got discharged from the hospital, she moved to stay with her mother. And I continued being her case manager, monitoring her service, seeing her, like, maybe three times a week, four times a week sometimes. But she moved in with her mother.

*Q.* What kind of services did you provide for Jenny at her mother's house after she moved back there?

*A.* I remained her case manager. I made sure, like, she needed -- she got all the things she needed, followed up with all the doctors' orders. The nurse also came. We came to see her. The nurse came to do her assessments and treat her. And I also continued to make sure that, you know, Jenny was

receiving her services, everything was okay, helped her get a hospital bed and made sure she was getting everything that she needed.

*Q.* You said that you got a hospital bed for Jenny. Did she have a hospital bed back at Beretta Court?

*A.* No. She didn't.

*Q.* Did she use the hospital bed when she was at her mother's place?

*A.* Yes.

*Q.* Where did she sleep at night?

*A.* At first, because when she came back, we had to get a hospital order through the doctor. So the mother would sleep on the couch, and Jenny would sleep in the mother's bed in her bedroom.

*Q.* What about after, when she got the hospital bed at the apartment there, did she sleep in the hospital bed or did she sleep in her mother's bed or somewhere else?

*A.* Slept in the hospital bed, and the mother slept back in her bed.

*Q.* Did you get a chance to observe Jenny's behavior in those days and months when she was staying at her mother's apartment afterwards?

*A.* Yes.

*Q.* How would you describe her behavior?

*A.* At first, I was worried maybe she was not going to be like herself; but after I would go back constantly and make, you know, do jokes with her, then she would do jokes back with me like before.

*Q.* Did she appear to you to be quieter?

*A.* Because Jenny, before the fire, she would speak, like, maybe, out of seven days she would say -- she will have three days of talking, where she will just talk all day and make jokes and laugh and say things out loud. So when I, you know, when I used to -- when I would see her before, I would see her, like, maybe three or four times a week when I would see her at the day-hab. So, then after the fire -- you know, before, I didn't know if she would speak, but then she started speaking again like she did.

*Q.* How long were you Jenny's care coordinator after the fire?

*A.* Case manager after the fire?

*Q.* Yes, ma'am. Sorry.

*A.* I don't know the exact time. I know it was several months maybe. I don't know the exact -- I can't remember how long I stayed as the case manager, but until she stayed with our company.

*Q.* What was Jenny's behavior like just before you left and stopped being her case manager?

*A.* The same as before. It was similar to what I remember.

*Q.* Would you say she was the same old Jenny?

*A.* Well, to my understanding, the way she communicated back with me. She had days where she was silent, and then she would make jokes and laugh.

*Q.* Ms. Obichuku, you have described for us at least one or two times where there was training involving Ms. Udemezue. Do you remember that?

*A.* Yes.

*Q.* Did Ms. Udemezue ever ask you any questions about things she didn't understand at those meetings or in-services?

*A.* I can't remember any of that. But we left a lot of room for the staff to ask questions for anything they didn't understand. And if she had questions, we would answer them.

*Q.* Would she have asked questions if she had them?

*A.* Yes. We always left room for questions or comments.

*MR. RAVAL:* Pass the witness.

*THE COURT:* Mr. Thweatt.

*MR. THWEATT:* Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. THWEATT:

*Q.* Ms. Obichuku, you say that Jenny was the same old Jenny after this fire as she was before; is that right?

*A.* Yes.

*Q.* Does that look like the same old Jenny as she was after the fire?

*A.* I was talking about her personality.

*Q.* Was Jenny in pain after the fire?

*A.* Yes.

*Q.* She wasn't in pain before the fire, was she? That is not the same old Jenny, is it?

*A.* I was referring to her personality.

*Q.* You went to the hospital to visit Jenny?

*A.* Yes.

*Q.* You saw the wound care that was being provided to her at the hospital, didn't you?

*A.* Yes.

*Q.* Did it appear painful to you?

*A.* Yes.

*Q.* That wasn't the same old Jenny either, was it?

*A.* I was referring to her personality.

*Q.* Well, Jenny in the hospital wasn't making jokes, was she?

*A.* I can't remember that, no.

*Q.* That wasn't a humorous or funny time for her, was it?

Did you spend the night at Ms. Wagner's apartment?

*A.* I'm sorry. Can you repeat that?

*Q.* Did you ever spend the night at Ms. Wagner's apartment?

*A.* No.

*Q.* So when you told the jury where Jenny slept and where Jenny resided at nighttime, you didn't have any personal knowledge of that, did you?

*A.* I did. I always asked Ms. Wagner, because part of my job is to advocate for the client. I have to make sure the client is being taken care of, even though she is her mom.

*Q.* I want to talk to you about Defense Exhibit 59.

Let's bring that up. Let's scroll down here.

This is a progress note pertaining to Jenny Wagner from Four J's Community Living Center. Do you see that there, Ms. Obichuku?

*A.* Yes.

*Q.* And your name is right there (indicating), Ngozi Obichuku. That's you, right?

*A.* Correct.

*Q.* Now, if we scroll down on this, that's your signature?

*A.* Yes.

*Q.* Would you go ahead and read that progress note that appears on Defense Exhibit 59 aloud to the jury, please?

*A.* Sure.

"Case Manager called to check on Jenny. The nurse on duty informed me that Jenny's lung test showed that her lungs were slightly affected, and the nurse Alan informed me that Jenny's lungs were in good condition. He also informed me that Jenny's muscles and heart were also in good condition. Jenny is expected to have a soon recovery. Jenny will continue to be hospitalized for the next few days to monitor her oxygen levels. Case Manager spoke with Jenny's mother, whom was very pleased with Jenny's results."

*Q.* The case manager is you, right?

*A.* Correct.

*Q.* And you are writing this -- see the date of

the note there, September 6, 2008?

*A.* Uh-huh.

*Q.* This fire took place on September 4, 2008, right?

*A.* I don't remember the exact date.

*Q.* Well, if it did take place on September 4, 2008, your case note would have been entered two days after the fire, right?

*A.* Yes.

*Q.* And you are saying that two days after the fire, Jenny's mother was very pleased with Jenny's results. That's what you are saying?

*A.* I would not be lying in my note.

*Q.* You wouldn't be lying in your note?

*A.* I would not be lying in my note.

*Q.* Who do you work for right now?

*A.* Four J's Community Living.

*Q.* Anthonia Uduma is your boss?

*A.* My program director.

*Q.* She is your boss, right?

*A.* Correct.

*Q.* She is the president of the company?

*A.* Yes.

*Q.* You still draw a paycheck from her?

*A.* Yes.

*Q.* You realize that Jenny stayed in the hospital for a month, I think you told us.

*A.* I was there throughout, so --

*Q.* And you saw tube in her lungs, right?

*A.* Yes.

*Q.* Her lungs weren't in good condition, were they?

*A.* I didn't make it up. I said whatever -- you know, my case job as the case manager is to follow up with the hospital as well. And I give reports, you know, I put whatever they tell me. And I share that information her mom.

*Q.* Did you believe that Jenny's lungs were in good condition?

*A.* I'm not a medical expert.

*Q.* You are not a medical provider, are you?

*A.* I'm not a medical expert.

*Q.* Are you a nurse?

*A.* No. I'm a case manager.

*Q.* Are you a doctor?

*A.* I told you, I'm a case manager.

*Q.* Are you a doctor, ma'am?

*A.* No, I am not.

*Q.* You told the jury that there were two clients in wheelchairs at Four J's?

*A.* Only one. I never told them two.
*Q.* Rigo? You said --
*A.* I thought you were referring to Beretta Court. Correct.
*Q.* Were there other clients there at Four J's in wheelchairs?
*A.* Yes.
*Q.* How many?
*A.* I don't know off the top of my head, but there were other clients that had wheelchairs.
*Q.* More than ten?
*A.* I have to count them. I don't know off the top of my head.
*Q.* Suffice it to say there was at least two that you know of, right?
*A.* Yes.
*Q.* And just like Jenny, in the event of a fire, anybody in a wheelchair who is being cared for by Four J's is going to need to be able to have total care and total assistance in the event of a fire, right?
*A.* Yes.
*Q.* How many group homes did you preside over as a case manager?
*A.* Well, I didn't do it by group homes. I did

it by clients, you know. So sometimes I would have one client in a home, or sometimes I will have two clients, or all three clients may be monitored, so.

*Q.* How many group homes would you say you have been in that were operated by Four J's?

*A.* Let's see. Maybe five, six.

*Q.* And how many clients did you have total?

*A.* About 22.

*Q.* Any of those clients, in any of those five or six homes, did you ever see overhead sprinklers in any of them?

*A.* I don't know.

*Q.* You can't recall ever seeing overhead sprinklers in any of those homes?

*A.* No, not that I know of.

*Q.* Would you agree with me that in the event of a fire in a house where somebody needs total care, somebody is totally reliant on a staff member getting them out, if they can't get them out, an overhead sprinkler would act to suppress that fire quickly and make that person more safe?

*A.* Well, the HCS Program is a regulated program. Every year, in order to have a four-bed home, you have to have the fire marshal come out. They tell us what are the regulations we are supposed

to put over the house.

*Q.* That may be a minimum standard, but you would agree that Four J's can exceed the minimum standard, can't it?

*A.* We go --

*Q.* But you try to do your job, right?

*A.* We go by the State of Texas --

*Q.* I'm just asking you, Ms. Obichuku, if you understand it, you try, in your job, to do more than the minimum required?

*A.* I don't understand the question.

*Q.* Do you try, in your job, to do more than what is just required of you?

*A.* Yes.

*Q.* You try to meet or exceed what is required of you, right?

*A.* Well, I --

*Q.* You try to provide the best healthcare, the best care that you can, right?

*A.* Yes.

*Q.* And you try to make sure that people are as safe as they can, right?

*A.* Yes. I put my heart in my job, and I actually get attached to my clients.

*Q.* It actually is a lot more than just heart,

though, isn't it? You have to be able to foresee the dangers that your clients may come into contact with, right?

*A.* That's correct.

*Q.* And part of that, as your job, is to make sure that they are in a safe environment, right?

*A.* Correct.

*Q.* If you can walk into a house where your residents, who can't walk, who can't take care of themselves, and you can see a danger and make it safer for them, you ought to do that, shouldn't you?

*A.* Correct.

*Q.* That's part of your job, that's why you work there, right?

*A.* Uh-huh. I was an advocate for the clients.

*Q.* I noticed that you testified that you didn't know how to pronounce Amuche's last name.

*A.* Correct.

*Q.* How long did you work with her?

*A.* I don't remember. Maybe a year or under.

*Q.* And after a year, you still didn't know how to pronounce her last name?

*A.* I don't see why I would know how to pronounce her last name.

*Q.* She was taking care of Jenny, one of your

clients, right?

*A.* I don't know the other staff by last name either. I just know by first name.

*Q.* How much do you earn at Four J's?

*MR. RAVAL:* Objection, relevance.

*THE COURT:* Overruled.

*A.* I earn -- I get paid twice a month, so I get paid about 1,500 each paycheck.

*Q.* (By Mr. Thweatt) Do you have any plans on leaving Four J's?

*A.* I mean, after I finish with schooling, I plan on getting my profession in psychology.

*Q.* But you plan on staying there as long as they will have you, right, until you are done with your schooling?

*A.* Correct.

*Q.* You told us that you understand that the training and the procedures that were outlined in an emergency were not followed on the night of the fire.

*A.* Correct.

*Q.* Because of that, would you agree with me that the company, Four J's, bears some responsibility for what happened to Jenny?

*A.* When -- usually during emergencies, people always want to find a blame. You have to blame the

staff, since she was trained.

*Q.* Well, the staff works for the company, right?

*A.* Yes. But the company did everything they can, even including myself, to make sure she was trained.

*Q.* Did the company preside over fire drills?

*A.* I'm sorry. Can you say that again?

*Q.* Did the company preside over fire drills?

*A.* What do you mean by preside?

*Q.* Did they have fire drills?

*A.* Of course. Yes.

*Q.* Did you see those?

*A.* No. I just saw the notes. The fire drill residence staff --

*Q.* You weren't present for any of those?

*A.* I'm sorry?

*Q.* You weren't present for any fire drills?

*A.* No. The supervisor did that with the staff.

*Q.* Who would that be?

*A.* Whoever the resident supervisor was at the time.

*Q.* Would you agree with me that a fire drill that tests the ability of the staff member to evacuate a group home like the one in Beretta Court

ought to be conducted with as much realism as possible to ensure that when people have -- confront a real fire, that they respond appropriately?

*A.* Correct. Uh-huh.

*Q.* And that means that the residents should probably be asleep for a couple hours, right?

*A.* Right. We have fire drills where we have them asleep, and then we also do it at night where we wake up the clients.

*Q.* And that means also that those fire drills should be conducted to where, when they are timed, everybody has got to be out of the house and to a safe location before the drill is stopped on the stopwatch, correct?

*A.* Correct.

*Q.* You have been in the Beretta Court house, right?

*A.* Uh-huh.

*Q.* And you knew Esperanza Arzola, right?

*A.* Yes.

*Q.* And you knew that she had a history of suicide attempts?

*A.* No.

*Q.* You didn't know that?

*A.* No. She wasn't my client, but I knew a

little bit about her.

*Q.* Did Esperanza's case manager ever speak with her about her needs?

*A.* No. I don't see --

*Q.* Esperanza had a different case manager, right?

*A.* Correct.

*Q.* But you never coordinated the care of Esperanza as it might have related or impacted Jenny, did you?

*A.* No.

*Q.* What about Elisha Campbell and Tanya James, did they have different case managers too?

*A.* I was Elisha Campbell's case manager.

*Q.* Did Tanya James have a different case manager than you?

*A.* Correct.

*Q.* Did you ever coordinate what kind of care might be required for Tanya as it related to Jenny, with Tanya's case manager?

*A.* Whenever someone was new, we had meetings on that.

*Q.* And are there staffing decisions that you might recommend as a case manager and advocate for somebody?

*A.* How?

*Q.* Let me put it this way, if Jenny -- Jenny was your client, right?

*A.* Correct.

*Q.* Could you have gone to Ms. Uduma or somebody at the company and said, look, we need more than one staff in this house to protect Jenny in the event of a fire because she's difficult to get out quickly, and we have these other three people in the house that we need to attend to as well?

*A.* Right.

*Q.* Would you have done that?

*A.* It made it easier -- well, it's supposed to make it easier because Jenny is the only one in a wheelchair. So it should take them less than two minutes to get out of the home.

*Q.* Two minutes.

*A.* Correct. Less than that.

*Q.* Then what happens to the other three people?

*A.* Usually, like Esperanza, Elisha, the high functioning clients, they can just give them verbal and they will get out. And then the staff is supposed to keep their eye on them to make sure they, you know, are escorted out. But the first priority should be the client that can't do anything for

themselves.

*Q.* If that's not trained -- if that's not actually done, like it wasn't on this night --

*A.* I'm sorry --

*Q.* If Jenny is not the first person removed from the home, that means that Four J's rules were not followed, right?

*A.* Correct.

*Q.* That means one of Four J's employees didn't do their job, right?

*A.* Correct.

*Q.* And that's a departure from what, what a reasonable company should expect of its employees, right?

*A.* I'm sorry. Can you repeat the question?

*Q.* That's a departure from what a reasonable company should expect --

*A.* I don't know what you mean by that.

*Q.* Let me rephrase it.

The standard of care, I think you are telling us, requires that Jenny be removed first, right?

*A.* Correct.

*Q.* If that doesn't happen, that's a departure from the standard of care, right?

*A.* Right.

*Q.* Do you feel it's important, as Jenny's case manager, to know about the propensities and the history of the other clients who might be living in that house with her?

*A.* I'm sorry. Can you repeat the question?

*Q.* Do you think it's important, as Jenny's case manager, to know about the history and the propensities of the other clients who live in that house with her?

*A.* Well, it depends on the team, if they felt that, because we usually have team --

*Q.* I'm not asking about the team. I'm asking whether you, as Jenny's case manager -- you said that she was close to you, that you were her advocate. Don't you think that it's important to know about the tendencies and the history of the other residents in that home, as they relate to Jenny?

*A.* Well, it depends on the information given at the time of the staff meeting.

*Q.* Do you think it's important or not? If you don't, you can tell us. If you do --

*A.* Are you asking me personally or for my job?

*Q.* I'm asking you, in your capacity as Jenny's case manager, your professional capacity, isn't it

important to you to know the tendencies and the histories of the other residents who live that house with her?

*A.* The other clients didn't know the tendency of Jenny's background either, so --

*Q.* Jenny wasn't a threat to anybody, was she?

*A.* Esperanza or Elisha were, and the other clients were not a threat to Jenny as well.

*Q.* Esperanza was not a threat to Jenny?

*A.* Right. There was no history that I know of, of her being --

*Q.* You just told us, I think, earlier that you never communicated with Esperanza's case manager.

*A.* You said if I would communicate with her regarding Jenny and her together. But on average, I did know a little bit about Esperanza's background.

*Q.* So what did you know about her?

*A.* I knew that she was -- how should I say -- she is very, like, you know, needy. She will come in your office a lot. She will tell you, I want a boyfriend, stuff like that.

*Q.* Did you know that she tried to kill herself?

*A.* No, I didn't know that.

*Q.* Did you know she was on antipsychotic medication?

*A.* No, I didn't know that.

*Q.* Did you know that she was bipolar and schizophrenic?

*A.* I knew she was bipolar. I didn't know she was schizophrenic.

*Q.* Did you know that she had been sexually assaulted as a child?

*A.* I think I heard that, maybe.

*Q.* Before the fire?

*A.* Yes.

*Q.* You knew all that?

*A.* The questions I said yes to. Because I don't have her -- you know, usually, other case managers, we don't read each other's client history and all unless it is given to us.

*Q.* Oh. Well, don't you think it's important, if you knew those kinds of things about Esperanza Arzola, that she have extra supervision?

*A.* She had supervision based on what DADS, Department of Aging and Disability, whatever --

*Q.* I'm talking about in the home, where she lived.

*A.* I don't understand.

*Q.* I'm about talking about, knowing what you say you have told us that you knew, don't you think

that it was important that Esperanza Arzola have extra supervision in the house?

*A.* If the State says she --

*Q.* I'm not asking what the State says. I'm asking what you think.

*A.* I agree with whatever the State says.

*Q.* Whatever the State says is what you say?

*A.* Right. Because that's what, you know --

*Q.* Is that your position?

*A.* Yes, because --

*THE COURT:* One at a time. Let her finish her answer, please.

*A.* I'm sorry. Can you repeat your question?

*Q.* (By Mr. Thweatt) Whatever the State says is fine with you; is that right?

*A.* Right.

I didn't find Esperanza to be a harm to Jenny or any of the other ladies in the home. Esperanza was actually very nice to Jenny.

*Q.* Do you agree with me, Ms. Obichuku, that fire presents an extreme degree of risk --

*A.* Yes.

*Q.* -- to Jenny Wagner?

*A.* Yes.

*Q.* And you had an actual, subjective awareness

of that risk before the fire, right? You understand personally what kind of risk that presented to Jenny, right?

*A.* Uh-huh.

*Q.* Before the fire, you understood that?

*A.* Yes. Right.

*Q.* And despite understanding that, you never made a recommendation that Jenny have an extra caregiver in the home, did you?

*A.* I didn't feel like there was a need.

*Q.* And despite understanding the risk of fire, you never made a recommendation that Jenny be placed in a house, say, with overhead sprinklers or extra fire protection, did you?

*A.* We are under DADS regulation --

*Q.* I'm not asking about the regulation. I'm asking whether or not you made the recommendation or not.

*A.* I don't understand the question.

*Q.* Did you ever make a recommendation that Jenny be moved into a house -- you said you went into five or six of them. Did you ever make a recommendation that Jenny be moved into a house that might have had overhead sprinklers in it?

*A.* No. None of our homes -- whatever -- we

follow whatever DADS regulates us to. If the State feels like we have to have sprinklers -- because we have audits and stuff. And their number one goal is client safety, the environment is protected, and that's also my goal for the client.

*MR. THWEATT:* Objection, nonresponsive.

*THE COURT:* Overruled.

*MR. THWEATT:* Pass the witness.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPARKS:

*Q.* Good morning, ma'am.

*A.* Good morning.

*Q.* How are you today?

*A.* Fine, thank you.

*Q.* Ms. Obichuku?

*A.* Obichuku.

*Q.* Just a couple questions. Tell the jury the type of woman who Elisha -- was it Elisha Campbell?

*A.* Yes.

*Q.* Tell the jury about Elisha.

*A.* Elisha, she has schizophrenia, paranoid schizophrenia. She is also a client that is very kind, very sweet. She loves to write all day. She

has, I think, a fifteen or eighteen hundred calorie diet.

*Q.* What about her aggressive behaviors?

*A.* She has issues of aggression, but Elisha did not have any -- all of her behaviors, she did not have any -- she did not display any behaviors at the Beretta Court Home.

*Q.* Tell the jury about she being the last person in the group, in terms of the four women that lived there.

*A.* I'm sorry. Would you repeat that?

*Q.* Tell the jury about her being the last person in the group of the four women that lived there. She was the last person to make up that four-person group home, correct?

*A.* Yes, that's correct.

*Q.* And she also came from the same environment that Esperanza Arzola came from; is that correct?

*A.* No, she did not.

*Q.* She did not?

*A.* No.

*Q.* So when you made the staffing decision to put her in the four-person Beretta Court Home, you didn't know whether or not she had a history with Esperanza Arzola?

*A.* She came from Beaumont.

*Q.* She came from Beaumont?

*A.* Esperanza came from Corpus Christi.

*Q.* And they had never been in the same facility together. Is that what you're saying?

*A.* Elisha had lived with her parents. She was new to the program.

*Q.* You knew she had some aggressions issues, correct?

*A.* Yes.

*Q.* Did you ever staff with Ms. Anthonia Uduma whether or not putting that individual with an aggressive personality with a person who was already in there with an aggressive personality as Esperanza Arzola?

*A.* Ms. Uduma usually didn't attend the staffing meetings. It was just -- the staff meetings consisted of the IDT Team.

*Q.* Who makes a determination where they are placed?

*A.* The client? Their parent, if they have a parent, or their guardian, and the team from the state school.

*Q.* Who made the determination with Esperanza -- I mean, with Elisha Campbell to put her in that home

on Beretta Court?

*A.* They give her -- well, Elisha is her own guardian, so they give her a right to look at different homes, which she did. And then she chose that home. They give her a chance to see her roommates in advance as well.

*Q.* Were you present when that happened?

*A.* Yes.

*Q.* Did you make the recommendation to put her there?

*A.* No. We can never do that.

*Q.* Were you aware of putting her there with Esperanza Arzola?

*A.* Yes.

*Q.* Was it ever a concern, with her aggressive personality, in the same home with Esperanza Arzola?

*A.* Elisha was not aggressive.

*Q.* You just testified to the jury that she was.

*A.* At the Beretta Court Home, she had never had, not one behavior.

*Q.* But prior to that --

*A.* Uh-huh.

*Q.* Prior to that, you knew she was aggressive.

*A.* She had a history of aggression.

*Q.* She had a history of aggression.

*A.* Correct.

*Q.* And you don't know whether or not you ever had a conversation to determine whether that was a good match, putting her in the Beretta Court property with Esperanza Arzola?

*A.* I can't remember that.

*Q.* You can't remember that?

*A.* No, sir.

*Q.* Would that have been something that you think you would want to remember?

*A.* Maybe. It was a long time ago.

*Q.* Now, the four clients weren't the only persons in the home; is that correct?

*A.* Correct.

*Q.* You had other staff, you had staffing, right?

*A.* Yes. Twenty four hour supervision.

*Q.* Did you ever consider whether or not those two women together could be aggressive and threatening to the staff?

*A.* No. Not that I can recall.

*Q.* So it was never a concern to you, or it never came to your attention for the whole year, that -- or the period of time that Ms. Amuche worked there, that she was concerned about her safety being

in a home with Esperanza Arzola and Elisha Campbell?

*A.* Can you repeat the question?

*Q.* Did it ever come to your attention that the staff was concerned about the aggression of those two women in the home?

*A.* Not that I can remember.

*Q.* Not that you can remember?

*A.* Right.

*Q.* You say your job was the advocate of the client; is that right?

*A.* Right.

*Q.* What does that mean?

*A.* Advocate means, like, for instance, I speak for the client if they can't speak for themselves. I help protect their rights.

*Q.* So if you went to the home and you saw a situation that wasn't correct, your job was to advocate to whom for the client?

*A.* Yes. I report the staff. Sometimes I am able to write the staff up as well. If I see something done wrong or if I see the client is not in a safe place, I will do my best, you know, address it with the team.

*Q.* The in-service training that you guys had, that was done when the staff would go pick up their

paychecks, right?

*A.* Right. We have to -- there is usually, like, a two-hour meeting, and then they pick up their checks afterwards.

*Q.* So an individual who had worked 40, 50 hours, 60, 70 hours over a two-week time period, around the clock, without sleeping in the home --

*A.* Oh, no. We have shifts that --

*Q.* Can I finish my question?

*A.* Sorry.

*Q.* An individual that would work those many hours, ready to pick up their checks, had to sit through a two-hour service just to get their money that they have already worked for?

*A.* Well, we don't look at that way.

*Q.* Is that a yes or no?

*A.* I'm sorry. Can you repeat the question?

*Q.* Is that a yes or no?

*A.* Okay. You have to repeat the question again.

*Q.* An individual who has worked 50, 60, 70 hours, around the clock, not being able to sleep at the facility, goes to pick up their check. In order to get it, they have to go through a two-hour meeting. Is that correct?

*A.* That's not correct.
*Q.* That's not correct?
*A.* We have -- for those staff -- we have some staff in school, so they are not able to make it to the meeting. So they come back the next day or the next day after or that evening.
*Q.* So it wouldn't be unreasonable, then, for somebody to not have gone through these trainings; is that correct?
*A.* Everybody has to go through the trainings.
*Q.* Everybody has to go through the training?
*A.* Right.
*Q.* In order to get their checks?
*A.* Right. We make it convenient for the staff. If they can't make it to the 12:00 o'clock meeting, they will come, maybe, around 4:00 o'clock, or they will come the next day.
*Q.* Who was the individual that was on the table that you guys were mimicking and working with when some in-service training was dealing with --
*A.* Ms. Anthonia was the one that was on the -- she put her body on the table in the staff.
*Q.* Ms. Anthonia?
*A.* Correct.
*Q.* You went and saw individuals pick her up,

put her on the floor, drag her out?

*A.* Right.

*Q.* You also saw Ms. Amuche do that?

*A.* Yes.

*Q.* I thought you said you didn't remember.

*A.* Well, I mean, I remember now. But I think she did.

*Q.* You remember now?

*A.* Yes.

*Q.* But you think she --

*A.* Because I remember she was involved. Everybody was involved through the meeting. They all took turns.

*Q.* Was the table as high as this?

*A.* It was like one of those standard white tables that you use, like during meetings and stuff, like a white square table.

*Q.* They picked her up, each individual?

*A.* They grabbed her by the shoulders and pulled her off. Some of the staff was scared that they were going to hit her head but, you know, they were like, you know, so they were all taking turns.

*Q.* Now, did they all do it correctly?

*A.* I mean, some, you know, were -- she was having to lift for some, like the smaller staff, but

they all did it.

*Q.* And you say you went to a lot of these in-services, right?

*A.* Right. I would lead some of them as well.

*Q.* But you never heard of Dr. Lockwood?

*A.* I did.

*Q.* You did?

*A.* He was there for all of the meetings as well.

*Q.* So Dr. Lockwood -- you weren't there when he did training about the issues and aggression tendencies of Esperanza?

*A.* He -- yeah, I probably was there.

*Q.* Probably was there?

*A.* Yes. Because he went first, like from 12:00 to 12:30.

*Q.* So if you probably were there, then you would have known about the training issues of Esperanza?

*A.* Right.

*Q.* And that would have been of some concern to you, would it not?

*A.* I don't know what you mean.

*Q.* Would that have been concern to you about the issues he was speaking of in reference to

Esperanza?

*A.* It wasn't a concern at the time.

*Q.* It wasn't a concern?

*A.* Right.

*Q.* So when Dr. Lockwood is giving a training dealing with the aggressive tendencies of Esperanza, her psychiatric issues, her suicidal tendencies and things of that nature, you may have heard about it, it may have been something concerning you, but not necessarily so?

*A.* Because he in-services -- how he does his in-services, he does it on not when issues come up, he does it based on behavior therapy plan and shows staff how to prevent behavior if she has them. These are the key things you want to watch out for, and these are how to control it.

*Q.* Now, here he is, we have a trained professional that comes to do in-service --

*A.* Uh-huh.

*Q.* -- to help train the employees of Four J's.

*A.* Correct.

*Q.* Correct? To apprize them of issues and tendencies of problematic clients, right?

*A.* Correct.

*Q.* And Esperanza Arzola is certainly one?

*A.* Uh-huh.

*Q.* And she is also in the home where you have two clients, correct?

*A.* Correct.

*Q.* You have Jenny Wagner --

*A.* That's correct.

*Q.* -- and you have got Elisha Campbell?

*A.* Correct.

*Q.* And Elisha Campbell is the new addition to the four ladies in that home, correct?

*A.* That's correct.

*Q.* And you are here to tell this jury that you weren't concerned about what Dr. Lockwood had to say about her behavior?

*A.* I don't see -- there are guardians as well for -- each team knew about Esperanza, so that is not my call to make.

*Q.* I am not asking you in reference to whether it was your call. I want to know whether it was your concern.

*A.* I can't remember. That was so many years ago. If it was a concern, I would have addressed it.

*Q.* And you never addressed it?

*A.* No.

*Q.* So it wasn't a concern.

*A.* Right. Esperanza was --

*Q.* What about when Dr. Lockwood talked about the aggression tendencies and personalities of Elisha Campbell?

*A.* What about it?

*Q.* Was that a concern?

*A.* She was my client, so it was definitely my concern.

*Q.* What did you make of that, when he talked in reference to the staff members regarding her?

*A.* I made sure they were trained, you know, they had to attend the meeting by force. And to make sure how to prevent -- that's his key part of all his training that he does, prevent, prevention.

*Q.* Okay. So you made sure they got to the meeting by force. What do you mean by that?

*A.* I mean, they can't get their checks without, you know -- because we can't keep them on the schedule if they don't be --

*Q.* So they can't get paid unless they go through additional training?

*A.* Right.

*Q.* Now, did they get paid going through the training?

*A.* What do you mean?

*Q.* I mean was that -- that two-hour training, was that two hours more on their check the following week?

*A.* No.

*Q.* It was not?

*A.* Not to my knowledge.

*Q.* So having worked all those hours, you go to pick up your check, you got to go through the training. If you don't go through the training, you don't get your check. And then if you go through the training, you don't get more money on your check?

*A.* Sorry. Correction. It's like you -- if you don't go through the training, you are going to be moved off the schedule because you have to know about the client care.

*Q.* And if you go through the training, you don't get paid additional money?

*A.* No. Because it's a part of the Four J's standard, it's the policy.

*Q.* But that is correct?

*A.* Correct.

*Q.* Advocate for the client. What did you advocate in reference to helping get individuals who were in the wheelchairs out of the home? What did you advocate to?

*A.* To teach the staff how to transport them, make sure they change the diapers every two hours. I would tell them, don't leave them in the bed all day. Like, for instance, Jenny, she was in a wheelchair. Every two hours, you can take her from the bed to the recliner to the wheelchair. She would go --

*Q.* Now, Mr. Thweatt asked you about whether there was possibly maybe ten people in wheelchairs, because you didn't know the number, correct?

*A.* Correct.

*Q.* But you said it was at least two, possibly maybe ten?

*A.* I don't know the exact number.

*Q.* I'm not going to hold you to the ten.

*A.* Okay.

*Q.* But you had other clients besides Jenny who were wheelchair bound?

*A.* Correct.

*Q.* In other homes?

*A.* I would have, like, three or four clients, maybe three, maybe four clients that are in wheelchair.

*Q.* That are owned by Four J's --

*A.* Correct.

*Q.* -- that you were case manager of?

*A.* Correct.

*Q.* Give us the addresses of all those properties that had deadbolt locks on them on exit doors.

*A.* None that I know of.

*Q.* I'm sorry?

*A.* None that I know of.

*Q.* None that you know of?

*A.* Correct.

*Q.* None of the properties that you went to, owned by Four J's, with individuals that were under your care, had a deadbolt lock on the door?

*A.* Correct. Not to my knowledge.

*Q.* Not to your knowledge?

*A.* Correct.

*Q.* How often did you go out to the homes?

*A.* I live in Missouri City. So I would go to Beretta Court often. I would say, maybe, out of the week, I would go sometimes maybe twice a week. I would go -- as a case manager, I am required to go see my clients at either the home or the day-hab; but I would see the home.

*Q.* And when you went to the Beretta Court property, how did you get in?

*A.* I knocked on the door, always.

*Q.* You went in the front door?

*A.* Yes.

*Q.* Did you ever exit any other doors?

*A.* Huh-uh.

*Q.* Went in the front, always left out the front?

*A.* Correct.

*Q.* So if there has been testimony here that there was a deadbolt lock on the exit door to the back, that would be news to you?

*A.* Yes.

*Q.* Would you disagree with it?

*A.* It's information to me.

*Q.* Information to you?

*A.* Yes.

*Q.* So all the time that you worked for Four J's since this fire --

*A.* Uh-huh.

*Q.* -- out of all the things you have heard about, the other employees you have talked to, this is the first you have ever heard that that property had a back door that had a deadbolt lock on it. Is that your testimony?

*A.* I'm sorry. Can you repeat the question?

*Q.* Yes, I can.

Out of all the persons that you have talked to since the fire at Beretta Court, this is the first time, this morning, that you heard that that back door had a deadbolt lock on it?

*A.* I heard there was -- I think, back when the fire was being investigated, back when -- after it happened, there was a deadbolt or something on it. But I don't know if it was supposed to be there or not.

*Q.* You don't know if it was supposed to be there or not?

*A.* Correct.

*Q.* And if the State said it wasn't supposed to be there or not, since you go along with whatever the State says, that's correct?

*A.* Right.

*Q.* The other properties that you went to, when you were telling the individuals how to extricate those clients in the wheelchairs, did you ever help them or have them demonstrate to you how they would do it?

*A.* Some, maybe. I don't know the exact homes I would, but, you know -- because most of our meetings took place in the monthly meetings.

*Q.* Okay.

*A.* And in the office.

*Q.* Now, you mentioned that you didn't necessarily read other case workers' notes; is that correct?

*A.* Right.

*Q.* About other individuals in the home?

*A.* No.

*Q.* You didn't read their notes?

*A.* No. I didn't have time to do that.

*Q.* Tell the jury why you would read notes in reference to issues regarding fire drills.

*A.* Because that was my client. Anything pertaining to my client, I have to follow.

*Q.* Anything pertaining to your client, you have to follow?

*A.* As part of the advocate, my job as monitoring -- as the case manager, I am responsible for monitoring all of the services, fire drills, even environmental surveys.

*Q.* Did you know that in the event of an emergency that Tanya James was -- I mean, the caseworker, the care staff was instructed in how to go in and extricate Tanya James?

*A.* You mean how to get her out of the home?

*Q.* Yes, ma'am.

*A.* Yes, the staff should have been trained on that. I wasn't there at the actual training when the case manager probably in-serviced, you know, on that; but she should have been trained on that.

*Q.* She should have been trained on that?

*A.* Yes. But I wasn't there with the case manager. I just trained --

*Q.* Were you there at the hospital, with Tanya James at the hospital?

*A.* Yes. I loved Tanya as well. She's, she's a very lovable client.

*Q.* Tell the jury how she appeared to you when you saw her at the hospital.

*A.* When I saw Tanya at the hospital, she was burnt and not really, you know, she was -- you could still see her face and everything, but I don't know what portion of her body that had the, the -- it just felt like a nightmare, and I'm like -- I asked the nurse, and they said, the next day or so, they pronounced her dead.

*Q.* You have been over to the day-hab facility, have you not?

*A.* I'm sorry. I didn't hear what you said.

*Q.* You have been over to the day-hab facility, have you not?

*A.* Yes, I have. I have to see my clients.

*Q.* You have clients over there, too, you see, right?

*A.* Correct.

*Q.* Is it a common practice that other clients over there had access to smoking materials?

*A.* No. Well, you know, the clients are allowed to smoke. But they don't keep the lighters, the staff keep the lighters.

*Q.* Okay. They are allowed to smoke?

*A.* Correct. They have smoking breaks that they take.

*Q.* They have smoking breaks?

*A.* Correct.

*Q.* So Esperanza wasn't the only person in the whole day-hab community that went five times a week who had access to cigarettes and lighters; is that correct?

*A.* She didn't have access -- none of the clients have access to lighters. The staff are the ones that issue out the lighters.

*Q.* The staff issue the lighters?

*A.* Correct. And they would take it back after the clients were done during their break.

*Q.* You know that for a fact?

*A.* That's a part of the policy they all follow.

*Q.* So it wouldn't be unreasonable, then, to have a record of some sort to say staff gave out nine lighters, nine lighters came back?

*A.* Correct.

*Q.* There is a record of that?

*A.* I mean, that's what they -- you know, that's the procedure they follow.

*Q.* That's the procedure they follow?

*A.* Correct.

*Q.* They give out nine lighters, and they collect nine lighters back?

*A.* Correct.

*Q.* So if a lighter didn't come back, what would they do?

*A.* They would ask the client right away, and the client usually would give it. We never had that issue before.

*Q.* What happened if, for example, the lighter stopped lighting?

*A.* I guess the staff would have an additional one, or they would call the supervisor if they need something.

*Q.* So you give out nine lighters and seven came back, and they say, oh, the lighter fluid was gone.

*A.* They can call the residential staff -- I mean, the supervisor to go and get one, or they call the case manager, whoever is on duty.

*Q.* You are telling me what they could do. Tell me what they did. What is the policy or procedure regarding that? Because I get the impression you don't know, you are making this up.

*A.* I am not lying to you. I'm a Christian.

But at the same time, for lighters, I didn't have any of my clients that smoke.

*Q.* I didn't ask you did you have any clients that smoke.

*A.* Frankly, you are asking me to see it as if I saw it, those are my clients.

*Q.* But you did see smoke?

*A.* Yes.

*Q.* You did see personnel at the day-hab facility dispensing lighters to them?

*A.* Yes.

*MR. SPARKS:* Pass the witness, Judge.

*THE COURT:* Mr. Raval.

REDIRECT EXAMINATION

BY MR. RAVAL:

*Q.* Ms. Obichuku, you told us earlier that you are a client advocate and you help protect their

rights; is that correct?

*A.* Correct.

*Q.* What rights are you protecting, exactly?

*A.* The rights that are given by the State. You know, each client has a right to be treated with dignity and respect. There is a list of rights that each client has. They all have the same rights.

*Q.* Was it your job as a client advocate to make sure those rights were addressed?

*A.* Correct. Make sure they were being talked to with respect and everything. Right.

*Q.* You were asked a number of questions about how the team decides what client goes into a home. Do you remember those questions?

*A.* I'm sorry. Can you reask that question?

*Q.* You were asked some questions about the staffing for the group home and how was it decided how many staff members are needed in a group home. Do you remember those questions?

*A.* Can you say the question again? I'm sorry.

*Q.* Okay. What happens -- what does the IDT Team -- what does IDT stand for?

*A.* Interdisciplinary Team.

*Q.* What does the Interdisciplinary Team do? Or does it do anything with making recommendations about

how many staff should be in a particular group home?

*A.* Yes. That's some of the things they can plan as well.

*Q.* How is that done?

*A.* Well, depending on the clients, you know, something by the psychologist. The psychologist will say, this client requires one-on-one. The psychologist can make the recommendation. If the psychologist in the state school where they came from says one -- a shift staff or minimal supervision -- we have supervised living as well that requires minimal supervision. It depends on whatever the state school, wherever they came from, what type of supervision. And whenever we staff them in, we assess that, you know, to see if this client, what type of supervision they need, if it's, you know, we back it up and make sure that's the proper -- and if it's not the proper supervision, then we try to appeal it with the State.

*Q.* You were the case coordinator for Ms. Campbell at the Beretta Court Home, correct?

*A.* Case manager.

*Q.* Case manager, I'm sorry.

Did you make a recommendation or appeal that there should be more than one staff member at the

Beretta Court Home when Ms. Campbell arrived there?

*A.* No.

*Q.* Why not?

*A.* I didn't see any need. We can't say that. It has to come from the psychologist, if he says it's one-on-one, so.

*Q.* Do you know if Dr. Lockwood, the psychologist, made that recommendation?

*A.* No. It would have been in our behavior plan. No, he did not make that.

*Q.* Was Ms. Campbell a danger to Jenny or the other residents in the Beretta Court Home?

*A.* She didn't have any incidents of -- she didn't have any behaviors at all at the Beretta Court Home.

*Q.* At the time she moved into the Beretta Court Home, did you believe she could have posed a danger to the other clients in the home?

*A.* I mean, I don't know when clients have -- can do a behavior or not. So we just go by what we staff them in. So, no, I don't think so.

*Q.* Was it your opinion that Esperanza Arzola posed a danger to either of your clients, Ms. Campbell or to Ms. Wagner?

*MR. THWEATT:* Objection, foundation.

*THE COURT:* Overruled.

*A.* No.

*Q.* (By Mr. Raval) Why not?

*A.* Esperanza -- are you talking about Esperanza or Elisha?

*Q.* Well, I'm asking you -- you had two clients in the Beretta Court Home, right?

*A.* Uh-huh.

*Q.* Was it your opinion that Esperanza Arzola was a danger to either of those two clients in the home?

*A.* No.

*Q.* Why not?

*A.* Esperanza was not aggressive towards any of the clients.

*MR. SPARKS:* Objection, Your Honor.

*THE COURT:* Grounds?

*MR. SPARKS:* Speculation.

*THE COURT:* Overruled.

*A.* She was not aggressive towards anybody in the home. She was actually a very nice client, when you saw her other side. The other side of her would be crying all the time. But she was very, very loving at the same time.

*Q.* (By Mr. Raval) Did you ever see Esperanza

interact with either of your clients at the home?

*A.* Yes.

*Q.* What were those interactions like?

*A.* She treated Jenny as if Jenny was her daughter. She loved Jenny. She treated Elisha like she was her sister. They were like family to her. She didn't have family.

*Q.* You were asked some questions about some of the fire drills that were conducted. Did you conduct any fire drills?

*A.* No.

*Q.* Who would have conducted the fire trials at Beretta Court?

*A.* The resident supervisor.

*Q.* Do you remember who that was in 2008 for Beretta Court?

*A.* There was two. I don't know who was assigned to that house. There was Rosemary, and there was Mr. Inya.

*Q.* Mr. Inya?

*A.* Uh-huh.

*Q.* You described for us earlier about some of the training that you gave to the staff at the Beretta Court Home. Why is training so important?

*A.* Because you got to make sure the staff

understand what to do for the client, making sure their diet is being followed, behavior preventions are being prevented. They have behavior. There is things you can prevent them from happening. It's also important because, to make them understand how the client -- how to communicate with the client, you know, what tone of voice to use, things like that.

*Q.* Is it also important for the staff to know what to do in the event of an emergency?

*A.* Correct.

*Q.* Did you give that proper training?

*A.* Yes.

*MR. RAVAL:* Your Honor, pass the witness.

*THE COURT:* Mr. Thweatt.

RECROSS-EXAMINATION

BY MR. THWEATT:

*Q.* The caretaker on duty the night of the fire, Ms. Amuche, she spent much more time in that home than you did; isn't that right?

*A.* Correct.

*Q.* So if she has a different recollection and she has testified that Esperanza Arzola had scared her, you don't have any reason to dispute her testimony in that regard, do you?

*A.* No. I know Esperanza, you know, she would cry a lot and her eyebrows would look dark sometimes but --

*Q.* The important thing that I am trying to emphasize with you, Ms. Obichuku, is that she knew how Esperanza operated in that home because of the amount of time, as related to you, she had a much better perspective on that, didn't she?

*A.* Right. She worked there.

*Q.* Thank you.

*MR. THWEATT:* Pass the witness.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. SPARKS:

*Q.* In making sure that your clients had the ability to get out properly in an emergency, wouldn't you want to have them demonstrate to you their ability to get out of all doors that were designated as exists?

*A.* That's -- the resident supervisor comes in, and they do the training with the staff and the clients to make sure -- they actually observe them do the actual fire drills.

*Q.* I understand that. But I'm not talking

about fire drills. I'm talking about emergencies.

*A.* Evacuation. Right. When I came to the house, I pointed to which place would be the safest.

*Q.* You pointed to which place would be the safest?

*A.* Correct.

*Q.* And when you went to Beretta Court, did you do that?

*A.* Yes.

*Q.* Where did you point to, the safest --

*A.* The hallway beside Tanya and Jenny's room if a hurricane were to take place, or a tornado.

*Q.* What about fire?

*A.* Fire. You know, I can't remember exactly. Maybe the exits, whatever doors that are close by, the garage door, the back door, the front door.

*Q.* You told them to consider taking them out the back door?

*A.* Right. Or the window.

*Q.* But you never exited the back door?

*A.* I went to the backyard before.

*Q.* You did?

*A.* Yes.

*Q.* When?

*A.* I can't remember when, but I have been there

before. Because I have been to the house for years.

*Q.* You went to the house for years?

*A.* Yes. Visiting my clients. Sometimes we would have parties out there, in the backyard.

*Q.* When did you start working for Four J's?

*A.* 2004. Jenny has been my client since I first came.

*Q.* But you had no idea that that back door had a deadbolt lock on it?

*A.* No.

*MR. SPARKS:* Pass the witness, Judge.

*THE COURT:* Mr. Raval.

*MR. RAVAL:* No further questions.

*THE COURT:* Any reason this witness can't be excused?

*MR. RAVAL:* No, Your Honor.

*MR. THWEATT:* No, Judge.

*MR. SPARKS:* No objection.

*THE COURT:* Thank you for your time, ma'am. You are excused.

*(The witness was excused.)*

*THE COURT:* We're going to take our mid-morning break. We will start back up at 5 after 10:00.

*(Jury excused from the courtroom.)*

*(Recess.)*

*THE COURT:* Thank you. Please be seated.

*BAILIFF:* All rise.

*(The jury present, proceedings resumed in open court as follows.)*

*THE COURT:* Thank you. Please be seated.

Defense, call your next witness, please.

*MR. RAVAL:* Your Honor, the defense calls Inya Ogbonna.

*BAILIFF:* If you will stand here and raise your right hand, the Judge will swear you in.

*(Witness placed under oath.)*

*THE COURT:* Have a seat, please.

You may proceed.

*MR. RAVAL:* Yes, Your Honor.

INYA OGBONNA,

having been placed under oath, testified as follows:

DIRECT EXAMINATION

BY MR. RAVAL:

*Q.* Please introduce yourself to the jury.

*A.* Yes. My name is Inya Ogbonna.

*Q.* Can you spell that, please?

*A.* I-N-Y-A, Inya. Last name, O-G-B-O-N-N-A.

*Q.* Mr. Ogbonna, what do you do for a living?
*A.* I work at Four J's Community Center.
*Q.* What's your job duty right now at Four J's?
*A.* I'm the residential supervisor.
*Q.* What's the role of a residential supervisor?
*A.* The role, I, what I do is to make sure that the staff do what they are asked to do, take care of the clients we have, make sure that the houses are clean, the clients are taken care of, and the other duties that they are supposed to do they are able to do it. That they have what they need to do their job, I make sure they have it.
*Q.* Can you describe for us briefly what the types of employees are at Four J's? We heard earlier about case staff. We have heard about care coordinator. Now you are describing for us residential supervisors. Can you please tell us how that breaks down?
*A.* We have -- the case coordinators, they are also involved in training the staff. And we have the residential supervisors who make sure -- they go to the homes and make sure they meet with the staff and the clients on a daily basis, and we make sure that the staff do all their jobs that they are required to do. And then we have the direct care staff, the

people that work directly with the clients in the group homes.

*Q.* Were you a residential supervisor in 2008?

*A.* Yes.

*Q.* How many other residential supervises were there at Four J's at that time?

*A.* There were three of us.

*Q.* Who were they?

*A.* We had myself, we had Rosemary, and we had also Kingsley Igonna, yes.

*Q.* As a residential supervisor, did you have any duties that related to the Beretta Court Home?

*A.* I go to all the houses. I go there, sometime I went there for at the staff and the clients in the house working, I go make sure that everything is fine. Sometime, a lot of time, when they leave and come to the day-hab, I will go back there to make sure the houses are clean very well and all the items for the clients are in proper condition.

*Q.* If any repairs needed to be made at the houses or anything needed to be fixed, would that be your job?

*A.* We have a maintenance person who does all our, you know, maintenance. But if the direct care

staff have anything, any repairs, there is a, there is like a form you fill out for all that is needed in the house so that they can fill it out. If I am not able to see it, there is a list of things, a form to fill out, to say what needs to be done. Then I will take it and go to our maintenance person whom I will bring to the house, and he will take care of the repairs.

*Q.* Would the case staff send that form to you or someone else?

*A.* They can address it to the office, to the case coordinators or they can send it to me.

*Q.* If case staff needed keys to the houses, who would they go to, to get the keys?

*A.* I am the one. They would come to me to get it.

*Q.* As far as training new employees when they first came to work at Four J's, did you have any role in that as well?

*A.* Yes.

*Q.* What was your role?

*A.* When they are interviewed, hired, then the new staff will be sent to me. Then I will introduce the person to the house where we have availability. Then the person will go there, know who the

clients -- just introduce the new staff to the clients at the home where he or she would work. Then I will bring her back to the office to meet with the case coordinators and the nurse.

*Q.* Before taking the new employee to the house, was there any training conducted at the office?

*A.* Yes. We do trainings.

*Q.* What kind of training?

*A.* We have preemployment training where they are taken through all the things that they are going to do so they will be shown, shown all the things, all the things, all the needs for the clients, all the trainings that we do, they give to the clients, they get it first. The will come --

*Q.* Let me stop you just a second.

What are some of the kinds of preemployment training that were given?

*A.* We talk about the -- like, if a question. We talk about the fire drills. We talk about all the general care, like, the general hygiene. All the care that would be given to the clients, we discuss that.

*Q.* What would case staff do after having been given this training? What was the next step?

*A.* The next step, that's when they come to me.

Then I will go through, like, the schedules we have available. If they can do it, then I show them what schedule and the house that we have for the schedule. That's when I will take them to the house and show them the clients. Then they come back to the office to continue the training.

*Q.* How were the staff assigned to the different houses? Did you have a role in that?

*A.* Yes.

*Q.* How did you decide which staff went to which house?

*A.* When, when we have a vacancy, I will let the administration know that we need someone to be interviewed. Then after the interview, the person meet the interview, then they send the person to me. Then I will go through the schedule that we have. If he or she can do the schedule, that's when I continue.

*Q.* Who at Four J's was responsible for making sure that the homes had working fire detectors, smoke detectors?

*A.* The supervisors.

*Q.* Would you have been one of those supervisors?

*A.* Yes.

*Q.* Were you in that position in 2008?

*A.* Yes. In 2008, I would do that.

*Q.* Did you go to the Beretta Court Home in 2008 or sometime before?

*A.* Yes, I did.

*Q.* Are you familiar with the layout of the house?

*A.* Yes, I am.

*Q.* Okay. I want to go over some of it with you, if I can. Let me show you what is Defense Exhibit 71. It's going to be on that screen in front of you, as well.

Let's start out by, please tell us where the front door to the house was.

*A.* The front door? It should be right here (indicating).

*Q.* And let me just -- let me refer to it for you. Is this the front door to the house?

*A.* Yes, sir. Yes, that would be the front door.

*Q.* Were there any other doors in the house there that could get you inside or outside the house?

*A.* Yes, sir. There was a front door. Then there is a back door. There is another door into the garage.

*Q.* Okay. Let's start by going to the back door. Can you show me where the back door was?

*A.* The back door is straight through the living room.

*Q.* Would you put it here?

*A.* Yes, that's right.

*Q.* Or would you put it more to the right?

*A.* Let me see. Just a little, because it is nearer to the kitchen. So maybe the yellow spot, because it is nearer to the kitchen area.

*Q.* Would that be the back door (indicating)?

*A.* Yes.

*Q.* You told us about a third door, a garage door. Where would that be?

*A.* It would be just within the, the master bedroom and the door leading outside, which would be right just around here (indicating).

*Q.* Is this the door that goes between the house and the garage?

*A.* Yes. This one, this is the door that -- yeah. Yes, that's right.

*Q.* And is this the door that you were talking about that leads from the garage outside?

*A.* Yes. Yes, sir.

*Q.* Would it be okay with you if I put a letter

F for the word front door there?

*A.* Yes, the front door, yes. The front door.

*Q.* And could I put a B for back where you said the back door?

*A.* Yes, the back door.

*Q.* Was it the yellow?

*A.* The yellow.

*Q.* In 2008, was there a problem with the garage door?

*A.* No, sir.

*Q.* Did any of the staff that worked at Beretta Court tell you that the garage door was broken?

*A.* No, sir. No.

*Q.* Was the garage at Beretta Court ever used? Were cars parked there or anything put in the garage?

*A.* Yeah, cars parked inside. But in the garage, that's where they have the washing machines and the dryer. So it was always -- they were able to go into the garage to do that.

*Q.* Who parked cars in the garage?

*A.* Staff can park their cars in the garage.

*Q.* Was that permitted?

*A.* Yes, sir.

*Q.* And you said there was a washer, dryer in the garage?

*A.* Yes.

*Q.* If the side door to the garage leading outside the house was broken, would you expect the staff to tell you that?

*A.* They would tell me because the -- in the garage, it's a main garage door, and then there is another small door inside the garage that leads outside.

*Q.* Was there ever a time where you had the staff stop parking in the garage?

*A.* I didn't stop -- I don't stop the staff to park in the garage.

*Q.* Was it available for them if they needed to get in the garage?

*A.* Yes.

*Q.* You were telling us earlier about the person at Four J's who distributes the keys to the staff. Do you remember that?

*A.* Sorry?

*Q.* The keys to the house.

*A.* I distribute the keys to the house.

*Q.* Did you give the keys to Beretta Court to the staff who worked there?

*A.* Yes.

*Q.* Who worked at Beretta Court in 2008, what

staff?

*A.* We had, we had, in 2008 we had Chiaka Irondi that worked there.

*Q.* Chiaka Irondi?

*A.* Irondi.

*Q.* Who else?

*A.* We had Amuche.

*Q.* Would that be Ms. Udemezue?

*A.* Ms. Udemezue.

We also had Clara Nwafor. N-W-A-F-O-R. We also had Cherry Hicks, who worked there in 2008. And then we had Chima, Chima Anyanwu also worked in 2008.

*Q.* Can you spell that last name for us too?

*A.* Anyanwu. A-N-Y-A-N-W-U, Anyanwu.

*Q.* When these employees began working at Four J's, did you give them copies of keys to Beretta Court?

*A.* Yes, I did.

*Q.* How many keys were there for Beretta Court?

*A.* When a staff starts working, once we confirm that she gets the schedule, then she will get a key so that she will be able to go to work. So all the staff who worked there had a key.

*Q.* Did you have a set of the keys to Beretta

Court?

*A.* Yes, I do. I have the set of keys.

*Q.* How many keys were needed for this house?

*A.* There would be two keys because the back door had a separate key from the front door.

*Q.* Was there a medicine cabinet in the kitchen?

*A.* Yes, sir.

*Q.* Was that locked or unlocked?

*A.* It's always locked. But the key to that medicine, we leave it in the dresser, in the drawer in the kitchen. But the other keys, the staff will have the other. They didn't have a key to the medicine box. They leave it in the dresser for the staff who uses it.

*Q.* When a new employee came, or an employee came to work at Beretta Court, would you give them a set of two keys, a front and back door?

*A.* Yes, sir.

*Q.* Would you give that to each case staff who worked at the house?

*A.* Each staff will have a key, yes.

*Q.* Were there any other keys to Beretta Court that were kept elsewhere, either on the property or somewhere else?

*MR. SPARKS:* Your Honor, object to

leading.

*THE COURT:* Sustained.

*Q.* (By Mr. Raval) Were any other keys to Beretta Court kept by you or kept elsewhere?

*MR. SPARKS:* Same objection.

*THE COURT:* Overruled.

*A.* Yes. I have my own, I have my own key because I have a bunch of key for the houses. That's where I make copies to give out to the staff.

Then at Beretta Court, because you had the other door, that -- the key is different from the, from the front door, so there is -- at one time, we put the key in case anybody is in a hurry to go through the door but they don't have their own set of key which they go home and come back with. But for the maintenance guy or anybody who come in and don't have a key, we left the key right on there, on the door leading outside.

*Q.* (By Mr. Raval) Was that the key for the back door?

*A.* Yes, sir.

*Q.* Where did you leave that in the house?

*A.* Right on the doorpost, right on the door leading out to the garage.

*Q.* Looking at Exhibit 71, can you show us where

you would have left that key?

*A.* Right here (indicating)?

*Q.* Yes. Can you point to us or direct me where --

*A.* Right on the door leading outside.

*Q.* Are you saying you put it directly on the door?

*A.* Yes, sir. Right on top. On the door leading outside.

*Q.* Was the key in the lock or hanging somewhere above?

*A.* No. It's hanging above. Not in the lock.

*Q.* Did the case staff know the key was there?

*A.* Every staff should know, yes.

*Q.* If one of the case staff lost their keys to Beretta Court, who would they go to for a new set of keys?

*A.* They -- there's a -- the form we fill out for whatever you need, they can fill the form. But it would still come back to me because I will be the one to make the key to give it back to the staff. So they will fill out the form for whatever they need, and they send it to the office or they can even call me and let me know they don't have their key.

*Q.* Did Chiaka Irondi ever fill out a form or

call you and tell you that she didn't have a set of keys to this house?

*A.* I don't remember she ask me -- ask -- told me that she didn't have a key to the house.

*Q.* Did Amuche Udemezue ever call you or fill out a form and let you know that she didn't have a set of keys to this house?

*A.* No, sir. No.

*Q.* If they had asked you for another set of keys to the house, would you give it to them?

*A.* Yes, I will.

*MR. RAVAL:* Your Honor, we pass the witness.

*THE COURT:* Mr. Thweatt?

*MR. THWEATT:* Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. THWEATT:

*Q.* Sir, when you issue keys to employees, do you have them sign something acknowledging that they have received a key?

*A.* No, sir.

*Q.* So we don't have any documentation from Four J's that tells us that you actually did administer the keys like you are saying you did, right?

*A.* No, we don't fill a form.

*Q.* And in your business at Four J's, if it's not documented that means it's not done, right?

*A.* Yeah, we document.

*Q.* If it's not documented, though, that means it's not done, right? Isn't that the standard there at --

*A.* For services given, if we don't document services given, then it's not done.

*Q.* Let me show you Plaintiff's Exhibit Number 37. All right. I am showing you Plaintiff's Exhibit 37, sir.

*A.* Yes.

*Q.* This is the residential staff information. You are familiar with this document, are you not?

*A.* I am familiar.

*Q.* If you look on page 2 of Plaintiff's Exhibit Number 37, in quotes there it says, "If it's not documented, it's not done." Right? That's what that says there, isn't it?

*A.* Yes. All the services given, if it's not documented, then it's not done.

*Q.* All right. And you don't have any documentation that you gave keys to these employees, do you?

*A.* No, I don't, I don't have that.

*Q.* Let me show you Plaintiff's Exhibit Number 82. You said there was no problem with this garage door, right?

*A.* No, there was no problem with it.

*Q.* This is a picture taken by the Houston Fire Department after the fire. I want to focus your attention on the garage door. You see where I am pointing my pen on this picture. This is page 82 out of Plaintiff's Exhibit Number 26. Do you see that piece of wood right there leaning up against the garage? Do you see that?

*A.* Yeah, I see that.

*Q.* Let me show you the bottom picture on page 82 of Plaintiff's Exhibit Number 86. This is another view. Do you see that? This is the same piece of wood, isn't it?

*A.* I don't know if it's wood, but I see what you are showing me. I see it.

*Q.* Yeah. You see the garage frame where the wheels on the garage would normally ride up and down? Do you see that there? Do you see that there, sir, on the picture?

*A.* Yeah, I see it.

*Q.* Do you see how low the garage is hanging in

this picture, as if it were propped up by this wood? Do you see that?

*A.* Yeah, I see what you are showing me.

*Q.* And let's back out. Just look at the garage. I think your testimony was that the staff parked their cars in this garage?

*A.* Yes, sir.

*Q.* You think a staff, on the night of the fire, would have been able to park their car in that garage with all that debris and all those boxes and all those household items in there; that's your testimony?

*A.* Yes. We park cars in there.

*Q.* Let's take a look at another picture from Plaintiff's Exhibit 26. This is page 95 of that exhibit. Kind of a different view. Page 95 of Plaintiff's Exhibit 26, you can also see that piece of wood that's propped up against that garage, can't you? Do you see that?

*A.* I see it. Yes, I see it.

*Q.* Here's another look at it, on Page 95 of Plaintiff's Exhibit Number 26. Do you see that, there?

*A.* Yeah, I see it. I see what you are showing me.

*MR. THWEATT:* Pass the witness.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Just a couple questions, Your Honor.

CROSS-EXAMINATION

BY MR. SPARKS:

*Q.* Mr. Inya, how are you today, sir?

*A.* Fine, thank you.

*Q.* Just a couple questions. You stated that the medicine box key wherein the medicine for all the clients who resided at the Beretta Court was kept in a drawer; is that correct?

*A.* Yes.

*Q.* That wasn't given to the staff members?

*A.* No. The key, it's in the drawer in the kitchen for staff members to use it.

*Q.* So the medicine box key was in a drawer?

*A.* Yes. In a drawer.

*Q.* That wasn't given to the staff members?

*A.* No. They don't go home with it. They don't take it home.

*Q.* So that stayed in the drawer?

*A.* It stays in the drawer, yes.

*Q.* The extra key that you said was to the back door, what secured it?

*A.* What?

*Q.* What secured it?

*A.* What secured it?

*Q.* Yeah. What secured it?

*A.* Oh, it's in a, like a chain, like in a chain.

*Q.* Yes, sir.

*A.* You put it in a chain and then hung up on the door.

*Q.* Okay. So what was the chain hanging on?

*A.* It is a nail.

*Q.* A nail?

*A.* A nail on top of the door, right on top where, you know, they can reach it.

*Q.* Okay. Let me ask you probably a real obvious question. Why didn't you have the front door and the back door being on the same key?

*A.* No, the staff have their own. Because I have mine, the staff who work there had their own. But I put it there in case a maintenance guy, someone goes in there when there is no staff in the house, so they can have access to go to the yard.

*Q.* That I understand. But how come your front door key is not the same as your back door key? Why did you have separate keys?

*A.* That's how we had the door, they had two different keys.

*Q.* So at all the properties that you supervise, if you have to go into the front door you use one key, to go out the back door you have to use another key?

*A.* Yes. Most of them are like that.

*Q.* Most of them are like that?

*A.* Yes, sir.

*Q.* How many of them have deadbolt locks?

*A.* Right now, we don't have.

*Q.* No, no, not right now. I'm sorry. Let me rephrase my question.

*A.* Yes.

*Q.* 2008, how many had deadbolt locks?

*A.* I know Beretta Court had it. There were two other houses that had deadbolt.

*Q.* What were their addresses?

*A.* There was one on, at 16214 Sierra Grande.

*Q.* Sierra Grande?

*A.* Yes.

*Q.* Okay.

*A.* And 16014 Sierra Grande.

*Q.* And those properties, did they have individuals there who were wheelchair bound?

*A.* There is 16014, yes, sir, there is.

*Q.* Okay. So in addition to Beretta Court, you guys had another property that you had an individual there who was in a wheelchair and you also had a deadbolt lock on it, correct?

*A.* Yes.

*MR. SPARKS:* Pass the witness, Judge.

*THE COURT:* Mr. Raval?

*MR. RAVAL:* Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. RAVAL:

*Q.* Mr. Ogbonna, you were asked a question about if Four J's doesn't document it, it's not done. Is that correct?

*A.* Yes.

*Q.* What does that refer to?

*A.* The services given. All the services, like hygiene, giving the hygiene, feeding, assisting with medication and all the cleaning of the items. If you do not document that those were given, then we consider that you didn't do it.

*Q.* Is providing keys to staff a service?

*A.* No, sir. It's not a service. It's just what we give to staff so they will be able to go to work when they are supposed to be there.

*MR. RAVAL:* Pass the witness.

*THE COURT:* Mr. Thweatt.

RECROSS-EXAMINATION

BY MR. THWEATT:

*Q.* Let me make sure I understand where this key you say was on the door. You said there was a key to the back door in the Beretta Court house. Where exactly was it?

*A.* Right on top, the doorpost.

*Q.* And there was a nail, you said it hung down?

*A.* Yes. Just little chain that you put up there.

*Q.* There was a chain?

*A.* Yes, sir.

*Q.* Okay. Let me show you Page 70 of Plaintiff's Exhibit Number 26. Is that the back door you are talking about, at the Beretta Court house?

*A.* I don't remember it very well. But if this is Beretta Court, there is only one back door from the living room.

*Q.* Are you saying that there was a chain that may have been hanging in some other house, other than the Beretta Court house?

*A.* No.

*Q.* Is that what you are saying?

*A.* No. What I am saying, at Beretta Court we put the key because the, because the door has a deadbolt.

*Q.* Right.

*A.* But other houses we have, we don't have deadbolt.

*Q.* At the Beretta Court house, you said -- there was a house on Beretta Court.

*A.* Right.

*Q.* The house on Beretta Court, you said that there was a key attached to a chain that hung down, right?

*A.* Yes.

*Q.* Is this the door, looking at page 70 of Plaintiff's Exhibit Number 26?

*A.* Yes.

*Q.* Is that the door that's in the back of the Beretta Court Home?

*A.* Yes.

*Q.* Can you see a chain there?

*A.* No. It would be right up on the doorpost, right up on the door. Not halfway.

*Q.* Let me show you another picture. Page 69 of Plaintiff's Exhibit Number 26. Do you see any chains hanging down, holding a key on it, on this picture?

Can you see a chain there, sir?

*A.* I am not seeing it.

*Q.* We see a chain right here, what you use to lock the door with, right?

*A.* No, not that one.

*Q.* Yeah.

*A.* But this chain is not halfway on the door. It's all the way up.

*Q.* How long was the chain?

*A.* The chain was there until we had the incident of one of the clients trying to use it to get out of the house. So we put it also in the drawer.

*Q.* Well, was the chain there on September 4, 2008?

*A.* The chain would be at that or in the drawer, so that it was where the staff would know where to find it.

*Q.* So you don't know whether there was a chain there or not on September 4, 2008. Is that what you are saying?

*A.* I'm talking about the key. The key was there so if we have someone coming to do a job in the yard, so they will have access to go the yard.

*Q.* Well, you initially said it was on top of

the door.

*A.* Yes.

*Q.* And now you are saying it was in the drawer, right?

*A.* No. It was -- they always had it on top of the door or in the drawer. So staff know where to find it.

*Q.* They can't always have it in two places at the same time, can they? It's either got to be on top of the door or inside of a drawer in the house, right?

*A.* Yes.

*Q.* Which was it?

*A.* It would be on top of the door or in the drawer, where staff will know where to find it.

*Q.* If they had it at all, right?

*A.* They all had their own key. This was an extra key.

*Q.* Of course, there is no documentation that they were ever issues this key, is there?

*A.* It wasn't like -- we didn't ask them to pay for the keys. It was just to give them so they will be able to go in and out of the house.

*Q.* There is no documentation of you ever giving any of these caregivers in the house a key, is there?

*A.* We didn't make documentation. We don't sign for the key. Just for them to be able to go in and be able to do their work.

*Q.* And if it's not documented, it's not done, is it?

*A.* For the services, sir.

*Q.* Right.

*MR. THWEATT:* Pass the witness.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Just briefly, Judge.

RECROSS-EXAMINATION

BY MR. SPARKS:

*Q.* Sir, isn't it true that the reason why the deadbolt lock was put there was to keep Esperanza Arzola in the house because she was eloping and becoming a problem?

*A.* That was one of the reasons.

*Q.* That was one of the reasons?

And that's the same person that was also getting access to the key that you said was hanging on a nail above the door that had the chain on it? Was she the person you were talking about when you told the jury that it might have been moved to the drawer because she had access to that too?

*A.* We try not to let her get out of the house.

*Q.* She was an elopement problem, right?

*A.* Yes.

*Q.* That was one of the reasons you put the deadbolt on there, right?

*A.* That was the reason why we had the deadbolt and we left it.

*Q.* My last question to you, sir, was this: Were you aware of whether or not Jenny Wagner or Tanya James could have had access to that key to get out the door, if they needed to, in an emergency?

*A.* I don't know if Tanya would use the key to go. She never tried it, so we never had any record of that with Tanya.

*Q.* Same about Jenny, right?

*A.* No. Jenny, yeah.

*Q.* So either one of those persons getting out that door in the case of emergency was not a concern to you when you put that deadbolt on there, was it?

*A.* No, because --

*Q.* Your only concern was to keep Esperanza in?

*A.* With the staff trained, we expected -- you know, we were sure that the staff would be able to have access. We didn't expect Jenny to elope through the door --

*MR. THWEATT:* Pass the witness.

*THE COURT:* Let him finish his answer.

*MR. THWEATT:* I'm sorry.

*THE COURT:* Are you finished?

*A.* We didn't expect Jenny to get out through the door.

*MR. SPARKS:* Pass the witness.

*THE COURT:* Mr. Raval.

*MR. RAVAL:* Pass the witness, Your Honor.

*THE COURT:* Any reason this witness cannot be excused?

*MR. RAVAL:* No, your Honor.

*MR. THWEATT:* No, Your Honor.

*MR. SPARKS:* No, Your Honor.

*THE COURT:* Thank you for your time, sir. You are excused.

*(The witness was excused.)*

*THE COURT:* Call your next witness.

*MR. PLUMMER:* Your Honor, at this time we would call Ms. Anthonia Uduma.

*THE COURT:* Ms. Uduma, you are still under oath. Have a seat, please.

*THE WITNESS:* Thank you.

*THE COURT:* You may proceed.

*MR. PLUMMER:* Thank you, Your Honor.

ANTHONIA UDUMA,

having been previously placed under oath, testified as follows:

DIRECT EXAMINATION

BY MR. PLUMMER:

*Q.* Ms. Uduma, you testified yesterday. I want to follow up on that today. Do you understand that?

*A.* Yes.

*Q.* If you would, and your voice is awfully soft, if you would talk into the microphone, I would appreciate it, okay?

*A.* Yes, sir.

*Q.* Tell us a little about your educational background.

*A.* I have degree in accounting, which is undergraduate degree, and I have master's degree in accounting also.

*Q.* Where did you get your undergraduate degree, and where did you get your master's degree?

*A.* Texas Southern University.

*Q.* When?

*A.* I graduated my -- under my first degree, 1986, May 1986.

*Q.* Okay. And --

*A.* And my master's degree, I believe it was May

1994.

*Q.* Okay. Now did you work during college when you were at Texas Southern, or did you just go straight through school?

*A.* I went straight through the school for my undergraduate. But I worked for my master's degree.

*Q.* What kind of work did you do at that time?

*A.* I was a social worker with the Texas Department of Human Services.

*Q.* After you graduated with your master's degree, what kind of employment did you undertake?

*A.* I took the social service -- it was called eligibility specialist, so social service work.

*Q.* Social services what?

*A.* Eligibility specialist is what it was called by the Texas Department of Human Services.

*Q.* Okay. The title of the position was Social Service Eligibility --

*A.* Specialist.

*Q.* Specialist.

*A.* Yes.

*Q.* And what did you do in that position?

*A.* We determined the eligibility of the people for AFDC, food stamp and Medicaid.

*Q.* Okay. And you did that for how long in that

position?

*A.* I did, I did that job for two years. And then got a promotion to Eligibility Specialist Two. Did that one for two years, and then became a Social Service Supervisor in the same department.

*Q.* Now, when you had those three positions, up to supervisor, did the department you had have a host of regulations that you had to follow in doing your eligibility work for potential clients?

*A.* Yes. When I was working with the State, I learn that for you to keep your job you have to follow every steps of the rules and regulations.

*Q.* Okay.

*A.* Even in making determination on who is eligible for Medicaid, who is eligible for food stamp and who is eligible for AFDC. You have to follow the rules and regulations.

*Q.* And the guidelines?

*A.* And the guidelines, because the State will make sure that you follow it.

*Q.* Okay. After you became a Social Service Eligibility Supervisor, did you continue working with the State of Texas?

*A.* Yes. I was there for nine and a half years.

*Q.* Okay. And what were the other positions

that you had?

*A.* I was Acting Program Director.

*Q.* Okay. For what program?

*A.* For the same program.

*Q.* For the same department?

*A.* For the same department.

*Q.* Okay. When did you leave that employment?

*A.* I left that employment in May 1997.

*Q.* Okay. Is that when you started Four J's?

*A.* That's when I started Four J's.

*Q.* And is it fair to say that since that time up to the present you have operated and run Four J's Community Service Center as its Chief Executive Officer and as its Program Director? Is that right?

*A.* That's correct.

*Q.* Okay. If you would, Ms. Uduma, tell us what the responsibilities are of the Program Director for Four J's.

*A.* One of the -- well, we have different responsibilities. And some of them, we are making sure that the employees are trained, making sure that the agency complies with all the rules and regulations, which is called Community-based Standard by Texas Department -- it was then Texas Department of Mental Health and Mental Retardation. So part of

my job was to make sure that we comply with every rule. And then to make sure that when the State comes out to do an audit, that we have every document to present to them, because we have audit once a year that the State come and review the whole program. They go to the houses to make sure the houses are -- meet the health and safety of the clients. So they come to the office and review the documents, they interview employees.

And one of my job was to make sure -- part of the reason why I get involved in training is, when they go to the houses and they interview the staff, if the staff by any means did not answer questions regarding -- relating to every client, we get cited, which could lead to termination of contract. So to make sure that things are done, I usually have every other week meetings with the case managers and --

*Q.* Slow down a second. I didn't follow. You usually have what, now?

*A.* To make sure that we following all the rules and regulations, we have monthly meetings with all the employees where I give them in-services myself. The psychologist will do their own, the case managers will do their own. Different people will come in and

do it. Then --

*Q.* Before we go beyond that, let me understand this in-service, this monthly in-service. You say the psychologist comes in and does part of the in-service; is that right?

*A.* That's correct.

*Q.* And what is the psychologist's role in that regard, and what is he trying to do with your staff when that happens?

*A.* Well, we contract the psychologist to come and look at the, the documents of every client. The case managers give the documents to the psychologist. And the role of the psychologist is to train the staff to prevent any incident that would lead to that behavior as listed on the behavior therapy plan.

*Q.* Okay. So if you have a client who has -- who is bipolar and schizophrenic, are you saying that the psychologist's role is to train the staff as to how to deal with a, a client of that sort?

*A.* That's correct. And part of all the responsibility that I usually do is have an advisory committee meeting. That one, I host that one. That's part of the requirement by the State of Texas. Where we invite all the guardians, all the family members, including the clients, to have a meeting.

And in that meeting, they will tell us where we are lacking, if there is anything the agency is lacking. And then in that meeting, we look at the staffing, we look at the personnel record, we look at abuse and neglect. We look to see where there has been any complaints, any consumer right complaints. We discuss it, and then we staff it. We decide what we need to do to prevent this from ever happening again, if there is any problem. We give the families option to let us know if there is any area we need to improve.

*Q.* Okay. And in addition to the psychologist, do you have other professionals who also attend the in-services periodically to talk about other issues?

*A.* Yes.

*Q.* What kind of other professionals do you have coming in?

*A.* I have -- I invite them, I personally invite them, if I am -- we work with the City of Houston that comes almost every -- twice a year to do the actual fire drill using the fake fire. We also invite the people --

*Q.* Let me stop you on that. Did you do this before and including in 2008?

*A.* Yes, I did.

*Q.* Okay.

*A.* And we invited the Adult Protective Services to come and train the staff, this was just once a year, to train them on how to prevent abuse and negligence, to make them aware what is considered physical abuse, verbal abuse, neglect and exploitation.

*Q.* Okay. Physical abuse, verbal abuse, negligence and exploitation, are those terms that are used within the guidelines that outline the rights of the individual clients?

*A.* That's correct. Because when the State comes to do our annual audit, they are going to require me to produce all these documents.

*Q.* Okay. And verbal abuse is prohibited; is that correct?

*A.* Yes.

*Q.* Obviously, physical abuse is prohibited?

*A.* Yes.

*Q.* And that's all part of the rights of the client; is that correct?

*A.* That's correct.

*Q.* If you would, describe for us generally the rights of the client within the context of this program, the CR -- the HCS program.

*A.* It has the rights in that standard.

*Q.* Okay.

*A.* So they have the right to live in a safe and secure environment. They have the right to choose and transfer to another provider if they are not happy with the agency. They have the right to be treated like normal human being.

*Q.* Even if they have disabilities?

*A.* Even if they have disability. Back then, they had what they call age appropriate. Even if the client is profound, they still will not allow you to put something like a bib or something that would make it look like a child. They are still considered an adult, and you still have to go by that rights. And when they come to review the audit for the year, they have to go down all the list to make sure we did not violate any of their rights.

*Q.* Okay. What about personal rights, like the right to be free from intrusions, personal intrusions?

*A.* Yes.

*Q.* Okay. Explain that to us.

*A.* That standard, practically said that the house where they belong, the reason why they left institution is to come in the community and be

normalized --

*Q.* Okay.

*A.* -- and part of their right --

*Q.* Let me stop you a second.

*A.* Okay.

*Q.* You said the reason why they left an institution. What do you mean? What kind of institution?

*A.* Most of them came from state -- it used to be state schools. But now the name is state supported living centers. So when they live there for so many years, the IDT members would decide which client have managed their behaviors appropriately, which client have not had any episode of behaviors. And then they will recommend that client to receive a slot because they have to receive a slot in order to come to the community. They will recommend it to DADS. When their name comes up, they will staff it and review it to make sure that the client have not had any episode of behaviors. It will just state in their history. Then they will recommend the client for placement.

After that, the team from the state school will come and look at the houses. They will visit different providers. They will interview the

case managers. They will look at the other clients that live in the house. Then they will determine whether this client is suitable for that house.

*Q.* Okay. All right. So that's part of the process that's gone through before a client gets placed in a particular house?

*A.* That's correct. And once a client choose a company, it's a zero reject.

*Q.* You mean -- when you say zero reject, you mean you all can't say no to a particular client?

*A.* We cannot say no. Otherwise, we will lose the contract.

*Q.* That's part of the agreement you have --

*A.* Yes.

*Q.* -- with the --

*A.* It's in the standard. Yes.

*Q.* Okay. Now, the in-service -- you mentioned you had a fire marshal come, a Houston fire marshal, come on a semi-annual basis to in-service your staff on fire safety; is that right?

*A.* That's correct.

*Q.* And you did this 2008 and before; is that correct?

*A.* That's correct.

*Q.* And I think you started to say something

about a simulated fire. Would you tell us about that circumstance and how that was addressed?

*A.* Okay. Before I go into that, I just want you to know that the standard requires six fire drills in a year. But Four J's did twelve.

*Q.* That's six fire drills in a year per residence?

*A.* Per residence.

*Q.* And you all did twelve?

*A.* Twelve. And even in some instance, we did more than 12 because if a new employee comes in, that new employee will have to go through the fire drill.

*Q.* Okay. Tell us about the in-service with the fire marshal.

*A.* What happened when we had fire marshal to come in, in one of the in-services, he brought us a bunch of posters that he give us to take and put in our group homes. And he train the staff how to use fire extinguisher, and he train them on different types of fire. I can't remember all of them.

*Q.* You mean things like grease fires versus electrical fires --

*A.* Yes, yes. And which one you can use the fire extinguisher and which one you cannot use it. And then he use a trash can to make a fake fire in

one of the trainings, and show them how to point the fire extinguisher.

Every year we have to bring all the fire extinguishers from the group home and take it to a company that will check them to make sure that they are -- because when the State comes for audit, they have to make sure that the fire extinguisher is full.

*Q.* Do you recall whether Amuche ever attended one of those sessions where the fire marshal was there?

*A.* Amuche was one of the employees that never missed any training. She was there. She was a good employee. I mean, she did what we told her to do.

*Q.* Okay. Okay. So she attended all the trainings and all the training sessions?

*A.* She did.

*Q.* Tell us about the fire drills. What is your understanding of what you had in place for fire drills at the residences?

*A.* The way we had it set up is, each month, they come to the office for the in-service. We discuss about the fire drill. We discuss about the special needs. The case managers will come and talk about the emergency evacuation plan. Every month we will do that.

Then the supervisors will go to the houses, even as late as 12:00 midnight, to observe the staff to do it, because they do it with the staff to make sure that it is done right. Because the reason that we did that or I set it that way, when the State walks into the house, what they usually do, they will push the smoke alarm and see the reaction of the clients. If they don't run, it means it was never done. But in most cases, they will push it and the clients in the house will start running. So they don't just look at the paper. They have to go and observe it and interview the clients and the staff.

*Q.* And this was done across the board for all group homes?

*A.* Yes. That's part of the requirement.

*Q.* Including Beretta Court?

*A.* Yes, sir.

*Q.* And it was documented; is that correct?

*A.* It was documented.

*Q.* Okay. What other training were provided to staff members about other procedures, dietary procedures, handling clients with different kinds of health needs?

*A.* Well, when an employee is hired, I have, I got a seven set of videos where the employee will

have to go through that orientation. In those set of videos, it is included how to talk to people with mental retardation, how to transfer them --

*Q.* When you say transfer them, what do you mean?

*A.* How to -- for those that are wheelchair bound, how to lift them up from bed to wheelchair or wheelchair to bed.

*Q.* Okay.

*A.* How to -- it talked about how to bathe them.

*Q.* How to bathe them?

*A.* Yes. Bathe them. How to take their -- I mean, personal care. It's different topics. I'm sorry. I can't remember all the topics. But they have to go through that section and watch the videos.

The reason we did that, by the time they finish watching the videos, they already have idea what to do. Then they go to the case managers after they have been assigned, and then they will reemphasize what they have seen in the videos.

*Q.* You mean they go to the home or the case manager at the home where they will be working, or is this at the main office?

*A.* What they usually do, when they hire them and they go through all that videos, and the

supervisor of the personnel talk to them to make sure that they are knowledgeable, then the supervisor of personnel will call the supervisor, the residential supervisor, to tell them this person is ready.

Then the residential supervisor, which is Inya, will meet with them and assign them a schedule and take them to the house. And then they will come back to the office for, for the mention -- it's about not usually done in one day. They will come back to continue their in-services.

Then after the in-services with the case managers, they will then go back again to the house to shadow with another tenured staff for two days.

*Q.* To shadow with another staff?

*A.* Yes. For two days.

*Q.* The purpose of that is to, to have the other staff orient them for that particular house and those particular clients. Is that fair statement?

*A.* That's correct, sir.

*Q.* Okay.

*A.* In those two days, the staff -- the supervisor will meet them there to observe the new staff through fire drills, practice the emergency evacuation plan, sit with the new staff to train them on the paperwork, on how to do everything.

Then sometimes when they are new when they do fire drill, it would take them longer than three minutes. But we make them keep redoing it so that they will get comfortable on how to evacuate clients in case of any emergency.

*Q.* In a shorter period of time?

*A.* Yes.

*Q.* Now, tell me and tell the jury a little bit about the philosophy the HCS Program as it pertains to the disabled.

*A.* The philosophy behind it is just to allow -- give them the opportunity to come to the community and live as normal, normal, regular people.

*Q.* As much as possible?

*A.* As much as possible. And in the community, they don't even allow the provider to hang, like, posters or paperwork, because they don't want it look like an institution.

So way back then, the clients are the one that -- I mean, the State requires the company to make sure that all the training in-services are done. And the reason is this: Even before the client comes, the company will rent a house. They will rent a house not knowing which client going to go there. And the intention of renting the house is to give the IDT

members different options of different houses to choose.

*Q.* Okay. Now, you said that the regulations don't permit posting a lot of signs in the house, and that's to make it, I think I understood you to say, make it -- make it look less like an institutional setting.

*A.* That is correct.

*Q.* Is it fair to say -- and I noticed on one of the exhibits that were posted up, it says, "Whose house is this?" What is meant by that question, "Whose house is this?"

*A.* The "Whose house is this," you may not find it with another provider. It was a documentation that one of my case managers designed to just help her train the staff to understand this is the client's house. You don't go there and force them to do anything because nobody will come to your house to force you to do anything.

*Q.* So you want to make it as much like their home as humanly possible?

*A.* That's, that's what it is.

*Q.* Okay. It's not a prison or anything of that sort; is that correct?

*A.* No. It's their house.

*Q.* Okay.
*A.* Yes.
*Q.* How do you -- how did you train the staff to deal with conflicts among residents? How is that dealt with?
*A.* If there is any conflict between any of the clients, they usually will report it to the case managers, who will call IDT meeting.
*Q.* Who would call what?
*A.* The IDT -- the case manager will call IDT meeting.
*Q.* The IDT is the Interdisciplinary Team meeting?
*A.* Yes. They make all the decisions. And part of the reason they don't allow program directors to be a member is to avoid them influencing the team's decision. So we not allowed to even participate in that meeting.
*Q.* Okay.
*A.* So --
*Q.* And if there is a conflict, is that the type of thing that's documented somewhere?
*A.* Yes.
*Q.* Okay.
*A.* If there is a conflict, the direct staff

will do an incident report to let the case manager know there was a problem here. Then the case manager will staff it to see how they are going to handle it. Do they need to move the client to a different house, or the psychologist will get involved if it's a client with behavior therapy plan. And the psychologist will be the one to make that determination whether they need to address that or not.

*Q.* That's where that determination comes from about staffing and how many staff; is that correct?

*A.* Yes, sir.

*Q.* It's part of that Interdisciplinary Team evaluation; is that correct?

*A.* That's correct.

*Q.* Okay. And if the psychologist or the team determines that there needs to be two people in a particular group home, that's what is done. Is that a fair statement?

*A.* That's correct. Also, that determination will be made either by the state school or by MHMR before they place the client.

*Q.* Okay. Let me understand this. MHMR or the state school has already done an evaluation of the client; is that correct?

*A.* That's correct.

*Q.* And before they place a client in a particular group home, they have already determined what the required level of staffing is. Is that what you are telling us?

*A.* That's correct. And state school will not release a client who still have behaviors going on. So they will release them only if it becomes a history, maybe they haven't had any episode for about two years or three years or longer than that.

*Q.* Okay. When you say they won't release anybody who has behaviors going on, you don't mean that the client has been cured of their bipolar disease or their schizophrenia, do you?

*A.* No. That's not what I mean. What I mean is that they have tried with different medications and the behavior therapy plan, they have kind of controlled and it is working with the client. That's what I mean.

*Q.* If there were an incident at the Beretta Court house where any of the clients harmed any other client, was that the kind of thing that had to be documented?

*A.* Oh, yes.

*Q.* Was that the kind of thing that would have

been conferenced and addressed?

*A.* Yes. And the staff would have notified the psychologist because, on the behavior therapy plan, it gives you listed how to deal with any aggression. But the staff supposed to call the psychologist to let the psychologist know what happened.

*Q.* So it's not a matter of just writing out a note and turning in a form, the staff is supposed to pick up the phone and call the psychologist. Is that what you are saying?

*A.* Yes, sir. If you look at the behavior therapy plan, it gives you steps to go.

*Q.* Okay.

*A.* The final step, you call the psychologist. And the case manager and the supervisors.

*Q.* Would that also apply to health issues and the nurse?

*A.* If there is any health -- the way the program standard goes, if there is any health issues they have to notify the nurse first --

*Q.* Okay.

*A.* -- before the case manager. And if it's a life-threatening, they are trained to call 911. And then when they have the opportunity to call the nurse, they will call the nurse and then notify the

case manager, because the case manager is the one that is going to notify the parents or the guardians.

*Q.* Okay. In 2007 and 2008, was there ever any report of conflicts between the clients at Beretta Court?

*A.* No. They did not have any conflict.

*Q.* Was there ever any report of any aggression by one client against any other client in that house?

*A.* No.

*Q.* Any reports of aggression toward Jenny Wagner?

*A.* No.

*Q.* Any reports of aggression toward Tanya James?

*A.* No.

*Q.* Any reports of conflicts between Elisha Campbell and Esperanza Arzola?

*A.* No.

*Q.* Okay. Were there any reports out of Beretta Court by the staff of any assaults or conflicts between Amuche and any of the clients?

*A.* No.

*Q.* So when Jenny Wagner -- Jenny Wagner has been at Beretta Court since 2002; is that correct?

*A.* That's correct.

*Q.* Okay. And Esperanza, do you recall when Esperanza Arzola started staying at Beretta Court, approximately?

*A.* I believe it was in 2008 or so.

*Q.* Okay. And when did Amuche start working at Beretta Court, do you recall?

*A.* From what I was told, she started working there in 2007.

*Q.* Okay. And what about the other case -- the caregivers at Beretta Court, who were they?

*A.* You had Christina Olachi also that worked there.

*Q.* Okay.

*A.* Because the time with HCS is employees --

*Q.* I'm sorry. I didn't understand all that. What now?

*A.* The issue with HCS, sometimes --

*Q.* Who is ACS?

*A.* Home and Community-based Services.

*Q.* HCS. Okay.

*A.* Employees come and go. If their school schedule conflicts with their schedule, sometimes they quit to concentrate on their schoolwork.

*Q.* Okay.

*A.* If we don't have any other schedule for

them.

*Q.* Okay. So Amuche. And who was the other person?

*A.* Amuche was there. Clara was there. Christina. Cherry Hicks. Ethyl was there.

*Q.* Now this was a 24-hour care home; is that correct?

*A.* Yes.

*Q.* So that meant there was a staff person there with the clients at all times; is that correct?

*A.* That's correct.

*Q.* And each client had a folder that set out the individual emergency plan, the individual care plan for each of those clients; is that correct?

*A.* That's correct.

*Q.* And those folders and those plans were put together by a team effort. Is that a fair statement?

*A.* That's correct.

*Q.* One of -- in the emergency plan, one of the aspects of the emergency plan talks about evacuating in an emergency and not leaving the particular client alone. Do you remember that?

*A.* That's correct.

*Q.* Okay. Practically speaking, if you evacuate somebody like Jenny and take them out and there are

other clients in the home, is it practical to leave her momentarily to make sure the others are out before returning to Jenny?

*A.* It could be the wording. What that means is, after you finish evacuating everybody, make sure you keep your eyes on them, do not leave them unattended.

*Q.* Okay.

*A.* That's what it's supposed to mean.

*Q.* And what was the priority, in the event of an emergency, for the staff to address the clients? What were the priorities there?

*A.* When I give the training, what I usually tell the staff is, the person who is wheelchair bound have to be the first person to be evacuated. But it all depends on the location of the fire.

*Q.* Okay.

*A.* That's what I usually tell them. The person who is closer to the location of the fire needs to be evacuated first. Then you go after the other ones.

*Q.* Any priority when you go after the other ones?

*A.* It would be the person who is wheelchair bound.

*Q.* When you say wheelchair bound, you mean the

person who is least able to get out themselves?

*A.* Yes, sir.

*Q.* And in Beretta Court, that would have been Jenny?

*A.* That would have been Jenny.

*Q.* September 4, 2008, the fire happened at Beretta Court, right?

*A.* That's correct.

*Q.* And you were notified that night; is that correct?

*A.* That's true.

*Q.* And did you go to the hospital?

*A.* That night?

*Q.* Either that night or later.

*A.* The first thing in the morning, I went to the hospital.

*Q.* Okay.

*A.* Yes.

*Q.* I think the testimony is that Jenny was in the hospital for approximately a month and that Tanya died the next day. Were you there during that period of time?

*A.* When they notified me of the fire, it was at night. And it was -- the way I was notified was, there was a fire at Beretta Court house. I said what

do you mean? They said, there is fire at Beretta Court house. I said how? I believe -- I don't know if it was Inya that called me. I said, I don't know, I am rushing over there. I am rushing over there. And then I got another phone call from Kingsley. He said, there is fire --

*MR. THWEATT:* Objection, hearsay.

*THE COURT:* Sustained.

*Q.* (By Mr. Plummer) Let me ask it another way. You sent your husband over there that night?

*A.* They called me and they called him.

*Q.* Okay.

*A.* When they called me, (pause) my whole body was just shaking. I was in shock. But because this is something that you don't really anticipate. You never imagine, the way we structure the group homes and the way we make sure that there is no fire hazard, the way we give them everything possible, the way we maintain every equipment there, it is just something that you can never imagine that would have happened.

*Q.* Okay.

*A.* And I was just confused. I didn't know what to do.

*Q.* And, and did you get reports from your

people throughout the evening?

*A.* Yes.

*Q.* When did you go to the hospital?

*A.* That night, I wanted to go, me and Ngozi wanted to go -- because Ngozi stay with me, and we just cried and cried and cried when we got the report that Jenny was burned and Tanya was burned. We just cried and cried. My whole body was shaking. I didn't even know what to do. I was so confused. I cry. I want to go there, but I was just shaking. I had to go back. And we stayed on the phone. I tried to call Jenny's mother.

*Q.* You tried to call Jenny's mother?

*A.* I told Ngozi to call Jenny's mom because I could not call her. Ngozi did and left a message. That morning, she called again. The next morning, my friend came because I still couldn't drive.

*Q.* Okay.

*A.* My friend came and took me to the hospital. We went there. I met with Jenny's mom. She came to the hospital. So we cry. We were praying. Everybody got around.

*Q.* Is it fair to say that everybody was upset?

*A.* I was very angry, very upset. And we were just upset and just could not imagine what could --

why something like that would have happened.

*Q.* Now, after this event, was there a time when you tried to determine what had happened?

*A.* Yes. I was at the hospital all morning, all day. I came back to the office. I told them to call Amuche. So Amuche came. I asked Amuche what happened.

*MR. THWEATT:* Objection, hearsay.

*THE COURT:* Sustained.

*Q.* (By Mr. Plummer) Did you make an effort to determine what happened, yes or no?

*A.* Yes, I did.

*Q.* And did you determine how the fire got started?

*A.* Yes.

*Q.* Okay. And how did the fire get started?

*MR. THWEATT:* Objection, foundation.

*THE COURT:* Sustained.

*Q.* (By Mr. Plummer) Did you, did you go forward in -- was there a procedure that was followed under DADS rules --

*A.* Yes.

*Q.* -- that put a limit on what kind of an investigation you could undertake?

*A.* Yes, sir.

*Q.* And what was that procedure?

*A.* That procedure is, if there is an emergency or an incident and Adult Protective Services has been called --

*Q.* Okay.

*A.* -- the Program Director at that time must step aside.

*Q.* And that's you?

*A.* And that's me.

*Q.* So that means that you are not to be involved in any particular investigation?

*A.* No, not at all.

*Q.* Do you know what the reason for that rule is?

*A.* Because they don't want you to go and influence the employees or to tell the employees what to say, what to do. So I abide by all the rules, so I just stayed away.

*Q.* Okay. Now, do they also gather all your records at that point in time?

*MR. THWEATT:* Objection, Your Honor. May we approach.

*THE COURT:* What's the grounds of your objection?

*MR. THWEATT:* Relevance.

*THE COURT:* Yes. Come on up.

*(Bench discussion.)*

*MR. THWEATT:* Your Honor, we have a limine point on this investigation, and it was sustained. And we are getting very, very close to talking about this investigation within the confines of that limine order that we asked the Court to issue.

*THE COURT:* Response, Mr. Plummer?

*MR. PLUMMER:* I'm not going any further than where I have been already. I just want to make sure that the evidence shows that the records were retained, preserved intact and not changed.

*THE COURT:* What's the point of making that point in the record?

*MR. PLUMMER:* Because some of the records in evidence are from that investigation.

*THE COURT:* But why do you need to show the jury that records were obtained and intact during that process?

*MR. PLUMMER:* Because I think it's important they understand the integrity of the records that they will be looking at.

*THE COURT:* All right. Move on.

*MR. PLUMMER:* Okay.

*(Open court.)*

*Q.* (By Mr. Plummer) If you would, Ms. Uduma, tell me all of the fire safety features there were in Beretta Court immediately before September 4, 2008.

*A.* One of the things that I did --

*Q.* No, no, no. Tell me what the fire safety features were.

*A.* We had the smoke detectors --

*Q.* Okay.

*A.* -- in the houses. We had the exit doors.

*Q.* The exit doors?

*A.* Exit doors.

*Q.* Uh-huh.

*A.* And also, in those windows, we made sure it is a sliding window where you can slide up and then you can go through it. And in Jenny's room, she had one. In Tanya's room and Esperanza's room and Elisha's room, they all had those sliding windows.

*Q.* Why was that, what does that relate -- how does that relate to fire safety?

*A.* Because the staff were trained, if there is a fire where you can't get through any of the doors, pull the window up and drag the client through the window.

*Q.* Any others?

*A.* There were fire extinguishers.

*Q.* Okay.

*A.* There were also additional smoke detectors in each room and in the living room and in the kitchen.

*Q.* Okay.

*A.* And we also made sure that the staff were trained. And then before the, before the installation of the, of the smoke alarm, we did, we pulled that portion of the standard, the requirement by Department of Aging and Disability that we give to the alarm company to review with, so they came to us and tell us -- they went to the City also. I believe they use NPF 101 --

*Q.* Let me stop you a second, and let me see if I can understand this.

You said you got the state regulations and you gave it to the fire alarm people. Right?

*A.* Yes, sir.

*Q.* And that's -- that was the OMNI group that we heard testimony about earlier, right?

*A.* Yes, sir.

*Q.* And you said you want to fully comply with those regulations; is that correct?

*A.* That's correct.

*Q.* Then they come back to the home and make

installations consistent with those requirements. Is that a fair statement?

*A.* They came back with the diagram or with everything that we need. And then they, they give me the price. I paid. So -- and also they had to go file it with the City Fire Marshal, who came to the house to go through every door. Before then, we made sure that we had a hardcore doors. We replace all the doors.

*Q.* Okay. Wait. Before then, you did have hardcore doors or didn't have hardcore doors?

*A.* When Four J's lease the house, we change all the doors to hardcore doors --

*Q.* Okay.

*A.* -- with hinges that will slide it open and -- when you open, it will slide closed. So we replace all the doors in the house and put all that in place.

*Q.* Okay.

*A.* The fire marshal, when the fire marshal came in, they went through every door to make sure that those doors were working properly.

*Q.* Okay. What about fire inspections and fire marshal inspections for Beretta Court, how often were those done and by whom were those done?

*A.* Those were done by OMNI Alarm. So when it's time for inspection, they usually will call me or call Inya to let them in.

*Q.* Okay.

*A.* So Inya sometimes will leave the key or keys under the carpet or will just open the door.

*Q.* And let the -- was this fire inspection people or fire marshal?

*A.* No. Fire inspection people.

*Q.* Okay.

*A.* So but the fire marshal, I took the fire marshal, the state fire marshal that comes once a year to do the inspection.

*Q.* Okay. In 19- -- excuse me. In 2007 and 2008, did the fire marshal do an inspection of Beretta Court?

*A.* Yes.

*Q.* And did the fire marshal identify any deficiencies from a fire safety standpoint for Beretta Court in any of those inspections?

*A.* No, sir.

*Q.* You have heard testimony and questions by, by counsel about not having sprinklers in the, in Beretta Court. Do you remember that testimony?

*A.* Yes, sir.

*Q.* Tell us why you didn't have sprinklers in Beretta Court.

*A.* Part of my job, when turning the house into four beds, that's the only time you are required to put the smoke detectors. Part of my job, what we usually do with the case managers is to complete what the City of Houston call E score.

*Q.* Call what?

*A.* E score. E and score.

*Q.* Okay.

*A.* So and in that E score, you list the client's name, and it gives you series of questions whether the client would be able to evacuation promptly. So you answer those questions. So when you answer those questions, you submit those forms with the questions and answer to DADS, Department of Aging and Disability. They review it, and they determine whether you need sprinkler system or just the smoke alarm.

*Q.* Okay.

*A.* So when he came back, they approved it for just smoke alarm, no sprinkler system was needed.

*Q.* Okay. You have heard testimony that Esperanza started this fire with a lighter. Do you remember that testimony?

*A.* Yes, sir.

*Q.* Do you know how Esperanza got the lighter?

*A.* No, sir.

*Q.* Do you all have a smoking policy for each residence?

*A.* Yes, sir.

*Q.* And what is that policy?

*A.* They were not allowed to keep lighters.

*Q.* When you say "they," you mean the clients?

*A.* The clients that smoked.

*Q.* Okay.

*A.* None of them are allowed to keep lighters or to smoke inside the house or inside the Four J's buses.

*Q.* Inside Four J's what?

*A.* Van, the headquarters.

*Q.* But they can smoke outside?

*A.* They can smoke outside.

*Q.* Why not prohibit smoking completely?

*A.* That will violate their rights.

*Q.* When you say "violate their rights," do you mean -- the rules and regulations say that if a client has the ability and the capacity to make a decision they want to smoke, you can't stop them from doing that. Is that a fair statement?

*A.* I cannot stop them, or the agency cannot stop them from doing that. The only way the agency will stop them from doing that is if the psychologist recommended that.

*Q.* Okay.

*A.* Then the case managers, the guardians and the client, they will have to meet, and staff. And the psychologist will be the one to restrict that right. So when the State comes for audit, they will look at the steps. There are several steps you have to follow in order to take the rights away from the client.

*Q.* What about clients, either at the home or at the activity center, possessing lighters and matches? Did you have a rule on that?

*A.* Yes, sir.

*Q.* And what was that rule?

*A.* That the clients cannot have lighter.

*Q.* Okay. What about matches?

*A.* They cannot -- nobody gives them matches.

*Q.* Well, how do they get their cigarettes lit?

*A.* We have the program manager, what they do, the case managers buy the cigarettes and they give it to the --

*Q.* Buy the cigarettes?

*A.* For the clients.

*Q.* So the clients can't go out and buy cigarettes on their own?

*A.* Four J's, as a whole, there's only two clients that are allowed to do that.

*Q.* And why are those two clients allowed to do that.

*A.* Those two clients are just Level One. They are very high functioning.

*Q.* When you say Level One, that's a category --

*A.* Their IQ is almost like 69.

*Q.* Okay.

*A.* So even with that, the staff will still have to walk them to the store to buy it.

*Q.* Okay.

*A.* But the reason we did that was to give them the opportunity to live like a normal, regular person and not --

*Q.* But other than those two, are the other clients allowed to buy cigarettes on their own?

*A.* No.

*Q.* Okay. So staff buys cigarettes. What about when they want to smoke? How is that handled?

*A.* They have cigarette breaks where they have a -- apparently there is a detailed process how it

goes. But I know they go to the day-hab director, and that day-hab director or the trainers will pass the cigarette. They will all be outside and then they will smoke. After that 15-minute cigarette break, they will take the lighters and everyone will go back in inside. I can't really tell you the protocol.

*Q.* Okay. But the protocol is that they are not supposed to have lighters and matches and leave the with grounds with that; is that correct?

*A.* That's correct.

*Q.* You have heard testimony, I believe, that Arzola hid her lighter in her bra. Do you remember that testimony?

*A.* Yes, sir.

*Q.* And that's the one she used to start the fire?

*A.* Yes, sir.

*Q.* Okay. The first question is, in the entire history of Esperanza Arzola, is there any record or any report of her involvement with pyromania, setting fires or any other kind of behavior that would alert you to the likelihood that she would do something like that?

*A.* No. Even when the Adult Protective Services

came --

*Q.* Okay. We can't get into that.

*A.* Oh, okay.

Even with all the documents we gave to the psychologist and even after the fire, I went back and pulled every report. No report. I called San Antonio State School, where she came from. No record.

*Q.* No record of that?

*A.* No record of that kind of behavior.

*Q.* After Jenny was let out of the hospital, we understand that your case manager continued to work with Jenny and her mother for a period of time; is that correct?

*A.* That's correct.

*Q.* Did you have occasion to be involved in that continued effort with Jenny?

*A.* Yes. Before Jenny --

*Q.* And what was that, if you can.

*A.* Before Jenny was discharged from the hospital, the case manager called IDT meeting.

*Q.* Called a what?

*A.* Interdisciplinary meeting.

*Q.* I'm sorry. Okay.

*A.* For them to determine the appropriate placement for her at that time.

*Q.* Okay.

*A.* She came to me, she told me --

*MR. THWEATT:* Objection, hearsay.

*A.* The case manager --

*THE COURT:* Sustained.

*Q.* (By Mr. Plummer) Okay. The team?

*A.* The team decided that they going to offer Ms. Wagner a chance to be a foster care mom and have Jenny live in her house.

*Q.* Okay.

*A.* And the reason they brought it to my attention is because I have to be the one to sign the contract between Four J's and Ms. Wagner.

*Q.* And did she become a foster care parent?

*A.* She became a foster care parent.

*Q.* Did you all continue to provide any other services to Ms. Wagner in addition to the case management services?

*A.* Yes. When she became a foster care provider, she got on our payroll. And also the case manager, everybody have to -- the nurse, they have to go there and in-service and train her on Jenny's special needs --

*Q.* Well, this is her mother?

*A.* -- even though -- well, that is what the

standard said we have to do. Even though she is Jenny's mom, we still have to go through the whole list of training, how to do emergency evacuation, how to evacuate her. Because when she became a foster care, according to the Department of Aging and Disability, she now becomes part of Four J's employee, as a contractor. So we still have to go through all those steps, making sure that she is trained.

*Q.* Did you do that?

*A.* Yes.

*Q.* Was there -- did you ever step outside the, the -- take off the hat of the Four J's CEO with Ms. Wagner to assist her during this period of time?

*A.* Yes, sir.

*Q.* And how did you do that?

*A.* When Jenny was discharged, myself, the nurse and Ngozi we went to the house. So she was lying -- Ngozi went first, before Jenny arrived, to make sure that everything is okay. So I went back in the evening. They were doing dressing changes on Ms. Wagner's bed. When I looked at it, I, I told Ngozi, call IDT meeting --

*MR. THWEATT:* Objection, hearsay.

*THE COURT:* Sustained.

*MR. PLUMMER:* Judge, I think the statement was coming from the witness.

*THE WITNESS:* Yes, I am the one that told --

*THE COURT:* All right. The objection is overruled.

*Q.* (By Mr. Plummer) You instructed your staff to do what, now?

*A.* I instructed Ngozi to call IDT meeting and let them look at providing Jenny a hospital bed and all the things that she may need.

*Q.* Was that done?

*A.* Yes. Ngozi called the emergency --

*Q.* No, no.

*A.* It was done.

*Q.* So the hospital bed was delivered?

*A.* Yes, sir.

*Q.* And other services were provided?

*A.* Yes, sir.

*Q.* I think the record shows that Tanya James didn't have any family members who came to see her while she was a client at Four J's. Is that --

*MR. THWEATT:* Objection, speculation and relevance.

*THE COURT:* Rephrase your question.

*MR. PLUMMER:* Thank you, Your Honor.

*Q.* (By Mr. Plummer) Did you attend the funeral of Tanya James?

*A.* Yes, sir.

*Q.* And do you recall about when that was, or how long was it after she passed away?

*A.* As soon as she passed away, the guardian notified me to -- I was the one that went to Forest Park East, made all the funeral arrangement, paid for all the funeral services, organized for a reverend to come and pray, organized for everybody to attend the funeral services.

*Q.* So you did -- you provided the funeral services. Now, were there any family members present?

*A.* No, sir.

*Q.* Was Ms. Taylor present?

*A.* No, sir. We didn't even know she had a family member or a son. We did not know that.

*Q.* Okay. All right. You purchased the Beretta Court property and later leased it to Four J's; is that correct?

*A.* Yes, sir.

*Q.* Okay. At the time you purchased the Beretta Court property and in preparation for leasing it to

Four J's, were there any changes made to the house, as far as you can recall?

*A.* Yes, sir.

*Q.* What changes were those?

*A.* We put a wheelchair ramp.

*Q.* Okay.

*A.* And then we change all the windows to (indicating).

*Q.* Changed the windows to make them double hung?

*A.* Yes. Yes, sir.

*Q.* When you say you put the wheelchair ramp up, what part of -- was that for the front and back of the house?

*A.* For the front door.

*Q.* Okay. Any other changes?

*A.* We widened the bathrooms.

*Q.* Okay. To accommodate wheelchairs?

*A.* For the wheelchairs. We widened the bedrooms.

*Q.* The bedroom doors?

*A.* The bedroom doors.

*Q.* Okay.

*A.* Replaced them with hardcore doors. So those were done before the, the house was leased to

Four J's.

*Q.* Okay. What about the locking system, did you change the kinds of locks in the house? Or do you recall one way or the other?

*A.* I, I don't really remember, sir. I can't recall. That was back in 2001.

*Q.* Okay. You now understand Amuche's actions once she discovered this fire; is that correct, Ms. Uduma?

*A.* Yes, sir.

*Q.* You have heard her testimony?

*A.* Yes, sir.

*Q.* And I think we all agree that she didn't follow the training she had been given; is that correct?

*A.* Yes, sir.

*Q.* Is there any amount of training that you are aware of that you could have given Amuche to ensure that she did not panic at the time of this crisis?

*MR. SPARKS:* Objection, Your Honor. Calls for speculation.

*THE COURT:* Rephrase your question.

*Q.* (By Mr. Plummer) What else could you have done with Amuche to make sure she didn't panic at the time of this crisis?

*A.* I don't think there is any kind of training or in-services that would have given to her because she keep running back and forth three times, to the neighbors, to this, to that. If she had followed all the training that was given to her or all the in-services that was given to her, she would have been able to get, to get those clients out.

*Q.* Jenny wouldn't have been burned?

*A.* No, sir.

*Q.* And Tanya wouldn't have died?

*A.* (Shook head negatively.)

*MR. PLUMMER:* Pass the witness.

*THE COURT:* I tell you what, let's take our lunch break. We will start back up at 1:00 p.m.

*(Jury excused from the courtroom.)*

*(Lunch recess.)*

*BAILIFF:* All rise.

*(The jury present, proceedings resumed in open court as follows.)*

*THE COURT:* Thank you. Please be seated.

Mr. Thweatt.

*MR. THWEATT:* Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. THWEATT:

*Q.* Ms. Uduma, it's true that you never spoke to Esperanza Arzola after this fire, correct?

*A.* Correct.

*Q.* Because you did not speak to Esperanza Arzola after this fire, you have no personal knowledge of what her intent was when she set that fire, right?

*A.* That's correct.

*Q.* You do understand, though, after listening to the testimony that was read to the jury from Dr. Karen Gollaher yesterday, that Esperanza Arzola had trouble reciting the alphabet. Do you remember that testimony?

*A.* There were a lot of things said.

*Q.* Do you remember it?

*A.* I remember it.

*Q.* Do you also understand from Dr. Gollaher's testimony that Esperanza Arzola was having hallucinations. Do you remember that?

*A.* Maybe.

*Q.* Do you also understand from Dr. Gollaher's testimony that Esperanza Arzola was deemed incompetent? Do you understand that?

*MR. PLUMMER:* Excuse me, Your Honor. Objection. Not limited to a specific time period.

*THE COURT:* Rephrase your question.

*MR. PLUMMER:* Thank you, Your Honor.

*Q.* (By Mr. Thweatt) Do you understand from Dr. Gollaher's testimony that Esperanza Arzola was deemed incompetent to stand trial in a criminal proceeding. Do you understand that?

*A.* That's what was read.

*Q.* Well, that's what Dr. Gollaher said, right?

*A.* That's what was read.

*Q.* I want to show you a page from Plaintiff's Exhibit Number 44. This is actually page 5 of Plaintiff's Exhibit Number 44. This is Esperanza Arzola's Individual Service Plan. The first behavior for Esperanza Arzola Individual Service Plan at Four J's says that Esperanza is noncompliant most of the time. Do you remember that?

*A.* That's correct.

*Q.* And the second one says her inappropriate behaviors observed were elopement, fighting with staff and consumers, destroying property and verbally abusing staff and peers. Staff and peers. That means other residents, doesn't it?

*A.* Yes.

*Q.* You testified to this jury that there was no record in Four J's files that Esperanza Arzola ever abused another resident. Isn't that what you just said?

*A.* That's correct. This is history, not, not current. Actually, if you look at the beginning of the behavior plan that Dr. Lockwood developed, he had aggression degrees and property destruction degrees. And the suicidal attempt was actually removed from one because she had no episode while at Four J's.

*Q.* You understand that this document that I am showing this jury is from your company?

*A.* This is the history --

*Q.* This is your from company; you understand that, right?

*A.* That's correct, but we have to show the history.

*Q.* Ma'am, I don't need an explanation. I just need to know whether this document is from your company. And it is, isn't it?

*A.* It is.

*Q.* Behavior number 3 says, "Esperanza has a history of illicit drug use, sexual promiscuity, sexual abuse, suicidal attempts, pica, mood swings and noncompliance."

That's what it says, doesn't it?

*A.* Yes.

*Q.* And that she participants in "behavior therapy program targeting deceleration" or, in lay terms, reduction "of aggression," self-industry -- "self-injury, property destruction and eloping." Right?

That's what it says?

*A.* Yes.

*Q.* All that was known to your company before this fire, right?

*A.* Yes. This was known --

*Q.* It's just a "yes" or "no" question.

*A.* Yes.

*Q.* All right. Esperanza Arzola had a cigarette lighter on the night of the fire, didn't she?

*A.* I wasn't there.

*Q.* If Esperanza Arzola had a cigarette lighter, Ms. Uduma, on the night of the fire, the only place she could have gotten it from is from Four J's; isn't that right?

*A.* I wasn't there, and you don't want me to say anything based on hearsay. So I was not there. I don't know.

*Q.* You don't want to speculate that your

company may have been the one that provided Ms. Arzola with the incendiary device that killed someone and later caused injuries that we have seen pictures of that were lifelong permanent scar. You don't want to admit that, do you?

*A.* No, that's not right.

*Q.* You are not aware of any other source of a cigarette lighter for Ms. Arzola, other than your company, are you?

*A.* Because the --

*Q.* Are you aware of it or not?

*A.* I cannot say anything based on hearsay.

*Q.* What you do know is that your clients are given cigarette lighters by your own employees. They are given those things by your employees, aren't they?

*A.* I am not aware of that, sir.

*Q.* Did you not hear your residential staff director, Inya, testify earlier today that he provided cigarette lighters to your clients?

*A.* No, he did not say that.

*Q.* He didn't say that?

*A.* No, sir.

*Q.* You don't believe that, because there is smoking permitted at Four J's by the residents, that

your staff members are the persons who give them the devices to light their cigarettes?

*A.* He did not say that.

*Q.* Are cigarette lighters permitted in the Beretta Court Home?

*A.* Actually, if you look at the records, Esperanza never smoked at the residence.

*Q.* Are cigarette lighters permitted, ma'am, at the Beretta Court residence?

*A.* If anyone is to smoke at the residence, yes, the staff will have to have the cigarette lighter.

*Q.* That's not my question. Is there a rule at Four J's that says you cannot have cigarette lighters in this house? Is there a rule like that or not?

*A.* Generally, no.

*Q.* There is no rule like that --

*A.* No, sir.

*Q.* -- right?

*A.* No, sir.

*Q.* Don't you think there should be one?

*A.* There was no need for me to think there should be one at that time.

*Q.* That's not my question. My question is: Don't you think there ought to be a rule like that?

*A.* I did not think so.

*Q.* You still don't think that, do you?

*A.* We have a rule that --

*Q.* You still don't think that, do you, ma'am?

*A.* I don't know, sir.

*Q.* Even after all that has happened, after someone died and after someone spent a month in the hospital and months in rehab, you still don't think that there ought to be a rule against cigarette lighters at your company. Is that true?

*A.* We cannot just ban cigarette lighters from my group homes because that will mean we have to violate the rights of the other consumers who smoke. We can allow cigarette lighter, but the staff will have to have control of the cigarette lighter.

*Q.* Ms. Uduma, there is no personal right that anybody has to own a cigarette lighter, is there? That is not in any agency regulation that you know of, is it?

*A.* They have the right to choose to smoke and to choose not to smoke.

*Q.* That's not the question.

The question is: Are you aware of some rule that says mentally retarded persons and persons with suicide and depression and antipsychotic -- or psychotic behavior, that those people have a right to

have a cigarette lighter?

*A.* According to State of Texas, yes.

*Q.* Have you brought that document with you to this jury?

*A.* We provided you the standard back in March.

*Q.* I am asking you whether or not that document that you say exists, has that been provided to this jury?

*A.* I don't know, sir. I haven't seen what goes to the jury.

*Q.* You told this jury that you instructed Ngozi Obichuku to call Ms. Wagner the night of the fire, didn't you?

*A.* That is correct, sir.

*Q.* You heard Ms. Wagner say that she didn't get a call from the case worker, Ms. Obichuku, until the morning after the fire. Didn't you hear her say that?

*A.* That's what she said.

*Q.* Is Ms. Wagner lying about that?

*A.* I can't say that, sir.

*Q.* You never called Ms. Wagner, did you?

*A.* I met her in the hospital.

*Q.* You never called her, did you?

*A.* No, sir, I didn't.

*Q.* You told this jury that there is at least six fire drills that are required every year for the Beretta Court Home, right?

*A.* According to the Department of Aging and Disability standard, we are required to have six fire drills.

*Q.* And all those should be documented, correct?

*A.* That's correct.

*Q.* If it's not documented, that means it didn't happen, right?

*A.* That's correct.

*Q.* In fact, I think you told this jury that you go beyond what the standard of six that is required, you do it every month, right?

*A.* That's correct.

*Q.* And that should be documented too, right?

*A.* That's correct.

*Q.* And if it didn't -- if it wasn't documented, that means it didn't happen, right?

*A.* If you don't have all the copies here, that didn't mean that it didn't --

*Q.* I'm not asking that.

If it wasn't documented, that means it didn't happen, right?

*A.* Yes. But I'm one hundred percent sure it

was documented.

*Q.* Okay.

*A.* Because I review it every year before the audit.

*Q.* Let me show you Defendants' Exhibit Number 22.

All right. This is a Four J's Community Living Center Fire Evacuation Drill Report. We can see it's marked Defendant's Exhibit Number 22. And I've about got in my hand, Ms. Uduma, five. Five fire drill reports.

*A.* We have --

*Q.* Do you see that?

*A.* Yes, sir.

*Q.* The first one is dated January 24th, 2008 from Defendants' 22.

The next one in that pile that your attorneys have provided to this jury is dated April 3rd, 2008. Do you see that?

*A.* Yes.

*Q.* That means we don't have documentation from any fire drill in February or March, right?

*A.* We did.

*Q.* Well, where is it?

*A.* All those documents were given to Adult

Protective Services.

*Q.* You haven't brought it to show it to this jury, right?

*A.* I don't know what you were given, but I made those documents available.

*Q.* What I have been given is what your attorney provided to this jury.

The next document is May 6th, 2008. Do you see that?

*A.* Yes.

*Q.* Then there is one for June 20th, 2008?

*A.* Yes.

*Q.* And then the last one, the fifth and final piece of paper evidencing all of the fire drills for 2008, is dated August the 5th, 2008. So we are missing July, we are missing February, we are missing March, according this paperwork, aren't we? Right?

*A.* All those documents were provided because we had an audit in that June and we made all the documents available to DADS.

*Q.* Well, you --

*A.* They review fire drill hundred percent for every house.

*Q.* I'm sorry. What was the last part?

*A.* The Department of Aging and Disability, when

they come for audit, it's one of the documents they review hundred percent for every single house.

*Q.* All right. But, again, if it's not documented, it wasn't done. That's what the rule is in your business, right?

*A.* We, we provided those documents. I don't know why you don't have it.

*Q.* That's not my question.

Is that the rule?

*A.* Yes. But we did document all that.

*Q.* All right. Let me talk to you about training of Amuche.

You said Amuche was at all the training and that she did everything that was asked of her, right?

*A.* That's correct.

*Q.* Is there a document anywhere in your files that indicates that Amuche had a fire extinguisher placed into her hands, where she pulled the pin, where she pressed down the lever, where she was shown, actually in her hand, how to operate and use a fire extinguisher? Is there a document that reflects that?

*A.* Usually when the fire marshal gives training, we give them the same document to sign

their names.

*Q.* Is there a document which reflects that?

*A.* There should have been one.

*Q.* Have you brought it to show this jury?

*A.* I give everything out, so I don't know what you have now.

*Q.* You told the jury that the fire marshal came to provide training to your employees; is that right?

*A.* That's correct.

*Q.* Let me show you Defendants' Exhibit 23. These are the only minutes of staff in-service training that you have provided in this case for the year 2008. Do you understand that?

*A.* We had --

*Q.* Do you understand that these are the only minutes?

*A.* That wasn't the only minute that happened.

*Q.* Well, that's the only ones that your attorneys have shown to this jury. I want you to read this quietly to yourself and show me where the words "fire marshal" appear, anywhere in those minutes.

*A.* Okay. I said --

*THE COURT:* Bring her a hard copy.

*MR. THWEATT:* Yes, Your Honor.

*A.* I said the fire marshal comes --

*Q.* (By Mr. Thweatt) There isn't a question pending, Ms. Uduma. I would like you to read that to yourself.

*(Referenced document tendered to the witness.)*

*A.* What I said was that the fire marshal comes --

*THE COURT:* Ma'am, focus on the question that's asked, please.

*A.* (Witness complies.)

Okay.

*Q.* (By Mr. Thweatt) You are reading from Defendants' Exhibit Number 23. Correct?

*A.* Yes.

*Q.* Do the words "fire marshal" appear anywhere in that document?

*A.* This is the one --

*Q.* Do the words "fire marshal" appear anywhere in that document?

*A.* No, sir.

*Q.* Thank you.

*MR. THWEATT:* Pass the witness, Your Honor.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Briefly, Judge.

CROSS-EXAMINATION

BY MR. SPARKS:

*Q.* Good afternoon, Ms. Uduma. How are you today?

*A.* I'm fine, sir.

*Q.* We spoke earlier, did we not? Okay.

Tell the jury what years you went out to the property with the fire marshal?

*A.* The fire, the fire marshal inspection is usually done once a year. So I went there -- I don't know if it was November or December of '07.

*Q.* November of 2007?

*A.* Yes. I'm not really sure what month.

*Q.* Okay. Would you have gone in 2006?

*A.* Yes. It's every year.

*Q.* Would you have gone in 2005?

*A.* Yes.

*Q.* And November 2004?

*A.* I'm not sure.

*Q.* You're not sure?

*A.* Yes.

*Q.* When you went in 2007, you took the fire marshal to the property?

*A.* Yes.

*Q.* And you showed him around?
*A.* Yes.
*Q.* And you opened up the back door for him?
*A.* Yes.
*Q.* Was the key that Mr. Inya was talking about that was hanging up at the top, was that where it was at?
*A.* It was in the drawer.
*Q.* It was in the drawer?
*A.* Yes.
*Q.* And was it also there in -- and you took him in 2006, you also opened that door for him?
*A.* Yes, sir.
*Q.* You did?
*A.* Yes, sir.
*Q.* And in 2005?
*A.* I -- maybe.
*Q.* Do you recall in February -- I'm sorry, November 17th of 2010 having your deposition taken by us?
*A.* Okay. Do I recall it? Yes.
*Q.* You did give your deposition, yes?
*A.* Yes.
*Q.* And --
*MR. SPARKS:* Judge, may I approach the

witness, Your Honor?

*THE COURT:* Yes.

*Q.* (By Mr. Sparks) I want to give you a copy of your deposition. Have you ever seen it in this form? This would have been provided to your attorneys after it was compiled by the court reporter. Have you ever seen that?

*A.* No, not in this form.

*Q.* I want to direct your attention, if I may, to page 4 of that volume. I'm going to put it up on the screen so the jury can see it.

*THE COURT:* Just read it.

*MR. SPARKS:* Okay.

*Q.* (By Mr. Sparks) It says on page 4, "Having been first duly sworn, testified" -- I'm sorry. "Anthonia Uduma, having been first duly sworn, testifies as follows."

Do you recall being sworn at that deposition before giving your testimony?

*A.* Yes.

*Q.* You do?

*A.* Yes.

*Q.* I want to direct your attention, if I can, ma'am, to page 147 of that document.

*A.* Okay.

*Q.* And the question on page 147, line 19 is this: "Would it have been customary?"

*MR. PLUMMER:* Excuse me, Your Honor. May we approach?

*THE COURT:* Yes.

*(Bench discussion.)*

*MR. PLUMMER:* I'm not sure counsel -- whether counsel is trying to read testimony or impeach the witness. But if he is trying to impeach the witness, I think he is going about it the wrong way.

*THE COURT:* What are you trying to do?

*MR. SPARKS:* I'm just trying to get her to recall the testimony.

*THE COURT:* She didn't indicate that she couldn't remember. She told you in 2005, yes. She gave you "yes" or "no" answers. I don't remember her saying anything like "I don't remember" or "I can't remember."

*MR. SPARKS:* All right. I'll, I'll --

*THE COURT:* If you are going to use it to refresh her recollection, you will need to lay that predicate.

*MR. SPARKS:* All right. Thank you.

*(Open court.)*

*Q.* (By Mr. Sparks) Ms. Uduma, do you ever

recall telling me that you were not aware that that back door had a deadbolt lock on it until after the fire?

*A.* I don't recall telling you that.

*Q.* You don't recall telling me that?

*A.* No, sir. If I did, it must have been -- if it's written, then maybe I was misunderstood. But I don't recall that because I know I opened the back door for the fire marshal.

*Q.* Okay. Can you look on page 147?

*A.* Okay.

*Q.* Look at line 22. My question to you was: "Is it your testimony, ma'am, that regarding the locking mechanism at the Beretta property is one of the reasons that that deadbolt lock at the back door was because Ms. Esperanza was an eloper?"

And you said, "That's what I was told."

*MR. PLUMMER:* Objection. I'm not sure whether -- objection, Your Honor. May we approach the bench?

*THE COURT:* Yes.

*(Bench discussion.)*

*MR. PLUMMER:* Objection, improper foundation for impeachment. He is reading something completely different from what the question was he

asked. He has no predicate at all.

*MR. SPARKS:* She said she didn't recall making that statement.

*THE COURT:* Right. So you look at the deposition and say, does that refresh your recollection. If she still denies it, then you go and you lay your foundation to impeach.

*MR. SPARKS:* Thank you, Judge.

*(Open court.)*

*Q.* (By Mr. Sparks) Ma'am, could I direct your attention to page 147, at the bottom, line 22. And then I want you to, if you would, please, go to page 148 and look at line 12, and tell me whether that refreshes your memory of your testimony about the deadbolt lock.

*A.* Yes.

*Q.* So is your memory refreshed now in reference to what you told me then?

*A.* Yes.

*Q.* And what is it? Were you aware that the deadbolt lock existed before or after the fire?

*A.* I don't really know. But I remember there was a section also that I addressed the issue that I opened the back door for the fire marshal. So I don't really know.

*Q.* I understand that, and you said that today.

My question is: Do you recall telling me in November that you never were aware that that door had -- that it had the deadbolt lock on it until after the fire?

*A.* Yes.

*Q.* And was that what your testimony in this deposition was then?

*A.* I'm not really sure.

*Q.* Okay. Can you read line 12 to the jury?

*MR. PLUMMER:* Excuse me, Judge. May we approach?

*THE COURT:* Do you have an objection?

*MR. PLUMMER:* Yes. Improper predicate.

*THE COURT:* Sustained.

*MR. PLUMMER:* Thank you.

*Q.* (By Mr. Sparks) So your testimony, ma'am, is that you were not aware that the deadbolt lock existed on the property until after the fire?

*MR. PLUMMER:* Objection, repetition. We have already been over this, Judge.

*THE COURT:* Overruled.

*A.* Can you ask the question again?

*Q.* (By Mr. Sparks) Yes, ma'am.

Did you not testify previously that you

were not aware that the deadbolt lock existed at the Beretta Court property until after the fire?

*A.* That's what I saw here.

*Q.* That's what you said then?

*A.* Yes.

*Q.* Is that a "yes"?

*A.* I guess so. Yeah.

*Q.* But now you are saying that you were aware that it existed because you went over there even before the fire, at least on three prior occasions, and opened the door for the fire marshal?

*A.* That's what I thought I did. It had been too long. That's what I thought I did. But I remember testifying that also on November, if I am correct. I haven't read the documents where I said that I opened the door for the fire marshal. So I don't know.

*Q.* You don't know whether the statement you gave in February is more accurate or the statement you have given today?

*A.* I'm not sure.

*Q.* You are not sure?

*A.* Yes.

*Q.* All right. Look at page 161, if you would, please. And look at line 22 and your answer to it on

25, and tell me if that helps you with your recollection.

*A.* Which line is it?

*Q.* 22, page 161.

*A.* Okay.

*Q.* So does that help you with what your answers were back on November 17, 2010 on the same subject matter, about the back door lock being there?

*A.* Yeah. That reminds me.

*Q.* It reminds you?

*A.* Uh-huh.

*Q.* So my question is: Were you aware of the back door having the deadbolt lock on it before or after the fire?

*A.* I really can't remember.

*Q.* You really can't remember?

*A.* Yes.

*Q.* But you do remember going there with the fire marshal in 2005 and letting him in with a key to that lock; is that correct?

*A.* I remember going there in 2007 --

*Q.* In 2007?

*A.* -- with the fire marshal.

*Q.* Which would have been before the fire?

*A.* Yes.

*Q.* Okay. So if you went in 2007 before the fire, then you would have been aware of that deadbolt lock being on the door; is that correct?

*A.* I'm not really sure because it's been too long. So I don't even know.

*MR. SPARKS:* No further questions, Judge.

*THE COURT:* Mr. Plummer.

*MR. PLUMMER:* Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. PLUMMER:

*Q.* You have familiarized yourself, Ms. Uduma, with Esperanza Arzola's clinical history and Individual Service Plan; is that correct?

*A.* That's correct.

*Q.* And you have also familiarized yourself with her other history, as reflected in the records of Four J's, that predated her coming to Four J's group home and while she was there; is that correct?

*A.* That's correct.

*Q.* And is it fair to say -- well, based upon that review and based upon that history, do you believe Arzola understood what she was doing when she lit that lighter?

*MR. THWEATT:* Objection, calls for

speculation.

*MR. SPARKS:* Objection.

*THE COURT:* Sustained.

*Q.* (By Mr. Plummer) Mr. Thweatt has gone through a list of items that were in her Individual Service Plan, her annual service plan review. Do you remember that?

*A.* Yes, sir.

*Q.* Okay. Let me ask you, during the time Esperanza was at Four J's, did her condition remain the same as it was when she got there, get worse or improve?

*MR. THWEATT:* Objection, foundation.

*THE COURT:* Rephrase your question.

*Q.* (By Mr. Plummer) Based on, based on the annual Individual Service Plan that was prepared for Arzola, did Esperanza Arzola's condition get worse, remain the same, or improve while she was at Four J's?

*A.* Improve.

*Q.* Okay. And it improved significantly in the area of aggression; is that correct?

*MR. THWEATT:* Objection, leading.

*THE COURT:* Sustained.

*Q.* (By Mr. Plummer) Well, let me show you a

part of the record. Let me show you page 15, please, of that record.

*THE COURT:* Which exhibit are you referring to, Mr. Plummer?

*MR. PLUMMER:* I'm sorry, Your Honor. It is Exhibit 44.

*MR. THWEATT:* Plaintiff's Exhibit 44.

*MR. PLUMMER:* I'm sorry. It's Plaintiff's Exhibit 44. I said Exhibit 44, is that right?

*MR. THWEATT:* You did.

*MR. PLUMMER:* Okay.

*Q.* (By Mr. Plummer) And the very top up there, if you would, read that out to the jury, please, ma'am.

*A.* "The team accepted the recommendations as written. Esperanza's trainer informed the IDT that Esperanza has made a tremendous improvement in handling conflict and exercising. She recommended that running the same program with Esperanza for another year will further enhance her skills and improve her independence in the community."

*Q.* And is it fair to say there are other provisions of that report that reflect the same kind of improvement, tremendous improvement in her

behavior?

*MR. THWEATT:* Objection, leading.

*THE COURT:* Sustained.

*Q.* (By Mr. Plummer) Let me direct your attention to Page 14 and the second paragraph of Exhibit 44. If you would, direct your attention down to the second or the third sentence in that paragraph, second paragraph, that begins with the word "While at the day habilitation." Do you see that?

*A.* No, sir.

*Q.* Let me point it out for you. Beginning here.

*A.* Okay.

*Q.* If you would, read that to the jury, please.

*A.* "While at the day habilitation program, she participates in activities designed to assist in acquisition, retention and improvement of adaptive skills, socialization and activities of daily living. Esperanza was trained in the area of avoiding and resolving conflicts and exercise skills. These goals paid off as Esperanza lost over 40 pounds this period. She is presently on the independent stage."

*Q.* When you say "independent stage," what does that mean?

*A.* It means getting ready to move to her own apartment.

*Q.* So part of the process employed with the group home with high functioning individuals like Esperanza was designed to be able to move somewhere else?

*A.* Yes.

*Q.* Okay. Very good.

*MR. PLUMMER:* May I approach the witness, Your Honor?

*THE COURT:* Yes.

*Q.* (By Mr. Plummer) Who was the fire marshal who you visited with, or the fire person who you visited with, for the inspections from the Texas Health and Human Services Commission? Do you remember who that was?

*A.* Yes.

*Q.* What was his name, do you remember?

*A.* Ron Waldie.

*Q.* Okay. And he visited -- you visited with him at each home; is that correct?

*A.* Yes. Part of the procedure, when I visit with him, he will look at all the fire drills to make sure we have every fire drill before approving the continuation of the permit.

*Q.* Okay.

*MR. PLUMMER:* May I approach, Your Honor?

*THE COURT:* Yes.

*Q.* (By Mr. Plummer) Let me show you what's been marked as Defendants' Exhibit Number 9. Can you recognize that document, please, ma'am?

*(Referenced document tendered to the witness.)*

*A.* Yes, sir.

*Q.* (By Mr. Plummer) Is that the report Ron did of a fire inspection of Beretta Court back in 2007?

*A.* Yes, sir.

*Q.* Okay. Does it show any deficiencies on it?

*A.* No, sir.

*Q.* Okay. And you are supplied a copy of that as part of your records, your business records; is that right?

*A.* Yes, sir.

*MR. PLUMMER:* We would offer Defendants' Exhibit 9.

*THE COURT:* Any objection?

*MR. SPARKS:* Yes, sir, Judge. That document is hearsay.

*THE COURT:* Approach the bench, please.

*(Bench discussion.)*

*(Referenced document tendered to the Court.)*

*THE COURT:* Your response, Mr. Plummer?

*MR. PLUMMER:* Beg your pardon?

*THE COURT:* Your response to the hearsay objection?

*MR. PLUMMER:* Well, first of all, the response to the hearsay objection is that this is a part of her business records. It is maintained with her. And this is a report, and she was there with the fire marshal and he supplied her with a copy.

*THE COURT:* So this is a document generated by the fire marshal?

*MR. PLUMMER:* Yes.

*THE COURT:* It is not generated by Four J's?

*MR. PLUMMER:* It is not -- the transmittal letter is generated by Four J's, but the fire marshal report is generated by them. It is supplied to them as a part of their normal recordkeeping that they are supposed to keep in their records.

*THE COURT:* Mr. Sparks?

*MR. SPARKS:* Judge, it's not a business

record in terms of -- because they didn't produce the record. She can't say it was made at a time that the information was produced. She didn't have it. She's not signing this.

*MR. THWEATT:* As being made in the course of their business documents, it is retrieved from somewhere else and stuffed into a file. That's an end around the hearsay rule.

*THE COURT:* I don't think you have satisfied the business records exception.

*MR. PLUMMER:* Very well, Your Honor.

*THE COURT:* The objection is sustained.

*MR. SPARKS:* We would like to have an instruction.

*(Open court.)*

*THE COURT:* The objection is sustained. The jury will disregard any testimony about the contents of Defendants' Exhibit 9 unless it is ever admitted into evidence.

*Q.* (By Mr. Plummer) Couple more questions, Ms. Uduma. When Ron Waldie visited with you at the Beretta Court and went through his inspection, did he complete his report at that time?

*A.* Yes. Right there.

*Q.* Right there?

*A.* Right there. He complete it and then tear the copy, give me a copy and take the yellow one.

*Q.* The date he did that -- do you recall the date?

*A.* It has to be the date written on the form.

*Q.* Do you recall what date that was?

*A.* That was in December '07.

*Q.* Okay. Would it help to refresh your memory to see the document?

*A.* Yes.

*Q.* Does that help refresh your memory as to when it was?

*A.* Yes.

*Q.* Now, the second page of that document, is that a letter from you?

*A.* Yes. Before he comes to the house --

*Q.* No, no.

*A.* Yes. Yes.

*Q.* And what does that letter -- is that a letter addressed to the fire marshal?

*A.* Yes, sir.

*Q.* Or to Ron Waldie?

*A.* To the fire marshal.

*Q.* The fire inspector?

*A.* Yes, sir.

*Q.* What does that letter tell the fire inspector before he gets there?

*A.* It tells the fire inspector that we have applied fire retardant. And the reason they require us to applied it, in case there is fire, we apply it on the beds, the curtains, the draperies, everything. It will slow the fire from --

*Q.* Spreading?

*A.* -- spreading rapidly. We sprayed it on all the cabinets, the sofas, everywhere.

*Q.* So you gave this to Mr. Waldie at the time he did his inspection; is that correct?

*A.* Yes, sir. You have to have it there.

*Q.* Now, are you required to maintain this record in your files?

*A.* Yes, sir. This is one of the documents, when the State comes to do the audit, they have to review this to make sure that we pass the fire inspection, fire marshal inspection.

*Q.* So it's an official record that you have to keep in your records in order to comply with the statutory requirements and the regulatory requirements; is that right?

*A.* It is, sir. Yes.

*Q.* Okay.

*MR. PLUMMER:* We renew our offer, Your Honor, to Exhibit 9.

*THE COURT:* Any objection?

*MR. THWEATT:* We renew our objection to hearsay.

*THE COURT:* Come on up.

*(Bench discussion.)*

*THE COURT:* All right. So your objection is hearsay, and your argument is that she is required by law to keep it in her records?

*MR. PLUMMER:* Yes, sir.

*THE COURT:* And this is generated by a governmental agency?

*MR. PLUMMER:* Yes. It's Ron Waldie, it's the Texas Human Health and Services Commission. Texas Health and Human Services Commission.

*THE COURT:* Why isn't it a public record?

*MR. THWEATT:* Well, I don't think it's a public record, Judge, because Mr. Waldie has not confirmed that he's the one who prepared this. He may have, but that's not before this Court.

*THE COURT:* The objection is overruled. This is, what, 9?

*MR. PLUMMER:* Exhibit 9, Your Honor.

*THE COURT:* Defendants' Exhibit 9 will be admitted.

*MR. PLUMMER:* Thank you, Your Honor.

*(Open court.)*

*THE COURT:* The objection is overruled. Defendants' Exhibit 9 is now admitted. The jury may disregard my prior instruction about it.

*(Defendants' Exhibit 9 is received in evidence.)*

*THE COURT:* Mr. Plummer.

*MR. PLUMMER:* Thank you, Your Honor.

I'm sorry.

*(Referenced document returned to counsel.)*

*MR. PLUMMER:* Your Honor, at this time, the Defendants pass the witness.

*THE COURT:* Y'all approach the bench real quick.

*(Bench discussion.)*

*THE COURT:* Plaintiffs are up to 6 -- Intervenors are up to 6 hours, 54 minutes. So you have about 6 minutes left with this witness for any recross. Do you have any other witnesses after Ms. Uduma?

*MR. PLUMMER:* No, Your Honor.

*THE COURT:* All right. Have a seat.

*(Open court.)*

*THE COURT:* Mr. Thweatt.

*MR. THWEATT:* Nothing further, your Honor.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Just briefly, Judge.

RECROSS-EXAMINATION

BY MR. SPARKS:

*Q.* What did the fire marshal tell you about the deadbolt lock?

*A.* He did not say anything.

*Q.* He didn't say anything?

*A.* No, sir. If he had any concern, on that comments, he will make -- he will make comments there, and then he will fail the house.

*Q.* And you certainly were aware --

*MR. PLUMMER:* Excuse me, Your Honor. I don't believe she had finished answering the question.

*THE COURT:* Let him ask his question.

What's your next -- go ahead and ask your question.

*Q.* (By Mr. Sparks) You certainly were aware that not everyone in the house had access to exit that door, it being in the condition it was in with

the locking mechanism, right?

*A.* I was not aware of that.

*Q.* You weren't aware of that?

*A.* No, sir.

*Q.* So you weren't aware that Tanya James couldn't unlock that door?

*A.* The team will have to determine this. I wasn't aware of that.

*Q.* The team would have to determine that, you weren't aware of that?

*A.* I wasn't aware of that. I'm not part of the team.

*Q.* You're not part of the team?

*A.* Yes, sir.

*Q.* You are the owner of the club, right?

*MR. PLUMMER:* Excuse me. Your Honor, objection to the sidebar.

*THE COURT:* Sustained.

Rephrase the question.

*Q.* (By Mr. Sparks) You are the owner of the company, are you not?

*A.* That's correct.

*Q.* And the team works for you, do they not?

*A.* No, sir, not all of them.

*Q.* Not all of them?

*A.* Yes, sir.

*Q.* So you weren't aware that Tanya wasn't able to leave that property because the team hadn't communicated to you? Is that your statement?

*A.* The team will meet and make all the decisions and recommendations. They are not supposed to communicate that to me unless there is a problem.

*Q.* My question is, ma'am: You weren't aware that Tanya wasn't able to leave that facility unless the team had informed you of that? Is that your testimony, yes or no?

*A.* I'm not even sure what you are asking me, sir.

     *MR. SPARKS:* Pass the witness, Judge.

     *THE COURT:* Mr. Plummer.

     *MR. PLUMMER:* Nothing further, Your Honor.

     *THE COURT:* Thank you. You may step down.

     *(The witness was excused from the witness stand.)*

     *THE COURT:* Defense, call your next witness.

     *MR. PLUMMER:* Your Honor, subject to some motions, the Defendants would rest at this time.

*THE COURT:* Defendants rest. All right. Approach the bench, please.

*(Bench discussion.)*

*THE COURT:* Y'all have 5 minutes for a rebuttal case. Are you going to put on any rebuttal?

*MR. THWEATT:* I'm going to put Ms. Wagner on for two or three questions in rebuttal. That's it, Your Honor.

*THE COURT:* All right. Have a seat.

*(Open court.)*

*THE COURT:* Mr. Thweatt, call any witnesses you have to call.

*MR. THWEATT:* Your Honor, we call Ms. Wagner back for rebuttal.

*THE COURT:* Ms. Wagner, I will remind you, you are still under oath. Have a seat.

You may proceed, Mr. Thweatt.

PATTI WAGNER,

having been previously placed under oath, testified as follows:

DIRECT EXAMINATION

BY MR. THWEATT:

*Q.* Ms. Wagner, I want to ask you a question about the document that we questioned Ms. Obichuku about, Defendants' Exhibit Number 59. Okay?

*A.* Yes, sir.

*Q.* And I want to ask you about this last sentence here that Ms. Obichuku says she wrote. It says, "Case Manager spoke with Jenny's mother, whom was very pleased with Jenny's results." That's dated September 6, 2008.

Do you see that?

*A.* Yes, sir.

*Q.* Were you pleased with the results that were happening on September 6, 2008?

*A.* Jenny was still in critical condition. She was alive. I was pleased with that. But I never spoke with, with Ms. -- with Ms. Ngozi. I was at the hospital at that time of day.

*Q.* What were you feeling, other than pleasure, during that period of time in your life?

*A.* I was terrified.

*Q.* Ms. Ngozi, you heard her testify that Jenny was sleeping in her bed at your apartment once she was released from Memorial Hermann Hospital. Do you remember that testimony?

*A.* Yes, sir.

*Q.* Is that true?

*A.* No, sir.

*Q.* Where was Jenny sleeping when you brought

her home to your apartment after the fire?

*A.* She was sleeping in a recliner. She called it her comfy chair.

*Q.* Why was Jenny sleeping in her recliner?

*A.* At first, it was because when we brought her home she had bandages on her legs from where the grafts were. And in order to keep her as free as possible from pain, we had her sleeping in the comfy chair because laying flat pulled on the bandage. It's a special bandage, and it would pull on her thighs. And that's why it started out. She would be in the comfy chair. And then my mom and dad stayed with me that first two weeks and slept in my bedroom.

*Q.* Where did you sleep?

*A.* On the couch in the living room with Jenny.

*Q.* Where does Jenny sleep now?

*A.* In her comfy chair.

*Q.* If you put her in her bed in her room at night, will she sleep?

*A.* No, sir.

*MR. THWEATT:* Pass the witness, Your Honor.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* No questions, Your Honor.

*THE COURT:* Mr. Plummer.

*MR. PLUMMER:* No questions, Your Honor.

*THE COURT:* Thank you, ma'am. You may step down.

*(The witness was excused from the witness stand.)*

*THE COURT:* Anything else, Mr. Thweatt?

*MR. THWEATT:* No, Your Honor.

*THE COURT:* Mr. Sparks?

*MR. SPARKS:* No, sir.

*THE COURT:* Plaintiffs and Intervenors rest?

*MR. THWEATT:* We do, Your Honor.

*MR. SPARKS:* We do, Your Honor.

*THE COURT:* Ladies and gentlemen, that completes the presentation of testimony and evidence in this case. The lawyers and I have some work we need to do. Sometimes that can take a very short amount of time, sometimes it takes a little bit longer. Since I don't know exactly how long it is going to take, I don't want to keep you all sitting in the jury room wondering whether you are going to be coming back in 10 minutes, 30 minutes, or an hour. So we are going to break early today for you all. We will start up tomorrow morning at 8:30 with the Charge of the Court, and then the parties will give their

closing arguments to you. And after we have finished closing arguments, you will retire to deliberate.

Y'all have done a fantastic job being prompt and on time. I appreciate that. And so if you can just keep it up so we can start right in promptly at 8:30 tomorrow morning, that will be great.

See you all tomorrow morning.

*(Jury excused from the courtroom.)*

*THE COURT:* You may be seated.

*MR. PLUMMER:* Judge, can we have a 15-minute break before we start --

*THE COURT:* Oh, yes. We are going to talk about the schedule. I'm not going to launch immediately into any arguments.

For those of you keeping score at home, I may have given y'all a slight miscalculation. Plaintiff and Intervenor used 6 hours, 52 minutes total, including Ms. Wagner's rebuttal testimony. Defendants used 3 hours, 57 minutes. So for those of you who want to use that as a benchmark for future cases, there you go.

*MR. PLUMMER:* Judge, is there a software program we can use for that? Because that's a really wonderful tool.

*THE COURT:* It's called Microsoft Excel.

I just set it up. I have my own personal setup. Some judges use chess clocks. I don't have a chess clock, and sometimes when I get multiparty things chess clocks don't work. So basically, that's how it works.

All right. How much time do y'all need to -- more time do y'all need to look at the charge before we can have a charge conference? I think we will just do a charge conference so that, once I have absorbed any rulings, I can get a final official version of the charge out to you all before you leave today so that you can prepare your closing arguments and come in ready to go tomorrow morning.

But, you know, is 30 minutes enough? Do you want a little longer? It's just shy of 2:00 o'clock. Understanding that I need y'all to be quick in your objections and your requests so that I can then turn something around. Sometimes -- first of all, I don't have a law clerk so I'm the one who is going to be making these changes. So I need to be able to get it turned around and get the final version back to you. How much time do you need?

*MR. THWEATT:* I certainly do not need more than half an hour.

*MR. SPARKS:* Same, Judge.

*MR. PLUMMER:* Same with us, Judge.

*THE COURT:* Okay. We will come back in at 2:30, and we will come back in and argue the charge.

*(Recess.)*

*THE COURT:* All right. Turning to the Charge of the Court --

*MR. PLUMMER:* Judge, before we do the charge, could I make a real quick motion?

*THE COURT:* Yes, sure.

*MR. PLUMMER:* Judge, I want to move for leave to amend our answer to explicitly include the statute of limitations to conform to the evidence. The evidence shows the necessary information for a statute of limitations defense. And to the extent there is any ambiguity in our answer, we want to move to amend to add that count.

*THE COURT:* Responses?

*MR. SPARKS:* Judge, we have already rested. We tried this case. And you ruled on this yesterday, if I am not mistaken.

*THE COURT:* I ruled on motions for directed verdict. He is asking for a trial amendment, it sounds like to me. All I did was deny his motion for directed verdict.

*MR. SPARKS:* Yes, sir.

*THE COURT:* This is a different issue, as to whether he gets to amend or not. So any response to his request for a trial amendment?

*MR. SPARKS:* Well, we certainly ask that you deny it, Judge. We have been laboring at this for a very long time, as you are aware. He came in late and filed documentation. I think it's totally unfair to do it now.

*THE COURT:* Mr. Thweatt.

*MR. THWEATT:* Your Honor, we join in the objection. Well, I'm not sure I have standing since this doesn't apply to me; but let me talk to Mr. Sparks.

*THE COURT:* Are you asserting limitations against both Plaintiffs?

*MR. PLUMMER:* No, Your Honor. I'm sorry. I should have clarified that. The evidence we want to conform to is the evidence related to Ms. James and Ms. Taylor's claim only.

*MR. SPARKS:* Judge, the issue is, you know, he didn't object to any of this, he agreed to it. And now he is trying to assert a brand-new defense. We tried this by consent. He didn't object to it then.

*THE COURT:* I think he is arguing that

you all tried this by consent by not objecting to evidence, and he's alleging that he should be allowed to conform his pleadings to the evidence that he claims was presented. That's usually what the argument is on a trial amendment.

*MR. SPARKS:* Judge, we think for them to make that amendment now is certainly prejudicial. And it's by surprise.

The other thing, Judge, when we were talking about the tolling statute and the relation back to this, Mr. Plummer never objected to any of that.

*THE COURT:* Mr. Plummer, why wouldn't Ms. James be surprised by this amendment?

*MR. PLUMMER:* The pleadings have alleged limitations up to -- and there may be an ambiguity in our amended answer that was filed last week and that the Court permitted in. And so I want to get rid of the ambiguity and make it clear. But limitations has always been an issue.

*THE COURT:* I am going to deny the motion.

*MR. PLUMMER:* Very well, Your Honor.

*THE COURT:* Anything else?

*MR. PLUMMER:* Not on that issue, Judge.

Thank you.

*MR. SPARKS:* Judge, the only other thing is, there is a Rule 11 agreement we entered into that I think we may have given you a copy of.

*THE COURT:* It's a stipulation relating to the submission of medical charges?

*MR. SPARKS:* Yes, sir.

*THE COURT:* I have an unsigned copy of it. Is there anything I need to do about that, or are you just filing it?

*MR. SPARKS:* We're just filing it. We have agreed to its admission.

*THE COURT:* You are admitting it as an exhibit?

*MR. SPARKS:* Yes, sir.

*THE COURT:* Okay.

*MR. PLUMMER:* Judge, I don't think it should be admitted as an exhibit that goes to the jury. I don't mind counsel telling the jury that he has had those expenses and I don't mind the Court instructing the jury in that regard, but I --

*THE COURT:* Do you want me to say that it has been stipulated?

*MR. PLUMMER:* Yes. I have no problem with the Court saying that it has been stipulated he

has those expenses. But for the actual Rule 11 to go to the jury, I think it doesn't make sense.

*THE COURT:* All right. I will allow you to tell the jury that it's stipulated.

All right. Mr. Thweatt, what say the Plaintiffs to the charge?

*MR. THWEATT:* Your Honor, we have no objection to Question Number 1, we have no objection to Question Number 2.

With regard to Question Number 3, Item f, "reasonable expenses of necessary medical care that in reasonable probability Jenny Wagner will incur in the future," we would request that that be deleted and omitted.

*THE COURT:* So you are not going to seek future medical?

*MR. THWEATT:* We are not.

*THE COURT:* All right. That's fine.

*MR. THWEATT:* With regard to Question Number 4, under Item b, I believe, Your Honor, instead of Jenny Wagner it should say Tanya James there.

*THE COURT:* Thank you.

*MR. THWEATT:* Beyond that, we have no objection.

*THE COURT:* That's Tanya with an O,

correct?

*MR. SPARKS:* Tanya with an A, Judge.

*THE COURT:* Oh, it's supposed to be with an A throughout here?

*MR. SPARKS:* T-a-n-y-a.

*THE COURT:* Okay. When you get the signed version, you may want to make sure I have her name spelled correctly throughout. I will try to make a global change of that. So it's T-a-n-y-a?

*MR. SPARKS:* Yes, sir.

*THE COURT:* Okay. All right.

Mr. Sparks, what says Intervenor to the charge?

*MR. THWEATT:* Your Honor, we only got through the fourth question.

*THE COURT:* I thought you said you had no more objections.

*MR. THWEATT:* No. Question Number 5, we have no objection.

*THE COURT:* All right.

*MR. THWEATT:* Question Number 6, it looks like there is a formating or spacing issue on Question 6.b and d, in the copy that I have. It may not be on your copy, Your Honor. But we have no objection --

*THE COURT:* I see it. Thank you.

*MR. THWEATT:* We have no objection to Question 7.

On Question Number 8, Item b and d, again there is a formating or spacing issue on the copy that I have. We have no objection to Question 8.

Question Number 9, we have no objection.

Question Number 10.b and d, again there is a repeated spacing or formating issue on the copy that I have; but I have no objection to the substance of the question.

Question Number 11, we have no objection.

Question Number 12.b and d, there is a spacing or formating issue on the copy that I have; but we have no substantive objection to that question.

We object to Question 13 and Question 14.

*THE COURT:* Grounds for your objection to Questions 13 and 14?

*MR. THWEATT:* The grounds are these: There is no evidence before this Court that speaks to Esperanza Arzola's intent at the time that this act was committed. And that, of course, is a central question under the definition that this Court has

provided. It reads, "A person commits arson if the person starts a fire, regardless of whether the fire continues after ignition or causes an explosion, with the intent to destroy or damage."

I specifically asked Ms. Uduma whether she had spoken to Ms. Arzola. She told us that she had not. Therefore, she has no personal knowledge of what Ms. Arzola's intent would have been at the time of the act.

Dr. Karen Gollaher testified in this case that Ms. Arzola was incapable of reciting her ABCs, that she was hallucinating, that she had a history of psychosis, of suicidal ideations, of depression, bipolar schizophrenia. She also told us, of course, that she was deemed incompetent to stand trial at the criminal proceeding.

If anything, there is an abundance of evidence that Ms. Arzola was not capable of forming the mens rea, or the intent as the Court has defined it in the instructions, that she -- that it was her -- that it was Ms. Arzola's conscious objective or desire to engage in the conduct or cause the result. We don't believe there is any evidence to support that, and that's the basis of our objection.

*THE COURT:* Response.

*MR. RAVAL:* Responding to the objection to Questions 13 and 14, there has been evidence with regard to some of the issues relating to the question on arson. Specifically, arson in the definition requires here, under part 2.a, "knowing that it is within the limits of an incorporated city or town." I believe there was evidence that Ms. Arzola understood, she knew where the house she lived was and understood that what burned was the house in which she lived.

*THE COURT:* The objection was that there was no evidence of intent. So let's focus on the parts of these criminal violations that require intent as opposed to knowingness or recklessness.

*MR. RAVAL:* As to intent, I believe the intent can be deduced from the circumstances. You can have circumstantial evidence of intent rather than simply what the person themselves knew or testified to.

And whether or not she was deemed competent to stand trial at the criminal proceeding, we can still refer to circumstantial evidence regarding how the lighter was kept, which is to say it was hidden away in her bra, that she understood that a fire had been started in the home and she was the one who started it. That is sufficient evidence regarding

intent with regard to all these elements.

With regard to arson specifically, I point to 2.a, simply knowing that a building is within the limits of a city or a town is enough for intent under that definition of arson.

*THE COURT:* Well, let's look at the very beginning of the definition of arson. It says, "A person commits arson if the person starts a fire, regardless of whether the fire continues after ignition or causes an explosion, with the intent to destroy or damage." What evidence do I have of intent to destroy or damage?

*MR. RAVAL:* Your Honor, I believe there was evidence that Ms. Arzola understood that she was burning down the house in which she lived. That evidence is the intent to destroy or damage the property of another.

*THE COURT:* You are saying I have evidence at the time the fire occurred that she understood that she was burning it down, or are you talking about evidence that afterwards she understood that the fire had consumed the building?

*MR. RAVAL:* Whether or not she knew at the time she was interviewed by Dr. Gollaher what had happened or what her actions were, if we turn back to

the point in time when the fire occurred and when she was outside just at that time, I believe the evidence showed, and I think it was Ms. Udemezue who said that she was aware that she either started the fire by burning a sheet in the bed -- in the room or that she had a lighter and was the one who started the fire. The fact that she knew that --

*THE COURT:* Would there be any different reaction if, as opposed to intentionally lighting a sheet on fire, she was lighting a cigarette and it fell and she knew she had started a fire that burned down the house? I mean, what can I take from that testimony, if that is in the record, that shows an intent to destroy or damage as opposed to an acknowledgment that she understood that whatever she had done, it had caused the fire?

*MR. RAVAL:* I believe the evidence, Your Honor, is the intent to damage the building. So if she had -- if, if there was evidence that she had mistakenly dropped a cigarette or mistakenly dropped a lighter or that she didn't intend to do that, that might be a little bit different. But I think Dr. Gollaher's deposition excerpts demonstrated that Ms. Arzola understood that she started the fire.

*THE COURT:* I realize that. But what

does that say -- if someone started a fire, you can recognize that you started a fire accidentally or you can recognize you started a fire intentionally. Just recognizing that you started a fire doesn't tell me whether or not that that fire starter did it with intent or did it, like I said, accidentally. What do I have that tells me that she had an intent to destroy or damage?

*MR. RAVAL:* I believe Ms. Udemezue testified that at the time of the fire or just before the time of the fire, earlier that evening, Ms. Arzola was upset with Ms. Udemezue, was upset with her caretaker. And based on the series of actions and events that led up to the time of the fire, I think we can use that evidence circumstantially to demonstrate that Ms. Arzola's setting of the fire was not an accident.

*THE COURT:* Mr. Thweatt.

*MR. THWEATT:* Your Honor, Mr. Plummer made a very big point in this trial that Ms. Arzola had no history of pyromania or starting fires or anything like that. I think that's important when you consider this question. The fact that she was upset prior to the fire for any reason is not definitive evidence of what her mental state, what her mens rea

was at the time she had that cigarette lighter in her hand and she set that mattress aflame. That's what they require in order for a conviction in a criminal proceeding, in addition to all the findings of mental competency.

But she does not -- they do not -- counsel's belief that there was evidence is not evidence. There is either evidence on that issue or there isn't. And the only thing he said was that she was upset. We don't know why she was upset, we don't know the response that she had to that anger, to being upset. We don't know if that's causally linked, the fact that she was upset. We don't know if -- there is no evidence that causally links that, the fact that she was upset, to the fire being started. There is no evidence before this Court that Ms. Arzola intended to destroy or damage.

*THE COURT:* Reply, Mr. Raval?

*MR. RAVAL:* Your Honor, Ms. Udemezue testified that before the fire took place, Ms. Arzola was upset with her for a variety of reasons. I believe she then testified -- and maybe I am using the wrong phrase -- I think she then testified that after Ms. Arzola became upset with Ms. Udemezue she retreated to her room and started the fire. That is

evidence, circumstantial evidence but still evidence, that she intended to start the fire and that the starting of the fire was not an accident.

*THE COURT:* The objection is overruled.

Anything else, Mr. Thweatt?

*MR. THWEATT:* No, Your -- I have the same objection for both 13 and 14. I don't know if I urged that. If I didn't --

*THE COURT:* Right. I understood that as an objection to evidence of intent as to 13 and 14. And that objection as to both questions is overruled.

*MR. THWEATT:* Beyond that, no further objections.

*THE COURT:* Mr. Sparks, what say Interventors to the charge?

*MR. SPARKS:* I think that Mr. Thweatt has pointed out to you some of the things that we had concern about in reference to Question 4, which you have noted, in terms of the Jenny Wagner and Tanya James matter; and we have discussed that.

The other matters, housekeeping as far as the b and d on Questions 8 and the others.

On the issue of 13 and 14, we also object, Judge. And I just want to point out that we have all indicated what Ms. Amuche said that happened,

but in reality that's not true. What happened was, she was upset and she went and kicked the window. And after kicking the window, when she was going to give some medication to her foot, she calmed down. She watched TV. She gave her some medication. She went back. And it was sometime thereafter that the fire started.

I just want to share with the Court that with individuals, in terms of trying to identify intent, we have to take them as we find them. We have heard a substantial amount of evidence that Esperanza Arzola was a very troubled person, Judge, in that she was under a tremendous amount of medication all the time. And there's nothing to say that she had the intent to commit this act, and she certainly had no history of committing a particular act of this nature. So to say that she intentionally committed an arson or did destruction to the property with the conscious idea to cause this destruction, I don't think that is what the evidence shows. And I also, like Mr. Thweatt, urge that 13 and 14 be stricken.

*THE COURT:* All right. Same ruling. The objection is overruled.

Anything else, Mr. Sparks?

*MR. SPARKS:* No, Judge.

*THE COURT:* All right. Mr. Raval, what says defense to the charge?

*MR. RAVAL:* Your Honor, we are fine with the instructions.

As to Question 1, we would request a different definition of negligence and definition of ordinary care. Plaintiffs' proposed jury instructions and their amended charge -- and we'll submit the same in a moment -- have one change. And that is, our proposed definition is, "You are instructed that negligence means failure to use ordinary care; that is, failing to do that which a person or company of ordinary prudence," and the rest of the definition would be the same. For ordinary care, we would also add in "person or company of ordinary prudence."

*MR. PLUMMER:* Let me give the Court a copy of that.

*(Referenced document tendered to the Court.)*

*THE COURT:* Response?

*MR. THWEATT:* I have no objection to that, Your Honor.

*THE COURT:* Mr. Sparks.

*MR. SPARKS:* Yes, sir, Judge. We don't

have a premises claim against the company. It's against the owner.

*THE COURT:* Do you have any claim against the company, or are you just suing Ms. Uduma?

*MR. SPARKS:* We will withdraw the objection, Judge.

*THE COURT:* All right. So that request will be granted, and I will make that change.

*MR. RAVAL:* Aside from that, Your Honor, and just making sure that we are clear on Question 3, part f, being withdrawn, aside from that, we have no objections to any of the questions.

*THE COURT:* Anything else?

*MR. RAVAL:* That's all, Your Honor.

*THE COURT:* Okay. All right. So let me go make these changes. I will get copies out to you all.

What I would ask you to do is, before you leave the courtroom once I get the final version out to you, is look it over to make sure that I got all the corrections that y'all understood I was going to make and take 15 minutes to proof it. And then if there was something, a misspelling or I missed a formating thing or forgot to put the word "company" in one of those instructions, I will fix that so that

y'all have a final final version to go home and rehearse your closing arguments with. All right?

When I come back, we will talk about how long y'all need for closing argument as well, so you can be thinking about that. All right.

*(Recess.)*

*THE COURT:* Mr. Thweatt, how much time do you need for closing arguments?

*MR. THWEATT:* I would like 30 minutes for the initial argument and then 15 minutes for rebuttal, Your Honor. I don't know that I will use all of that, but that's what I would request.

*THE COURT:* Mr. Sparks -- and that's for yourself, that's not splitting with Mr. Sparks?

*MR. THWEATT:* That's correct.

*THE COURT:* Mr. Sparks, how much time are you asking for in closing argument?

*MR. SPARKS:* Judge, I figure 20 minutes.

*THE COURT:* Do you want to split that between opening and rebuttal or --

*MR. SPARKS:* Well, now, what I think about rebuttal, I would like to split 30, if I could, Judge.

*THE COURT:* How do you want to split it? You tell me.

*MR. SPARKS:* I would like to do possibly 20 and then reserve 10.

*THE COURT:* Mr. Raval.

*MR. RAVAL:* I think we would probably use about 40 to 45 minutes, and we would probably be giving some time back.

*THE COURT:* All right. 45 minutes for Plaintiff. You want to split it 30, 15?

*MR. THWEATT:* Yes, Your Honor.

*THE COURT:* With a five-minute warning?

*MR. THWEATT:* Thank you. That would be fine.

*THE COURT:* And then, Mr. Sparks, you were asking for 20 and 10?

*MR. SPARKS:* Yes, sir.

*THE COURT:* And do you want a five-minute warning?

*MR. SPARKS:* Yes, sir.

*THE COURT:* And then defense gets 45 minutes. And you want a warning?

*MR. RAVAL:* If we could get a ten-minute warning.

*THE COURT:* All right.

The way this will shake out, we will probably -- we are probably going to have to take a

mid-morning break in the middle of closing argument. We're not going to go all the way through. Since I don't know how long it's going to take me to read the charge, it's hard to predict exactly when that break will be. I will probably break us after Mr. Sparks has finished his initial opening and before defense gives their closing argument. We will break, come back, defense will give their closing argument. Then Mr. Thweatt and Mr. Sparks will give rebuttal arguments.

Does that make sense to everyone?

*MR. THWEATT:* Yes, Your Honor.

*THE COURT:* All right. And did Alex hand out the charges to you all?

*MR. THWEATT:* Yes, sir.

*THE COURT:* If you could just proofread them and let Lois or Quee or someone know if you find a correction that I forgot to make, and I will fix that.

*MR. THWEATT:* Your Honor.

*THE COURT:* Yes.

*MR. THWEATT:* Pursuant to the court reporter's instructions, we were reviewing the exhibits to make sure that everything appropriate was there and anything inappropriate was out. In

reviewing that, I found Plaintiffs' Exhibit 52, which is one of our designated experts, Edward Anthony Corral's resume. We didn't call him so I am withdrawing that exhibit now. Opposing counsel has indicated that they have no objection to that. So we have a removed it from our exhibits. I just wanted the Court to know.

*THE COURT:* All right. Thank you for reminding me about that.

Y'all are responsible for marshaling your own exhibits and doublechecking opposing side's exhibits. It is not the reporter's job. You need to make sure you have all the exhibits with her. The exhibits stay with her, so if you need to use any during closing arguments, you need to use your own copies or figure out how you are going to do that.

Once we are done with closing arguments, the jury will deliberate. They set the schedule; so we break when they break, and we will let you know when they break. I require at least one lawyer for each party to be in the courtroom while the jury is deliberating or in the attorney ready rooms or if you need to step out to the restroom, that's fine. I don't want anybody going out to the cafeteria or to your car, just in case we get a question from the

jury, we can respond to it quickly. Or if we get a verdict quickly, we can respond to it. So that's how things will go tomorrow.

*MR. THWEATT:* Thank you, Your Honor.

*THE COURT:* All right. Let me know if there is anything I need to come back out here and correct from our charge conference. I will be up here for a few more minutes. See y'all tomorrow.

*MR. THWEATT:* Thank you, Your Honor.

*MR. RAVAL:* Thank you, Your Honor.

*(Recess.)*

*MR. THWEATT:* This is Lee Thweatt, counsel for Plaintiff in this case. I have reviewed all of the Defendants' admitted trial exhibits and found them to be appropriate and appropriately redacted.

*MR. SPARKS:* Shelton Sparks for the Intervenor. We have looked at the same documents and concur with the determination made by Mr. Thweatt. The trial exhibits are appropriately admitted.

*MR. RAVAL:* I'm Raval, counsel for Defendants. We have reviewed Plaintiff's exhibits and Intervenor's exhibits and find them appropriately redacted and admitted for submission to the jury. And our own as well.

*MR. SPARKS:* And our own as well.

*MR. THWEATT:* And I have reviewed the Plaintiff's exhibits. They are fine.

*(Conclusion of proceedings for the day.)*

THE STATE OF TEXAS

COUNTY OF HARRIS

I, Kathleen Keese, Official Court Reporter in and for the 269th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $______________ and was paid by __________________________________________________.

WITNESS MY OFFICIAL HAND this the 29th day of December, 2011.

/s/ Kathleen Keese
______________________________

KATHLEEN KEESE
TEXAS CSR NO. 758
Expiration: 12/31/12
Official Court Reporter
269th District Court
201 Caroline, 13th Floor
Houston, Texas 77002

VOLUME 1 OF 1
REPORTER'S RECORD
CAUSE NO. 2009-40925

| | | |
|---|---|---|
| PATTI WAGNER, AS GUARDIAN OF JENNY ANN WAGNER, AN INCAPACITATED ADULT<br>Plaintiff | * | IN THE DISTRICT COURT OF |
| And | * | |
| WYLETTE TAYLOR AS GUARDIAN OF DERRICK JAMES, AN INCAPACITATED ADULT<br>Intervenor, | * | |
| VS. | * | HARRIS COUNTY, T E X A S |
| FOUR J'S COMMUNITY LIVING CENTER, INC., ANTHONIA UDUMA AND GODFREY UDUMA<br>Defendants. | * | 269TH JUDICIAL DISTRICT |

HEARING ON MOTION FOR ENTRY OF JUDGMENT
JANUARY 13, 2012

On the 13th day of January, 2012, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Dan Hinde, Judge Presiding, held in Houston, Harris County, Texas. Proceedings reported by stenographic machine shorthand.

KATHLEEN KEESE,CSR
Official Court Reporter
269th District Court

A P P E A R A N C E S:

Mr. L. Lee Thweatt
SBN: 24008160
Mr. Joseph D. Terry
SBN: 24013618
TERRY & THWEATT, P.C.
One Greenway Plaza, Suite 100
Houston, Texas 77046-0102
713.600.4710

Mr. Russell S. Post
SBN: 00797258
Mr. Robert H. Ford
SBN: 24074219
BECK REDDEN & SECREST
1221 McKinney, Suite 4500
Houston, Texas 77010
713.951.3700

COUNSEL FOR PLAINTIFF

Mr. Shelton Sparks
SBN: 06507160
SHELTON SPARKS & ASSOCIATES, L.L.C.
706 Cordell Street
Houston, Texas 77009
713.862.5533

Ms. Tiffany C. Harvey
SBN: 24067343
THE LAW OFFICE OF TIFFANY HARVEY
706 Cordell Street
Houston, Texas 77009
832.498.7076

COUNSEL FOR INTERVENOR

A P P E A R A N C E S:

Mr. James C. Plummer
SBN:  16075700
Mr. Amar Raval
SBN:  24046682
PLUMMER & KUYKENDALL
4203 Montrose Blvd., Suite 270
Houston, Texas  77006
713.522.2887

Mr. David W. Holman
SBN: 09902500
THE HOLMAN LAW FIRM, PC
24 Greenway Plaza, Suite 2000
Houston, Texas  77046
713.400.4840

COUNSEL FOR DEFENDANTS

# I N D E X

VOLUME 1 OF 1

JANUARY 13, 2012

Page

PROCEEDINGS .................................. 5

Calling of case .............................. 5

Appearances of Counsel ....................... 5

Plaintiff and Intervenor's Joint Motion for Entry of Judgment ................ 6

Ruling of the Court .......................... 69

Court Reporter's Certification .............. 75

* * * * * * * *

P R O C E E D I N G S

*THE COURT:* The Court calls Cause Number 2009-40925. Patti J. Wagner versus Four J's Community Living Center, Inc.

Can I have appearances of counsel for the record, please.

*MR. POST:* Your Honor, on behalf of the Plaintiff, Ms. Wagner, Russell Post.

*MR. THWEATT:* Lee Thweatt, Jim Terry on behalf of the Plaintiff, Ms. Wagner.

MR. FORD: Robert Ford on behalf of the Plaintiff, Ms. Wagner.

MS. HARVEY: Tiffany Harvey for the Intervenor.

MR. SPARKS: Shelton Sparks for the Intervenor.

*MR. HOLMAN:* David Holman on behalf of the Defendants.

MR. PLUMMER: Jim Plummer on behalf of the Defendants, Your Honor.

*THE COURT:* Good afternoon. I appreciate y'all's patience, as a couple of the earlier hearings went a little longer. So thank you for your patience.

We're here on the Plaintiff and

Intervenor's Joint Motion for Entry of Judgment. We've got a lot of substantial briefing on this. I have read the motion and the response and the reply and looked at the cases. So that's just to give y'all a heads up on that. But this is the Plaintiff and Intervenor's motion, so I will let you all proceed first.

*MR. POST:* Your Honor, I appreciate it and I'm happy to proceed in whatever way is simplest for the Court. We have a very straightforward motion for entry of judgment on the verdict. It seems to me it might make sense to allow Mr. Holman to present his substantive challenges, and it may be more efficient for the Court for us to respond to his argument. But I'm happy to proceed whichever way the Court would prefer.

*THE COURT:* Would you like to go first, Mr. Holman?

*MR. HOLMAN:* Sure.

*THE COURT:* All right.

*MR. HOLMAN:* Your Honor, we saw their motion for entry of judgment on the verdict; and there were a couple of problems that we saw initially. Number one, if Chapter 74 applies, then the damages must be reduced, the noneconomic damages,

must be reduced from $14 million down to $250,000 per claimant. Number two, they were asking for judgment against Ms. Uduma personally; and there is no basis for judgment against Ms. Uduma personally. Let me address those in order.

First, the question of whether Chapter 74 applies. As you know, this issue was raised pretrial. Mr. Plummer filed a motion to amend his answers to allow him to assert Chapter 74, which the Court recognized was relevant as to the damage caps. They -- the Plaintiff and the Intervenor filed motions to strike that amended answer, and the Court took that up. The Court allowed that amended answer, and so Chapter 74 is in the case.

Now, does Chapter 74 apply? We think that there is no question Chapter 74 applies; and let me go through the analysis, if I can. First of all, there is in black and white in the Civil Practice and Remedies Code a statement about what constitutes a health care institution. And it says that a health care institution is "a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act, as amended."

Now, there is no dispute in this record that Four J's is a home and community-based services program for the treatment of mentally retarded persons, as authorized by DADS under the charter of the State of Texas. The reason that there is no dispute about that is that every single document -- almost every single document discusses that Four J's is a home and community-based services program. There is -- we presented the Court in our response to -- to the brief filed by the Plaintiff, Wagner, we filed excerpts from all the exhibits that talk about Four J's being a home and community-based services program, an HCS program, for mentionly retarded adults.

Then there was -- we also presented the Court with the reference to the testimony of Ms. Wagner, who said that she was putting Jenny into -- transferring Jenny to Four J's which was an HCS program. We also presented the Court with references to the testimony of other folks, such as Ms. Uduma, Ms. Obichuku and Mr. Kern, all of whom testified about HCS and HCS policies and also the regulation by DADS.

We also presented the Court with the reference to Mr. Kern's expert report in which Mr. Kern said Four J's is a home and community-based

services program, services facility, HCS facility.

The Texas Administrative Code 40, Texas Administrative Code 9.153 defines an HCS program as a home and community-based services waiver program as authorized by Section 1915(c) of the Social Security Act.

*THE COURT:* What provision is that again?

*MR. HOLMAN:* That's 40, Texas Administrative Code 9.153.

*THE COURT:* All right. 9.153?

*MR. HOLMAN:* Yes, sir.

*THE COURT:* Thank you.

*MR. HOLMAN:* Also we cited in our brief the other administrative code provision which further defines the HCS program; and that is 9.154(a), which states, "The HCS Program is a Medicaid waiver program approved by the Centers for Medicare and Medicaid Services (CMS) pursuant to 1915(c) of the Social Services (CMS) pursuant to 1915(c) of the Social Security Act. It provides community-based services and supports to eligible individuals as an alternative to the ICF/MR Program," which is the intermediate facility program. That would be similar to the state school program. "The HCS Program is operated by DADS under the authority of HHSC." That's in the 40, Texas

Administrative Code, Section 9.154(a).

Now, so there is no dispute that Four J's -- and there was never any dispute in the record of this case during the trial of the case -- that Four J's operated as a home and community-based waiver program under DADS.

It is clear under Section 74.001(a)(11)(I) that "a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act," is a health care institution. And then we turn to the next section which defines a health care provider; and a health care provider is defined as including, under (12)(A)(vii), "a health care institution." So if you are a health care institution you qualify as a health care provider under Chapter 74. Thus, we don't think that there is any dispute in the record and there can be no dispute in the record that Chapter 74 applies to Four J's and that Four J's is a health care provider. And we have cited the Court to two cases that have held in the same way. They have held that the -- the -- the nature of this entity is a home and community-based services program for mentally retarded adults; and, therefore, it is a health care provider.

Now, the more difficult question for you is whether Ms. Uduma is a health care provider. Now, on a blank slate, if this were being written on a blank slate, there could be no question that as a matter of law Ms. Uduma is a health care provider. And the reason for that is that the statute in unmistakeable terms says that an owner, a director, an employee of a health care provider is a health care provider. We know from the undisputed testimony that was given by both the Plaintiffs and the Defendants in the trial of this case that Ms. Uduma is the owner of Four J's and she is the CEO of Four J's and that she is the president of Four J's. So she would qualify, on a blank slate, as a health care provider under this statute, no question.

The question arises because at the time that the Court in pretrial was wrestling with the issue of whether to grant the motion to amend, the Court -- they raised the question about whether Chapter 74 applied to Ms. Uduma because the argument -- our argument was that she was being sued as a premises owner. Mr. Plummer said, I agree with you, I don't think Chapter 74 applies. And he went further. He said, we are not going to assert any remedies, any rights, defenses for Ms. Uduma under

Chapter 74.

Now, they have taken the position that that is a judicial admission and that bars him from -- bars Ms. Uduma from arguing that she is a health care provider under Chapter 74. I was troubled by the statements that Mr. Plummer made as well. And, you know, I made no secret of that to Mr. Plummer when I saw it because I thought: Well, gosh, you know, you made these statements; the Court heard these statements. But then I started looking into the law of judicial admission. The law of judicial admission is that you can judicially admit a fact but you can't judicially admit a matter of law. The idea is, I can't judicially admit, for example, that the Tort Claims Act doesn't apply to the City of Houston. That's not subject to judicial admission because it is a question of law.

*THE COURT:* Step away from the Tort Claims Act because that brings in the issues of sovereign immunity which also brings in the issues of jurisdiction --

*MR. HOLMAN:* Sure.

*THE COURT:* Give me a different example.

*MR. HOLMAN:* Let me give you a different example. There is a case that we cited where there

were deemed admissions, and one of the deemed admissions was that the defendant breached the contract. Another one of the deemed admissions was that defendant owed a commission. And the Court looked at that as judicial admission and said it doesn't qualify as a judicial admission because it's admitting a question of law. And you can't, in judicial admission, admit a question of law. So those deemed admissions, the Court said, were of no effect.

We cited a number of other cases --

*THE COURT:* So lawyers who make arguments in court can't bind their clients as to the concessions they make? Say you are in oral argument and you concede that, well, Your Honor, yes, this law does not apply in this context. They can't be bound by that concession?

*MR. HOLMAN:* Well, you know, I -- and that's what I had trouble with, as well. I mean, frankly, I was -- I was troubled with the idea of Mr. Plummer representing to you that Chapter 74 didn't apply in that situation. What I did was I looked at it under the concept of judicial admission. If -- if I were to judicially admit, as, you know, Mr. Plummer did, that Chapter 74 doesn't apply to Ms. Uduma and Chapter 74 as a matter of law applies to

Ms. Uduma, I don't think that judicial admission has any effect. I think you can in certain circumstances, you -- you can simplify your case by eliminating certain claims and that sort of thing. Certainly, you know, there are ways you can stipulate and abandon and do Rule 11 agreements and all kinds of things.

*THE COURT:* What's your response, though, to Plaintiff and Intervenor's argument that, well, if Mr. Plummer hadn't said that we would have accepted the Court's offer to continue trial because that did shape our trial strategy and the way we approached presenting evidence and arguing to the jury?

*MR. HOLMAN:* I, you know -- frankly, I have no response to that. I think that -- that probably -- were I arguing on their behalf, I would probably argue judicial estoppel. I would say that, you know, they relied upon that because he made that statement and therefore he should be judicially estopped from taking the contrary position. But, you know, the argument that they made was judicial admission; and, you know, frankly, I'm just addressing the argument that they made.

I believe that what we have to do is look at the statute. And, you know, if we are going

to hold that Four J's is indisputably a health care provider, which I think we have to do, then the question is: Is the owner of Four J's subject to Chapter 74 or not?

I think Mr. Plummer's problem was that when he looked at it he was thinking that they were suing her as a premises owner and that fell outside the statute. And, you know, I think there was some confusion on his part, perhaps; but I don't think that that changes the nature of how the statute applies. But --

*THE COURT:* Well, let me just stop you there.

*MR. HOLMAN:* Okay.

*THE COURT:* What record suggests that they were not suing her as the premises owner?

*MR. HOLMAN:* Nothing.

*THE COURT:* Then why do -- why do we care about whether Chapter 74 applies?

*MR. HOLMAN:* Well, because if she is a health care provider then it becomes a health care liability claim even though they are suing her as, quote, a premises owner.

*THE COURT:* How is that? How is she a health care provider as a premises owner?

*MR. HOLMAN:* Because -- well, Four J's is a health care provider. She, being an employee, whatever, of Four J's is a health care provider. If they sue her for her failure to provide safety for the people that were the residents, the patients, then that's a health care liability claim. You know, we presented those -- all of these cases that talk about health care liability claims and what constitutes a health care liability claim. And there is a number of cases, including the Marks case that they rely upon and the Omaha Healthcare case, the spider bite case, that the Court is familiar with, where the Court said -- where they tried to make the distinction, well, it's just a premises claim, it's not a health care liability claim. And the Court said, no, it's a health care liability claim because the central focus of this claim, the underlying nature of the claim is that you are suing them for failing to provide safety for the residents.

*THE COURT:* So if someone -- let's take a nurse. She owns her own house. Someone trips and falls in the house and scrapes their knee. And she goes, "Oh, wait. I've got the Bactine in my first aid kit and the Band-Aid." She goes and disenfects it, puts a Band-Aid on it. But, unbeknownst to the person

who is injured, the house is infected with staph; and he comes down with a staph infection. And he files a premises liability case, defective condition, that the house had a staph infection. The very fact that, just because she is a nurse, she would not be subject to the ordinary premises liability standards for whether or not she was liable for, you know, failing to warn and make safe her staph-infected house?

*MR. HOLMAN:* Well, you know, I think if you have a situation where you have a nurse and there is a premises problem, somebody falling --

*THE COURT:* And add in that she works for a hospital --

*MR. HOLMAN:* Okay.

*THE COURT:* -- a health care institution.

*MR. HOLMAN:* Right. And somebody falls down in her house. That is a, definitely, a premises claim.

*THE COURT:* She is an employee of the health care institution.

*MR. HOLMAN:* Yes.

*THE COURT:* She is a health care provider.

*MR. HOLMAN:* But what you do is you look

at the underlying nature of the claim. The underlying nature of their claim is they're claiming that these folks were residents of the entity which is a health care provider and that these folks were not provided safety.

The best case on this -- and, you know, I discussed it in the brief; but, you know, it was discussed pretrial, which is the brown recluse spider case. What happened is it's a nursing home, and a spider bit one of the residents. And the plaintiff sued saying, "Well, you didn't do proper pest control. And, you know, you should have prevented spiders from getting in here." And that's a premises claim.

The Court analyzed that and they said, "Look, if somebody is in your -- in your facility and they are in custodial care in your facility and you are responsible for providing their fundamental needs --" What are their fundamental needs? Health and safety. And if your argument is you didn't provide them safety, then that's a health care liability claim. And that's what we're -- that's what we're faced with here.

The arguments and all of their arguments, the underlying nature of all their arguments is: They were patients and you

didn't provide them safety from the fire that occurred. You didn't provide them protection from this fire, protection from this harm. You didn't provide for their fundamental needs. That's a health care liability claim.

Now, whether they are suing Ms. Uduma as a, quote, premises owner or not, the underlying nature of the claim is the same as far as Ms. Uduma goes.

But let me address, if I may, because this -- this feeds right into the other argument. Say Chapter 74 doesn't apply to Ms. Uduma. What are we left with? They want to sue Ms. Uduma individually. They want to get liability against her, a judgment against her personally as a, quote, premises owner. And you have seen that. I mean, you have seen that in their, in their pleadings. You have seen it in their questioning of Ms. Uduma.

They said, "Ms. Uduma, you realize you are being sued as a premises owner?" You saw that in the charge conference and in the language, in the language that they put in the charge about how they wanted liability against her with respect to the condition of the premises, so forth.

Can Ms. Uduma be liable as a premises

owner in this situation? And I submit to you that the case law states that she cannot be liable as a matter of law.

Now, the case that I cite is the same case that they cite. It's the landmark case. It's the Johnson County Sheriff's Posse versus Endsley. It's a Texas Supreme Court 1996 case. And what that case says is that a lessor has no duty to protect one from dangerous conditions that occur on the premises after the, after the place has been leased. There is no duty. Once the lessor leases the premises, there is no duty. And the Court said, the reason for this is because she has relinquished possession of the property; therefore, we will not as a matter of law impose a duty on her.

Now, there are three exceptions to that rule, that general rule. And the three exceptions are burdens that the plaintiff has to prove, according to the Endsley case. The only exceptions that they have are these three: One, to show negligent repairs. There is no allegation or proof of that. Number two, concealed defects. No allegation or proof of that. Or, third, that she retained control over a portion of the premises on which the injury occurred. There is no allegation or proof of that.

Now, in their brief they alleged -- in their brief they allege that she retained control of the fire safety. And they tried to establish that by showing that she took the fire marshal around and that she was the one that dealt with the OMNI group that did the fire alarms. The first problem with that analysis is that there is no showing that she retained any control over a portion of the premises after she leased the property to Four J's. And there is no evidence whatsoever about that, but the second problem is that the evidence establishes the contrary of that proposition.

She was asked directly about taking the fire marshal around and "Didn't you do that as the premises owner?" She said, "No. I had leased the property."

They asked Mr. Overholt, "Well, didn't you --" I can't remember the exact words; but it was something like, "What was your relationship with Ms. Uduma?" He said, "I knew her as the principal of Four J's. Did she ever mention to you that she was the property owner?" He said, "I assumed that, but she never used those words."

There is no evidence whatsoever that she as the premises owner, apart from -- you know, as

the premises owner retained any control over fire safety as if they were retaining control over the premises. So, under the Endsley case -- and the Endsley case is clear -- there are no exceptions that apply to the general rule. And the general rule is that she has no duty as a lessor; and, therefore, she has no duty and cannot be personally liable for this judgment.

Now, they have also cited and we cited as well Restatement provisions 360 and 361. And I think those are important too because the Restatement provisions talk about retention of part of the land. And both of those provisions talk about retention of part of the land. That's the way that a lessor becomes liable, if the lessor retains control over part of the land. And there is no evidence whatsoever that she ever retained control over part of the land, as if, you know, the lessor would retain control over common areas, for example.

Now, they have cited a case called the Osti case. And, if I may, that's the only case that they cited that they say supports liability in this situation against Ms. Uduma. Osti was a case in which the fellow was in a third-floor apartment that didn't have any exits. And the Court said that's a

structural issue. The lessor had a duty to provide a fire escape, and the lessor didn't do it. So the lessor can be liable for failing to provide a fire escape because that's a structural issue.

We don't have that situation here. There is no allegation that there is some kind of structural problem wrong with the house, with the group home that she leased to Four J's.

*THE COURT:* Could it have been a back door that would not open?

*MR. HOLMAN:* Well, it's a back door that was locked, that had a dead bolt; but that's Four J's problem. Four J's was the occupier of the premises. Once she relinquished possession to Four J's, Four J's was responsible for all of that stuff. There is no allegation here that this was a third-floor apartment without a fire escape.

So that -- that case stands for a limited proposition that deals with structural problems. And there are no such problems that are alleged in -- and that case doesn't have any -- I couldn't find any other cases that relied on that case. But I found plenty of cases that relied on the Endsley case that say that there is no duty on the lessor in this particular type of situation.

Now, the other thing that I saw was that they have cited something in the brief called the International Residential Code. And we tried to look through the record of the trial and couldn't find any reference to the International Residential Code. So I don't know where that comes from or how it applies or would be promulgated or how -- how it would apply to Ms. Uduma in this situation. It might apply to Four J's because Four J's was the occupier of the premises, but it wouldn't apply to Ms. Uduma because she had already leased the premises to Four J's.

Now, there is another argument that's made about Ms. Uduma personally, which would apply, I guess, if Chapter 74 didn't apply to Ms. Uduma personally. And they say that, that she could be liable personally as the agent of Four J's. And, first of all, that was not what was tried. As the Court knows they tried her being a premises owner. That's how they framed their case. That's how they told the jury that they were trying their case, that she was being sued personally as a premises owner. They never sued her as an agent.

They did have alterego allegations, but they never tried those alterego allegations.

There is a problem with them trying to hold her personally liable as the agent of the corporation. There is a series of cases -- Leitch versus Hornsby, Chron Tri versus J.T.T., Texas Supreme Court cases -- that said that if the corporate agent is accused of violating the same duty that is owed by the corporation then you can't hold the corporate agent personally liable. And there is a number of cases that have followed that. And, you know, the idea is that they have to have some independent duty that was violated. And there was no evidence or proof of some independent duty that was here. But more importantly -- and I pointed this out at the end of the argument -- is the illogic of it. If it's true that Four J's is a health care provider whose damages are limited to 250,000 per claimant and their argument now is that Ms. Uduma was an agent of Four J's, under the statute an agent of Four J's is also a health care provider and would be subject to the damage caps. But what they are saying in their brief is you should hold that Four J's -- that damages are limited for Four J's, but they are -- you can get unlimited damages against Ms. Uduma as the agent of Four J's. And that doesn't make any sense at all. And it is certainly not the proper construction of the

statute in that circumstance.

If they are saying that she is personally liable as a premises owner, that's one thing. We can deal with that argument. But if she tries to say -- if they try to say she is an agent of Four J's, that takes us right back into Chapter 74.

So what we are asking the Court to do -- this is their motion for entry of judgment -- we are asking the Court, if the Court enters judgment, to reduce the damage caps to 250,000 per claimant. And it's just the noneconomic damages, the 14 million, reduce those down to 250,000 per claimant, pursuant to 74.301, which is the limitation on noneconomic damages. And then, do not enter judgment against Ms. Uduma personally because there is no basis for it.

*THE COURT:* Are you still persisting in this argument that because there was no expert report as to Ms. Uduma that the claims against her should be dismissed?

*MR. HOLMAN:* No. No, we're not. I had made that argument before I saw your comments in the pretrial. And your comments in the pretrial made it clear that that expert report argument was waived, and we're not raising that anymore.

*THE COURT:* All right.

All right. I've got a couple questions for you.

One of the arguments that the Plaintiffs make was that there was a lack of evidence that Four J's was actually licensed at the time of the fire. What evidence do you have in the record that shows that Four J's was actually a licensed institution at the time of the fire?

*MR. HOLMAN:* I don't think that there is a license on file. But -- and, as we said, the undisputed evidence is that they were operating as an HCS facility under the auspices of DADS. Everybody admitted and all the documents admitted that they are operating under, under the authority of DADS.

*THE COURT:* Don't you have to have a license to operate under the authority of DADS?

*MR. HOLMAN:* Of course. The, the situation in Texas is you can't operate a facility as an HCS facility without a license. And, believe me, if we -- if there was any dispute about whether we had a license -- which there wasn't throughout the trial -- if there was any dispute, they would have brought that up and said, you are violating the regulations because you are operating this facility without a license. There was never any evidence or

any dispute that we were properly authorized to act as an HCS facility. And all the documents support that.

*THE COURT:* All right. Those are my questions.

Mr. Post.

*MR. POST:* Yes, sir. Your Honor, I would like to begin with the Chapter 74 question regarding Four J's. I think it's important to step back for one moment and see the big picture of the case, see how the issues interact, because Four J's was found 60 percent responsible for this incident. So it would be jointly and severally liable. Four J's does not have any duty argument here. Four J's is depending on its ability now to establish the applicability of Chapter 74. If it fails in that effort, then the Plaintiff and the Intervenor are entitled to a joint and several judgment of the uncapped damages with respect to Four J's. We still, obviously, would want the judgment with respect to Ms. Uduma personally. But that would essentially be a roadmap to a decision of the case.

*THE COURT:* But that would be after 60 percent -- the percentage liability application, right?

*MR. POST:* With respect to whom, Your

Honor?

*THE COURT:* Four J's.

*MR. POST:* No. Four J's is jointly and severally liable because --

*THE COURT:* But I'm saying that -- you're not saying that you could get 14 million against Four J's? You are saying 60 percent of 14 million?

*MR. POST:* That would include -- we would be entitled to recover everything.

*THE COURT:* That's with the 60 percent of --

*MR. POST:* Yes, because under Chapter 33 a defendant that is found more than 50 percent liable is --

*THE COURT:* All right.

*MR. POST:* We wouldn't be entitled to recover twice, obviously. We would never try to do that.

*THE COURT:* It would be up to Ms. Uduma then to seek contribution for --

*MR. POST:* Exactly. That's exactly right.

*THE COURT:* I see.

*MR. POST:* Now, let me turn to the

question of whether Four J's is entitled to invoke Chapter 74 because this is a question of conclusive evidence. It's not a legal question.

Mr. Holman has cited the statutes that make an HCS program fall within the definition of a health care institution; but the key is he has to establish the factual predicate that Four J's at the time of this incident was, in fact, an HCS program.

We had a full trial. Mr. Holman says repeatedly there was no dispute about this issue, but this is not our burden. It is the Defendants' burden of proof to prove that they are entitled to invoke this statute. They had the burden to prove it, and they did not prove it at trial. And they did not ask for jury findings on it. And so, in this posture, they had the obligation under Rule 279 to establish it conclusively. If it's not conclusively established that Four J's was a certified HCS program at the time of this incident, that defense is waived and they cannot invoke Chapter 74.

The proof that you see in their motion I think underscores their full awareness that they did not prove this fact at trial. The issue never came up. When they filed their original response to our motion for judgment, they simply asserted that they

were an HCS program without proof. We filed our response and pointed out that they hadn't established that fact. They had a month in which to dredge the record for that evidence. And they don't have evidence that conclusively establishes that.

Here's what I want to emphasize. They have given you four categories of evidence that they say establishes that they are an HCS program. None of that evidence is conclusive. And it's important to look at this carefully in light of the conclusive evidence standard. Mr. Holman correctly cites a couple of cases that have found HCS programs to be health care institutions; but, importantly, in neither of those cases was the Court faced with the question of whether the defendant proved it was an HCS program. This is that case.

Now, the first category of evidence that they cite is a series of exhibits that referred to Four J's as an HCS program. That was their Appendix A. All that is is a series of internal documents from Four J's that internally brand it as an HCS program. But those documents don't say anything about certification; they don't say anything that establishes that, in fact, Four J's was certified at the time of this incident; and, in fact, they don't

conclusively establish even that it's an HCS program. They simply say Four J's holds itself out as such. A fact finder would not be obligated to believe that evidence. At best, that would have been probative evidence to put before the jury. But they didn't ask the jury to make a finding, and that's not conclusive evidence of anything.

In a moment, when I deal with the Web site evidence, I'm going to walk you through the way the administrative scheme works; and you will see there is a certification procedure that involves annual reviews, relicensing. And there is a certificate that has to be issued. They haven't dealt with any of that with these internal exhibits.

Their second category of evidence they claim is trial testimony. I read every excerpt of that trial testimony today. None of it says that Four J's was a certified HCS program. Yes, there are references to the procedures of HCS programs. Yes, there are some references to a variety of regulatory proceedings. But nothing in that testimony ever specifically says HCS is a certified program. And even if it did, it's within the province of the trier of fact to believe or disbelieve contested testimony. We would have a chance to impeach and cross-examine

witnesses on that issue if they had ever put a witness up who gave that testimony. So that can't be conclusive evidence.

I would emphasize, among the excerpts that they cited, from the October 18th trial testimony was the testimony of the Plaintiff's expert Mr. Kern, who at Pages 256 to 261 talked some about the certification procedure and the fact that there are annual reviews and that an institution can loose its certification. And so there is in fact converting evidence in the record that would allow a fact finder to question whether this institution was certified. That's certainly not conclusive evidence as they have to prove it.

The third category of evidence -- and this is, I think, the real evidence of a guilty conscience -- is they try to use the Plaintiff's Chapter 74 expert report to prove that they were an HCS program. As the Court knows, that expert report is not in evidence; and so it cannot be used now to establish their defenses as a matter of law.

Second, under Chapter 74, which they are trying to rely on, no expert report can be used for any purpose. They would not be trying to rely on that expert report if they believed they had proved

this defense as a matter of law at trial. They know they didn't.

So that brings us to the key to their case, and their whole defense now rests on this one premise. They want you now to reopen the evidence and take judicial notice of two Web sites which they say now, two months after trial, are going to prove their defense. And I want to talk at some length about what's wrong with that effort to rely on these Web sites.

First of all, I don't think it's an appropriate use of judicial notice to ask a Court to judicially notice a fact that is essential to establish an essential element of a theory of recovery or defense after trial. What they are saying is we can come in for the first time after trial and, essentially, establish the element of our defense as a matter of law. Rule 270 says that you cannot take additional evidence on a controversial matter after the jury has returned a verdict. And that's the essence of what they are asking you to do here. And it fits with the judicial notice rule because, even when judicial notice is proper, it's proper only if the fact that is being requested for judicial notice is not within reasonable dispute. They have to

conclusively establish that the fact exists that they are asking you to take judicial notice of. And these Web site excerpts simply won't do it.

If you turn to the actual documents that they have attached, I want to point out a few problems with these Web site excerpts. The Web site excerpts don't say anything about whether Four J's is certified. That's the key fact, is whether Four J's was in fact an HCS program in accordance with the Social Security Act at the time of this incident. Nothing in these two excerpts say that. In fact, there is a detailed certification procedure --

Robert, if you will give the Court a copy of this.

*(Referenced document tendered to the Court and counsel.)*

*MR. POST:* -- that an institution has to go through to maintain its certification.

I'm going to try to do this efficiently. I don't want to get lost in the regulations, but Tab A is Section 9.151 of the Administrative Code. You will see Paragraph 3 says this statute controls the process for certifying an HCS program. Likewise, Tab B says this subchapter applies to all HCS programs.

I think this is exactly the statutes

that they are relying on.

*THE COURT:* Let me ask, this tab -- these are administrative codes?

*MR. POST:* Correct, Your Honor.

*THE COURT:* You were referring to a statute.

*MR. POST:* Well, I'm loosely referring to the Administrative Code as a statute. It is technically regulatory, but it is the applicable regulatory law here.

*THE COURT:* All right. Thank you.

*MR. POST:* Tab C, Your Honor, in Paragraph (a) -- this is the language upon which Mr. Holman relies. And I agree with him -- establishes that an HCS program is the Medicaid waiver program that is referenced in Section 1915(c) of the social Security Act. We don't quarrel with that conclusion, but they have to establish that they are a certified program.

Turn then to Tab D. Section 9.171 sets forth the certification and review procedures. Paragraph (a) makes clear a provider has to be in continuous compliance with the program certification principles.

Paragraph (c) points out that

DADS conducts on-site certification reviews annually. And Paragraph (d) provides that a certification lasts for one year only, and it has to be renewed each year. And so the fact that at one point in time this institution was a certified HCS program does not mean that it is "world without end, amen."

Turn then to Tab E, which discusses the process for certification. Paragraph (a) assumes the best case. If DADS does a certification review and finds compliance with all certification principles, the program is certified. But that's not the only provision. This is an entire spectrum of what the regulation calls sanctions that deals with the extent of noncompliance. I want to point you to just a couple of potential consequences.

They have the burden to show you conclusively that they were certified; so, I'm not going to try and go through this exhaustively. But look, if you would, at the second page of this provision at Paragraph (d), left-hand column, one-half of the way down, "If DADS determines that a program provider is out of compliance with between 10 and 20 percent of the certification principles at the end of the review exit conference ... DADS does not certify the program." That throws the program into a

follow-up review process. At the end of which -- and you can see this in Paragraph (2) -- "Based on the results of the follow-up review," Subparagraph (B), if corrective action has not been satisfactorily taken DADS denies certification of the program and implements other sanctions.

Without burdening the Court with a lot of administrative parlance, I will tell you that if you go through the rest of this provision you will see heightening degrees of sanctions that, likewise, lead to denials of certification. So it's not the case that simply because one assumes that this program was once an HCS program it is automatically and forever an HCS program.

So what do we have then on these Web sites? Again, the Web sites don't say anything about whether HCS is in fact -- pardon me -- about whether Four J's is in fact a certified HCS program, particularly not on this date. They don't say anything about whether certification was present at the time. And I want to talk a little about the details of what you see on the face here.

These Web site excerpts specifically say, we're providing this as a service to provide a list of providers. Look at -- at the bottom of the

first page at the caution.

The caution says: This is simply a tool we provide you to help you make a selection. This is not a report of the agency's official business. This is a public service to provide a list of potential providers. And, importantly, look at the last sentence of that caution. This site may include some self-declared and unverified information.

The test the Supreme Court has laid out for judicial notice is that the fact you are asked to take judicial notice of must be, quote, verifiably certain. That's what the Supreme Court said in the Eagle Trucking case. This Web site says, we are telling you some of the information on this list is not verifiable. On its very face, it's not appropriate for judicial notice.

When you look at the second attachment that they have provided, you see a compliance history. It is littered with noncompliance. We don't know what action was taken by DADS at the relevant time. We don't know what corrective steps were taken. We don't know whether they were certified at the time.

Now, perhaps a fact finder could draw an inference had this evidence been properly introduced at trial that they were certified; but it's certainly

not conclusive evidence that no reasonable mind could dispute. And had they tried to put it on at trial, we would have cross-examined them, not only about what is on this document, but on the nature of the investigations that took place, the review process that took place, and whether there was in fact a certification.

I want you to note in this respect the dog that's not barking. They didn't put Ms. Uduma on to testify that they were certified as an HCS program. They haven't given you an official certificate that says on this date they were certified as an HCS program. Mr. Holman says, if I hear him correctly, they don't have it.

This is categorically not appropriate --

*MR. HOLMAN:* I don't mean to interrupt, but -- --

*THE COURT:* You will get a chance to respond.

*MR. HOLMAN:* -- I never said that I didn't have it.

*THE COURT:* You will get a chance to respond.

*MR. POST:* They have to prove this fact

conclusively. This evidence doesn't prove this fact conclusively. And because they can't establish it, they have to live with the consequences. They have not established their right to invoke Chapter 74, which means all the other questions related to Chapter 74 are inapplicable.

Now I'm going to touch very briefly on Ms. Uduma's argument that she can invoke Chapter 74. Mr. Holman says he meets the one argument that we raised in our response that this was a judicial admission made by defense counsel; but, of course, I didn't make one argument in my response, I made three arrangements in my response. I argued it was a judicial admission, but I also argued that it was a waiver because counsel made a stipulation to these lawyers and to the Court that he would not assert a defense. And even if you have a legitimate legal position, a lawyer representing a client can choose to waive that position; and defense counsel did that. And you cannot overcome that by saying the evidence was conclusive. He stipulated he would not assert this defense, and he has to be bound by that stipulation.

And the third argument I made, he needed your leave to file an amended pleading asserting

this defense on behalf of Ms. Uduma. You didn't give him that leave because, when counsel on this side of the table asked for a clarification of your ruling, you looked at him and you said: Are you asking for relief for Ms. Uduma? And he said no. He does not have a ruling granting him leave to amend and assert Chapter 74. He has waived that consciously. That means it's immaterial whether it's a judicial admission.

Now, with respect to the judicial admission point, Auld is the only case cited by the parties that deals with the application of Chapter 74; and Auld stands for the proposition that whether you are a health care provider is a fact that can be judicially admitted. And I believe it was admitted here, but that question is not even before the Court.

I'm going to touch finally on the duty question with respect to Ms. Uduma. I don't think we're really in any disagreement about the law. I agree with Mr. Holman's statement of the basic principles. I also agree with his statement of the exceptions with regard to the retention of control.

The Osti case is the key case on this point. It is a Houston 14th Court of Appeals case and

it is in the fire safety context. And the Houston court held that control remained with the property owner with respect to safe egress from the property and the tenant didn't have the obligation to provide a safe fire escape. Mr. Holman tries to distinguish Osti, but I submit he cannot distinguish it on its facts. He says that a structural problem in the premises is what Osti is all about. That's what this case is all about. The dead-bolted fire exit without the key is in violation of the applicable property ordinances and creates a premises defect. It is a structural defect. It is the same as a wall because you couldn't exit. And, in addition, there was evidence at this trial that there should have been overhead sprinklers in this facility. That is another structural defect that falls squarely within the Osti rule.

The argument that's made today that the control that Ms. Uduma exercised over the premises with respect to the fire escape procedures and the fire safety procedures definitely falls within control of the property. And it was for the jury to decide whether she exercised that control as the property owner or as an agent of Four J's.

The jury was asked to apportion fault

between Four J's and Ms. Uduma personally. The jury made this resolution, that she had that control and she acted negligently. And that finding should be upheld.

*THE COURT:* Thank you. I have got a few questions for you.

*MR. POST:* Of course, Your Honor.

*THE COURT:* All right. Just so that we're all clear here, are Plaintiffs persisting in argument that their claim against Ms. Uduma was in her capacity only as the premises owner?

*MR. POST:* As opposed to, again, capacity as the agent, Your Honor?

*THE COURT:* Or anything else.

*MR. POST:* Well, I hadn't even thought about anything else.

*THE COURT:* Negligence. Negligent activity. The only theory of recovery against Ms. Uduma is against her in her capacity as the premises owner?

*MR. POST:* I believe that is correct. Let me confer with lead trial counsel, since I wasn't at the trial.

(Pause.)

*MR. POST:* I think that's right, Your

Honor.

*THE COURT:* Okay. Now, the -- is it the Johnson case -- whatever Supreme Court case -- that talks about a landlord's duty or lack thereof --

*MR. POST:* Yes, Your Honor.

*THE COURT:* -- and sets out the three exceptions? It talks about the exception for a landlord to retain control of a portion of the lease premises. I think the standard thought is the common areas in a condominium or in an apartment complex or whatnot. And your -- as I understand, your argument is that, well, Osti explains that that also addresses control of access and departure, egress and exit -- access and egress -- it's been a long day; excuse me -- of the property. Is that what you are arguing?

*MR. POST:* That's right.

*THE COURT:* Okay. What -- what evidence do I have that Ms. Uduma maintained control of any structural changes to the property?

*MR. POST:* Well, Your Honor, I believe that the testimony was that she, obviously, is the property owner; that she made the decisions about the fire safety systems, the systems that had been installed, the systems that had not been installed

with respect to sprinklers; that she was the individual who worked with the fire marshal on the OMNI systems on dealing with inspections; that she was aware of the dead-bolted door. All of that is evidence from which the jury could draw a conclusion about the capacity in which she was exercising control.

Essentially, the argument that's made by Defendants is that she wore two hats; and, therefore, when she undertook this activity, she was necessarily wearing her Four J's hat. I don't think the evidence of that proposition is conclusive. And so it's for the jury to decide. The jury was asked: Do you find Four J's liable? Do you find Uduma liable? And the jury made that determination and apportioned fault. And I think that the jury had enough evidence before it to conclude that Ms. Uduma was acting in her capacity as property owner when she was dealing with these issues.

*THE COURT:* All right. Do you want to make any responsive reply?

*MR. HOLMAN:* Yes, Your Honor.

First of all, Mr. Post started his argument by saying that we have some duty to get jury findings about our status as a health care provider.

There is not a single case in Texas jurisprudence that would ask a health care provider to get jury findings on that. That's a matter of the Court's interpretation of statute based on the undisputed evidence.

*THE COURT:* Is there any case that says it's a question of law as opposed to a question of fact?

*MR. HOLMAN:* Well, there is cases that talk about it being a construction of statute as a matter of law. And we would submit that we have undisputed --

*THE COURT:* What am I construing? I'm just looking at the definition and applying it to the party to determine whether they satisfied the definition, right?

*MR. HOLMAN:* True.

*THE COURT:* Why isn't that a question of fact?

*MR. HOLMAN:* Well, the question -- it's not a question of fact because the facts are undisputed in this instance.

*THE COURT:* They have got a pretty big brief there as to whether they are a health care institution.

*MR. HOLMAN:* Let me -- let me say why that doesn't apply. The only time that they ever raised this argument about, you know, whether there is certification, or whatever, is after we made the argument post-verdict that Chapter 74 applied. They said, well, you didn't show that you were certified. Well, first of all, everyone admitted, every -- every bit of testimony during the trial admitted that we were an HCS program. There wasn't a single person that got up on the stand or any document they presented that said, wait a minute, they are not an HCS program because they didn't present certification. Had they have done that, we would have presented the certification. And we have the certification to present, if we need to. If we needed to, if that was ever an issue in this case, we certainly would have presented it.

*THE COURT:* But doesn't the definition require there to be -- for the party to be duly certified?

*MR. HOLMAN:* Well, first of all, there is not a single case in Texas that has required a hospital, for example, to come in and present its license in order to be recognized as a health care provider. The only time that would come up is if

somebody said, you don't have a license. Then they would say, well, okay, I have to present my license. But, otherwise, a hospital or an HCS program is operating under the, under the auspices of the State of Texas unless shown otherwise.

There is no proof in -- anywhere that they were operating in somehow some kind of a renegade fashion as a treater of mentally retarded adults in Texas without a license or without certification. There is no -- not even an indication or inference of that.

*THE COURT:* But whose burden is this? I mean, you are asking to impose statutory caps on damages. Isn't it your burden to establish a right to those statutory caps?

*MR. HOLMAN:* And --

*THE COURT:* So why does it matter whether there is any evidence that they are a rogue operation? Isn't it on you all to produce evidence, get a jury finding that would support a judgment by me imposing those caps?

*MR. HOLMAN:* No. There is no -- there is no case that would require us to get a jury finding on that. The Court looks at the nature of the institution and decides whether it qualifies as a

health care provider. And that's those two cases that I showed you where the Court said, the nature of this entity is a home and community-based service program for mentally retarded adults; therefore, it is a health care provider. It is the Court's determination based on the nature of the beast. Just like their argument that somehow we needed to get jury findings on whether this was a health care liability claim or not, there is no case that so holds. In fact, the Supreme Court cases all hold that the way you determine that is to look at the nature of the underlying claim.

That Omaha Healthcare case, the spider bite case, says you look at the nature of the underlying claim in order to determine whether it's a health care liability claim. So you look at the evidence that was presented in this case, and the only evidence that was presented in this case is that they were an HCS program being regulated by DADS. If they are an HCS program being regulated by DADS, they are under Chapter 74. And it's in crystal clear terms in the statute. Now, if they are a health care institution, then they are a health care provider.

Now, this whole issue is a make-way issue about whether there is certification or not. If

that were a requirement of the statute, there would be some case somewhere that said, well, you didn't make your certification requirement. But there is no case.

*THE COURT:* Well, let's be clear, though. The certification that I am referring to -- well, okay. Looking first at the definitions in 74.001 Paragraph (11), it lists a whole slew of different entities that can be considered a health care institution. And one of those is a hospital. And it doesn't say anything about qualifications or certifications or licensure. It just says hospital.

*MR. HOLMAN:* Right.

*THE COURT:* But you are seeking protection under Subparagraph (I) --

*MR. HOLMAN:* Right.

*THE COURT:* -- which is, from what I can tell, the longest definition under Paragraph (11)

*MR. HOLMAN:* Right.

*THE COURT:* "An intermediate care facility for the mentally retarded or a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act."

So it's not like just any intermediate care facility can qualify for that definition. They

are making it narrow there. So why shouldn't you have to establish that you fall within the narrow confines there?

*MR. HOLMAN:* You will notice -- and this definition doesn't say anything about license, about licensure either, just like the hospital doesn't.

*THE COURT:* But (12)(A), "Health care provider" does.

*MR. HOLMAN:* Right. And what they say is "chartered by the State of Texas." The only way you can operate an HCS facility is to be chartered by the State of Texas. You can't go out and operate an HCS facility without one, and that's clear in all the regulations. And in the regulations that we cited to the Court about HCS programs, the only way that you can be an HCS program is to operate under Section 1915(c) of the Social Security Act.

There is no -- there is no dispute about any of this. There is no dispute about what constitutes a home and community-based services program for mentally retarded adults. The regulations require it. And, therefore, we are not required, just like a hospital is not required, to prove that we have a license on file because we are a chartered -- we -- we were operating under the regulations of the State.

And if it were a requirement that you will have to come in and show here is a license, there would be some case that said that, that that was part of the requirement here, to show that, well, wait a minute, that you had a license on file. That's not a requirement. They are just making that up because it's the only attack -- they haven't said -- you notice, they haven't said they are not a home and community-based services program for mentally retarded adults under Section 1915(c). They haven't said that. If we are, then we qualify as a health care provider.

Now, Mr. Post made the statement that I indicated we didn't have such a certification. I never said that. In fact, we have the certification. The problem is that I didn't want to get into the position of asking you to reopen the evidence to show the certification because I didn't think that was part of my burden in order to show that we are a home and community-based services program under 1915(c) because that was never an issue. And it shouldn't be an issue now.

*THE COURT:* Let me ask you something. A doctor is out there treating someone and leaves a sponge in the abdomen, and it turns out that the

doctor had lost his license to practice medicine. Whose burden is it at trial to show that the doctor qualifies as a health care provider?

*MR. HOLMAN:* Well, here's -- here's my belief. You show -- you show the requirements of the statute. You say: I fit this category. I am here. I'm hereby abiding by this statute. I qualify as a health care provider. Then I think the burden is on the opposing party to say: No, they don't. They don't qualify as a health care provider because of XYZ. Because, once you qualify as a health care provider, then the benefits of Chapter 74 follow.

And here's the -- here's the rub. We say we qualify as a health care provider, we fit all the definition requirements under the statute; and they come in and say, well, you didn't prove that you had a certification -- notice they didn't say you don't have a certification -- so you don't qualify as a health care provider. They didn't say: Wait a minute. There is no license; so, you don't qualify as a health care a provider. What they said is: You didn't prove that you had a license; so, you don't qualify as a health care provider.

We fit the definition of the statute. And we are definitely chartered by the State of Texas,

because otherwise you couldn't operate such a group home.

*THE COURT:* Do you -- I just want to make sure I'm clear. You agree that this is an affirmative defense of the Defendants that the -- the application of the Chapter 74 damage caps?

*MR. HOLMAN:* Yes, I do.

*THE COURT:* Okay. Let's take it as a different type of case, a contract case. The defendant claims the affirmative defense of fraud, vitiating the contract. Whose obligation is it to establish the seven elements of fraud to support the jury finding to vitiate the contract? Is it up to the defendant to make sure the question is asked as to the seven elements or is it incumbent on the plaintiff to produce evidence that they didn't show justifiable reliance?

*MR. HOLMAN:* I think the answer to that is, of course, they have to present all the evidence of the statute.

*THE COURT:* Then why wouldn't the health care provider in this situation have to establish that they are licensed or certified?

*MR. HOLMAN:* Just like I said, Your Honor, all of the evidence -- there isn't any dispute

about what the evidence is. All the evidence establishes that they are a home and community-based services program for mentally retarded persons under Section 1915(c). No dispute about that. If they are operating as an HCS program, they are operating under the authority of the State of Texas. That's what the regulations tell us.

We don't have to come in and show our -- here's our contract, by the way. Here's our contract under which we were operating. Because all -- there is no -- there is not a single bit of evidence that controverts that we were properly operating as an HCS provider. And so it seems to me ridiculous that we would be required as part of our burden of proof to come in and present the licenses under which we are operating if nobody ever contested that, if there was never any dispute that we were properly operating as an HCS program. And there still is no dispute to this day. So they bring up this argument, but they don't have any -- a lick of evidence that we weren't operating properly as an HCS provider.

*THE COURT:* What is your response to their argument that Osti interprets the control exception for landlord liability to issues of access and egress problems?

*MR. HOLMAN:* Well, I think it's important to recognize that Ms. Uduma leased the property in 2002. The access and egress that they are talking about is a dead bolt on a door. And the dead bolt on the door that we're talking about was in 2008 and whether there was a key available to open that door or not. And the key was -- I think the testimony was that the key was there but it wasn't in the door, or that sort of thing. That's far different because that kind of duty -- the duty of whether you put in sprinklers after 2002 or not, that was all on Four J's because Four J's was the occupier of the premises. They had possession of the premises. They had the right to control what happened with how they did their fire safety. I think that's clear in the evidence.

There was a statement that the fire marshal -- by her taking the fire marshal around was somehow some evidence that she controlled fire safety. And I quote from the record -- and let me just read it into the record here, for the purposes of our record.

The question was asked by Mr. Thweatt of Ms. Uduma, "Why did you take the fire marshal to the house?"

Ms. Uduma answered, "Because when you

have a four-bed the HCS policy and procedure require that every year the fire marshal will have to come and do inspection to make sure that all the fire systems are working, that the house is in compliance with the State fire code."

Question: "Because you owned the house and you had to escort the fire marshal through the premises, right?"

Answer: "No. This was done by Four J's. But I usually take the fire marshals. It has nothing to do with the group home because the house was leased to the company."

So the only evidence is that Ms. Uduma was doing it on behalf of Four J's, not as the premises owner. So their argument that somehow she retained control because she escorted the fire marshal around, that that imposed liability on her as a premises owner is incorrect.

*THE COURT:* All right. Do you have anything else to add?

*MR. HOLMAN:* No, I don't.

*THE COURT:* Mr. Sparks, I forgot to ask you if you had anything to add; and I apologize for that.

MR. SPARKS: I do, Judge.

I just want to say that Mr. Holman is incorrect because there was some contest about whether or not Four J's was duly licensed and certified. In fact, Mr. Thweatt was arguing against it when we were challenging the third combined amended answer via our motion to strike. And, if I am not mistaken, you asked him yourself, Judge, whether or not they had a license, certification, registration. And he said that he thought they did. And then you asked him if they attached it to their pleadings, and he said they didn't. Then he gave you a document that was nine years old, and then he said that they were going to come back and give you additional documentation and they were going to prove it up by testimony. That's in the record.

Once we got through with the examination of Ms. Uduma, we passed Ms. Uduma; and Mr. Plummer reserved any and all questions that he had about the licensing or anything else related to them being certified until his case in chief. So, at the time, when we got through with Ms. Uduma, there had been nothing in the record that had been elicited from her regarding their corporate status, certification, registration, or anything of that nature.

Once Mr. Plummer took her on his case in

chief -- you can look through the record, Judge -- he asked her not one question, not one, about registration, licensing, certification, any of the things that you asked him about in reference to them proving up whether or not they came up under the Chapter 74 protections. So he never asked her and he never put any additional information into -- no additional evidence into the record.

So our position is that they didn't meet their burden of proving and establishing Chapter 74. And, if they didn't meet their burden, then Ms. Uduma, who allegedly is the owner of the company, can't also be a health care provider unless she is a doctor or a nurse. And her testimony is that she was not. She was some type of counselor.

What they want to do is say, well, Mr. Plummer waived her ability to have Chapter 74 protections; but that's a conclusion of law, he couldn't do that. But our position is, if, in fact, she never -- if, in fact, Four J's was never established as a health care provider because they hadn't met the requirements of providing a license, registration, or certification from the State of Texas, then Ms. Uduma didn't either. And for him to stipulate that she wasn't a health care provider and

they weren't seeking those protections and of which we detrimentally relied on and passed a continuance that you offered us, they can't come back now and say we're protected under Chapter 74.

So I submit to you, Judge, that, not only that Mr. Plummer did not meet their burden after telling you that he would -- you asked him the question, if I'm not mistaken, two or three times about a license. It's in the record. And he said he was going to give it to you. They never did. And he never asked Ms. Uduma any questions about whether or not she was certified by the Social Security Administration, whether or not she was certified by DADS or anybody else.

The issue, Judge, in reference to Ms. Uduma having control over the premises, I think -- I think the facts that went to the jury were several. One of them was how she instructed the staff to never take the people out the back door because it was always locked; to take them out of a window; take them out the garage; try to take them out the front door, even though that back door had been a designated fire exit. And the only time that door was utilized was when she showed up to open it up for the fire marshal. Other than that, they had been instructed not to open

that door. And she was doing that as the owner of the premises.

Mr. Plummer, in his argument to the jury tried to even say this: There is another exit out the side of the garage that they could have went out of. But that wasn't a designated fire exit. The back door had been a designated fire exit, and it had been closed off and sealed off from our clients being able to exit it.

The employee, who ran out of the house when the place was on fire because she was afraid, said that the first thing she did when she thought about trying to extradite these people from the property was that the back door was locked and she didn't have a key. She panicked and she ran out.

Additionally, Judge, I want to share with you the issue on the fire sprinkler system. Ms. Uduma instructed the employees how to go in and do these mock fire drills and put down on the reports that they were getting the people out within a two or three-minute time period, even though everybody else testified that wasn't correct in terms of how it practically happened. And we submitted to the jury that they were manipulating, based on Ms. Uduma's instructions, manipulating the time periods to show

that they could get the people out in less than three minutes so they wouldn't have to put the sprinklers systems in. And I submit, Judge, that by her being directly involved in terms of the fire safety system, the exit door, and what the employees should have done to try to get the people out in the event of a fire showed, and the jury ruled, that she maintained control over those aspects of the property. Therefore, they held her 40 percent liable for the verdict.

And I ask you, Judge, to not throw away the hard work that this jury did and the testimony that they heard and the hours of deliberation they did back there, painstakingly, and came up with this verdict. I ask you to submit it -- to sign it and to render it against Four J's and Ms. Uduma.

*MR. HOLMAN:* May I say one more thing, Your Honor?

*THE COURT:* Yes.

*MR. HOLMAN:* First of all, there is not a single case in Texas jurisprudence that holds that in order to prove that you are a health care provider you are required to present a license or a certification, not a single case that does that. We do not believe that it is our burden to have to prove

that since the undisputed evidence establishes that we are an HCS program. And under the law an HCS program qualifies as a health care institution, under the statute, which is a health care provider.

Now, if the Court believes or is troubled by whether we are properly certified as an HCS program, despite all the evidence that we have presented and was presented undisputed in the record that we are an HCS program, then we would ask the Court to reopen the evidence to allow us to present our certification.

Mr. Post said he didn't think we had it. We have it. We have certification, and it's certified by the State of Texas. And the certification continues until terminated, and it is good as gold. We can present that evidence under a Rule 270 motion to reopen the evidence, which is subject to this Court's discretion.

I am sure that this Court does not want to make a mistake on a matter of law like this when it's involving so many millions of dollars.

*MR. POST:* Your Honor, I will speak only to that one point.

We strenuously object to any effort to reopen the record.

Rule 270 explicitly says, "... provided that in a jury case no evidence on a controversial matter shall be received after the verdict of the jury."

Counsel has essentially admitted they did not prove their defense at trial. And they cannot prove it today.

*MR. HOLMAN:* Let me respond to that point.

Whether one is a health care provider or not is not a jury issue.

*THE COURT:* Can you list for me any other affirmative defenses that are questions of law as opposed to questions of fact?

*MR. HOLMAN:* Well, whether it's a health care liability claim is a question of law.

*THE COURT:* I said "other." It's clear what your argument is, that it's an affirmative defense; but it's a question of law, not a question of fact. Can you list for me any other affirmative defenses that are questions of law and not questions of fact?

*MR. HOLMAN:* Whether the Tort Claims Act applies.

*THE COURT:* I'm sorry. That's an

affirmative defense?

*MR. HOLMAN:* It would be an affirmative defense. They would have to allege the Tort Claims Act or it would be waived.

*THE COURT:* All right. What else?

*MR. HOLMAN:* I'm thinking of other statutory remedies. Whether, whether the -- whether damages should be capped under the punitive damages statute. That wouldn't be an affirmative defense; but it would be as a matter of law whether damages should be capped, and you would apply the statutory remedy. And that wouldn't be a jury issue either.

*THE COURT:* All right. Any further response, Mr. Sparks?

*MR. SPARKS:* Briefly.

Mr. Holman indicated that there are cases -- Brown versus Villegas was cited, 202 S.W.3d 803. That talks about a doctor who came up under a provision of health care provider. But there was a LabCorp that was alleging that they also came up under that same protection because they had done business with the doctor, and the Court ruled that they had to prove it. They didn't have a license. They didn't have a certification. They denied Chapter 74

protections.

*THE COURT:* What was the name of that case?

*MR. SPARKS:* Brown versus Villegas.

*THE COURT:* What is the citation for that?

*MR. SPARKS:* 202 S.W.3d 803, 2006, out of San Antonio.

*THE COURT:* It was a San Antonio court of appeals?

*MR. SPARKS:* Yes, sir.

*MR. POST:* Your Honor, I will just add to that, for the Court's benefit. I think the leading case under Article 4590i that sets out the burden on this issue was Webster versus Johnson, which was a First District case from 1987. It's at 737 S.W.2d 884. And it held that applying the Article 4590i caps is an affirmative defense that has to be asserted by the defendant, and every affirmative defense where there is any factual component has to be proved by the party that has the burden of proof.

*MR. HOLMAN:* What was the cite on that?

*MR. POST:* It is 737 S.W.2d 884.

Any questions, Your Honor?

*THE COURT:* Just a moment.

Brown versus Villegas, Page 806 of the opinion, quote, "With regard to the assertion that LabCorp meets the definition of a health care provider because it is certified by the State of Texas, LabCorp, as the movant, had the burden to present evidence to establish that it is certified by the State of Texas." Cited: Cf. City of Van Alstyne, a Dallas court case that -- and they describe the City of Van Alstyne case as saying, "Noting burden of proof in a motion to dismiss for lack of jurisdiction is on movant."

In Brown versus Villegas, the Court goes on to state, "Without that evidence, we cannot determine whether LabCorp is a health care provider such that the MLIIA is applicable to Brown's claim against LabCorp."

All right. First of all, I want to thank everyone. This has been a very intense and very, very well argued set of issues on this. I know there is a lot at stake, and I have taken it very seriously. And I think all clients have been well served by the arguments of the counsel and the efforts that counsel have made on this matter. So, first of all, I want to thank everyone for their efforts on this.

I am persuaded to grant the motion for entry of judgment. I am not persuaded to apply the caps. I am not persuaded to exclude Ms. Uduma from liability.

Do you have a judgment for me?

*MR. THWEATT:* I do, Your Honor.

*(Referenced document tendered to the Court and counsel.)*

*MR. HOLMAN:* Your Honor, prior to signing the judgment, would you entertain a motion to reopen the evidence to allow us to present the certification, if that is the issue?

*THE COURT:* Under 270?

*MR. HOLMAN:* Yes, sir.

*THE COURT:* I will deny that motion for the reasons, the arguments Mr. Post made, the arguments -- I mean, y'all substantively already argued it anyway, so...

Also, for purposes of the record, I am denying the request to take judicial notice of those Web sites.

*MR. HOLMAN:* Understood.

*THE COURT:* All right. Do you need me to sign an order?

*MR. HOLMAN:* Your Honor, I will present

you with an order on that.

*THE COURT:* All right. Well, you have got it on the record.

*MR. HOLMAN:* Yes.

I would like to, just for the purposes of the record, present the Court with the certification from the --

*THE COURT:* Well, I -- you can make a bill if you would like.

*MR. HOLMAN:* That's what I am doing.

*THE COURT:* Let me finish with this. Since I have denied your request to reopen, let me finish with this; and then we will take up your bill here in a moment.

I am going to -- by the way, it's my standard practice of not specifying what the court costs are in a judgment since the clerk's office generates a tax bill for the court costs. So I'm going to cross that part out of the judgment.

*MR. THWEATT:* Yes, Your Honor.

*THE COURT:* It's not that -- I am awarding court costs to the Plaintiff. I just defer to the clerk's office to calculate the bill.

Now, you all have double-checked your calculations here and made sure that you have applied

the right fractions to the jury verdict, right?

*MR. THWEATT:* Yes, Your Honor.

*THE COURT:* All right. Before I sign this, Mr. Sparks, you have seen the proposed final judgment Mr. Thweatt just handed to me?

*MR. SPARKS:* I have, Judge.

*THE COURT:* And you agree with entry of it as he requested?

*MR. SPARKS:* I do, Judge.

*THE COURT:* Okay. Again, as I said to Mr. Thweatt, I'm just crossing out the number for the court costs that are listed in here, not because I'm excluding that, but it's simply because I defer to the clerk's office to generate the tax bill. I am awarding court costs. It's just up to them to calculate the amount.

*MR. SPARKS:* Yes, Your Honor. Thank you.

*THE COURT:* All right. I have signed the final judgment.

Mr. Holman, you wanted to make a bill real quick?

*MR. HOLMAN:* Actually, Your Honor, I will do that later. I will present the Court with it later. I have looked at the document; and although

it's a valid document, I want to get it in admissible form to present it before the Court.

*THE COURT:* All right. Is there anything else we need to address in this matter?

*MR. POST:* No, Your Honor.

*MR. HOLMAN:* No, Your Honor.

*THE COURT:* Everybody has got everything on the record, every argument and every piece of evidence that they think I should be considering or at least gotten rulings on every piece of evidence?

Can I hear an oral answer to that, please?

*MR. HOLMAN:* Yes, Your Honor.

MR. PLUMMER: Subject to the, the bill.

*THE COURT:* You are going to make a bill on the motion to reopen under Rule 270; I understand that.

MR. PLUMMER: Yes, Judge.

*MR. HOLMAN:* We want to present it in admissible form as to the certification that Four J's was operating under during the time in question.

*THE COURT:* Are you going to do that by way of written motion?

*MR. HOLMAN:* Yes, Your Honor.

*THE COURT:* Okay. So I don't need to

schedule another oral hearing on the record for that, do I?

*MR. HOLMAN:* I don't think so.

*THE COURT:* All right.

*MR. HOLMAN:* We will be filing, of course, postjudgment motions; and we will have to have an oral hearing on those. But as far as the motion dealing with the certification, no.

*THE COURT:* When you file your motion for new trial or whatever motion, go ahead and get a hearing date. Don't wait. Because basically Quee's instructions are that whenever a motion for new trial comes in, she brings it to me; and I set it for hearing regardless. So go ahead and get your hearing because then, you know, we have a little more flexibility as to the particular date you get.

All right. Anything else, Mr. Thweatt?

*MR. THWEATT:* No, Your Honor.

*THE COURT:* Again, very well argued, a lot of really interesting issues. I know y'all have a strong interest on how this will be taken up upstairs. I have a strong intellectual interest, at least, in how they are going to resolve some of these issues. So I say good luck to both sides.

All right. Y'all are excused. Have

a good weekend.

*(Conclusion of proceedings.)*

THE STATE OF TEXAS

COUNTY OF HARRIS

I, Kathleen Keese, Official Court Reporter in and for the 269th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $______________ and was paid by

__________________________________________________.

WITNESS MY OFFICIAL HAND this the 15th day of February, 2012.

/s/ Kathleen Keese
______________________________

KATHLEEN KEESE
TEXAS CSR NO. 758
Expiration: 12/31/12
Official Court Reporter
269th District Court
201 Caroline, 13th Floor
Houston, Texas 77002

No. ________________

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

# IN RE PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT,
**Relator.**

Original Proceeding from the 269th District Court,
Harris County, Texas, Trial Court Cause No. 2009-40925
Honorable Dan Hinde, Presiding

# VERIFICATION

STATE OF TEXAS §
§
COUNTY OF TRAVIS §

BEFORE ME, the undersigned authority, on this day personally appeared William R. Peterson, who, after being duly sworn, upon his oath, stated as follows:

1. My name is William R. Peterson. I am over the age of 21, competent to make this affidavit, and have personal knowledge of the facts stated herein. Those facts are true and correct.

2. I am the attorney for the Relator in this original proceeding.

3. The Relator's Record in Support of Petition for Writ of Mandamus has been prepared at my direction to accompany the Petition for Writ of Mandamus. The documents contained in the Mandamus Record are true and correct copies of the originals.

4. I have reviewed the Petition for Writ of Mandamus and confirm that every factual statement in the petition is supported by competent evidence in the Relator's Record and the Appendix attached to the petition.

William R. Peterson

William R. Peterson

SUBSCRIBED AND SWORN TO BEFORE ME on September 8, 2015.

MELISSA PATAK
Notary Public, State of Texas
My Commission Expires
May 09, 2017

Melissa Patak

Notary Public in and for the State ofTexas

My Commission Expires: 5/09/17